IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, <br><br> Plaintiffs, <br><br> v. <br><br> MCNEIL CONSULTANTS, LLC D/B/A ACCIDENT INJURY LEGAL CENTER and LAUREN VON MCNEIL, <br><br> Defendants. | § § § § § § § § § § § § § CIVIL ACTION NO. 3:19-cv-2025 <br><br> **JURY DEMANDED** |

## ORIGINAL COMPLAINT

Plaintiffs Jim S. Adler, P.C. (the "Adler Firm") and Jim Adler, appearing through their undersigned counsel, alleges as follows:

### NATURE OF ACTION AND JURISDICTION

1. This is an action for trademark infringement and unfair competition under the Trademark Act of 1946, as amended, 15 U.S.C. §1051 *et seq.* ("Lanham Act"); for trademark dilution under the Texas Business and Commerce Code; and for trademark infringement, unfair competition, misappropriation of name or likeness, misappropriation of a business opportunity, tortious interference, and unjust enrichment under Texas common law.

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. §1121, and Chapter 85 of the Judiciary and Judicial Procedure Code, 28 U.S.C. §§1331 and 1338, and has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367(a).

3. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §§1391(b) and (c) because a substantial part of the events giving rise to the claim occurred in the district and

Defendants have conducted business in the Northern District of Texas and is subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

4. Plaintiff Jim S. Adler, P.C. is a Texas corporation with a principal place of business at 3D/International Tower, 1900 West Loop South, 20th Floor, Houston, Texas 77027.

5. Plaintiff Jim Adler is a Texas resident domiciled in Houston.

6. Upon information and belief, Defendant McNeil Consultants, LLC is an Oklahoma limited liability company with a principal place of business at 7910 Mid America Boulevard, Suite 230, Oklahoma City, Oklahoma 73135.

7. Upon information and belief, Defendant Lauren Von McNeil is an individual residing at 2576 Forest Glen Drive, Choctaw, Oklahoma 73020.

## STATEMENT OF THE CASE

8. This lawsuit arises out of Defendants' intentional use of Plaintiffs' registered trademarks to knowingly deceive and confuse consumers who are searching specifically for Plaintiffs using a mobile device. Defendants' fraudulent scheme involves buying keyword ads using Plaintiffs' registered marks for Google searches made from mobile devices, and using them in conjunction with confusingly similar or generic "click-to-call" ads. "Click-to-call" ads are a relatively new tool for search engine advertising. The "click-to-call" ads target mobile devices and users, and instead of linking to a website, once tapped by a consumer, the ad causes the device to call a predetermined phone number.

9. To further their objectives in this illegal scheme, Defendants have bid increasingly higher amounts to strategically place their own confusing ads next to—and often before—Plaintiffs' own ads in the search results. Defendants have done so intentionally, knowing that

having their ad appear next to or before Plaintiffs' ad will cause a significant number of consumers specifically searching for Plaintiffs to be confused and contact Defendants instead.

10. As with all advertising and new technology, there are both legitimate and illegitimate ways in which it can be used. Defendants' scheme and this lawsuit involve the latter. This is not a case about legitimate comparative advertising. Rather, Defendants are knowingly and intentionally using Plaintiffs' famous trademarks to deceive and confuse consumers.

## FACTS

**A.  Jim Adler, The Texas Hammer**

11. The Adler Firm is a preeminent Texas personal injury law firm, representing injured parties in all types of personal injury cases, with a particular focus on auto accidents and commercial vehicle / eighteen-wheeler accidents. Jim Adler and the Adler Firm view their practice as "safety law," and focus on trying to help Texas injury victims and their families recover to the greatest extent possible, while at the same time using the legal system to make society a safer place to live.

12. The Adler Firm was formed and is led by Jim Adler, who has become widely known in Texas over the course of his fifty-two year (and counting) legal career. In 1967, Jim Adler graduated from the University of Texas School of Law and was admitted to practice law by the State Bar of Texas. After brief stints serving in a legal capacity in both the military and law enforcement, in 1973, Jim Adler went into private practice, hanging his own shingle and starting the Adler Firm.

13. Since beginning as a solo practitioner, Jim Adler has grown the Adler Firm into one of the largest, most widely recognized, and most successful personal injury law firms in Texas. The Adler Firm currently has four offices in Houston, Dallas, San Antonio, and Channelview. The

Adler Firm employs approximately 300 people, including 27 lawyers.

14. The success of Jim Adler and the Adler Firm are the result of decades of hard work, building a strong reputation for aggressively representing Texas injury victims and their families. Over the years, Jim Adler and the Adler Firm have built a strong referral base comprised of several generations of satisfied clients and a strong reputation in the community for aggressively representing Texas injury victims and their families.

15. This reputation is the result not only of the hard work of Jim Adler and the Adler Firm, but also of the significant effort and expense that Jim Adler and the Adler Firm have incurred in promoting themselves throughout Texas.

16. In 1977, the United States Supreme Court upheld the right of lawyers to advertise their legal services, holding it was commercial free speech protected under the First Amendment. Shortly after that decision, Jim Adler and the Adler Firm became one of the first lawyers and firms in Texas to advertise on television. Jim Adler and the Adler Firm's advertising efforts stem from a desire to provide knowledge to and serve members of the community that are unfamiliar with the legal system or otherwise unaware of their legal rights. That commitment remains one of the driving forces behind Jim Adler and the Adler Firm's practice.

17. For decades, as the Dallas Business Journal wrote in 2015, "Jim Adler, 'The Texas Hammer,' has used an aggressive, memorable advertising campaign to make his law firm a household name in several areas of the state." The Dallas Business Journal also noted that, "[a]s far as personal injury lawyers go, Jim Adler might be the most well known in Texas."

**B.     The ADLER Marks**

18. Since at least the 1990s, Jim Adler and the Adler Firm have consistently and continuously used several trademarks, including JIM ADLER, THE HAMMER, TEXAS

HAMMER, and EL MARTILLO TEJANO, (collectively, the "ADLER Marks") to identify and promote Jim Adler and the Adler Firm, and the legal services they provide.

19.     The ADLER Marks are inherently distinctive and serve to identify and indicate the source of Plaintiffs' services to the consuming public.

20.     The ADLER Marks are famous in the State of Texas under TEX. BUS. & COM. CODE §16.103. The ADLER Marks became famous in the State of Texas before Defendants' use described herein.

21.     In accordance with the provisions of federal law, Plaintiff Jim S. Adler, P.C. registered the ADLER Marks on the Principal Register of the United States Patent and Trademark Office. *See* U.S. Reg. Nos. 3,507,257; 3,503,851; 3,503,852; and 3,730,395. These registrations are valid and subsisting, and each is incontestable under 15 U.S.C. §1065. True and correct copies of these registrations are attached hereto as **Exhibit A**.

**C.     Jim Adler and the Adler Firm's Well-Known Brand**

22.     In order to build a strong brand for aggressively representing Texas injury victims and their families, Jim Adler and the Adler Firm advertise on television, radio, billboards, and on the internet. The ADLER Marks are consistently used in Plaintiffs' advertisements across all media formats. The ads themselves are strategically designed to position Jim Adler and the Adler Firm as leading attorneys capable of handling all types of personal injury claims, with an emphasis on auto and truck accidents. The bulk of Plaintiffs' advertising is in the three largest markets in Texas—Houston, San Antonio, and Dallas-Fort Worth.

23.     Since 2000, the Adler Firm has spent over $100 million on television, internet, radio, and billboard advertisements targeting the Houston, San Antonio, and Dallas-Fort Worth markets.

24. For each of these three major Texas markets, Plaintiffs run numerous television advertisements in both English and Spanish on multiple television stations throughout the year. In Houston, Jim Adler and the Adler Firm run approximately 45,000 television commercials per year. In San Antonio, they run about 87,000 television commercials per year. And in Dallas-Fort Worth, Jim Adler and the Adler Firm run approximately 85,000 television commercials per year.

25. The use of television advertisements in these major Texas markets has allowed Jim Adler and the Adler Firm to reach millions of Texans and build an incredibly strong brand. The Houston market is the eighth largest television market in the nation, reaching more than 6 million viewers. The San Antonio market is the thirty-first largest television market in the nation, reaching more than 2.3 million viewers. The Dallas-Fort Worth market is the fifth largest television market in the nation, reaching more than 6.8 million viewers. Combined, Plaintiffs' television advertising allows them to reach over 15 million people—more than half of all Texans.

26. A review of the television advertisements Jim Adler and the Adler Firm ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm. In 2019, over a four-week period, not including commercials run on cable, television advertisements for Jim Adler and the Adler Firm repeatedly reached a large portion of the 25-to-54-year-old demographic in each of these major markets. In the Houston market, Plaintiffs' advertisements reached 70.4% of the demographic, with the average viewer seeing each ad 15.2 times, for 29,563,125 total impressions. In the San Antonio market, their advertisements reached 47.5% of the demographic, with the average viewer seeing each ad 14.0 times, for 6,420,146 total impressions. And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 58.7% of the demographic, with the average viewer seeing each ad 13.9 times, for 23,406,564 total impressions.

27. For each of these major Texas markets, Jim Adler and the Adler Firm run numerous radio advertisements in both English and Spanish on multiple radio stations throughout the year. For Houston, San Antonio, and Dallas-Fort Worth, Jim Adler and the Adler Firm run approximately 23,000 radio commercials per year in each market.

28. The use of radio advertisements in these major markets has allowed Jim Adler and the Adler Firm to reach millions of Texans and enhance their brand recognition. The Houston market is the sixth-largest radio market in the nation, reaching more than 5 million listeners. The San Antonio market is the twenty-sixth largest radio market in the nation, reaching more than 1.8 million listeners. And the Dallas-Fort Worth market is the fifth-largest radio market in the nation, reaching more than 5.3 million listeners. Combined, Plaintiffs' radio advertising allows them to reach over 12 million Texans.

29. A review of the radio advertisements Jim Adler and the Adler Firm ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm. In 2019, over a four-week period, radio advertisements for Jim Adler and the Adler Firm repeatedly reached a majority of the 25-to-54-year-old demographic in each of these major markets. In the Houston market, Plaintiffs' radio advertisements reached 87% of the demographic, with the average listener hearing each ad 8.9 times, for 23,519,600 total impressions. In the San Antonio market, their advertisements reached 67% of the demographic, with the average listener hearing each ad 9.2 times, for 6,258,000 total impressions. And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 56.1% of the demographic, with the average listener hearing each ad 7.1 times, for 13,133,600 total impressions.

30. For each of these major Texas markets, Jim Adler and the Adler Firm run numerous billboard advertisements in both English and Spanish. At any given time, Jim Adler and the Adler

Firm have approximately 40 billboard advertisements in the Houston market, 20 in the San Antonio market, and 40 in the Dallas-Fort Worth market. On average, the billboard advertisements purchased by Jim Adler and the Adler Firm generate 25 to 30 million impressions per week.

31. Plaintiffs' advertisements, all of which prominently incorporate the ADLER Marks, have enabled Jim Adler and the Adler Firm to develop very strong brand recognition in Texas. In 2007, the Houston Chronicle wrote that "[e]verybody knows what Adler sounds like from his ceaseless TV commercials." In 2015, the Dallas Morning News named one of Plaintiffs' television commercials to a list of five of the most memorable attorney ads in Dallas-Fort Worth. More recently, a montage comprised of Plaintiffs' English- and Spanish-language television advertisements was featured on a 2019 episode of *Last Week with John Oliver*, an Emmy-award winning HBO news satire program broadcast around the globe.

32. As a result of Plaintiffs' long use and promotion of the ADLER Marks, the marks have become distinctive to designate Plaintiffs, to distinguish Plaintiffs and their services from those of others, and to distinguish the source or origin of Plaintiffs' services. As a result of these efforts by Plaintiffs, the consuming public throughout the United States, including in Texas, widely recognizes and associates the ADLER Marks with Plaintiffs.

33. As a result of Plaintiffs' long use and promotion of the ADLER Marks, Plaintiffs have acquired valuable and enforceable common law rights in those marks.

**D.    Jim Adler and the Adler Firm's Internet Advertising**

34. As with their television advertising, Jim Adler and the Adler Firm were also early leaders among lawyers in using the internet to advertise their legal services. Since 1997, Jim Adler and the Adler Firm have marketed their legal services through the "jimadler.com" domain. In 2018, jimadler.com averaged more than 52,000 visitors to the site per month.

35. Plaintiffs also engage in a substantial amount of online advertising, including purchasing keyword search engine advertising to drive internet traffic to the Adler Firm. Plaintiffs spend a considerable sum of money each month to advertise online, including by purchasing keyword ads through Google's search engine. Plaintiffs spend hundreds-of-thousands of dollars every year purchasing keyword ads for its own ADLER Marks.

36. Jim Adler and the Adler firm only purchase keywords that are their own marks or generic terms related to the type of cases they handle. For example, Plaintiffs purchase keyword ads for "Jim Adler" or "Texas Hammer," as well as when someone searches more generically for "car accident lawyer." The vast majority of the keyword ads that Plaintiffs purchase is for someone searching for their own marks, rather than generic terms. Jim Adler and the Adler Firm do not purchase keywords related to any other lawyer's name, firm, or mark.

37. All the search engine advertisements purchased by Jim Adler and the Adler Firm prominently include the ADLER Marks and clearly identify the Adler Firm as the source of the advertisement. Here is an example of one such advertisement, as it appeared from a Google search:



### E. Defendants' Infringing Click-to-Call Scheme

38. Defendants are engaged in a fraudulent scheme to trade on the goodwill and reputation of Plaintiffs and the ADLER Marks in Texas, and to deceptively induce prospective clients who are using mobile devices to specifically seek out Jim Adler and the Adler Firm into mistakenly contacting Defendants and engaging lawyers referred through Defendants instead.

39. Upon information and belief, Defendant Lauren Von McNeil is the sole owner of Defendant McNeil Consultants, LLC d/b/a Accident Injury Legal Center, which operates a lawyer referral website at accidentinjurylegalcenter.com and a call center associated with that site. Defendant Lauren Von McNeil directs and controls Defendant McNeil Consultants, LLC d/b/a Accident Injury Legal Center's activities and use of the ADLER marks. As its sole owner, Lauren Von McNeil has the authority to bind Defendant McNeil Consultants, LLC d/b/a Accident Injury Legal Center in transactions.

40. Upon information and belief, through the website accidentinjurylegalcenter.com and associated call center, Defendants solicit and refer personally injury cases to lawyers with whom Defendants have a referral agreement.

41. Upon information and belief, Defendants are paid for referring leads through accidentinjurylegalcenter.com to the lawyers with whom it has referral agreements.

42. To carry out their scheme, Defendants purchase the ADLER Marks as keyword advertisements on mobile devices through Google's search engine and uses them in conjunction with a "click-to-call" advertisement. Upon information and belief, Defendants purchase the marks as keyword ads on mobile devices for use in click-to-call ads because of the likelihood that consumers will be confused and quickly click on Defendants' ad not realizing that the link is not affiliated with Plaintiffs.

43. As a result, Google searches for "JIM ADLER," "THE TEXAS HAMMER," and "EL MARTILLO TEJANO" on mobile devices result in search pages that display Defendants' advertisement and accidentinjurylegalcenter.com, often directly below one or more of the ADLER Marks, as shown directly below:



44. As shown above, Defendants' online click-to-call advertisements do not identify a particular lawyer or law firm as the source of the advertisement. Instead, the advertisements are designed to display generic terms that consumers might associate with any personal injury firm. Consumers specifically searching for Jim Adler or the Adler Firm are likely to believe that Defendants' advertisements are actually for the Adler Firm or that Defendants are somehow affiliated with Plaintiffs. This is particularly true on mobile devices, where consumers are quickly searching, often when dealing with the stressful aftermath of an accident, the typeface of the ads is much smaller, and the only content displayed on the screen is an advertisement directly below one or more of the ADLER Marks, which consumers have entered as a search term.

45. Also as part of their scheme, Defendants are bidding increasingly higher amounts for the ADLER Marks as keyword advertisements. The effect of Defendants' increasingly higher bids is not only to drive up the cost for Plaintiffs to purchase their own marks for keyword searches, but also to allow Defendants' advertisements to appear next to or before Plaintiffs' own ads. By having their generic or confusing ads appear next to or before Plaintiffs' ads, Defendants are able

to confuse consumers and cause a higher number of consumers searching specifically for Jim Adler or the Adler Firm to instead mistakenly call Defendants.

46. As also shown above, Defendants' online advertisements on mobile devices include a click-to-call link rather than a link to Defendants' website. Consumers who click on the click-to-call link (intentionally or not) are connected to the call center operated by Defendants. Defendants' ads do not give the consumer the ability to click through to a separate website or garner any further information regarding Defendants before the call is made.

47. Upon information and belief, Defendants' employees who answer such calls are instructed to answer the call with a generic greeting such as "did you have an accident" or "tell me about your accident." This continues Defendants' scheme of deceiving consumers into believing that they have contacted the Adler Firm and are speaking with the Adler Firm, or someone affiliated with the Adler Firm. Defendants' scheme is to keep confused consumers, who were specifically searching for Jim Adler and the Adler Firm, on the phone and talking to their own employees as long as possible in a bait-and-switch effort to build rapport with the consumer and ultimately convince them to engage lawyers referred through Defendants instead.

48. In this manner, Defendants wrongfully induces prospective clients trying to reach Plaintiffs into engaging competitive lawyers and law firms. The nature of their scheme leaves little doubt as to Defendants' bad-faith intent to trade on Plaintiffs' goodwill and reputation.

49. Defendants have used and are using the ADLER Marks in commerce, including in Texas. Defendants' use of these marks began long after Plaintiffs developed rights in the ADLER Marks and after the ADLER Marks became famous in Texas.

50. Defendants are not affiliated with or sponsored by Plaintiffs and have not been authorized by Plaintiffs to use the ADLER Marks, or any mark confusingly similar to the ADLER

Marks.

F. **Effect of Defendants' Scheme**

51. Defendants' unauthorized use of the ADLER Marks is likely to cause confusion, to cause mistake, and/or to deceive customers and potential customers of the parties, at least as to some affiliation, connection, or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' services by Plaintiffs.

52. Defendants' unauthorized use of the ADLER Marks falsely designates the origin of their services and falsely and misleadingly describes and represents facts with respect to Defendants and their services.

53. Defendants' unauthorized use of the ADLER Marks enables Defendants to trade on and receive the benefit of goodwill built up at great labor and expense by Plaintiffs over the years, and to gain acceptance for their services not solely on their own merits, but on the reputation and goodwill of Plaintiffs, the ADLER Marks, and Plaintiffs' services.

54. Defendants' unauthorized use of the ADLER Marks allows it to appropriate Jim Adler's name or likeness and the value associated with that name or likeness. Significantly, Jim Adler is identifiable from Defendants' advertising in that one or several of ADLER Marks are displayed in proximity to the ads after a prospective consumer uses the marks as search terms.

55. Defendants' unauthorized use of the ADLER Marks allows Defendants to appropriate the product of Plaintiffs' efforts in developing extensive advertising materials and executing costly marketing efforts, thereby enabling Defendants to gain a special advantage in competing with Plaintiffs through avoiding the costs and burden incurred by Plaintiffs in cultivating their strong reputation among the public.

56. Defendants' unauthorized use of the ADLER Marks is likely to dilute the famous ADLER Marks as their use weakens the ability of the marks to clearly and unmistakably distinguish the source of Plaintiffs' services.

57. Defendants' unauthorized use of the ADLER Marks unjustly enriches Defendants at Plaintiffs' expense. Defendants have been and continue to be unjustly enriched by obtaining a benefit from Plaintiffs by taking undue advantage of Plaintiffs and their goodwill. Specifically, Defendants have taken undue advantage of Plaintiffs by trading on and profiting from the goodwill in the ADLER Marks developed and owned by Plaintiffs, resulting in Defendants wrongfully obtaining a monetary and reputational benefit for their own business and services.

58. Defendants' unauthorized use of the ADLER Marks removes from Plaintiffs the ability to control the nature and quality of the services provided under the ADLER Marks, and places the valuable reputation and goodwill of Plaintiffs in the hands of Defendants, over whom Plaintiffs have no control.

59. Defendants' unauthorized use of the ADLER Marks has prevented an otherwise-likely business relationship from forming between Plaintiffs and their prospective consumers. Since Defendants began using the ADLER Marks, the rate at which Plaintiffs convert prospective consumers into clients through keyword advertising is measurably lower, and that marked decrease coincides with Defendants' unauthorized use of the ADLER Marks. The nature of Defendants' scheme demonstrates that they intended to interfere with Plaintiffs' prospective relationships, and that they knew their use of the ADLER Marks was certain or substantially certain to prevent Plaintiffs from forming business relationships with prospective customers. Such interference and misappropriation has harmed and damaged Plaintiffs.

60. Unless these acts of Defendants are restrained by this Court, they will continue, and they will continue to cause irreparable injury to Plaintiffs and to the public for which there is no adequate remedy at law.

### COUNT I: FEDERAL TRADEMARK INFRINGEMENT

61. Plaintiffs repeat the allegations above as if fully set forth herein.

62. The acts of Defendants complained of herein constitute infringement of the federally registered ADLER Marks in violation of 15 U.S.C. §1114(1).

63. Defendants' acts complained of herein have been deliberate, willful, intentional, or in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights in the ADLER Marks, and with intent to cause confusion and to trade on Plaintiffs' vast goodwill in the ADLER Marks. In view of the egregious nature of Defendants' infringement, this is an exceptional case within the meaning of 15 U.S.C. §1117(a).

### COUNT II: VIOLATION OF LANHAM ACT SECTION 43(a)

64. Plaintiffs repeat the allegations above as if fully set forth herein.

65. The acts of Defendants complained of herein constitute trademark infringement, false designation of origin, false or misleading descriptions or representations of fact and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

66. Plaintiffs have been damaged by Defendants' acts of trademark infringement, false designation or origin, false or misleading descriptions or representations of fact and unfair competition.

### COUNT III: COMMON LAW TRADEMARK INFRINGEMENT

67. Plaintiffs repeat the allegations above as if fully set forth herein.

68. The acts of Defendants complained of herein constitute trademark infringement in

violation of the common law of the State of Texas.

### COUNT IV: COMMON LAW UNFAIR COMPETITION

69. Plaintiffs repeat the allegations above as if fully set forth herein.

70. The acts of Defendants complained of herein constitute unfair competition in violation of the common law of the State of Texas.

### COUNT V: DILUTION UNDER TEXAS LAW

71. Plaintiffs repeat the allegations above as if fully set forth herein.

72. The acts of Defendants complained of herein constitute dilution by blurring of Plaintiffs' famous ADLER Marks in violation of Texas Business and Commerce Code §16.103.

73. Defendants willfully intended to trade on the recognition of the famous ADLER Marks.

### COUNT VI: UNJUST ENRICHMENT

74. Plaintiffs repeat the allegations above as if fully set forth herein.

75. The acts of Defendants complained of herein constitute unjust enrichment of Defendants at the expense of Plaintiffs.

### COUNT VII: MISAPPROPRIATION OF NAME OR LIKENESS

76. Plaintiffs repeat the allegations above as if fully set forth herein.

77. The acts of Defendants complained of herein constitute misappropriation of name or likeness in violation of the common law of the State of Texas.

### COUNT VIII: MISAPPROPRIATION OF BUSINESS OPPORTUNITY

78. Plaintiffs repeat the allegations above as if fully set forth herein.

79. The acts of Defendants complained of herein constitute misappropriation of a business opportunity (also known as unfair competition by misappropriation) in violation of the

common law of the State of Texas.

### COUNT IX: TORTIOUS INTERFERENCE

80.  Plaintiffs repeat the allegations above as if fully set forth herein.

81.  The acts of Defendants complained of herein constitute tortious interference with a prospective business opportunity.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that:

(a)  Defendants, as well as their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be permanently enjoined and restrained from using the ADLER Marks and any other mark or name confusingly similar to or likely to cause dilution of the ADLER Marks, including by purchasing the ADLER Marks or any confusingly similar marks as keyword advertisements, from misappropriating Jim Adler's name or likeness and Plaintiffs' business opportunities, and from any attempt to retain any part of the goodwill misappropriated from Plaintiffs, including but not limited to by purchasing the ADLER Marks as keywords;

(b)  Defendants, as well as their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be required to deliver up and destroy all internet postings and advertisements, and any other materials bearing or using the ADLER Marks and/or any other mark or name that is confusingly similar to or likely to dilute the ADLER Marks;

(c)  Defendants be ordered to file with this Court and to serve upon Plaintiffs, within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and

under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(d) Plaintiffs recover all damages they have sustained as a result of Defendants' activities, and that said damages be trebled;

(e) An accounting be directed to determine Defendants' profits resulting from their activities and that such profits be paid over to Plaintiffs, increased as the Court finds to be just under the circumstances of this case;

(f) Plaintiffs recover their reasonable attorneys' fees;

(g) Plaintiffs recover their costs of this action and prejudgment and post-judgment interest; and

(h) Plaintiffs recover such other relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiffs demand a jury trial in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

Date: August 23, 2019

*s/ Jered E. Matthysse*
Jered E. Matthysse
Texas Bar No. 24072226
Giulio Yaquinto (*to be admitted pro hac vice*)
Texas Bar No. 24107292
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 78702
Telephone: (512) 322-5200
Fax: (512) 322-5201
jmatthysse@pirkeybarber.com
gyaquinto@pirkeybarber.com

Kurt Kuhn
Texas Bar No. 24002433
KUHN HOBBS PLLC

                3307 Northland Drive, Suite 310
                Austin, Texas 78731
                Telephone: (512) 476-6005
                Fax: (512) 476-6002
                Kurt@KuhnHobbs.com

                ATTORNEYS FOR PLAINTIFFS