## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A ACCIDENT INJURY LEGAL CENTER, QUINTESSA MARKETING, LLC D/B/A ACCIDENT INJURY LEGAL CENTER, and LAUREN MINGEE, | § | **JURY DEMANDED** |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated: January 13, 2023

*/s/ Jered E. Matthysse*
Jered E. Matthysse
Texas Bar No. 24072226
jmatthysse@pirkeybarber.com
Giulio Yaquinto
Texas Bar No. 24107292
gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 788702

Kurt Kuhn
Texas Bar No. 24002433
kurt@kuhnhobbs.com
KUHN HOBBS PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731

*/s/ Garrett W. Mize*
Garrett W. Mize
Texas Bar No. 24089610
gmize@jimadler.com
JIM S. ADLER & ASSOCIATES
2711 North Haskell Avenue, Suite 2500
Dallas, Texas 75204

**COUNSEL FOR PLAINTIFFS**

# Table of Contents

INTRODUCTION .................................................................................................................... 1

I.  BACKGROUND ........................................................................................................... 1

   A.  Jim Adler, a Texas Legend ....................................................................................... 1

   B.  Lauren Mingee and the Origin of Defendants' Scheme ............................................ 3

   C.  Lauren Mingee Brings Defendants' Scheme to Texas .............................................. 5

     1.  Buy Lawyers' Names ██████████ ................................................................ 5

     2.  Maintain the First Position ................................................................................... 6

     3.  Display Non-Distinctive, Generic Ads ................................................................. 6

     4.  Use Mobile, Call-Only Ads .................................................................................. 7

     5.  Stick to the Script ................................................................................................. 7

     6.  Close Quickly ....................................................................................................... 8

   D.  Nearly ████ Instances of Actual Confusion ........................................................... 8

     1.  Defendants' Intake Descriptions .......................................................................... 8

     2.  ██████████████ Defendants' Referral Attorneys ...................................... 10

     3.  Defendants' Call Recordings .............................................................................. 15

   E.  Defendants Think Actual Confusion is the ██████████████ ............................ 17

II.  ARGUMENT ............................................................................................................... 18

   A.  Defendants Are Liable for Trademark Infringement and Unfair Competition as a Matter of Law ................................................................................................................................ 18

     1.  The Overwhelming Amount of Actual Confusion Requires a Finding of Likely Confusion (Factor 7) ............................................................................................ 20

     2.  Defendants Intended to Capitalize on Adler's Popularity (Factor 6) .................. 22

     3.  The Adler Marks are Strong, Inherently Distinctive Marks (Factor 1) .............. 24

     4.  The Marks at Issue are Identical (Factor 2) ........................................................ 25

     5.  The Parties' Products, Purchasers and Outlets, and Advertising Media are Identical (Factors 3-5) ........................................................................................................... 26

     6.  Defendants Exploit Accident Victims' Vulnerable Position and Lack of Familiarity with the Legal System (Factor 8) ............................................................................ 27

   B.  Adler is Entitled to Injunctive Relief and Disgorgement of Defendants' Profits ..... 28

CONCLUSION ..................................................................................................................... 30

Table of Authorities

## Cases

*Abbott Lab'ys v. Adelphia Supply USA,*
    No. 15-CV-5826, 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) ........................................24

*Abraham v. Alpha Chi Omega,*
    708 F.3d 614 (5th Cir. 2013) ........................................................................................28

*All. for Good Gov't v. Coal. for Better Gov't,*
    901 F.3d 498 (5th Cir. 2018) ..................................................................... 18, 19, 20, 25

*Bd. of Regents of the Univ. of Houston v. Houston Coll. of L., Inc.,*
    214 F. Supp. 3d 573 (S.D. Tex. 2016) .......................................................................21, 25

*Bd. of Regents of Univ. of Texas Sys. v. Reynolds,*
    No. 18-CV-182, 2019 WL 7758920 (W.D. Tex. Sept. 18, 2019) ....................................30

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.,*
    550 F.3d 465 (5th Cir. 2008) .................................................................................*passim*

*Beef/Eater Restaurants, Inc. v. James Burrough Ltd.,*
    398 F.2d 637 (5th Cir. 1968) ........................................................................................19

*Brunswick Corp. v. Spinit Reel Co.,*
    832 F.2d 513 (10th Cir. 1987) ......................................................................................29

*Cachet Fin. Servs. v. Cachet Fin. Sols., Inc.,*
    No. 13-CV-1546, 2016 WL 10077328 (C.D. Cal. Sept. 30, 2016) .................................30

*Choice Hotels Int'l, Inc. v. Gosla Fam. Tr.,*
    No. 5:18-CV-00648-ADA, 2022 WL 4295362 (W.D. Tex. Sept. 16, 2022).....................29

*Diageo N. Am., Inc. v. Mexcor, Inc.,*
    661 F. App'x 806 (5th Cir. 2016).................................................................................28

*Edible Arrangements, LLC v. Provide Com., Inc.,*
    No. 3:14-CV-00250 (VLB), 2016 WL 4074121 (D. Conn. July 29, 2016) ..................26, 27

*Elvis Presley Enters., Inc. v. Capece,*
    141 F.3d 188 (5th Cir. 1998) ................................................................................18, 24, 25

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.,*
    628 F.2d 500 (5th Cir. 1980) .................................................................................22, 26

*Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.,*
    725 F.2d 336 (5th Cir. 1984) .................................................................................20, 22

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.,*
  507 F. App'x 26, (2d Cir. 2013) ...................................................................24

*Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC,*
  397 F. Supp. 3d 847 (N.D. Tex. 2019) .......................................................25

*Fla. Bar v. Went For It, Inc.,*
  515 U.S. 618 (1995) ...................................................................................27

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,*
  670 F.2d 642 (6th Cir. 1982) .....................................................................20

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.,*
  982 F.3d 280 (5th Cir. 2020) ...............................................................19, 22

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.,*
  921 F.3d 1343 (11th Cir. 2019) .................................................................29

*Hearts on Fire Co., LLC v. Blue Nile, Inc.,*
  603 F. Supp. 2d 274 (D. Mass. 2009) ........................................................26

*Holiday Inns, Inc. v. Airport Holiday Corp.,*
  493 F. Supp. 1025 (N.D. Tex. 1980) ..........................................................29

*Holiday Inns, Inc. v. Alberding,*
  683 F.2d 931 (5th Cir. 1982) .....................................................................29

*Jim S. Adler, P.C. v. Angel L. Reyes & Assocs. PC,*
  No. 3:19-CV-2027, 2020 WL 5099596 (N.D. Tex. Aug. 7, 2020) .........19, 26

*Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.,*
  10 F.4th 422 (5th Cir. 2021) ...........................................................20, 23, 26

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.,*
  735 F.3d 735 (7th Cir. 2013) .....................................................................28

*Mary Kay, Inc. v. Weber,*
  661 F. Supp. 2d 632 (N.D. Tex. 2009) .......................................................28

*Nat. Ass'n of Realtors v. Champions Real Est. Servs. Inc.,*
  812 F. Supp. 2d 1251 (W.D. Wash. 2011) ..................................................30

*Ohralik v. Ohio State Bar Ass'n,*
  436 U.S. 447 (1978) ...................................................................................27

*Pebble Beach Co. v. Tour 18 I Ltd.,*
  155 F.3d 526 (5th Cir. 1998) .....................................................................29

*Playboy Enterprises, Inc. v. Netscape Comm'ns Corp.*,
354 F.3d 1020 (9th Cir. 2004) ................................................................20

*Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*,
83 F. Supp. 2d 810 (S.D. Tex. 1999) ........................................................28

*S & H Indus., Inc. v. Selander*,
932 F. Supp. 2d 754 (N.D. Tex. 2013) ......................................................28

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
983 F.3d 1273 (11th Cir. 2020) ..............................................................25

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*,
851 F.3d 440 (5th Cir. 2017) ..................................................21, 22, 25

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*,
932 F.2d 1113 (5th Cir. 1991) ................................................................29

*Texas Tech Univ. v. Spiegelberg*,
461 F. Supp. 2d 510 (N.D. Tex. 2006) ......................................................29

*Venture Tape Corp. v. McGills Glass Warehouse*,
540 F.3d 56 (1st Cir. 2008) ..................................................................29

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*,
891 F.3d 178 (5th Cir. 2018) ..........................................20, 22, 25

*World Carpets, Inc. v. Dick Littrell's New World Carpets*,
438 F.2d 482 (5th Cir. 1971) ..........................................20, 22

*WSM, Inc. v. Tennessee Sales Co.*,
709 F.2d 1084 (6th Cir. 1983) ................................................................29

*Zapata Corp. v. Zapata Trading Int'l, Inc.*,
841 S.W.2d 45 (Tex. App.—Houston [14th Dist.] 1992, no writ) ....................18

*Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*,
103 F. Supp. 3d 1032 (D. Minn. 2015) ......................................................30

**Statutes**
15 U.S.C. § 1115(b) ............................................................................19

15 U.S.C. § 1116 ................................................................................28

15 U.S.C. § 1116(a) ............................................................................28

15 U.S.C. §1117(a) ............................................................................28

**Other Authorities**

J. Thomas McCarthy,
    MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2018) ............ 19, 21, 25, 28, 29

**INTRODUCTION**

This is not an ordinary trademark lawsuit in which two parties dispute whether their marks are likely to cause confusion. Defendants admit that they are using Adler's federally registered marks and that there have been ███████████████ of instances of actual confusion among Adler's potential and existing clients. The dispute in this case is whether Defendants can use Adler's marks to intentionally confuse accident victims searching for Adler into mistakenly calling Defendants instead, and then claim it is just ███████████████

Defendants use Adler's marks in a bait-and-switch scheme to confuse vulnerable accident victims trying to reach Adler on their phone into calling Defendants, who get paid to refer the victim to another attorney. Defendants have spent more than ████████████████████████ buying Adler's marks as keywords so their generic, call-only ads appear first when a victim searches for Adler. When a confused accident victim mistakenly calls and asks whether they reached the Adler firm, ██████████████████████████████████████████ ███████████ their scheme has caused substantial actual confusion, which continues to this day.

The undisputed facts show that Adler is entitled to judgment as a matter of law for willful trademark infringement and unfair competition. The Court should grant Adler's motion and order supplemental briefing on the appropriate scope of the injunction and the amount of profits to be disgorged.

## I.    BACKGROUND

### A.    Jim Adler, a Texas Legend

Jim Adler is a living legend in Texas, both among the personal-injury bar and the public alike. For over fifty years, Adler has represented injured parties in all types of personal-injury cases, with a particular focus on auto accidents. *See* Appx. 1. He has grown his firm into one of the most widely recognized and successful personal-injury firms in Texas. *Id.* Adler operates four offices across the

1

state (Dallas, Houston, San Antonio, and Channelview) and employs hundreds in the pursuit of his clients' interests. *Id.*

Adler's success is the result of decades of hard work and significant investment in his brand. As detailed in a recent episode on CBS News' nationally syndicated Sunday Morning program, Adler was one of the first attorneys in the country to start advertising after he opened his firm in 1973. *Id.* 9-11. At the time, Adler's choice was unpopular. Recounting his experience for CBS, Adler explained it was not a decision he made lightly: "Would it be proper? What would my friends say?" *Id.* 9. And sure enough, Adler paid a price. "I was a pariah. People couldn't believe that I advertised." *Id.* But the public caught on, and Adler's business took off. *Id.* ("The phone started ringing off the hook.").

Adler has used several trademarks to promote his legal services over the years, including Jim Adler, The Texas Hammer, The Hammer, and El Martillo Tejano (the "Adler Marks"). *See id.* 1. He filed to register the Adler Marks at the Patent and Trademark Office, obtaining federal registrations that are now incontestable under the Lanham Act. *Id.* 13-16. And he frequently uses the Adler Marks—individually and together—in television, radio, billboard, and digital advertising. *See id.* 18-70.

Adler's advertising spend across all media between 2012 and 2022 exceeded ███████ *Id.* 1. That includes approximately ██████ for television, ██████ for radio, ██████ for billboards, and ██████ for digital. *See id.* Broken down by market, Adler has spent at ██████ in Dallas, ██████ in Houston, and ██████ in San Antonio over the past ten years. *Id.* And Adler has made over ██████ over those ten years. *See id..* Adler and his son Bill Adler are also fixtures in the community, often appearing at schools, civic functions, and charitable events. *See id.*; *id.* 72-85. In recognition of those acts and years of philanthropic efforts, the City of Houston proclaimed July 31, 2021, "Jim Adler Day." *See id.* 1.

Texas media outlets likewise recognize Adler's renown, both as a lawyer and a public figure. The Dallas Business Journal proclaimed in 2015: "As far as personal injury lawyers go, Jim Adler might

be the most well known in Texas." *Id.* 103-04. Other media outlets in Dallas and Houston have observed Adler's ubiquitous stature. *Id.* 109 (Adler's advertising is "stuck in the heads of every Dallas resident with a TV or Internet connection"), 117 ("To anyone who has spent more than an hour watching TV in Houston you know . . . Jim Adler is the 'Texas Hammer.'"); *see also id.* 91-101 (additional television and radio appearances). Adler's renown goes beyond Texas—in addition to CBS's Sunday Morning profile, Adler has been featured twice on *Last Week Tonight* with John Oliver, an Emmy-award winning HBO news satire program broadcast around the globe. *See id.* 1.

Ultimately, one need go no further than Defendants to confirm Adler's renown—they agree that Adler is ████████████ in Texas. *Id.* 116. And of greater significance, Defendants have spent more money on "Jim Adler" as a keyword ████████████████████████████████████ ████████████████████████████ In fact, out of their top ten competitive keywords by spend in Texas, ████████████████████████████████████████████████████████ ██████████████████

**B.    Lauren Mingee and the Origin of Defendants' Scheme**

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Unsurprisingly, these tactics led to multiple lawsuits. Lauren and McNeil Consultants were sued in 2017 by a New York law firm for trademark infringement based on Defendants' use of the firm's trademark as a keyword. *See id.* 118, 125. The suit settled quickly, with Lauren signing a settlement agreement individually and as the "Managing Member" of McNeil Consultants and

Quintessa Marketing, agreeing to stop bidding on the firm's name as a keyword. *See id.* Defendants were also sued by Ben Abbott. *Id.* 118. ████████████████████████████████

████████████████████████

### C.    Lauren Mingee Brings Defendants' Scheme to Texas

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████    Defendants'

keyword-advertising scheme in Texas is simple—they use the six tactics described below to confuse vulnerable accident victims searching on their phone for a specific attorney, including Adler, into calling Defendants instead. The cumulative effect of these tactics has caused substantial amounts of actual confusion among Adler's existing and potential clients. *See infra* Part I.D.

### 1.    Buy Lawyers' Names ████████████████

Between 2019 and mid-2022, Defendants spent ████████████ on competitive keyword ads (*i.e.*, keywords incorporating other lawyers' and law-firms' names) in Texas alone. *Id.* 169. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

---

████████████████████████████████████████████████

████████████████████████████████████

### 2.    Maintain the First Position

Defendants go to great lengths to ensure their advertisements place first on Google, ▮

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

### 3.    Display Non-Distinctive, Generic Ads

Defendants never use their own name (*e.g.*, Quintessa Marketing) in competitive keyword ads. Instead, Defendants intentionally use a rotation of generic terms—*e.g.*, "Accident Injury Legal Center," "Injury Case Reviews," "Car Accident USA," "Injury Help Network," etc.—and generic ad copy, such as "Texas Car Accident Lawyers" and "Get The Money You Deserve! Let Us Fight On Your Behalf." *See id.* 127-28. Examples of Defendants' generic Google ads triggered by an accident victim's search for Adler are shown below.



² The "Absolute Top" metric refers to the overall percentage of Google ads triggered by the bidder's keywords that reach the top spot.

6

### 4. Use Mobile, Call-Only Ads

Defendants' competitive keyword advertisements appear ███████████ on mobile devices as "call-only" ads. *See id.* 116. "Call-only" means that when accident victims touch Defendants' ad on their phone, it brings up a prompt to automatically call a number belonging to Defendants. The prompt does not identify who the number belongs to and contains no information other than an unidentified number. There is no opportunity to visit a website or learn any information about the source of the ad, and the text appears smaller and harder to read than on a desktop. ████████

███████████████████████████

### 5. Stick to the Script

Accident victims searching for Adler who click on Defendants' call-only ad and ask whether they have reached the Adler firm are told: ██████████████████████ ███████████████ If the victim asks again, ██████████████ ████████████████████████ Defendants' Chief Operating Officer confirmed this point. ██████████████████

█████████████████████████████

██████████████████████



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

### 6.     Close Quickly

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

### D.     Nearly ██████ Instances of Actual Confusion

The undisputed evidence shows that these tactics have caused ████████████████ of instances of actual confusion among accident victims seeking Adler. Defendants admit as much. Some of the evidence of the actual confusion caused by Defendants' scheme include: (1) descriptions from Defendants' intake specialists of their incoming and outgoing phone calls; (2) emails from Defendants' referral attorneys ████████████████████████; and (3) call recordings ███████████ ███████████████████████████████████████████████

### 1.     Defendants' Intake Descriptions

Defendants produced intake descriptions for what they claim were each separate phone call they received in which a victim ██████████████████████████████████████████

██████████████████████ after clicking on Defendants' Google ad. *See id.* 116; *id.* 134 (manually

filed Excel spreadsheet with Defendants' intake data from 2018 to January 2022); *id.* 134 (Defendants'

March-August 2022 intake data). These descriptions from Defendants' own records show ███████

such calls between 2018 and mid-2022. Below are a few such descriptions:



██████████████████████████████████

██████████████████ The descriptions show Defendants had already received ██████████

███████████████████████████ prior to their motion to dismiss Adler's claims in January

2020. *Id.* 134. Defendants would go on to receive ████████████████ in 2020 and 2021, *id.*; *see*

*id.* 116, and ████████████████████████████, *see id.* 134.

Importantly, these numbers underreport the amount of actual confusion—███████



In one such instance Adler was able to discover, Defendants received a call from a 17-year-old accident victim whose mother hired Adler. *Id.* 135. The minor victim searched Google to find Adler's phone number for an update on his case and clicked Defendants' ad believing it was Adler's number. *Id.* After speaking with Defendants' intake specialist, he signed a retainer agreement with one of Defendants' referral attorneys, believing it was related to his representation with Adler. *Id.* ████████████████████████████ many instances like this have occurred when accident victims assume they reached the Adler firm but do not use his name on the call. *See infra* Part I.D.2.

2.   █████████████    **Defendants' Referral Attorneys**

Starting as early as 2018 and through today, Defendants received █████████

████████████████████████████ The chart below highlights a handful of these emails, which establish that Defendants knew the impact of their scheme from the outset, and that widespread confusion has continued throughout this lawsuit.

| From | Date/Time | Email |
|------|-----------|-------|
| ████ | ████ | ████████████████████ |



*See id.* 136.











### 3.     Defendants' Call Recordings

Likewise, Defendants' call recordings that were not destroyed make plain the predatory nature of their bait-and-switch scheme. Adler has submitted a sample of those recordings for the Court to review. The recordings speak for themselves, shining a bright light on Defendants' scheme.



E.    **Defendants Think Actual Confusion is the** ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████
████████████████████████████

████████████████████████████████████████

██████████████████████████

████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Defendants never truly addressed, let alone tried to stop, the confusion caused by their bait-and-switch scheme, even after Adler filed suit. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

Unsurprisingly given the minimal nature of these changes, actual confusion has continued to occur. ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

## II.    ARGUMENT

The undisputed facts show that Defendants' use of the Adler Marks creates a likelihood of confusion. Indeed, there is widespread actual confusion. Adler is entitled to summary judgment on his federal and state claims for trademark infringement and unfair competition.

### A.    Defendants Are Liable for Trademark Infringement and Unfair Competition as a Matter of Law

The elements for trademark infringement and unfair competition are substantively the same. Adler must show: (1) ownership of the Adler Marks; and (2) a likelihood of confusion created by Defendants' scheme. *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 505 (5th Cir. 2018).[5]

---

[5] The standards are the same for Adler's state and federal claims for infringement and unfair competition. *See, e.g.*, *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998); *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ).

Adler indisputably owns valid rights in the Adler Marks given his ownership of incontestable federal trademark registrations for those marks. *See* Appx. 18-21. These registrations are "*conclusive* evidence of the validity of the" Adler Marks, "of [Adler's] ownership of the" marks, and "of [Adler's] exclusive right to use" the marks in commerce. *See* 15 U.S.C. § 1115(b) (emphasis added). Defendants assert no affirmative defenses contesting the validity of the Adler Marks. *See* ECF No. 47. Thus, the first element of Adler's infringement and unfair competition claims is met.

On the second element, the Lanham Act "protects against several types of consumer confusion, including point-of-sale confusion, initial interest confusion, and post-sale confusion." J. Thomas McCarthy, 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:32 (5th ed. 2018). Adler's claims implicate both initial-interest and point-of-sale confusion. Courts in the Fifth Circuit analyze eight factors to gauge the likelihood of confusion in either situation: (1) mark strength; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *See, e.g.*, *Good Gov't*, 901 F.3d at 505. "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). However, two factors "possess particular prominence"—actual confusion and intent. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020). Each of the eight factors weigh in Adler's favor, proving a likelihood of confusion as a matter of law. *Cf. Jim S. Adler, P.C. v. Angel L. Reyes & Assocs. PC*, No. 3:19-CV-2027, 2020 WL 5099596, at *8 (N.D. Tex. Aug. 7, 2020) (finding at the dismissal stage that each weighed factor favored Adler, but that consideration of actual confusion was "premature").

The Fifth Circuit regularly affirms findings of likely confusion at summary judgment where, as here, the facts "are not in dispute" and "conclusions from such facts are required as a matter of law." *See Beef/Eater Restaurants, Inc. v. James Burrough Ltd.*, 398 F.2d 637, 640 (5th Cir. 1968); *accord*

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 198 (5th Cir. 2018); *Good Gov't*, 901 F.3d at 513; *Smack Apparel*, 550 F.3d at 483-84. Importantly, "very little proof of actual confusion" is "necessary to prove the likelihood of confusion" and "an almost overwhelming amount of proof would be necessary to refute" proof of actual confusion. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971); *accord Viacom*, 891 F.3d at 198. As the Fifth Circuit has observed, "a showing of actual confusion probably requires a finding of likelihood of confusion even in the absence of other proof." *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir. 1984) (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 n.5 (6th Cir. 1982) ("Indeed, it is difficult to conceive of a situation where a showing of substantial actual confusion would not result in a legal conclusion of likelihood of confusion.")).

### 1. The Overwhelming Amount of Actual Confusion Requires a Finding of Likely Confusion (Factor 7)

While "not necessary" to show likely confusion, actual confusion is "the best evidence." *Good Gov't*, 901 F.3d at 513. Here, the undisputed evidence showing ███████████████ of instances of actual confusion establishes that Defendants' scheme is likely to cause confusion.

*First*, Defendants' intake descriptions alone establish an overwhelming amount of initial-interest confusion. "Initial interest confusion is confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 427 (5th Cir. 2021). Agreeing with Ninth Circuit precedent, the Fifth Circuit in this case held that initial-interest confusion is actionable in the keyword advertising context if "consumers searching for trademark terms initially believe that 'unlabeled banner advertisements' are links to sites that belong to or are affiliated with the trademark owner." *Id.* at 428 (quoting *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004)). "[T]he critical issue is whether there is consumer confusion" evidenced by the accident victim clicking on Defendants' ad

while mistakenly believing the ad belonged to Adler and would connect them to Adler rather than Defendants. *See id.* (citing McCarthy, *supra*, § 25A:8).

Defendants' own records show that ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ *Supra* Part I.D.1. Defendants cannot genuinely dispute that they are liable for trademark infringement and unfair competition given the substantial amount of initial-interest confusion *recorded by Defendants' own employees.* Defendants' call recordings underscore the point. ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

*Second*, emails from Defendants' referral attorneys show ███████████████████████

██████████. Point-of-sale confusion asks "whether a prospective purchaser will likely be confused as to a product's source at the time he purchases the product," *Bd. of Regents of the Univ. of Houston v. Houston Coll. of L., Inc.*, 214 F. Supp. 3d 573, 598 (S.D. Tex. 2016), and is the "most common and widely recognized type of confusion that creates infringement," *see* McCarthy, *supra*, § 23:5. Point-of-sale confusion requires only that the confusion "sway consumer purchases." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017).

Defendants' *own documents* unambiguously establish point-of-sale confusion. *See supra* Part I.D.2. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

21

*Third*, Adler's survey expert Dr. David Stewart conducted a survey analyzing Defendants' use of "The Texas Hammer" as a keyword, which yielded a 44% net confusion rate. *See* Appx. 201-02. Dr. Stewart observed: "Even with the correct response among the alternatives . . . more respondents selected the alleged infringing advertisement than the correct advertisement associated with Adler." *Id.* Significant percentages of respondents believed that "Accident Injury Legal Center" was associated with "The Texas Hammer." *See id.* Consumer surveys qualify as evidence of actual confusion, *Viacom*, 891 F.3d at 197, and the Fifth Circuit has found a survey showing a 15% confusion rate to be "strong evidence indicating a likelihood of confusion," *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980). Dr. Stewart's survey strongly supports what Defendants own documents already show—that Defendants' use of the Adler Marks is causing actual confusion in the marketplace.

Given that "very little proof of actual confusion" is "necessary to prove the likelihood of confusion," *World Carpets*, 438 F.2d at 489, this evidence alone demonstrates that Adler is entitled to judgment as a matter of law, *see Falcon Rice*, 725 F.2d at 345 ("a showing of actual confusion probably requires a finding of likelihood of confusion even in the absence of other proof").

### 2. Defendants Intended to Capitalize on Adler's Popularity (Factor 6)

Like actual confusion, an infringer's intent has "special importance" in the likelihood-of-confusion analysis. *See Future Proof*, 982 F.3d at 298. While not necessary to a finding of likelihood of confusion, bad-faith intent "may alone be sufficient to justify an inference that there is a likelihood of confusion." *Id.* at 289. The Fifth Circuit has found bad-faith intent where "the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity." *Streamline*, 851 F.3d at 456. Likewise, bad-faith intent may be found where "the defendant did not choose the mark with intent to confuse but subsequently used the mark in a way that evidenced an intent to trade on the senior user's reputation." *Id.*

The evidence here demonstrates that Defendants "intended to capitalize on the potential for confusion" among victims searching for Adler. *See Smack Apparel Co.*, 550 F.3d at 482. Defendants admit Adler is ███████████ in Texas. Defendants sought to exploit Adler's popularity and goodwill by spending ███████████ on the Adler Marks as keywords and running what they call ███████████ ads directly under the Adler Marks, which "enhances rather than dispels" the potential for confusion. *See Adler*, 10 F.4th at 429. ███████████████████████████████████

███████████████████████████████████████████████████████

████ Defendants' generic, call-only ads and ███████████, combined with their knowledge of the strength of the Adler Marks in Texas, prove bad-faith intent as a matter of law.

Other undisputed evidence strongly supports the same conclusion. █████████████ ██████████████████████████████████ Defendants knew in January 2020 when they sought to dismiss Adler's claims that █████████████████████████ Defendants also knew in August 2021 before the Fifth Circuit decision that █████████████ ███████████████████ Defendants further knew in August 2021 that ████████████ their referral attorneys who purchased Defendants' leads ███████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████ Unsurprisingly, actual confusion has continued.

Moreover, throughout that time period, Defendants' own referral attorneys ████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

23

████████████████████████████████████████████████████████████████

█████████████

Nor is this the first time Defendants have been sued for the unlawful use of attorneys' names in keyword advertising. *See supra* Part I.B. (discussing prior trademark lawsuits against Defendants). The prior suits against Defendants by other attorneys ████████████████████████████████████ ████████████████████████████████████████ is yet more evidence establishing willful infringement. *See, e.g., Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826, 2019 WL 5696148, at *24 (E.D.N.Y. Sept. 30, 2019) (willful infringement at summary judgment; "H&H was previously sued by Johnson & Johnson for the exact same conduct at issue in this case . . . . Although H&H points out that the circumstances of the settlement were favorable and did not require H&H to admit liability, that does not erase the fact that H&H was on notice that, at minimum, a manufacturer might consider the diversion of international test strips to be unlawful and grounds for suit."); *accord Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (willful infringement at summary judgment; "Ashley Reed was clearly on notice that it might be infringing trademarks after Fendi's 2001 cease and desist letter and multiple lawsuits filed by other designers in 2000 and 2001.").

The undisputed facts support only one conclusion—Defendants' scheme seeks to capitalize on Adler's popularity and goodwill by tricking accident victims looking for Adler into calling them instead. The scope of actual confusion in this case, alongside Defendants' years of inaction and "intent to profit from [Adler's] reputation," compel a finding of infringement. *Smack Apparel*, 550 F.3d at 483.

### 3. The Adler Marks are Strong, Inherently Distinctive Marks (Factor 1)

"The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Elvis*, 141 F.3d at 201. Here, there is no dispute that the Adler Marks are both conceptually and commercially strong. *See*

24

*Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 397 F. Supp. 3d 847, 860 (N.D. Tex. 2019) (mark strength turns on "conceptual strength" and "commercial strength").

Adler's federal trademark registrations create a presumption of conceptual strength. *See Good Gov't*, 901 F.3d at 507-08. On commercial strength ("the more important of the two"), Adler has practiced for over fifty years in Texas, spent ███████████ in just the past ten years advertising his services, earned ███████████ in that same time period, and has repeatedly received unsolicited media attention. *See supra* Part I.A.; *see also Univ. of Houston*, 214 F. Supp. 3d at 585 ($5.5-$7 million ad budget, decades of use, and media recognition support finding of commercial strength); *Viacom*, 891 F.3d at 190-93 (18 years of use and millions in revenue support finding of strength); *Smack Apparel*, 550 F.3d at 472, 479 (annual sales exceeding $93 million "in recent years" supports finding of strength). The Adler Marks are strong and entitled to a significant scope of protection. *See Elvis*, 141 F.3d at 201.

Indeed, there is a direct line between the actual confusion in this case and the Adler Marks' strength. *See McCarthy*, *supra*, § 15:11 ("If buyers are confused between two sources, then this also means that they must have recognized plaintiff's designation as a trademark and associated it only with plaintiff."). Accident victims looking for personal-injury services online do not search for "Quintessa Marketing" or "Accident Injury Legal Center." ████████████████████████████ ██ Adler's brand, on the other hand, is strongly associated with such services. *See supra* Part I.A. That is precisely why Defendants have spent ███████████ on the Adler Marks as keywords. *See Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1283 (11th Cir. 2020). The Adler Marks' strength heavily favors a finding of likely confusion as a matter of law. *See Viacom*, 891 F.3d at 193.

### 4.    The Marks at Issue are Identical (Factor 2)

"The more similar the marks, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 454. That Defendants refrain from using Adler's marks in the text of their ads is irrelevant, particularly given that accident victims had to have those marks in mind to conduct a search leading them to

Defendants' deceptive ads in the first place. *See Adler*, 10 F.4th at 430; *see also Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 288 (D. Mass. 2009) ("A consumer who had just entered a search for Hearts on Fire diamonds might easily believe that the Defendant was one such authorized retailer when presented with Blue Nile's sponsored link, even if the accompanying text did not contain the trademarked phrase."). Thus, Defendants' use of keywords identical to and incorporating the Adler Marks, in conjunction with ads that are substantively and visually similar, "weighs heavily" in favor of finding confusion. *See Edible Arrangements, LLC v. Provide Com., Inc.*, No. 3:14-CV-00250 (VLB), 2016 WL 4074121, at *8 (D. Conn. July 29, 2016).

> **5.    The Parties' Products, Purchasers and Outlets, and Advertising Media are Identical (Factors 3-5)**

These three factors address the level of competition between the parties in the marketplace. Defendants admit all three, which weigh in favor of a finding of likely confusion. *See* ECF No. 55-1 at 8 ("Quintessa competes directly with Adler in online search engine marketing to develop leads for personal injury cases."); Appx. 206 (Resp. No. 2) ("Defendants admit that Quintessa competes directly with Adler in some, but not all, auctions for certain search engine keywords in online search engine marketing to develop leads for personal injury cases."), *id.* (Resp. No. 3) ("Defendants admit that Quintessa competes directly with Adler in some, but not all, auctions for the Adler Marks as search engine keywords in online search engine marketing to develop leads for personal injury cases.").

Defendants are middlemen between accident victims and Adler's "competitor[s] providing the same class of services." *See Reyes*, 2020 WL 5099596, at *8; *see also Exxon*, 628 F.2d at 505 (finding "strong similarity" between gas-station services and auto-repair services based on common relation to "car care"). There is no dispute the parties "compete to reach the same consumers: Texas personal injury plaintiffs and their families." *See Reyes*, 2020 WL 5099596, at *8. Additionally, both parties advertise their services using Google and other online media. *See id.* ("Plaintiffs and Defendant both purchase and display keyword ads on mobile devices"). In fact, among those confused by Defendants

are Adler's existing clients, which Defendants then try to lure away. Ultimately, Defendants are a "direct competitor selling [services] within the same general class" as Adler's that "serv[e] the same purpose." *See Edible Arrangments*, 2016 WL 4074121, at *8. As such, the similarity of the parties' services, outlets and purchasers, and advertising media strongly favor a finding of likely confusion as a matter of law.

### 6.    Defendants Exploit Accident Victims' Vulnerable Position and Lack of Familiarity with the Legal System (Factor 8)

The Supreme Court has repeatedly acknowledged the interest in protecting "unsophisticated, injured, or distressed lay person[s]" whose "very plight" makes them "more vulnerable to influence" from deceptive forms of attorney advertising. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 465 (1978); *accord Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (crediting petitioner's argument concerning the "special vulnerability" of "victims or their families"). The Court has also recognized that certain forms of attorney advertising may invade accident victims' privacy, "even when no other harm materializes." *Ohralik*, 436 U.S. at 465-66. The undisputed facts here establish that both concerns are well-founded. Defendants' intake descriptions, attorney complaints, and call recordings confirm the same thing—███████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████

Nor is there any question that Defendants knew of these vulnerabilities. Lauren has worked in the personal-injury field for over a decade. ██████████████████████████████████████

████████████████████████████████, and she has been sued for the very conduct at issue in this case on multiple occasions. The lack of consumer sophistication—confirmed to exist not least by Defendants' efforts to exploit it—heavily favors a finding of confusion as a matter of law.

**B.        Adler is Entitled to Injunctive Relief and Disgorgement of Defendants' Profits**

The Lanham Act provides a suite of remedies "upon a finding of a violation" of its trademark infringement and unfair competition provisions. 15 U.S.C. §§ 1116(a), 1117(a). The undisputed facts show Adler is entitled to injunctive relief and disgorgement of Defendants' profits as a matter of law.

"A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment." *Diageo N. Am., Inc. v. Mexcor, Inc.*, 661 F. App'x 806, 813 (5th Cir. 2016). An injunction requires a showing: (1) of irreparable harm; (2) that legal remedies are inadequate; (3) that the balance of hardships favors an injunction; and (4) that an injunction serves the public interest. *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013). Those elements are met.

The Lanham Act imposes a rebuttable presumption of irreparable harm that Defendants cannot overcome. *See* 15 U.S.C. § 1116; *see also* McCarthy, *supra*, § 30:46. Indeed, "[t]he same evidence [establishing] a likelihood of confusion" as a matter of law also "demonstrates the necessary irreparable harm." *S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 765 (N.D. Tex. 2013); *see also Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services."); *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) ("irreparable harm is especially likely in a trademark case" where "a nontrivial period of consumer confusion" gives rise to "the difficulty of quantifying the likely effect on a brand"). Adler's "loss of control also demonstrates that money damages cannot adequately compensate [Adler] for [Defendants'] unauthorized use" of the Adler Marks. *See S & H Industries*, 932 F. Supp. 2d at 765. Additionally, Defendants cannot credibly claim that the balance of hardships or the public interest weighs against injunctive relief given the scope of actual confusion and indisputable proof of Defendants' bad faith. *See Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 640 (N.D. Tex. 2009)

("a permanent injunction will only require the defendants to bring their business into line with the requirements of the law" and ensures "there [will] be no confusion" in the marketplace). Adler is thus entitled to injunctive relief.

Turning to profits, disgorgement is an equitable remedy decided by the Court. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1359 (11th Cir. 2019) ("[A]n accounting and disgorgement of a defendant's profits in a trademark infringement case is equitable in nature and does not carry with it a right to a jury trial."). Courts regularly grant profits at summary judgment where, as here, the undisputed facts show willful infringement. *See, e.g., Texas Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 525 (N.D. Tex. 2006); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1026 (N.D. Tex. 1980), *aff'd sub nom. Holiday Inns, Inc. v. Alberding*, 683 F.2d 931 (5th Cir. 1982).[6] The Fifth Circuit considers six non-exclusive factors to determine whether disgorgement is equitable: (1) defendant's intent; (2) scope of actual damages; (3) adequacy of other remedies; (4) any unreasonable delay by the plaintiff; (5) the public interest; and (6) whether it is a case of palming off. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998). Each of these factors favors disgorgement.

Defendants are using the Adler Marks to exploit Adler's popularity and confuse consumers. *See supra* Part II.A.2. That bad faith is alone sufficient to impose disgorgement even absent evidence of actual confusion. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1126 (5th Cir. 1991) (proof of actual confusion not necessary for disgorgement). Nevertheless, the undisputed evidence of actual confusion, which is overwhelming, establishes that Adler has been damaged. *See, e.g., Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987) ("actual consumer confusion or deception resulting from the violation" establishes proof of actual damages); *see also* McCarthy, *supra*, § 30:74.

---

[6] *See also Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 62-63 (1st Cir. 2008) (affirming profits award at summary judgment); *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1087 (6th Cir. 1983) (same); *Choice Hotels Int'l, Inc. v. Gosla Fam. Tr.*, No. 5:18-CV-00648-ADA, 2022 WL 4295362, at *4 (W.D. Tex. Sept. 16, 2022) ("[I]t is undisputed that Defendants undertook no efforts to remove the Comfort name from the hotel prior to this case being filed.").

Further, Adler did not unreasonably delay, having filed suit in August 2019 shortly after Defendants began using the Adler Marks in earnest. *See supra* Part I.C. And Defendants are clearly trying to palm off their services as if they are Adler. *See, e.g.*, Part I.D.2. ("It would appear that these unsophisticated clients were deceived into signing with us"). Adler is therefore entitled to disgorgement of Defendants' profits as a matter of law. *See Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1043, 1049 (D. Minn. 2015) (awarding profits at summary judgment where infringer's use included purchase of plaintiff's mark as keyword and deceptive call-center practices; "Distinctive was advertising with near identical terms to the 'Zerorez' mark knowing, as evidenced through the testimony of its call center manager, that its campaign was causing confusion.").

The Court should enter summary judgment against Defendants regarding Adler's entitlement to injunctive relief and disgorgement. The Court should also order supplemental briefing on the scope of the injunction and the amount of profits to be disgorged, as is commonly done once courts find infringement and unfair competition as a matter of law in trademark cases. *See, e.g.*, *Bd. of Regents of Univ. of Texas Sys. v. Reynolds*, No. 18-CV-182, 2019 WL 7758920, at *2 (W.D. Tex. Sept. 18, 2019) (ordering supplemental briefing on remedies, including profits, upon finding of infringement and unfair competition as a matter of law); *Cachet Fin. Servs. v. Cachet Fin. Sols., Inc.*, No. 13-CV-1546, 2016 WL 10077328, at *1 (C.D. Cal. Sept. 30, 2016); *Zerorez*, 103 F. Supp. 3d at 1049; *Nat. Ass'n of Realtors v. Champions Real Est. Servs. Inc.*, 812 F. Supp. 2d 1251, 1263 (W.D. Wash. 2011).

### CONCLUSION

The undisputed facts show that Defendants' use of the Adler Marks in a bait-and-switch scheme targeting Adler's clients is likely to cause confusion. The Court should grant Adler's motion and order supplemental briefing on the scope of the injunction and amount of profits to be disgorged.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 13, 2023, a true and correct copy of the foregoing was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the court's local rules.

<u>*/s/ Jered E. Matthysse*</u>
Jered E. Matthysse