## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL NO. 3:19-CV-2025-K |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| QUINTESSA MARKETING, LLC | § | |
| D/B/A ACCIDENT INJURY LEGAL | § | |
| CENTER and LAUREN VON MCNEIL, | § | |
| | § | |
| Defendants. | § | |

---

## DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT DAVID STEWART

---

*Christopher J. Schwegmann*
Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
Rebecca L. Adams
State Bar No. 240298255
radams@lynnllp.com
Barira Munshi
State Bar No. 24095924
bmunshi@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR DEFENDANTS
MCNEIL CONSULTANTS, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER,
QUINTESSA MARKETING, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER and
LAUREN VON MCNEIL**

## Table of Contents

I.    **SUMMARY OF ARGUMENT** ..................................................................................1

II.    **STATEMENT OF FACTS** .....................................................................................2

    A.    Plaintiffs' Relevant Claims ...............................................................................2

    B.    Dr. Stewart's Survey ..........................................................................................2

    C.    Dr. Stewart's Conclusions ................................................................................4

III.    **ARGUMENT & AUTHORITIES** .........................................................................5

    A.    The Court Should Exclude Dr. Stewart's Survey Because He Failed to Use a Proper Control. .................................................................................................6

    B.    The Court Should Exclude Dr. Stewart's Survey Because He Failed to Confirm that Respondents Were Able to View the Blurry Stimulus. ...........7

    C.    The Court Should Exclude Dr. Stewart's Survey Because It Does Not Reflect Market Conditions. .............................................................................10

        1.    Dr. Stewart's Survey Provided an Incomplete Search Engine Results Page ..................................................................................................11

        2.    The Survey Presented an Inaccurate and Unrealistic Adler Advertisement .....................................................................................13

    D.    The Court Should Exclude Dr. Stewart's Survey Because The Instructions Are Contradictory and Ambiguous. .............................................................14

    E.    The Court Should Exclude Dr. Stewart's Survey Because The Probative Questions are Leading and Suggestive. ........................................................16

    F.    The Court Should Exclude Dr. Stewart's Survey Because He Failed to Analyze the Data, Which When Properly Adjusted is Not Probative of Any Likelihood of Confusion. ...............................................................................19

    G.    The Court Should Exclude Dr. Stewart's Survey for the Reasons Stated in the Expert Report of Dr. Jeffrey A. Stec. ......................................................23

IV.    **CONCLUSION** .......................................................................................................25

## Table of Authorities

**Cases**

*1–800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246–49 (10th Cir. 2013) ......................................23

*American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655 (2d Cir. 1979) ..................................11

*Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 997 (N.D. Ill. 2010) ..................................................14

*Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021) ...........................................................14

*Government Employees Ins. Co. v. Google, Inc.*, 77 U.S.P.Q.2d 1841 (E.D.Va. 2005) ....................................6

*Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 220 U.S.P.Q. 386 (7th Cir. 1983) .................23

*IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F.Supp.2d 815 (E.D.Va.1998) ...............................................17

*J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 CIV. 4060 DLC, 2013 WL 1903883 (S.D.N.Y. May 8, 2013), aff'd, 586 Fed. Appx. 8 (2d Cir. 2014) ...........................................................10, 13

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729 (2d Cir. 1991) ........................................10

*Leelanau Wine Cellars Ltd. v. Black & Red., Inc.*, 502 F.3d 504 (6th Cir. 2007) ...................................11, 17

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 ......................................................11

*Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F.Supp. 1103 (S.D.N.Y. 1993) ................................................................................................................6

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................7

*Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839 (N.D. Tex. 2009) ...............................................................19

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02-cv-3691 (DLC), 2004 WL 326708 (S.D.N.Y. Feb 23, 2004) .............................................................................................25

*Mini Melts Inc. v. Recklitt Benckiser LLC*, 118 U.S.P.Q.2d 1464, 2016 WL 3915987 (T.T.A.B. 2016) .................................................................................................................23

*Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F.Supp.2d 665 (E.D.Wis.1999) ..............................14

*Newport Pacific Corp. v. Moe's Southwest Grill, LLC*, No. 05-995-KI, 2006 WL 2811905 (D. Or. 2006) ........................................................................................................................23

*Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305 (S.D.N.Y. 2000) ..........................................23

ii

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594 (D.N.J. 2003) ................................................................................................................................................6

*Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268 (S.D.N.Y. 1994) ..............................................................................................................................................19

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004) ..................................5, 17

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884 (S.D. Tex. 2011) ......5

*Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279 (S.D.N.Y. 1997) .........................14

*Simon Property Group, L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1039 (S.D. Ind. 2000) ..............5, 6, 10

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440 (5th Cir. 2017) ...........................22

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218  (S.D.N.Y. 2010) ......................................6, 10

*Toth v. 59 Murray Enterprises, Inc.,* No. 15 CIV. 8028 (NRB), 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019) ....................................................................................................................................14

*Trouble v. Wet Seal*, 179 F.Supp.2d 291 (S.D.N.Y. 2001) .............................................................10

*Universal City Studios, Inc.*, 746 F.2d at 118 ................................................................................17

*Viacom Int'l v. IJR Cap. Inv.*, L.L.C., 891 F.3d 178 (5th Cir. 2018) .............................................1

*Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958 (E.D. N.Y. Sept. 27, 2005) ...................................................................................................10

*Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1126 (10th Cir. 2013) .............................11, 17, 22

*WE Media, Inc. v. General Electric Co.*, 218 F. Supp.2d 463 (S.D.N.Y. 2002) .............................11

*Wuv's Intern., Inc. v. Love's Enterprises, Inc.*, 208 U.S.P.Q. 736, 1980 WL 30296 (D. Colo. 1980) ..............................................................................................................................................23

**Other Authorities**

6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed.) ...........................10, 17

Diamond, Shari Seidman. Reference Guide on Survey Research, *Reference Manual on Scientific Evidence, Third Edition.* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council, p. 394 ................................................................................................16

*Encyclopedia of Survey Research Methods*, Paul J. Lavrakas, Editor, SAGE Publications, Inc., Thousand Oaks, CA, 2008) ...................................................................................................16

Jacoby, J. (2013). Trademark Surveys Volume 1, Designing, Implementing, and
Evaluating Surveys. US: American Bar Association, p.897 ................................................. 12, 21

Jon A. Krosnick, *Survey Research*, 50 *Ann. Rev. Psychol.*, 537, 552 (1999) ............................................17

Shari Seidman Diamond, Reference Guide on Survey Research, in Reference Manual
On Scientific Evidence at 229, 258 (Federal Judicial Center 2d ed.2000) ...............................16

*Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Second Edition, edited
by Shari S. Diamond and Jerre B. Swann. American Bar Association, Section of
Intellectual Property Law, p. 344 .....................................................................................................16

Defendants McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center and Lauren Von McNeil (collectively "Quintessa" or "Defendants") file this Motion to Exclude Plaintiffs' Jim S. Adler, P.C. and Jim Adler (collectively "Adler" or "Plaintiffs") Expert Dr. David Stewart (the "Motion") and respectfully shows as follows:

## I.    SUMMARY OF ARGUMENT

In some cases, "a survey can be so badly flawed that it cannot be used to demonstrate the likelihood of consumer confusion." *Viacom Int'l v. IJR Cap. Inv.*, L.L.C., 891 F.3d 178, 197 (5th Cir. 2018) (internal quotations omitted). This is one of those cases. Dr. Stewart's survey suffers from at least six serious flaws – many of which are fatal in their own right – that have the cumulative effect of rendering his survey utterly unreliable and therefore inadmissible:

- *First*, Dr. Stewart's survey fails to use a proper control. Instead, he chose a control that has virtually nothing in common with the Quintessa ad, which he further deemphasized by displaying it in a smaller font on a blurry screen. Because the control is too dissimilar from the stimulus, it cannot effectively control for noise.

- *Second*, Dr. Stewart did not ensure that respondents could clearly *see* the stimulus, which Dr. Stewart admitted is blurry. Because the stimulus was blurry, and in some instances illegible, Dr. Stewart's failure to establish that respondents could clearly see it is a fatal flaw.

- *Third*, Dr. Stewart's blurry stimulus does not even remotely reflect actual marketplace conditions. In the real world, internet users have the ability to scroll up and down on a search result page. This gives users the ability to see full ads, along with organic listings, which provide critical context for drawing conclusions regarding the search engine results. Dr. Stewart's survey provided only a blurry, static image of a purported cell phone screen with the Quintessa ad artificially enlarged. Worse, he doctored the Adler ad to remove the words "The Texas Hammer," removing another critical contextual clue that would exist under normal marketplace conditions. Because Dr. Stewart's survey artificially deprived users of important context that would be available to them in the real marketplace, his survey is unreliable.

- *Fourth*, the instructions in Dr. Stewart's survey are contradictory, ambiguous, and confusing. The instructions do not clarify whether the respondent should click on an

advertisement for legal services *generally* or for the Texas Hammer *specifically*. Dr. Stewart's flawed instructions and survey questions render his survey unreliable.

- *Fifth*, Dr. Stewart's probative questions are impermissibly leading, despite Dr. Stewart's admission that survey questions should not be leading. This flaw further renders the results of Dr. Stewart's survey unreliable.

- *Sixth*, in reaching his conclusions regarding net confusion, Dr. Stewart wholly ignores the open-ended responses describing as to *why* respondents clicked on any particular ad, *even when the answer demonstrated that the respondent was not confused at all*.

These issues do not go solely to the weight of the evidence. This survey is "so badly flawed" that it cannot be used to demonstrate relevant confusion. Consequently, Dr. Stewart's report, survey, and testimony should be excluded.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs' Relevant Claims

Adler asserts that Quintessa confuses consumers by bidding on the Adler Marks on Google which results in allegedly confusing click-to-call mobile advertisements. Adler alleges that Quintessa's use of the Adler Marks to generate online advertisements cause consumers to confuse the Quintessa ads with Adler's ads.

### B.    Dr. Stewart's Survey

Adler designated Dr. Stewart to quantify the likelihood of confusion allegedly caused by the Quintessa ads with a consumer survey. The target population and universe for Dr. Stewart's survey was "consumers 18 years of age or older who reside in the state of Texas and who indicated that they had previously used the services of a personal injury attorney or would consider using such services in the future if they sustained an injury."[1] According to Dr. Stewart, 782 respondents entered the survey, and 400 respondents completed the survey over this period.[2]

---

[1] App. 10-11 (Stewart Report at 8-9).
[2] App. 9 (Stewart Report at 7); *see also* App. 188 (Stec Report at 11).

After completing certain preliminary screening questions and reviewing preliminary instructions, respondents were shown the following instructions:

> For purposes of this survey and the questions to follow, we want you to assume that you have decided to seek information on or shop for the services of a personal injury attorney. You have decided to use your mobile telephone to seek this information. You have heard of an attorney that uses the name "The Texas Hammer," so you do a Google search on your mobile telephone for that attorney. The Google search produces results on your mobile telephone that are shown on the next screen. Please click the "Continue" button when you are ready to review the search results. After you have reviewed the search results indicate which ad, if any, you would respond to.[3]

As explained below, the instructions do not clearly state whether the survey participant should select an advertisement for any personal injury attorney or specifically for an advertisement for Adler.

On the next screen, however, respondents were shown the following blurry and static image of a Google search result for "The Texas Hammer," and asked to "Click the ad below to indicate which result you would choose to obtain those services."[4]

---

[3] App. 126 (Stewart Report at Exhibit C, p. 12).
[4] App. 127 (Stewart Report at Exhibits C, p. 13)



Dr. Stewart totaled the responses, counting as "confused" anyone who clicked on an advertisement other than the Adler advertisement, which itself did not contain the words "The Texas Hammer."

**C.    Dr. Stewart's Conclusions**

Based on the survey responses, Dr. Stewart concluded and opined as follows:

- "Applying the traditional correction for guessing by subtracting the percent of respondents who selected the control (Semi Truck Settlement) from the percent of respondents who selected the alleged infringing advertisement (Accident Injury Legal Center) yields a level of net confusion of 44% (47% - 3%)."[5]

- "These results provide strong evidence that a substantial number of consumers are likely confused when confronting Accident Injury Legal Center's

---

[5] *See* App. 19 (Stewart Report at 17).

advertisement as to the relationship between Accident Injury Legal Center and the law firm doing business as 'The Texas Hammer.'"[6]

Dr. Stewart testified that his conclusion that the Quintessa ad yields a level of net confusion of 44% is based *only* on the ad that respondents selected, and that he did not base this conclusion on the answers to Q1-Q3A (collectively referred to as the "Probative Questions"). *See* App. 280 (Stewart Depo. at 125:18-23) ("Q. …So you counted people as confused if they clicked on the [Quintessa] ads, regardless of what they responded to in Questions 1, 2, and 3 that came after, correct? A. For that particular – for that particular computation, yes.").

## III.    ARGUMENT & AUTHORITIES

Courts in the Fifth Circuit generally focus on two separate issues to assess the validity and reliability of a consumer survey, "first, the manner of conducting the survey, including especially the adequacy of the universe; and second, the way in which participants are questioned." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004). While it is true that minor flaws in a survey "generally bear on the weight, not admissibility," *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 890 (S.D. Tex. 2011), serious flaws—particularly those that diminish the reliability of a survey—make any reliance unreasonable. *Scott Fetzer*, 381 F.3d at 488. "Otherwise any survey, no matter how tendentious, would force the parties to trial." *Scott Fetzer Co.*, 381 F.3d at 488; *see also Simon Property Group, L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1039 (S.D. Ind. 2000) ("The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial.").

---

[6] *See* App. 20 (Stewart Report at 18).

**A.    The Court Should Exclude Dr. Stewart's Survey Because He Failed to Use a Proper Control.**

Choosing a proper control is an essential feature of reliable survey evidence because a proper control eliminates the "noise" or "error" in a survey. *See Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 601 (D.N.J. 2003) (rejecting consumer survey where the expert did not adequately control for consumers' preexisting beliefs) (internal quotation marks and citation omitted). A proper control should "share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) (excluding survey where it failed to replicate actual marketplace and failed to use an adequate control) (citing Shari Seidman Diamond, Reference Guide on Survey Research, in Reference Manual On Scientific Evidence at 229, 258 (Federal Judicial Center 2d ed.2000), *Government Employees Ins. Co. v. Google, Inc.*, 77 U.S.P.Q.2d 1841, 1846–47 (E.D.Va. 2005), and *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d at 1045). S*ee also Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F.Supp. 1103, 1123–24 (S.D.N.Y. 1993) (finding "both surveys contain a complete lack of controls rendering the data meaningless and having no evidentiary value"), vacated pursuant to settlement, 859 F. Supp. 80 (S.D.N.Y.1994).

Here, Dr. Stewart's use of the "Semi Truck Settlement" ad as a purported "control" was inappropriate because it shares almost nothing in common with the Quintessa ad he was trying to test. The Quintessa ad is a click-to-call ad, whereas the Semi Truck Settlement control is not. The Quintessa ad has four lines of text under the headline, whereas the Semi Truck Settlement control's text is limited to three words and does not mention at all the provision of legal services. The Quintessa ad shows a phone number, whereas the Semi Truck Settlement control does not. The Quintessa ad is enlarged, whereas the Semi Truck Settlement control is small.

Most importantly, the "Semi Truck Settlement" ad does not fit the criteria for the instructions that respondents were provided. Respondents were instructed that they were seeking information on

6

or shopping for the services of a personal injury attorney. However, the Semi Truck Settlement ad does not indicate that it is for a law firm, lawyer, or legal services. Further, despite the fact that the Semi Truck Settlement control contains the statement "Call us today," it does not provide any clear way for the respondents to actually reach the company who placed the ad because, unlike both the Quintessa ad and the Adler ad, the Semi Truck Settlement control contains no phone number or call button.

In short, Dr. Stewart's control changed far more than the characteristic(s) he was trying to assess. Instead, his control shares almost nothing in common with either the Quintessa ad *or* the Adler ad. The result of this differentiation is that the control ad does not fit with or satisfy the instructions that Dr. Stewart provided to respondents. Consequently, Dr. Stewart's improper control renders his survey unreliable because it cannot account for any of the noise from preexisting beliefs, satisficing, and guessing that occurred in his survey.

**B.      The Court Should Exclude Dr. Stewart's Survey Because He Failed to Confirm that Respondents Were Able to View the Blurry Stimulus.**

It is self-evident that survey respondents must be able to clearly view and evaluate the stimulus presented to them in order for survey results to be reliable and valid. If the stimulus presented to the respondents is blurry and illegible there is no way to tell if the respondents were able to evaluate the stimulus fully and accurately. A survey that presents respondents with illegible stimuli is improper and may render the survey "so fundamentally unreliable that the flaw is enough on its own to justify exclusion and improper stimuli can render a survey as inadmissible." *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 585-93 (S.D.N.Y. 2007) (excluding a survey in part on the finding that "the stimulus [expert] used in his survey is improper" where stimuli "were blurred beyond comprehension" and key portions of the stimuli "are illegible.").

Dr. Stewart did not ask respondents at any point if they could see the stimulus clearly. *See* App. 276 (Stewart Depo. at 87:2-4). Dr. Stewart's failure to confirm that respondents could see the stimulus clearly was a critical omission, particularly because even Dr. Stewart concedes this point:

Q.      So do you agree that the -- at least the control, the URL is illegible?
…
A.      Well, I would not agree that it's illegible. I would agree that it's blurry. Again, in this copy the image is blurred.

Q.      And do you agree that the URL for the Adler ad is blurry?

A.       Yeah, I would -- yeah, I would agree, certainly.

Q.      And would you agree that the headlines for both the control and the Adler ads are blurry?

A.      I would agree that in this copy they are blurry.

Q.      And would you agree that the content of the Adler ad below the headline is blurry?

A.      I would agree that it's blurry, yes.

*See* App. 275-276 (Stewart Depo. at 86:10-87:1).

Further, a simple review of the stimulus, which is included in Exhibit C of Dr. Stewart's report, confirms that the stimulus, as viewed by respondents, was blurry and difficult to read:



*See* App. 127 (Stewart Report at Exhibit C, p. 13).

The consequences of Dr. Stewart's blurry stimulus cannot be overstated. For example, the URL is a critical piece of identifying information in an ad for at least two reasons: (1) the URL line contains the word "Ad" before it, and (2) the URL describes the website that the ad is publicizing. Here, the URLs in the bottom two ads are essentially illegible. Making it difficult for respondents to read the URL, as well as other descriptive portions of the stimulus, deprives them of the opportunity to evaluate the ads in the stimulus in their full context, as respondents would be able to do in the real-world marketplace. The fact that Dr. Stewart's survey used a blurry – and in some instances illegible – stimulus is a fatal flaw that makes his survey unreliable.

**C.    The Court Should Exclude Dr. Stewart's Survey Because It Does Not Reflect Market Conditions.**

In order for a survey to be relevant and reliable, it must "mirror the situation in which the ordinary person would encounter the trademark" or claim at issue. 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:163 (5th ed.). Surveys that do not mirror marketplace conditions are inaccurate in predicting consumer perceptions, and any conclusions regarding the term of language being tested are unreliable. One important marketplace condition is the context in which the salient advertisement appears.

It is imperative that a survey attempts to replicate actual market conditions because "the contextual clues that can serve to dispel otherwise existent confusion are widely cited as relevant in assessing the likelihood that an appreciable number of consumers will be confused." *J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 CIV. 4060 DLC, 2013 WL 1903883, at *20 (S.D.N.Y. May 8, 2013), aff'd, 586 Fed. Appx. 8 (2d Cir. 2014) (citing *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 735 (2d Cir. 1991) (collecting cases)).

Numerous courts have excluded surveys based on their failure to replicate actual marketplace conditions, particularly when, as here, that failure is accompanied by other serious flaws. *See, e.g., THOIP v. Walt Disney Co.*, 690 F. Supp. 2d at 240-41 (survey was excluded in a jury trial because it failed to approximate marketplace conditions, failed to use an adequate control, and therefore was not a reliable indicator of consumer confusion); *Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *7 (E.D. N.Y. Sept. 27, 2005) (survey was excluded because it failed to use the proper universe, failed to use a control, and failed to replicate marketplace conditions); *Trouble v. Wet Seal*, 179 F.Supp.2d 291, 307-308 (S.D.N.Y. 2001) (excluding a consumer confusion survey in a jury case because it used an improper universe, improper stimulus, failed to approximate marketplace conditions, and asked irrelevant questions); *Simon Property Group, L.P. v. mySimon, Inc.*, 104 F. Supp2d at 1052 (survey excluded from a jury trial where it failed to replicate

10

marketplace conditions, used no control, and asked leading questions); *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (upholding district court decision to exclude survey for failure to approximate marketplace conditions); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 568-571, 581-600, 600-605 (adopting special master's findings and excluding two separate likelihood of confusion surveys, one of which was "without a doubt inadmissible" where it used improper stimulus, poor choice of a control, and failed to replicate marketplace conditions).[7] *See also Leelanau Wine Cellars Ltd. v. Black & Ref., Inc.*, 502 F.3d 504, 518 (6th Cir. 2007) (affirming district court's refusal to afford survey significant weight where the survey did not replicate conditions that consumers would encounter in the marketplace);

Dr. Stewart's survey utterly fails to replicate market conditions in at least three critical ways: (1) the survey provided an incomplete view of the search engine results, (2) the survey failed to present an accurate Adler advertisement for "the Texas Hammer.", and (3) the survey stimulus was blurry and, in certain instances, illegible, as discussed *supra* at Section III.B.

### 1. *Dr. Stewart's Survey Provided an Incomplete Search Engine Results Page*

It is common knowledge to anyone who has ever conducted a search on Google that the ability to scroll up and down the search results page is a critical step in evaluating the search results in their full context. Dr. Stewart agrees that the opportunity to scroll through search results is a common part of the Google search experience. *See* App. 268 (Stewart Depo. at 38:20-24) ("Q. Do you agree that if someone were to conduct this search in real life, that they would have the opportunity to scroll

---

[7] Many courts have also excluded surveys from consideration at the summary judgment stage for failing to replicate market conditions. *See, e.g., WE Media, Inc. v. General Electric Co.*, 218 F. Supp.2d 463, 474 (S.D.N.Y. 2002) (holding that a survey that failed to approximate marketplace conditions could not be considered in summary judgment); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1126 (10th Cir. 2013) (affirming district court's finding that likelihood of confusion survey would not be considered as evidence of likelihood of confusion for purposes of motion for summary judgment because it was flawed, including over inclusive survey universe, failed to replicate marketplace conditions, and asked leading and suggestive questions), upholding *Water Pik, Inc. v. Med-Systems, Inc.*, 2012 WL 2153162 (D. Co. 2012) (finding that the survey was "devoid of any probative value and therefore irrelevant" in the context of a motion for summary judgment).

up and down the search results page on their mobile phone? A. They would have the opportunity."). However, Dr. Stewart's survey does not afford respondents the same opportunity that they would have in the actual marketplace to view the Google search results in context and in their entirety. *See* App. 268 (Stewart Depo. at 37:25-38:7).

In the actual marketplace, a search for "The Texas Hammer" would not generate only three search results on a static page – as shown in Dr. Stewart's survey stimulus – but multiple results where consumers, if they chose to do so, could scroll up and down on their smartphone screen to view all of the results on the page. *See* App. 205-206 (Stec Report at 28-29) (showing examples of full search results for searches for "the Texas Hammer" produced by Adler). The search engine results page in the actual marketplace would also include organic results such as Jim Adler videos, links to Jim Adler's websites, similar questions people also ask, links to news articles, other sites, and Jim Adler images. *Id.* By constraining the image presented to respondents to only three advertisements and no organic results, Dr. Stewart has failed to present respondents with what they would have seen in the real marketplace. Instead, Dr. Stewart artificially focused respondents on the three advertisements he chose to test and stripped respondents of the ability to evaluate the contextual cues that would normally surround those ads in the marketplace.

Dr. Jacob Jacoby, a leading trademark survey expert. has warned in his treatise, "[r]esearchers conducting tests of stimuli appearing on the Internet need to be especially careful not to diminish the number and nature of cues associated with the test stimulus in the marketplace."[8] But Dr. Stewart did exactly that. He made the intentional decision to only show respondents a partial and static view of the Google results in the stimulus. This is a significant flaw because it stripped respondents of their ability to view "the contextual clues that can serve to dispel otherwise existent confusion." *J.T. Colby*

---

[8] Jacoby, J. (2013). Trademark Surveys Volume 1, Designing, Implementing, and Evaluating Surveys. US: American Bar Association, pp.485-487.

*& Co.*, 2013 WL 1903883 at *20. As Dr. Stec opined, Dr. Stewart's artificial focus on the three advertisements he chose to test "significantly increased the likelihood that respondents would click on one of these three advertisements and not any additional content that should have been included in the search results. Therefore, Dr. Stewart's result of 47% of respondents selecting Accident Injury Legal Center when asked to look for "The Texas Hammer" is overstated and unreliable.

### 2. *The Survey Presented an Inaccurate and Unrealistic Adler Advertisement*

Not only did Dr. Stewart deprive respondents of the opportunity to view the entire search engine results page, but his stimulus also departs from reality by failing to show a real ad placed by Jim Adler for "the Texas Hammer" search term. Dr. Stewart testified that it was important to him that the Adler ad in his survey be representative of an Adler ad that would appear in response to a search for "the Texas Hammer," and that is what Dr. Stewart asked Adler's attorneys to provide. *See* App. 277-278 (Stewart Depo. at 97:13-98:9). Nevertheless, the "Tough Smart Lawyer" ad that Dr. Stewart used in his survey is ***not*** an ad that Adler places in response to inquiries for "the Texas Hammer."

 Adler's historical ad copy, as well as the 28 examples of Adler's ads that it produced in this matter, establish that Adler's ads always contain "The Texas Hammer" or "Texas Hammer" in the headline. *See* App. 207-208 (Stec Report at 30-31). Further, there is no evidence that Adler has ever placed an ad that included the combination of headlines used by Dr. Stewart or the headline 'Tough Smart Lawyer.'" *Id.* at 31, FN 94.

Dr. Stewart testified that he purposely chose an Adler ad in his survey that did not include the term "Texas Hammer" because he did not want to give the term "undue precedence." *See* App. 278-279 (Stewart Depo. at 98:19-99:4). In other words, Dr. Stewart intentionally chose an Adler ad that would not have appeared as a result for the search for "the Texas Hammer" in real life in order to artificially downplay the prevalence of the term in Adler's ad. In doing so, Dr. Stewart failed to

replicate the market and artificially inflated the percentage of respondents that clicked on the McNeil advertisement. *See id.* at 31-32. Dr. Stewart's deliberate decision to show respondents an unrealistic Adler ad, which artificially omitted the trademarked search term "Texas Hammer" from the headline, makes his survey unreliable.

### D.     The Court Should Exclude Dr. Stewart's Survey Because the Instructions Are Contradictory and Ambiguous.

The instructions Dr. Stewart provided in his survey are contradictory, ambiguous, and confusing. Where instructions or questions in a survey are ambiguous, courts have found that surveys should be excluded or afforded significantly reduced weight. *See, e.g., Competitive Edge, Inc. v. Staples, Inc.,* 763 F. Supp. 2d 997, 1008, 1010 (N.D. Ill. 2010), aff'd, 412 Fed. Appx. 304 (Fed. Cir. 2011) (excluding survey and describing it as "replete with potential ambiguities where the survey the questions were open to multiple interpretations*); Toth v. 59 Murray Enterprises, Inc.,* No. 15 CIV. 8028 (NRB), 2019 WL 95564, at *8 (S.D.N.Y. Jan. 3, 2019), *aff'd in part, vacated in part, remanded sub nom. Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021) (excluding survey for flaw such as undefined and ambiguous terms in the survey questions and confusing and misleading questions); *Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F.Supp.2d 665, 668 (E.D.Wis.1999) (survey consisting of only one vague question, with no controls or comparison questions, excluded from evidence)."); *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 290-91 (S.D.N.Y. 1997) (survey flawed from ambiguous wording that could carry "any number of possible meanings" and the expert never defined the ambiguous term or elicited a definition of the term from the survey respondents--"[t]hus, there is no way of knowing which meaning of the word [] the respondents intended.").

Here, the instructions oscillate between telling respondents that they are generally "seeking an injury lawyer's help" and that they are trying to reach the Texas Hammer ***specifically***. For instance, the initial survey instructions state, in relevant part:

> *For purposes of this survey and the questions to follow, we want you to assume that you have decided* **to seek information on or shop for the services of a personal injury attorney**…
>
> **You have heard of an attorney that uses the name "The Texas Hammer," so you do a Google search on your mobile telephone for that attorney.** *The Google search produces results on your mobile telephone that are shown on the next screen. Please click the "Continue" button when you are ready to review the search results. After you have reviewed the search results* **indicate which ad, if any, you would respond to.…"**[9]

On the screen that included either the test or control stimulus, respondents were then instructed:

> *"Click the ad below to indicate which result you would choose* **to obtain those services."**[10]

But neither this question nor the instructions on the previous page unambiguously define "those services." As a result, these instructions are both contradictory and ambiguous. They are contradictory because they transition between instructing respondents that they are seeking information about or shopping for services of any "personal injury lawyer" and instructing respondents that they are searching for "the Texas Hammer" specifically. They are also ambiguous because, while Jim Adler is an injury attorney, seeking information about or shopping for services of a personal injury lawyer could mean seeking help from Jim Adler *or* any other injury attorney.

The contradiction and ambiguity in Dr. Stewart's instructions are both fatal to the survey because, in reality, the ad for Quintessa also connect potential clients with personal injury lawyers. As such, if respondents were to focus on the initial instructions – which instruct respondents to simply seek information about or shop for the services of a personal injury lawyer – then clicking on the ad for Quintessa would be a correct and valid choice.

Notably, the instructions never explicitly tell respondents that they are trying to contact or retain "the Texas Hammer" specifically. In order to understand that they are supposed to be trying to reach only Jim Adler, respondents would have to recall the precise wording of the instructions on the

---

[9] App. 126 (Stewart Report at Exhibit C, p. 12 (emphasis added)).
[10] App. 127 (Stewart Report at Exhibit C, p. 13 (emphasis added)).

previous page, to which they were not permitted to return. Simply put, clicking on a link that would allow respondents to gather information about or shop for the services of connect "a personal injury attorney" is a very different task than selecting a link that would connect someone with Jim Adler. Dr. Stewart instructed respondents to do both. Because of the multiple interpretations available to respondents, there is no way to tell from a respondent's ad selection whether they were actually confused.[11]

### E.    The Court Should Exclude Dr. Stewart's Survey Because the Probative Questions are Leading and Suggestive.

Dr. Stewart's survey is critically flawed because the Probative Questions are leading and suggestive. Leading and suggestive questions are problematic in surveys because they lead to acquiescence response bias. Acquiescence response bias is a measurement error introduced into a survey when respondents agree to or passively accept a proposition offered by the question.[12] According to Shari Diamond's Reference Guide on Survey Research:[13]

> [o]ne form of closed-ended question format that typically produces some distortion is the popular agree/disagree, true/false, or yes/no question. Although this format is appealing because it is easy to write and score these questions and their responses, the format is also seriously problematic. With its simplicity comes acquiescence, '[T]he tendency to endorse any assertion made in a question, regardless of its content.'[14]

Courts have recognized that the presence of acquiescence bias is misleading and artificially inflates the rate of agreement to questions like the ones contained in Dr. Stewart's survey.[15] And survey

---

[11] To evaluate actual confusion, one would have to rely on the respondents' answers to the Probative Questions (although the Probative Questions are also seriously flawed, as discussed *infra* at Section III.E). Yet Dr. Stewart did not do so. Rather, Dr. Stewart based his conclusions regarding net confusion levels solely on respondents' initial ad selection in the stimulus. *See* App. 280-281(Stewart Depo. at 125:18-126:10)

[12] Holbrook, Allyson. "Acquiescence Response Bias", *Encyclopedia of Survey Research Methods*, Paul J. Lavrakas, Editor, SAGE Publications, Inc., Thousand Oaks, CA, 2008)

[13] Notably, Dr. Stewart cites to the Reference Guide on Survey Research in his own report and agreed in his deposition that it is a credible authority in survey methodology. *See* App. 283 (Stewart Depo. at 150:3-14).

[14] *See* Diamond, Shari Seidman. Reference Guide on Survey Research, *Reference Manual on Scientific Evidence, Third Edition*. Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council, p. 394.

[15] Seidman Diamond, Shari. 2022 "Control Foundations: Rationales and Approaches." pp. 342-361 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Second Edition, edited by Shari S. Diamond

research has shown that acquiescence response bias is a systematic source of bias that has produced an inflation effect of 10% across a number of studies.[16]

Numerous courts have also held that leading and suggestive questions can make a survey unreliable and inadmissible. "A survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." *Scott Fetzer Co.*, 381 F.3d at 488 (finding that "[n]o reasonable jury could view the proffered survey as evidence of confusion among relevant consumers" in part due to the survey's leading and suggestive questions); *see also Universal City Studios, Inc.*, 746 F.2d at 118 (survey was inadmissible where it utilized an improper universe and asked leading and suggestive questions); *Leelanau Wine Cellars Ltd.*, 502 F.3d at 518 (affirming district court's refusal to afford survey significant weight where the survey questions were suggestive and misleading). In *Scott Fetzer* the leading question was similar to what was asked in Dr. Stewart's survey: Respondents were shown an ad for the defendant and were asked whether the defendant was "in any way affiliated with, connected with, associated with or authorized by" the plaintiff's company. *Id.* at 487–88 (internal quotation marks omitted); *see also Universal City Studios, Inc.*, 746 F.2d at 118 ("To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" (internal quotation marks omitted)); *IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F.Supp.2d 815, 831 (E.D.Va.1998) ("Do you think there is any connection between (BAILEYS Irish Cream/BAILEYS liqueur/BAILEYS alcohol, if mentioned) and Bailey's cigarettes?" (internal quotation marks omitted)); *see generally* sharSharTHY ON TRADEMARKS § 32:175 ("In the author's view, it is not improperly leading to present the

---

and Jerre B. Swann. American Bar Association, Section of Intellectual Property Law, p. 344. *See also Water Pik, Inc.,* 726 F.3d at 1148 ("By suggesting the possibility that SinuSense might be connected with another brand, and limiting the candidates to SinuCleanse and NeilMed, the survey questions risked sowing confusion between SinuSense and SinuCleanse when none would have arisen otherwise. The district court could reasonably conclude that the question suggested the very answer most helpful to Med–Systems' cause rather than eliciting responses as they might occur spontaneously in the marketplace.").

[16] Jon A. Krosnick, Survey Research, 50 *Ann. Rev. Psychol.*, 537, 552 (1999).

respondent with a fair and accurate representation of the contesting marks and ask in a neutral manner if the respondent thinks there is or is not some connection, affiliation or sponsorship relation between the owners of the marks—or that the respondent doesn't know…. However, it will probably be improperly leading to suggest the desired response in the form of a yes or no question.").

Dr. Stewart agreed in his deposition that survey questions should not be leading. *See* App. 284 (Stewart Depo. at 158:14-22) ("I agree that [questions posed to respondents] should not be leading … And it's important that questions not suggest an answer, which would be a leading question…"). However, despite his agreement with this maxim, Dr. Stewart structured both his probative closed-ended questions (Q1, Q2, and Q3) and open-ended questions (Q1A, Q2A, and Q3A) in a leading and suggestive manner. With respect to the closed-ended questions, each question suggests an affirmative link between the test and control stimulus without also suggesting that there may not be a link or that the respondent may not know if there is a link. Further Dr. Stewart emphasized the suggestion that there may be an affirmative link between the test and control stimulus by including the affirmative suggestion in bold and underlined font:

> Q1. Thinking about the ad you selected, do you think this advertisement is **put out by the same personal injury attorney for which you were searching?** If you don't know, feel free to say so.
>
> Q2. Now thinking about the ad you selected, do you think the services being advertised **are likely affiliated, associated or connected with the personal injury attorney for which you were searching?** If you don't know, feel free to say so.
>
> Q3. Now thinking about the ad you selected, do you think the services being advertised **are likely to have the authorization, approval or endorsement of the personal injury attorney for which you were searching**? If you don't know please feel free to say so.

App. 128-144 (Stewart Report at Exhibit C, pp. 14-31) (emphasis in original).

Dr. Stewart should have asked these questions in a neutral manner by presenting respondents with all three potential answers in the body of the question, such as: From what you know, do you think the company you selected (clicked on) **is or is not** put out by the same personal injury attorney

for which you were searching, **or you do not know**? The bold and underlined font should have been used to emphasize the three different potential answers, not just the affirmative link that is suggested in the questions.

Dr. Stewart's Probative Questions were also inappropriately leading because, in those questions, Dr. Stewart first reminded respondents that they had already answered the prior question in the affirmative before asking them to explain their answer (*i.e.* "Q.1a. You indicated that the ad is **likely to be put out by** the same personal injury attorney for which you were searching. Why do you think this? Please be as complete as possible, as it will help us understand your answer."). *Id.* at 7 (emphasis in original). By first reminding respondents (in bold font) that they had already provided an affirmative answer, respondents would be more likely to try to justify their prior answer than provide an honest explanation, admit to guessing, or admit to a mistake. Dr. Stewart's departure from the standard survey methodology of asking neutral questions is inappropriate and his conclusions regarding net confusion are flawed and likely overstated due to acquiescence response bias.

**F.    The Court Should Exclude Dr. Stewart's Survey Because He Failed to Analyze the Data, Which When Properly Adjusted is Not Probative of Any Likelihood of Confusion.**

This Court should exclude Dr. Stewart's survey and report because he failed to analyze the answers submitted by respondents to explain the basis for their purported confusion. Dr. Stewart's failure to consider the explanatory answers caused his survey to vastly overstate the amount of legally relevant confusion. *See Mary Kay, Inc. v. Weber,* 601 F. Supp. 2d 839, 849 (N.D. Tex. 2009) (excluding portions of survey results that were "bald assertions" of confusion and explaining generally that the interviewees' explanations of their confusion must be considered); *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (rejecting survey purporting to show confusion where expert counted respondents as confused even when respondents did not articulate a legally meaningful reason why they believed that a junior mark and senior mark were associated with

one another), *aff'd without op.*, 57 F.3d 1062 (2d Cir. 1995). As Judge Fish stated in *Mary Kay Inc,* the "legally irrelevant confusion must be weeded out before the evidence can be presented to the jury." *Id.* The same is true here.

Although Dr. Stewart collected data regarding respondents' answers to the Probative Questions, he did not include this data in his findings regarding the overall net confusion level in his report; instead, he simply counted as "confused" any respondent who initially clicked on the ad for Quintessa, **even if they indicated no confusion or legally irrelevant confusion in response to the Probative Questions**. *See* App. 280-281(Stewart Depo. at 125:18-126:10).[17] For example, Dr. Stewart counted respondents as confused where they entered gibberish or nonsensical answers, such as the ones below, in response to open ended questions:

- "Fggdhu fghut fgjytg fghbgbb"[18]

- "Yes"[19]

- "Just because"[20]

- "Google listens in on me"[21]

Dr. Stewart also counted respondents as confused even where their responses to the open-ended questions indicated that they understood exactly what type of company Quintessa is:

- "The link says it is a legal center. It could be a company who contracts lawyers so that people can go through their services or that may have a registry for lawyers they support/promote."[22]

- "It's a helpline. It's probably linked to several attorneys"[23]

---

[17] Strangely, Dr. Stewart testified that he conducted an analysis that would have allowed him to state the number of respondents that selected Quintessa's ad and answered "yes" to one of the three Probative Questions, but for some reason he chose not to include that number or analysis in his report. 282 (Stewart Depo. at 127:7-17).
[18] *See* App. 215 (Stec Report at 38).
[19] *Id.*
[20] *Id.*
[21] *See* App. 287 (TexasAccident33157B_Legal_IV_Dat_062320).
[22] *Id.*
[23] *Id.*

- (After answering yes to Q.2, which asks whether the ad selected is "likely affiliated associated, or connected with the personal injury attorney for which you were searching") "Well no i guess not. Not specifically with the one i was looking for. But a personal injury lawyer."[24]

In disregarding respondents' answers to the Probative Questions, Dr. Stewart significantly inflated the level of confusion by incorrectly including customers who correctly chose ads (*i.e.*, the Quintessa ad) that would allow them to seek the help of an injury attorney and indicated in their responses that they were not confused. He also incorrectly included people who seemed to have guessed (by either directly saying so or by providing non-responsive answers to questions Q1A, Q2A, or Q3A). In other words, Dr. Stewart failed to weed out the legally irrelevant confusion.

Dr. Stewart's decision to ignore respondents' answers to the Probative Questions is a significant deviation from the standard methodology for evidentiary surveys. As Dr. Jacoby states in his treatise, "confusion surveys typically ask separate questions to determine whether respondents were (1) confused as to source or origin, (2) confused as to connection or relationship, or (3) confused as to sponsorship or authorization. The percentages for each type of confusion are then cumulated to arrive at an estimate of "overall likely confusion."[25]

Dr. Stewart's approach is fundamentally flawed because the likelihood of confusion, which is what his survey purports to test, is based entirely on consumers' perception. That is, the critical question for relevant confusion is not whether someone might click on the ad for Quintessa for any reason, but whether they did so *because* they thought that the ad was put out by the same law firm as the Texas Hammer, affiliated with the Texas Hammer, or with the permission of the Texas Hammer. It is imperative that a survey weed out legally irrelevant confusion because, as the Fifth Circuit has made clear, "not all confusion counts." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440,

---

[24] *See* App. 287 (TexasAccident33157B_Legal_IV_Dat_062320).
[25] Jacoby, J. (2013). Trademark Surveys Volume 1, Designing, Implementing, and Evaluating Surveys. US: American Bar Association, p.897.

457 (5th Cir. 2017). "[E]vidence of actual confusion *must* show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed *and* it swayed consumer purchases." *Id.* (emphasis added).

Additionally, in his report, Dr. Stewart explicitly draws conclusions specifically about the cause of respondents' confusion and their perception as to the relationship between Quintessa and the Texas Hammer:

> These results provide strong evidence that a substantial number of consumers are likely confused when confronting Accident Injury Legal Center's advertisement *as to the relationship between Accident Injury Legal Center and the law firm doing business as "The Texas Hammer."*

App. 20 (Stewart Report at 18 (emphasis added)).

However, Dr. Stewart's net confusion level of 44% ignores respondents' answers to the Probative Questions; as such, Dr. Stewart has no reliable basis to render an opinion as to the cause of respondents' purported confusion, that is, *why* respondents clicked on the Quintessa ad.

In order to offer an opinion as to *why* respondents clicked on the Quintessa ad, Dr. Stewart would have had to account for responses to the Probative Questions in his net confusion analysis. But, when properly adjusted, Dr. Stewart's data demonstrates net confusion far below the numbers that Dr. Stewart includes in his findings. When isolating net confusion levels to those respondents who indicated that their confusion was somehow related to the name of the Texas Hammer in their open-ended responses to Q1a, Q2a, and Q3a, - *i.e.* legally relevant confusion – Dr. Stewart's survey shows net confusion level of **0.5%** for legally relevant source confusion, **0.5%** of legally relevant sponsorship confusion, and **0%** legally relevant confusion affiliation confusion.[26]

Notably, these confusion levels are well below any threshold that is probative of a likelihood of confusion. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1149 (10th Cir. 2013) ("Net confusion

---

[26] *See* App. 214 (Stec Report at 37).

rates of 6.5%...do not create a genuine factual issue of likelihood of confusion.") (*citing 1–800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246–49 (10th Cir. 2013) (net confusion rates of 7.5% and 7.3% not indicative of likelihood of confusion)).[27] Because Dr. Stewart's analysis regarding net confusion fails to account for responses to the Probative Questions, his opinions are unreliable and should be excluded.

## G.   The Court Should Exclude Dr. Stewart's Survey for the Reasons Stated in the Expert Report of Dr. Jeffrey A. Stec.

In addition to the reasons stated above, the Court should exclude Dr. Stewart's survey for all of the reasons discussed in Dr. Stec's expert report, which is submitted with this Motion to Exclude. Those reasons include:

- **Dr. Stewart's Survey Suffers from Question Order Effect Bias**. Dr. Stewart failed to randomize the order in which respondents saw the advertisements that were presented to them, as well as the questions and answers that he used throughout this survey. Dr. Stewart testified that he made no effort to determine the frequency with which Quintessa ads appear above Adler's ads, or vice versa, in the real marketplace. Moreover, he testified that order in which the ads most commonly appear in real life did not matter to his survey design. *See* App. 269-274 (Stewart Depo. at 59:2-64:17). Instead, Dr. Stewart deliberately placed the Quintessa advertisement at the top of the search results page for every respondent. This strategic choice by Dr. Stewart introduced the phenomenon of question order effect bias occurs when the order of questions or the order of answers alters the way in which a respondent answers a question or a series of questions. The relative position of questions or answer choices in a survey may uniquely influence the way in which a respondent answers the questions. *See* App. 193-194 (Stec Report at 16-17). Dr. Stec also explains that Dr.

---

[27] *See also Mini Melts Inc. v. Recklitt Benckiser LLC*, 118 U.S.P.Q.2d 1464, 1477, 2016 WL 3915987 (T.T.A.B. 2016) (Survey percentages of between 7% and 8.5% support the position that there is no likelihood of confusion.); *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358, 220 U.S.P.Q. 386 (7th Cir. 1983) ("The remaining question is whether the district court was correct in holding that a 7.6% confusion finding weighs against infringement. We hold that it was. Kraft has pointed to no case in which a 7.6% figure constituted likelihood of confusion."); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305 (S.D.N.Y. 2000) (5% held "virtually indistinguishable" from the control group, not indicative of likelihood of confusion); *Newport Pacific Corp. v. Moe's Southwest Grill, LLC*, No. 05-995-KI, 2006 WL 2811905 (D. Or. 2006) (14% confusion result is "barely above McCarthy's threshold that confusion results below 10% are evidence that confusion is not likely."); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1248–1249 (10th Cir. 2013) ("We are not persuaded … that surveys showing confusion as low as 7% can by themselves sustain a finding of likelihood of confusion."); *Wuv's Intern., Inc. v. Love's Enterprises, Inc.*, 208 U.S.P.Q. 736, 756, 1980 WL 30296 (D. Colo. 1980) (9% results; no likelihood of confusion proven).

Stewart introduced order effect bias into his survey by failing to rotate the response options to his close ended questions in the main survey. *See id.*

- **Dr. Stewart Failed to Implement an Experimental Design.** An experimental design in survey research is the use of two (or more) groups that complete the same survey design and questionnaire, except for different stimuli presented to respondents, which allows for the survey researcher to specifically test for the effect of the change in the stimulus. Dr. Stewart did not implement an experimental design in his survey. Instead, he included an additional search result in the Google search results to act as a control. However, Dr. Stewart did not apply any control to his assessment of source; association or affiliation; or authorization, approval, or endorsement confusion. Courts have recognized the absence of a control is a fatal weakness of a survey.[28] Given that Dr. Stewart's survey failed to implement an appropriate experimental design, the results of his survey cannot be used to determine if a likelihood of confusion exists in the market. *See* App. 198-199 (Stec Report at 21-22).

- **Dr. Stewart Misspecified the Target Population.** The appropriate target population for a survey assessing the likelihood of forward confusion is purchasers and potential purchasers of the junior user's products or services bearing the infringing mark. The target population for Dr. Stewart's survey "was defined as consumers 18 years of age or older who reside in the state of Texas and who indicated they had previously used the service of a personal injury attorney or would consider using such services in the future if they sustained an injury." However, only 10% of his sample is from customers that had previously used the services of a personal injury attorney. The other 90% is composed of the respondents that would consider hiring a personal injury attorney in the future if they sustained an injury. Dr. Stewart does not explain why he only collected 10% of past purchasers and 90% of potential purchasers. Additionally, the close ended and leading manner in which Dr. Stewart asked the screening question allowed a respondent to identify the answer they needed to enter the survey and receive the incentive they would earn for completing the survey. *See* App. 202-204 (Stec Report at 25-27).

- **Dr. Stewart Placed Improper Focus on the Accused Advertisement.** Dr. Stewart's survey stimulus artificially increased the size of the Quintessa advertisement so that it appeared larger on the image of the search engine results than either of the other two ads. Dr. Stewart also improperly differentiated the Quintessa ad by making it the only click-to-call ad option in the search results with no apparent basis for doing so. *See* App. 209-210 (Stec Report at 32-33). "By increasing the size of the accused advertisement he was testing, differentiating that advertisement from the others, limiting the search results to only three advertisements, and always presenting the accused advertisement first, Dr. Stewart's result of 47% of respondents selecting Accident Injury Legal Center when asked to look for 'The Texas Hammer' is clearly overstated and cannot be relied upon." *Id.* at 33.

---

[28] *See* App. 199 (Stec Report at 22, FN 71) (collecting citations to treatises and supporting cases).

- **<u>Dr. Stewart Placed Respondents in an Incorrect and Misleading Scenario</u>**. After clicking the link in Dr. Stewart's version of a Google search result for "The Texas Hammer," respondents were instructed that they had automatically placed a call and the person answering the call "identified itself as the intake department for the law firm." *See* App. 210 (Stec Report at 33). This instruction is both incorrect and misleading, given that the uncontroverted evidence in this case is that Defendants' call center agents identify themselves as "the intake department," but not as "the intake department *for a law firm*." *Id.* By including the additional phrase "intake department *for a law firm*" Dr. Stewart failed to replicate market conditions, which makes his survey unreliable.

- **<u>Dr. Stewart Improperly Introduced the Subject of his Survey</u>.** In the fourth question of Dr. Stewart's survey, he asked respondents, "[h]ave you participated in a survey about attorneys or legal services in the past three months?" By doing this, Dr. Stewart indicated the subject matter of the survey before the respondent entered the main portion of the survey. Introducing the subject matter of the survey in the screener is inappropriate because it likely introduced bias into the survey by creating a sample of respondents that are more likely to be interested in attorneys or legal services and knowledgeable in that regard. This introduction of potential bias was completely avoidable since this screening question could have been asked at the end of the survey.

These and other serious flaws in Dr. Stewart's survey are cumulative. Thus, while several of these flaws are fatal in their own right, at a minimum, they render Dr. Stewart's survey unreliable when considered in their totality. *See Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02-cv-3691 (DLC), 2004 WL 326708, at *10 (S.D.N.Y. Feb 23, 2004) (excluding a survey based upon the cumulative effect of flaws in the methodology that "diminish[ed] its relevance in predicting actual confusion ... such that the potential for the Survey's results to prejudice unfairly, to confuse, and to mislead the jury substantially outweighs any limited relevance"). For the reasons stated above, this Court should exclude Dr. Stewart's Report and survey evidence.

## IV.    CONCLUSION

Dr. Stewart's survey is unreliable and, therefore, inadmissible. For all of the reasons stated herein, Defendants respectfully request that this Court grant Defendants' motion and exclude Dr. Stewart's report, survey, and testimony from trial.

DATE: January 13, 2023

Respectfully submitted,

*Christopher J. Schwegmann*
Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
Rebecca L. Adams
State Bar No. 240298255
radams@lynnllp.com
Barira Munshi
State Bar No. 24095924
bmunshi@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile:  (214) 981-3839

**ATTORNEYS FOR DEFENDANTS
MCNEIL CONSULTANTS, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER,
QUINTESSA MARKETING, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER and
LAUREN VON MCNEIL**

## CERTIFICATE OF CONFERENCE

Counsel for Defendants have complied with the meet and confer requirement in Local Rule CV-7.1(b). A personal telephonic conference was conducted between myself and Plaintiffs' counsel Jered Matthysse on January 9, 2023. Plaintiffs are opposed to the requested relief. The issues in this Motion have conclusively ended in an impasse, leaving an open issue for the Court to resolve.

*/s/ Rebecca L. Adams*
Rebecca L. Adams

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, a true and correct copy of the foregoing was served via the Court's electronic filing system upon all counsel of record.

*Christopher J. Schwegmann*
Christopher J. Schwegmann

26