IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | No. 3:19-cv-2025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | **FILED UNDER SEAL** |
| QUINTESSA MARKETING, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| and LAUREN VON MCNEIL, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jim S. Adler, P.C. and Jim Adler have filed a Motion for Sanctions for Spoliation of Evidence, *see* Dkt. No. 72-2 (the "Spoliation Sanctions Motion"), "and ask the Court to sanction Defendants [McNeil Consultants, LLC d./b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren Von McNeil (collectively, "Defendants" or "Quintessa")] for their failure to preserve critical evidence for over two years, all during this litigation," *id.* at 5.

As remedies for Defendants' alleged spoliation, Adler asks the Court to order that:

1. "Defendants are deemed to have admitted that they caused substantial instances of confusion among an appreciable number of consumers searching for Adler online and that Defendants took no action to address the ongoing confusion";

2. "Plaintiffs are entitled to an adverse-inference instruction, the language of which will be determined at the jury-charge conference or another appropriate time;"

3. "Defendants' equitable defenses are stricken"; and

4. "Adler is entitled to an award of attorney's fees incurred in connection with the [Spoliation Sanctions Motion], in an amount to be determined upon supplemental briefing as ordered by the Court."

Dkt. No. 72-19 at 1; *accord* Dkt. No. 72-2 at 21-23.

Defendants filed a response, *see* Dkt. No. 77, and Adler filed a reply, *see* Dkt. No. 115.

For the reasons and to the extent explained below, the Court grants in part and denies in part the Spoliation Sanctions Motion [Dkt. No. 72-2].

## Background

The parties and the Court are familiar with the background of this case, so the Court will not repeat it here. *See, e.g.*, *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422 (5th Cir. 2021).

In the Spoliation Sanctions Motion, Adler contends that

[t]he central issue in this lawsuit is Defendants' use of Adler's trademarks as keywords to confuse Adler's existing and potential clients into calling Defendants instead. As part of their bait-and-switch scheme, Defendants keep Adler's clients confused as to Defendants' affiliation with Adler, while trying to convince the victims to hire a competing law firm. Despite the obvious significance of such evidence, Defendants:

    (1)    did not even begin to preserve the hundreds if not thousands of call recordings of confused clients trying to reach Adler until late 2021;

(2)     took no steps to preserve Slack messages exchanged by
        their employees during the intake process; and

(3)     permanently deleted the email account of Jason Love –
        Director of Intake for Defendants' call center – after he left
        the company in December 2021.

This loss of evidence was not simple negligence. Defendants
admit that, from the time this lawsuit was served in September 2019
through at least the Fifth Circuit decision in August 2021, they made no
effort whatsoever to preserve any documents. At the same time,
Defendants' owner Lauren Mingee told her employees that Defendants
had won the lawsuit. Defendants cannot credibly explain their failure to
maintain years of call recordings or Slack messages, nor their deletion
of Love's email account over two years after Adler filed suit and after
Adler served discovery requests. This pattern of conduct – spoliating
some of the most direct proof of the confusion and harm caused by
Defendants' unlawful scheme while falsely telling employees the case
had ended – shows Defendants' bad faith.

To remedy Defendants' abuse of the judicial process, the Court
should: (1) enter a deemed factual admission against Defendants
regarding confusion during the spoliated period; (2) issue an adverse-
inference instruction to the jury about Defendants' spoliation; (3) strike
Defendants' equitable defenses; and (4) award Adler his reasonable
attorneys' fees incurred in connection with this issue.

Dkt. No. 72-2 at 6.

As factual background, Adler explains that

Defendants call themselves a "legal lead generation" company.
However, Defendants' business is far more predatory and troubling than
the label suggests.

Defendants use search-engine marketing techniques to capture
and redirect online traffic from persons conducting a search on their
mobile device. Specifically, Defendants target auto-accident victims
searching on their phones for well-known personal injury law firms,
including Adler's firm. Defendants conduct their scheme by purchasing
the trademarks and brand names of well-known personal-injury firms
as search-engine keywords. For example, Defendants purchase "Jim
Adler" as a Google keyword. As a result, an accident victim or existing
client looking up "Jim Adler" on their phone may instead be shown a
paid Google ad for Defendants.

Defendants' resulting ads use only generic, non-branded ad copy
like "Texas Car Accident Lawyers" and "Get The Money You Deserve!
Let Us Fight On Your Behalf." This language, by design, encourages an

affiliation with the personal injury firm the accident victim was trying to reach (in this case, Adler). Further, unlike most Google search ads, Defendants' mobile ads do not link to a branded website; instead, they use a "click to call" or "call only" mechanism. When the accident victim taps the ad on their mobile device, it brings up a prompt to automatically call a phone number belonging to Defendants. The prompt does not identify who the number belongs to and contains no information other than an unidentified number. These calls go to Defendants' intake center.

….

When an accident victim calls Defendants through one of Defendants' "click to call" or "call only" Google ads, Defendants' intake specialists are trained to further confuse the victim and steer them away from the law firm they were trying to reach (in this case, Adler) and toward competing firms with whom Defendants have referral arrangements. Specifically, when victims ask whether they have reached the Adler firm, Defendants' script instructs their intake specialists to respond: "This is the intake department, are you calling in regards to a new case or an existing case?" Rausa Decl. ¶ 4, Ex. 3. If pressed further, Defendants' intake specialists are instructed to repeat that the victim has reached "the intake department" and, if the confused victim is an existing client of another law firm, urge them to accept a second opinion from one of Defendants' competing law firms. [Mike Walker, Defendants' Chief Operating Officer, confirmed this at his deposition. *See* Rausa Decl. ¶ 5, Ex. 4 ("Walker Dep.") at 95:18-22 ("Q. And if someone asked again, but is this the Adler law firm, the call center agent was instructed to say, sir/ma'am, this is the intake department, correct? A. Yes.").] Confused accident victims, believing they reached Adler, then share personal information and details about their accident with Defendants' intake specialists, ███████████ ███████████████████████████████████████████ *See* Rausa Decl. ¶ 6, Ex. 5 ("Love Dep.") at 133:15-134:11; *see also* Walker Dep. 117:9-118:10. [The script instructs intake specialists to move quickly in obtaining information about an accident: "get the [date of incident], injuries/treatment, liability, and insurance in 2 min[utes] and continue call." *See* Rausa Decl., Ex. 3.]

Asked why Defendants' intake specialists are taught to answer the phone this way, Defendants' owner Lauren Mingee claimed that "intake department" is a "d/b/a" for Quintessa. Mingee admits that such a greeting could be confused as the intake department for a law firm (such as Adler's firm), but when asked about that risk of confusion, she testified that it would be addressed only "if that concern was brought up" by the caller. Defendants do not instruct their intake specialists to

-4-

plainly answer "No" when a caller asks whether they are the intake department for Adler or any other specific firm. Defendants' owner Mingee claimed that such a "blanket statement" would be inappropriate, and she has repeatedly "refused" to issue that instruction.



As a result of Defendants' Adler keyword purchases and misleading tactics, accident victims have signed retainers with Defendants on the mistaken belief that they were engaging Adler, typically without ever being told otherwise. *See, e.g.*, *id.* 293:14-18; Rausa Decl., Ex. 6 (Dep. Ex. 39) (discussing an instance in which "the signed client thought he had hired Adler even after signing a retainer [with Defendants] and being warm transferred to [Defendants' referral firm]"). Defendants' referral firms have complained to Defendants about receiving retainers for clients looking for or already engaged with Adler. *See, e.g.*, *id.* 302:24-303:6; Rausa Decl., Ex. 6 (Dep. Ex. 40) (email to Defendants from a referral firm: "I'm on the phone with [client] who is advising she signed with Jim Adler and was set up with treatment at a clinic today. She's not sure how she was referred to us, but she is currently signed with Adler."). And on multiple occasions, Defendants' referral firms have told Defendants that their intake process is misleading and unethical. *E.g.*, *id.* 330:20-331:13; Rausa Decl., Ex. 6 (Dep. Ex. 51) (advising Defendants that referred clients were "currently still under the representation of Jim Adler" and that Defendants' actions were "unethical"); *id.* 336:6-22 (advising Defendants that their intake specialists "deliberately misled" the victim into believing he was signing with Adler).

Dkt. No. 72-2 at 7-10 (cleaned up).

Adler explains that "[t]he spoliated evidence [at issue] includes three categories of materials – call recordings (including ones made during this litigation)

from confused victims who were trying to reach Adler; Slack messages exchanged by Defendants' intake employees during those calls; and emails sent to and from Defendants' Director of Intake, who managed the call center and intake specialists during that time":

> ***Call Recordings:*** Since 2016, Defendants' call center has received its incoming phone calls through a "Voice Over IP" (VoIP) software called Talkdesk. The Talkdesk software automatically records every incoming call.
>
> In their sworn written interrogatory responses, Defendants claimed that Talkdesk keeps call recordings "in the regular course of business for 13 months." Rausa Decl. ¶ 8, Ex. 7 (Def's Resp. to ROG No. 11). The artful drafting of this response implies – but is careful not to actually say – that this 13-month preservation period is controlled by Talkdesk. During her deposition, however, Defendants' owner admitted that they can change a setting on Talkdesk to preserve the call recordings for longer. Mingee also admitted that Talkdesk allows Defendants to download call recordings for permanent offline storage.
>
> Despite having each of these two simple preservation options available, Defendants failed to preserve Adler-related recordings for roughly two years after being served with this suit. Specifically, Defendants have admitted that they failed to preserve the recordings from service of this lawsuit in September 2019 until, at the earliest, the Fifth Circuit decision in August 2021. Thus, Defendants did not produce any call recordings from 2016 through 2020, even though Talkdesk automatically recorded each of those incoming calls. [Defendants have not explained why an appellate decision from the Fifth Circuit – rather than the filing and service of this lawsuit two years prior – would be the appropriate time for Defendants to start complying with their legal and ethical obligation to preserve relevant evidence.]
>
> Defendants admit that at least some of the deleted call recordings came from accident victims looking for or already engaged with Adler. *See* Mingee Dep. 254:7-255:6; *id.* 264:25-265:24 (caller from July 2020 asking Defendants whether they were "from Jim Adler" because the caller "thought they signed with Adler"); Rausa Decl., Ex. 6 (Dep. Ex. 23) (caller from August 2019 claiming they were "referred by Jim Adler"). Corroborating this admission, documents produced by Defendants revealed many instances of callers expressing confusion during calls for which the recordings were deleted. *See, e.g., id.* 264:25-266:24 (confusion in 2020); *id.* 268:19-269:9 (same); *id.* 275:22-276:9.

While the exact number of deleted call recordings cannot be known, the answer is likely in the hundreds if not thousands. Defendants' documents show that their intake center received nearly 15,000 calls stemming from their purchase of the Adler Marks as keywords. *See* Rausa Decl. ¶ 9, Ex. 8 (Leathers Report). Defendants have produced summaries of about 1,600 of those calls in which Adler was specifically named or discussed. *See* Rausa Decl. ¶ 10, Ex. 9 ("Quintessa Dep.") at 61:15-65:5; *see id.* 63:12-16 ("Q. And so these are examples of instances in which someone -- a PC called into Quintessa and either mentioned Jim Adler or the Texas Hammer or was looking for Jim Adler, the Texas Hammer, correct? A. Correct."). Once Defendants began complying with their duty to preserve call recordings sometime in late 2021, they produced over 400 Adler-related calls from 2021 and January 2022 alone.

Taking these figures together, the Court can reasonably infer that hundreds, if not thousands, of recordings from September 2019 through 2020 were deleted. Defendants also failed to preserve recordings from before the lawsuit's filing – i.e., from 2016, 2017, 2018, and the first part of 2019 – which likely included several hundred (if not thousands) more Adler-related calls.

***Slack Messages:*** Slack is a third-party service provider that allows users to communicate via its instant-messaging platform. *See* slack.com (last visited Dec. 18, 2022). Defendants' use of Slack is integral to their business.



Despite Slack's central role in their business, Defendants failed to preserve any Slack messages. Defendants' Chief Operating Officer testified that "Slack was searched" for responsive documents but "[i]ts recording history is like nine days." Walker Dep. 261:12-13. He further explained that, while the Slack messages could have been preserved longer, Defendants had to obtain "a paid subscription." *Id.* 261:16. Defendants declined to pay the additional cost and continue to do so, *id.* 261:17-19, despite earning more than $22 million in revenue last year, *see* Rausa Decl. ¶ 13, Ex. 12. As a result, Adler has not received any Slack messages in response to numerous discovery requests covering those materials.

The significance of this evidentiary gap cannot be overstated. Messages sent in Slack between Defendants' intake specialists and supervisors represent the most direct evidence establishing how, in real time, Defendants discussed the voluminous amount of confusion among accident victims who intended to reach Adler's law firm. According to Defendants, they received nearly 15,000 calls since 2019 from keyword ads triggered by the Adler Marks. *See* Rausa Decl. ¶ 9, Ex. 8 (Leathers Report).

And Adler's name came up in over a thousand of these calls. *See* Quintessa Dep. 61:15-65:5. It is therefore highly likely that Adler was referenced in Defendants' Slack messages. Even assuming otherwise, the absence of Slack messages referencing Adler would be highly relevant as it would show that Defendants' intake specialists failed to report numerous instances of confusion to their supervisors. Such a failure is strong evidence of Defendants' mental culpability in carrying out their unlawful scheme. *See* Love Dep. 79:15-18 ("Q. Did any [intake specialists] report instances of a caller calling in looking for a non-client law firm? A. I don't know that anybody reported it. I mean, it was known. Q. Okay. It was known that that happened at the company? A. Yes.").

***Jason Love's Email Account:*** Jason Love was Defendants' Director of Intake from June 2020 until December 2021. *See* Love Dep. 31:11-32:4, 157:21-158:2. When he was hired, his position was a "new role" within Defendants' business, in which he was tasked with "manag[ing] ... intake operations at Quintessa," "provid[ing] support to agents," and "helping them whatever way [he] could" in carrying out their job as intake specialists. *Id.* 34:7-11, 34:25-35:19.

Love had significant visibility into how Defendants' intake specialists addressed confusion among accident victims. As Director of Intake, he was "on the receiving end of ... the inbound calls" to Defendants' intake center. *See id.* 47:4-5. Love confirmed that his intake specialists received calls from victims looking for "third-party law firm[s] that [were] not a client of [Defendants]," including Adler specifically. *Id.* 70:11-71:2. He explained that intake specialists were to

"follow the script" and "advise that this is the intake department" when asked by victims if they were speaking with Adler. *Id.* 72:9-13. In discussing the scripts with Defendants' owner Lauren Mingee, "the importance" that intake specialists "stay[] on script" and "not deviate" was impressed upon him. *See id.* 37:22-38:5.

Part of Love's responsibilities involved reviewing recordings from calls with accident victims after Defendants' referral-firm clients complained that the victim had signed a retainer agreement with them believing that he/she was in fact engaging another firm, including Adler's firm. *Id.* 70:7-71:22. Love listened to such recordings involving victims who were searching for Adler specifically. *See id.* 107:6-11, 111:7-14, 115:15-25. He also confirmed that he listened to recordings where, although the victim never mentioned Adler's firm during the initial call, that victim later claimed to have believed that they were engaging Adler when they were instructed to sign a retainer agreement with one of Defendants' referral firms. *See id.* 87:10-88:18.

Love also testified that, "personally," he was concerned that Defendants' use of the generic name "intake department" might be misleading. *Id.* 67:16-25. But Defendants assured Love that their script was "within legal bounds." *See id.* 67:15-25; *see also id.* 62:16-64:6. Asked whether it "c[a]me as a surprise" when he received reports of confused victims who thought they had hired Adler after mistakenly signing a retainer agreement with one of Defendants' referral firms, Love answered "No," because he "had heard [of] that before." *Id.* 111:15-20.

As Director of Intake for Defendants' call center, Love's email account would have been a significant source of evidence supporting Adler's claims. Any doubt on that point is resolved by his deposition testimony. Nevertheless, Love's email account was permanently deleted in December 2021, after Adler served discovery requests. Defendants' Chief Operating Officer (Mike Walker) confirmed that Love's email account was not searched because it had been permanently deleted. *See* Walker Dep. 259:15-17; Quintessa Dep. 163:15-18.

Dkt. No. 72-2 at 10-15 (cleaned up).

In response, Defendants argue that "Adler's Motion should be denied for four

reasons":

First, Defendants did not fail to take reasonable steps to preserve electronic data at the time the lawsuit was filed on August 23, 2019. Quintessa has produced over a thousand documents in this lawsuit, including: (1) 488 Talk Desk call recordings where Adler is mentioned

from 2021 to the present; (2) hundreds of emails from the custodians Lauren Mingee, Mike Walker, Wallace Kittredge, Leo Mingee, and Quintessa Intake; (3) emails to and from these custodians to and from Jason Love, (4) intake logs of all calls from 2018 to the present where Adler is mentioned; (5) Quintessa's intake scripts; and (6) Quintessa's bidding data as it relates to the Adler Marks. Adler never served Defendants with a litigation hold or ESI preservation letter asking Defendants to preserve the specific categories of electronic documents discussed in this motion. Until Defendants received discovery requests from Adler in November of 2021 – over two years after this lawsuit was filed – Defendants were unaware that Adler sought Talk Desk call recordings and Slack messages, which were routinely deleted automatically by the respective platforms.

Second, Adler has suffered no prejudice by the loss of this specific ESI. Adler overexaggerates the relevance and importance of the Talk Desk call recordings, but Adler has never questioned a single Defendant or Quintessa employee about any of the 488 Talk Desk call recordings that have been produced. Moreover, Quintessa produced call logs and intake records contemporaneously describing the lost calls, along with other data and emails responsive to Adler's request for records of instances of confusion. Additionally, Adler suffers no prejudice from the loss of Slack messages because Defendants do not use Slack for the purpose Adler claims (i.e., to document instances of confusion), a fact Defendants confirmed during depositions. Nevertheless, after receiving Adler's discovery requests, Defendants have diligently searched Slack for any messages relating to Adler and have found none. Finally, Adler makes hay about the inadvertent deletion of Jason Love's email account; but Defendants have produced dozens of emails with Jason Love, including from other custodians during the same time period, addressing the very information Adler claims has been lost, i.e., emails mentioning Adler.

Third, the record is devoid of any evidence establishing by a clear and convincing standard that Defendants intentionally destroyed evidence or acted in bad faith. To the contrary, the evidence shows that once Defendants became aware of the data and information Adler sought and learned that previous data was automatically and routinely deleted, Defendants immediately implemented changes to preserve all recordings moving forward. And as discussed above, Defendants produced call logs and intake records contemporaneously describing the content of the calls during the same time period further underscoring Defendants' lack of intent to destroy or deprive Adler of relevant evidence.

Finally, the sanctions and remedies Adler seeks are extreme, disproportionate, and inappropriate, especially in the absence of any bad

faith by Defendants. Adler seeks sanctions beyond those permitted under Rule 37(e)(2), and which courts within this district are reluctant to order.

Dkt. No. 77 at 5-6 (emphasis removed).

As factual background, Defendants explain that

Adler filed this lawsuit on August 23, 2019. Prior to initiating this lawsuit, and to date, Adler never served an ESI preservation letter or litigation hold letter to Defendants. On January 22, 2020, well before the service of any discovery, Defendants filed a motion to dismiss. Docket No. 25. On August 10, 2020, the Magistrate Judge issued a Findings, Conclusions, and Recommendation of the United States Magistrate Judge, granting Defendants' Motion to Dismiss. Docket No. 32. The District Judge accepted the Findings, Conclusions, and Recommendations on August 29, 2020, and dismissed the action. Docket No. 35.

      Adler appealed on September 10, 2020. Docket No. 37. Nearly one year later, on September 1, 2021, the Fifth Circuit reversed, vacated, and remanded the case back to this Court. Docket No. 39. The Court entered the Initial Scheduling Order on November 20, 2021, Docket No. 45, and on November 11, 2021, Adler served his first set of written discovery.

      Adler spends a gratuitous amount of his Motion discussing argumentative "facts" which are largely irrelevant to the issue of spoliation and sanctions issues at hand. Defendants instead provide the Court with a brief overview of the substantive question in this case: Does bidding on a branded keyword in search engine advertising, such as Google Ads, constitute trademark infringement?

      Google does not think so. Neither does the State Bar of Texas. Nevertheless, Adler has sued Quintessa for exactly this reason. Critically, Adler does not allege that any of Quintessa's advertisements contain or use Adler's branded terms. The advertisements at issue do not reference any of Adler's Marks in the ad copy, the URL, or anywhere else in the search result. Rather, Quintessa simply participates in internet search-based advertising programs – as is commonplace among lawyers and lead generator agencies – by bidding on certain phrases or words through Google Ads that then trigger Quintessa's advertisements to appear in the top three results for individuals seeking personal injury assistance. Sometimes Quintessa bids on Adler's Marks as keywords.

      When an accident victim sees Quintessa's advertisement in response to a certain search query and clicks on the phone number in the ad, the caller is directed to Quintessa's intake center. The intake

representative then

Adler alleges that three categories of ESI have been spoliated: Talk Desk call recordings, Slack messages, and the email account for Jason Love.

**Talk Desk Call Recordings.** Talk Desk is a Voice Over IP (VOIP) platform Quintessa has used since 2016 through which it answers calls from potential clients. Talk Desk stores recordings of calls. At the time the lawsuit was initiated – and unbeknownst to Defendants – Talk Desk automatically deleted call recordings after a storing them for a period of 13 months. Notwithstanding this inadvertent loss, Defendants produced contemporaneous intake call logs from 2018 to the present describing any time Adler or "the Hammer" was referenced in a call note. Once Defendants were on notice that Adler sought Talk Desk call recordings, Defendants swiftly investigated and then rectified the issue to ensure that Talk Desk call recordings would be saved moving forward. Moreover, because Talk Desk stores call recordings for a period of 13 months, Quintessa produced recordings dating back to early 2021.

**Slack Messaging.** Slack is a messaging platform which Quintessa uses

Slack has a recording history of 9 days, which may be increased by a paid subscription.

**Jason Love's E-mails.** Jason Love was the Director of Intake for Quintessa from June 2020 until December 2021. After Love's departure from Quintessa, Love's license was removed from Quintessa's Google system and transferred to a new employee, resulting in the inadvertent deletion of Love's emails. Once Quintessa learned of the inadvertent deletion, Quintessa attempted to recover Love's emails but was unable to do. Notwithstanding this inadvertent loss, Quintessa has produced numerous emails to and from Love, as well as hundreds of emails from other Quintessa custodians during the same time period.

-12-

Adler contends that Defendant intentionally failed to preserve and destroyed in bad faith these three forms of ESI. For the reasons explained below, Defendants did not fail to take reasonable steps to preserve the lost ESI and, assuming arguendo they did, Adler is not prejudiced by the loss of this ESI nor was the loss due to any bad faith conduct by Defendants. Sanctions are thus inappropriate and Adler's Motion should be denied.

Dkt. No. 77 at 6-9 (cleaned up).

According to Defendants,

- "Adler cannot show that Defendants failed to take reasonable steps to preserve ESI in this case – information which it could not have known or predicted Adler would seek absent any ESI preservation letter or discovery requests until two years after this case was first filed."

- "But even if Defendants had a duty to preserve the ESI at issue here, Adler has incurred no prejudice from the loss of this data, nor has Adler has shown by clear and convincing evidence that Defendants acted in bad faith."

- "Finally, the sanctions and remedies Adler seeks are extreme, disproportionate, and inappropriate given the inadvertent loss of the ESI."

Dkt. No. 77 at 23-24 (emphasis removed).

In reply, Adler argues that,

[f]or over two years after this lawsuit was filed, Defendants failed to preserve and affirmatively deleted extensive evidence at the heart of the issues in dispute, including hundreds of call recordings that Defendant Lauren Mingee has repeatedly pointed to as relevant to the issue of actual confusion. In opposing sanctions, ECF No. 74-2 ("Resp."), Defendants offer conflicting arguments. They assert Adler is not prejudiced by the loss of voluminous evidence of actual confusion, yet also claim the remaining evidence supports only "de minimis" confusion. Defendants say there is no evidence the spoliation was in bad faith, while ignoring that, at the time the ESI was deleted, Lauren falsely told

-13-

her employees the "lawsuit was over" and there "wasn't anything to be concerned about."

  Nothing excuses Defendants' failure to preserve the evidence. Defendants should not be allowed to fail to preserve and actively delete some of the best evidence relevant to actual confusion and Defendants' intent, and benefit from doing so by then arguing there is insufficient evidence of actual confusion and bad-faith intent. The Court should grant Adler's motion and impose the requested sanctions, all of which are reasonable and necessary to cure the prejudice created by Defendants' spoliation.

Dkt. No. 115 at 1.

According to Adler,

- "For more than two years, Defendants disregarded their obligation to preserve highly relevant evidence."

- "That evidence is now lost, allowing Defendants to make claims about the evidence that can never be confirmed." "

- The Court should grant Adler's motion and impose the requested sanctions, foreclosing Defendants' ability to benefit from their conduct and deterring similar behavior in the future from other litigants."

Dkt. No. 115 at 10.

## Legal Standards

"The loss of electronically stored information [("ESI")] is governed by Rule 37(e), which provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

    (C) dismiss the action or enter a default judgment."

*Castro v. Wal-Mart Real Estate Bus. Trust*, ___ F. Supp. 3d ___, No. SA-21-CV-00702-XR, 2022 WL 17544339, at *3 (W.D. Tex. Dec. 8, 2022) (quoting FED. R. CIV. P. 37(e)).

"To apply Rule 37(e) sanctions, a court must determine that the following four predicate elements exist: (1) there is ESI that should have been preserved; (2) that ESI has been lost; (3) the ESI was lost because of a party's failure to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced" through additional discovery. *Cleary v. Am. Airlines, Inc.*, No. 4:21-cv-184-O, 2022 WL 5320126, at *7 (N.D. Tex. July 22, 2022) (cleaned up).

As to the first predicate element, "[a] party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015); *accord Falkins v. Goings*, No. CV 21-1749, 2022 WL 17414295, at *3 (E.D. La. Dec. 5, 2022) (explaining that Rule 37(e) "does not create a new duty; instead, it is based on a common law duty to preserve relevant information when litigation is reasonably foreseeable, so courts should consider whether and when the duty to preserve arose"); FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments ("Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve. The rule does not apply when information is lost before a duty to preserve arises."). "When the duty arises, even information subject

to routine deletion may fall within the duty's reach, requiring that the deletion process be interrupted." *Ringers Techs. LLC v. Harmer*, No. 4:18-CV-4347, 2020 WL 6385813, at *2 (S.D. Tex. Aug. 17, 2020), *rep. & rec. adopted*, 2020 WL 6384349 (S.D. Tex. Oct. 30, 2020).

If these four predicate elements exist, the Court then turns to the matter of possible remedies under Rules 37(e)(1) or 37(e)(2), which "have different requirements before sanctions can be imposed and can lead to different sanctions." *Richard v. Inland Dredging Co.*, LLC, No. 6:15-0654, 2016 WL 5477750, at *3 (W.D. La. Sept. 29, 2016).

Reading these subdivisions together, Rule 37(e)

- allows courts, under Rule 37(e)(2), "to impose certain severe sanctions for the intentional failure of a party to preserve relevant ESI, but only after a finding that the party 'acted with the intent to deprive another party of the information's use in the litigation,'" and

- "[i]f the court does not find that the spoliating party acted with an intent to deprive, but determines that the loss of ESI prejudiced another party," allows courts, under Rule 37(e)(1), to "impose lesser sanctions in the form of 'measures no greater than necessary to cure the prejudice.'"

*Castro*, 2022 WL 17544339, at *3 (citing FED. R. CIV. P. 37(e); cleaned up).

"'Prejudice' under Rule 37(e) means that a party's ability to obtain the evidence necessary for its case has been thwarted." *DR Distributors*, 513 F. Supp. 3d at 981; *see also J.S.T. Corp. v. Robert Bosch LLC*, No. 15-13842, 2019 WL 2324488, at *6

(E.D. Mich. May 30, 2019) ("'Prejudice' can be properly understood as a party's ability to obtain the proofs necessary for its case.... which is another way of saying the loss of ESI could negatively impact a party's ability to make its case, or prejudice that party because of the loss of information." (cleaned up)), *rep. & rec. adopted*, 2019 WL 2296913 (E.D. Mich. May 30, 2019).

The United States Court of Appeals for the Fifth Circuit recently explained, by quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010), that "[a] party suffers prejudice where it cannot present 'evidence essential to its underlying claim.'" *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 575 (5th Cir. 2020). The *Victor Stanley* court had further explained that "[p]rejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof" and that, "[g]enerally, courts find prejudice where a party's ability to present its case or to defend is compromised." 269 F.R.D. at 532 (cleaned up; quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010)); *accord Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011).

Rule 37(e)(1) "does not contain an 'intent' requirement; a party need not act willfully, deliberately, intentionally, or with any objective or subjective bad faith." *Richard*, 2016 WL 5477750, at *4; *accord Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2019 WL 330865, at *4 (S.D. Fla. Jan. 25, 2019) ("Intent to deprive is not a prerequisite for obtaining relief under Rule 37(e)(1). The Rule itself makes that distinction clear, and the case law recognizes the obvious difference.").

Under Rule 37(e)(1), after finding prejudice to another party from loss of the ESI, "[a] curative measure recognized by the Advisory Committee notes is barring evidence" – that is, "forbidding the party that failed to preserve information from putting on certain evidence." *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (N.D. Ill. 2021) (cleaned up).

And "[a] common curative measure courts impose is instructing the jury that it can consider the circumstances surrounding the loss of the ESI." *Id.* The Rules Advisory Committee explained in its notes to the 2015 amendments to Rule 37(e) that "[s]ubdivision (e)(2) applies to jury instructions that permit or require the jury to presume or infer that lost information was unfavorable to the party that lost it" and "covers any instruction that directs or permits the jury to infer from the loss of information that it was in fact unfavorable to the party that lost it" but "does not apply to jury instructions that do not involve such an inference." FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments. As another court has explained,

> subdivision (e)(2) would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision. These measures, which would not involve instructing a jury it may draw an adverse inference from loss of information, would be available under subdivision (e)(1) if no greater than necessary to cure prejudice. In addition, subdivision (e)(2) does not limit the discretion of courts to give traditional missing evidence instructions based on a party's failure to present evidence it has in its possession at the time of trial.

*Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at *7 (N.D. Ill. Mar. 23, 2018) (quoting FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments).

"Courts also routinely award attorney's fees and expenses under Rule 37(e), to cover the time and effort necessary to bring the issue of spoliation before the court." *BalanceCXI, Inc. v. Int'l Consulting & Rsch. Grp., LLC*, No. 1:19-CV-0767-RP, 2020 WL 6886258, at *15 (W.D. Tex. Nov. 24, 2020) (footnote omitted), *rep. & rec. adopted*, 2021 WL 2194900 (W.D. Tex. Feb. 3, 2021).[1]

Under Rule 37(e)(2), "however, before a Court can impose the sanction of an adverse presumption, an adverse instruction to the jury, or default judgment, it must find that the party that caused the loss 'acted with the intent to deprive another party of the information's use in the litigation'" – and "a finding of negligence or gross negligence" will not suffice to justify "the giving of an adverse-inference instruction." *Richard*, 2016 WL 5477750, at *4 (cleaned up; citing FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments).

But, "when the court finds that a party acted with the intent to deprive," Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information." *Falkins*, 2022 WL 17414295, at *3.[2] Some courts have

---

[1] *Accord Bolyard v. Vill. of Sherman*, No. 19-CV-03146, 2022 WL 16738647, at *6 (C.D. Ill. Nov. 7, 2022); *Hughes v. City of N.Y.*, No. 1:18-CV-09380-MKV, 2021 WL 4295209, at *14 (S.D.N.Y. Sept. 21, 2021), *reconsideration denied*, 2022 WL 3919637 (S.D.N.Y. Aug. 31, 2022); *Aramark Mgmt., LLC v. Borgquist*, No. 818CV01888JLSKESX, 2021 WL 864067, at *22-*23 (C.D. Cal. Jan. 27, 2021), *rep. & rec. adopted*, 2021 WL 863746 (C.D. Cal. Mar. 8, 2021).

[2] *Accord* FED. R. CIV. P. 37(e), advisory committee's notes to 2015 amendments ("Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice."); *DR*

explained that, "[i]f intent is established, then prejudice is presumed," *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 622 (N.D. Ill. 2022), or "inferred," *CaramelCrisp LLC v. Putnam*, No. 19 C 2699, 2022 WL 1228191, at *5 (N.D. Ill. Apr. 26, 2022).[3]

As explained above, where, as here, Rule 37(e) governs a motion for sanctions for spoliation of ESI, Rule 37(e)(2) requires a "finding that the party acted with the intent to deprive another party of the information's use in the litigation" before a court can sanction the spoliating party by "instruct[ing] the jury that it may or must

---

*Distributors*, 513 F. Supp. 3d at 958-59, 980 ("If intent (which presumes prejudice) exists, then the court can impose sanctions, including presuming that the information was unfavorable, instructing the jury to presume the information was unfavorable, or entering dismissal or default. FED. R. CIV. P. 37(e)(2). …. Intent must be established before a court can impose sanctions, such as adverse jury instructions, default, and dismissal under Rule 37(e)(2). FED. R. CIV. P. 37(e), advisory committee's notes to 2015 amendments. If intent is established for these sanctions, prejudice need not be separately established because prejudice is assumed from the intent."); *Ringers*, 2020 WL 6385813, at *2.

[3] *Accord In re Marquette Transp. Co. Gulf-Inland, LLC*, No. 6:18-CV-01222, 2022 WL 393640, at *1 (W.D. La. Feb. 8, 2022) ("If the intent to deprive is found, prejudice is presumed, and the court may impose an adverse inference, dismiss the action or enter a default judgment."); *id.* at *1 n.10 ("negligent and even grossly negligent behavior is insufficient to support an adverse inference; prejudice is presumed under § (e)(2)"); *Packrite, LLC v. Graphic Packaging Int'l, LLC*, No. 1:17CV1019, 2020 WL 7133806, at *10 n.17 (M.D.N.C. Dec. 4, 2020) ("[T]he plain language of Rule 37(e) permits the Court to presume prejudice to Plaintiff from Defendant's deletion of ESI, i.e., to presume that 'the lost [ESI]' would have helped Plaintiff because it 'was unfavorable to [Defendant],' FED. R. CIV. P. 37(e)(2)(A), 'only upon finding that [Defendant] acted with the intent to deprive [Plaintiff] of the [ESI's] use in th[is] litigation,' FED. R. CIV. P. 37(e)(2) (emphasis added)."), *rep. & rec. adopted*, 2021 WL 9681472 (M.D.N.C. Jan. 6, 2021); *Budewitz v. Daubert L. Firm, S.C.*, No. 19-CV-593-JDP, 2020 WL 5775428, at *5 (W.D. Wis. Sept. 28, 2020) ("If the court finds that the loss of evidence prejudices the moving party, the court may order relief only to cure that prejudice. But a court may presume that lost evidence is unfavorable to the responsible party only if it finds that that party intended to deprive the moving party of the evidence for use in litigation.").

presume the information was unfavorable to the party," FED. R. CIV. P. 37(e)(2), or what is referred to in short hand as an "adverse inference instruction," *Bellamy v. Wal-Mart Stores, Tex., LLC*, No. SA-18-CV-60-XR, 2019 WL 3936992, at *5 (W.D. Tex. Aug. 19, 2019); *accord Falkins*, 2022 WL 17414295, at *3.

And, for many years, decisions of the United States Court of Appeals for the Fifth Circuit have held that courts may impose such "an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.'" *Guzman*, 804 F.3d at 713.

But, aside from one recent unpublished decision, those decisions predate (and so did not apply) the 2015 amendments to Rule 37(e); did not involve ESI; or did not cite or discuss amended Rule 37(e). As another judge has noted,

> [i]t is not clear that a finding of "bad faith" is required under Rule 37(e)(2). Before the 2015 amendment to the rule, the Fifth Circuit generally "permit[ted] an adverse inference against the destroyer of evidence only upon a showing of bad faith or 'bad conduct.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). The 2015 version of Rule 37(e) does not mention "bad faith" and instead requires a showing that the party at fault acted with the "intent to deprive another party of the information."

*BalanceCXI*, 2020 WL 6886258, at *12 n.8.

After the 2015 amendments, outside the ESI context in which Rule 37(e) governs, "it appears that in the Fifth Circuit a court may use its inherent authority to sanction a party for the loss or destruction of non-ESI, but sanctions can only be assessed upon a showing of 'bad faith' or 'bad conduct.'" *Bellamy*, 2019 WL 3936992, at *6 (citing *Guzman*, 804 F.3d at 713)); *accord Coastal Bridge*, 833 F. App'x at 573-75 (applying standards from *Guzman* and earlier case law to spoliation of non-ESI).

But, as to spoliation of ESI, "[a]s one district judge has noted, since the adoption of Rule 37(e)(2), the Fifth Circuit has not clarified whether its prior spoliation jurisprudence has been abrogated or otherwise amended pursuant to the amendment of Rule 37(e)." *BalanceCXI*, 2020 WL 6886258, at *12 n.8 (cleaned up).[4]

In any event, this lack of clarity will generally make no difference in how the Court applies the governing standard for a requested adverse-inference instruction sanction for spoliation of ESI. The Fifth Circuit has held that "[b]ad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence," *Guzman*, 804 F.3d at 713, and that "[m]ere negligence is not enough to warrant an instruction on spoliation," *Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007) (cleaned up). Those standards overlap with Rule

---

[4] *See also* FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments ("New Rule 37(e) replaces the 2006 rule. It authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures. It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used. .... The new rule applies only to electronically stored information, also the focus of the 2006 rule."); *see generally Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules. .... Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."); *Moody Nat. Bank of Galveston v. GE Life & Annuity Assur. Co.*, 383 F.3d 249, 252 (5th Cir. 2004) (explaining that "we are bound to follow the prior panel rulings of this court" but that "[t]his rule is inapplicable … where Congress makes a change in statutory law that directly affects a prior panel opinion").

37(e)(2)'s requirement of an "intent to deprive another party of the information's use in the litigation."[5]

And the Fifth Circuit's only decision citing or applying amended Rule 37(e) laid out the "bad faith" and Rule 37(e)(2) "intent to deprive" standards together, suggesting in that unpublished decision that, for ESI spoliation, they overlap or even are interchangeable. *See Eagan v. Walgreen Co.*, No. 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022) ("Spoliation is 'the destruction or the significant and meaningful alteration of evidence.' Sanctions are only appropriate on a showing of bad faith. Bad faith 'generally means destruction for the purpose of hiding adverse evidence.' For electronically stored information, an adverse inference may be given to

---

[5] *See Coastal Bridge*, 833 F. App'x at 573, 574 ("A plaintiff alleging spoliation must establish that the defendant intentionally destroyed the evidence for the purpose of depriving opposing parties of its use. …. The potential levels of culpability range from no culpability to bad faith, with intervening levels including negligence, gross negligence, and willfulness. Negligence is not enough to support the imposition of sanctions for spoliation, for it does not sustain an inference of consciousness of a weak case. Accordingly, a party seeking sanctions is not entitled to an adverse inference instruction unless that party can show that its adversary intentionally and in bad faith disposed of the evidence." (cleaned up)); *Guzman*, 804 F.3d at 713 ("The district court concluded, however, that even if Guzman had been under a duty to preserve evidence, his conduct did not merit sanctions or adverse instructions because Appellants produced no evidence suggesting bad faith. Guzman's disclosure of his intent to have surgery during his deposition suggests he was not seeking to deceive Appellants. …. While the timing of Guzman's surgery may seem strange, there is no evidence to suggest that he acted in a manner intended to deceive Appellants or that he undertook the surgery with the intent of destroying or altering evidence. The district court concluded that the timing of Guzman's surgery alone was insufficient to demonstrate he had acted in bad faith."); *accord BalanceCXI*, 2020 WL 6886258, at *12 n.8 ("In this case, that question is largely academic, however, because, as discussed in what follows and in the fact findings, there is no question that the Defendants' actions were taken in bad faith, since they knowingly and intentionally destroyed evidence they were obligated to preserve.").

the jury 'only upon [a] finding that the party acted with the intent to deprive another party of the information's use in the litigation.' If the trial court concluded there was 'prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice.'" (cleaned up)).[6]

---

[6] *Accord Stovall v. Brykan Legends, LLC*, No. 17-2412-JWL, 2019 WL 480559, at *3 (D. Kan. Feb. 7, 2019) ("'If an aggrieved party seeks an adverse inference jury instruction – as plaintiff does here – that party must also prove bad faith on the part of the producing party.' Rule 37(e)(2) imposes the same culpability requirement when a plaintiff seeks default judgment as a sanction." (cleaned up)); *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP, 2016 WL 4544052, at *2 (S.D. Miss. Aug. 31, 2016) ("Regardless, the result of this motion would not change, as Rule 37(e) requires a 'finding that the party acted with intent to deprive another party of the information's use in the litigation ....' FED. R. CIV. P. 37(e)(2)."); *see also Ford v. Anderson Cnty., Tex.*, No. 6:19-CV-384-JDK, 2022 WL 1424973, at *21 n.12 (E.D. Tex. May 5, 2022) ("But Rule 37(e)(2) permits such a presumption 'only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation.' *see also Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ('We permit an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.") (citation omitted)."); *see also Grant v. Gusman*, No. CV 17-2797, 2020 WL 1864857, at *11 n.175 (E.D. La. Apr. 13, 2020) ("The parties here mostly focus on 'bad faith' instead of 'intent to deprive another party of the information.' Before the 2015 amendment to Rule 37(e), the Fifth Circuit generally 'permit[ted] an adverse inference against the destroyer of evidence only upon a showing of bad faith or 'bad conduct." *Guzman*, 804 F.3d at 713. Yet the 2015 version of Rule 37(e) does not mention 'bad faith' and instead requires the party at fault to act with 'intent to deprive another party of the information.' Recently, in 2016, the Southern District of Mississippi noted that the 'Fifth Circuit has not clarified whether its prior spoliation jurisprudence has been abrogated or otherwise amended pursuant to the [2015] amendment of Rule 37(e).' *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP, 2016 WL 4544052, at *2 (S.D. Miss. Aug. 31, 2016). Nevertheless, Plaintiff can neither meet the 'intent' requirement under Rule 37(e) nor the general bad faith requirement under Rule 37(e)."); *Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 489-90, 493 (N.D. Tex. 2016), *objections overruled*, No. 3:13-CV-2110-KS-BH, 2016 WL 5942223 (N.D. Tex. Oct. 13, 2016) (assessing motion under both "bad faith" and Rule 37(e)(2) intent standards); *cf. Coastal Bridge*, 833 F. App'x at 573-75.

-24-

"The party seeking the spoliation sanction bears the burden of proof." *Castro*, 2022 WL 17544339, at *3.

Following the 2015 Advisory Committee notes, courts have observed that amended Rule 37(e)(1) "leave[s] to the Court's discretion determining which party has the burden of proving prejudice." *Flores v. AT&T Corp.*, No. EP-17-CV-00318-DB, 2018 WL 6588586, at *8 (W.D. Tex. Nov. 8, 2018). Here, the Court determines that the burden to prove prejudice should lie with Adler, where, at this stage of the case and in light of the parties' briefing, "placing the burden of proving prejudice on the party that did not lose the information [is not] unfair" in this case. *Id.* at *7 (cleaned up).

Defendants contend that, "[a]lthough the Fifth Circuit has not directly addressed whether the standard of proof on spoliation issues is a preponderance of the evidence or the higher burden of clear and convincing evidence, courts within this circuit have required clear and convincing evidence of bad faith or misconduct before ordering sanctions." Dkt. No. 77 at 11.

But the Court is not persuaded that Adler must satisfy a clear and convincing evidence standard under Rule 37(e) or the Fifth Circuit's spoliation case law – neither of which impose that burden.

Outside the context of alleged spoliation of ESI, the Fifth Circuit has explained that "[a]llegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed in federal courts through the inherent power to regulate the litigation process, if the conduct occurs before a case

is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct." *Coastal Bridge*, 833 F. App'x at 573.

But none of the Fifth Circuit's inherent-powers spoliation decisions impose or apply a clear and convincing evidence standard.[7]

And, even if they did, Rule 37(e) (as amended in 2015) addresses the alleged conduct of spoliating ESI at issue here and, as a "rule that adequately addresses the conduct," *Coastal Bridge*, 833 F. App'x at 573, governs this motion for sanctions. The Court's inherent powers – under which the Fifth Circuit has generally (outside the spoliation context) required a finding of clear and convincing proof of bad faith to impose sanctions, *see, e.g.*, *Vikas WSP, Ltd. v. Econ. Mud Prod. Co.*, 23 F.4th 442, 455 (5th Cir. 2022) – therefore are not the source of or basis for the requested sanctions here.

_____

[7] *See, e.g.*, *Zeng v. Tex. Tech Univ. Health Sci. Ctr. at El Paso*, 836 F. App'x 203, 215 (5th Cir. 2020); *Coastal Bridge*, 833 F. App'x at 572-75; *Crain v. City of Selma*, 952 F.3d 634, 638-40 (5th Cir. 2020); *Bryant v. Wal-Mart La., L.L.C.*, 729 F. App'x 369, 370 (5th Cir. 2018); *Hale v. City of Biloxi, Miss.*, 731 F. App'x 259, 265 (5th Cir. 2018); *Eaton-Stephens v. Grapevine Colleyville Indep. Sch. Dist.*, 715 F. App'x 351, 354 (5th Cir. 2017); *Saldivar v. Austin Indep. Sch. Dist.*, 674 F. App'x 347, 349-50 (5th Cir. 2016); *Estes v. Lanx, Inc.*, 660 F. App'x 260, 261 (5th Cir. 2016); *Guzman*, 804 F.3d at 713; *Schreane v. Beemon*, 575 F. App'x 486, 490-91 (5th Cir. 2014); *Clayton v. Columbia Cas. Co.*, 547 F. App'x 645, 652 (5th Cir. 2013); *Ford v. Potter*, 354 F. App'x 28, 33 (5th Cir. 2009); *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284-85 (5th Cir. 2008); *Russell*, 234 F. App'x at 207-08; *White v. Wal-Mart Stores E., L.P.*, 169 F. App'x 850 (5th Cir. 2006); *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005); *Baker v. Randstad N. Am., L.P.*, 151 F. App'x 314, 318 (5th Cir. 2005); *BCE Emergis Corp. v. Cmty. Health Sols. of Am., Inc.*, 148 F. App'x 204, 219 (5th Cir. 2005); *King v. Illinois Cent. R.R.*, 337 F.3d 550, 555-56 (5th Cir. 2003); *Touchberry v. Coyote Mississippi Mall*, 37 F. App'x 91 (5th Cir. 2002); *Ratliff v. City of Gainesville, Tex.*, 256 F.3d 355, 363-64 (5th Cir. 2001); *Caparotta v. Entergy Corp.*, 168 F.3d 754, 755-58 (5th Cir. 1999); *Vick v. Tex. Emp. Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *see also, e.g.*, *United States v. Wise*, 221 F.3d 140, 156-57 (5th Cir. 2000).

And the Fifth Circuit's one decision citing or applying amended Rule 37(e) did not impose or apply a clear and convincing evidence standard. *See Eagan*, 2022 WL 683636, at *3.

Defendants point out that the court in *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 776, 802-03 (N.D. Tex. 2011), found "that Plaintiff has proven by clear and convincing evidence that the Defendants engaged in evidence spoliation" and that, "[w]hen considered in the context of all of Defendants' other questionable post-accident conduct, the evidence is clear and convincing that the Defendants, purposefully, over a sustained period of time, engaged in a concerted effort to hide and destroy evidence."

But the *Ashton* court did not discuss whether the plaintiff there was required to make a showing on clear and convincing evidence for the court to impose spoliation sanctions.

And the Court here finds no basis in Rule 37(e) or governing case law to conclude that Adler must make any showing on clear and convincing evidence on his Spoliation Sanctions Motion. The Court instead will assess Adler's required showings under Rule 37(e) against the preponderance of the evidence standard. *See generally Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 778 (7th Cir. 2016) (explaining, in the context of sanctions imposed under either Federal Rule of Civil Procedure 37(b)(2) or the court's inherent power, that, "unless the governing statute (or in this case, the rule) specifies a higher burden, or the Constitution demands a higher burden because

of the nature of the individual interests at stake, proof by a preponderance of the evidence will suffice").

"To determine whether a referred motion for sanctions is dispositive or non-dispositive, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether [Federal Rule of Civil Procedure] 72(a) or 72(b) applies." *Siegel v. Compass Bank*, No. 3:18-cv-1023-X, 2021 WL 4498914, at *1 (N.D. Tex. Jan. 11, 2021) ("To allow otherwise would permit the party seeking sanctions to engage in a game of labels that would improperly dictate the standard of review.") (cleaned up).[8]

The undersigned has authority to enter a nondispositive order granting attorneys' fees or other nondispositive sanctions under Federal Rule of Civil Procedure 37(e) or denying a request for what might be considered a dispositive sanction. *See* 28 U.S.C. § 636(b); *Merritt v. Int'l Bhd. of Boilermakers*, 649 F.2d 1013, 1016-17 (5th Cir. Unit A June 1981) (per curiam) (a magistrate judge has authority

---

[8] *See also Brown v. Bridges*, No. 3:12-cv-4947-P, 2015 WL 410062, at *1-*4 (N.D. Tex. Jan. 30, 2015) (explaining that, when a district judge refers a motion for sanctions to a magistrate judge, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether Federal Rule of Civil Procedure 72(a) or 72(b) applies and that, when the magistrate judge finds that dismissal or another sanction disposing of a claim or defense is unwarranted, the motions should be characterized as non-dispositive and may be ruled on by the magistrate judge) (followed in *Green Hills Dev. Co., LLC v. Credit Union Liquidity Servs., LLC*, No. 3:11-cv-1885-L-BN, Dkt. No. 373 at 2 (N.D. Tex. Dec. 1, 2016)); *accord Flores*, 2018 WL 6588586, at *3-*4 (collecting authorities); *Cortis, Inc. v. CortiSlim Int'l, Inc.*, No. 12-CV-0562-P, 2015 WL 5227816, at *3 (N.D. Tex. Sept. 8, 2015).

to enter a nondispositive order granting attorneys' fees as a sanction under Federal Rule of Civil Procedure 37).

Analysis

## I. Adler established that Rule 37(e)'s four predicate elements exist

### a. The ESI should have been preserved

As a preliminary matter, the Court agrees with Adler that "Defendants' call recordings, Slack messages, and emails qualify as ESI." Dkt. No. 72-2 at 14.

Adler then asserts that "Defendants had a duty to preserve the ESI at issue" and that

> [t]his motion presents no issue about whether litigation was "reasonably anticipated." Defendants' spoliation – over two years' worth of it – occurred after Adler filed suit in August 2019 and served Defendants in early September 2019. Adler's original complaint put Defendants on notice that caller confusion would be a central issue. *See, e.g.*, ECF No. 1 ¶¶ 38-60. Each call recording is a unique piece of relevant evidence showing that confusion firsthand. *See generally Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir. 1993) (emphasizing that consumer confusion is the "linchpin" of the analysis in infringement cases). So too are the Slack messages unique, as they represent the only internal, written communications among Defendants' intake specialists during their calls with confused victims. Likewise, Jason Love's emails are a singular source of evidence showing how the highest-ranking employee in Defendants' intake department addressed the confusion created by Defendants' scheme, including but not limited to in emails with call-center employees. Defendants should have preserved the spoliated evidence, and they cannot credibly argue otherwise.

Dkt. No. 72-2 at 19-20 (cleaned up).

Defendants respond that

> Adler complains that Defendants failed to preserve Talk Desk call recordings from 2016 to 2020 – years before Adler even filed this lawsuit in August 2019. "A duty to preserve arises when a party knows or should

-29-

know that certain evidence is relevant to pending or future litigation." *Ashton*, 772 F. Supp. 2d at 800 (citing *Rimkus*, 688 F. Supp. 2d at 612). Quintessa did not have a duty to preserve Talk Desk recordings, or Slack messages, prior to the initiation of this lawsuit and therefore should not be subject to sanctions for any ESI lost prior to the lawsuit.

....

It was not reasonable, however, to expect Quintessa to preserve Talk Desk call recordings which Quintessa could not have known would have been requested by Adler prior to receiving discovery requests. *See also The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* (September 2005) (The obligation to preserve electronic data and documents requires reasonable and good faith efforts to retain information that may be relevant to pending or threatened litigation. However, it is unreasonable to expect parties to take every conceivable step to preserve all potentially relevant data) (emphasis added).

Dkt. No. 77 at 11-12, 13.

Adler replies that

[i]t is beyond question that, once this lawsuit was pending, Defendants had an affirmative duty to preserve the evidence at issue, which goes directly to the issues of actual confusion and intent. To avoid their responsibility to do so, and without citing any authority, Defendants offer a new, self-serving standard concerning their duty to preserve evidence. *See* Resp. at 13 ("It was not reasonable ... to expect Quintessa to preserve Talk Desk call recordings which Quintessa could not have known would have been requested by Adler prior to receiving discovery requests."). Unsurprisingly, their proposed standard is not the law – Defendants had an affirmative duty to preserve relevant evidence while the lawsuit was pending, including while on appeal to the Fifth Circuit.

"The duty to preserve evidence is a duty owed to the court." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011). "A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Repass v. Rosewood Hotels & Resorts, LLC*, 184 F. Supp. 3d 401, 405 (N.D. Tex. 2015). Parties are obligated to preserve "unique, relevant evidence that might be useful to an adversary." *Allstate Texas Lloyd's v. McKinney*, 964 F. Supp. 2d 678, 684 (S.D. Tex. 2013). "[O]nce a party reasonably anticipates litigation, it must take affirmative action to satisfy its preservation duties." *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 929 (N.D. Ill. 2021) (emphasis added). "The preservation obligation runs first to counsel, who has a duty to advise

his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction. Moreover, this responsibility is heightened in the age of electronic discovery." *Orbit One Commc'ns. v. Numerex Corp.*, 271 F.R.D. 429, 437 (S.D.N.Y. 2010).

....

Moreover, the spoliated evidence at issue relates to actual confusion among accident victims and Defendants' intent to confuse those victims. As Defendants are well aware, this type of evidence is of "particular prominence" in trademark cases, *see Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020), meaning that evidence related to either issue is highly relevant to Adler's claims. Adler's complaint put Defendants on notice that caller confusion would be a central issue. *See, e.g.*, ECF No. 1 ¶¶ 38-60. And Lauren herself – both in responding to complaints about the confusion from her referral attorneys and in testifying at her deposition – claims that listening to the call recordings is relevant to determining whether the caller was confused. *See* ECF No. 72-2 at 7.

Defendants cannot seriously contend they "could not have known" Adler would seek such evidence until he served discovery requests. Indeed, Defendants knew that their generic, call-only ads and deceptive script have been generating a substantial amount of confusion for years.

Dkt. No. 115 at 2-3 (cleaned up).

"[L]ost or destroyed evidence is relevant if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Ashton*, 772 F. Supp. 2d at 801 (cleaned up).

Adler persuasively explains how the three categories of ESI at issue are relevant to the claims in the case.

And the Court finds that Defendants had a duty to preserve it after Adler filed suit in August 2019 and served Defendants in early September 2019.

Triggering that duty did not require Adler to serve an ESI preservation letter or a litigation hold. As Adler correctly notes in reply,

it was [Defendants'] obligation to institute a litigation hold, not Adler's. "[I]n cases involving ESI, to satisfy their preservation duties, parties

> must investigate and disable autodelete functions ... at the onset of litigation if those accounts reasonably contain relevant information and it is reasonable under the circumstances of the case to do so." *DR Distributors*, 513 F. Supp. 3d at 931. "[E]ven after the 2015 amendments [to Rule 37], courts continue to expect litigants to reasonably investigate and alter routine data destruction once litigation is reasonably anticipated to satisfy their preservation duties." *Id.* at 932-33 (collecting cases). "The rationale behind directing litigants to investigate and disable autodelete functions is obvious: if ESI is relevant to litigation that may or has commenced, the Rules of Civil Procedure require that that data be preserved, which cannot be done if the data is set to autodelete and is ultimately deleted." *Id.* at 933.

Dkt. No. 115 at 2-3 (cleaned up). While "[t]he Court acknowledges that [Defendants do] not have to preserve 'every shred of paper, every e-mail or electronic document, and every backup tape,'" "having found above that the ESI at issue in this motion is relevant, the ESI should have been preserved." *Flores*, 2018 WL 6588586, at *6 (cleaned up).

Neither does it matter whether "Defendants were unaware that Adler sought Talk Desk call recordings and Slack messages" until "Defendants received discovery requests from Adler in November of 2021." Dkt. No. 77 at 5. Adler's complaint, which makes those materials relevant, triggered Defendants' preservations obligations by giving them "notice that [these materials are] relevant to the litigation" – or, at least, putting Defendants in a position in which they "should have known that [these materials] may be relevant." *Guzman*, 804 F.3d at 713.

The Court therefore cannot accept Defendants' argument that, "until it received discovery requests from Adler – in November of 2021, over two years after Adler filed this lawsuit – Quintessa did not know that Talk Desk recordings and Slack messages were not being preserved or that this data would be even relevant to Adler's

claims, given the existence of call logs and intake records during this time period (which were preserved)." Dkt. No. 77 at 12; *see also id.* at 13 ("It was not reasonable, however, to expect Quintessa to preserve Talk Desk call recordings which Quintessa could not have known would have been requested by Adler prior to receiving discovery requests."). Defendants at least should have known these materials were relevant two years earlier, and pointing to other evidence regarding these same calls confuses relevance with relatedness or (possibly, but not actually here) redundancy.

### b. The ESI has been lost

The parties do not dispute that the Talk Desk call recordings, Slack messages, and Jason Love's emails at issue in the Spoliation Sanctions Motion have been lost. And the Court finds, on this record, that they have been. *Accord Ringers*, 2020 WL 6385813, at *6 ("As it is undisputed that the emails were deleted, the second element of Rule 37(e) is met.").

### c. The ESI was lost because of Defendants' failure to take reasonable steps to preserve it

Adler asserts that "Defendants breached their duty to preserve":

> To meet that duty, Rule 37(e) "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection." *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. Courts may not issue sanctions under Rule 37(e) for ESI "lost as a result of the routine, good-faith operation of an electronic information system." *Id.* However, "the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation." *Id.*
>
> The evidence establishes that, from service of this lawsuit in September 2019 until at least the Fifth Circuit decision in August 2021, Defendants took no steps to preserve any ESI, let alone the ESI at issue. Moreover, Defendants admitted that the ESI could have been saved. Talkdesk offers two options – both easy to implement, and neither remotely approaching an "extraordinary" measure – to preserve the recordings. Defendants could have changed the default deletion period,

or they could have downloaded the recordings for permanent offline storage. Similarly, preservation of the Slack messages and Love's emails – both of which were deleted after the Fifth Circuit decision and after Adler served discovery requests – merely required Defendants to pay additional storage fees. *See* Walker Dep. 260:3-7, 261:16-19.

At best, Defendants did not take "reasonable steps to preserve information by intervening in [the] routine operation" of the systems they rely on to track calls and facilitate communication among employees. *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. That "failure to intervene" is sufficient to impose sanctions. *See id.* Yet Defendants preserved other evidence, including emails and written business records, during that same time period. Defendants have failed to produce satisfactory or consistent reasons why. As discussed below, the Court should take Defendants' lack of explanation into account when crafting an appropriate remedy, as it supports a finding of bad faith.

Dkt. No. 72-2 at 20-21 (cleaned up).

Defendants respond that, "[a]s to Jason Love's emails, [Defendants] address[] the mistaken deletion of these emails below" as to prejudice under Rule 37(e)(1) but that they "did not fail to take reasonable steps to preserve the Talk Desk call recordings and Slack messages":

As to recordings from August 2019 through 2020 and Slack messages after the filing of this lawsuit, Quintessa did not fail to take reasonable steps to preserve this data. Based on the information known to Quintessa at the time Adler filed his lawsuit, Quintessa (by and through Ms. Mingee), instructed its employees not to delete any e-mails or documents. [*See* App.39, (Mingee Dep. at 240:3-8 (Q: What have you done to retain documents since the Adler lawsuit was filed in 2019? A: We've – a memo was sent out to everyone about not deleting any e-mails or things of that nature. We haven't deleted e-mails. Our e-mails were pulled from, like 2016.)).]

Adler alleges, without any evidence, that this testimony is untrue, and that Quintessa never instructed its employees not to delete information. However, Adler conflates two separate, but not inconsistent, actions: that Quintessa instructed employees not to delete any e-mails or documents (which is true), and that Quintessa did not affirmatively change any processes for saving Talk Desk recordings until after the appeal (which is also true).

-34-

This is not a case where a party failed to preserve ESI after receiving a litigation hold or spoliation letter. Nor is it a case where a party intentionally failed to preserve ESI after the information was sought in discovery requests. Indeed, until it received discovery requests from Adler – in November of 2021, over two years after Adler filed this lawsuit – Quintessa did not know that Talk Desk recordings and Slack messages were not being preserved or that this data would be even relevant to Adler's claims, given the existence of call logs and intake records during this time period (which were preserved). Quintessa's corporate representative testified that "[o]nce the discovery process came about and we started pulling documentation, we did not know – we weren't deleting, but we didn't know that things like [Talk] Desk were only keeping data for 14 months ... Unfortunately we don't have like a head of security... so whether it was right or wrong, I thought that everything was just there and not being deleted."

"[A] corporation, upon recognizing the threat of litigation, need not preserve 'every shred of paper, every e-mail or electronic document, and every backup tape.'" *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006). "Instead, the duty to preserve extends to any documents or tangible things made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.'" *Id.* Quintessa did just that. It took reasonable steps to preserve all relevant electronic documents and e-mails, and not destroy any relevant evidence, once it became aware of this lawsuit.

Dkt. No. 77 at 11-13 & n.16 (cleaned up).

Adler replies that Defendants' "failure to preserve the spoliated evidence was plainly unreasonable and breached their duty to the Court." Dkt. No. 115 at 2-3 (cleaned up).

The Court agrees. "Had [Defendants] implemented a litigation hold and suspended [their] practice[s] of deletion … upon receipt of [Adler's complaint], the ESI would not have been lost." *Flores*, 2018 WL 6588586, at *6 (cleaned up); *see generally Sosa*, 2019 WL 330865, at *4-*5 ("Thus, although negligence is insufficient to permit a court to impose any of the harsher-type sanctions available under subsection (e)(2), such as a permissible or mandatory jury presumption that the lost

-35-

ESI was unfavorable to the party, it is sufficient to demonstrate that a party failed to take reasonable steps to preserve the ESI.").

The evidence supports a finding that Defendants did not know about the automatic deletion policies and protocols of the Talk Desk call recordings and Slack messages because Defendants did not check. Whether the deletion was inadvertent or intentional, Defendants' lack of awareness of routine deletion protocols, after being served with a lawsuit, does not make it reasonable for Defendants to have taken no steps to investigate and suspend their or their vendors' deletion policies and practices. *See DR Distributors*, 513 F. Supp. 3d at 979 ("To preserve the GoDaddy emails, Defendants simply needed to disable the autodeletion setting, which is something that Duke was able to complete after a single phone call to GoDaddy. As the legion of case law discussed earlier in this order shows, disabling an autodeletion function is universally understood to be one of the most basic and simple functions a party must do to preserve ESI." (cleaned up)).

And the Court finds that Defendants failed to take reasonable steps to preserve Jason Love's emails by, again, at best, failing to carefully handle the status of his emails and inform themselves of the consequences of any actions taken as to those emails after he left his position in December 2021 – more than two years into this case and two months after the Fifth Circuit's decision in this case.

### d. The ESI cannot be restored or replaced through additional discovery

Adler asserts that "[t]estimony from Defendants' officers establishes that the recordings, messages, and emails cannot be replaced." Dkt. No. 72-2 at 19. And

Defendants do not expressly address this element or do not suggest that they "still [have] the lost ESI in some form." *Flores*, 2018 WL 6588586, at *6.

It is not sufficient for Defendants to assure Adler that all of Love's relevant emails must have been preserved and produced through the other custodians' emails. *See* Dkt. No. 77 at 9 ("Notwithstanding this inadvertent loss, Quintessa has produced numerous emails to and from Love, as well as hundreds of emails from other Quintessa custodians during the same time period."). "Because [Defendants were] unable to fully recover [Love's] e-mails, no amount of discovery will confirm the extent to which information was lost." *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 46 (D.D.C. 2019) ("Here, Mrabet's e-mails are irremediably lost because they cannot be restored or replaced through additional discovery. The e-mails could only be recovered from one source, and One DC has already attempted, and failed, to fully recover them. In addition, while One DC argues that it has identified alternate copies and produced a substantial number of Mrabet's deleted e-mails, the organization acknowledges that at least some responsive e-mails were likely irremediably lost, presumably because Mrabet did not copy another employee on every single e-mail she sent while working at One DC." (cleaned up).[9]

---

[9] *Accord DR Distributors*, 513 F. Supp. 3d at 980 ("Of course, allowing a deposition of a witness is not what Rule 37(e) meant by 'restored or replaced through additional discovery.' FED. R. CIV. P. 37(e). The question is whether the electronically stored information can be restored or replaced." (cleaned up)); *Ringers*, 2020 WL 6385813, at *6 ("Lastly, according to Plaintiff, it produced all relevant emails from that period that were saved in other locations. Therefore, all emails that could be restored or replaced have been. Defendant need not go as far as deposing Plaintiff's employees to test their recollections as to what relevant information was in the deleted emails. That option is neither reliable nor fair to the party who did not destroy

Based on all of the evidence on this record, the Court finds that the lost ESI cannot be restored or replaced through additional discovery.

## II. Defendants did not act with bad faith or the intent to deprive Adler of the lost ESI's use in this litigation

Because Adler established that Rule 37(e)'s four predicate elements exist, the Court turns to assessing whether Defendants acted with the intent to deprive Adler of the lost ESI's use in this litigation, or bad faith.

Adler asserts that, "[b]ecause direct proof of intent is rarely available, a finding of bad faith may be inferred from circumstantial evidence, particularly where documents are destroyed after the initiation of litigation," and that "[c]ourts in the Fifth Circuit often infer bad faith if relevant evidence is destroyed by a party after receiving notice of a legal claim and without reasonable explanation." Dkt. No. 72-2 at 23 (cleaned up).

The Fifth Circuit has explained that, "[t]ypically, we do not draw an inference of bad faith when documents are destroyed under a routine policy" and that "we do not automatically draw an inference of bad faith simply because documents are destroyed after the initiation of litigation," but that a moving party "would have had a stronger argument for spoliation had she been able to prove that the documents

---

the missing evidence."); *Freidig v. Target Corp.*, 329 F.R.D. 199, 208 (W.D. Wis. 2018) ("Target says that Freidig did not depose Raemisch or other Target employees, and it argues that she could have obtained comparable evidence if she had. But that is not what Rule 37(e) means by 'restore or replace.' This provision is referring to digital backups and the likelihood that electronic documents have multiple versions. The availability of non-electronic evidence is a factor that speaks to prejudice, not whether the lost evidence can be restored." (cleaned up)).

were destroyed after [the alleged spoliating party] had notice of their relevance to her claim." *Russell*, 234 F. App'x at 208 (cleaned up).

And other courts in the Fifth Circuit have noted that "bad faith may be inferred by evidence that a party has misrepresented the existence of documents or allowed the destruction of documents, and had explanations of spoliation that were not credible." *Dixon v. Greyhound Lines, Inc.*, No. CIV. A. 13-179-JWD, 2014 WL 6087226, at *2 (M.D. La. Nov. 13, 2014); *see also Lou v. Lopinto*, No. CV 21-80, 2022 WL 16685539, at *7 (E.D. La. Nov. 2, 2022) ("A court does have substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors given that direct evidence of intent rarely exists." (footnote omitted)).

And, outside of this circuit, courts have explained that "[i]ntent may be inferred if a party is on notice that documents were potentially relevant and fails to take measures to preserve relevant evidence, or otherwise seeks to keep incriminating facts out of evidence." *Hunters Cap., LLC v. City of Seattle*, No. C20-0983 TSZ, 2023 WL 184208, at *6 (W.D. Wash. Jan. 13, 2023) (cleaned up). But, in applying this standard, these courts have found the required intent on facts that involved affirmatively deleting ESI. *See id.* at *6, *8-*10.

And, in assessing the extent to which intent or bad faith can be inferred, the Court finds helpful guidance in the decisions of courts in the Fifth Circuits that have

- determined that "[e]vidence of destruction as part of a regular course of conduct is insufficient to support a finding of intent to deprive, as required by Rule

37(e)(2), because it does not demonstrate bad faith," and concluded that a moving party did not meet Rule 37(e)(2)'s required showing where he relied on the fact of "the loss of the ESI occurring after the filing of [an EEOC charge]" and offered no "evidence that [the alleged spoliator's] failure to preserve the relevant ESI was anything more than a negligent continuation of its routine policy," *Flores*, 2018 WL 6588586, at *8-*9; *see also Coastal Bridge*, 833 F. App'x at 575 ("Adherence to normal operating procedures may counter a contention of bad faith.");

- denied a spoliation sanctions motion where, "despite the destruction of documents during a litigation hold, the documents were destroyed pursuant to a routine document retention policy," reasoning "that the defendant's failure to retain the document was not the result of a directed action to delete it but rather a failure to turn off the automatic deletion mechanism which at best constituted negligence and not bad faith," *Lou*, 2022 WL 16685539, at *7;

- held, outside the context of ESI spoliation, "that, while Defendants acted negligently or even recklessly in discarding vendor records, Defendants' culpability does not rise to bad faith," where "[b]ad faith is a high hurdle – more than even the intentional destruction of information despite looming litigation – a finding of bad faith must be predicated on the destruction of information for the purpose of hiding adverse information, or on behavior seeking to avail of a later litigation advantage, or on some other conscious wrongdoing," *Luxottica Grp., S.p.A. v. Ochoa's Flea Mkt., LLC*, No. 7:20-CV-

00061, 2022 WL 836823, at *4 (S.D. Tex. Mar. 21, 2022) (cleaned up); and

- noted that "[t]he Fifth Circuit has declined to infer bad faith based on odd or suspicious timing of the loss of evidence alone," *Nale v. Finley*, No. 3:19-CV-00473, 2020 WL 9421164, at *2 (W.D. La. Dec. 2, 2020) (citing *Guzman*, 804 F.3d at 713), and that, "when evidence has been merely misplaced, and there is no greater showing of intentional destruction, the Fifth Circuit has routinely held that an inference of bad faith is not appropriate," *id.*

Against this legal backdrop, Adler argues that

[a]ny claim of mere accident or mistake does not adequately explain Defendants' spoliation of evidence. In truth, the loss was caused by Defendants' intentional disregard for their obligations as a litigant.

Although Defendants' owner Lauren Mingee first testified that "a memo" was "sent out to everyone about not deleting e-mails or things of that nature" related to this lawsuit, she could not recall when that memo was sent. *See* Mingee Dep. 240:3-15. [Mingee also claimed that "[w]e haven't deleted any e-mails," even though Jason Love's email account was deleted shortly before her deposition. *See* Mingee Dep. 240:3-8.] That is because her testimony was untrue – Defendants never sent out a preservation memo. *See* Quintessa Dep. 160:21-161:18. It comes as no surprise, then, that Defendants' officers later testified that they never received any instructions about preserving documents prior to the Fifth Circuit decision in late 2021. *See* Love Dep. 58:13-17 (never received instructions on preservation); Walker Dep. 265:24-266:4 (unaware of efforts to preserve documents until after Fifth Circuit decision); *see also* Rausa Decl. ¶ 16, Ex. 15 ("Kittredge Dep.") at 120:7-18 (never received instructions on preservation).

Moreover, Defendants' officers were led to believe that Defendants had "prevailed" in this lawsuit. *See* Love Dep. 59:19-25; *see also* Walker Dep. 233:3-10. Jason Love explained that, not long after he was hired in June 2020, Defendants' owner Lauren Mingee told him "[t]he lawsuit was over" and "[t]here wasn't anything to be concerned about." Love Dep. 61:7-15; *see id.* 62:4-7. When Love learned of his deposition in July this year, he thought "there were two separate Adler lawsuits" and "didn't realize that this was the same" lawsuit Mingee told him Defendants had won. *Id.* 120:21-25.

-41-

Mike Walker offered similar testimony. Responding to an email from one of Defendants' law firm clients in October 2020, Walker suggested that many competing lead generators had moved into Texas "since the judge dropped the Adler case against Lauren." *See* Walker Dep. 231:13-232:9. Asked at his deposition where he got the impression that Adler's suit was "dropped," Walker testified that it likely came from Defendants' owner Mingee. *Id.* 233:3-12.

In sum, Defendants took no steps to preserve evidence during the year-long period between when Adler filed suit and his complaint was dismissed. Defendants' owner Lauren Mingee then falsely told her employees the suit was over. The failure to preserve documents continued for at least another year until the Fifth Circuit decision. And well after the decision, Defendants permanently deleted Jason Love's email account and allowed – into 2022 – its Slack messages to be permanently deleted. *See* Quintessa Dep. 162:9-165:12.

As such, Defendants are far more culpable than a merely negligent party. For approximately two years, they did nothing to fulfill their obligation as a litigant to preserve relevant evidence. Given these circumstances, Defendants' spoliation of evidence is a product of bad faith on Defendants' part.

Dkt. No. 72-2 at 15-16.

With that factual background, Adler asserts that,

[h]ere, the following and below facts taken together indicate bad faith: (1) the ease with which Defendants could have preserved the evidence; (2) the length of time Defendants failed to preserve the evidence; (3) the fact that those years of spoliation occurred *after* Defendants were served with this lawsuit; (4) the importance of the call recordings as the only direct, firsthand evidence of Defendants' deceptive tactics and the confusion those tactics caused; (5) Defendants' preservation of other evidence during that same period, suggesting that Defendants singled out only the most direct and damaging evidence to spoliate; (6) the fact that Defendants' other evidence reveals a significant amount of confusion, which Defendants have repeatedly denied; (7) Defendants' inconsistent explanations for why the call recordings were not preserved; (8) Defendants' artful drafting of their sworn interrogatory response about the deleted recordings, which appears to blame Talkdesk but omits any mention of the other avenues through which Defendants could have easily preserved the recordings; and (9) Defendants' deletion of the Love emails and Slack messages in late 2021 and into 2022. This Court and others have found bad faith on analogous facts. [*See, e.g.,* *Ashton*, 772 F. Supp. 2d at 802 (finding bad faith where claims manager

-42-

failed to preserve screenshots of "primary communications" between truck company and truck driver concerning fatal accident: "[A]t any point in time over the year before this data was automatically deleted by the system, [the claims manager], who was being regularly pressured for the data ... could have simply printed the screen shots and saved them. Inexplicably, he did not."); *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598 (S.D. Tex. 2010) (finding bad faith where, as here, the defendants: (1) knew about the litigation when the evidence was deleted; (2) gave inconsistent explanations for why the evidence was deleted; and (3) produced other evidence that "reveal[ed] what the defendants had previously denied"); *Wiginton v. Ellis*, No. 02-CV-6832, 2003 WL 22439865, at *7 (N.D. Ill. Oct. 27, 2003) (finding bad faith where the spoliating party "knew that it had a duty to preserve relevant documents" but "fail[ed] to change its normal document retention policy, knowing that relevant documents would be destroyed if it did not act").]

Further, Defendants engaged in numerous acts contributing to the spoliation. Rather than send out a preservation notice, which Defendants' owner Lauren Mingee falsely testified had been sent, Mingee told her officers that Adler's suit "was over" and "there was nothing to be concerned about." As a result, the exact persons within Defendants' organization who were in a position to ensure adequate preservation efforts had no reason to think those efforts were necessary. Thus, when Defendants' Chief Operating Officer deleted Jason Love's email account sometime after Love left in December 2021, he was either unaware of Defendants' duty to preserve evidence or he disregarded that duty despite having learned about the loss of Defendants' call recordings around the same time. As Defendants' owner Lauren Mingee explained:

> Q. Okay. Did Mike [Walker] bring this to your attention around the time of the Fifth Circuit decision or was it prior to then?
> A. No. I believe it was after.
> Q. After the Fifth Circuit decision?
> A. Yes, sir.
> Q. Okay. Do you know what caused him to look into that?
> A. Whenever – I believe discovery.

*See* Mingee Dep. 242:5-13. Given that Adler served his first set of discovery requests in November 2021 approximately a month before Love's departure, there is a strong likelihood that Walker deleted Love's email account after learning about the deleted call recordings. But even assuming otherwise, his lack of awareness was the result of the inaccurate statements by Defendants' owner Mingee about the status of Adler's lawsuit.

The circumstances therefore show that Defendants' spoliation was in bad faith. Defendants – despite running a sophisticated, multi-

million-dollar business – did nothing to preserve evidence for well over two years. In addition, Defendants' owner told her officers they had beaten Adler when she knew that was not the case, and then falsely testified under oath about Defendants' preservation efforts. [To the extent Defendants suggest that owner Lauren Mingee – despite being represented by counsel – did not fully understand the ramifications of Adler's appeal, the suggestion is implausible and does not avoid a finding of bad faith. *See Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134 (7th Cir. 1987) (finding bad faith spoliation of evidence; "Radutzky's explanation that he was unaware that Brown & Williamson had a right to appeal the initial dismissal is implausible. We do not think it immodest of us to suggest that many people know that an appellate court such as the Seventh Circuit exists.... For a person of his experience, it is completely implausible that he would be unaware that a party who lost in a lower court had a right to challenge the decision in an appellate court.").] As a result, critical evidence was lost long after Defendants were on notice of their duty to preserve. There is no credible explanation for the loss of evidence here, aside from bad faith.

Dkt. No. 72-2 at 23-25 (footnotes omitted).

Defendants respond that,

[e]ven if the Court finds that Defendants had a duty to preserve the lost ESI and Adler has been prejudiced, the Court must make a specific finding by clear and convincing evidence that Defendants acted with intent to deprive Adler the information's use in this litigation, i.e., bad faith, in order to impose sanctions pursuant to Rule 37(e)(2). The evidence shows Quintessa did not act in bad faith.

"The Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith' or 'bad conduct.'" *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005). The term "bad faith" has been described as conduct involving "fraudulent intent and a desire to suppress the truth." *Ashton*, 772 F. Supp. 2d at 800-01 (citing *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 344 (M.D. La. 2006)). Another court described "bad faith" as "destruction for the purpose of depriving the adversary of the evidence." *Id.* The Fifth Circuit has instructed that an adverse inference jury instruction for spoliation is appropriate where a showing is made that the malfeasant party "intentionally destroy[ed] important evidence in bad faith [and] did so because the contents of those documents were unfavorable to that party." *Whitt v. Stephens County*, 529 F.3d 278, 284

(5th Cir. 2008) (quoting *Russell v. Univ. of Tex.*, 234 Fed. App'x. 195, 207 (5th Cir. 2007)).

Defendants, along with Quintessa's employees, have consistently maintained that the Talk Desk recordings, Slack messages, and Jason Love's email account were lost inadvertently. At worst, the loss of the ESI was mere negligence, which the Fifth Circuit has emphasized is insufficient for a finding of spoliation.

Adler attempts to string together a number of circumstantial facts in an effort to manufacture a bad faith argument. Mot. at 18-19. But none of these "facts" meet the stringent requirement of showing intentional destruction of evidence as outline above. The ease with which evidence can be preserved or the length of time evidence was not preserved are not evidence of culpability. The fact that certain ESI was lost after the lawsuit was filed is negated by the facts that (1) Defendants preserved and produced other documents during this same time period that contains much of the same evidence; and (2) discovery requests weren't served until two years after the lawsuit was initiated; Defendants could not have known what evidence to preserve absence an ESI preservation letter or discovery requests. Defendant has already addressed why the Talk Desk recordings were inadvertently deleted, and how these recordings have proven largely irrelevant to Adler's claims and depositions. Defendants have also already addressed the loss of the Love emails and Slack messages.

As to Adler's claim that Defendants' other evidence "reveals a significant amount of confusion," that is hardly the case. In fact, the data shows the opposite. From 2018-2021, there were 1,595 instances of callers mentioning "Jim Adler" or "The Texas Hammer" to Quintessa's intake department. However, when compared to the 30,693 phone calls that Quintessa received from 2018-2021, i.e. the number of actual leads processed by Quintessa from its competitive bidding campaign, the percentage of callers who mentioned "Jim Adler" or "The Texas Hammer" is 5.2% of the total number of calls. Additionally, of these 1,595 calls there have been only 37 instances of alleged confusion. At best, these instances of alleged confusion only rise to a level of de minimis confusion that is far below the level of actionable confusion under trademark law. *See* McCarthy § 32:189 (percentages below 10% indicate confusion is not likely); *see Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1149 (10th Cir. 2013) ("Net confusion rates of 6.5% ... do not create a genuine factual issue of likelihood of confusion.") (citing *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246-49 (10th Cir. 2013) (net confusion rates of 7.5% and 7.3% not indicative of likelihood of confusion)).

Adler relies upon cases where bad faith was found in egregious circumstances to argue that the Court should find bad faith here. But

the facts in these cases are inapposite. For example, in *Ashton*, the Court found bad faith was established by a "strong chain of circumstantial evidence" in a case where a trucking company employee fled the scene of an accident, promptly changed the tires in another state, and deliberately deleted all of the company email communications between the trucking company and the driver. *Ashton*, 772 F. Supp. 2d at 802-03. *Ashton* was not a simple case of routine data deletion. Similarly, in *Rimkus*, the evidence showed that the defendants did not have emails deleted through routine, good-faith operation of a computer system; rather the defendants had decided on a "policy" of deleting emails more than two weeks old, and affirmatively took steps to delete potentially relevant documents. 688 F. Supp. 2d at 642.

Here, Adler cannot point to any evidence that Defendants intentionally and affirmatively took steps to delete ESI because the information was unfavorable. Rather, Quintessa's robust and fulsome production to date demonstrates that it has acted in good faith in searching for and producing all documents responsive to Adler's discovery requests. In fact, Quintessa produced other documents during the same time period as the lost ESI and concerning the very subject matter of the ESI. There is no evidence that Defendants here, like in defendants in *Rimkus*, rushed to delete any e-mails after the lawsuit was filed. The license for Jason Love's email account was transferred to a new employee after Love's departure, which inadvertently resulted in the loss of his emails. Defendants made a good-faith attempt to recover these but were unable to do so. There is also no evidence that Defendants intentionally sought to delete Talk Desk recordings like the trucker in *Ashton*; to the contrary, once Quintessa became aware of the 13-month retention period, Quintessa ensured that call recordings would be kept or downloaded moving forward, and has in fact produced all of those recordings. As to the Slack messages, Quintessa never kept these messages or rushed to discard them after the lawsuit was initiated; they simply never were kept as a routine matter of business. *See Luxottica*, 2022 WL 836823, at *4.

"Typically, we do not draw an inference of bad faith when documents are destroyed under a routine policy." *Russell v. Univ. of Texas of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007); *see also Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975) ("There was indication here that the records were destroyed under routine procedures without bad faith ...."). Here, Jason Love's email account, the Talk Desk recordings, and Slack messages were lost as a result of routine procedures without bad faith. Once Defendants realized this issue, Defendants moved quickly to ensure the preservation of this ESI thereafter, and produced the relevant information moving forward, further underscoring any lack of bad faith. There is a plethora of case

-46-

law where courts have held similarly. *See, e.g.*, *Flores*, 2018 WL 6588586, at *9 (no finding of bad faith where "Plaintiff has failed to provide any hint of evidence that AT&T's failure to preserve the relevant ESI was anything more than a negligent continuation of its routine policy as required to support the most severe measures" even after Plaintiff filed his EEOC charge); *Coastal Bridge*, 833 Fed. App'x. at 574-75 ("The record indicates no such culpability [of bad faith].... Adherence to normal operating procedures may counter a contention of bad faith."); *Luxottica*, 2022 WL 836823, at *4 ("The Court holds that, while Defendants acted negligently or even recklessly in [routinely] discarding vendor records [daily], Defendants' culpability does not rise to bad faith.").

      Because Defendants did not act culpably in the loss of the ESI, and Adler cannot point to any evidence in the record establishing bad faith by clear and convincing evidence, sanctions are not appropriate.

Dkt. No. 77 at 17-21 (cleaned up).

      And Adler replies that

Defendants dismiss Adler's evidence showing their bad faith as merely "circumstantial facts" and assert that Adler cannot establish that the spoliated evidence was intentionally lost with clear and convincing proof. However, "the law makes no distinction between direct and circumstantial evidence," *Pioneer Nat. Res. USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 689 (E.D. La. 2009), and sanctions under Rule 37(e) may be ordered on the preponderance of the evidence, *Ramirez v. T&H Lemont*, Inc., 845 F.3d 772, 778 (7th Cir. 2016) ("[U]nless the governing statute (or in this case, the rule) specifies a higher burden, or the Constitution demands a higher burden because of the nature of the individual interests at stake, proof by a preponderance of the evidence will suffice."). The preponderance of the evidence shows that the spoliated evidence was lost as a direct result of Defendants' disregard for their duty to preserve evidence during this litigation.

      Indeed, Defendants admit that they took no steps to preserve any evidence until over two years after this case was filed and Adler served his first set of discovery requests. That admission alone strongly supports a finding of bad faith. *See, e.g.*, *Arista Recs., L.L.C. v. Tschirhart*, 241 F.R.D. 462, 464 (W.D. Tex. 2006) ("[D]efendant destroyed material evidence. Further, she destroyed the evidence after the obligation to preserve it arose and after she had clear notice of that obligation. The Court is forced to conclude that defendant destroyed the material evidence deliberately and in bad faith."). While Defendants point to Lauren's testimony that she allegedly sent a memo to employees

on preserving evidence, *see* ECF No. 74-2 at 12 n.17, they again omit a key detail – no such memo has ever been produced or shown to have existed. Asked when the memo was sent, Lauren could not remember the date or even whether it was sent in 2019. *See* ECF No. 72-4 at 240:12-17. Defendants' officers, on the other hand, testified that they never received instructions to preserve evidence at any point prior to the Fifth Circuit's decision. *See* ECF No. 72-8 at 58:13-17 (never received instructions on preservation); ECF No. 72-7 at 265:24-266:4 (unaware of efforts to preserve documents until after Fifth Circuit decision); ECF No. 72-18 at 120:7-18 (never received instructions on preservation). And tellingly, Defendants do not include a copy of the supposed memo in their Response. The evidence demonstrates that Defendants did nothing to meet their duty as a litigant for over two years.

Defendants offer no credible explanation for their protracted failure to preserve clearly relevant evidence, instead claiming they had no way to know the call recordings – which they allegedly rely on to address complaints about confusion – would be relevant. That claim is unbelievable, particularly given Lauren's experience as a defendant in prior suits and her own use (both before and during this litigation) of the call recordings to justify her claim that there is little to no actual confusion.

Defendants also suggest that the ease with which the spoliated evidence could be preserved (a point they do not dispute) and the length of time they ignored their duty to preserve are irrelevant. Defendants are wrong on both points. *See, e.g., Edwards v. 4JLJ, LLC*, No. 2:15-CV-299, 2018 WL 2981154, at *12 (S.D. Tex. June 14, 2018) (finding bad faith and ordering adverse-inference instruction; "J4 breached its duty to preserve the FleetMatics data by failing to put a litigation hold on it and/or by failing to copy, print, or download the information, which was available to it by easy computer command."); *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 432 (W.D.N.Y. 2017) ("[D]efendants' repeated failure over a period of years to confirm that the data had been properly-preserved despite its ongoing and affirmative Rule 11 and Rule 26 obligations ... is so stunningly derelict as to evince intentionality."). Defendants are likewise wrong that their preservation of other evidence does not additionally indicate bad faith. *See Ashton*, 772 F. Supp. 2d at 797 ("To suggest that he inadvertently failed to preserve key communications between Muthee and Knight, when he did preserve them for other dates, ... was not credible and supports a strong inference that the missing screen shots contained relevant evidence – now altered – that was unfavorable to the Defendants.").

Further, while Defendants suggest their deletion of Love's email account was "inadvertent," they do not contest or even address whether

-48-

Lauren told Love and Walker this lawsuit was over, or whether Walker knew about the loss of the call recordings at the time he deleted Love's account. These omissions speak volumes. Any reasonable person would know that the Director of Intake's emails would likely contain highly relevant information. Either Walker knew about the loss of the call recordings when he deleted Love's account, or he was in the dark about the need to preserve them due to Lauren's false statements about the status of the lawsuit and failure to properly instruct him on Defendants' duty to preserve relevant documents. Both alternatives strongly suggest bad faith. As Director of Intake, Love was "on the receiving end of ... the inbound calls" to Defendants' intake center, responsible for overseeing Defendants' intake specialists, and tasked with analyzing call recordings after Defendants' referral attorneys complained about confusion among leads Defendants' sold them. There is nothing "conclusory," Resp. at 16, about Adler's argument that Love's account likely contained relevant evidence. Neither Adler nor the Court should be forced to take Defendants' word to the contrary.

Accordingly, ample evidence supports a finding that the spoliated evidence was lost in bad faith. Defendants' admitted failure "over a period of years" to take steps to preserve relevant evidence was "stunningly derelict." *Moody*, 271 F. Supp. 3d at 432. Defendants' inability to offer a credible explanation for that dereliction − coupled with how easily the spoliated evidence could have been saved and Lauren's false statements to her employees − establishes that the spoliated evidence was lost not by mere negligence but by Defendants' conscious disregard for their obligations as a litigant. "This type of unexplained, blatantly irresponsible behavior" shows that Defendants acted "with the intent to deprive [Adler] of the use of [the spoliated evidence] in connection with [his] claims against [Defendants]." *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017).

Dkt. No. 115 at 6-9 (cleaned up).

Outside the context of Rule 37(e) and spoliation of ESI, "[c]ourts have declined to find a culpable state of mind when the destruction of evidence could be explained by negligence, incompetence, or reasons other than to deprive the movant of its use."

*B & J Inc. v. Marmac, LLC*, No. 2:20-CV-00686, 2022 WL 15085653, at *2 (W.D. La. Oct. 25, 2022).

-49-

In the discovery context, including as to spoliation sanctions motions, courts have defined "negligence" as "a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *Rella v. Westchester BMW, Inc.*, No. 7:16-CV-916 (JCH), 2019 WL 10270223, at *3 (D. Conn. Sept. 30, 2019). In this context, courts have defined "gross negligence" as "a failure to exercise even that care which a careless person would use." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012).

And, in this discovery context as to spoliation, courts have defined "recklessness" as a "gross deviation from reasonable conduct." *Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539-CIV, 2014 WL 5816585, at *11 (S.D. Fla. Nov. 10, 2014) (cleaned up).

And, "[i]n the discovery context," courts have explained that, to be "willful," "a party must intentionally act in disregard of a known or obvious risk that was so great as to make it highly probably that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *N.V.E., Inc. v. Palmeroni*, No. CIV.A. 06-5455 ES, 2011 WL 4407428, at *4 (D.N.J. Sept. 21, 2011). And other courts have treated "willful" and "reckless" as synonymous and sharing this same meaning. *See Pension Comm.*, 685 F. Supp. 2d at 464.[10]

_____

[10] *Cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 69 (2007) (explaining that, "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well" and

But acting "with the intent to deprive another party of the [ESI's] use in the litigation" requires more than any of those culpable states of mind entail.[11]

---

that "the common law has generally understood [the term 'reckless'] in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known'" (cleaned up; quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."))).

[11] *See, e.g.*, FED. R. CIV. P. 37(e), advisory committee's notes to 2015 amendments (Rule 37(e)(2) "authorizes courts to use specified and very severe measures to address or deter failures to preserve electronically stored information, but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation. It is designed to provide a uniform standard in federal court for use of these serious measures when addressing failure to preserve electronically stored information. It rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."); *Grant*, 2020 WL 1864857, at *11 ("The 2015 advisory committee notes to Rule 37(e) explicitly reject prior caselaw that permitted an adverse-inference instruction 'on a finding of negligence or gross negligence.' Instead, a party must prove 'actual intent.'" (cleaned up)); *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. SAG-18-3403, 2020 WL 1809191, at *5 (D. Md. Apr. 9, 2020) ("Alternatively, Gobble insists that '[e]ven if Rule 37(e)(2)'s 'intent to deprive' applies, willful conduct – not bad faith – suffices.' Not so. The Rule itself makes clear that the party must do more than intend to destroy the evidence; it must do so with an 'intent to deprive another party of the information's use in the litigation.' FED. R. CIV. P. (e)(2)." (cleaned up)); *Sosa*, 2019 WL 330865, at *4-*5 ("Indeed, under the current version of Rule 37(e), a party can fail to take reasonable steps to preserve ESI and not act with an intent to deprive. Phrased differently, unreasonable steps might be defined as merely negligent ones. …. [N]egligence is insufficient to permit a court to impose any of the harsher-type sanctions available under subsection (e)(2), such as a permissible or mandatory jury presumption that the lost ESI was unfavorable to the party…."); *Stovall*, 2019 WL 480559, at *3 ("[P]laintiff has cited no fact that could support a finding that defendant intended to deprive her of the surveillance video. The court is not convinced that defendant's negligence – even recklessness – in not taking steps to preserve the 'desk drawer' copy of the video and in allowing the normal expiration policy of the 'workers' compensation' copy of the video to proceed unimpeded rises to the stringent 'intent' requirement set forth in the amended Rule 37(e)." (cleaned up)); *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) ("A showing of negligence or even gross negligence will not do the trick.").

And, so, under Rule 37(e), other courts have explained that, for example, they are "not convinced that defendants' negligence – even recklessness – in allowing the normal video destruction policy to patter away unimpeded rises to the stringent 'intent' requirement set forth in the amended Rule 37(e)." *Storey v. Effingham Cnty.*, No. CV415-149, 2017 WL 2623775, at *4 (S.D. Ga. June 16, 2017); *see also Atta v. Cisco Sys., Inc.*, No. 1:18-CV-1558-CC-JKL, 2020 WL 7384689, at *8 (N.D. Ga. Aug. 3, 2020), *rep. & rec. adopted*, 2020 WL 7022450 (N.D. Ga. Nov. 30, 2020).

And, under Rule 37(e)(2), the Court cannot infer that a "party acted with the intent to deprive another party of the [ESI's] use in the litigation" based only on evidence that amounts to what is required to satisfy the four predicate elements – that is, showing that ESI that should have been preserved has been lost because of a party's failure to take reasonable steps to preserve it and now cannot be restored or replaced through additional discovery. *Accord Wilson v. HH Savannah, LLC*, No. CV420-217, 2022 WL 3273718, at *7 (S.D. Ga. June 1, 2022) ("Plaintiff argues that Hyatt acted intentionally because it is a large, 'litigation-savvy' corporation that knows 'when and how to preserve the data at issue.' This argument appears to address the first factor discussed above: Hyatt is a sophisticated party which should have known that the HotSOS data was material to impending litigation. Even if the Court agreed that Hyatt's sophistication leans the first factor in her favor, there is no indication that Hyatt 'affirmative[ly] acted' to delete the data." (cleaned up)).

Another court has similarly rejected an argument that, under Rule 37(e)(1), the moving party was "prejudiced because the lost ESI 'is relevant and cannot be

restored or replaced.'" *Flores*, 2018 WL 6588586, at *7. As that court explained, "[t]his assertion overlooks the construction of Rule 37(e) which requires that the four predicate elements, including relevancy and the inability to be restored or replaced, be found before a court can consider prejudice. If [a moving party] were correct that the existence of lost evidence which is relevant and which cannot be replaced means there is prejudice, it would be unnecessary for Rule 37(e) to require a court to find the four predicate elements before a court could find prejudice and order measures to cure the prejudice under Rule 37(e)(1)." *Id.* (cleaned up).[12]

So, too, if the required "intent to deprive" could be inferred by facts that offer only what is necessary to find that the four predicate elements exist, there would be no need for Rule 37(e)(2) to require its own, more stringent showing for a party to be entitled to the most severe spoliation sanctions. And, because a finding under Rule 37(e)(2) that a "party acted with the intent to deprive another party of the [ESI's] use in the litigation" eliminates the need to separately find (or allows a court to automatically infer or presume) prejudice, inferring the necessary intent to deprive from nothing more than the set facts that the four predicate elements require would read both subdivisions (e)(1) and (e)(2) out of Rule 37(e).

---

[12] *Accord Sosa*, 2019 WL 330865, at *5 (although negligence "is sufficient to demonstrate that a party failed to take reasonable steps to preserve the ESI," "the mere existence of negligence is insufficient to allow even the milder-type sanctions available under subsection (e)(1)," "because the party seeking relief must also meet its burden of establishing the other prerequisites (i.e., duty to preserve the ESI, the ESI cannot be restored or replaced through additional discovery, and a finding of prejudice to a party from loss of the ESI)").

Adler's briefing discusses Defendants' alleged intent to deprive and bad faith without separately addressing (1) the Talk Desk call recordings and Slack messages and (2) Jason Love's emails. But the circumstances surrounding the loss of the ESI, while overlapping, are distinct and require separate analyses.

As to the Talk Desk call recordings and Slack messages, most of what Adler points to as support for a finding of bad faith and "intent to deprive" under Rule 37(e)(2) are what Adler was required to show to establish that the four predicate elements exist:

| Predicate element (1): there is ESI that should have been preserved | "(3) the fact that those years of spoliation occurred after Defendants were served with this lawsuit"<br>"(4) the importance of the call recordings as the only direct, firsthand evidence of Defendants' deceptive tactics and the confusion those tactics caused" |
|---|---|
| Predicate element (2): that ESI has been lost | "(9) Defendants' deletion of the … Slack messages in late 2021 and into 2022" |
| Predicate element (3): the ESI was lost because of a party's failure to take reasonable steps to preserve it | "(1) the ease with which Defendants could have preserved the evidence"<br>"(2) the length of time Defendants failed to preserve the evidence"<br>"(8) Defendants' artful drafting of their sworn interrogatory response about the deleted recordings, which appears to blame Talkdesk but omits any mention of the other avenues through which Defendants could have easily preserved the recordings"<br>"Rather than send out a preservation notice, which Defendants' owner Lauren Mingee falsely testified had been sent, Mingee told her officers that Adler's suit 'was over' and 'there was nothing to be concerned about.' As a result, the exact persons within Defendants' organization who were in a position to ensure adequate preservation efforts had no reason to think those efforts were necessary." |

Again, the Court finds that, at best, Defendants did not know about the automatic deletion policies and protocols of the Talk Desk call recordings and Slack messages because they did not check.

That was negligent, a failure to conform to the standards of what a party must do to meet its discovery obligations. And that Defendants failed to check and therefore allowed the deletion to continue for two years – when they could easily have learned of and stopped the deletion protocols – might make this conduct reckless or willful (by intentionally acting in disregard of a known or obvious risk that was so great as to make it highly probable that spoliation of relevant evidence would occur) or grossly negligent (by failing to exercise even that care which a careless person would use).

But none of that amounts to a showing that Defendants acted with the intent to deprive Adler of the Talk Desk call recordings' and Slack messages' use in this case.

Defendants' preserving other evidence during that same period and "Defendants' inconsistent explanations for why the call recordings were not preserved" might suggest, as Adler asserts, "that Defendants singled out only the most direct and damaging evidence to spoliate." Dkt. No. 72-2 at 24. But – even considering Lauren Mingee's allegedly falsely claiming that Defendants sent out a preservation memo or telling employees that Adler's case had ended – none of Adler's circumstantial evidence, individually or collectively, makes that intentional destruction explanation more likely or even as likely as the explanation that the automatic deletion of the Talk Desk call recordings and Slack messages was the

product of negligence, gross negligence, or recklessness. *See Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018) ("Auer did not present sufficient evidence of this serious and specific sort of culpability. She supported her request with allegations that incriminating voicemails, emails, and other electronic communications were lost because the city failed to properly search some computers, tablets, and phones; waited too long to search others; and generally failed to take basic steps necessary to find and preserve files that could be relevant to her case. Still, her allegations would at most prove negligence in the city's handling of electronic information, not the sort of intentional, bad-faith misconduct required to grant an adverse presumption. To be sure, intent can be proved indirectly and Auer did not need to find a smoking gun before she could seek sanctions against the city. But without even circumstantial evidence that city personnel had knowledge that relevant files were being lost (if indeed they were), the record cannot support a finding that the city 'inten[ded] to deprive' Auer of information she could have used in this case." (cleaned up)).

And Adler's assertion "that Defendants' other evidence reveals a significant amount of confusion, which Defendants have repeatedly denied," does not itself support a finding of "intent to deprive" under Rule 37(e)(2)'s stringent standard and at least partially undermines Adler's argument that Defendants' preserving other materials "suggest[s] that Defendants singled out only the most direct and damaging evidence to spoliate." Dkt. No. 72-2 at 24.

Adler relies on the court's conclusion in *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017), *aff'd*, No. 20-11141, 2022 WL 433457 (11th

Cir. Feb. 14, 2022). But that case involved employees' engaging in an affirmative act of deleting relevant ESI. *See id.* ("As discussed above, Boeing anticipated (or, at a minimum should have anticipated) litigation with Pemco, and the parties had agreed to a manner of handling Pemco-related ESI. In furtherance of that agreement, Boeing instituted a Firewall Plan calling for Pemco-related ESI to be removed from Boeing employees' computers and sent to the legal department. Blake's Pemco-related ESI was intentionally destroyed by an affirmative act which has not been credibly explained. Smith and Holden knew how to comply with the Firewall Plan (and they did so with their own information), but failed to do so with Blake's. No credible explanation has been given as to why they departed from the Firewall Plan's protocols and intentionally deleted Blake's information."), *see also id.* at 742 ("Holden and Smith then accessed Blake's computer and searched specifically for Pemco-related ESI and then deleted it rather than removing it and delivering it to the legal department.").

And *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410 (W.D.N.Y. 2017), to which Adler also points, likewise involved defendants who "destroyed or recycled [a] laptop without ever confirming that the data had been preserved in another repository." *Id.* at 431-32.

The Court finds, as to the Talk Desk call recordings and Slack messages, that Defendants did not act with bad faith or the intent to deprive Adler of the lost ESI's use in this litigation.

-57-

As to Jason Love's emails, most of what Adler points to as support for a finding of bad faith and "intent to deprive" under Rule 37(e)(2) again are what Adler was required to show to establish that the four predicate elements exist:

| Predicate element (2): that ESI has been lost | (9) Defendants' deletion of the Love emails … in late 2021… |
| --- | --- |
| Predicate element (3): the ESI was lost because of a party's failure to take reasonable steps to preserve it | (1) the ease with which Defendants could have preserved the evidence<br>Rather than send out a preservation notice, which Defendants' owner Lauren Mingee falsely testified had been sent, Mingee told her officers that Adler's suit "was over" and "there was nothing to be concerned about." As a result, the exact persons within Defendants' organization who were in a position to ensure adequate preservation efforts had no reason to think those efforts were necessary.<br>[W]hen Defendants' Chief Operating Officer deleted Jason Love's email account sometime after Love left in December 2021, he was either unaware of Defendants' duty to preserve evidence or he disregarded that duty despite having learned about the loss of Defendants' call recordings around the same time. …. Given that Adler served his first set of discovery requests in November 2021 approximately a month before Love's departure, there is a strong likelihood that Walker deleted Love's email account after learning about the deleted call recordings. But even assuming otherwise, his lack of awareness was the result of the inaccurate statements by Defendants' owner Mingee about the status of Adler's lawsuit. |

Unlike the evidence as to the Talk Desk call recordings and Slack messages, Defendants took an affirmative step that resulted in the loss of Love's emails.

But the facts before the Court support a finding that this action was equally or even more likely motivated by negligence or recklessness than by an intent to deprive Adler of the emails' use in this litigation. Defendants explain that, "[a]fter Love's departure from Quintessa, Love's license was removed from Quintessa's Google

-58-

system and transferred to a new employee, resulting in the inadvertent deletion of Love's emails." Dkt. No. 77 at 9; *see also id.* at 20.

And Adler himself argues that, "when Defendants' Chief Operating Officer deleted Jason Love's email account sometime after Love left in December 2021, he was either unaware of Defendants' duty to preserve evidence or he disregarded that duty despite having learned about the loss of Defendants' call recordings around the same time" and that, "[g]iven that Adler served his first set of discovery requests in November 2021 approximately a month before Love's departure, there is a strong likelihood that Walker deleted Love's email account after learning about the deleted call recordings" but that, "even assuming otherwise, his lack of awareness was the result of the inaccurate statements by Defendants' owner Mingee about the status of Adler's lawsuit." Dkt. No. 72-2 at 19-20. But this reliance of suspicious timing alone does not transform a set of facts that more likely amount to negligence or recklessness into bad faith or intentional destruction to deprive Adler of evidence.

The Court finds, as to Love's emails, that Defendants did not act with bad faith or the intent to deprive Adler of the lost ESI's use in this litigation.

### III.    The loss of the ESI caused prejudice to Adler

Although the Court does not find that Defendants acted with the required intent to deprive or bad faith as to any of the lost ESI at issue, Adler can still show that the ESI's loss prejudiced him and thereby allow the Court, under Rule 37(e)(1), to impose lesser sanctions in the form of "measures no greater than necessary to cure the prejudice."

According to Adler,

> [d]espite failing to preserve years' worth of Adler-related call recordings, Defendants have not hesitated in this lawsuit to make broad proclamations about what those same callers said and what they were thinking. Defendants' owner Lauren Mingee claimed at her deposition that the "vast majority" of callers were not confused, and that only a "very minute number" were confused. *See* Mingee Dep. 99:8-17; *see also id.* 212:15-21 (claiming only "small amounts" of confusion). Mingee made similar assertions about callers from the spoliated period specifically. *See, e.g., id.* 104:13-18 (claiming that, in 2018 and 2019, only a "minute number" of Defendants' referral firms complained about referred victims being confused); *id.* 266:18-268:1 (discussing instances of confusion in 2020 and dismissing them as "a small percentage").
>
> ....
>
> Defendants admit that, without the spoliated evidence, there are relevant facts they cannot provide. For example, Defendants claim an inability to testify about confusion from the spoliated period because their intake procedures have since changed. *See id.* 256:20-25 ("Q. So what's your theory of why these people are confused? ... A. This was in 2019. So our processes, procedures are different; so I can't speak to what – what it was then.").
>
> Defendants are also unable to reconcile discrepancies in their own written business records from the spoliated period – discrepancies that the call recordings may have resolved. For example, Defendants' written records show certain callers as having no prior attorney, when other evidence shows that those callers in fact were already engaged with Adler. *See, e.g.,* Mingee Dep. 308:6-309:23; Rausa Decl., Ex. 6 (Dep. Ex. 42). Defendants' owner Mingee testified that part of the procedure to investigate these issues would be to "[p]ull the recording," *id.* 269:18-270:7, but the deletion of the recordings has left Defendants unable to do so, *see, e.g., id.* 309:19-310:5. Nor are the Slack messages sent by Defendants' intake specialists during those calls available for review. Defendants' written records likewise show clients who signed with Defendants thinking they had signed with Adler's law firm, but Defendants could not provide the recordings or corresponding Slack messages to elucidate the situation. *See, e.g., id.* 271:22-272:22; Rausa Decl., Ex. 6 (Dep. Ex. 31).

Dkt. No. 72-2 at 16-17.

With that background, Adler asserts that "Defendants' deletion of the call recordings, Slack messages, and Love's email account prejudices Adler," where

[t]he deleted recordings provide the only direct, firsthand evidence of what actually happened on those calls. Any other evidence is secondhand at best, including Defendants' written summaries of the calls and testimony about what the intake specialists are trained to say. The recordings would show the Court and the jury exactly what Defendants' intake specialists say (including the tactics they use) and exactly what the victims express back to them (including, most centrally, any confusion).

Similarly, the Slack messages are the only evidence showing, in real time, how Defendants' intake specialists communicated internally about the voluminous confusion expressed by callers. Without the Slack messages, there is no direct, real-time evidence showing how supervisors instructed the intake specialists to deal with the ongoing confusion. Adler should not be forced to fill those gaps by relying on the testimony of Defendants' witnesses, which comes months or years after the individual incidents of confusion took place.

The same prejudice arises from Defendants' deletion of Jason Love's email account. Love was the highest-ranking employee in the intake center, charged with managing Defendants' intake specialists. While Love confirmed that he was generally aware of confusion among accident-victim callers and was "personally" concerned that Defendants' scripting was misleading, he was repeatedly unable to recall specific instances of confusion, or internal discussions about steps taken to address that confusion, without documents to refresh his collection. *See, e.g.*, Love Dep. 85:3-11, 101:3-102:19, 105:20-106:24, 113:10-114:19, 127:10-128:11. And because Defendants deleted his email account (over two years into the lawsuit and after Adler served discovery requests), Adler was necessarily limited in what documents were available to refresh Love's memory.

Defendants' positions in this suit further underscores the relevance of the spoliated evidence. Defendants try to claim that only a small percentage of callers were actually confused. Spoliating over two years' worth of call recordings, along with the corresponding Slack messages and Love's email account, prejudices Adler's ability to rebut that claim. Likewise, it prejudices Adler's ability to rebut Defendants' convenient assertion that, any time a caller is confused, Defendants "make sure they get unconfused." *See* Mingee Dep. 279:4-6. Given Defendants' lack of recollection about critical facts from the spoliated period, the spoliated evidence could have established those facts or impeached Defendants' testimony.

Consequently, Defendants' spoliation of evidence prejudices Adler. The Court may therefore enter sanctions under Rule 37(e)(1).

Dkt. No. 72-2 at 21-22.

Defendants respond that,

[s]hould the Court find that Defendants had a duty to preserve the lost ESI, Rule 37(e) requires a finding of prejudice to Adler from the loss of this information in order to impose any remedies. Here, Adler suffers no prejudice by the loss of the Talk Desk recordings, the Slack messages, or Jason Love's emails.

"A party suffers prejudice where it cannot present 'evidence essential to its underlying claim.'" *Coastal Bridge Co., L.L.C v. Heatec, Inc.*, 833 Fed. App'x. 565, 575 (5th Cir. 2020) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010)). "Prejudice to the non-culpable party can range from an utter inability to prove claims or defenses to minimal effects on the presentation of proof." *Ashton*, 772 F. Supp. 2d at 801 (citing *Rimkus*, 688 F. Supp. 2d at 613). "Generally, the prejudice element is satisfied 'where a party's ability to present its case or to defend is compromised.'" *Id.*

**Talk Desk Recordings.** Adler claims that the deleted Talk Desk recordings from September 2019 through 2020 provide the only direct evidence of what Defendants' intake specialists are trained to say. Mot. at 16. This is not true. In fact, Defendants have produced Talk Desk call recordings from 2021 – before the Fifth Circuit reversed dismissal – which provide Adler with the very information it complains has been lost: "exactly what the Defendants' intake specialists say (including the tactics they use)..." Mot. at 16. Moreover, Quintessa has produced contemporaneous notes taken by intake specialists documenting any instances where Adler was mentioned. Quintessa has also produced e-mails with law firms where a client mentioned Adler.

Underscoring just how unimportant these Talk Desk calls actually are to Adler's claims, Adler has not questioned Ms. Mingee, in her individual or corporate representative capacity, or any other Quintessa employee, about a single telephone call out of the 488 recordings that have been produced. Rather, Adler has focused on questioning Defendants about their written scripts, e-mails, and intake notes and logs.

Moreover, Adler claims that the Court can infer that "hundreds, if not thousands of recordings from September 2019 through 2020 were deleted." But this is an over-exaggeration of the number of calls that could be relevant to Adler's claims. Quintessa's intake records (again, which were preserved and produced) show that from August 23, 2019 (the date the lawsuit was filed) to the end of 2019, Quintessa received only 132 calls where Adler was mentioned (and even then, few callers expressed potential confusion). In 2020, Quintessa received 527 calls, again with a de minimis number expressing potential confusion.

Where the "abundance of preserved information [appears] sufficient to meet the needs of all parties," *see* FED. R. CIV. P. 37(e)(1) Committee Notes, as is the case here, the missing Talk Desk recordings have minimal effect on Adler's presentation of proof. *See also Flores v. AT&T Corp.*, No. EP-17-00318-DB, 2018 WL 6588586, at *7 (W.D. Tex. Nov. 8, 2018) ("Without an articulated reason as to why the lost ESI affects his presentation of proof or is prejudicial, the Court is unable to find that Plaintiff has suffered any prejudice..."); *see also Rimkus*, 688 F. Supp. 2d at 616 ("[c]ourts have held that speculative or generalized assertions that the missing evidence would have been favorable to the party seeking sanctions are insufficient.").

**Slack Messages.** The Slack messages are also irrelevant to Adler's claims, the loss of which has caused Adler no prejudice. Adler overstates the importance and role of Slack to Quintessa. Slack is not used as a communication channel amongst the Quintessa team.21 It is solely used by call center employees who input specific information, which is then sent to the intake management to determine what to do with that lead.22 If a lead is denied or a caller has an existing case, the information is not put through Slack. Ms. Mingee, as Quintessa's corporate representative, testified that

Adler even asked Ms. Mingee if the information in Quintessa_000001 (which contains a description of all calls received by intake where Adler has been mentioned since 2018) would be included in the Slack messaging, to which Ms. Mingee answered "no."

Moreover, the evidence that Adler seeks through the Slack messages does not exist. Whenever Quintessa has searched Slack for any messages relating to Adler (which started Quintessa performing routinely in 2021), no relevant messages have been found. For the reasons explained above, Adler suffers no prejudice through the loss of the Slack messages, which means sanctions are unwarranted.

**Jason Love's Emails.** Adler claims it was prejudiced in what documents were available to refresh Love's memory during his deposition as a result of Love's e-mail account being deleted. Mot. at 17. Adler states, in a conclusory fashion, that Love's email account would have been a significant source of evidence supporting Adler's claims because Love reviewed recordings from potential callers after law firm clients complained the caller had already signed a retainer agreement with another firm, including Adler. Mot. at 9-10. But Quintessa has already produced the exact emails that Adler seeks. Indeed, despite Love's email account being inadvertently deleted after his departure

-63-

from Quintessa, Quintessa has produced dozens of emails involving Love, many of which concern the very subject matter Adler claims are lost, i.e., emails with law firm clients about leads where a potential client expressed he or she was seeking Adler or had already retained Adler. Further, Adler seems to ignore the fact that all of the potential recipients of Love's emails, as well as people who would have sent emails to Love, were custodians for which Quintessa did produce documents. Adler fails to identify any potential type or category of email to or from Mr. Love that would not have been captured by Quintessa's email productions from other Quintessa employees and email accounts. Here, again, the "abundance of preserved information [appears] sufficient to meet the needs of all parties." *See* FED. R. CIV. P. 37(e)(1) Committee Notes.

Adler has failed to show that it has been prejudiced by the loss of these three types of ESI. More specifically, Adler has failed to articulate how or why the lost ESI affects his presentation of proof or why the ample evidence that has been produced (including Talk Desk recordings from 2021 and onward, intake notes taken contemporaneously with calls, and dozens of emails with Jason Love) is insufficient to meet his needs. *Flores*, 2018 WL 6588586, at *8. Accordingly, Adler is not entitled to any relief under Rule 37(e)(1).

Dkt. No. 77 at 13-17 (cleaned up).

But Adler replies that

Defendants claim Adler suffers no prejudice from the spoliated evidence, supposedly because other sources of evidence are adequate substitutes for the spoliated evidence or because the evidence purportedly would not have revealed actual confusion or other relevant evidence. *See* Resp. at 13-17. This is both inaccurate and conclusory. In effect, Defendants are asking the Court to take their word for it when they say that: (1) the existing intake data wholly captures the substance of the deleted call recordings; (2) their intake specialists never mentioned Adler or caller confusion on Slack while talking to accident victims who asked for Adler; and (3) Jason Love never communicated with lower-level employees (whose email accounts were not searched) or third parties about Defendants' scheme. The remaining evidence supporting Adler's motion shows otherwise.

First, while Defendants' intake data already establishes substantial amounts of initial-interest confusion, *see* ECF No. 97 (Appx. 365-69), the data does not give a complete picture as to the caller confusion or Defendants' tortious interference. For instance, the intake data produced by Defendants shows that on numerous occasions their

-64-

employees recorded that Adler's existing clients had called to ask for a second opinion. However, recordings of those same calls show that to be untrue – Adler's clients were not calling in for a second opinion; rather, they were offered a second opinion by Defendants after they expressed that they had been trying to call Adler. In addition, the intake data that still exists does not wholly capture the substance of those calls. For example, the data does not indicate the number of times an accident victim asked whether he or she was speaking with Adler. Nor do they indicate whether Defendants' intake specialists ultimately disclosed their lack of affiliation with Adler or simply repeated that they were the "intake department." The intake data – comprised of summaries written by Defendants' own employees – is clearly not a substitute for the deleted call recordings. Ultimately, Defendants failed to preserve hundreds of call recordings which are directly relevant to – and perhaps the best evidence of – actual confusion.

Second, Defendants' suggestion that their Slack messages would not include references to or discussions about Adler or caller confusion rests solely on misleading excerpts from Lauren's deposition testimony. Defendants point to Lauren's testimony in arguing that the messages are irrelevant because they would not have included discussions about Adler or caller confusion, but Defendants did not disclose Lauren's admission that she rarely uses Slack. *See* ECF No. 78 (Appx. 16 at 72:3-4 ("I am a 1 percent. I'm not really in it.")). Lauren also testified that Defendants' officers likewise rarely use Slack. *Id.* at 71:13-18 ("Q. Okay. And what does management – how does management use Slack? A. They don't.").

Instead, Slack is primarily used by Defendants' intake specialists and supervisors – the exact persons interacting directly with confused accident victims. *See id.* Mike Walker (Defendants' Chief Operating Officer) and Leo Mingee (Lauren's husband) testified that intake specialists use Slack if they need to communicate or ask questions. These messages are sent in real time, while confused callers are still on the phone. *See* ECF No. 72-2 at 7-8. In the face of that testimony and Lauren's admission that she rarely uses Slack, neither Adler nor the Court should be forced to accept Defendants' word that no relevant evidence was ever transmitted over Slack, particularly given that Slack is the only real-time tool used by Defendants' intake specialists to communicate with their supervisors during calls.

Third, Defendants' description of Jason Love's emails is inaccurate. Love oversaw Defendants' intake department during the relevant time period, and Love testified that consumer confusion involving Adler was known by Defendants at the time and that Defendants' use of the phrase "intake department" when responding to confused consumers concerned him. *See* ECF No. 97 (Appx. 326 at 67:7-

25). While they produced a small number of emails "involving" Love, *see* Resp. at 16, just one was sent by him. In other words, Defendants deleted almost every email Love himself actually sent and produced only emails in which he was cc'd by Defendants' other custodians. *See* Ex. A, Decl. of Diana Rausa in Support of Plaintiffs' Reply ¶ 2, Ex. 1. As a result, Adler has no way of knowing whether Love emailed Defendants' intake specialists or other third parties about Adler in particular or Defendants' scheme in general.

The loss of the spoliated evidence indisputably prejudices Adler, particularly in light of Defendants' misguided argument in their Response that, of the actual confusion already produced, only "a de minimis number" of callers "express[ed] potential confusion." *See* Resp. at 15. Defendants should not be allowed to attack the (substantial) amount of actual confusion shown by the records they did preserve while simultaneously claiming that Adler cannot be prejudiced by their destruction of evidence that would have shown additional instances of actual confusion.

Dkt. No. 115 at 3-6 (cleaned up).

For all the reasons that Adler explains in the Spoliation Sanctions Motion and the reply, the Court finds that the loss of the Talk Desk call recordings, Slack messages, and Jason Love's emails at issue has caused prejudice to Adler. This is not an instance in which Adler has offered no "articulated reason as to why the lost ESI affects his presentation of proof or is prejudicial." *Flores*, 2018 WL 6588586, at *8.

And the other discovery that Defendants have produced – including Talk Desk call recordings from a later year and intake logs of calls and intake scripts – does not provide a substitute for Adler's obtaining the call recordings and Slack messages themselves, for the reasons that Adler explains. *Accord Schmalz*, 2018 WL 1704109, at *4 ("The content of text messages cannot be replaced simply by eliciting testimony from the Defendants, and by having Plaintiff accept that testimony rather than relying on the actual messages to use as they deem fit. Without the lost text messages,

Plaintiff is deprived of the opportunity to know 'the precise nature and frequency' of those private communications, which occurred during a critical time period."). Pointing out that "Defendants have produced Talk Desk call recordings from 2021 – before the Fifth Circuit reversed dismissal – which provide Adler with the very information it complains has been lost" does not undermine Adler's assertion that his ability to present his case is compromised by the loss of "the deleted Talk Desk recordings from September 2019 through 2020," Dkt. No. 77 at 14 – which are "the only direct, firsthand evidence of what actually happened on those calls" (as opposed to later calls), Dkt. No. 72-2 at 16.

Neither is the Court persuaded by Defendants' assertion that Adler cannot show prejudice because "Adler has never questioned a single Defendant or Quintessa employee about any of the 488 Talk Desk call recordings that have been produced." Dkt. No. 77 at 5. That may be because call recordings are direct evidence of what was said during those calls – which, in Adler's counsel's judgment, may not give rise to a need for questions to clarify what occurred or, as with call logs, investigate what they do not include. *Cf. Hollis*, 603 F. Supp. 3d at 623 ("The record in this case establishes prejudice. Some witness testimony will favor the version of events advanced by Mr. Hollis, while other witness testimony will favor the version advanced by CEVA. Definitive proof would have been recorded by CEVA's security cameras aimed at the scene.").

And that, "after receiving Adler's discovery requests, Defendants have diligently searched Slack for any messages relating to Adler" and have "started …

performing [this search] routinely in 2021" and "have found none" does little to inform the Court's prejudice analysis where Defendants acknowledge that "Slack has a recording history of 9 days" and that they did not do any searches for the first two years of this case. Dkt. No. 77 at 6, 9, 16. Rather than an instance of "the dog that didn't bark," this may be an instance of "the dog that wasn't home" – which does not advance Defendants' position here.

As for Love's emails – for the reasons that Adler persuasively explains, including by noting that Defendants have produced only one email that Love sent, and based on much of the same analysis as the Court laid out above as to the "restored or replaced" predicate element – the Court cannot accept Defendants' argument that Adler cannot show prejudice because Defendants "produced numerous emails to and from Love, as well as hundreds of emails from other Quintessa custodians during the same time period." Dkt. No. 77 at 6, 9. On this record, the Court cannot find that Defendants have "already produced the exact emails that Adler seeks." *Id.* at 16.

The Court finds that Adler has met his burden to show that the loss of the three categories of ESI has caused him to be unable to present evidence essential to his claims and that Defendants' production of Talk Desk recordings from 2021 and onward, intake notes taken contemporaneously with calls, and dozens of emails with Jason Love is insufficient to meet his needs.

### IV.  Allowing evidence of and jury consideration of the lost ESI and an attorneys' fees award are the appropriate sanctions

Adler asserts that "[t]he most appropriate remedies for Defendants' spoliation are a deemed factual admission, an adverse-inference instruction, dismissal of

-68-

Defendants' equitable defenses, and a fee award," which are "four complementary sanctions":

> **First**, the Court should deem admitted that substantial instances of confusion between Adler and Defendants occurred during the spoliated period among an appreciable number of consumers, and that Defendants took no action to address the ongoing confusion. Courts have recognized this) sort of deemed admission – i.e., one that does not equate to a default judgment nor prevent the assertion of other defenses – as a "lesser" sanction. Defendants have claimed that any confusion in the spoliated period was insignificant and a small percentage of their business. They should not be allowed to make those sorts of claims, having failed to preserve the very evidence that would potentially impeach or disprove them. A deemed admission addresses this concern.
>
> [As an alternative to a deemed admission, the Court could enter a discovery sanction under Rule 37 excluding Defendants from arguing, testifying, or offering any evidence to the effect that the instances of confusion from the spoliated period were "small," "insignificant," or any similar unsupported claim, or that they took action to address the ongoing confusion. *See* FED. R. CIV. P. 37(e)(1) (authorizing a court to order any measures "necessary to cure the prejudice" when ESI "is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced"). Adler submits, however, that a deemed admission is a more appropriate and proportionate remedy on these facts. It better achieves the goals of deterrence, protecting the judicial process, and undoing the prejudice to Adler. *See Ashton*, 772 F. Supp. 2d at 801. Also, a deemed admission is a clean "one-shot" remedy, while an order of exclusion puts a greater ongoing burden on Adler to make sure Defendants do not violate the order.]
>
> **Second**, because Defendants acted in bad faith, the Court should issue an adverse-inference instruction to the jury at trial. *See, e.g., T & E Inv. Grp. LLC v. Faulkner*, No. 11-CV-0724-P, 2014 WL 550596, at *10, 19 (N.D. Tex. Feb. 12, 2014) (adopting magistrate's recommendation of sanctions, including a jury instruction that "would entitle the jury to draw an adverse inference that a party who intentionally spoliated evidence did so in order to conceal evidence that was unfavorable to that party"). The specific language of that instruction, which is within the Court's sound discretion, can be addressed by the parties during the jury-charge conference or at another appropriate time.
>
> **Third**, the Court should strike Defendants' equitable defenses of laches, acquiescence, estoppel, and unclean hands. Defendants' bad-faith spoliation precludes them from receiving any equitable relief. *See*

*Citrix Sys., Inc. v. Workspot, Inc.*, No. CV 18-588-LPS, 2020 WL 5884970, at *12 (D. Del. Sept. 25, 2020) ("Workspot, by submitting and relying on the false Chawla Declaration, has come to this Court with 'unclean hands.' It would offend notions of equity for Workspot to prevail on any equitable defense moving forward."); *see also Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 128 (4th Cir. 2019) (district court's sanctions order barring defendant from asserting equitable defenses requires reversal of summary judgment in defendant's favor on its equitable defenses).

**Fourth**, the Court should award Adler's reasonable attorneys' fees incurred in connection with investigating the spoliation issue and bringing this motion. *See T & E Inv.*, 2014 WL 550596, at *10, 19 (adopting recommendation of a monetary sanction in addition to an adverse-inference instruction).

Dkt. No. 72-2 at 26-28 (cleaned up).

Defendants respond that

Adler seeks a case-dispositive deemed factual admission of substantial instances of confusion, an adverse-inference instruction, dismissal of Defendants' equitable defenses, and a fee award. While Defendant contends that no sanctions are appropriate here, the first three requests in particular are extreme, disproportionate, and inappropriate.

First, the factual admission Adler seeks is not one of the three remedies available pursuant to Rule 37(e)(2) (which permits the court to (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment). Tellingly, the only case Adler relies upon to support this type of inappropriate remedy is an unpublished case from the Southern District of Texas in 2007 (pre-dating both *Rimkus* and *Ashton*) where a defendant had made repairs to a tractor involved in a collision, depriving the plaintiff's expert the opportunity to inspect the tractor. This case does not apply here. Recognizing that this is an inappropriate remedy, Adler offers an alternative to a deemed admission, i.e., a discovery sanction under Rule 37. But this remedy is also disproportionate and inappropriate, as Defendants have produced all instances of alleged confusion known to Defendants through other documents, which should not preclude Defendants from arguing the effect of these alleged instances of confusion. Accordingly, this request should be denied.

Second, Adler seeks an adverse-inference instruction to the jury. As explained above, an adverse inference jury instruction for spoliation is appropriate only where a showing is made that the malfeasant party

-70-

"intentionally destroy[ed] important evidence in bad faith [and] did so because the contents of those documents were unfavorable to that party." *Whitt*, 529 F.3d 278, 284 (5th Cir. 2008). Because the ESI at issue was not lost in bad faith, an adverse-inference instruction is inappropriate here. Nevertheless, even in cases where a court found that a defendant had a duty to preserve evidence, breached that duty in bad-faith, and the plaintiff suffered prejudice, courts in this district have still declined to give a jury an adverse-inference instruction. *See Repass v. Rosewood Hotels & Resorts, L.L.C.*, 184 F. Supp. 3d 401, 406-7 (N.D. Tex. 2015).

Third, Adler seeks to strike Defendants' equitable defenses. As with an adverse-inference instruction or granting a default judgment, "[a]s a general rule in this circuit, the severe sanctions of ... striking pleadings ... may not be imposed unless there is evidence of bad faith." *Rimkus*, 688 F. Supp. 2d at 614; *see also Coastal Bridge*, 833 Fed. App'x. at 575 ("Dismissal is justified 'only in circumstances of bad faith or other like action.") (internal citations omitted).

The cases Adler relies upon are inapposite (and not even from the Fifth Circuit). In *Citrix*, the defendant submitted and relied on a false declaration, which was the basis for striking defendants' unclean hands defense. Similarly, in *Beach Mart*, the court's order precluded the defendant from asserting licensee-estoppel where the defendant intended to deceive plaintiff and the Patent and Trademark Office about its rights in the disputed trademark. These situations of egregious misconduct don't apply here. Adler does not cite to a single case from this district (or even the Fifth Circuit) where a court awarded the extreme sanction of striking pleadings or defenses in factually analogous circumstances. That is because even in cases where courts have found bad-faith spoliation and prejudice to the plaintiff (which is not the case here), striking a defendant's pleadings is still inappropriate if "the prejudice suffered by Plaintiffs does not appear to make the challenge of proving their claims insurmountable." *T&E Inv. Group*, 2014 WL 550596, at *19. Here, Adler makes no showing that any prejudice it has suffered (which it has not) has made the challenge of proving his claims insurmountable.

Finally, Adler requests, as an afterthought, fees incurred in connection with investigating the spoliation issue and bringing this action. Adler relies upon one case where fees were granted in conjunction with a finding of prejudice and bad faith. But where Defendants have not acted with bad faith nor has Adler suffered any prejudice, an award of fees is inappropriate. *See, e.g.*, *Cornejo*, 2021 WL 4526703, at *5 (denying request for fees because a fact issue existed on the question of bad faith).

Dkt. No. 77 at 21-23 (cleaned up).

But Defendants also assert that, "even in cases where a court found that a plaintiff was entitled to Rule 37(e) sanctions, courts have been reluctant to strike pleadings and defenses and instead have issued sanctions 'in the form of denial of summary judgment,'" and that, "[t]o the extent the Court believes sanctions are appropriate here, Defendants contend this is the appropriate sanction." Dkt. No. 77 at 23 n.40.

Adler replies that

[m]uch of Defendants' argument against Adler's requested sanctions turns on their assertion that the spoliated evidence was not lost intentionally. Defendants also suggest that deemed admissions are unavailable under Rule 37(e) and that Adler's request for attorneys' fees is a throwaway argument. These arguments are meritless, not least because the facts show that Defendants were acting in bad faith when the spoliated evidence was destroyed. Significantly, Adler has not asked that the Court enter default judgment or strike Defendants' pleadings entirely.

Rule 37 authorizes any "measures" that are "necessary to cure the prejudice" from the loss of ESI. *See* FED. R. CIV. P. 37(e)(1). A deemed admission is necessary here given the obvious prejudice flowing from Defendants' claim that they confused only a "de minimis number" of consumers. At the very least, Defendants should be deemed to have admitted that they caused a substantial amount of actual confusion in connection with the spoliated evidence. *See* ECF No. 97 (Appx. 379-503). Further, attorneys' fees are the bare minimum in cases where a party engages in sanction-worthy spoliation. *See, e.g.*, *Carter v. Burlington N. Santa, LLC*, No. 4:15-CV-366-O, 2016 WL 3388707, at *5 (N.D. Tex. Feb. 8, 2016) ("[I]n addition to the attorney's fees mentioned above, the Court finds that the appropriate sanction for such spoliation ... will be that the jury will be given an adverse inference instruction."); *Repass v. Rosewood Hotels & Resorts, L.L.C.*, 184 F. Supp. 3d 401, 407 (N.D. Tex. 2015) (declining adverse inference instruction but granting fees). Otherwise, parties who expend resources investigating spoliation and bringing the issue to the court's attention would be prejudiced not only evidentiarily but also financially.

Dkt. No. 115 at 9-10 (cleaned up).

Because the Court cannot find that Defendants acted with bad faith or the intent to deprive Adler of the lost ESI's use in this litigation, the Court concludes that it cannot impose as a sanction the adverse-inference instruction and cannot – or at least should not – impose as sanctions the deemed admission and striking of Defendants' equitable defenses that Adler requests.[13]

Even if the deemed admission or striking defenses do not fall within the scope of what Rule 37(e)(2) governs and what the Court therefore cannot impose under Rule 37(e)(1), the Court is not persuaded that either requested sanction is an appropriate measure that is "no greater than necessary to cure the prejudice" under Rule 37(e)(1).

Adler's reasoning for striking equitable defenses does not hold where the Court has not found that Defendants acted with bad faith.

And, as to the requested deemed admission, while the Court finds that the loss of the ESI prejudices Adler's presentation of his case, Adler also asserts that Defendants' other evidence produced in discovery reveals a significant amount of

---

[13] *See generally* FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments ("In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies. Care must be taken, however, to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation. An example of an inappropriate (e)(1) measure might be an order striking pleadings related to, or precluding a party from offering any evidence in support of, the central or only claim or defense in the case.").

confusion. The Court finds that taking this core dispute off the table at trial, either through a deemed admission or the alternatively proposed discovery sanction, is not the appropriate measure that is no greater than necessary, under the circumstances, to cure the prejudice.

The Court instead determines that the appropriate sanction in this case under Rule 37(e)(1) is to "allow[] the parties to present evidence to the jury concerning the loss and likely relevance of [the lost ESI – Talk Desk call recordings, Slack messages, and the email account for Jason Love –] and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision." FED. R. CIV. P. 37(e), advisory committee's notes to 2015 amendments. As another court recently explained, "[o]ther [c]ourts have imposed similar sanctions when the non-spoliating party cannot show an 'intent to deprive,'" and this measure serves to cure the prejudice to Adler by having "the jury be able to determine the weight and importance of what the [lost ESI] may have shown[.]'" *Wilson*, 2022 WL 3273714, at *2 (cleaned up).

"At this pretrial stage, however, the Court declines to rule on the precise scope of admissible evidence regarding the [loss of the ESI], and the content of the jury instruction. Courts have noted that this approach affords the district judge with flexibility to determine the scope of the spoliation evidence to be presented at trial, including any argument that may be made to the jury on this issue, and to craft any related jury instructions on a full evidentiary record." *Id.* (cleaned up).

The Court will also order Defendants, jointly and severally, to pay Plaintiffs Jim S. Adler, P.C. and Jim Adler the reasonable attorneys' fees and costs that they incurred in having their attorneys draft and file the Motion for Sanctions for Spoliation of Evidence and the reply and appendices in support. This, the Court finds for the reasons that Adler urges in reply, is the other half of the appropriate measure that is no greater than necessary, under the circumstances, to cure the prejudice that the Court has found that the loss of the ESI has cause Adler.

Adler must, by no later than **Wednesday, March 8, 2023**, file an application for attorneys' fees that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees and costs (as described above) to be awarded. The fee application must be supported by documentation evidencing the "lodestar" calculation, including affidavits and detailed billing records, and citations to relevant authorities and must set forth the itemized number of hours expended in connection with the recoverable attorneys' fees described above as well as the reasonable rate(s) requested. *See generally Tollett v. City of Kemah*, 285 F.3d 357, 367 (5th Cir. 2002).

Defendants must file any response to the application by **Wednesday, March 29, 2023**, and Adler must file any reply by **Wednesday, April 12, 2023**.

## Conclusion

For the reasons and to the extent explained above, the Court grants in part and denies in part Plaintiffs Jim S. Adler, P.C. and Jim Adler's Motion for Sanctions for Spoliation of Evidence [Dkt. No. 72-2].

Finally, although this Memorandum Opinion and Order may not contain any confidential information, the Court will, out of an abundance of caution, conditionally enter it under seal because the underlying motion papers quoted or cited above were filed under seal. But the parties are ORDERED to file a joint report by **Wednesday, March 8, 2023** that (1) sets forth their views on whether this Memorandum Opinion and Order contain any confidential information – and, if so, where – and should therefore remain sealed and (2), if at least one party asserts that this Memorandum Opinion and Order should remain sealed, attaches for the Court's consideration a proposed public version of the Memorandum Opinion and Order with any and all assertedly confidential information redacted, along with supporting materials from the party asserting the need for sealing and for each proposed set of redaction to any portion of the Memorandum Opinion and Order. *See, e.g.*, *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 519-21 (5th Cir. 2022).

SO ORDERED.

DATED: February 15, 2023

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE