IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | No. 3:19-cv-2025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC d/b/a | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| QUINTESSA MARKETING, LLC d/b/a | § | FILED UNDER SEAL |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| and LAUREN VON MCNEIL, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**[1]

Defendants McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren Von McNeil Mingee (collectively, "Quintessa") move to exclude the expert opinion and evidence of David Stewart. *See* Dkt. No. 87.

Plaintiffs Jim S. Adler, P.C. and Jim Adler filed a response, see Dkt. No. 119, and Quintessa filed a reply, see Dkt. No. 134.

For the reasons explained below, the Court denies Defendants' Motion to Exclude Plaintiffs' Expert David Stewart [Dkt. No. 87]. *See See Jacked Up, L.L.C. v.*

---

1 Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

*Sara Lee Corp.*, 807 F. App'x 344, 346 n.2 (5th Cir. 2020) (the admissibility of an expert report is "a non-dispositive matter," which can be ""referred to a magistrate judge to hear and decide'" under Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A)).

## Background and Legal Standards

The parties and the Court are familiar with the background of this case, so the Court will not repeat it here.

As another judge in this district recently laid out,

> Federal Rule of Evidence 702 governs the admissibility of expert testimony as evidence. Rule 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's knowledge will assist the trier of fact, and (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."

*Ramos v. Home Depot Inc.*, No. 3:20-cv-1768-X, 2022 WL 615023, at *1 (N.D. Tex. Mar. 1, 2022) (cleaned up).

"In its gatekeeping role, the Court determines the admissibility of expert testimony based on Rule 702 and [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993),] and its progeny." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 800 (N.D. Tex. 2018), *aff'd*, No. 3:11-cv-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018). Under Rule 702 and *Daubert*,

> [a]s a gatekeeper, this Court must permit only reliable and relevant testimony from qualified witnesses to be admitted as expert testimony. The party offering the expert testimony has the burden of proof, by a

preponderance of evidence, to show that the testimony is reliable and relevant.

*Ramos*, 2022 WL 615023, at *1 (cleaned up). And "*Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Applying this analytical framework under Rule 702 and *Daubert*, a "court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Galvez v. KLLM Transp. Servs., LLC*, 575 F. Supp. 3d 748, 759 (N.D. Tex. 2021).

"First, an expert must be qualified. Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training or education." *Aircraft Holding Sols., LLC v. Learjet, Inc.*, No. 3:18-cv-823-D, 2022 WL 3019795, at *5 (N.D. Tex. July 29, 2022) (cleaned up). "The distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Holcombe*, 516 F. Supp. 3d at 679-80 (cleaned up); *accord Arnold v. Allied Van Lines, Inc.*, No. SA-21-CV-00438-XR, 2022 WL 2392875, at *18 (W.D. Tex. July 1, 2022) ("Testimony regarding first-hand,

historical perceptions constitutes lay, not expert, opinion testimony."). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Aircraft Holding*, 2022 WL 3019795, at *5 (cleaned up).

And, if the expert is qualified, "Rule 702 charges trial courts to act as gate-keepers, making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Expert testimony must be both relevant and reliable to be admissible." *Hall v. State*, No. CV H-21-1769, 2022 WL 2990912, at *4 (S.D. Tex. July 28, 2022) (cleaned up).

> Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue. Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has "any tendency to make a fact more or less probable than it would be without evidence" and "is of consequence in determining the action."

*Id.* (cleaned up). "Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). "To be relevant, the expert's reasoning or methodology [must] be properly applied to the facts in issue." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022) (cleaned up).

"When performing [the required gate-keeping Rule 702 and *Daubert*] analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). "Assisting the trier of fact means the trial judge ought to insist that a proffered

expert bring to the jury more than the lawyers can offer in argument," but "the helpfulness threshold is low: it is principally ... a matter of relevance." *Id.* at 293-94 (cleaned up).

As to reliability, the required "analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia," and "mandates that expert opinion be grounded in the methods and procedures of science." *Jacked Up*, 291 F. Supp. 3d at 801 (cleaned up). "Expert evidence that is not reliable at each and every step is not admissible." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "Expert testimony is reliable if the reasoning or methodology underlying the testimony is scientifically valid." *Ramos*, 2022 WL 615023, at *1 (cleaned up).

"Such testimony must be more than subjective belief or unsupported speculation." *Id.* (cleaned up). "In other words, this Court need not admit testimony that is connected to existing data only by the ipse dixit [– that is, an unproven and unsupported assertion resting only on the authority –] of the expert." *Id.* (cleaned up). "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Holcombe*, 516 F. Supp. 3d at 687 (cleaned up).

"Experts are permitted to rely on assumptions when reaching their opinions," but "those assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up*, 291 F. Supp. 3d at 807-07 (cleaned up). "But there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Id.* at 801 (cleaned up). More specifically, "[e]xperts are permitted to

assume the fact of liability and opine about the extent of damages," and "[a]n expert's reliance on assumptions does not itself make the expert opinion unreliable or inadmissible." *ENGlobal U.S. Inc. v. Native Am. Servs. Corp.*, No. CV H-16-2746, 2018 WL 1877015, at *8 (S.D. Tex. Apr. 19, 2018) (cleaned up).

And Federal Rule of Evidence 703 "permit[s] an expert witness to base his opinion on 'facts or data ... that the expert has been made aware of or personally observed' and to opine [and based his opinion] on inadmissible evidence if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 269 & n.10 (cleaned up). More specifically, courts have concluded that, although a party's damages expert "did not personally observe the facts or data in [another expert's report], as a damages expert, he may rely on hearsay, including other expert reports, in forming his opinions." *ENGlobal*, 2018 WL 1877015, at *11 (cleaned up).

Still, "Rule 702 and *Daubert* require an expert witness independently to validate or assess the basis for his or her assumptions," and "[t]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable," which "requires some objective, independent validation of the expert's methodology." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to

receive that opinion. In the words of the Third Circuit, "the suggestion that the reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results from an unduly myopic interpretation of Rule 702 and ignores the mandate of *Daubert* that the district court must act as a gatekeeper." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* at 348-49 (cleaned up). "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"The Court normally analyzes questions of reliability using the five nonexclusive factors known as the *Daubert* factors, [which are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community]." *Ramos*, 2022 WL 615023, at *1 & n.11 (cleaned up). "But these factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kim v. Nationwide Mut. Ins. Co.*, No. 3:21-cv-345-D, 2022 WL 2670393, at *5 (N.D. Tex. July 11, 2022) (cleaned up). "The point of this inquiry

is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Holcombe*, 516 F. Supp. 3d at 674 (cleaned up).

"The Court also does not need to admit testimony based on indisputably wrong facts." *Ramos*, 2022 WL 615023, at *1 (cleaned up). "The Fifth Circuit has recognized that [t]he *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion,'" and "an opinion based on insufficient, erroneous information, fails the reliability standard." *Jacked Up*, 291 F. Supp. 3d at 802 (cleaned up). "And although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, the existence of sufficient facts ... is in all instances mandatory." *Id.* (cleaned up).

But, "[i]n conducting its analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology." *Ramos*, 2022 WL 615023, at *1 (cleaned up). A motion to exclude is not properly based on an "objection that goes to whether [the proffered expert's] opinion is correct, not whether it is reliable," where "[t]he proponent need not prove to the judge that the expert's testimony is correct, but," rather, "by a preponderance of the evidence that the testimony is reliable." *Aircraft Holding*, 2022 WL 3019795, at *8 (cleaned up). "Even when a court rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." *United States v. Hodge*, 933

F.3d 468, 477 (5th Cir. 2019), as revised (Aug. 9, 2019) (cleaned up). And, so, "[w]hen the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *ENGlobal*, 2018 WL 1877015, at *8 (cleaned up).

The Court cannot accept arguments that "urge[] the Court to establish an unattainable goalpost, essentially arguing that each item of expert testimony is unreliable insofar as it fails to conclusively prove [the expert testimony's proponent's] theory of its case or an element of a claim or defense," and thereby "confus[e] admissibility with sufficiency, and sufficiency with certainty." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). That "is not the standard for admissibility," or "even the standard for success on the merits," and "[i]t is not the Court's role, in the context of a *Daubert* motion, to judge the conclusions that an expert's analysis generates; the ultimate arbiter of disputes between conflicting opinions is the trier of fact." *Id.*

"If, however, there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered, the court may exclude the testimony as unreliable." *Kim*, 2022 WL 2670393, at *5 (cleaned up). For example, "the Court may exclude [an expert witness's] analysis if the studies that he relies on are so dissimilar to the facts presented that [the expert witness's] opinions cannot be sufficiently supported by the studies." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). "But the notion that expert testimony is only admissible to the extent that it is based on studies of identical individuals under identical circumstances would not

only turn the 'flexible' inquiry envisioned under Rule 702 on its head, but such rigid constructions of reliability and relevance would defeat the very purpose of expert testimony: to help the trier of fact understand and evaluate the evidence." *Id.* at 676-77 (cleaned up).

The "evidentiary gates [provided by Rule 702 and *Daubert*] exist to keep out error that may impermissibly affect the jury" and "to protect juries from unreliable and irrelevant expert testimony." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 264, 268. But "[t]he court's inquiry is flexible in that [t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). And, "[p]articularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role – the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. Thus, [w]hile the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022) (cleaned up).

And "[t]he Fifth Circuit has noted that [a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration," and, "[a]ccordingly, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

means of attacking shaky but admissible evidence." *Ramos*, 2022 WL 615023, at *3 (cleaned up). Generally, an opposing party's "doubts about the bases for [an expert's] opinions do not render his opinions so unsupported as to create 'too great an analytical gap' between the evidence he relies on and his opinions." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up).

### Analysis

Adler retained Dr. David Stewart to conduct a survey to quantify the likelihood of confusion resulting from Quintessa's use of the Adler Marks.

Quintessa challenges the reliability of Dr. Stewart's survey and asks the Court to exclude Dr. Stewart's report, survey, and testimony.

Quintessa asserts Dr. Stewart's "survey [is] so badly flawed that it cannot be used to demonstrate the likelihood of consumer confusion," Dkt. No. 87 at 6 (quoting *Viacom Int'l v. IJR Cap. Inv., LLC*, 891 F.3d 178, 197 (5th Cir. 2018)), and alleges that it has six serious flaws:

> • *First*, Dr. Stewart's survey fails to use a proper control. Instead, he chose a control that has virtually nothing in common with the Quintessa ad, which he further deemphasized by displaying it in a smaller font on a blurry screen. Because the control is too dissimilar from the stimulus, it cannot effectively control for noise.

> • *Second*, Dr. Stewart did not ensure that respondents could clearly <u>see</u> the stimulus, which Dr. Stewart admitted is blurry. Because the stimulus was blurry, and in some instances illegible, Dr. Stewart's failure to establish that respondents could clearly see it is a fatal flaw.

> • *Third*, Dr. Stewart's blurry stimulus does not even remotely reflect actual marketplace conditions. In the real world, internet users have the ability to scroll up and down on a search result page. This gives users the ability to see full ads, along with organic listings, which

provide critical context for drawing conclusions regarding the search engine results. Dr. Stewart's survey provided only a blurry, static image of a purported cell phone screen with the Quintessa ad artificially enlarged. Worse, he doctored the Adler ad to remove the words "The Texas Hammer," removing another critical contextual clue that would exist under normal marketplace conditions. Because Dr. Stewart's survey artificially deprived users of important context that would be available to them in the real marketplace, his survey is unreliable.

· ***Fourth***, the instructions in Dr. Stewart's survey are contradictory, ambiguous, and confusing. The instructions do not clarify whether the respondent should click on an advertisement for legal services <u>generally</u> or for the Texas Hammer <u>specifically</u>. Dr. Stewart's flawed instructions and survey questions render his survey unreliable.

· ***Fifth,*** Dr. Stewart's probative questions are impermissibly leading, despite Dr. Stewart's admission that survey questions should not be leading. This flaw further renders the results of Dr. Stewart's survey unreliable.

· ***Sixth***, in reaching his conclusions regarding net confusion, Dr. Stewart wholly ignores the open-ended responses describing as to <u>why</u> respondents clicked on any particular ad, <u>even when the answer demonstrated that the respondent was not confused at all</u>.

*Id*. at 6-7 (emphasis in original). Quintessa contends that some of the flaws, standing alone, but more so the cumulative effect of the flaws render the survey inadmissible.

As explained above, the Court should not, in its gatekeeping role under Rule 702 and *Daubert*, exclude a proffered expert witness's opinion or testimony because (1) it is not correct; (2) it contradicts other expert testimony or relies on a sets of facts that conflicts with that relied on by contradictory expert testimony, even if that contradictory expert testimony has been found to be reliable; or (3) it does not conclusively prove the proponent's theory of its case or an element of a claim or defense.

But the Court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.

And the party offering the expert testimony bears the burden of proof, by a preponderance of evidence, to show that a qualified expert's testimony is relevant (that is, the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, and the expert's reasoning or methodology properly can be applied to the facts in issue) and reliable (that is, the testimony is based on sufficient facts or data and is the product of reliable principles and methods).

The Court should exclude expert testimony where (1) the expert cannot bring to the jury, on a matter of relevance, more than the lawyers can offer in argument; (2) the expert testimony is based only on subjective belief or unsupported speculation or is connected to existing data only by the unproven assertion of the expert, resting solely on the expert's authority; (3) there is simply too great an analytical gap between the basis for the expert opinion and the opinion proffered (such as if the studies that the expert relies on are so dissimilar to the facts presented that the expert's opinions cannot be sufficiently supported by the studies); (4) the expert testimony is based on indisputably wrong or erroneous or insufficient facts; (5) the proponent fails to provide some objective, independent validation of the expert's methodology; (6) the source on which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion; or (7) the expert relies on assumptions that have no factual basis in the record or no underlying

rationale.

Adler has met its burden as to Stewart's opinions, as explained below.

Adler must demonstrate that Dr. Stewart's survey is an accurate reflection of consumer confusion. *See RE/MAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 705 (S.D. Tex. 2009). Courts focus on two factors to assess the validity and reliability of a survey: (1) the question format and (2) how the survey is conducted. *See Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). "Usually, methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility." *Id.* "Only when 'serious flaws in a survey will make any reliance on that survey unreasonable' and '[n]o reasonable jury could view the proffered survey as evidence of confusion among relevant consumers' should the survey be discounted entirely." *RE/MAX*, 655 F. Supp. 2d at 705 (quoting *Scott Fetzer*, 381 F.3d at 488).

"Usually, methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility." *Viacom*, 891 F.3d at 197 (cleaned up). Dr. Stewart's survey is not the exception to this general rule, and the Court is not persuaded by Quintessa's arguments to the contrary.

I.    <u>The Survey</u>

Dr. Stewart used a modified *Squirt* design. *See* Dkt. No. 88 at 9-10 (Stewart Report at App. 7-8). He sampled 400 consumers who were 18 years of age or older, reside in Texas, and indicated that they had previously used the services of a personal injury attorney or would consider using such services in the future. *See id.*

at 11-12 (Stewart Report at App. 10). Respondents took the survey using their personal mobile devices. *See* Dkt. No. 119-3 at 15 (Anderson dep. at 47:13-9-18).

After completing certain preliminary screening questions and reviewing preliminary instructions, respondents were shown the following instructions:

> For purposes of this survey and the questions to follow, we want you to assume that you have decided to seek information on or shop for the services of a personal injury attorney. You have decided to use your mobile telephone to seek this information. You have heard of an attorney that uses the name "The Texas Hammer," so you do a Google search on your mobile telephone for that attorney. The Google search produces results on your mobile telephone that are shown on the next screen. Please click the "Continue" button when you are ready to review the search results. After you have reviewed the search results indicate which ad, if any, you would respond to.

*Id.* at App. 126.

On the next screen, respondents were shown three search results and instructed to "[c]lick the ad below to indicate which result you would choose to obtain those services." *Id.* at App. 127. *Id.* (Exhibit C to Dr. Stewart's report). 47% of the respondents selected Quintessa's ad, 3% selected the control, 32% selected Adler's ad, and 19% did not select a link. *See id.* 11, 20-22, 162.

Dr. Stewart found that "applying the traditional correction for guessing by subtracting the percent of respondents who selected the control (Semi Truck Settlement) from the percent of respondents who selected the alleged infringing link (Accident Injury Legal Center) yields a level of net confusion of 44% (47% - 3%)." *Id.* at 11, 21.

II.    The stimulus

-15-

Quintessa argues Dr. Stewart's survey should be excluded because the stimulus (the search engine results page) was blurry and difficult to read. *See* Dkt. No. 88 at 129 (App. at 127) (Dr. Stewart's Survey, Exhibit C).

After Adler produced Dr. Stewart's report, Quintessa requested additional materials from Adler relating to Dr. Stewart's survey, including "a link to the survey or screenshots of how the survey or screenshots appeared on a smartphone." Dkt. No. 134-1 at 7. In response, Adler produced a PDF document that included screenshots of the survey, which were a reproduction of the same desktop computer screenshots attached as Exhibit C to Dr. Stewart's survey. *See id.* at 5-39. The only images of the survey that Adler produced in this litigation are the blurry images.

Quintessa argues that the consequences of the blurry stimulus render the survey inadmissible. It explains that the URL is a critical piece of identifying information in the survey's ad for two reasons: (1) the URL line contains the ad before it and (2) the URL describes the website that the ad is publicizing. Quintessa asserts that the URLs in the bottom two ads on the survey's search results page are essentially illegible. It further argues that making it difficult for respondents to read the URL, as well as other descriptive portions of the stimulus, deprives respondents of the opportunity to evaluate the ads in the stimulus in their full context, as respondents would be able to do in the real-world marketplace.

Quintessa contends that the fact that Dr. Stewart's survey used a blurry and, in some instances, illegible stimulus is a fatal flaw that makes the survey unreliable. *See Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d 558, 585-93 (S.D.N.Y. 2007)

-16-

(excluding a survey in part on the finding that "the stimulus [expert] used in his survey is improper" where stimuli "were blurred beyond comprehension" and key portions of the stimuli "are illegible.")

Dr. Stewart was asked about the blurry stimulus during his deposition. He admitted that the stimulus in his report was blurry, *see* Dkt. No. 88 at 277-78 (Stewart dep. 85:10-87:1), but he also stated that the stimulus seen by the respondents was clear and legible, *see* Dkt. No. 119-3 at 33-35 (Stewart dep. 85:6-87:1). He did not ask respondents if they could see the stimulus clearly. *See* Dkt. No. 134-1 at 50 (Stewart dep. 87:2-4).

Quintessa complains that the only evidence respondents saw a clear and legible stimulus when they took the survey is Dr. Stewart's word that they did. But that is enough for admissibility. Although a witness's testimony may be and in most cases is self-serving, it should not be excluded for that reason alone. *See C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011). A witness's testimony is admissible if it is made on personal knowledge, sets out facts that would be admissible in evidence, and shows that the witness is competent to testify on the matters stated. *See Great Am. Ins. Co. v. Employers Mut. Cas. Co.,* 18 F.4th 486, 493 (5th Cir. 2021); *see also Heinsohn v. Carabin & Shaw, P.C.*, 823 F.3d 224, 245 (5th Cir. 2016) (holding court erred by rejecting testimony solely because it was self-serving); *C.R. Pittman*, 453 F. App'x at 443 (same). Dr. Stewart's testimony meets the admissibility requirements.

III.    The control

-17-

Quintessa argues Dr. Stewart's survey should be excluded because the control – the Semi-Truck Settlement ad – is not similar enough to the Quintessa ad to produce reliable results.

A survey designed to estimate likelihood of confusion must include a proper control. *See THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) (citing Shari Seidman Diamond, REFERENCE GUIDE ON SURVEY RESEARCH, IN REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 229, 258 (Federal Judicial Center 2d ed. 2000)).

A control is designed to estimate the degree of background "noise" or "error" in the survey. Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology. *See id.* (citing 6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §32:187 at 32-397 to 32-400 (5th ed.)). To fulfill its function, a control should "share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *Id.* (citing DIAMOND ON SURVEY RESEARCH at 258 and referencing *Gov't Emps. Ins. Co. v. Google, Inc.*, No. 1:04CV507, 2005 WL 1903128, at *5 (E.D. Va. 2005) and *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1045 (S.D. Ind. 2000)).

"There is a fine line between finding a control that is similar enough to provide accurate results as to likelihood of confusion but not too similar so as the cause confusion itself." *Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp.

3d 588, 598-600 (N.D. Ohio 2019). "Strong" controls have more common features with the product at issue but are more likely to cause confusion themselves, resulting in a "conservative estimate of 'net confusion.'" *Id.* "Weak" controls with fewer common features have the opposite result and are "likely to yield inflated estimates of 'net' confusion." Id. "Due in part to the complexity and arbitrariness of control choice, courts have been reluctant to exclude a survey based on inadequate controls alone.*" Id.*; *see, e.g., Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.,* 865 F. Supp. 2d at 884, 984 (S.D. Tex. 2011) (declining to exclude survey even though control shared "virtually no features" with test ad).

Quintessa contends that Dr. Stewart's control – the Semi-Truck Settlement ad – was inappropriate because it is not similar enough to the Quintessa ad to produce reliable results. Specially, Quintessa asserts that the control is flawed because, in the survey, the Qintessa ad (1) is "enlarged" as compared to the smaller control and even smaller Adler ad; (2) is a call-only advertisement with a phone number while the control had neither; and (3) has four lines of text under the headline while the control ad is limited to three words ("Call us today") under the headline and does not mention a law firm, lawyer, or the provision of legal services

The Court addressed the blurriness issue in Section II above and will not repeat that analysis here.

Dr. Stewart testified the control, as seen by the respondents, was not disproportionately sized as compared to Quintessa's ad. *See* Dkt. No. 134 at 51 (Stewart dep. 91:1-24) ("The ads would have been – would have been the same size

with the caveat that the ads themselves are somewhat different in terms of the amount of content and the amount of white space."); 56 (Stewart dep. at 96:4-9) ("I think I can say with a fairly high degree of certainty that the size issues and the blurring issues that you've identified were not present in the actual programmed product that we used.").

According to Adler, Dr. Stewart explained that the control did not include a click-to-call number because that is the mechanism Adler alleges creates confusion. *See* Dkt. No. 119-3 at 18 (Stewart dep. at 54:15-25). A control that includes the elements of the advertisement being tested is more likely to cause confusion and introduce noise that artificially lowers the measured confusion caused by the alleged infringing ad. *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 925 (S.D. Tex. 2014) (crediting expert's explanation that including "a control image that could possibly be infringing contradicts the reasons for having a control [ ] in the first place.").

Dr. Stewart testified that he selected the control after considering what factors would make a good control, including what elements should not be in the control because they are part of what was being tested from Quintessa's ads, including phone number, call-only mechanism, and prominent generic language, and what elements should be in the control because they were not being tested. *See* Dkt. No. 119-3 at 16-18 (Stewart dep. 52:25-54:25), 30-32 (Stewart dep. at 76:16-78:24), 66-67 (Stewart dep. 181:20-182:23).

Quintessa does not explain why a difference in word count would lead

respondents astray in their selections.

The fact that an expert's survey may be imperfect or conducted in an alternative fashion does not automatically render the survey unreliable or its methodology so flawed as to permit its exclusion under *Daubert*. Quintessa fails to show that Dr. Stewart's control is so flawed as to merit exclusion.

Instead, Quintessa's arguments about the similarity of the control to Quintessa's ad go the weight, not admissibility, of Dr. Stewart's testimony. To the extent that Quintessa maintains that Dr. Stewart should have used different controls, it is free to attack those aspects of the survey on cross-examination.

IV.    <u>Market conditions</u>

Quintessa argues that Dr. Stewart's survey should be excluded because it fails to replicate the context in which the ads appear in the marketplace.

A survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace. *See*, *e.g.,* 5 MCCARTHY ON TRADEMARKS § 32:163 at 32–237 (4th ed. 1999) ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results"); *Simon Prop. Group,* 104 F. Supp. at 1038. Although no survey can construct a perfect replica of "real-world" internet searches on mobile phones, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions. *See Conopco v. Cosmair, Inc.,* 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999) (citing *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d

1033, 1042 (2d Cir. 1992).

Quintessa contends Dr. Stewart's survey fails to replicate the context in which the ads appear in the marketplace because (1) the survey provides an incomplete view of the search engine results, (2) the survey fails to present an accurate Adler advertisement for "the Texas Hammer," and (3) the survey stimulus is blurry and, in certain instances, illegible.

First, Quintessa asserts that the survey's search engine results page was incomplete because it did not replicate the real-world user's opportunity to scroll through the search results. Without it, Quintessa argues, respondents were deprived of important contextual clues they would normally encounter in the marketplace. *See J.T. Colby & Co., Inc. v. Apple, Inc.*, No. 11 Civ. 4060(DLC), 2013 WL 1903883, at *20 (S.D.N.Y. May 8, 2013).

In the actual marketplace, a search for "The Texas Hammer" would generate multiple results where consumers could scroll up and down on their smartphone screen to view all results on the page. *See* Dkt. No. 88 at 207-208 (Rebuttal Expert Report of Jeffery A. Stec). The search engine results page in the actual marketplace would also include organic results such as Jim Adler videos, links to Jim Adler's websites, similar questions people also ask, links to new articles, other sites, and Jim Adler images. *See id.*

But Dr. Stewart's stimulus shows three advertisements on a static search results page. Quintessa argues that, by so limiting the search results, Dr. Stewart's stimulus deprived respondents of important contextual clues that they would

normally encounter when viewing Quintessa's and Adler's ads. *See id*. at 208.

Dr. Stewart agreed that the opportunity to scroll through search results is a common part of the Google search experience. *See* Dkt. No. 88 at 270 (Stewart dep. 38:20-25). But research shows that it is rare for consumers to scroll past the first page of search results when searching online. *See* Diamond, S. and Swann, J., TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS, LAW, SCIENCE, AND DESIGN (2d ed. 2022) at 75; Dkt. No. 119-3 at 8-13 (Stewart dep. 37:25- 42:16,); 21–22 (Stewart dep. at 57:-58:1), 65-66 (Stewart dep. at 180:18-181:19). And the number of ads that can appear on the first page of a search engine is significantly limited on a mobile device. *See id*. at 25-30 (Stewart dep. 71:14-76:10).

From a practical standpoint, allowing respondents to scroll can lead to other issues, including increased survey time, memory problems, and competition rate, that could introduce unwanted noise into the survey. *See id*. at 66 (Stewart dep. 181:7-19); *cf*. Diamond, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS, p. 75 n.102 ("Webpage stimuli in such surveys should be static (i.e., a screenshot), rather than dynamic (i.e, visiting a website "live"), in order to control what each respondent in the survey is viewing.").

By providing respondents taking the survey on their mobile phones a screen shot with three separate search results, Dr. Stewart provided a reasonable replication of what respondents might see on the first page of their phone when searching for "The Texas Hammer." *See* Dkt. No. 113 at 30 (Stewart dep. 76:6-10) ("[W]hat I provided is consistent with what might be seen on a first page" and "[i]it

would require additional action on the part of an individual to find that other information."); *see also id*. at 119-3 at 8-13 (Stewart dep. 37:25-42:16,); 15 (Stewart dep. at 47:13-18); 21–22 (Stewart dep. at 57:-58:1), 65-66 (Stewart dep. at 180:18-181:19).

The survey also closely replicated the scenario that Adler alleges is driving confusion in the marketplace, namely Quintessa's use of generic, call-only advertisements appearing atop the first page of search results for Adler keywords.

At the least, Quintessa has not shown that these alleged defects rise to the level of removing the survey and Dr. Stewart's testimony from the evidence at trial can be subjected to cross-examination.

Second, Quintessa asserts that the "Tough Smart Lawyer" ad that Dr. Stewart uses in the survey fails to present an accurate Adler advertisement because it is neither an actual Adler ad nor representative of an Adler ad that would appear in response to a search for "The Texas Hammer" since that term is not included in the headline.

Quintessa's argument is based on Adler's historical ad copy and the examples of Adler ads produced by Adler in this lawsuit in which the words "The Texas Hammer" or "Texas Hammer" always appear in the headline. *See* Dkt. No. 88 at 208-10 (Stec report at 29-31).

Dr. Stewart testified that he understood the advertisement to be a real Adler ad. *See* Dkt. 119-3 at 19-20 (Stewart dep. at 55:20-56:14). Dr. Stewart also testified that he specifically chose an ad that had "Texas Hammer" in the body but that he

did not want to give the term undue precedence by including it in the headline. *See id.* at 40-41 (Stewart dep. 98:7-99:3).

In its reply, Quintessa challenges the Declaration of Sara Drevecky [Dkt. No. 119-1], Adler's SEM specialist, because she did not produce the documents that she reviewed. Ms. Drevecky declared that the ad in used in Dr. Stewart's survey is an actual advertisement used by Adler that ran from at least June 2019 to August 2020 in response to searches for several keywords, including "The Texas Hammer*." See* Dkt. No. 119-1 at 2-3 (Drevecky Dec. ¶¶ 3-5). It was running while Dr. Stewart collected data for his survey. *See* Dkt. No. 88 at 20 ("[D]ata collection [for Dr. Stewart's survey] began on June 19, 2020 and was completed on July 2, 2020.").

In its reply, Quintessa argues that,

> [p]rior to filing their Response, Plaintiffs had not produced **any** evidence that the ad included in the survey was a real Adler ad, let alone an ad that is representative of how Adler's ads typically appear in the marketplace. For this reason, Plaintiffs were unable to cite to any document produced in discovery to support Dr. Stewart's choice for the Adler ad. Rather, Plaintiffs were forced to generate and rely on a self-serving declaration by Adler's SEM specialist, Sara Drevecky. Resp. Ex. 1 (Doc. 119-1). In her declaration, Drevecky claims that the Adler ad in the survey is an actual ad that Adler used from June 2019 to August 2020 and that the ad was triggered by multiple keywords including, "the Texas Hammer." Resp. Ex. 1 (Doc. 119-1) at 3. Presumably, Drevecky had to review certain Adler records in order to confirm this information, yet even then, Adler failed to produce the underlying records that supposedly support Drevecky's declaration.

Dkt. No. 134 at 8. The failure to produce the documents Ms. Drevecky reviewed does not itself make Ms. Drevecky's Declaration inadmissible. Although Ms. Drevecky's testimony may be self-serving, she states that she has personal knowledge and, as

Adler's SEM specialist, she was competent to review documents and testify about the authenticity of the Adler ad used in the survey. *See Great Am. Ins. Co.*, 18 F.4th at 493

Third, the Court discussed the blurriness issue in Section II above and will not repeat that analysis here.

V.    <u>Survey's instructions</u>

Quintessa argues that Dr. Stewart's survey should be excluded because the instructions in Dr. Stewart's survey are contradictory, ambiguous, and confusing.

The challenged instructions state:

> *For purposes of this survey and the questions to follow, we want you to assume that you have decided* to seek information on or shop for the services of a personal injury attorney…You have heard of an attorney that uses the name "The Texas Hammer," so you do a Google search on your mobile telephone for that attorney. *The Google search produces results on your mobile telephone that are shown on the next screen. Please click the "Continue" button when you are ready to review the search results. After you have reviewed the search results* indicate which ad, if any, you would respond to…."

Dkt. No. 88 at 128-129 (emphasis added by Adler). On the next screen, which shows the three advertisements, respondents are instructed to *"[c]lick on the ad below to indicate which result you would choose <u>to obtain those services</u>." Id.*

Quintessa argues that respondents might have been confused as to whether they were searching for personal injury attorney services generally or "The Texas Hammer" specifically. Dr. Stewart testified that he obtained no information suggesting that respondents did not understand the instructions.

Dr. Stewart's instructions also follow the common format of first introducing

respondents to the topic at hand (personal injury attorney services) before directing them to the brand at issue ("The Texas Hammer"). *See* Dkt. No. 199-3 at 47-51 (Stewart dep. 111:24-115:21), *see also Shell Trademark,* 765 F. Supp. at 893 n.7 (rejecting contention that survey was suggestive because it introduced the topic of the survey – motor oils – before asking specific questions about the brands at issue): Diamond, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS at 285 (noting "it is typically advisable for surveys to move from general to specific content" and giving example of asking respondents to first consider luxury cars and then consider specific brands).

Accordingly, Quintessa's concerns about the instruction go to the weight, not admissibility, of Dr. Stewart's survey.

VI.    <u>Leading Questions</u>

Quintessa argues that Dr. Stewart's survey should be excluded because the probative questions are leading and suggestive.

A survey question that begs its answer by suggesting a link between a plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004).

After respondents selected an advertisement, Dr. Stewart asked them three questions: "Thinking about the ad you selected, do you think this advertisement" (1) "**is likely put out by**"; (2) or "[if] the services being advertised" "**are likely affiliated, associated or connected with**" or (3) "**are likely to have the**

-27-

**authorization, approval, or endorsement of**" "**the same personal injury attorney for which you were searching**." Dkt. No. 88 at 130-44 (Stewart Report at Exhibit C, pp. 14-31) (emphasis in original). Respondents had three answer options: "yes, is likely, "no, is NOT likely," and "don't know." *See id.* Each "yes, is likely" response was followed by an open-ended question asking respondents why they thought that and instructing them to be as complete in their answers as possible. *See id.* at 137-39, 144-45 (Stewart Report at App. 136-141, 142-43)

Quintessa argues that the close-ended questions should have presented respondents with all three potential answers in the body of the question–for example, "[f]rom what you know, do you think the company you selected (clicked on) **is or is not** put out by the same personal injury attorney for which you were searching, **or you do not know**?"). Dkt. No. 87 at 23-24 (emphasis in original).

Although it may be beneficial in some cases to include questions that incorporate the affirmative, negative, and neutral positions in the question itself, that format may also create "cumbersome questions that are difficult to comprehend." Diamond, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS at 287. And Dr. Stewart explained that the format suggested by Quintessa, and the examples suggested by its rebuttal expert, would have been confusing because it would not be clear what a yes or no answer meant. *See* Dkt. No. 119-3 at 57-58 (Stewart dep. 166:16-167:10).

Quintessa's objections to the format of the survey questions goes to the weight, and not the admissibility, of the survey.

VII.    Dr. Stewart's analysis of the data

Quintessa argues Dr. Stewart's survey and report should be excluded because Dr. Stewart failed to properly analyze respondents' explanatory answers, which caused him to overstate the amount of legally relevant confusion.

Respondents who selected the response stating the ad they selected was likely put out by the lawyer for whom they were searching were asked a follow-up, open-ended question asking why they thought that.

Dr. Stewart coded all respondents who initially clicked on the Quintessa ad as confused regardless of their responses to the follow-up questions. *See* Dkt. No. 88 at 282-83 (Stewart dep. at 125:18-126:10).

Quintessa asserts some of those explanations show no evidence of confusion or legally irrelevant confusion like gibberish or nonsensical answers. *See* Dkt. No. 88 at 282 (Stewart dep. at 125:18-126:10).

"Not all confusion counts," *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017), and "legally irrelevant confusion must be weeded out before survey evidence can be presented to the jury," *May Key, Inc. v. Weber*, 601 F. Supp. 2d 839, 841 (N.D. Tex. 2009). Quintessa contends Dr. Stewart's report is unreliable because he did not weed out the legally irrelevant confusion.

But Dr. Stewart also computed the likelihood of confusion another way, this time analyzing "the subsequent open ends, which are useful but not definitive with respect to why people made their selections." *Id.* at 283-84 (Stewart dep. 126:23-127:1).

-29-

Open-ended responses "can be misleading" and imprecise. Diamond, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS at 249. Some responses may not make sense or may refer to irrelevant elements in the stimulus.

> The reason why such pseudo-reasons may occur is that respondents who are questioned about their reasons for an answer will search for a plausible explanation that may or may not be the reason for their earlier response. Although people are often able to justify their positions when asked to explain their actions, such post-hoc explanations can only imperfectly capture the reasoning that actually produced their answers.

*Id*. at 249-50. For example, in *Gucci Am., Inc. v. Guess?, Inc.* the defendant argued the survey should be excluded because plaintiff's expert improperly coded the responses by counting respondents as confused even if they did not explicitly mention the allegedly infringing elements. 831 F. Supp. 2d 723, 741 (S.D.N.Y. 2011). The Court held that "expecting survey respondents to be able to parse their thought processes with such a high degree of specificity in response to an open-ended "why-do-you-say-that" question is unrealistic." *Id.* "Instead, there will likely be a spectrum of response explanations. On one end, an explanation might be the ideal kind that Guess charges are necessary. On the other end, an explanation might not mention any component of the allegedly infringing trade dress." *Id.* Recognizing that "most surveys" will have explanations "spread out across the spectrum," the court refused to exclude a survey based on defendant's coding objections. *Id.*

Here, Dr. Stewart computed the likelihood of confusion objectively by coding all respondents who clicked on the Quintessa ad as confused. He also computed the likelihood of confusion considering those respondents' subjective explanations.

The Court cannot accept Quintessa's contention that Dr. Stewart ignored the responses to the open-ended questions. Although Quintessa may disagree with Dr. Stewart's coding choices, that is not enough to exclude Dr. Stewart's survey in its entirety, *see id.* and, unlike *Mary Kay*, the Court cannot "easily distinguish legally relevant confusion from legally irrelevant confusion," 601 F. Supp. 2d at 849.

Accordingly, Quintessa's complaints about how Dr. Stewart analyzed the data go the weight, and not admissibility, of his survey, report, and testimony.

VII.    <u>Rebuttal report of Dr. Jeffrey A. Stec</u>

Quintessa finally argues that the Court should exclude Dr. Stewart's survey for the reasons stated in its rebuttal expert's report. Quintessa lists reasons and attached a copy of the report to the motion to strike, but it does not brief or provide meaningfully analysis of Dr. Stec's criticisms.

As stated above, the Court should not exclude a proffered expert witness's opinion or testimony because it contradicts other expert's testimony. Nor, while exercising its role as a gatekeeper, should it transform a *Daubert* motion into a determination on the merits. This battle of the experts should be resolved at trial and not at this phase of the litigation.

## Conclusion

The Court DENIES Defendants' Motion to Exclude Plaintiffs' Expert David Stewart [Dkt. No. 87].

Although this Memorandum Opinion and Order may not contain any confidential information, the Court is, out of an abundance of caution, conditionally

entering it under seal because the underlying motion papers quoted or cited above remain filed under seal. After the Court rules on the pending issues regarding what should remain sealed, *see* Dkt. Nos. 132, 147-154, the Court will, if appropriate consistent with those rulings on sealing of the underlying motion papers, order this Memorandum Opinion and Order to be unsealed or enter a public, redacted version of the Memorandum Opinion and Order.

SO ORDERED.

DATED: July 27, 2023

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE