# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JIM S. ADLER, P.C. and JIM ADLER,** | § | |
| | § | |
| **Plaintiffs,** | § | <span style="color:red">**FILE UNDER SEAL**</span> |
| | § | |
| **v.** | § | **CIVIL NO. 3:19-CV-2025-K** |
| | § | |
| **MCNEIL CONSULTANTS, LLC D/B/A** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | |
| **QUINTESSA MARKETING, LLC D/B/A** | § | |
| **ACCIDENT INJURY LEGAL CENTER** | § | |
| **and LAUREN VON MCNEIL,** | § | |
| | § | |
| **Defendants.** | § | |

---

## APPENDIX TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR DILUTION, MISAPPROPRIATION, TORTIOUS INTERFERENCE, AND REQUEST FOR DISGOREMENT

---

1.     Excerpts from Christopher Anderson deposition ................................................. App. 1-22

DATE: January 13, 2023

Respectfully submitted,

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com
Rebecca L. Adams
Texas Bar No. 24098255
radams@lynnllp.com
Barira Munshi
Texas State Bar No. 24095924
bmunshi@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3829 – Facsimile

**ATTORNEYS FOR DEFENDANTS
MCNEIL CONSULTANTS, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER,
QUINTESSA MARKETING, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER and
LAUREN VON MCNEIL**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via ECF on counsel of record on January 13, 2023.

*/s/ Rebecca L. Adams*
Rebecca L. Adams

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION
3
    JIM S. ADLER, P.C. and JIM )
4   ADLER                      )
              Plaintiffs,      )
5                              )
    VS.                        )CIVIL NO. 3:19-CV-2025-K
6                              )
    MCNEIL CONSULTANTS, LLC,   )
7   D/B/A ACCIDENT INJURY LEGAL)
    CENTER, QUINTESSA MARKETING)
8   LLC, D/B/A ACCIDENT INJURY )
    LEGAL CENTER and LAUREN VON)
9   MCNEIL                     )
                               )
10            Defendants       )
11  *********************************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
12                  R. CHRISTOPHER ANDERSON
                      NOVEMBER 11, 2022
13
                CONFIDENTIAL/ATTORNEYS' EYES ONLY
14                   (REMOTELY REPORTED)
    *********************************************************
15
16            ORAL AND VIDEOTAPED DEPOSITION of R.
    CHRISTOPHER ANDERSON, produced as a witness at the
17  instance of the Defendants and duly sworn, was taken in
    the above-styled and numbered cause on the 11th day of
18  November, 2022, from 9:39 a.m. to 4:33 p.m., before
    Rebecca Jones, Certified Shorthand Reporter in and for
19  the State of Texas, reported by computerized stenotype
    machine, at Christopher Anderson's Office, 500 W. 2nd
20  Street, Suite 1900, Austin, Texas 78701 pursuant to the
    Texas Rules of Civil Procedure, the First Emergency
21  Order regarding the COVID-19 State of disaster, and the
    provisions stated on the record or attached hereto.
22
23
24
25
```

```
 1                    A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4        JERED MATTHYSSE
          GIULIO YAQUINTO
 5        PIRKEY BARBER
          1801 East 6th Street
 6        Suite 300
          Austin, Texas 78702
 7        Telephone: 512.482.5245
          E-mail: jmatthysen@pirkeybarber.com
 8
 9   FOR THE DEFENDANTS:
10        REBECCA ADAMS
          BARIRA MUNSHI
11        LYNN PINKER HURST & SCHWEGMANN
          2100 Ross Avenue, Suite 2700
12        Dallas, Texas 75201
          Telephone: 214.981.3800
13        E-mail: radams@lynnllp.com
14
15   Also Present:
     Host, Ray Aguirre
16   Videographer, Guy Tubbs
17
18
19
20
21
22
23
24
25
```

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    ended up going to Quintessa in this particular case.

2              So if you sort of triangulate the two

3    pieces of information, that customers thought they were

4    getting Adler but got someone else and the fact that

5    Quintessa was bidding head to head directly against

6    Adler and achieving a position on the search engine

7    results above that, that the combination of at least

8    those two datapoints showed that customers were

9    ultimately going to go to Quintessa.

10        Q.   Is it your opinion or contention that any

11   Internet user who enters a search for Jim Adler but

12   ultimately retains a different attorney is a lost sale

13   for Adler?

14        A.   I don't think I would put it that way, no.

15        Q.   Okay.  Did you review Adler's daily sign up

16   reports in support -- or to determine whether Adler lost

17   sales?

18        A.   No, I did not.

19        Q.   Did you ask for that information?

20        A.   I don't know what that is.  So, no, I didn't.

21        Q.   Well, are you aware that Ms. Traveki testified

22   yesterday that Adler's firm tracks its daily sign-ups?

23        A.   No, I don't know what she testified to

24   yesterday.

25        Q.   Well, did you ask anyone in Adler's office

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    Q.    Do you know, sitting here today, whether

2  Adler's average daily sign-ups have increased or

3  decreased between 2019 and 2022?

4    A.    No.  I don't know.

5    Q.    Wouldn't that information be relevant to

6  determining whether Adler lost sign-ups due to

7  Quintessa's alleged infringement?

8    A.    It's possible that it is but because I don't

9  know what it is and I don't know anything about what the

10  data is or how it's tracked, I can't say one way or

11  another if it is.

12    Q.    Okay.  So you didn't review any data from Adler

13  about his daily, monthly or annual sign-ups, correct?

14    A.    I think that's correct.  I don't recall seeing

15  anything like that.

16    Q.    And just to make sure we're on the same page,

17  when we say "sign-ups" that's the same thing as client

18  engagement, which you said is what you are referring to

19  when you say "sales," right?

20    A.    I don't follow your question exactly.  Will you

21  repeat that?

22    Q.    Well, earlier we said -- you said that when you

23  are saying "lost sales" in this context, that you are

24  referring to client engagements, right?

25    A.    Yes.  I think that's fair.

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    Q.   Okay.  And so, I guess, I'm just saying when we
2    say "sign-ups," that's the same thing as a client
3    engagement, fair?
4    A.   I just don't know.  I haven't seen that
5    document and don't know anything about what that data
6    is, so I can't speak to what it does or doesn't say.
7    Q.   Okay.  So you didn't review any of Adler's
8    actual data with respect to client engagements to
9    develop your opinion that Adler lost client engagements,
10   did you?
11   A.   I don't recall if I saw anything about their
12   specific client engagements.  It doesn't -- doesn't
13   sound familiar.
14   Q.   Okay.  And you didn't do any analysis to
15   determine whether Quintessa's bidding activity
16   correlated or caused any increase or decrease in Adler's
17   client engagements, did you?
18   A.   No.  I don't believe so.
19   Q.   Okay.  So you don't have any basis for opining
20   that Adler actually lost or suffered a decrease in
21   client engagements as a result of Quintessa's bidding
22   activity --
23            MR. MATTHYSSE:  Objection --
24   Q    (By Ms. Adams) -- did you or do you?
25            MR. MATTHYSSE:  Objection to form.

1   asking -- I'm wanting a precise answer.  You don't --

2   your opinion that clients -- that Adler lost client

3   engagements is not actually based on any of Adler's data

4   with respect to client engagements, is it?

5       A.   I'm not sure.  With respect to daily sign-ups,

6   I don't have any data about daily sign-ups or the number

7   of clients that they signed up on a daily basis.  But

8   the auction insights data is -- is specific to Adler and

9   their performance with respect to the keyword searching,

10  so I'm not sure if that has some connection to what it

11  is that you are talking about.

12      Q.   Okay.  Setting aside the daily sign-ups, did

13  you review any data from Adler regarding client

14  engagements?

15      A.   You could -- you could argue that the auction

16  insights data is Adler data or specific to Adler that

17  has some bearing on client engagements.

18      Q.   Okay.  Well, did you do any analysis -- did you

19  do any analysis to determine how many -- that would

20  allow you to tie Adler's bidding data to actual client

21  engagements or sign-ups?

22      A.   Not anything with respect to Adler's bidding

23  data, no.

24      Q.   Okay.  So you cannot tie or tell me how Adler's

25  bidding data is related to client engagements, right?

1    A.   When you say "bidding data," I'm not clear on
2  what it is you mean by that.
3    Q.   Well, his auction insights -- his Google Ad
4  data, is that better?
5    A.   Yes.  So will you repeat the question with that
6  understanding?
7    Q.   All right.  So you do -- you cannot tell me how
8  Adler's Google Ad data correlates to his client
9  engagements, right?
10   A.   Right.  I don't have a statistic that shows
11 that.
12   Q.   Okay.  So you -- so given that you cannot tie
13 Adler's Google Ad data to his client engagements, you
14 also did not review any data related to client
15 engagements, right?
16        MR. MATTHYSSE:  Objection to form.
17   A.   It's sort of a broad thing to say because I do
18 think that the auction insights data does contain some
19 information about client engagements for Adler, so I
20 think it's too broad to say "I didn't review any data."
21 But with respect to some specific date that you have
22 asked about, I don't have that specific data that you're
23 referring to.
24   Q.   Well, I'm a little bit confused.  I thought we
25 just established that you could not tell me how his

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    Q.    Okay.  How are you connecting the dots?  What

2    analysis did you do to connect those dots?

3    A.    So I analyzed the auction insights data, which

4    shows a number of different metrics surrounding how

5    Adler is performing relative to others, and based on

6    that particular data, you can see that in many cases

7    Adler is not the top position in the search engine

8    results and overlaps with the number of people that are

9    competing effectively against him in that particular

10   case.  And as the performance of Quintessa increased

11   over a period of time, there is -- there is, based on

12   how the search engine results work, such that the top of

13   the page is the most valuable top of the page, you can

14   conclude or at least draw a logical conclusion that

15   Adler would get fewer of those -- fewer of those calls

16   then they would have otherwise.

17   Q.    Okay.  Well, did you do any analysis -- did you

18   review any data with respect to Adler's call volume?

19   A.    No, I didn't have that.

20   Q.    Okay.  So did you do any analysis with respect

21   to how Quintessa's bidding activity impacted Adler's

22   conversion rates?

23   A.    I don't think so.  But I don't remember

24   specifically but I don't think so.

25   Q.    Did you do any analysis as to how Quintessa's

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    Q.   Okay.  You don't know, sitting here today,

2  whether Adler's average daily sign-ups would increase or

3  decrease for your damages period, right?

4    A.   Right.

5    Q.   Okay.  So given that, you don't know whether

6  Adler actually lost any client engagements as a result

7  of Quintessa's bidding activity?

8              MR. MATTHYSSE:  Objection to form.

9    A.   I don't know of the specific client engagements

10  that they lost but I know that they lost client

11  engagements based on the bidding activity.

12    Q    (By Ms. Adams) Okay.  And so you are -- you are

13  drawing a conclusion from bidding activity that applies

14  to Adler's client engagements, right?

15    A.   Yes.  I think you could characterize it that

16  way.

17    Q.   Okay.  And you are drawing that conclusion

18  without having analyzed Adler's conversion rates?

19    A.   Yes, I am.  I don't have Adler's conversion

20  rates.

21    Q.   And you are drawing that conclusion without

22  having analyzed others call volume?

23    A.   Correct.  I don't have their call volume.

24    Q.   And you are drawing that conclusion without

25  having Adler's daily sign-up data?

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    A.    Correct.  I didn't have his daily sign-up data.

2    Q.    Okay.  You also mentioned in that sentence in

3  Paragraph 62, the third sentence down, that you analyzed

4  available information to determine whether Adler lost

5  sales or profits, correct?

6    A.    Correct.

7    Q.    Okay.  Did you determine that Adler lost

8  profits during the damages -- damages period?

9    A.    Yes.

10   Q.    Okay.  And what information did you analyze to

11 determine whether Adler lost profits?

12   A.    The number one thing was their cost per click.

13 If their cost went up, they would have made less profit

14 than if their costs were lower.  So on the lost profits

15 scale, it's an increase in cost that caused them to lose

16 profits.

17   Q.    Okay.  Well, did you review Adler's -- any

18 financial statements from Adler?

19   A.    I don't recall any financial statements, no.

20   Q.    Okay.  Did you review any ledgers?

21   A.    Definitely not ledgers.

22   Q.    Did you review any profit and loss statements?

23   A.    No, I did not.

24   Q.    Did you review any information with respect to

25 Adler's revenues during the damages period?

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    A.    No, I did not.

2    Q.    Okay.  Do you agree that if Adler's cost

3 increased but his revenues also increased that he may

4 not have suffered any lost profits?

5    A.    That is possible.

6    Q.    Did you conduct any analysis to determine

7 whether an increase in the cost per click also

8 correlated with increased conversion rates for those

9 same keywords?

10    A.    Whose cost per click and whose conversion rate

11 are you referring to?

12    Q.    Adler's.

13    A.    Will you ask that again, please?

14    Q.    Did you do any analysis to determine whether

15 Adler's increase in cost per click correlated to an

16 increase in conversion rates for Adler for those same

17 keywords?

18    A.    No, I did not.

19    Q.    Would you agree that if Adler's cost per click

20 went up but he's also -- as a result of that increase in

21 cost per click, he's also getting a higher conversion

22 rate, that he may not have lost profits?

23    A.    I don't know one way or another.

24    Q.    So that's not something you looked at?

25    A.    No.

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    A.   That sounds right.  I was just getting to it to

2  make sure.  Yes.  Okay.

3    Q.   Okay.  And I -- I don't see Adler 645 listed in

4  this scheduled documents you considered in the report,

5  do you?

6    A.   No, I don't.

7    Q.   Okay.  As a matter of fact, I see -- in the

8  Bates numbers I see that you list the documents

9  labeled -- excuse me -- Adler 640 to 643 and then it

10  goes to Adler 649 to 649, is there any reason that you

11  did not review this document in coming up with your

12  report?

13    A.   Not that I know of.  I just don't recall ever

14  seeing it.

15    Q.   Okay.  Were you provided with a complete copy

16  of Adler's production in this case?

17    A.   I don't know.

18    Q.   Okay.  So do you know if this document was ever

19  provided to you prior to your report?

20    A.   I don't know.

21    Q.   Okay.  Would you agree that in order to

22  determine a company's profits, you need to know both

23  their revenues and their costs?

24    A.   Yes.

25    Q.   Okay.  But you didn't -- and you looked at

1  Adler's cost per click, right?

2       A.   Yes, I did.

3       Q.   Okay.  But you did not look at his revenues,

4  fair?

5       A.   Fair.

6       Q.   So you reached an opinion that Adler lost

7  profits without reviewing any data with respect to

8  revenue?

9       A.   That's correct.

10      Q.   Okay.  So you only looked at one piece of the

11  puzzle with respect to profits, right?

12               MR. MATTHYSSE:  Objection to form.

13      A.   I only looked at cost but you can still draw

14  the conclusion that they lost profits if their cost

15  increased.

16      Q    (By Ms. Adams) Okay.

17      A.   Their profits as a percentage might not have

18  changed but their absolute profits would have changed.

19  ▮▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

22      A.   So in this particular case, I don't know if

23  this is referring to revenue or if it's referring to

24  profit.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    A.    Right.

2    Q.    And when we went on the break, Mr. Matthysse

3  got confirmation from somebody in Mr. Adler's office

4  that this summary of annual income is revenues, correct?

5    A.    That's correct.

6    Q.    Okay.  And so just to recap, this is not a

7  document that you ever recall seeing before today,

8  right?

9    A.    Right.

10    Q.    And there is no indication from your report

11  that you ever reviewed this document in coming up with

12  your opinion?

13    A.    That's correct.

14    Q.    And you don't recall reviewing any other

15  financial documentation related to revenues in coming up

16  with your opinions, correct?

17    A.    Whose revenues are you referring to?

18    Q.    Adler's?

19    A.    Correct.

20    Q.    Okay.  All right.  ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████

23    A.    That's correct.

24    Q.    Okay.  And did that correlate -- did you do --

25  in your analysis, did you find that Adler's CPCs, his

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1  cost per click, also went up from 2018 to 2019?

2      A.   I don't recall whether it went up from 2018 to

3  2019.   ████████████████████████████████████

   ████████████████████████████████████████████████████

   ████████████████████████████████████████████

6      Q.   Okay.  So you don't have any basis to opine

7  whether this ████████████████████ correlates with an

8  increase or decrease in profits, correct?

9      A.   That's correct.  I haven't seen this document

10 so I can't speak to what it says.

11     Q.   And that's not something that you looked into

12 with respect to your analysis in this case, right?

13     A.   Right.

14     ██   ████████████████████████████████████████

   ████████████████████████████████████████████

16     A.   Right.

17     Q.   All right.  And if we look at your report, if

18 you will go with me to Schedule 5.3.

19     A.   Okay.

   ██   ██   ████████████████████████████████████████

   ██ ████████████████████████████████████████████████

   ██ ███████

   ██   ██   ██████████████████████████████

24     Q.   Okay.  And if you will look with me at

25 Scheduled 9.

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    A.   Okay.

2    Q.   Did Adler's cost per click also go down from

3 2019 to 2020?

4    A.   I don't know if it went down on the whole

5 because this only does it by quarter, so I don't know

6 whether or not it went down on an annual basis from one

7 year to the next.

8    Q.   Okay.  That's not something that you -- that

9 you completed in your analysis?

10    A.   What is not something that I completed in my

11 analysis?

12    Q.   Determining whether Adler's cost per click went

13 down from 20- -- on an annual basis from 2019 to 2020 on

14 his branded campaigns?

15    A.   I did not calculate it on an annual basis that

16 I recall.  I believe our analysis is on a quarterly

17 basis.

18    Q.   All right.  So based on what we just looked at,

19 we see that combining these two documents, ███████████

███ ████████████████████████████████████████████████████████

███ ████████████████████████████████████████

22    A.   I think from the questions that you just asked,

23 that is true.

24    Q.   Okay.  And so ████████████████████████████████████

███ ████████████████████████████████████████████████████████

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1  ███████████████████████████████ and you have not done

2  any analysis to determine whether Adler's profits

3  increased or decreased from 2019 to 2020, did you?

4       A.   I did not look at whether or not his total

5  profits increased or decreased from 2019 to 2020, that

6  is -- that is true.

7  ███   ██████   ████████████████████████████████

8  ███████████████████████████████████████

9       A.   Yes.

10  ███   ██████   ████████████████████████████████

11  █████████████████████████████████████████████

12  ██████████████████████████████████

13       A.   I'm sorry, will you repeat the question?  I

14  missed a piece of it.

15  ███  ████████████████████████████████████████████

16  █████████████████████████████████████████████████

17  █████████████████████████████████████████████████

18  ███████████████████████████████████

19       A.   Not on an annual basis, no.

20       Q.   Okay.  Wouldn't that be important information

21  to consider, Adler's revenues, to determine whether

22  Adler actually lost profits over the damages period?

23       A.    It is one variable that you can look at but you

24  can also look at cost to determine whether or not their

25  profits went up or down?

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    fewer new clients then they would have absent what she

2    was doing.

3        Q.    Where in your report is the part about the

4    fewer clients?

5        A.    That would be a combination of the auction

6    insights data, the data about the customers, I believe,

7    that they were calling or trying to sign up with Adler

8    who ultimately went to a Quintessa client and I think

9    there were a few other things in there but I don't know

10   that there is a -- a single crystalized piece in there

11   for you.

12       Q.    Uh-huh.  You didn't do any analysis to

13   determine whether changes in or increases in Adler's

14   cost per click also correlated to increased conversions,

15   right?

16       A.    Right.

17       Q.    And you did not do any analysis to determine

18   whether any increase in cost per click also correlated

19   with an increase in call volumes, correct?

20       A.    Correct.  You are referring --

21       Q.    And you didn't do any --

22       A.    Sorry.  You are referring to Adler's cost per

23   click, right?

24       Q.    Yes.  We are just talking about Adler, yes.

25       A.    Yes.

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1    Q.   And you did not do any analysis to determine

2  whether Adler's -- any increases in Adler's cost per

3  click also correlated with increases in case sign-ups or

4  client engagements, correct?

5    A.   Correct.

6    Q.   And just briefly to go back a step before we

7  move on from this section, when we were talking earlier

8  about lost sales or lost client engagements that you

9  opined on, you did not do any analysis to quantify the

10 number of lost client engagements that you believed

11 Adler suffered as a result of Quintessa's bidding

12 activity, right?

13   A.   Right.

14   Q.   So there is no number that you can point to

15 sitting here today to say Adler lost out on "X" many

16 client engagements as a result of Quintessa, fair?

17   A.   Fair.

18   Q.   Okay.  All right.  Going back to Page 20 of

19 your report, Paragraph 62.

20   A.   Okay.

21   Q.   Okay.  And that sentence that we have been

22 looking at where you said, (reading) To do so, I

23 analyzed the available information to determine whether

24 Adler's -- or whether Adler lost sales or profits or

25 otherwise suffered some form of business loss.

R. Christopher Anderson - CONFIDENTIAL/ ATTORNEYS' EYES ONLY - November 11, 2022

1      Right?

2      A.   Right.

3      Q.   Okay.  So with respect to other forms of

4  business loss, you did not conduct any analysis as to

5  whether Adler suffered any alleged reputational harm,

6  did you?

7      A.   No, I did not.

8      Q.   Okay.  So you are not offering any opinion in

9  this case that Adler suffered reputational harm, are

10  you?

11      A.   I am not.

12      Q.   Okay.  And you did no analysis to determine

13  whether Adler suffered any loss of goodwill due to

14  Quintessa's conduct, right?

15      A.   Right.

16      Q.   So you are not offering any opinion on that?

17      A.   That's correct.  I'm not offering an opinion on

18  that.

19      Q.   And you are not offering any opinion with

20  respect to any loss of enterprise value with respect to

21  the Adler firm, are you?

22      A.   No, I'm not.

23      Q.   You didn't analyze whether Quintessa conducts

24  caused Adler to lose market share, did you?

25      A.   No, I did not.

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION
 3  JIM S. ADLER, P.C. and JIM )
    ADLER                      )
 4          Plaintiffs,        )
                               )
 5  VS.                        )CIVIL NO. 3:19-CV-2025-K
                               )
 6  MCNEIL CONSULTANTS, LLC,   )
    D/B/A ACCIDENT INJURY LEGAL)
 7  CENTER, QUINTESSA MARKETING)
    LLC, D/B/A ACCIDENT INJURY )
 8  LEGAL CENTER and LAUREN VON)
    MCNEIL                     )
 9                             )
            Defendants         )
10
                 REPORTER'S CERTIFICATION
11       ORAL DEPOSITION OF R. CHRISTOPHER ANDERSON
                   NOVEMBER 11, 2022
12
            I, Rebecca Jones, Certified Shorthand Reporter
13  in and for the State of Texas, hereby certify to the
    following:
14
            That the witness, R. CHRISTOPHER ANDERSON, was
15  duly sworn by the officer and that the transcript of the
    oral deposition is a true record of the testimony given
16  by the witness;
17          I further certify that pursuant to FRCP Rule
    30(e)(1) that the signature of the deponent:
18
    _____ was requested by the deponent or a party
19  before the completion of the deposition and is to
    be returned within 30 days from the date of receipt of
20  the transcript.  If returned, the attached Changes
    and Signature Page contains any changes and the
21  reasons therefor;
22  _____ was not requested by the deponent or a party
    before the completion of the deposition.
23
24
25
```

1   That the amount of time used by each party at
2  the deposition is as follows:

3       Rebecca Adams (05 hours:11 minutes)

4       That pursuant to information given to the
5  deposition officer at the time said testimony was taken,
   the following includes counsel for all parties of
   record:
6  FOR THE PLAINTIFFS:
   JERED MATTHYSSE
7  GIULIO YAQUINTO
   PIRKEY BARBER
8  1801 East 6th Street
   Suite 300
9  Austin, Texas 78702
10 Telephone: 512.482.5245
   E-mail: jmatthysen@pirkeybarber.com
11 FOR THE DEFENDANTS:
   REBECCA ADAMS
12 BARIRA MUNSHI
   LYNN PINKER HURST & SCHWEGMANN
13 2100 Ross Avenue, Suite 2700
   Dallas, Texas 75201
14 Telephone: 214.981.3800
   E-mail: radams@lynnllp.com

15      I further certify that I am neither counsel
16 for, related to, nor employed by any of the parties or
   attorneys in the action in which this proceeding was
17 taken, and further that I am not financially or
18 otherwise interested in the outcome of this action.

19
20      Certified to by me this 30th day of November,
   2022.

21      Rebecca Jones, CSR
   Texas CSR #4925
22 Expiration: 10/31/2023
   DICKMAN DAVENPORT, INC.
23 Firm Registration 312
   4228 North Central Expressway
24 Suite 101
   Dallas, Texas 75206
25 214.855.5100