**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

JIM S. ADLER, P.C. and JIM ADLER,　　　　§
　　　　　　　　　　　　　　　　　　　　§
　　　　　Plaintiffs,　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　　　　§　Civil Action No.: 3:19-cv-02025-K-BN
　　　　　　　　　　　　　　　　　　　　§
MCNEIL CONSULTANTS, LLC D/B/A　　　§
ACCIDENT INJURY LEGAL CENTER,　　　§　**JURY DEMANDED**
QUINTESSA MARKETING, LLC D/B/A　　§
ACCIDENT INJURY LEGAL CENTER,　　　§
and LAUREN MINGEE,　　　　　　　　　§
　　　　　　　　　　　　　　　　　　　　§
　　　　　Defendants.　　　　　　　　　§

**UNOPPOSED MOTION FOR LEAVE TO FILE MOTION**
**FOR SANCTIONS FOR SPOLIATION OF EVIDENCE UNDER SEAL**

Plaintiffs Jim S. Adler, P.C. and Jim Adler (collectively, "Adler") respectfully move this Court

for an Order allowing the filing of Adler's Motion for Sanctions for Spoliation of Evidence under

seal. Because Adler's Motion for Sanctions includes voluminous evidence designated by Defendants

as "Confidential" or "Confidential-Attorneys' Eyes Only," counsel for Adler emailed Defendants'

counsel on December 14, 2022 regarding the Motion. On December 15, Defendants' counsel stated

that Defendants will not de-designate the evidence but do not oppose this motion.

In support of this motion, Adler submits as follows: throughout Adler's Motion for

Sanctions, Adler describes, quotes, and cites deposition transcripts designated by Defendants

"Confidential" or "Confidential-Attorneys' Eyes Only." Adler also describes, quotes, and cites

several deposition exhibits, an expert report, and numerous documents designated by Defendants

"Confidential" or "Confidential-Attorneys' Eyes Only." Such evidence includes but is not limited to

information regarding Defendants' business strategies and records, call script, intake procedures,

revenue and keyword purchases, and internal communications.

Given the nature of the information and Adler's Motion for Sanctions, as well as Defendants'
designation of such evidence as "Confidential" or "Confidential-Attorneys' Eyes Only," Plaintiffs
seek leave to file their Motion for Sanctions under seal. A Proposed Order is attached to this motion.

Dated: December 20, 2022                Respectfully submitted,

                                        _/s/ Jered E. Matthysse_
                                        Jered E. Matthysse
                                        Texas Bar No. 24072226
                                        jmatthysse@pirkeybarber.com
                                        Giulio Yaquinto
                                        Texas Bar No. 24107292
                                        gyaquinto@pirkeybarber.com
                                        PIRKEY BARBER PLLC
                                        1801 East 6th Street, Suite 300
                                        Austin, Texas 788702
                                        (512) 322-5200
                                        (512) 322-5201 (fax)

                                        Kurt Kuhn
                                        Texas Bar No. 24002433
                                        kurt@kuhnhobbs.com
                                        KUHN HOBBS PLLC
                                        7000 N. MoPac Expy., Suite 315
                                        Austin, Texas 78731
                                        (512) 476-6000
                                        (512) 476-6002 (fax)

                                        and

                                        _/s/ Garrett W. Mize_
                                        Garrett W. Mize
                                        Texas Bar No. 24089610
                                        gmize@jimadler.com
                                        JIM S. ADLER & ASSOCIATES
                                        The Tower at City Place
                                        2711 North Haskell Avenue, Suite 2500
                                        Dallas, Texas 75204
                                        (214) 220-3224
                                        (214) 220-3233 (fax)

                                        **COUNSEL FOR PLAINTIFFS**

2

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2022, a true and correct copy of the foregoing was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the court's local rules.

*/s/ Jered E. Matthysse*
Jered E. Matthysse

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No.: 3:19-cv-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | **JURY DEMANDED** |
| QUINTESSA MARKETING, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| and LAUREN MINGEE, | § | |
| | § | |
| Defendants. | § | |

## [PROPOSED] ORDER GRANTING UNOPPOSED MOTION FOR LEAVE TO FILE MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE UNDER SEAL

After considering Plaintiffs' Unopposed Motion for Leave to File Motion for Sanctions for

Spoliation of Evidence under seal, the Court finds that the motion should be GRANTED.

IT IS HEREBY ORDERED that Plaintiffs' Motion for Sanctions for Spoliation of Evidence

shall be sealed from public inspection and access.

IT IS SO ORDERED.

Dated: _____

_____
Judge David L. Horan
U.S. Magistrate Judge

1

Dated: December 20, 2022                    Respectfully submitted,

/s/ Jered E. Matthysse
Jered E. Matthysse
 Texas Bar No. 24072226
 jmatthysse@pirkeybarber.com
Giulio Yaquinto
 Texas Bar No. 24107292
 gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 788702
(512) 322-5200
(512) 322-5201 (fax)

Kurt Kuhn
 Texas Bar No. 24002433
 kurt@kuhnhobbs.com
KUHN HOBBS PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731
(512) 476-6000
(512) 476-6002 (fax)

and

/s/ Garrett W. Mize
Garrett W. Mize
 Texas Bar No. 24089610
 gmize@jimadler.com
JIM S. ADLER & ASSOCIATES
The Tower at City Place
2711 North Haskell Avenue, Suite 2500
Dallas, Texas 75204
(214) 220-3224
(214) 220-3233 (fax)

**COUNSEL FOR PLAINTIFFS**

2

# **ATTACHMENT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

JIM S. ADLER, P.C. and JIM ADLER,

    Plaintiffs,

v.

MCNEIL CONSULTANTS, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER,
QUINTESSA MARKETING, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER, and
LAUREN MINGEE,

    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. 3:19-cv-02025-K-BN

**SEALED DOCUMENT**

**JURY DEMANDED**

## MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Dated: December 20, 2022

*/s/ Jered E. Matthysse*

Jered E. Matthysse
Texas Bar No. 24072226
jmatthysse@pirkeybarber.com
Giulio Yaquinto
Texas Bar No. 24107292
gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 788702

Kurt Kuhn
Texas Bar No. 24002433
kurt@kuhnhobbs.com
KUHN HOBBS PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731

*/s/ Garrett W. Mize*

Garrett W. Mize
Texas Bar No. 24089610
gmize@jimadler.com
JIM S. ADLER & ASSOCIATES
2711 North Haskell Avenue, Suite 2500
Dallas, Texas 75204

**COUNSEL FOR PLAINTIFFS**

# TABLE OF CONTENTS

INTRODUCTION...........................................................................................................................................1

FACTS............................................................................................................................................................2

A.  Defendants use deceptive search-engine marketing to confuse accident victims, including Adler's existing clients, into calling Defendants' intake center.......................................2

B.  Defendants' employees are trained to mislead accident victims into believing Defendants are affiliated with Adler...............................................................................................3

C.  Defendants spoliated critical evidence establishing the full scope of their unlawful scheme. .................................................................................................................................................5

D.  The spoliation was caused by Defendants' bad faith....................................................................10

E.  Defendants' broad claims about the amount of caller confusion cannot be fully assessed without the spoliated evidence. ........................................................................................11

F.  Defendants cannot provide complete discovery without the spoliated evidence.....................12

LEGAL STANDARD..................................................................................................................................12

ARGUMENT AND AUTHORITIES.......................................................................................................13

I.  By failing to preserve call recordings and internal communications central to the issues in dispute, Defendants have committed sanction-worthy spoliation. .......................................13

  A.  Rule 37(e)'s predicate elements are met. ...........................................................................14

  B.  Defendants' deletion of the call recordings, Slack messages, and Love's email account prejudices Adler. .................................................................................................16

  C.  The spoliation was caused by Defendants' bad faith. ......................................................18

II.  The most appropriate remedies for Defendants' spoliation are a deemed factual admission, an adverse-inference instruction, dismissal of Defendants' equitable defenses, and a fee award....................................................................................................................21

CONCLUSION............................................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Accord Benebone LLC v. Pet Qwerks, Inc.,*
No. 20-CV-00850, 2021 WL 831025 (C.D. Cal. Feb. 18, 2021)...........................................................14

*Allstate Texas Lloyd's v. McKinney,*
964 F. Supp. 2d 678 (S.D. Tex. 2013) ...................................................................................................15

*Arista Recs., L.L.C. v. Tschirhart,*
241 F.R.D. 462 (W.D. Tex. 2006)...........................................................................................................18

*Ashton v. Knight Transp., Inc.,*
772 F. Supp. 2d 772 (N.D. Tex. 2011).............................................................................................passim

*Beach Mart, Inc. v. L&L Wings, Inc.,*
784 F. App'x 118 (4th Cir. 2019) ...........................................................................................................23

*Borum v. Brentwood Vill., LLC,*
332 F.R.D. 38 (D.D.C. 2019) .................................................................................................................14

*Brackett v. Stellar Recovery, Inc.,*
No. 3:15-CV-00024, 2016 WL 1321415 (E.D. Tenn. Feb. 24, 2016)...................................................14

*Brown & Williamson Tobacco Corp. v. Jacobson,*
827 F.2d 1119 (7th Cir. 1987)................................................................................................................21

*Chilcutt v. United States,*
4 F.3d 1313 (5th Cir. 1993)....................................................................................................................22

*Citrix Sys., Inc. v. Workspot, Inc.,*
No. CV 18-588-LPS, 2020 WL 5884970 (D. Del. Sept. 25, 2020) .......................................................23

*Cleary v. Am. Airlines, Inc.,*
No. 4:21-CV-00184, 2022 WL 5320126 (N.D. Tex. July 22, 2022)......................................................14

*Consol. Aluminum Corp. v. Alcoa, Inc.,*
244 F.R.D. 335 (M.D. La. 2006) ............................................................................................................18

*DeYoung v. Dillon Logistics, Inc.,*
No. 6:19-CV-00527, 2021 WL 523494 (E.D. Tex. Feb. 11, 2021) .......................................................18

*Duque v. Werner Enters., Inc.,*
No. 05-CV-183, 2007 WL 998156 (S.D. Tex. Mar. 30, 2007) .......................................................21, 22

*Est. of Esquivel v. Brownsville Indep. Sch. Dist.,*
No. 1:16-CV-00040, 2019 WL 219888 (S.D. Tex. Jan. 16, 2019) ........................................................18

*Guzman v. Jones,*
804 F.3d 707 (5th Cir. 2015) ............................................................................................................ 18

*Hsueh v. New York State Dep't of Fin. Servs.,*
No. 15-CV-3401, 2017 WL 1194706 (S.D.N.Y. Mar. 31, 2017) ......................................................... 14

*Laub v. Horbaczewski,*
No. 17-CV-6210, 2020 WL 7978227 (C.D. Cal. Nov. 17, 2020) ........................................................ 14

*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,*
988 F.2d 587 (5th Cir. 1993) ............................................................................................................ 15

*Peals v. QuikTrip Corp.,*
No. 4:20-CV-22, 2021 WL 2043185 (E.D. Tex. May 21, 2021) .......................................................... 18

*Repass v. Rosewood Hotels & Resorts, LLC,*
184 F. Supp. 3d 401 (N.D. Tex. 2015) ............................................................................................... 14

*Rimkus Consulting Grp., Inc. v. Cammarata,*
688 F. Supp. 2d 598 (S.D. Tex. 2010) ............................................................................................... 19

*Russell v. Univ. of Texas of Permian Basin,*
234 F. App'x 195 (5th Cir. 2007) ...................................................................................................... 18

*T & E Inv. Grp. LLC v. Faulkner,*
No. 11-CV-0724-P, 2014 WL 550596 (N.D. Tex. Feb. 12, 2014) ................................................. 22, 23

*Wiginton v. Ellis,*
No. 02-CV-6832, 2003 WL 22439865 (N.D. Ill. Oct. 27, 2003) ........................................................ 19

**Rules**

FED. R. CIV. P. 37(e) ...................................................................................... 13, 14, 15, 16, 18, 22

## INTRODUCTION

Plaintiffs Jim S. Adler, P.C. and Jim Adler (collectively, "Adler") file this motion and ask the Court to sanction Defendants for their failure to preserve critical evidence for over two years, all during this litigation. The central issue in this lawsuit is Defendants' use of Adler's trademarks as keywords to confuse Adler's existing and potential clients into calling Defendants instead. As part of their bait-and-switch scheme, Defendants keep Adler's clients confused as to Defendants' affiliation with Adler, while trying to convince the victims to hire a competing law firm. Despite the obvious significance of such evidence, Defendants:

    (1)    did not even begin to preserve the *hundreds if not thousands* of call recordings of confused clients trying to reach Adler until late 2021;

    (2)    took no steps to preserve Slack messages exchanged by their employees during the intake process; and

    (3)    permanently deleted the email account of Jason Love—Director of Intake for Defendants' call center—after he left the company in December 2021.

This loss of evidence was not simple negligence. Defendants admit that, from the time this lawsuit was served in September 2019 through at least the Fifth Circuit decision in August 2021, they made no effort whatsoever to preserve *any* documents. At the same time, Defendants' owner Lauren Mingee told her employees that Defendants had won the lawsuit. Defendants cannot credibly explain their failure to maintain years of call recordings or Slack messages, nor their deletion of Love's email account over two years after Adler filed suit and after Adler served discovery requests. This pattern of conduct—spoliating some of the most direct proof of the confusion and harm caused by Defendants' unlawful scheme while falsely telling employees the case had ended—shows Defendants' bad faith.

To remedy Defendants' abuse of the judicial process, the Court should: (1) enter a deemed factual admission against Defendants regarding confusion during the spoliated period; (2) issue an adverse-inference instruction to the jury about Defendants' spoliation; (3) strike Defendants' equitable defenses; and (4) award Adler his reasonable attorneys' fees incurred in connection with this issue.

## FACTS

### A. Defendants use deceptive search-engine marketing to confuse accident victims, including Adler's existing clients, into calling Defendants' intake center.

Defendants call themselves a "legal lead generation" company. *See* quintessamarketing.com (last visited Dec. 18, 2022).[1] However, Defendants' business is far more predatory and troubling than the label suggests.

Defendants use search-engine marketing techniques to capture and redirect online traffic from persons conducting a search on their mobile device. *See* Mingee Dep. 95:8-96:22, 222:3-23. Specifically, Defendants target auto-accident victims searching on their phones for well-known personal injury law firms, including Adler's firm. *See id.* 55:24-56:15. Defendants conduct their scheme by purchasing the trademarks and brand names of well-known personal-injury firms as search-engine keywords. *See id.* For example, Defendants purchase "Jim Adler" as a Google keyword. *Id.* 191:14-19. As a result, an accident victim or existing client looking up "Jim Adler" on their phone may instead be shown a paid Google ad for Defendants. *See id.* 157:15-159:23.

Defendants' resulting ads use only generic, non-branded ad copy like "Texas Car Accident Lawyers" and "Get The Money You Deserve! Let Us Fight On Your Behalf." *See id.* 53:17-54:14, 95:8-96:3.[2] This language, by design, encourages an affiliation with the personal injury firm the accident victim was trying to reach (in this case, Adler). *See id.*; *see also id.* 295:4-22, 298:6-9. Further, unlike most Google search ads, Defendants' mobile ads do not link to a branded website; instead, they use a "click to call" or "call only" mechanism. *See id.* 180:2. When the accident victim taps the ad on their mobile

---

[1] Defendant Quintessa Marketing, LLC is the primary corporate entity for Defendants' business. Defendant McNeil Consultants, LLC is a predecessor entity. Defendant Lauren Mingee is the sole owner of Quintessa and McNeil Consultants. *See* Ex. A, Decl. of Diana Rausa ¶ 2, Ex. 1 ("Mingee Dep.") at 43:11-16. For simplicity, this motion will use the blanket term "Defendants."

[2] Rausa Decl. ¶ 3, Ex. 2 (ADLER_001769, 1771-72).

device, it brings up a prompt to automatically call a phone number belonging to Defendants. The prompt does not identify who the number belongs to and contains no information other than an unidentified number. These calls go to Defendants' intake center. *See id.* 52:4-17, 90:8-15, 170:4-17.

## B. Defendants' employees are trained to mislead accident victims into believing Defendants are affiliated with Adler.

When an accident victim calls Defendants through one of Defendants' "click to call" or "call only" Google ads, Defendants' intake specialists are trained to further confuse the victim and steer them away from the law firm they were trying to reach (in this case, Adler) and toward competing firms with whom Defendants have referral arrangements. *See id.* 39:15-16, 101:1-23, 297:3-5, 316:4-8; *see also id.* 157:15-159:23. Specifically, when victims ask whether they have reached the Adler firm, Defendants' script instructs their intake specialists to respond: "This is the intake department, are you calling in regards to a new case or an existing case?" Rausa Decl. ¶ 4, Ex. 3. If pressed further, Defendants' intake specialists are instructed to repeat that the victim has reached "the intake department" and, if the confused victim is an existing client of another law firm, urge them to accept a second opinion from one of Defendants' competing law firms. *See id.*[3] Confused accident victims, believing they reached Adler, then share personal information and details about their accident with Defendants' intake specialists.

. *See* Rausa Decl. ¶ 6, Ex. 5 ("Love Dep.") at 133:15-134:11; *see also* Walker Dep. 117:9-118:10.[4]

---

[3] Mike Walker, Defendants' Chief Operating Officer, confirmed this at his deposition. *See* Rausa Decl. ¶ 5, Ex. 4 ("Walker Dep.") at 95:18-22 ("Q. And if someone asked again, but is this the Adler law firm, the call center agent was instructed to say, sir/ma'am, this is the intake department, correct? A. Yes.").

[4] The script instructs intake specialists to move quickly in obtaining information about an accident: "get the [date of incident], injuries/treatment, liability, and insurance in 2 min[utes] and continue call." *See* Rausa Decl., Ex. 3.

3

Asked why Defendants' intake specialists are taught to answer the phone this way, Defendants' owner Lauren Mingee claimed that "intake department" is a "d/b/a" for Quintessa. *See* Mingee Dep. 295:8-14. Mingee admits that such a greeting could be confused as the intake department for a law firm (such as Adler's firm), but when asked about that risk of confusion, she testified that it would be addressed only "if that concern was brought up" by the caller. *Id.* 298:20-24. Defendants do not instruct their intake specialists to plainly answer "No" when a caller asks whether they are the intake department for Adler or any other specific firm. *See id.* 310:24-316:13; *see also* Walker Dep. 164:20-165:2. Defendants' owner Mingee claimed that such a "blanket statement" would be inappropriate, and she has repeatedly "refused" to issue that instruction. *See* Mingee Dep. 316:9-13.

As a result of Defendants' Adler keyword purchases and misleading tactics, accident victims have signed retainers with Defendants on the mistaken belief that they were engaging Adler, typically without ever being told otherwise. *See, e.g.*, *id.* 293:14-18; Rausa Decl., Ex. 6 (Dep. Ex. 39) (discussing an instance in which "the signed client thought he had hired Adler even after signing a retainer [with Defendants] and being warm transferred to [Defendants' referral firm]"). Defendants' referral firms have complained to Defendants about receiving retainers for clients looking for or already engaged

4

with Adler. *See, e.g.*, *id.* 302:24-303:6; Rausa Decl., Ex. 6 (Dep. Ex. 40) (email to Defendants from a referral firm: "I'm on the phone with [client] who is advising she signed with Jim Adler and was set up with treatment at a clinic today. She's not sure how she was referred to us, but she is currently signed with Adler."). And on multiple occasions, Defendants' referral firms have told Defendants that their intake process is misleading and unethical. *E.g.*, *id.* 330:20-331:13; Rausa Decl., Ex. 6 (Dep. Ex. 51) (advising Defendants that referred clients were "currently still under the representation of Jim Adler" and that Defendants' actions were "unethical"); *id.* 336:6-22 (advising Defendants that their intake specialists "deliberately misled" the victim into believing he was signing with Adler).

## C.    Defendants spoliated critical evidence establishing the full scope of their unlawful scheme.

The spoliated evidence includes three categories of materials – call recordings (including ones made during this litigation) from confused victims who were trying to reach Adler; Slack messages exchanged by Defendants' intake employees during those calls; and emails sent to and from Defendants' Director of Intake, who managed the call center and intake specialists during that time.

***Call Recordings***: Since 2016, Defendants' call center has received its incoming phone calls through a "Voice Over IP" (VoIP) software called Talkdesk. *See* Mingee Dep. 226:1-13. The Talkdesk software automatically records every incoming call. *Id.* 247:23.

In their sworn written interrogatory responses, Defendants claimed that Talkdesk keeps call recordings "in the regular course of business for 13 months." Rausa Decl. ¶ 8, Ex. 7 (Def's Resp. to ROG No. 11). The artful drafting of this response implies—but is careful not to actually say—that this 13-month preservation period is controlled by Talkdesk. *See id.* During her deposition, however, Defendants' owner admitted that they can change a setting on Talkdesk to preserve the call recordings for longer. *See* Mingee Dep. 227:13-21. Mingee also admitted that Talkdesk allows Defendants to download call recordings for permanent offline storage. *Id.* 227:22-24.

Despite having each of these two simple preservation options available, Defendants failed to preserve Adler-related recordings for roughly *two years* after being served with this suit. Specifically, Defendants have admitted that they failed to preserve the recordings from service of this lawsuit in September 2019 until, at the earliest, the Fifth Circuit decision in August 2021. *See id.* 240:16-241:13, 242:5-14; *see also* Walker Dep. 265:24-266:4. Thus, Defendants did not produce *any* call recordings from 2016 through 2020, even though Talkdesk automatically recorded each of those incoming calls.[5]

Defendants admit that at least some of the deleted call recordings came from accident victims looking for or already engaged with Adler. *See* Mingee Dep. 254:7-255:6; *id.* 264:25-265:24 (caller from July 2020 asking Defendants whether they were "from Jim Adler" because the caller "thought they signed with Adler"); Rausa Decl., Ex. 6 (Dep. Ex. 23) (caller from August 2019 claiming they were "referred by Jim Adler"). Corroborating this admission, documents produced by Defendants revealed many instances of callers expressing confusion during calls for which the recordings were deleted. *See, e.g.*, *id.* 264:25-266:24 (confusion in 2020); *id.* 268:19-269:9 (same); *id.* 275:22-276:9.

While the exact number of deleted call recordings cannot be known, the answer is likely in the hundreds if not thousands. Defendants' documents show that their intake center received nearly 15,000 calls stemming from their purchase of the Adler Marks as keywords. *See* Rausa Decl. ¶ 9, Ex. 8 (Leathers Report). Defendants have produced summaries of about 1,600 of those calls in which Adler was specifically named or discussed. *See* Rausa Decl. ¶ 10, Ex. 9 ("Quintessa Dep.") at 61:15-65:5; *see id.* 63:12-16 ("Q. And so these are examples of instances in which someone -- a PC called into Quintessa and either mentioned Jim Adler or the Texas Hammer or was looking for Jim Adler, the The Texas Hammer, correct? A. Correct."). Once Defendants began complying with their duty

---

[5] Defendants have not explained why an appellate decision from the Fifth Circuit—rather than the filing and service of this lawsuit two years prior—would be the appropriate time for Defendants to start complying with their legal and ethical obligation to preserve relevant evidence.

to preserve call recordings sometime in late 2021, they produced over 400 Adler-related calls from 2021 and January 2022 alone.

Taking these figures together, the Court can reasonably infer that hundreds, if not thousands, of recordings from September 2019 through 2020 were deleted. Defendants also failed to preserve recordings from before the lawsuit's filing—i.e., from 2016, 2017, 2018, and the first part of 2019— which likely included several hundred (if not thousands) more Adler-related calls.

***Slack Messages***: Slack is a third-party service provider that allows users to communicate via its instant-messaging platform. *See* slack.com (last visited Dec. 18, 2022). Defendants' use of Slack is integral to their business.

Despite Slack's central role in their business, Defendants failed to preserve *any* Slack messages. Defendants' Chief Operating Officer testified that "Slack was searched" for responsive documents

7

but "[i]ts recording history is like nine days." Walker Dep. 261:12-13. He further explained that, while the Slack messages could have been preserved longer, Defendants had to obtain "a paid subscription." *Id.* 261:16. Defendants declined to pay the additional cost and continue to do so, *id.* 261:17-19, despite earning more than $22 million in revenue last year, *see* Rausa Decl. ¶ 13, Ex. 12. As a result, Adler has not received any Slack messages in response to numerous discovery requests covering those materials.[6]

The significance of this evidentiary gap cannot be overstated. Messages sent in Slack between Defendants' intake specialists and supervisors represent the most direct evidence establishing how, in real time, Defendants discussed the voluminous amount of confusion among accident victims who intended to reach Adler's law firm. According to Defendants, they received nearly 15,000 calls since 2019 from keyword ads triggered by the Adler Marks. *See* Rausa Decl. ¶ 9, Ex. 8 (Leathers Report). And Adler's name came up in over a thousand of these calls. *See* Quintessa Dep. 61:15-65:5.

It is therefore highly likely that Adler was referenced in Defendants' Slack messages. Even assuming otherwise, the absence of Slack messages referencing Adler would be highly relevant as it would show that Defendants' intake specialists failed to report numerous instances of confusion to their supervisors. Such a failure is strong evidence of Defendants' mental culpability in carrying out their unlawful scheme. *See* Love Dep. 79:15-18 ("Q. Did any [intake specialists] report instances of a caller calling in looking for a non-client law firm? A. I don't know that anybody reported it. I mean, it was known. Q. Okay. It was known that that happened at the company? A. Yes.").

***Jason Love's Email Account.*** Jason Love was Defendants' Director of Intake from June 2020 until December 2021. *See* Love Dep. 31:11-32:4, 157:21-158:2. When he was hired, his position was a "new role" within Defendants' business, in which he was tasked with "manag[ing] . . . intake

---

[6] *See, e.g.*, Rausa Decl. ¶ 14, Ex. 13 (Pl.'s Request for Prod. Nos. 5 &17); *id.* ¶ 15, Ex. 14 (Pl.'s Request for Prod. Nos. 64-84).

operations at Quintessa," "provid[ing] support to agents," and "helping them whatever way [he] could" in carrying out their job as intake specialists. *Id.* 34:7-11, 34:25-35:19.

Love had significant visibility into how Defendants' intake specialists addressed confusion among accident victims. As Director of Intake, he was "on the receiving end of . . . the inbound calls" to Defendants' intake center. *See id.* 47:4-5. Love confirmed that his intake specialists received calls from victims looking for "third-party law firm[s] that [were] not a client of [Defendants]," including Adler specifically. *Id.* 70:11-71:2. He explained that intake specialists were to "follow the script" and "advise that this is the intake department" when asked by victims if they were speaking with Adler. *Id.* 72:9-13. In discussing the scripts with Defendants' owner Lauren Mingee, "the importance" that intake specialists "stay[] on script" and "not deviate" was impressed upon him. *See id.* 37:22-38:5.

Part of Love's responsibilities involved reviewing recordings from calls with accident victims after Defendants' referral-firm clients complained that the victim had signed a retainer agreement with them believing that he/she was in fact engaging another firm, including Adler's firm. *Id.* 70:7-71:22. Love listened to such recordings involving victims who were searching for Adler specifically. *See id.* 107:6-11, 111:7-14, 115:15-25. He also confirmed that he listened to recordings where, although the victim never mentioned Adler's firm during the initial call, that victim later claimed to have believed that they were engaging Adler when they were instructed to sign a retainer agreement with one of Defendants' referral firms. *See id.* 87:10-88:18.

Love also testified that, "personally," he was concerned that Defendants' use of the generic name "intake department" might be misleading. *Id.* 67:16-25. But Defendants assured Love that their script was "within legal bounds." *See id.* 67:15-25; *see also id.* 62:16-64:6. Asked whether it "c[a]me as a surprise" when he received reports of confused victims who thought they had hired Adler after mistakenly signing a retainer agreement with one of Defendants' referral firms, Love answered "No," because he "had heard [of] that before." *Id.* 111:15-20.

As Director of Intake for Defendants' call center, Love's email account would have been a significant source of evidence supporting Adler's claims. Any doubt on that point is resolved by his deposition testimony. Nevertheless, Love's email account was permanently deleted in December 2021, after Adler served discovery requests. Defendants' Chief Operating Officer (Mike Walker) confirmed that Love's email account was not searched because it had been permanently deleted. *See* Walker Dep. 259:15-17; Quintessa Dep. 163:15-18.

### D. The spoliation was caused by Defendants' bad faith.

Any claim of mere accident or mistake does not adequately explain Defendants' spoliation of evidence. In truth, the loss was caused by Defendants' intentional disregard for their obligations as a litigant.

Although Defendants' owner Lauren Mingee first testified that "a memo" was "sent out to everyone about not deleting e-mails or things of that nature" related to this lawsuit, she could not recall when that memo was sent. *See* Mingee Dep. 240:3-15.[7] That is because her testimony was untrue – Defendants never sent out a preservation memo. *See* Quintessa Dep. 160:21-161:18. It comes as no surprise, then, that Defendants' officers later testified that they never received any instructions about preserving documents prior to the Fifth Circuit decision in late 2021. *See* Love Dep. 58:13-17 (never received instructions on preservation); Walker Dep. 265:24-266:4 (unaware of efforts to preserve documents until after Fifth Circuit decision); *see also* Rausa Decl. ¶ 16, Ex. 15 ("Kittredge Dep.") at 120:7-18 (never received instructions on preservation).

Moreover, Defendants' officers were led to believe that Defendants had "prevailed" in this lawsuit. *See* Love Dep. 59:19-25; *see also* Walker Dep. 233:3-10. Jason Love explained that, not long

---

[7] Mingee also claimed that "[w]e haven't deleted any e-mails," even though Jason Love's email account was deleted shortly before her deposition. *See* Mingee Dep. 240:3-8.

after he was hired in June 2020, Defendants' owner Lauren Mingee told him "[t]he lawsuit was over" and "[t]here wasn't anything to be concerned about." Love Dep. 61:7-15; *see id.* 62:4-7. When Love learned of his deposition in July this year, he thought "there were two separate Adler lawsuits" and "didn't realize that this was the same" lawsuit Mingee told him Defendants had won. *Id.* 120:21-25.

Mike Walker offered similar testimony. Responding to an email from one of Defendants' law firm clients in October 2020, Walker suggested that many competing lead generators had moved into Texas "since the judge dropped the Adler case against Lauren." *See* Walker Dep. 231:13-232:9. Asked at his deposition where he got the impression that Adler's suit was "dropped," Walker testified that it likely came from Defendants' owner Mingee. *Id.* 233:3-12.

In sum, Defendants took no steps to preserve evidence during the year-long period between when Adler filed suit and his complaint was dismissed. Defendants' owner Lauren Mingee then falsely told her employees the suit was over. The failure to preserve documents continued for at least another year until the Fifth Circuit decision. And well after the decision, Defendants permanently deleted Jason Love's email account and allowed—into 2022—its Slack messages to be permanently deleted. *See* Quintessa Dep. 162:9-165:12.

As such, Defendants are far more culpable than a merely negligent party. For approximately two years, they did *nothing* to fulfill their obligation as a litigant to preserve relevant evidence. Given these circumstances, Defendants' spoliation of evidence is a product of bad faith on Defendants' part.

### E. Defendants' broad claims about the amount of caller confusion cannot be fully assessed without the spoliated evidence.

Despite failing to preserve years' worth of Adler-related call recordings, Defendants have not hesitated in this lawsuit to make broad proclamations about what those same callers said and what they were thinking. Defendants' owner Lauren Mingee claimed at her deposition that the "vast majority" of callers were not confused, and that only a "very minute number" were confused. *See* Mingee Dep. 99:8-17; *see also id.* 212:15-21 (claiming only "small amounts" of confusion). Mingee made

similar assertions about callers from the spoliated period specifically. *See, e.g.*, *id.* 104:13-18 (claiming that, in 2018 and 2019, only a "minute number" of Defendants' referral firms complained about referred victims being confused); *id.* 266:18-268:1 (discussing instances of confusion in 2020 and dismissing them as "a small percentage").

**F.     Defendants cannot provide complete discovery without the spoliated evidence.**

Defendants admit that, without the spoliated evidence, there are relevant facts they cannot provide. For example, Defendants claim an inability to testify about confusion from the spoliated period because their intake procedures have since changed. *See id.* 256:20-25 ("Q. So what's your theory of why these people are confused? . . . A. This was in 2019. So our processes, procedures are different; so I can't speak to what - what it was then.").

Defendants are also unable to reconcile discrepancies in their own written business records from the spoliated period—discrepancies that the call recordings may have resolved. For example, Defendants' written records show certain callers as having no prior attorney, when other evidence shows that those callers in fact were already engaged with Adler. *See, e.g.*, Mingee Dep. 308:6-309:23; Rausa Decl., Ex. 6 (Dep. Ex. 42). Defendants' owner Mingee testified that part of the procedure to investigate these issues would be to "[p]ull the recording," *id.* 269:18-270:7, but the deletion of the recordings has left Defendants unable to do so, *see, e.g.*, *id.* 309:19-310:5. Nor are the Slack messages sent by Defendants' intake specialists during those calls available for review. Defendants' written records likewise show clients who signed with Defendants thinking they had signed with Adler's law firm, but Defendants could not provide the recordings or corresponding Slack messages to elucidate the situation. *See, e.g.*, *id.* 271:22-272:22; Rausa Decl., Ex. 6 (Dep. Ex. 31).

## LEGAL STANDARD

Spoliation is the "destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Ashton v. Knight*

*Transp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011). The duty to preserve evidence is a duty owed to the Court. *Id.* at 800. A party's failure to preserve electronically stored information ("ESI"), such as the items spoliated in this case, is governed by Rule 37. *See* FED. R. CIV. P. 37(e). Courts may issue sanctions under Rule 37 where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." *Id.*

Assuming those predicates are met, sanctions are available "upon [a] finding [of] prejudice to another party from loss of the information" or a "finding that the party acted with the intent to deprive another party of the information's use in the litigation." *See* FED. R. CIV. P. 37(e)(1)-(2). Courts may order measures necessary to cure any prejudice found. *See* FED. R. CIV. P. 37(e)(1). Courts have "broad discretion" to craft spoliation sanctions "proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party." *Ashton*, 772 F. Supp. 2d at 801. In the event a party spoliated evidence intentionally, courts may: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." *See* FED. R. CIV. P. 37(e)(2).

## ARGUMENT AND AUTHORITIES

### I.  By failing to preserve call recordings and internal communications central to the issues in dispute, Defendants have committed sanction-worthy spoliation.

"To apply Rule 37(e) sanctions, a court must determine that the following four predicate elements exist: (1) there is ESI that should have been preserved; (2) that ESI has been lost; (3) the ESI was lost because of a party's failure to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced." *Cleary v. Am. Airlines, Inc.*, No. 4:21-CV-00184, 2022 WL 5320126, at *7 (N.D. Tex. July 22, 2022). If the four predicate elements exist, courts then consider whether prejudice or culpable intent justifies the imposition of sanctions. *See* FED. R. CIV. P. 37(e)(1)-(2). Here, sanctions are warranted on both grounds.

13

## A.  Rule 37(e)'s predicate elements are met.

Rule 37(e) applies to ESI that cannot be restored or replaced and was lost due to a party's breach of their duty to preserve that evidence. *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (Rule 37(e) sanctions are based on the "common-law duty" to "preserve relevant information when litigation is reasonably foreseeable" and unavailable "when substitute information can be found elsewhere"). The predicates are easily met under the facts of this case.

Defendants' call recordings, Slack messages, and emails qualify as ESI. *See, e.g.*, *Laub v. Horbaczewski*, No. 17-CV-6210, 2020 WL 7978227, at *4 (C.D. Cal. Nov. 17, 2020) (Slack messages are "electronically stored information . . . housed at Slack.com"); *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 45 (D.D.C. 2019) (applying Rule 37(e) to deletion of emails); *Hsueh v. New York State Dep't of Fin. Servs.*, No. 15-CV-3401, 2017 WL 1194706, at *4 (S.D.N.Y. Mar. 31, 2017) (applying Rule 37(e) to electronically stored audio recordings).[8] Testimony from Defendants' officers establishes that the recordings, messages, and emails cannot be replaced.

Also, Defendants had a duty to preserve the ESI at issue. "A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Repass v. Rosewood Hotels & Resorts, LLC*, 184 F. Supp. 3d 401, 405 (N.D. Tex. 2015). Once litigation is reasonably anticipated, a party "must not destroy unique, relevant evidence that might be useful to an adversary." *Allstate Texas Lloyd's v. McKinney*, 964 F. Supp. 2d 678, 684 (S.D. Tex. 2013).

This motion presents no issue about whether litigation was "reasonably anticipated." Defendants' spoliation—over two years' worth of it—occurred *after* Adler filed suit in August 2019

---

[8] *Accord Benebone LLC v. Pet Qwerks, Inc.*, No. 20-CV-00850, 2021 WL 831025, at *1 (C.D. Cal. Feb. 18, 2021) (referring to Slack messages as "electronically stored information"); *Brackett v. Stellar Recovery, Inc.*, No. 3:15-CV-00024, 2016 WL 1321415, at *2 (E.D. Tenn. Feb. 24, 2016) (applying Rule 37(e) to audio call recordings stored by third-party vendor).

and served Defendants in early September 2019. Adler's original complaint put Defendants on notice that caller confusion would be a central issue. *See, e.g.*, ECF No. 1 ¶¶ 38-60. Each call recording is a unique piece of relevant evidence showing that confusion firsthand. *See generally Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir. 1993) (emphasizing that consumer confusion is the "linchpin" of the analysis in infringement cases). So too are the Slack messages unique, as they represent the *only* internal, written communications among Defendants' intake specialists during their calls with confused victims. Likewise, Jason Love's emails are a singular source of evidence showing how the highest-ranking employee in Defendants' intake department addressed the confusion created by Defendants' scheme, including but not limited to in emails with call-center employees. Defendants should have preserved the spoliated evidence, and they cannot credibly argue otherwise.

Lastly, Defendants breached their duty to preserve. To meet that duty, Rule 37(e) "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection." *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. Courts may not issue sanctions under Rule 37(e) for ESI "lost as a result of the routine, good-faith operation of an electronic information system." *Id.* However, "the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation." *Id.*

The evidence establishes that, from service of this lawsuit in September 2019 until at least the Fifth Circuit decision in August 2021, Defendants took no steps to preserve *any* ESI, let alone the ESI at issue. Moreover, Defendants admitted that the ESI could have been saved. Talkdesk offers two options—both easy to implement, and neither remotely approaching an "extraordinary" measure— to preserve the recordings. Defendants could have changed the default deletion period, or they could have downloaded the recordings for permanent offline storage. Similarly, preservation of the Slack messages and Love's emails—both of which were deleted *after* the Fifth Circuit decision and *after* Adler

15

served discovery requests—merely required Defendants to pay additional storage fees. *See* Walker Dep. 260:3-7, 261:16-19.

At best, Defendants did not take "reasonable steps to preserve information by intervening in [the] routine operation" of the systems they rely on to track calls and facilitate communication among employees. *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. That "failure to intervene" is sufficient to impose sanctions. *See id.* Yet Defendants preserved other evidence, including emails and written business records, during that same time period. Defendants have failed to produce satisfactory or consistent reasons why. As discussed below, the Court should take Defendants' lack of explanation into account when crafting an appropriate remedy, as it supports a finding of bad faith.

**B.      Defendants' deletion of the call recordings, Slack messages, and Love's email account prejudices Adler.**

To show prejudice, the party seeking spoliation sanctions must establish that the missing evidence would have been relevant. *Ashton*, 772 F. Supp. 2d at 801. Missing evidence is relevant if a reasonable factfinder "could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Id.* Prejudice can range from an "utter inability to prove claims or defenses to minimal effects on the presentation of proof." *Id.* The prejudice standard is "not too onerous, otherwise the spoliating party might be allowed to profit from its own misconduct." *Id.*

The deleted recordings provide the only direct, firsthand evidence of what actually happened on those calls. Any other evidence is secondhand at best, including Defendants' written summaries of the calls and testimony about what the intake specialists are trained to say. The recordings would show the Court and the jury exactly what Defendants' intake specialists say (including the tactics they use) and exactly what the victims express back to them (including, most centrally, any confusion).

Similarly, the Slack messages are the only evidence showing, in real time, how Defendants' intake specialists communicated internally about the voluminous confusion expressed by callers. Without the Slack messages, there is no direct, real-time evidence showing how supervisors instructed

the intake specialists to deal with the ongoing confusion. Adler should not be forced to fill those gaps by relying on the testimony of Defendants' witnesses, which comes months or years after the individual incidents of confusion took place.

The same prejudice arises from Defendants' deletion of Jason Love's email account. Love was the highest-ranking employee in the intake center, charged with managing Defendants' intake specialists. While Love confirmed that he was generally aware of confusion among accident-victim callers and was "personally" concerned that Defendants' scripting was misleading, he was repeatedly unable to recall specific instances of confusion, or internal discussions about steps taken to address that confusion, without documents to refresh his collection. *See, e.g.*, Love Dep. 85:3-11, 101:3-102:19, 105:20-106:24, 113:10-114:19, 127:10-128:11. And because Defendants deleted his email account (over two years into the lawsuit and after Adler served discovery requests), Adler was necessarily limited in what documents were available to refresh Love's memory.

Defendants' positions in this suit further underscores the relevance of the spoliated evidence. Defendants try to claim that only a small percentage of callers were actually confused. Spoliating over two years' worth of call recordings, along with the corresponding Slack messages and Love's email account, prejudices Adler's ability to rebut that claim. Likewise, it prejudices Adler's ability to rebut Defendants' convenient assertion that, any time a caller is confused, Defendants "make sure they get unconfused." *See* Mingee Dep. 279:4-6. Given Defendants' lack of recollection about critical facts from the spoliated period, the spoliated evidence could have established those facts or impeached Defendants' testimony.

Consequently, Defendants' spoliation of evidence prejudices Adler. The Court may therefore enter sanctions under Rule 37(e)(1).

17

### C. The spoliation was caused by Defendants' bad faith.

Courts analyze Rule 37(e)(2)'s "intent to deprive" standard by examining whether the spoliating party engaged in bad faith. *See, e.g.*, *Peals v. QuikTrip Corp.*, No. 4:20-CV-22, 2021 WL 2043185, at *7 (E.D. Tex. May 21, 2021); *Est. of Esquivel v. Brownsville Indep. Sch. Dist.*, No. 1:16-CV-00040, 2019 WL 219888, at *1 (S.D. Tex. Jan. 16, 2019). A finding of bad faith does not require an affirmative act of destruction by the spoliating party; rather, courts have described bad faith in this context as "fraudulent intent and a desire to suppress the truth." *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 343-34 (M.D. La. 2006); *accord Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ("Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence.").

Because direct proof of intent is rarely available, a finding of bad faith may be inferred from circumstantial evidence, particularly where "documents are destroyed after the initiation of litigation." *See Russell v. Univ. of Texas of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007). Courts in the Fifth Circuit often infer bad faith if relevant evidence is destroyed by a party after receiving notice of a legal claim and without reasonable explanation. *See, e.g.*, *Arista Recs., L.L.C. v. Tschirhart*, 241 F.R.D. 462, 464 (W.D. Tex. 2006) ("[D]efendant destroyed material evidence. Further, she destroyed the evidence after the obligation to preserve it arose and after she had clear notice of that obligation. The Court is forced to conclude that defendant destroyed the material evidence deliberately and in bad faith."); *see also DeYoung v. Dillon Logistics, Inc.*, No. 6:19-CV-00527, 2021 WL 523494, at *2 (E.D. Tex. Feb. 11, 2021) ("DeYoung has produced evidence establishing that the phone was functioning after the collision. That evidence, combined with the phone's utter destruction, supports a bad faith finding.").

Here, the following and below facts taken together indicate bad faith: (1) the ease with which Defendants could have preserved the evidence; (2) the length of time Defendants failed to preserve the evidence; (3) the fact that those years of spoliation occurred *after* Defendants were served with this lawsuit; (4) the importance of the call recordings as the only direct, firsthand evidence of Defendants'

18

deceptive tactics and the confusion those tactics caused; (5) Defendants' preservation of other evidence during that same period, suggesting that Defendants singled out only the most direct and damaging evidence to spoliate; (6) the fact that Defendants' other evidence reveals a significant amount of confusion, which Defendants have repeatedly denied; (7) Defendants' inconsistent explanations for why the call recordings were not preserved; (8) Defendants' artful drafting of their sworn interrogatory response about the deleted recordings, which appears to blame Talkdesk but omits any mention of the other avenues through which Defendants could have easily preserved the recordings; and (9) Defendants' deletion of the Love emails and Slack messages in late 2021 and into 2022. This Court and others have found bad faith on analogous facts.[9]

Further, Defendants engaged in numerous acts contributing to the spoliation. Rather than send out a preservation notice, which Defendants' owner Lauren Mingee falsely testified had been sent, Mingee told her officers that Adler's suit "was over" and "there was nothing to be concerned about." As a result, the exact persons within Defendants' organization who were in a position to ensure adequate preservation efforts had no reason to think those efforts were necessary. Thus, when Defendants' Chief Operating Officer deleted Jason Love's email account sometime after Love left in December 2021, he was either unaware of Defendants' duty to preserve evidence or he disregarded

---

[9] *See, e.g., Ashton*, 772 F. Supp. 2d at 802 (finding bad faith where claims manager failed to preserve screenshots of "primary communications" between truck company and truck driver concerning fatal accident: "[A]t any point in time over the year before this data was automatically deleted by the system, [the claims manager], who was being regularly pressured for the data . . . could have simply printed the screen shots and saved them. Inexplicably, he did not."); *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598 (S.D. Tex. 2010) (finding bad faith where, as here, the defendants: (1) knew about the litigation when the evidence was deleted; (2) gave inconsistent explanations for why the evidence was deleted; and (3) produced other evidence that "reveal[ed] what the defendants had previously denied"); *Wiginton v. Ellis*, No. 02-CV-6832, 2003 WL 22439865, at *7 (N.D. Ill. Oct. 27, 2003) (finding bad faith where the spoliating party "knew that it had a duty to preserve relevant documents" but "fail[ed] to change its normal document retention policy, knowing that relevant documents would be destroyed if it did not act").

that duty despite having learned about the loss of Defendants' call recordings around the same time.

As Defendants' owner Lauren Mingee explained:

> Q. Okay. Did Mike [Walker] bring this to your attention around the time of the Fifth Circuit decision or was it prior to then?
>
> A. No. I believe it was after.
>
> Q. After the Fifth Circuit decision?
>
> A. Yes, sir.
>
> Q. Okay. Do you know what caused him to look into that?
>
> A. Whenever -- I believe discovery.

*See* Mingee Dep. 242:5-13. Given that Adler served his first set of discovery requests in November 2021 approximately a month before Love's departure, there is a strong likelihood that Walker deleted Love's email account after learning about the deleted call recordings. But even assuming otherwise, his lack of awareness was the result of the inaccurate statements by Defendants' owner Mingee about the status of Adler's lawsuit.

The circumstances therefore show that Defendants' spoliation was in bad faith. Defendants—despite running a sophisticated, multi-million-dollar business—did nothing to preserve evidence for well over two years. In addition, Defendants' owner told her officers they had beaten Adler when she knew that was not the case, and then falsely testified under oath about Defendants' preservation efforts.[10] As a result, critical evidence was lost long after Defendants were on notice of their duty to preserve. There is no credible explanation for the loss of evidence here, aside from bad faith.

---

[10] To the extent Defendants suggest that owner Lauren Mingee—despite being represented by counsel—did not fully understand the ramifications of Adler's appeal, the suggestion is implausible and does not avoid a finding of bad faith. *See Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134 (7th Cir. 1987) (finding bad faith spoliation of evidence; "Radutzky's explanation that he

**II.    The most appropriate remedies for Defendants' spoliation are a deemed factual admission, an adverse-inference instruction, dismissal of Defendants' equitable defenses, and a fee award.**

When a party spoliates evidence, courts have "broad discretion in crafting a remedy." *Ashton*, 772 F. Supp. 2d at 801. The remedy must be "proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party." *Id.* Appropriate sanctions should: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* Courts also consider whether the sanctions will prevent "abuses of the judicial system" and "promote the efficient administration of justice." *Id.*

While courts are not limited to a specific menu, sanctions traditionally awarded for spoliation include—in order of increasing severity—awarding attorneys' fees, deeming certain facts admitted, giving an adverse-inference instruction to the jury, striking pleadings, entering a default judgment, and dismissing the case entirely. *Id.* (citing *Duque v. Werner Enters., Inc.*, No. 05-CV-183, 2007 WL 998156, at *2-3 (S.D. Tex. Mar. 30, 2007). The more severe sanctions—granting default judgment, striking pleadings, and giving adverse-inference instructions—require a showing of bad faith conduct. *Id.* at 801-802; *accord* FED. R. CIV. P. 37(e)(2). Here, Adler requests four complementary sanctions.

***First***, the Court should deem admitted that substantial instances of confusion between Adler and Defendants occurred during the spoliated period among an appreciable number of consumers, and that Defendants took no action to address the ongoing confusion. Courts have recognized this

―――――――――――――

was unaware that Brown & Williamson had a right to appeal the initial dismissal is implausible. We do not think it immodest of us to suggest that many people know that an appellate court such as the Seventh Circuit exists. . . . For a person of his experience, it is completely implausible that he would be unaware that a party who lost in a lower court had a right to challenge the decision in an appellate court.").

sort of deemed admission—*i.e.*, one that does not equate to a default judgment nor prevent the assertion of other defenses—as a "lesser" sanction. *E.g.*, *Duque*, 2007 WL 998156, at *2 (citing *Chilcutt v. United States*, 4 F.3d 1313, 1320 n.17 (5th Cir. 1993)). Defendants have claimed that any confusion in the spoliated period was insignificant and a small percentage of their business. They should not be allowed to make those sorts of claims, having failed to preserve the very evidence that would potentially impeach or disprove them. A deemed admission addresses this concern.[11]

**Second**, because Defendants acted in bad faith, the Court should issue an adverse-inference instruction to the jury at trial. *See, e.g., T & E Inv. Grp. LLC v. Faulkner*, No. 11-CV-0724-P, 2014 WL 550596, at *10, 19 (N.D. Tex. Feb. 12, 2014) (adopting magistrate's recommendation of sanctions, including a jury instruction that "would entitle the jury to draw an adverse inference that a party who intentionally spoliated evidence did so in order to conceal evidence that was unfavorable to that party"). The specific language of that instruction, which is within the Court's sound discretion, can be addressed by the parties during the jury-charge conference or at another appropriate time.

**Third**, the Court should strike Defendants' equitable defenses of laches, acquiescence, estoppel, and unclean hands. Defendants' bad-faith spoliation precludes them from receiving any equitable relief. *See Citrix Sys., Inc. v. Workspot, Inc.*, No. CV 18-588-LPS, 2020 WL 5884970, at *12 (D. Del. Sept. 25, 2020) ("Workspot, by submitting and relying on the false Chawla Declaration, has come

---

[11] As an alternative to a deemed admission, the Court could enter a discovery sanction under Rule 37 excluding Defendants from arguing, testifying, or offering any evidence to the effect that the instances of confusion from the spoliated period were "small," "insignificant," or any similar unsupported claim, or that they took action to address the ongoing confusion. *See* FED. R. CIV. P. 37(e)(1) (authorizing a court to order any measures "necessary to cure the prejudice" when ESI "is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced"). Adler submits, however, that a deemed admission is a more appropriate and proportionate remedy on these facts. It better achieves the goals of deterrence, protecting the judicial process, and undoing the prejudice to Adler. *See Ashton*, 772 F. Supp. 2d at 801. Also, a deemed admission is a clean "one-shot" remedy, while an order of exclusion puts a greater ongoing burden on Adler to make sure Defendants do not violate the order.

to this Court with 'unclean hands.' It would offend notions of equity for Workspot to prevail on any equitable defense moving forward."); *see also Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 128 (4th Cir. 2019) (district court's sanctions order barring defendant from asserting equitable defenses requires reversal of summary judgment in defendant's favor on its equitable defenses).

**Fourth**, the Court should award Adler's reasonable attorneys' fees incurred in connection with investigating the spoliation issue and bringing this motion. *See T & E Inv.*, 2014 WL 550596, at *10, 19 (adopting recommendation of a monetary sanction in addition to an adverse-inference instruction).

## CONCLUSION

Defendants spoliated critical evidence in bad faith for over two years, all while this litigation was pending. Accordingly, the Court should enter a deemed factual admission and adverse-inference instruction, strike Defendants' equitable defenses, and award Adler his reasonable attorneys' fees incurred in connection with this motion. If the Court grants Adler's request for fees, Adler will submit documentation of its reasonable fees separately as the Court instructs.

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a), on December 6, 2022, Plaintiffs' counsel Jered Matthysse and Giulio Yaquinto conferenced with Defendants' counsel Rebecca Adams, who informed Plaintiffs' counsel that Defendants oppose this motion.

*/s/ Jered E. Matthysse*
Jered E. Matthysse

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2022, a true and correct copy of the foregoing was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the court's local rules. In addition, I served a copy of the foregoing via email on the following:

radams@lynnllp.com
cschwegmann@lynnllp.com
bmunshi@lynnllp.com
ssmoot@lynnllp.com
nstallbohm@lynnllp.com
dholmes@lynnllp.com

*/s/ Jered E. Matthysse*
Jered E. Matthysse

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | **JURY DEMANDED** |
| QUINTESSA MARKETING, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| and LAUREN MINGEE, | § | |
| | § | |
| Defendants. | § | |

**SEALED DOCUMENT**

**DECLARATION OF DIANA RAUSA IN SUPPORT OF
MOTION FOR SPOLIATION SANCTIONS**

I, Diana Rausa declare as follows:

1.  I am a paralegal employed by the law firm of Pirkey Barber PLLC, which represents

Plaintiffs Jim S. Adler, P.C. and Jim Adler ("Plaintiffs") in this case.

2.  Attached as **Exhibit 1** are true and correct copies of excerpts from the April 13, 2022

deposition of Lauren Von McNeil Mingee.

3.  Attached as **Exhibit 2** are true and correct copies of documents produced by Plaintiff

marked with production numbers ADLER_001769 and 001771-72.

4.  Attached as **Exhibit 3** is a true and correct copy of Defendants' intake call scripts

produced by Defendants marked with production number QUINTESSA_02595.

5.  Attached as **Exhibit 4** are true and correct copies of excerpts from the September 28,

2022 deposition of Mike Walker.

1

6.      Attached as **Exhibit 5** are true and correct copies of excerpts from the July 22, 2022 deposition of Jason Love.

7.      Attached as **Exhibit 6** are true and correct copies of Exhibits 23, 31, 39, 40, 42 and 51 from the April 13, 2022 deposition of Lauren Von McNeil Mingee.

8.      Attached as **Exhibit 7** are excerpts from Defendants' First Amended Objections and Answers to Plaintiffs' First Set of Interrogatories dated March 11, 2022.

9.      Attached as **Exhibit 8** is a true and correct copy of the Expert Rebuttal Report of David M. Leathers dated August 15, 2022.

10.     Attached as **Exhibit 9** are true and correct copies of excerpts from the November 16, 2022 30(b)(6) deposition of Quintessa Marketing, LLC.

11.     Attached as **Exhibit 10** is a true and correct copy of a document produced by Defendants marked QUINTESSA_000003-000023 titled "The 3 Leg Stool and the 6 Things".

12.     Attached as **Exhibit 11** are true and correct copies of excerpts from the August 12, 2022 deposition of Leo Mingee.

13.     Attached as **Exhibit 12** is a true and correct copy of a screenshot of a Benzinga article titled "Quintessa Marketing's CEO Lauren Mingee Nominated for Journal Records 2022 Woman of the Year" dated July 20, 2022, available at https://www.benzinga.com/pressreleases/22/07/n28142671/quintessa-marketing-deo-lauren-mingee-nominated-for-journal-records-2022-woman-of-the-year which I captured on October 5, 2022.

14.     Attached as **Exhibit 13** are true and correct copies of excerpts from Plaintiffs' First Set of Requests for Production dated November 11, 2021.

15.     Attached as **Exhibit 14** is a true and correct copy of Plaintiffs' Fourth Set of Requests for Production dated July 1, 2022.

2

16.     Attached as **Exhibit 15** are true and correct copies of excerpts from the September 30, 2022 deposition of Wallace Kittredge.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 20, 2022 in Austin, Texas.

/s/ *Diana Rausa*
Diana Rausa

# EXHIBIT 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION

3    JIM S. ADLER, P.C. and      )
     JIM ADLER,                   )
4       Plaintiffs,              )
                                  )
5    VS.                          )  CA NO. 3:19-cv-02025-K-BN
                                  )
6    MCNEIL CONSULTANTS, LLC      )
     D/B/A ACCIDENT INJURY        )
7    LEGAL CENTER, QUINTESSA      )
     MARKETING, LLC D/B/A         )
8    ACCIDENT INJURY LEGAL        )
     CENTER, and LAUREN VON       )
9    MCNEIL,                      )
        Defendants.               )
10       *****************************************
              ORAL AND VIDEOTAPED DEPOSITION OF
11
                LAUREN VON MCNEIL MINGEE
12
                      CONFIDENTIAL
13
                    April 13, 2022
14       *****************************************
        ORAL AND VIDEOTAPED DEPOSITION OF LAUREN VON MCNEIL
15
     MINGEE, produced as a witness at the instance of the
16
     Plaintiffs, and duly sworn by me, taken in the above-
17
     styled and numbered cause on April 13, 2022, from
18
     10:08 a.m. to 7:29 p.m., before DIANA BENGS, CSR, RPR,
19
     Texas CSR No. 4907, in and for the State of Texas,
20
     reported by machine shorthand, at the offices of Lynn,
21
     Pinker, Hurst & Schwegmann, 2100 Ross Avenue, Suite 2700,
22
     Dallas, Texas, pursuant to the Federal Rules of Civil
23
     Procedure and provisions stated on the record.
24
     Reported By: DIANA M. BENGS, CSR, RPR
25   Job No. 207160

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
          Jered Matthysse, Esq.
 4        Giulio Yaquinto, Esq.
          Pirkey Barber
 5        1801 East 6th Street
          Austin, TX 78702
 6

 7

 8

 9
     FOR THE DEFENDANTS:
10        Christopher Schwegmann, Esq.
          Rebecca Adams, Esq.
11        Lynn Pinker Hurst & Schwegmann
          2100 Ross Avenue
12        Dallas, TX 75201

13

14

15

16   VIDEOGRAPHER:
          MR. MICHAEL MOORE
17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2                                                    PAGE

 3   Appearances                                         2

 4   Stipulations                                        9

 5

 6   LAUREN VON MCNEIL MINGEE

 7   EXAMINATION BY MR. MATTHYSSE                         9

 8

 9   CHANGES AND SIGNATURE                             352

10

11   REPORTER'S CERTIFICATION                          354

12

13                      EXHIBITS

14   NO.   DESCRIPTION                                 PAGE

15

16   Exhibit 1    Settlement and Mutual Release Agreement    62

17   Exhibit 2    Quintessa Bulk Marketing and Full Service  70

18                Platform General Terms of Service

19   Exhibit 3    Quintessa Marketing Printout              94

20   Exhibit 4    The Three Leg Stool and The Six Things    107

21   Exhibit 5    Defendants' First Amended Objections and  135

22                Answers to Plaintiffs' First Set Of

23                Interrogatories

24   Exhibit 6    E-mail, Bates No. Quintessa_000121        140

25   Exhibit 7    E-mail, Bates No. Quintessa_000343        152
```

Page 4

| 1 | Exhibit 8 | Google Invoice, Bates | 160 |
| 2 | | Nos. Quintessa_001001 to 001002 | |
| 3 | Exhibit 9 | Google Invoice, Bates | 160 |
| 4 | | Nos. Quintessa_001017 Through 001018 | |
| 5 | Exhibit 10 | E-mail, Google Ads Bates | 170 |
| 6 | | Nos. Quintessa_000959 Through 000960 | |
| 7 | Exhibit 11 | E-mail, Google Ads, Bates | 172 |
| 8 | | Nos. Quintessa_000961 Through 000962 | |
| 9 | Exhibit 12 | E-mail, Google Ads, Bates | 174 |
| 10 | | Nos. Quintessa_000965 Through 000966 | |
| 11 | Exhibit 13 | E-mail Chain, Bates Nos. Quintessa_001252 | 175 |
| 12 | | Through 001254 | |
| 13 | Exhibit 14 | E-mail Chain, Bates Nos. Quintessa_000704 | 179 |
| 14 | | Through 000705 | |
| 15 | Exhibit 15 | List of Texas Law Firms, Bates | 195 |
| 16 | | No. Quintessa_001395 | |
| 17 | Exhibit 16 | Attorney Revenues, Bates | 196 |
| 18 | | No. Quintessa_001396 | |
| 19 | Exhibit 17 | Defendant's Original Answer | 202 |
| 20 | Exhibit 18 | Defendants' Rule 26(a)(1) Initial | 213 |
| 21 | | Disclosures | |
| 22 | Exhibit 19 | Defendants' First Amended Objections and | 232 |
| 23 | | Answers to Plaintiffs' Interrogatories 4 | |
| 24 | | and 5 | |
| 25 | | | |

| 1 | Exhibit 20 | Defendants' Objections and Answers to | 234 |
| 2 | | Plaintiffs' Second Set of Interrogatories | |
| 3 | Exhibit 21 | E-mail Chain, Bates Nos. Quintessa_000129 | 243 |
| 4 | | Through 000133 | |
| 5 | Exhibit 22 | E-mail Chain, Bates Nos. Quintessa_000146 | 248 |
| 6 | | Through 000152 | |
| 7 | Exhibit 23 | E-mail Chain, Bates Nos. Quintessa_000190 | 252 |
| 8 | | Through 000194 | |
| 9 | Exhibit 24 | E-mail Chain, Bates Nos. Quintessa_001100 | 257 |
| 10 | | Through 001104 | |
| 11 | Exhibit 25 | E-mail Chain, Bates Nos. Quintessa_000295 | 260 |
| 12 | | Through 000298 | |
| 13 | Exhibit 26 | Attorney-Client Contingency Fee | 262 |
| 14 | | Contract/HIPAA Authorization | |
| 15 | Exhibit 27 | E-mail Chain, Bates Nos. Quintessa_000305 | 263 |
| 16 | | Through 000307 | |
| 17 | Exhibit 28 | E-mail Chain, Bates Nos. Quintessa_000314 | 264 |
| 18 | | Through 000315 | |
| 19 | Exhibit 29 | E-mail, Bates No. Quintessa_000321 | 266 |
| 20 | Exhibit 30 | E-mail, Bates Nos. Quintessa_000365 | 268 |
| 21 | | Through 000366 | |
| 22 | Exhibit 31 | E-mail Chain, Bates Nos. Quintessa_000390 | 271 |
| 23 | | Through 000393 | |
| 24 | Exhibit 32 | E-mail, Bates No. Quintessa_000416 | 273 |
| 25 | | | |

Confidential

| 1  | Exhibit 33 | Mott & Moffett LLP Power of Attorney and         | 275 |
| 2  |            | Contingency Fee Contract                         |     |
| 3  | Exhibit 34 | E-mail, Bates No. Quintessa_000456               | 275 |
| 4  | Exhibit 35 | E-mail, Bates Nos. Quintessa_000457              | 277 |
| 5  |            | Through 000459                                   |     |
| 6  | Exhibit 36 | E-mail, Bates No. Quintessa_000810               | 280 |
| 7  | Exhibit 37 | E-mail Chain, Bates Nos. Quintessa_000214        | 282 |
| 8  |            | Through 000217                                   |     |
| 9  | Exhibit 38 | E-mail, Bates Nos. Quintessa_000220              | 284 |
| 10 |            | Through 000224                                   |     |
| 11 | Exhibit 39 | E-mail Chain, Bates Nos. Quintessa_000229        | 291 |
| 12 |            | Through 000233                                   |     |
| 13 | Exhibit 40 | E-mail, Bates Nos. Quintessa_ 000234             | 302 |
| 14 |            | Through 000240                                   |     |
| 15 | Exhibit 41 | E-mail Chain, Bates Nos. Quintessa_000241        | 306 |
| 16 |            |  Through 000242                                  |     |
| 17 | Exhibit 42 | E-mail Chain, Bates Nos. Quintessa_000289        | 308 |
| 18 |            | Through 000294                                   |     |
| 19 | Exhibit 43 | E-mail Chain, Bates Nos. Quintessa_000309        | 310 |
| 20 |            | Through 000313                                   |     |
| 21 | Exhibit 44 | E-mail Chain, Bates Nos. Quintessa_000376        | 311 |
| 22 |            | Through 000380                                   |     |
| 23 | Exhibit 45 | E-mail Chain, Bates Nos. Quintessa_000412        | 317 |
| 24 |            | Through 000415                                   |     |
| 25 |            |                                                  |     |

| 1 | Exhibit 46 | E-mail Chain, Bates Nos. Quintessa_000762 | 319 |
| 2 | | Through 000763 | |
| 3 | Exhibit 47 | E-mail Chain, Bates Nos. Quintessa_000758 | 320 |
| 4 | | Through 000760 | |
| 5 | Exhibit 48 | E-mail Chain, Bates Nos. Quintessa_000940 | 322 |
| 6 | | Through 000944 | |
| 7 | Exhibit 49 | E-mail Chain, Bates Nos. Quintessa_000685 | 324 |
| 8 | | Through 000686 | |
| 9 | Exhibit 50 | E-mail Chain, Bates Nos. Quintessa_000336 | 328 |
| 10 | | Through 000338 | |
| 11 | Exhibit 51 | E-mail Chain, Bates Nos. Quintessa_000979 | 330 |
| 12 | | Through 000982 | |
| 13 | Exhibit 52 | E-mail Chain, Bates Nos. Quintessa_001128 | 333 |
| 14 | | Through 001131 | |
| 15 | Exhibit 53 | E-mail Chain, Bates Nos. Quintessa_001147 | 335 |
| 16 | | Through 001149 | |
| 17 | Exhibit 54 | E-mail Chain, Bates Nos. Quintessa_001177 | 335 |
| 18 | | Through 001180 | |
| 19 | Exhibit 55 | E-mail Chain, Bates Nos. Quintessa_001234 | 338 |
| 20 | | Through 001239 | |
| 21 | Exhibit 56 | E-mail Chain, Bates Nos. Quintessa_001289 | 342 |
| 22 | | Through 001296 | |
| 23 | Exhibit 57 | E-mail Chain, Bates Nos. Quintessa_001297 | 347 |
| 24 | | Through 001298 | |
| 25 | | | |

Case 3:19-cv-02025-K-BN Document 190-2 Filed 08/22/23 Page 47 of 406 PageID 6445

```
 1                    P R O C E E D I N G S

 2                    THE REPORTER:  Would you like to state

 3   your stipulations for the record?

 4                    MR. SCHWEGMANN:  Just by the Rules.

 5                    THE VIDEOGRAPHER:  And good morning.  We

 6   are now on the record at 10:08 a.m. on April the 13th,

 7   2022.

 8                    THE REPORTER:  I am Diana Bengs, Texas

 9   Certified Shorthand Reporter, CSR No. 4907, here for

10   the court reporting firm TSG Reporting, Inc., 747 Third

11   Avenue, 10th Floor, New York, New York 10017.

12                    Today's date is April 13, 2022.  The

13   time is 10:08 a.m.  We are in the offices of Lynn,

14   Pinker, Hurst & Schwegmann, 2100 Ross Avenue,

15   Suite 2700, Dallas, Texas 75201.  This is the

16   deposition of Lauren Mingee in the matter of Jim S.

17   Adler, P.C. and Jim Adler, Plaintiffs, vs. McNeil

18   Consultants, LLC, et al, in the United States District

19   Court for the Northern District, Dallas Division, Cause

20   No. 3:19-cv-02025-K-BN.

21                    LAUREN VON MCNEIL MINGEE,

22   having been first duly sworn/affirmed, testified as

23   follows:

24

25
```

```
 1                          EXAMINATION

 2   BY MR. MATTHYSSE:

 3       Q.   Good morning.

 4       A.   Good morning.

 5       Q.   Could you state your full name for the record.

 6       A.   Lauren Von Mingee.

 7       Q.   Ms. Mingee, just to clarify for the record,

 8   was your prior married name Lauren Von McNeil?

 9       A.   Yes, sir.

10       Q.   Okay.  And -- and so you recognize that you

11   are one of the defendants in this case under the name

12   Lauren Von McNeil, but today you've since been married.

13   Your name is Lauren Mingee; correct?

14       A.   Yes, sir.

15       Q.   Have you been deposed before, Ms. Mingee?

16       A.   Yes, sir.

17       Q.   About how many times?

18       A.   I believe three times.

19       Q.   When was the first time you were deposed?

20       A.   I don't remember the exact...

21       Q.   Do you remember what the case was about?

22       A.   It was a -- it was for a lawsuit against a

23   former employer.

24       Q.   Was that the Azar lawsuit?

25       A.   The Azar lawsuit?
```

1  you were purchasing just California law firms?

2      A.  Yes.

3      Q.  In that time, do you recall if those were

4  website-linked-type ads; or were they optional click or

5  call ads?

6      A.  I don't remember the mix, but I know that it

7  was a mix of call extensions and desktop.

8      Q.  And did the firm then use their call center to

9  receive those calls?

10     A.  Yes, sir.

11     Q.  Were you involved in the intake process at

12  all?

13     A.  Yes, sir.

14     Q.  What was your involvement there?

15     A.  I helped in hiring intake people.

16     Q.  Did you train them?

17     A.  Yes.

18     Q.  Did you ever answer phones at all?

19     A.  I'm sure I did.  I don't remember if it was a

20  normal occasion or -- I think it was if someone was

21  missing or gone for the day.

22     Q.  Okay.  During your time -- remind me how to

23  pronounce the firm's name?

24     A.  West Seegmiller.

25     Q.  Seegmiller.  Okay.

1      Q.   Okay.  When you left Exclusive, was McNeil

2  Consultants engaged in any sort of business activity?

3      A.   I am unsure on that.  My ex-husband may have

4  been doing some side projects.

5      Q.   Okay.  So -- and that's Daniel McNeil;

6  correct?

7      A.   Yes, sir.

8      Q.   Was he a co-owner of McNeil Consultants with

9  you?

10     A.   No, sir.

11     Q.   So you were the sole owner of McNeil

12  Consultants?

13     A.   Yes, sir.

14     Q.   Just as you are the sole owner of Quintessa;

15  correct?

16     A.   Yes, sir.

17     Q.   But explain for me, what did Mr. McNeil do as

18  a subcontractor of McNeil Consultants?

19     A.   He had experience with postproduction and with

20  developing TV commercials and with -- I believe it's

21  Final Cut Pro, so editing commercials; and so once we

22  decided to leave Exclusive, he was wanting to do

23  editing for other companies.

24     Q.   Gotcha.  And so he would get paid through

25  McNeil Consultants; correct?

1    Q.   Anything else?

2    A.   I do not believe so.  Intake training was

3    available, but I started shying away from that.

4    Q.   So at that point in '16, you were offering

5    pay-to-click to these personal injury law firms.  Did

6    you have your own call center at that time?

7    A.   Yes, I did.

8    Q.   And how many folks were in the call center at

9    that time?

10    A.   It would range -- with call centers, they --

11    they are not the best individuals sometimes; so we

12    would range from 3 to 10.

13    Q.   Where was -- at that point, 2016, where was

14    Quintessa based out of?

15    A.   Midwest City.

16    Q.   And is that where the call center was?

17    A.   Yes, sir.

18    Q.   Did you answer calls?

19    A.   On rare occasions.  If someone called in, then

20    yes.

21    Q.   And at that point in 2016, was yourself and

22    Quintessa engaged in competitive keyword bidding?

23    A.   Yes, sir.

24    Q.   When your advertisements showed up on behalf

25    of your clients in 2016, what -- how did they typically

1    appear?  What was the language in the Google

2    advertisements?

3        A.    It was something very generic.  So "Injured in

4    accident, call today for help."  That was one of

5    them -- one of our advertisements.

6        Q.    Okay.  And were they desktop, to your

7    knowledge?

8        A.    They were a blend of desktop and call --

9        Q.    Okay.

10       A.    -- extensions.

11       Q.    And today is it primarily mobile?

12       A.    No.  We have both.

13       Q.    Is one larger than the other, mobile versus

14    desktop?

15       A.    I don't have the numbers in front of me, so I

16    couldn't...

17       Q.    Okay.  And you said that you used generic

18    terms in the advertisements.  What was the reason for

19    using those types of terms?

20       A.    It wasn't flashy like some of the personal

21    injury lawyers, the larger ones we worked with; and I

22    didn't feel like you needed that to be able to get

23    someone to call in for help.

24       Q.    Did you test other types of advertisements to

25    see how they'd perform?

1    A.  Yes, sir.

2    Q.  Did you use any ones that used more

3  distinctive language like Quintessa or McNeil

4  Consultants?

5    A.  No, sir.

6    Q.  Why not?

7    A.  Every incorporation has D/B/As for different

8  reasons; and just because Quintessa or McNeil

9  Consultants was a parent company, the D/B/As would be

10  used for the certain type of ad that we were going

11  after to be relevant.

12    Q.  And at that point, do you recall if you were

13  using Accident Injury Legal Center?

14    A.  Yes, sir, I believe so.

15    Q.  Okay.  Was that the main domain that you used

16  at the time for -- for personal injury accidents?

17    A.  Yes, sir, I believe so.

18    Q.  Do you recall when you started the business

19  around 2016 if you owned any domains other than

20  accidentinjurylegalcenter.com?

21    A.  We owned hundreds.

22    Q.  Okay.  So -- and you still own hundreds of

23  domain names?

24    A.  Yes, sir.

25    Q.  And what's the purpose of owning hundreds of

1  domain names?

2      A.    If they look like a pretty domain with a

3  really nice title, then we don't want someone else

4  having that one.

5      Q.    What do you mean by "pretty domain with a

6  really nice title"?

7      A.    So "Accident Injury Legal Center," we would

8  probably have bought a pleural of that.

9      Q.    Okay.  What other types of domains, just

10  examples, do you own?

11      A.    Caraccidenthelp.com.

12      Q.    And do you use those different domains in your

13  Google advertisements?

14      A.    Not always.

15      Q.    How do you decide when to use those domain

16  names?

17      A.    I don't believe we have a rhyme or reason.

18      Q.    And at that point, when you were starting to

19  engage on behalf of         and other personal injury

20  law firms in competitive keyword advertising, did your

21  call center ever get any folks calling in looking for

22  an attorney different than the one that you were

23  engaged in -- with?

24      A.    Can you rephrase that?

25      Q.    Yeah.  In 2016 when you were working with

1          and other personal injury law firms, did your

2    call center ever get calls from victims calling in for

3    a law firm that you were not engaged with?

4      A.   Yes, sir.

5      Q.   Do you know why that was?

6      A.   I guess I'm -- why we received phone calls?

7      Q.   Why you received those types of phone calls,

8    yeah.

9      A.   I can't speak to Google's algorithm, but it

10   found our keywords relevant for different law firms.

11     Q.   What do you mean by that?

12     A.   Broad match.

13     Q.   Okay.  But you were purchasing competitors'

14   keywords; right?

15     A.   Yes, sir.

16     Q.   And so it is conceivable that folks were

17   clicking on your advertisement thinking that they were

18   looking for that competitor; correct?

19     A.   Google in different match types with broad.

20   So for instance, you could put "                              "

21   in broad, and you would get other terms like "car

22   accident lawyer," people looking for that.  Google

23   views law firms sometimes synonymous with those terms,

24   if that makes sense.

25     Q.   Fair.  I'm saying you were purchasing directly

Confidential

1    A.    My executive assistant and Mike Walker.

2    Q.    Who is your executive assistant?

3    A.    Rachel Roe, R-o-e.

4    Q.    Do you know approximately how many employees

5  you currently have?

6    A.    I believe 42, but I do not have the exact

7  number.

8    Q.    Okay.  How many of those are in the intake

9  call center?

10    A.    I believe 35.

11    Q.    I recall seeing in mid 2021 that y'all posted

12  that you had 20 positions to fill.  Do you recall that?

13    A.    Yes, sir.

14    Q.    And were most of those for the intake center?

15    A.    Yes, sir.

16    Q.    You also mentioned in the notice that the

17  intake specialist position can get monthly performance

18  bonuses.  Do you recall that?

19    A.    I didn't write it.

20

Q. One of the positions mentioned was a client
6  success manager and parenthetical account manager. Do
7  you know what that is?

8  A. It is investing in the client's success. So
9  they would look at their leads and see how they were
10  doing and what their conversion rates were, if they
11  were having a low contact rate; so they are a point of
12  contact for the client.

13  Q. So is that for the leads being given by
14  Quintessa to the client or is that for the client's own
15  business?

16  A. For Quintessa's clients to the law firm.

17  Q. Gotcha.

18  A. Sorry. Quintessa's leads to the law firm.

19  Q. Okay. To see -- to make sure that that is up
20  to par for what they -- that you would expect them to
21  be getting?

22  A. Yes, sir.

23  Q. Okay. And then y'all recently also moved into
24  a new building; is that right?

25  A. A little over a year ago.

1  as you can see at the bottom there,

2  quintessamarketing.com.  Do you recognize that image

3  from your website?

4      A.  Yes, sir.

5      Q.  And quintessamarketing.com is owned by

6  Quintessa, your company; correct?

7      A.  Yes, sir.

8      Q.  If I could point you in the first full

9  sentence under "Quintessa Marketing, A New Brand of

10 Legal Marketing," it says that "Quintessa Marketing

11 delivers highly qualified leads for lawyers.  Using

12 nonbranded advertising, we help those who seek legal

13 assistance find you and help you turn them into

14 clients."

15          Do you see that?

16     A.  Yes, sir.

17     Q.  What do you mean by nonbranded advertising?

18     A.  Instead of using jimadler.com, you would

19 use -- you would hire someone to produce leads under

20 their own brand, whether it be to let someone know you

21 are not in the market or just to have a competitive

22 edge.  They come to us instead of producing their own

23 leads.

24     Q.  So is this -- by nonbranded advertising, is

25 that essentially like your Google Ads that show up and

1  say "Accident Injury Legal Center"?  Is that what

2  you --

3     A.  Yes, sir.

4     Q.  Okay.  So you would qualify that as a

5  nonbranded advertisement?

6     A.  Yes, sir.

7     Q.  Okay.  Later on on this page of your website,

8  it says, "...our own highly trained intake department

9  that acts as an appendage to your law firm to assist in

10  getting potential clients information to qualify them

11  as a viable client.  If they meet qualifications, we

12  sign them up on your retainer agreement."

13          Do you see that?

14     A.  Yes, sir.

15     Q.





1

16     Q.

24     Q.     Is that a single person who does that?

25     A.     I believe they have hired two people, and they



23    Q.    Why did it take the Fifth -- until the Fifth

24  Circuit decision for you to change your ad copy?

25              MR. SCHWEGMANN:   Objection, form.

1    you can be 99 percent at fault.  So this is the basis

2    of a very general fact-gathering pattern.

3         Q.   Okay.  And so if someone does sign, typically

4    is that done while -- signed the retainer, is that

5    typically done while that individual injured victim is

6    on the phone with the intake specialist?

7         A.

8         Q.

9         A.

16        Q.   Okay.  So --

21

1

9       Q.    Okay.  If you can go to the next page,

10    Ms. Mingee, page Quintessa 6.  See at the top there,

11

12      A.    Yes, sir.

13      Q.    And it has a screenshot here of what's called

14    "                          "  Do you see that?

15      A.    Yes, sir.

16      Q.    Can you just tell for me generally what is the

17                                  ?

18      A.

25                  A couple questions I have is:  What is the

```
 1   possible that you are sending a lead that's already
 2   represented; is that correct?
 3       A.    I'm unsure how it could because it's asking
 4   that question in -- and I'm unsure of the exact
 5   wording, but it is in the questionnaire before they
 6   send it over.
 7       Q.    Okay.   And then it says here,



11                  Do you see that?
12       A.    Yes, sir.
13       Q.



16       Q.    Prior to November of '21?
17       A.    Again, this is not my sheet that I created;
18   so -- but our intake, we'll ask someone if they are
19   happy.
20       Q.    After being told that they have
21   representation?
22       A.    I'm not sure on every instance, but --
23       Q.    Okay.
24       A.    -- I have heard that, yes.
25       Q.    Okay.   And then underneath that, it shows
```

Case 3:19-cv-02025-K-BN Document 190-4 Filed 08/22/22 Page 66 of 406 PageID 8134

1   here,



4       A.   Yes, sir.

5       Q.



8       A.   Yes, sir.

9       Q.   Do you know where -- do you personally know

10  where this instruction came from?

11      A.   No, sir.

12      Q.   Was this -- prior to Mike creating this, had

13  you seen that type of instruction before?

14      A.





19      Q.   Was that something --

20      A.   -- form fill.

21      Q.   Oh, sorry.

22      A.   That's all right.   The form fill.

23      Q.   Okay.   Was that something that you brought

24  over from Exclusive?   Was that something practiced

25  there?

Confidential

1    A.    I'm unsure.

2    Q.

15              MR. MATTHYSSE:  All right.  I think we're

16  good to take a lunch break.

17              MR. SCHWEGMANN:  Okay.  Great.  Thank

18  you.

19              THE VIDEOGRAPHER:  The time is

20  12:59 p.m., and we're off the record.

21              (Brief Recess, 12:59 p.m. until

22  1:58 p.m.)

23              THE VIDEOGRAPHER:  The time is 1:58 p.m.,

24  and we are back on the record.

25       Q.    (BY MR. MATTHYSSE)  All right.  Ms. Mingee,

1  the time.

2      Q.   Was Exclusive doing that, too?

3      A.   No, not when they initially started.

4      Q.   How were they -- what was their -- to your

5  knowledge, what was their setup?

6      A.   From what I was told, that they would live

7  transfer leads over.

8      Q.   So was it your decision to create this new

9  business model that would actually have retainers?

10     A.   No, it wasn't.  It came about as a problem

11  solving, and I'm unsure if it was myself or Coety

12  Bryant who said.  But it was that we were losing

13  potential clients because the firm was not talking to

14  them fast enough or whatever may have you; and it

15  became a -- I'm trying to think of the word.  We saw a

16  problem, and then this was a fix.  Saw another

17  problem --

18     Q.   Got it.

19     A.   -- then that would be a fix.

20     Q.   So was part of the fix here signing them up

21  before you sent them to the third-party law -- to your

22  client law firm?

23     A.   Yes.

24     Q.   And was also part of the fix getting retainers

25  up front, or was that done with Exclusive?

1  and it is just the Texas campaign?

2      A.

7      Q.   And that's been true since its existence, the

8  beginning of its existence?

9      A.   I can't say every single bid; but for the most

10  part, we target the entire state.  That has been our

11  practice for a very long time.

12      Q.   So is it your position then when someone

13  searches for "Thomas J. Henry," they are just looking

14  for any old car accident lawyer in Texas, in

15  San Antonio?

16      A.   I think -- I can't speak to everybody and what

17  they are searching for because we only get a minute

18  amount of their traffic of people that are searching

19  for "Thomas J. Henry" or "Jim Adler."  So I'm unsure

20  exactly what it is that they are searching for, but I

21  can look for the search terms.

22      Q.   So you don't know?

23      A.   Don't know if they are looking for any old car

24  accident lawyer?  I can't assume what they are

25  searching for.

1    Q.    And is it not reasonable to assume that they

2  are searching for Thomas J. Henry and his services?

3                MR. SCHWEGMANN:  Objection to form.

4                But you can answer.

5    A.    I don't think in every instance, no.

6    Q.    (BY MR. MATTHYSSE)  Same for Jim Adler?

7                MR. SCHWEGMANN:  Same objection.

8    A.    I don't believe so, no.

9    Q.    (BY MR. MATTHYSSE)  So your answer's not the

10  same?

11   A.    I cannot speak to what every individual is

12  searching for.

13   Q.    Do you have evidence in your business records

14  that many folks called -- many, as in hundreds, of

15  injured victims called looking for Jim Adler?

16   A.    I guess I would need to see over what time

17  frame.

18   Q.    Over the existence of your business, your

19  business records.

20   A.    Whatever was provided --

21                MR. SCHWEGMANN:  Objection to form.

22                But you can answer.

23   A.    In the documents, I do not have everything

24  memorized; but whatever was produced is the amount of

25  times that that name was mentioned.

1    Q.   (BY MR. MATTHYSSE)  Did that surprise you when

2  you pulled those records and looked at them?

3    A.   I didn't really dig into that as much.

4    Q.   Why not?

5    A.   It's such a minute part of our business.

6    Q.   So it doesn't bother you that folks are

7  calling and asking for Jim?

8    A.   You keep asking me that; and if there is

9  confusion, we will always clarify and we will always

10  address.  If someone feels confused, that bothers me.

11  It is never to mislead anybody.  The job is to help

12  someone that has been injured in an accident and to get

13  them with an attorney who will take care of them.

14    Q.   But it didn't bother you enough until you lost

15  at the Fifth Circuit to change your behavior in any

16  way; right?

17    A.   I didn't say that.

18    Q.   So what did you change prior to the Fifth

19  Circuit decision to rectify the situation?

20    A.   We would do more training.  We would call back

21  clients and confirm and see what happened.  But in any

22  instance, if anything happened, we would address it.  I

23  mean, it was taken very seriously.

24    Q.   And you didn't stop bidding on "Adler" as a

25  keyword; right?

1    A.   On a mobile ad with just -- you can put like

2   500 characters, so you could mention "car accident

3   lawyer" 20 times and have a fantastic quality score.

4    Q.   Got it.  And have y'all done -- has the

5   company done any studies or investigations into the

6   amount or quality of leads that you get from those

7   click-to-call ads versus from a normal link-only ad?

[REDACTED]

18   Q.   Okay.  I am going to hand you what will be

19  marked as Exhibit 10.

20             (Exhibit No. 10 was marked.)

21             THE WITNESS:   Thank you.

22   Q.   (BY MR. MATTHYSSE)  As you can see here,

23  Ms. Mingee, this is -- appears -- well, this is a

24  document produced by Quintessa and appears to be an

25  e-mail from Google Ads policy manager to Wallace.  Do

1      A.    He was referencing the ad group of Jim Adler.

2  So Texas call-only is an entire campaign of Texas.

3      Q.    Got it.

4      A.    And he was referencing that.  In this, he was

5  speaking about getting spammed.

6      Q.    Okay.  Is that what you were referencing

7  before is potentially being caused by ▮▮▮▮▮ or

8  someone else?

9              MR. SCHWEGMANN:  Objection to form.

10     A.    In Google there is a side where it shows

11  invalid clicks.

12     Q.    (BY MR. MATTHYSSE)  Okay.

13     A.    So whether it be someone at your client's

14  office or whether it be another competitor, they can go

15  in and quadruple click just to try and run out

16  someone's budget.

17     Q.    Okay.

18     A.    And then -- at Quintessa, we just call them

19  "spam clicks."

20     Q.    Gotcha.  And Wallace uses the phrase

21  (Reading:)  ABS Top started -- or ABS Top started

22  dropping.  Do you know what "ABS Top" means?

23     A.    Absolute top.

24     Q.    What does that mean, "Absolute Top"?

25     A.    Your top of the page, where you rank.

1     Q.   And that's -- was that one of the Google

2  policy --

3     A.   The bills.

4     Q.   -- or the Google invoice?

5     A.   Yes, sir.

6     Q.   Okay.  So account ID is the same as account?

7     A.   Yes, sir.

8     Q.   Okay.  And the billing ID, like you said, is

9  the overall billing ID for Quintessa?

10     A.   The billing ID, yes, it is the same.  Yes,

11  sir.

12     Q.   Okay.

13     A.   I just --

14     Q.   Another question I had and -- so, for

15  instance, this is the search keywords "Jim Adler"; and

16  this is from August of '17 to January '22 when this was

17  produced; and it has the campaigns listed here.  Do you

18  see that, the campaigns (indicating)?

19     A.   Yes, sir.

20     Q.   And, for instance, it looks like some of the

21  main ones are the ones we've discussed, which is the QM

22  Texas call-only.  But then there is other ones that are

23  sometimes pulled in that look like they might not

24  necessarily be as relevant, and I'm wondering if you

25  know why that is?  For instance,

1    A.    So for someone, if you were going to go into

2    Google to find out who's bidding on a term, you would

3    have to put brackets around that term because that's

4    signalling to Google:  Show me only people in exact

5    match.

6        Q.    In Google's ad system?

7        A.    No.  In -- in Google.

8        Q.    Okay.

9        A.    So if you type in "Jim Adler," if I am bidding

10    on "car accident lawyer," you would see my ad, as well.

11        Q.    Okay.  So how do you -- is it possible for you

12    to purchase an exact match and you to show up when

13    someone searches for "Jim Adler," the phrase?

14        A.    Yes.

15        Q.    Okay.  Ms. Mingee, is it your position in this

16    lawsuit that Quintessa's use of the Adler marks has not

17    resulted in confusion?

18              MR. SCHWEGMANN:  Objection, form.

19              But you can answer.

20        A.    There have been signals of confusion in -- in

21    small amounts, in my opinion.  To me, if there was

22    ultimate confusion, I think you would have seen more

23    people clicking on the ad.

24        Q.    (BY MR. MATTHYSSE)  What do you mean by that?

25        A.    If 97 percent of people did not click on an

1    A.  Yes, sir.

2    Q.  And then it says that, "Quintessa engages in

3  advertising through search engines such as Google Ads,

4  social media platforms, e-mail, and affiliate

5  marketing."

6          Do you see that?

7    A.  Yes, sir.

8    Q.  And I believe we've discussed all that.  I

9  just wanted to clarify to make sure.  It says, "such as

10  Google Ads."  Do you -- have you in the past used other

11  search engines?

12    A.  I believe we've used Bing, but not -- it is

13  such a small amount, though.

14    Q.  Okay.  So do you currently use Bing?

15    A.  No, sir.

16    Q.  Okay.  And social media platforms, do you know

17  which of those you advertise on?

18    A.

24    Q.  Okay.  And do you also do some advertising on

25  those platforms to find leads?

1   page 7 that, "Defendants respond that Quintessa uses a

2   cloud-based call center software program called

3   Talkdesk, which records incoming calls that are kept in

4   the regular course of business for 13 months."

5               Do you see that?

6       A.   Yes, sir.

7       Q.   First, I guess, what is Talkdesk?

8       A.   It is a VoIP, so V-o-I-P -- I don't even know

9   what it -- Voice Over Internet.  I'm not sure of the

10  definition.

11      Q.   Okay.  And how long have you used Talkdesk

12  for?

13      A.   I believe since 2016.

14      Q.   Okay.  And you used them primarily to record

15  the calls, or is there other purposes that Talkdesk --

16  services that Talkdesk offers?

17      A.   We use Talkdesk just for -- as a platform to

18  be able to answer calls through.

19      Q.   Okay.  So the call comes through, and it is

20  over their VoIP?

21      A.   Yes, sir.

22      Q.   And it says here that the calls are "kept in

23  the regular course of business for 13 months."

24              Do you see that?

25      A.   Yes, sir.

1    Q.    Where does that 13-month figure come from?

2    A.    So when we spoke with Talkdesk, they said that

3    they -- so whether we said one month or three months or

4    10 years in the -- you know, they only keep them for 13

5    months.  So even if we selected a shorter time, the

6    only -- the amount of time that they store them is for

7    13 months.

8    Q.    No matter what?

9    A.    No matter what.

10   Q.    When did you speak to them about that?

11   A.    Mike speak -- Mike spoke with them, and I

12   believe it was just a few weeks ago, to confirm that.

13   Q.    And so you are saying Talkdesk told Mike that

14   no matter what you-all have said, they'll only keep

15   things for 13 months?

16   A.    So if we set it for a lesser time than 13

17   months, they would keep them for 13 months.  The max

18   that we can select them for is, I believe, two years,

19   one year, one of the two.

20   Q.    Okay.  So you could select longer?

21   A.    I believe so.

22   Q.    Is there an option for you to download the

23   recordings and keep them yourself?

24   A.    Yes.

25   Q.    Okay.  Why did you choose 13 months?

Confidential

1   keep types of documents in the company.

2       A.   No, sir.

3       Q.   What have you done to retain documents since

4   the Adler lawsuit was filed in 2019?

5       A.   We've -- a memo was sent out to everyone about

6   not deleting any e-mails or things of that nature.  We

7   haven't deleted e-mails.  Our e-mails were pulled from,

8   like, 2016.

9       Q.   Okay.

10      A.   But we wanted to make sure that -- that

11  everyone was clear on that.

12      Q.   And that was sent in 2019?

13      A.   I'm unsure --

14      Q.   Okay.

15      A.   -- on the exact date.

16      Q.   And what have you done since the lawsuit was

17  filed to make sure the Talkdesk recordings have not

18  been deleted?

19      A.   They have been -- since it was -- since it was

20  turned over, they have been -- Mike has downloaded them

21  to make sure that they are being preserved.

22      Q.   What do you mean "since it was turned over"?

23      A.   Since the Fifth Circuit.

24      Q.   Okay.  So there's Talkdesk recordings that

25  have been -- that are no longer there or that you did

1  not preserve after the filing of the lawsuit?

2      A.   Yes, sir.

3      Q.   What is the earliest Talkdesk recordings that

4  you currently have?

5      A.   I'm unsure.

6      Q.   When you realized that the Talkdesk recordings

7  were being -- were not being preserved -- well, when

8  did you first realize that?

9      A.   I'm unsure of the exact date.  Mike brought it

10  to my attention, and I told him to make sure that we

11  preserve anything moving forward because a button had

12  not been selected to preserve to its longest amount of

13  time on Talkdesk.

14     Q.   Have you had this issue come up before in

15  prior lawsuits as to your preservation of Talkdesk

16  recordings?

17     A.                          had asked for recordings of his

18  clients; but that was back in -- I don't -- I'm not

19  sure when -- when his lawsuit was for, what time frame

20  it was; but they weren't there either.

21     Q.   So you were on notice that this was -- this

22  had been an issue?

23              MR. SCHWEGMANN:  Objection to form.

24     A.   His lawsuit was after yours.

25     Q.   (BY MR. MATTHYSSE)  When -- about when did

1    that rise as an issue in that ERB lawsuit?

2        A.   In the last couple of months.

3        Q.   Okay.  So that's recent?

4        A.   Yes, sir.

5        Q.   Okay.  Did Mike bring this to your attention

6    around the time of the Fifth Circuit decision or was it

7    prior to then?

8        A.   No.  I believe it was after.

9        Q.   After the Fifth Circuit decision?

10       A.   Yes, sir.

11       Q.   Okay.  Do you know what caused him to look

12   into that?

13       A.   Whenever -- I believe discovery.

14       Q.   So -- okay.  Gotcha.

15           To your knowledge, have you -- has

16   Quintessa produced all of the recordings that it still

17   currently has in its possession?

18           MR. SCHWEGMANN:  Objection to form.

19           You can answer to the best of your

20   ability.

21           I mean, we're happy to answer that

22   question for you.  It just may not come from her, but

23   go ahead and try.

24           MR. MATTHYSSE:  Okay.  That's fair.

25       A.   I'm just not in the day-to-day.

```
 1      A.   No, sir.

 2      Q.   Did you recall -- so you don't recall --

 3   sitting here today, you don't recall this e-mail chain?

 4      A.   It's been four years ago.  I looked at it --

 5      Q.   Okay.

 6      A.   -- the e-mail since then.

 7      Q.   Okay.  And then you responded, "We checked

 8   with him.  He signed with Adler two days after because

 9   he wasn't contacted."

10           What -- do you recall what you meant by

11   that?

12      A.   So when we spoke earlier, if it -- if a

13   concern like this was brought up, what I can only infer

14   from this e-mail is that we reached out to him and he

15   said that he was not contacted and because of that, he

16   retained other counsel.

17      Q.   Okay.  So you were able to confirm with him

18   that he didn't sign with Adler until after y'all had

19   e-signed him?

20      A.   That's -- that's what my e-mail says.

21      Q.   Okay.  And are those calls that are -- those

22   follow-up calls recorded?

23      A.   Every phone call through Talkdesk is recorded.

24      Q.   Okay.  But ones prior to 13 months before

25   y'all realized the issue are no longer available;
```

1 form?

2     A.   If they call in and they are unhappy and they

3 disengage from that attorney, then it goes into "prior

4 attorney."

5     Q.   Even with no drop letter?

6     A.   Absolutely.

7     Q.   Okay.  So 191.  The next morning, ▮▮▮▮

▮▮▮▮▮▮ e-mails and says, (Reading:)  I spoke with this

9 lady last night, and she kept insisting that Jim Adler

10 referred her to us.  I've had several potential clients

11 tell me that.  Why are they under the impression they

12 are being referred by Jim Adler?

13           Do you see that?

14     A.   Yes, I do.

15     Q.   Do you recall this e-mail?

16     A.   I cannot remember every single e-mail that

17 I've been on.

18     Q.   Does it surprise you to hear that sitting

19 here?

20           MR. SCHWEGMANN:  Objection, form.

21     A.   You are pointing out e-mails -- three e-mails

22 out of thousands that I've received.

23     Q.   (BY MR. MATTHYSSE)  So that doesn't surprise

24 or upset you?

25           MR. SCHWEGMANN:  Objection to form.

```
 1      A.   I obviously was concerned, because we also

 2   called and clarified and spoke with them, as well.

 3      Q.   (BY MR. MATTHYSSE)   And do you have the

 4   recordings for that?

 5      A.   I have also let you know that we do not have

 6   those recordings.

 7      Q.   What did the potential client tell you?

 8      A.   In my e-mail, it says, "We will call and

 9   clarify.  She said she had spoken with them previously,

10   so she may be confused."

11      Q.   Do you recall that conversation, sitting here

12   today?

13      A.   I did not do that.

14      Q.   So someone else did that conversation?

15      A.   I don't handle the intake.

16      Q.   So in all these when you are saying that

17   someone's talked to them, it's been -- is that usually

18   the call center?

19      A.   An intake rep.

20      Q.   Okay.  And then they report to you the

21   conversation?

22      A.   Yes.

23      Q.   The first page of this Exhibit 23, 190, ▮▮▮▮

24   responds to you by saying, (Reading:)  Maybe, but it

25   has been an ongoing with some of these potential
```

 1   clients; and on one of them, she thought -- though
 2   seems she means thought -- she signed up with Jim Adler
 3   until she came to meet with us in person.  She's a very
 4   satisfied client, but I was just wondering why they are
 5   under that impression.
 6              Do you see that?
 7   A.   Yes, sir.
 8   Q.   You respond to her, to ██████████, "Not sure,
 9   but we all do the same marketing as all the big
10   attorneys so we run concurrent marketing."
11              What did you mean by that?
12   A.   We do advertising that runs alongside most of
13   the big attorneys.
14   Q.   So why would that explain the confusion?
15   A.   So if -- if I bid on "truck accident lawyer,"
16   so does Jim Adler, so does Brian Loncar; so wherever
17   you click -- right? -- if you are typing in whatever
18   have you, we show up in the same types of marketing as
19   most of the firms that do pay-per-click advertising.
20   Q.   So that's your theory of why these people are
21   confused?
22              MR. SCHWEGMANN:  Objection to form.
23   A.   This was in 2019.  So our processes,
24   procedures are different; so I can't speak to what --
25   what it was then.

```
 1                  And Jason responds that "This was rejected
 2   a bit ago, but you just signed them.  Client already
 3   has an attorney."
 4                  Do you see that?
 5       A.    Yes.
 6       Q.    Did Leo ever bring this up to you, this
 7   specific issue?  Do you recall?
 8       A.    This was a very long time ago, so I'm unsure.
 9       Q.    Okay.  And I believe you had said that it
10   should have been, especially for those e-mail leads,
11   the policy of Quintessa not to recontact that client.
12   Do you know why                             was recontacted?
13       A.    That doesn't mean he was necessarily
14   contacted.  He could have called back in to us, so I
15   can't speak in specific details to it.
16       Q.    Okay.  And -- but -- so sitting here today,
17   you just don't know?
18       A.    No, sir.
19       Q.    And, again, this would be one where you don't
20   have the recording any longer; is that correct?
21       A.    No, sir.
22       Q.    I'm handing you, Ms. Mingee, what will be
23   marked as Exhibit 28.
24                  (Exhibit No. 28 was marked.)
25       Q.    (BY MR. MATTHYSSE)  As you can see, this is an
```

1   e-mail between ███████████ and Leo, your husband.

2   This is July of 2020. Do you recognize the name ████

    ████████ or ████████████████

4       A.   Yes, sir.

5       Q.   Are they or were they a client law firm?

6       A.   I wasn't -- I don't know if I ever spoke with

7   them.

8       Q.   Would you recognize that name as a client law

9   firm?

10      A.   Yes.

11      Q.   Okay. In Texas?

12      A.   Yes.

13      Q.   All right. Do you know off the top of your

14  head if they are a current client law firm?

15      A.   I do not.

16      Q.   Okay. So ████████ says to Leo in the second

17  paragraph, (Reading:) One other thing has happened

18  today. I had PCs that I called, and one asked if I was

19  from -- if I was from Jim Adler because they thought

20  they signed with Adler. And then an Austin case said

21  they thought they had signed with Thomas J. Henry and

22  not us. We had never experienced that before.

23               Do you see that?

24      A.   Yes.

25      Q.   Do you recall whether you ever discussed this

1   specific issue with Leo?

2       A.   I do not.

3       Q.   Do you recall whether Leo ever -- were you

4   ever in any meetings where this issue with ▮▮▮▮ having

5   those experiences was brought up?

6       A.   So our protocol was always if there was any

7   concern, find out the name of the client, pull the

8   phone call, audit that, and then address with intake,

9   and then address with the attorney.

10      Q.   Okay.  Did you ever discuss this issue with

11  ▮▮▮▮▮▮▮▮

12      A.   It looks like Leo was on it, but I don't see

13  my name on it.

14      Q.   Okay.  I'm handing you what will be marked as

15  Exhibit 29.

16              (Exhibit No. 29 was marked.)

17              THE WITNESS:   Thank you.

18      Q.   (BY MR. MATTHYSSE)  ▮▮▮▮ again e-mails Leo

19  with subject line, "Follow up," in July of 2020, saying

20  in the second sentence, "We continue to have clients

21  tell us they signed with Adler or Thomas Henry or other

22  law firms."

23              Do you see that?

24      A.   Yes.

25      Q.   I expect that you did not discuss this with

Confidential

1  Leo or ▮▮▮ is that correct?

2      A.  I don't recall.

3      Q.  Okay.  Sitting here today, does it surprise

4  you to see that ▮▮▮ is having these issues in December

5  of 2020?

6      A.  I mean, we've gone over like three different

7  years; so this is a small amount of e-mails that we're

8  looking at.

9      Q.  So it doesn't concern you because it is just a

10 couple of e-mails?

11          MR. SCHWEGMANN:  Objection to form.

12          You can answer.

13     A.  I didn't say that it didn't concern me.  I'm

14 just saying you are only looking at a few e-mails.

15     Q.  (BY MR. MATTHYSSE)  What's the relevance of

16 that?

17     A.  That you are not looking at the thousands of

18 other e-mails with no problem.

19     Q.  So it is okay if you confuse folks as long as

20 you are not doing it for everyone?

21          MR. SCHWEGMANN:  Objection to form.

22     A.  That's not what I said.

23     Q.  (BY MR. MATTHYSSE)  Do you find it to be a

24 coincidence that this keeps coming up, these e-mails?

25     A.  I don't believe that.  Again, it is a small

1  percentage.

2      Q.   Does it matter that a number of your potential

3  clients are concerned -- or sorry -- confused and that

4  your potential -- or your current law firms are

5  concerned?

6          MR. SCHWEGMANN:  Objection to form.

7      A.   We have a protocol; and that protocol is

8  supposed to be followed by all;

11     Q.   (BY MR. MATTHYSSE)  But not to change your

12  advertisements or not to stop bidding on Jim's name?

13         MR. SCHWEGMANN:  Objection, form.

14     A.   The protocol is like I stated.

15     Q.   (BY MR. MATTHYSSE)  Okay.  I'm handing you

16  what will be marked as Exhibit 30.

17         (Exhibit No. 30 was marked.)

18         THE WITNESS:  Thank you.

19     Q.   (BY MR. MATTHYSSE)  This is another e-mail

20  from          this time in August of '20; and it's

21  this time to Mike Walker; and it says, "Problem cases

22  (or potential problem cases.)"

23         Do you see that?

24     A.   I do.

25     Q.   And if you go down to the second page, 366,

1    No. 19,                    .  Do you see that?

2         A.    I do.

3         Q.    It says, "This case is with Jim Adler, and it

4    is a minimum policy case.  Client is unhappy because

5    there is not more insurance.  This seems to be

6    happening a lot lately.  I'm not sure why we keep

7    getting these types of cases sent."

8               Do you see that?

9         A.    I do.

10        Q.    Do you recall Mike ever raising this issue

11   with you?

12        A.    I don't.  I'm not on the e-mail.

13        Q.    But you have no recollection of discussing any

14   issues with Mike about              unhappiness?

15             MR. SCHWEGMANN:  Objection to form.

16        A.    I don't have recollection of him speaking

17   about              specifically.

18        Q.    (BY MR. MATTHYSSE)  What about more generally

19   as to            claiming that he was getting PCs that

20   thought he was Adler?

21        A.    I don't believe -- on 19, that's not how I

22   interpret it.  I don't know if he was talking about

23   that he was with Jim Adler and he's unhappy because it

24   is a minimum policy case and he's getting clients with

25   past attorneys.  So I don't -- I don't know how to

1  interpret 19.

2       Q.   Okay.  And so today if you got that, you would

3  pull the recording, talk to the case -- talk to intake,

4  and try to figure out what happened?

5       A.   Pull the recording, talk to the client, the

6  potential client, talk to the intake if necessary, talk

7  to the attorney.

8       Q.   Okay.  And if it turned out that it was your

9  advertisement that was causing the people to be

10  confused and calling thinking they were calling Jim,

11  you wouldn't change that advertisement?

12            MR. SCHWEGMANN:  Objection to form.

13       A.   I'm didn't say that.

14       Q.   (BY MR. MATTHYSSE)  I'm asking.

15            MR. SCHWEGMANN:  Same objection.

16            But you can answer.

17       A.   I think it depends on the instances that we're

18  seeing.

19       Q.   (BY MR. MATTHYSSE)  So as long as it's a small

20  amount enough in the grand scheme of things, you would

21  just keep going?

22       A.   As a business, we have to operate on the

23  98 percent of people that we speak with.  So if there

24  is an issue with 2 percent, we need to do our best to

25  improve it; and that's what we do.

1    Q.   Even if thousands are calling and confused?

2              MR. SCHWEGMANN:  Objection, form.

3    A.   That's your words.  I don't believe that's

4  true.

5    Q.   (BY MR. MATTHYSSE)  I said even if thousands

6  were calling and confused?

7              MR. SCHWEGMANN:  Same objection.

8    A.   Again, I don't believe that to be true.

9    Q.   (BY MR. MATTHYSSE)  But if that were true, you

10  would still proceed?

11             MR. SCHWEGMANN:  Objection to form.

12   A.   I -- I just don't believe that to be true.

13   Q.   (BY MR. MATTHYSSE)  Can't be true?

14   A.   I didn't say that.  I said, "I don't believe

15  that to be true."

16   Q.   What do you base that on?

17   A.   The data that we pull from Google.

18   Q.   I'm handing you, Ms. Mingee, what will be

19  marked as Exhibit 31.

20             (Exhibit No. 31 was marked.)

21             THE WITNESS:  Thank you.

22   Q.   (BY MR. MATTHYSSE)  This is another e-mail

23  from            to the intake forms and also cc'ing Mike

24  Walker.  This is on September 14th, 2020, as you can

25  see from Accident Intake Forms, "PC and all passengers

Confidential

1   are signed.  The client would like direct contact as

2   soon as possible to do immediate treatment required.

3   Thank you."

4              Do you see that?

5       A.   I do.

6       Q.   And then Mike responds about an hour, a little

7   over an hour later, saying, (Reading:)  They are

8   stating they -- that Jim Adler's office called them and

9   that they think they signed contracts with Jim Adler.

10             Do you see that?

11      A.   I do.

12      Q.   Do you recall this one being brought up by

13  Mike to your attention?

14      A.   I'm not on the e-mails, and I don't know what

15  e-mail was sent back to him after this.

16      Q.   Okay.  But do you recall this person, this

17  issue being brought to your attention by Mike?

18      A.   I do not.

19             MR. SCHWEGMANN:  Objection to form.

20      Q.   (BY MR. MATTHYSSE)  Do you know if we would

21  have this recording?

22      A.   I do not.

23      Q.   Okay.  Do you have any knowledge of what Mike

24  did to address this issue?

25      A.   No, sir.  If you are going to ask me about

1  represented by an attorney" filter?

2      A.   I don't recall.

3      Q.   Okay.  I'm handing you what will be marked as

4  Exhibits 33 and 34.

5                  (Exhibit Nos. 34 and 34 were marked.)

6                  THE WITNESS:  Thank you.

7                  MR. SCHWEGMANN:  So is this one 33

8  (indicating)?

9                  MR. MATTHYSSE:  That's 33, yeah.

10                  THE WITNESS:  Yes.

11                  MR. MATTHYSSE:  And here is 34

12  (indicating).

13                  THE WITNESS:  Thank you.

14      Q.   (BY MR. MATTHYSSE)  So 33, as you can see, is

15  a Power of Attorney and Contingency Fee Contract signed

16  by                with                Do you see that?

17      A.   I do.

18      Q.   And on page 463 is the client's signature and

19  that would be another one where they sign on the phone;

20  right?

21      A.   Yes, sir.

22      Q.   Okay.  And then Exhibit 34 is referencing this

23  individual, this PC, where I believe this is a

24  disengagement attempt by        .  Do you understand that

25  to be that in Exhibit 34?

1    A.    Yes.

2    Q.    And the reason that ▮▮▮ gives is that ▮▮▮

3  was "represented at the time lead was sent.  PC was

4  called by ▮▮▮ he claims and he was signing with Jim

5  Adler.  Claims he did not want to sign with us and did

6  not know who we are.  Was told he was signing with Jim

7  Adler's office."

8            Do you see that?

9    A.    I do.

10   Q.    Did -- I know that you have a lot of potential

11  clients.  Do you recall this specific one?

12   A.    No.

13   Q.    Okay.  Have you seen this type of claim before

14  where someone thought they were signing with Jim

15  Adler's office when they signed with one of your

16  clients' law firms?

17   A.    If we ever had an issue like this come up, we

18  would pull the call, call the client, talk to intake,

19  and then spoke with the attorney.

20   Q.    So you have seen it come up before?

21   A.    Yes.

22   Q.    Okay.  Do you recall the name ▮▮▮

23   A.    She was an intake representative.

24   Q.    Do you know if she's still there?

25   A.    No, I don't believe so.

```
 1                    MR. SCHWEGMANN:  Objection, form.
 2        A.    If someone says that they are confused, then
 3   we make sure that they get unconfused.
 4        Q.    (BY MR. MATTHYSSE)  How do you make them
 5   unconfused?
 6        A.    We make sure we are very clear with them.
 7        Q.    And then try to sell them your client law
 8   firm; right?
 9        A.    I can't speak to what all of our intake reps
10   do.
11        Q.    Okay.  But that's one of the instructions;
12   right?  If there is a current attorney representing the
13   PC, the instructions in the
                                               ?
15        A.    No.                                       .
16        Q.    Okay.

18        A.
20        Q.    Okay.  So I mentioned the                 ;
21
```

```
 1    is an ops assistant to Mike.

 2         Q.    Gotcha.  So for this e-mail, in 231 it's

 3    another one of these Accident Intake Forms being sent

 4    to ████.


 6              Do you see that?

 7         A.    I do.

 8         Q.    And then in response, in 230,


11         A.    He's no long there.

12         Q.    Was?

13         A.    Yes, sir.

14         Q.    He says, (Reading:)  Lauren, our intake team

15    tells me this signed client thought he had hired Adler

16    even after signing a retainer and being warm

17    transferred to us.

18              Do you see that?

19         A.    I do.

20         Q.    (Reading:)  You and I are likely on the same

21    page regarding competitor conquest PC- -- PPC.

22              Do you see that?

23         A.    I do.

24         Q.    Do you know -- what did you take that to mean?

25         A.    Competitive bidding.
```

1    itself.  Do you recall that conversation that we had?

2        A.    Nonbranded ad copy, what do you -- just -- if

3    you can --

4        Q.    The way it is described in the Quintessa

5    website which is you do nonbranded advertising, where

6    you use generic terms -- right? -- in your ad copy?

7        A.    Correct.

8        Q.    Okay.  And we talked about that.  But why do

9    you use the phrase "intake center" or "intake

10   department" when folks call rather than "Quintessa"?

11       A.    So letting them know what they had reached was

12   an intake department and we handle intakes, so that is

13   just a D/B/A for Quintessa.

14       Q.    Intake department is a D/B/A for Quintessa?

15       A.    It was, yes.

16       Q.    Okay.  Is it still?

17       A.    I'm unsure.  I believe so.

18       Q.    Okay.  You don't -- do you believe that that's

19   confusing to folks who have called in and you just say,

20   "We're the intake department"?

21       A.    After the Fifth Circuit issued their ruling,

22   then we changed things to make sure that it wasn't.

23       Q.    Just by putting "third party" before that?

24       A.    No.  By putting that, you know, we're a

25   third-party intake and that we're not a firm and then

Confidential

1  you discuss using anything other than "intake

2  department" when people call?

3      A.    We have had multiple conversations on our

4  scripting and what to say and what to make sure that

5  we're clear on; so, yes.

6      Q.    Okay.  And do you recall alternative names

7  thrown out there for what to call yourself when people

8  call?

9      A.    I don't remember.  I know that we wanted to

10  wait for the Fifth Circuit for clarification on what

11  they wanted to see so that we weren't trying to train

12  20 people on one thing and then change it again --

13      Q.    Yeah.

14      A.    -- weeks later.

15      Q.    How did you choose -- who chose "intake

16  department" to be the name that's answered when folks

17  call?

18      A.    I believe it was myself.

19      Q.    How did you choose that?

20      A.    I'm trying to remember the circumstances

21  around it.  I don't remember the how or where or why.

22      Q.    Okay.  So clearly you've liked it enough to

23  not change it prior to the Fifth Circuit decision;

24  right?

25      A.    Yes.

Case 3:19-cv-02025-K-BN Document 107-2 Filed 08/22/23 Page 103 of 406 PageID 14569

1    Q.    And why did you like it?

2    A.    I don't know if it's that, if it is something

3    I liked.  It was just something that we had decided;

4    and when we decided and it worked; and to me it was

5    clear to them of what we were and what we did.

6    Q.    How does the phrase "intake department" make

7    it clear what you are and what you do?

8    A.    We're not answering the phone as a law firm.

9    Q.    Okay.

10   A.    And whenever our calls were going through

11   recording, it would talk about thank you for, you know,

12   calling the crisis help line, or thank you for calling;

13   and -- and then whenever we spoke to people if they

14   asked what it was, we let them know we were an intake

15   department and what we do is we get information from

16   you and get you matched with an attorney.

17   Q.    Law firms, too, also have intake departments;

18   right?

19   A.    Yes, they do.

20   Q.    So were you ever worried that folks might be

21   confused that you were the intake department for a

22   specific law firm?

23   A.    If that concern was brought up, then we would

24   let them know that we weren't.

25   Q.    Okay.  Have you seen that concern brought up?

Confidential

1  edge -- actually, it doesn't seem to be.  I don't think
2  we have this recording, do we?
3       A.   I'm unsure.
4       Q.   Okay.  And then you kept bidding on Jim's
5  name; right?
6       A.   Yes, sir.
7       Q.   I'm handing you what will be marked as
8  Exhibit 40.
9                 (Exhibit No. 40 was marked.)
10                THE WITNESS:  Thank you.
11      Q.   (BY MR. MATTHYSSE)  Okay.  Exhibit 40 is
12  another e-mail exchange with            law firm a week
13  later, February 14th, 2020.  If you look on the second
14  page of Exhibit 40, Quintessa 235, at the bottom it
15  says, "PC e-signed; live transferring."
16                Do you see that?
17      A.   I do.
18      Q.   So this means that the person
19  signed -- e-signed on the phone and -- correct?
20      A.   Yes.
21      Q.   Okay.  And what does "live transferring" mean?
22      A.   Live transferring it to the firm from our call
23  center to their call center.
24      Q.   Okay.  And so then 15 minutes later,
25  from        responds, (Reading:)  I'm on the phone with

Case 3:19-cv-02025-K-BN Document 190-2 Filed 08/22/23 Page 103 of 406 PageID 204571

1            who is advising she signed with Jim Adler

2   and was set up with treatment at a clinic today.  She's

3   not sure how she was referred to us, but she is

4   currently signed with Adler.

5              Do you see that?

6       A.   I do.

7       Q.   Do you have -- do you recall this instance?

8       A.   No, sir.

9       Q.   Do you have any knowledge of how this type of

10  confusion or -- sorry.  Strike that.

11             If I could point you on 237.

12      A.   Yes.

13      Q.   Do you see "Prior Attorney Name:  None"?

14      A.   Yes.

15      Q.   Have you seen that before, where an intake

16  department person engages someone who has a current

17  attorney but is able to put "None" in past attorney and

18  transfer it to the -- one of your client firms?

19      A.   Our intake representatives, they are told

20  that; and that's a question that's asked.  So if they

21  are currently represented, they don't sign them up with

22  a law firm.

23      Q.   Okay.  Do you have any knowledge of how this

24  one happened where the person claims 15 minutes later

25  to have been represented but was signed and

1    A.    █████ has always been that -- when we've

2  spoken has been that he's not going to.

3    Q.  Okay.  I'm handing you what will be marked as

4  Exhibit 42.

5              (Exhibit No. 42 was marked.)

6    Q.  (BY MR. MATTHYSSE)  This is another exchange

7  between yourself and the █████ firm, and just a few

8  questions about this one.  So it says at the bottom of

9  the first page, 289, Exhibit 42, █████ at █████ says

10  that she, (Reading:)  Finally connected with

11  █████████, and he said that he'd submitted notice to

12  release by posting a review to the Jim Adler website.

13              Do you see that?

14    A.  I do.

15    Q.  Is that a process that Quintessa has potential

16  clients do to disengage from a current attorney?

17    A.  If the client says that they are unhappy and

18  they don't want to be with the attorney anymore and

19  they ask us how they can leave the attorney, then yes,

20  they are told how to do that.

21    Q.  Okay.  And is part of the instructions -- so

22  is that while they are on the phone with y'all?

23    A.  It depends on what type of phone they may

24  have; or sometimes they may say, "No, I actually want

25  to talk to my person and let them know over the

Case 3:19-cv-02025-K-BN Document 190-2 Filed 08/22/23 Page 105 of 406 PageID 24573
Confidential

1  phone" --

2      Q.   Okay.

3      A.   -- or send them an e-mail.

4      Q.   And so in this case, it looks like

5  submitted notice to release by posting a review to the

6  Jim Adler website.  Is that a typical way in which

7  the -- Quintessa has folks on the phone, PCs, disengage

8  from a current attorney?

9      A.   No.  And --

10     Q.   Okay.

11     A.   -- I think -- and I can't -- I do not know

12  exactly what          means; but I would think she meant

13  posting a -- not a review, because there's no reviews

14  on the website.  You can't leave a review on the

15  website.

16     Q.   Yeah.

17     A.   So, I think she's meaning like an e-mail

18  submission.

19     Q.   Do you have any knowledge -- so later on in

20  the form itself, it lists "none" for prior attorney

21  name.  Do you have any knowledge of why that would not

22  list Adler?

23     A.   No, I do not.

24     Q.   Okay.

25     A.   Because they are instructed -- I mean, it is

Confidential

1  there; so you are supposed to fill it out.

2      Q.   Okay.  And this is another one, I believe --

3  right? -- where you're not sure if the recording is

4  still in your possession?

5      A.   Correct.

6      Q.   I'm handing you, Ms. Mingee, what we'll mark

7  as Exhibit 43.

8              (Exhibit No. 43 was marked.)

9      Q.   (BY MR. MATTHYSSE)  Exhibit 43, Ms. Mingee, is

10  another        e-mail exchange; and if I would point you

11  to 310, towards the top.

              (Reading:)  I just spoke to ACT who have been

13  trying to get PNC scheduled.  They told me he's being

14  uncooperative and they searched their system and PNC

15  is -- was referred to them last week by Jim Adler.

16  This is a Quintessa lead.  Should I continue pushing to

17  speak to client or hold off until we get a drop letter

18  from Jim Adler?

19              Do you see that?

20      A.   I do.

21      Q.   And then        e-mails you, and says, "Lauren,

22  see below.  This case crossed up with Adler, et cetera.

23  What direction can you give our team?"

24              Do you see that?

25      A.   I do.

1    Q.   Did you ever discuss with ████ this idea of

2   cases being crossed up with Adler?

3    A.   I can't speak to what he means.  I take it as

4   if the client was confused or if they had Adler as

5   prior representation, what they needed to do with it.

6    Q.   Okay.  And so that had come up with ████, it

7   seems like, at least a few times; correct?

8    A.   Yes.

9    Q.   Okay.

10   A.

12   Q.   And do you recall this specific instance?

13   A.   No, sir.

14   Q.   Okay.  And, again, you don't know whether or

15   not the recording exists for this one; correct?

16   A.   No, sir.

17   Q.   I'm handing you what is being marked as

18   Exhibit 44.

19            (Exhibit No. 44 was marked.)

20            THE WITNESS:   Thank you.

21   Q.   (BY MR. MATTHYSSE)  I'll give you a minute to

22   look at this; but as you will be able to see, it is

23   another e-mail exchange with ████ between yourself,

24   ████ and Leo; and it is a little later in 2020 after

25   these instances of confusion that we were just

1  discussing.  And it references an agreement that y'all

2  are negotiating.  Do you recall that agreement?

3           MR. SCHWEGMANN:  Objection to form.

4           But you can answer.

5    A.  I don't know if anything came to fruition with

6  the agreement.

7    Q.  (BY MR. MATTHYSSE)  Okay.  Do you know what

8  the agreement is?  It says "commercial" on the back --

9  oh, sorry -- the last page, 380, the attachment is

10  "Commercial Template_RBR Version AR Edits."

11    A.  We went back and forth on about 20 different

12  red lines with them.  So I don't know --

13    Q.  Okay.

14    A.  -- what the final one ended up being.

15    Q.  Okay.  But what was the agreement?  What was

16  the subject matter of the agreement?

17    A.

21    Q.  Gotcha.  Okay.

22          And if I can point you to 377.

23    A.  Yes.

24    Q.

Confidential

Page 313



```
 1

 7                        And then on the next page,       says,

 8      "


15                        Do you see that?

16      A.   I do.

17      Q.   Do you recall that -- receiving that e-mail

18   from        ?

19      A.   I do.

20      Q.   So it seems like        wanted you to include

21   that in the agreement to make clear and say "no" when

22   someone asked if you were, for instance, Jim Adler;

23   correct?

24      A.   It was a -- I took it as a -- as a CYA.

25      Q.   Okay.
```

Confidential

1  A.  So --

2  Q.  What do you mean by that?

3  A.  Because if -- and in my response to him, you

4  know, if someone called in and said, "Hey, is this Jim

5  Adler," and our intake rep said, "Well, ma'am, actually

6  this is just an intake department.  You know, I can get

7  you some help, whatever."  If they didn't explicitly

8  say "no," then we could get sued.  To me, I was like, I

9  can't confirm that every single intake rep is going to

10 do exactly as you say; and unfortunately when you are

11 dealing in law, if you agree to something and then

12 something's not done, you know, that could end up being

13 another lawsuit to deal with.

14 Q.  And so you refused to put that in --

15 correct? -- to the agreement?

16 A.  I -- I refused to sign off on what he had put

17 in.

18 Q.  Okay.  And in your response to him, though,

19 you don't mention this concept that you just raised

20 about rogue call center employees.  You say, "We tell

21 them who we are.  We don't always say 'no.'"

22      Do you see that?

23 A.  Yes.

24 Q.  Okay.  Why don't you always say "no"?

25 A.  Well, for instance -- and it says, (Reading:)

1  For instance, if someone has called you -- or if

2  someone says have you called Jim Adler, and if you say

3  you've reached                          is that saying

4  no or are you telling them your company name?  That is

5  what we do.  So I cannot say we will not say no and

6  cannot sign off on that.

7      Q.   So it doesn't have to do with rogue employees.

8  It's just that you think that saying "we're the intake

9  department" is enough; right?

10     A.   No.  I'm not saying rogue -- I wasn't even

11 inferring to rogue employees; but if -- if you asked me

12 if my name's Heather, and I'm telling you my name's

13 Lauren, that's in an instance saying "no."

14     Q.   Okay.  But here the difference -- right? -- is

15 if someone calls for Jim Adler and you say this is

16 "                        and don't say "no," it's pretty clearly

17 not Jim Adler; right?

18     A.   Yes, they have said --

19     Q.   Okay.

20     A.   -- that's another person.

21     Q.   If someone calls for Jim Adler and they say

22 "this is the intake department," how is that clearly

23 not Jim Adler?  Couldn't the intake department be for

24 Jim Adler?

25     A.   I mean, that's an assumption.  But if they ask

1    if this is an intake department for Jim Adler, the

2    answer's "no." We were telling them our name is the

3    intake department.

4         Q.   But folks -- prior to the Fifth Circuit

5    decision, folks -- the Intake Center was trained that

6    if someone called and asked for Jim Adler, they would

7    say, "This is the intake department"?

8         A.   Correct.

9         Q.   Okay. And you refused to agree to require

10   your intake department to say "no," when people asked

11   if you were Jim Adler?

12        A.   I refused to agree that a blanket statement

13   would always be issued to every single call.

14        Q.   And you've never instructed -- prior to the

15   Fifth Circuit decision, you've never instructed your

16   intake department to say "no" in response to, "Are you

17   Jim Adler?"

18        A.   ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████

22        Q.   And so there could be instances like we've

23   seen in which folks just assumed it was the intake

24   department for Jim Adler; correct?

25                  MR. SCHWEGMANN:   Objection to form.

Confidential

```
 1   know, we wanted to make sure that we were -- if we were
 2   seeing it multiple times, like with         to do an
 3   overall audit of what was going on for there to be so
 4   many instances.
 5       Q.  Okay.  And do you recall what the conclusion
 6   of that audit, at least for    , was?
 7       A.  I do not because Mike was over that account.
 8       Q.  Okay.  So that would be a conversation for
 9   Mike?
10       A.  It would.
11       Q.  Okay.
12       A.  So we -- it was, again, about establishing the
13   leadership; and as leadership would come to me with
14   issues, I would tell them this is -- you need to
15   resolve it, this is what I would do; and then they were
16   tasked to go and hopefully resolve it.
17       Q.  Got it.
18               I'm handing you what we'll mark as
19   Exhibit 51.
20               (Exhibit No. 51 was marked.)
21       Q.  (BY MR. MATTHYSSE)  This is another e-mail
22   between         and Quintessa.  And stemming from
23   this Accident Intake Form, this time in early 2021,
24   which said that this subject PC, "The PCs are signed
25   and aware you will call."
```

1        And later that day, this ▋▋▋▋▋▋

2   responds, "These clients are currently still under the

3   representation of Jim Adler, and the clients advised

4   that they informed you of this fact.  We are currently

5   in the process of assisting the clients with

6   terminating their relationship with Jim Adler.  Please

7   be aware that actions taken that led to these clients

8   being signed under our representation were unethical,

9   Moving forward, please make sure to verify information

10  as important as this.  Signing a party who has current

11  active legal representation is a principle violation

12  and can result in extreme consequences for our

13  attorneys and our firm."

14        My first question for you is:  Was this

15  ever forwarded to your attention?

16     A.   It's -- I'm on this e-mail.

17     Q.   I'm sorry.  You are on the e-mail.

18        Do you recall receiving this e-mail then?

19     A.   Yes.  And if you look on prior attorney name,

20  it says "Jim Adler."

21     Q.   Okay.

22     A.   So it was referenced.  What their issue was is

23  that they didn't have a drop letter, so they don't know

24  if he's going to hold an interest in that.  So some law

25  firms don't take a client until they know if someone is

1  client in Texas; correct?

2      A.  Yes.

3      Q.  Okay.  Do you know, by the way, about how many

4  current Texas clients y'all have?

5      A.  I do not.

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9              And that is then obviously sent to ▮▮▮▮

▮▮▮▮▮▮▮▮, and he states that he had a very concerning

11  conversation with Mr. Hubbard.  And the third paragraph

12  says, "Also he stated that he was referred to our firm

13  by Ruby, who works for Jim Adler.  I confirmed what he

14  said and he repeated that he was under the belief that

15  Ruby works for Jim Adler and she referred him to us.  I

16  confirmed with him multiple times that he fully

17  understood that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  It seems to me

19  like Ruby, who is a Quintessa employee, deliberately

20  misled ▮▮▮▮▮▮▮▮▮▮ in her conversation."

21              Do you see that?

22      A.  I do.

23      Q.  This one is to Mike, but my question for you

24  is whether or not he brought this one to your

25  attention?

Confidential

```
 1                    ERRATA SHEET

 2   Case Name:

 3   Deposition Date:

 4   Deponent:

 5   Pg.  No. Now Reads      Should Read  Reason

 6   __  __ _____       _____   _____

 7   __  __ _____       _____   _____

 8   __  __ _____       _____   _____

 9   __  __ _____       _____   _____

10   __  __ _____       _____   _____

11   __  __ _____       _____   _____

12   __  __ _____       _____   _____

13   __  __ _____       _____   _____

14   __  __ _____       _____   _____

15   __  __ _____       _____   _____

16   __  __ _____       _____   _____

17   __  __ _____       _____   _____

18   __  __ _____       _____   _____

19   __  __ _____       _____   _____

20                                   _____

21                                   Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2022.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

Confidential

```
1                    J U R A T

2

3     I,                , do hereby certify under

4     penalty of perjury that I have read the foregoing

5     transcript of my deposition taken on            ;

6     that I have made such corrections as appear noted

7     herein in ink, initialed by me; that my testimony as

8     contained herein, as corrected, is true and correct.

9

10    DATED this ____ day of _____,2022,

11    at _____,           .

12

13

14

15

16

17    _____

18              SIGNATURE OF WITNESS

19

20

21

22

23

24

25
```

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3   JIM S. ADLER, P.C. and          )
    JIM ADLER,                      )
4        Plaintiffs,                )
                                    )
5                                   )
    VS.                             )  CA NO. 3:19-cv-02025-K-BN
6                                   )
                                    )
7   MCNEIL CONSULTANTS, LLC         )
    D/B/A ACCIDENT INJURY           )
8   LEGAL CENTER, QUINTESSA         )
    MARKETING, LLC D/B/A            )
9   ACCIDENT INJURY LEGAL           )
    CENTER, and LAUREN VON          )
10  MCNEIL,                         )
         Defendants.                )
11

12              REPORTER'S CERTIFICATION

13         DEPOSITION OF LAUREN VON MCNEIL MINGEE

14                   April 13, 2022

15              (REPORTED REMOTELY)

16

17              I, DIANA M. BENGS, Certified Shorthand

18  Reporter in and for the State of Texas, hereby certify

19  to the following:

20              That the witness, LAUREN VON MCNEIL

21  MINGEE, was duly sworn by the officer and that the

22  transcript of the oral deposition is a true record of

23  the testimony given by the witness;

24              I further certify that pursuant to

25  FRCP Rule 30(f)(1) that the signature of the deponent:

1        XXX was requested by the deponent or a

2    party before the completion of the deposition and that

3    the signature is to be before any notary public and

4    returned within 30 days from the date of receipt of the

5    transcript.  If returned, the attached Changes and

6    Signature Pages contains any changes and the reasons

7    therefore;

8        ____ was not requested by the deponent or

9    a party before the completion of the deposition.

10       I further certify that I am neither

11   counsel for, related to nor employed by any of the

12   parties or attorneys in the action in which this

13   proceeding was taken, and further that I am not

14   financially or otherwise interested in the outcome of

15   the action.

16       SWORN TO AND SUBSCRIBED by me in Tarrant

17   County, Texas, on this 25th day of April, 2022.

18

19       *Diana Bengs*

20   _____
     DIANA M. BENGS, CSR, RPR
21   Texas CSR No. 4907
     Certification Expires:  January 31, 2024
22   TSG REPORTING, INC.
     747 Third Avenue, 10th Floor
23   New York, New York 10017
     877.702.9580 (Office)
24

25

# EXHIBIT 2



Case 3:19-cv-02025-N-BN Document 190-7 Filed 08/23/22 Page 121 of 406 PageID 1589

## ✅ Your ad is showing

For the keyword [jim adler] ██████████ ▪ ██ ██

⚠ 2 of your extensions are not being shown.
View details

Preview of mobile search results





Confidential - Attorneys' Eyes Only

jim adler

Location
Dallas-Ft. Worth TX, Texas, Un…

Language
English

Device
Mobile

Audience
Users not in any audience

Case 3:19-cv-02287-N-BW Document 197-2 Filed 08/23/22 Page 123 of 406 PageID 3691



✔ **Your ad is showing**

For the keyword [jim adler] ███████████ ▪ ██ ██

⚠ 3 of your extensions are not being shown.
View details

Preview of mobile search results



# EXHIBIT 3

# Competitive Call script



CONFIDENTIAL

# EXHIBIT 4

1

2                IN THE UNITED STATES DISTRICT COURT

3                FOR THE NORTHERN DISTRICT OF TEXAS

4                          DALLAS DIVISION

5

6    JIM S. ADLER, P.C. AND JIM        )
     ADLER,                            )
7                                      )
          Plaintiffs,                  )
8                                      )
     VS.                               )
9                                      ) CIVIL ACTION NO.
     MCNEIL CONSULTANTS, LLC D/B/A     ) 3:19-CV-O2025-K-BN
10   ACCIDENT INJURY LEGAL CENTER,     )
     QUINTESSA MARKETING, LLC D/B/A    )
11   ACCIDENT INJURY LEGAL CENTER,     )
     AND LAUREN MINGEE,                )
12                                     )
          Defendants.                  )
13

14

15

16

17            ORAL AND VIDEOTAPED DEPOSITION OF

18                      MICHAEL WALKER

19                    SEPTEMBER 28, 2022

20

21

22

23

24   REPORTED BY : Therese J. Casterline

25   JOB NO. 217612

 1

 2                    ORAL AND VIDEOTAPED DEPOSITION of

 3     MICHAEL WALKER, produced as a witness at the instance

 4     of the Plaintiffs, and duly sworn, was taken in the

 5     above-styled and -numbered cause on the 28th of

 6     September, 2022, from 9:36 a.m. to 4:03 p.m., before

 7     Therese J. Casterline, CSR in and for the State of

 8     Texas, reported by machine shorthand, at the offices

 9     of Lynn Pinker Hurst & Schwegmann LLP, 2100 Ross

10     Avenue, Suite 2700, in the City of Dallas, County of

11     Dallas, State of Texas, pursuant to the Federal Rules

12     of Civil Procedure and the provisions stated on the

13     record.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                    A P P E A R A N C E S

 3

 4    FOR THE PLAINTIFFS:

 5              Jered Matthysse, Esq.
               Giulio Yaquinto, Esq.
 6              Pirkey Barber
               1801 East 6th Street
 7              Austin, TX 78702

 8

 9

10
      FOR THE DEFENDANTS:
11
               Rebecca Adams, Esq.
12             Barira Munshi, Esq.
               Lynn Pinker Hurst & Schwegmann
13             2100 Ross Avenue
               Dallas, TX 75201
14

15

16

17    ALSO PRESENT:

18             Ms. Erica Taylor, Videographer

19

20

21

22

23

24

25
```

1

2                          I N D E X

3                                                              PAGE

4    Appearances                                              3

5

6    WITNESS:  MICHAEL WALKER

7    EXAMINATION BY MR. MATTHYSSE                             9

8    EXAMINATION BY MS. ADAMS                                 266

9

10   CHANGES AND SIGNATURE                                    270

11   REPORTER'S CERTIFICATE                                   272

12

13

14                         EXHIBITS

15   NUMBER                 DESCRIPTION                       PAGE

16   Exhibit 107   Insurance Call Script                      86
                   QUINTESSA_002490
17
     Exhibit 108   Competitive Call script                    89
18                 QUINTESSA_002595

19   Exhibit 109   8-5-21 PRWeb article titled                130
                   Quintessa Marketing to Fill
20                 20 New Jobs in Oklahoma City

21   Exhibit 110   9-14-20 Walker email to ▮▮▮▮               160
                   with attached email string
22                 QUINTESSA_000394 -
                   QUINTESSA_000398
23
     Exhibit 111   6-21-21 Reust email to Brown               206
24                 with attached email string
                   QUINTESSA_001147 -
25                 QUINTESSA_001149

1

2                                    EXHIBITS

3      NUMBER                      DESCRIPTION                          PAGE

4      Exhibit 112    7-9-21 accidentintakeforms1                       211
                      @gmail.com email to
5                     disengagementreports@quintessa
                      marketing.com and
6                     system@quintessamarketing.com
                      QUINTESSA_001170
7
       Exhibit 113    9-15-21          email to Walker                  222
8                     with attached email string

9      Exhibit 114    10-21-20 Walker email to                         230
                      with attached email string
10                    QUINTESSA_000473 -
                      QUINTESSA_000475
11
       Exhibit 115    2-3-22 Intake User email to                     244
12                                          with attached
                      email string
13                    QUINTESSA_001331 -
                      QUINTESSA_001336
14
       Exhibit 116    5-16-22                email to                  249
15                    with attached email string

16     Exhibit 117    2022 Attorney Revenues                          253
                      QUINTESSA_002619
17

18     (Previously marked)

19     Exhibit 4      The 3 Leg Stool and the 6 Things                 98
                      QUINTESSA_000003 -
20                    QUINTESSA_000023

21     Exhibit 16     2019-2022 Attorney Revenues                     251

22     Exhibit 30     8-30-20        email to Walker                  158
                      QUINTESSA_000365 -
23                    QUINTESSA_000366

24     Exhibit 32     9-21-20        email to Walker                  176
                      QUINTESSA_000416
25

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | 10-5-20 ▮▮▮ email to Walker with attached email string QUINTESSA_000457 - QUINTESSA_000459 | 179 |
| Exhibit 47 | 12-8-20 ▮▮▮ email to Walker with attached email string QUINTESSA_000758 - QUINTESSA_000760 | 185 |
| Exhibit 50 | 8-14-20 ▮▮▮ email to accidentintakeforms1@gmail.com and ▮▮▮ with attached email string QUINTESSA_000336 - QUINTESSA_000338 | 153 |
| Exhibit 54 | 7-21-21 ▮▮▮ email to Walker with attached email string and attachment QUINTESSA_001177 - QUINTESSA_001180 | 214 |
| Exhibit 55 | 11-12-21 ▮▮▮ email to ▮▮▮ and McNeil with attached email string QUINTESSA_001234 - QUINTESSA_001239 | 227 |
| Exhibit 63 | 8-6-21 ▮▮▮ email to Walker and McNeil with attached email string QUINTESSA_002374 - QUINTESSA_002378 | 216 |
| Exhibit 64 | 12-17-20 McNeil email to ▮▮▮ with attached email string QUINTESSA_002043 - QUINTESSA_002045 | 189 |

```
 1
 2                            EXHIBITS
 3      NUMBER                 DESCRIPTION                    PAGE
 4      Exhibit 81      9-21-20        email to Walker         170
                        and        with attached email
 5                      string
                        QUINTESSA_001911 -
 6                      QUINTESSA_001915
 7      Exhibit 82      9-16-20        email to Walker         167
                        and others with attached email
 8                      string
                        QUINTESSA_000399 -
 9                      QUINTESSA_000401
10      Exhibit 89      3-15-21        email to Walker         195
                        QUINTESSA_001025
11
        Exhibit 90      4-6-21     email to Walker             197
12                      with attached email string
                        QUINTESSA_001060 -
13                      QUINTESSA_001064
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2          P R O C E E D I N G S

3          THE VIDEOGRAPHER:  This is the start

4    of media labeled number 1 of the

5    video-recorded deposition of Michael Walker,

6    in the matter of Jim S. Adler, PC, versus

7    McNeil Consultants and others, in the court

8    of the United States District Court for the

9    Northern District of Texas, Dallas Division,

10   Number 3:19-CV-02025-K-BN.

11         This deposition is being held at Lynn

12   Pinker Hurst & Schwegmann at 2100 Ross

13   Avenue, Dallas, Texas 75201, on

14   September 28th, 2022, at approximately

15   9:36 a.m.

16         My name is Erica Taylor.  I'm the

17   Legal Video Specialist from TSG Reporting,

18   Incorporated, headquartered at 228 East 45th

19   Street, Suite 810, New York, New York 10017.

20         The court reporter is Therese

21   Casterline in association with TSG

22   Reporting.

23         Counsel, please introduce

24   yourselves.

25         MR. MATTHYSSE:  Jered Matthysse with

```
 1                           WALKER
 2          Pirkey Barber on behalf of plaintiffs.
 3                MR. YAQUINTO:  Giulio Yaquinto, also
 4          from Pirkey Barber on behalf of
 5          plaintiffs.
 6                MS. ADAMS:  Rebecca Adams on behalf of
 7          Defendants with Lynn Pinker Hurst &
 8          Schwegmann.
 9                THE VIDEOGRAPHER:  Okay.
10                MS. MUNSHI:  Barira Munshi, also with
11          Lynn Pinker Hurst & Schwegmann.
12                THE VIDEOGRAPHER:  Okay.  Will the
13          court reporter please swear in the witness.
14                      MICHAEL WALKER,
15     having been first duly sworn, testified as follows:
16                      EXAMINATION
17     BY MR. MATTHYSSE:
18          Q.    Good morning.
19          A.    Good morning.
20          Q.    Could you state your full name for the
21          record.
22          A.    Michael Gene Walker.
23          Q.    Mr. Walker, have you been deposed
24          before?
25          A.    I have.
```

```
 1                    WALKER

 2       A.    Yes.  There is a -- a manager's

 3  like -- we call it lobby in Slack.  It's utilized

 4  more like as a shout-out, like to do this, do

 5  that, ask a question, you know, but not

 6  one-on-one conversations.

 7       Q.    Okay.  So are you familiar with how --

 8  Slack on the left-hand side has different

 9  channels, correct?

10       A.    Uh-huh.

11       Q.    What are the channels in Quintessa's

12  Slack?

13
```

```
 1                    WALKER

 2      A.   Yes.

 3      Q.   Then it says, sir/ma'am, this is the

 4  intake department.

 5           Do you see that?

 6      A.   Yes.

 7      ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

22      A.   Yes.

23      Q.   Did you ever -- did Jason Love ever

24  raise this with you, this issue?

25      A.   No.
```

Case 3:19-cv-02025-BJK-BN Document 19072-7 Filed 08/22/23/22 Page 433 of 406 PageID 554606

```
 1                    WALKER
 2    enough information here to get you some help.  If
 3    you don't mind, I would like to run this by my
 4    intake supervisor since you have a unique
 5    situation.  Is it okay if I place you on a brief
 6    silent hold?
 7              Do you see that?
 8      A.    Yes.
 9      Q.    And so correct me if I'm wrong, but I
10    believe this hold is for the conversation to take
11    place in Slack, right?
12      A.    Yes.
13      Q.    ████████████████████████████
      █████████████████████████████████████████
      █████████████████████████████████████████████
      ██████████████████████████████████████████
      █████████████████████
18              Do you see that?
19      A.    Where are we at?  I'm sorry.
20      Q.    Right beneath the first paragraph
21    where it starts, by now a supervisor.
22      A.    Okay, yes.
23      Q.    █████████████████████████████████████
      ██████████████████████████
25              Do you see that?
```

```
 1                      WALKER

 2        A.    Yes.

 3        Q.    ████████████████████████████
████████████████
████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████
████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████
15              Do you see that?

16        A.    Yes.
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████
██████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████
24        A.    Correct.

25        Q.    And why is that the case?  Why is it
```

| | | |
|---|---|---|
| 1 | | WALKER |
| 2 | | immediate termination. |
| 3 | Q. | Okay. |
| 4 | A. | So that was my reason for saying |
| 5 | that. | |
| 6 | Q. | And that contract with the call center |
| 7 | agent was in existence in September of 2020? | |
| 8 | A. | Yes. |

9 ███████████████████████

████████████████████████████████

███████████████████████

██████████████

████████████████████████

████████████████████████

████████████████████████

16      Q.    Okay.  And law firms, to your

17  knowledge, have intake departments, correct?

18          MS. ADAMS:  Objection, form.

19      A.    They do.

20      Q.

24          MS. ADAMS:  Objection, form.

25      A.

```
 1                           WALKER

 2          Q.

 5          Q.    Okay.  And did you tell any of that to

 6     ███████████████

 7          A.    I don't recall.

 8          Q.    Okay.  Do you recall ever telling that

 9     to any of your client law firms?

10          A.    I be- -- yeah, I do.  I do.  It was

11     kind of like in a -- in a state like this, we

12     don't identify ourself as attorneys.  We -- we

13     say we are the intake department.

14                I don't recall who it was, but I have

15     said that before.

16          Q.    So you've told client law firms what

17     is in your script?

18          A.    No, not "the" script, but I -- but I

19     have said -- I have mentioned the intake

20     department.

21          Q.    How -- how have you mentioned that?

22          A.    I don't know the exact details.  I

23     just -- I just feel like I've said it before.

24          Q.    Do you recall specifically when?

25          A.    No, I don't.
```

```
 1                        WALKER
 2        Q.    And              , if I can point you to
 3    the second page of the exhibit, Brian Englehard
 4    had emailed
                           .
 6              Do you see that?
 7        A.    Yes.
 8        Q.    Okay.
 9        A.    I do not.
10        Q.    And do you know what
11                         ?
12        A.    I do not.
13        Q.    Okay.  And this is an email to
14                  , asking if her firm is able to handle
15    live transfer and essentially offering their
16    services.
17              Do you see that?
18        A.    I do.
19        Q.    Do you know if Quintessa works with
20          and his company?
21        A.    No.
22        Q.    You don't know or they don't?
23        A.    I -- I -- we -- Quintessa does not.
24        Q.    So the email from yourself to
25              on October 21st, 2020, says -- she
```

```
 1                    WALKER
 2   forwards it to you.  And you say, Wow!  Thanks,
 3   ▮▮▮▮▮▮, for forwarding to me.  I truly
 4   appreciate it.  I can tell you since the judge
 5   dropped the Adler case against Lauren many groups
 6   are trying to move -- are trying to moving in
 7   Texas, but they are in today and out the same.
 8             Do you see that?
 9        A.   I do.
10        Q.   So it looks like you weren't correct
11   when you said that you learned about the case in
12   2021; is that right?
13        A.   I guess, yes.
14        Q.   Okay.
15        A.   I --
16        Q.   So does this refresh your recollection
17   of when you may have learned a lot it -- about
18   it?
19        A.   Maybe.
20        Q.   Okay.  And when might that have been?
21        A.   I don't recall.  I really don't.
22        Q.   So clearly here you knew about the
23   case, right?
24        A.   Yes.  I would --
25        Q.   Okay.
```

```
 1                          WALKER
 2          A.    Yes.
 3          Q.    And what led you to say, I can tell
 4    you since the judge dropped the Adler case?  Why
 5    did you believe the judge had dropped the Adler
 6    case in October of 2020?
 7          A.    I don't remember.  I would -- I'm sure
 8    I probably heard it.
 9          Q.    From who?
10          A.    Probably -- probably Lauren.
11          Q.    Okay.
12          A.    Yeah.
13          Q.    So to the best of your recollection,
14    Lauren told you that the judge had dropped the
15    Adler case?
16                MS. ADAMS:  Objection, form.
17          A.    I don't know.  I -- I'm assuming.
18          Q.    Okay.  Would you have heard that from
19    anywhere else?
20          A.    I don't think so.
21          Q.    Okay.  Do you have a better memory now
22    on when Lauren might have told you about the
23    case?
24          A.    No.
25          Q.    So you knew about the case, though, in
```

Case 3:19-cv-02025-BNK-BN Document 19072-7 Filed 08/22/23/22 Page 145 of 406 PageID 24613

1                          WALKER

2          Q.    Okay.  And so you said the emails that

3     were searched -- did you conduct the email

4     search?

5          A.    I did not.

6          Q.    Okay.

7          A.    No.

8          Q.    Was that -- who -- who conducted the

9     email search?

10         A.    Our CTO, Austin Greenfield.

11         Q.    Do you have any knowledge of what --

12    which emails he searched?

13         A.    Yes.  Mine, Wallace, Lauren, I believe

14    Leo, intake@quintessa.  I think that's it.

15         Q.    All right.  Do you have any knowledge

16    of Jason Love's emails being searched or not?

17         A.    They were not.

18         Q.    And why is that?

19         A.    That was -- that was my error.

20    When -- when an employee leaves, I remove from

21    Google the -- the -- the license, not realizing

22    that everything disappears.  But since then,

23    we've -- we've tried to improve that process.

24         Q.    Okay.  So -- so when Jason left, you

25    removed the license from Google.  What do you

Case 3:19-cv-02025-BNK-BN Document 19072-7 Filed 08/22/23/22 Page 146 of 406 PageID 34614

```
 1                         WALKER

 2    mean by that?

 3         A.    So with Google you're -- you can buy

 4    it -- you can buy the -- a certain amount of

 5    licenses.  And we were at the top -- we were

 6    pretty much maxed -- we were pretty much maxed

 7    out on our licenses.

 8              And so when an employee leaves, in

 9    order to continue if -- with a new -- onboarding

10    in a new person, removing that other -- the past

11    employee allows for -- for a new one to be

12    created.

13         Q.    Did you look into recovering the

14    information?

15         A.    I did.

16         Q.    And what -- how did you look into

17    that?

18         A.    There's a -- there's a time frame, and

19    I can't remember what exactly the time frame is.

20    It -- once -- once you delete a user, you have a

21    certain amount of time to retract that

22    information.

23         Q.    And so obviously his emails were not

24    searched because they were deleted, correct?

25         A.    Correct.
```

```
 1                         WALKER

 2        Q.    And what about the intake system?

 3        A.    Intake was.

 4        Q.    Okay.

 5        A.    Yeah.

 6        Q.    And were you involved in that search?

 7        A.    I -- I did not do the search.

 8        Q.    Okay.

 9        A.    That was done by Austin.

10        Q.    Okay.  What about Slack?  Do you know

11   if Slack was searched?

12        A.    Now, Slack is -- Slack was searched.

13   Its recording history is like nine days.

14        Q.    Okay.  And, to your knowledge, is

15   there a way to increase that history?

16        A.    I think so, by a paid subscription.

17        Q.    Okay.  And -- and Quintessa, to your

18   knowledge, did not do so?

19        A.    No.

20        Q.    Okay.  And what about Talkdesk?  Did

21   you have any role in collecting recordings in

22   this case for -- from Talkdesk?

23        A.    The in- -- yeah, the in- -- most of

24   the initial recordings, yes.

25        Q.    Okay.  And was there a time in which
```

```
 1                        WALKER

 2        Q.

 5        A.    No.  I mean, it's up there.  That's

 6   why I'm -- I'm pretty sure that's              .

 7        Q.    Okay.  And did they -- to your

 8   knowledge, was that

 9

10        A.    I don't believe so.

11        Q.    Okay.  Do you know --

12

13        A.

14        Q.

17        Q.    Would that be Tonya?

18        A.    It was Lauren.  I think it originated

19   with a guy named Ismael took -- took the sales

20   call.  Lauren took it from there.

21        Q.    Got it.

22              And that was from the              ad?

23        A.    Yes.

24        Q.    Mr. Walker, sitting here today, are

25   you aware of any actions that Quintessa took to
```

Case 3:19-cv-02025-B2B-BN Document 1072-1 Filed 08/22/23 Page 149 of 406 PageID 64617

1                       WALKER

2        preserve documents prior to the Fifth Circuit

3        decision?

4              A.    I am not aware.

5                    MR. MATTHYSSE:  No further questions.

6                           EXAMINATION

7    BY MS. ADAMS:

8              Q.    Mr. Walker, I just have a -- a couple

9        of questions for you about certain things you

10       were asked about earlier.

11                   Earlier today, Mr. Matthysse was

12       asked -- asked you a line of questions about

13       something to the effect about whether you were

14       concerned or surprised about certain interest --

15       instances of potential clients saying they

16       thought they had signed with Adler's firm.

17                   And he asked the follow-up question

18       about whether, in your opinion -- whether in your

19       mind that was just the cost of doing business.

20                   And you gave an answer that you didn't

21       get to finish.  And so I wanted to give you a

22       chance.

23                   Did you have something further to say

24       in response to that question?

25              A.    Yes.  So a while ago -- yes.  I mean,

Case 3:19-cv-02025-BJK-BNK Document 190-2 Filed 08/22/23 Page 450 of 406 PageID 64618

```
1                        ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads      Should Read  Reason

6    ___  ___ _____     _____   _____

7    ___  ___ _____     _____   _____

8    ___  ___ _____     _____   _____

9    ___  ___ _____     _____   _____

10   ___  ___ _____     _____   _____

11   ___  ___ _____     _____   _____

12   ___  ___ _____     _____   _____

13   ___  ___ _____     _____   _____

14   ___  ___ _____     _____   _____

15   ___  ___ _____     _____   _____

16   ___  ___ _____     _____   _____

17   ___  ___ _____     _____   _____

18   ___  ___ _____     _____   _____

19   ___  ___ _____     _____   _____

20                                  _____

21                                  Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2022.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

```
1                    J U R A T

2

3    I,                 , do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on            ;

6    that I have made such corrections as appear noted

7    herein in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10   DATED this _____ day of _____,2022,

11   at _____,            .

12

13

14

15

16

17   _____

18           SIGNATURE OF WITNESS

19

20

21

22

23

24

25
```

1

2              IN THE UNITED STATES DISTRICT COURT

3              FOR THE NORTHERN DISTRICT OF TEXAS

4                      DALLAS DIVISION

5    JIM S. ADLER, P.C. AND JIM          )
     ADLER,                              )
6                                        )
          Plaintiffs,                    )
7                                        )
     VS.                                 )  CIVIL ACTION NO.
8                                        )  3:19-CV-02025-K-BN
     MCNEIL CONSULTANTS, LLC D/B/A       )
9    ACCIDENT INJURY LEGAL CENTER,       )
     QUINTESSA MARKETING, LLC D/B/A      )
10   ACCIDENT INJURY LEGAL CENTER,       )
     AND LAUREN MINGEE,                  )
11                                       )
          Defendants.                    )
12

13              REPORTER'S CERTIFICATION

14   ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL WALKER

15                  SEPTEMBER 28, 2022

16

17          I, Therese J. Casterline, Registered Merit

18      Reporter, Certified Realtime Reporter, Certified

19      Shorthand Reporter, do hereby certify that there

20      came before me on the 28th day of September,

21      2022, at the offices of Lynn Pinker Hurst &

22      Schwegmann LLP, located at 2100 Ross Avenue,

23      Suite 2700, Dallas, Texas, the following named

24      person, to wit:  MICHAEL WALKER, who was duly

25      sworn to testify the truth, the whole truth, and

1

2      nothing but the truth of knowledge touching and

3      concerning the matters in controversy in this

4      cause; and that he was thereupon examined upon

5      his oath and his examination reduced to

6      typewriting under my supervision; that the

7      deposition is a true record of the testimony

8      given by the witness, that review by the witness

9      was requested on the record, and signature of the

10     witness is to be signed before any notary public.

11         I further certify that I am neither attorney

12     nor counsel for nor related to any of the parties

13     to the action in which this deposition is taken,

14     and further that I am not a relative or employee

15     of any attorney or counsel employed by the

16     parties hereto, or financially interested in this

17     action.

18         Given under my hand on this the 10th day of

19     October, 2022.

20                 *Therese J. Casterline*

21                 Therese J. Casterline, RMR, CRR, CSR
                   TSG Reporting - Worldwide
22                 228 E. 45th Street, Suite 810
                   New York, New York 10017
23                 (877) 702-9580

24

25

# EXHIBIT 5

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF TEXAS

4                  DALLAS DIVISION

5

6

7  JIM S. ADLER, P.C., and JIM        )
   ADLER,                             )
8                                     )
             Plaintiffs,              )
9                                     )
   VS.                                )Case No.
10                                    )3:19-CV-02025-K-BN
                                      )
11 MCNEIL CONSULTANTS, LLC,           )
   d/b/a ACCIDENT INJURY LEGAL        )
12 CENTER; QUINTESSA MARKETING,       )
   LLC, d/b/a ACCIDENT INJURY         )
13 LEGAL CENTER; and LAUREN           )
   MINGEE,                            )
14                                    )
             Defendants.              )
15

16

17

18                  * * * * *

19          VIDEOTAPED DEPOSITION OF JASON LOVE

20                  ON JULY 22, 2022

21              IN OKLAHOMA CITY, OKLAHOMA

22                  * * * * *

23

24 REPORTED BY: KORTNEY V. HOUTS, CSR

25 TSG Job No. 212449

1

2

3

4

5                      JULY 22, 2022

6                       9:39 A.M.

7

8

9           Videotaped Deposition of JASON LOVE, held at

10 the Wyndham Grand, 10 North Broadway Avenue, Oklahoma

11 City, Oklahoma, before Kortney Houts, a Certified

12 Shorthand Reporter of the State of Oklahoma.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2  A P P E A R A N C E S:

3

4

     PIRKEY BARBER PLLC
5       Attorneys for Plaintiffs
     BY:   JERED MATTHYSSE, ESQ.
6            GIULIO YAQUINTO, ESQ.
          1801 East 6th Street
7            Austin, Texas 78702

8

9

10

11       LYNN PINKER HURST & SCHWEGMANN, LLP
     Attorney for Defendants
12       BY:   REBECCA ADAMS, ESQ.
          2100 Ross Avenue
13            Dallas, Texas 75201

14

15

16

17

18

19

20

21

22

23

24

25  VIDEOGRAPHER: Dan Willis - TSG Reporting

1

2            IT IS HEREBY STIPULATED AND AGREED by and

3   between the attorneys for the respective parties

4   herein, that filing and sealing be and the same are

5   hereby waived.

6            IT IS FURTHER STIPULATED AND AGREED that all

7   objections, except as to the form of the question,

8   shall be reserved to the time of the trial.

9            IT IS FURTHER STIPULATED AND AGREED that the

10  within deposition may be sworn to and signed before any

11  officer authorized to administer an oath, with the same

12  force and effect as if signed and sworn to before the

13  Court.

14

15

16

17

18

19

20

21

22

23

24

25

1                          J. LOVE

2              THE VIDEOGRAPHER:  We are on the record for

3  the video recorded deposition of Jason Love in the

4  matter of Adler, et al., versus McNeil Consultants,

5  LLC, et al., filed in the United States District Court

6  for the Northern District of Texas, Dallas Division,

7  Case Number 3:19-CV-02025-K-BN.  This deposition is

8  being held at 10 North Broadway Avenue in Oklahoma

9  City.  The date is July 22nd, 2022.  The time is

10 9:39 a.m. Central.

11             My name is Dan Willis.  I am the legal video

12 specialist for TSG Reporting, Incorporated,

13 headquartered at 228 East 45th Street, Suite 810, New

14 York, New York.  The court reporter is Kortney Houts in

15 association with TSG Reporting.

16             Counsel, please introduce yourselves.

17             MR. MATTHYSSE:  Jered Matthysse with Pirkey

18 Barber on behalf of plaintiffs.

19             MR. YAQUINTO:  Giulio Yaquinto, also with

20 Pirkey Barber on behalf of plaintiffs.

21             MS. ADAMS:  Rebecca Adams with Lynn Pinker

22 Hurst & Schwegmann on behalf of the defendants and the

23 witness, Jason Love.

24             THE VIDEOGRAPHER:  Will the court reporter

25 please swear in the witness.

1                    J. LOVE

2                    JASON W. LOVE,

3       called as a witness, having been duly sworn,

4       was examined and testified as follows:

5  EXAMINATION BY

6  MR. MATTHYSSE:

7       Q    Good morning.

8       A    Good morning.

9       Q    Could you state your full name for the

10 record?

11      A    Jason Woodrow Love.

12      Q    Mr. Love, have you been deposed before?

13      A    I have not.

14      Q    Okay.  And have you ever testified in any

15 capacity prior to today?

16      A    Yes.

17      Q    And where was that?

18      A    An employment hearing.

19      Q    And how many times was that?

20      A    I don't recall.

21      Q    Okay.  Have you ever testified in a trademark

22 case prior to today?

23      A    I have not.

24      Q    Do you realize that you're fully under oath

25 and must answer all of my questions to the best of your

```
 1                          J. LOVE
 2 ability?
 3      A    I do.
 4      Q    If my questions are unclear, just ask me to
 5 clarify.  Does that sound good?
 6      A    Sure.  Yeah.
 7      Q    And if you need a break, just let me know,
 8 and we can work one in.  Does that sound good?
 9      A    Yeah.
10      Q    Mr. Love, is there any condition or other
11 reason that you cannot give complete and accurate
12 testimony today?
13      A    No.
14      Q    Where do you currently live?
15      A    Yukon, Oklahoma.
16      Q    And what is your current occupation or job
17 title?
18      A    I'm a lien transformation specialist with
19 Mercy Hospital.
20      Q    Mr. Love, I'm going to hand you what will be
21 marked as --
22           MR. MATTHYSSE:  Let's actually start at 58.
23      Q    -- Exhibits 58 and 59.
24      A    Okay.
25           MR. MATTHYSSE:  That's 58 and then 59.
```

1                              J. LOVE

2       Q    And it says that Jason Love -- that's you,

3  correct --

4       A    I am.

5       Q    -- has knowledge concerning the business and

6  operations of the call center.  Do you see that?

7       A    I do.

8       Q    Would you agree that you had knowledge of

9  Quintessa's business and operations of the call center?

10      A    Yes.

11      Q    Okay.  And so when you joined Quintessa, I

12 believe that was June of '20.  Is that right?

13      A    That sounds probable.

14      Q    Okay.  What was your -- what was the -- what

15 was your title when you joined?

16      A    I believed that my initial title was manager

17 of intake operations.

18      Q    Was that your title the entire time you were

19 there?

20      A    No.

21      Q    What different titles did you have at

22 Quintessa?

23      A    Director of intake operations.

24      Q    So from manager to director?

25      A    Uh-huh.  Yes.

Case 3:19-cv-02025-BNK-BN Document 19072-8 Filed 08/22/23/22 Page 163 of 406 PageID 304631

1                          J. LOVE

2      Q    Okay.  About when did your title change?

3      A    I don't recall.  It wasn't a very long time I

4 was there.

5      Q    Okay.  And did you request the title change?

6      A    No.

7      Q    Who made that decision?

8      A    I believe it was Leo.

9      Q    Did he explain to you why he made that

10 decision?

11     A    No.

12     Q    Did it involve a salary increase?

13     A    No.

14     Q    Were there other managers of intake

15 operations there?

16     A    No.

17     Q    So you were the only manager of intake

18 operations, and then you became the only director of

19 intake operations.  Is that correct?

20     A    Yes.

21     Q    When you came on board in June of 2020,

22 that's, obviously, shortly after the pandemic started.

23 Were you all going in to the office at that point?

24     A    When I started, yes.

25     Q    Okay.  And did you go in every day?

Case 3:19-cv-02025-BNK-BD Document 19072-8 Filed 03/22/23 Page 164 of 406 PageID 814632

```
1                        J. LOVE

2       A    At the time I was hired, no.  My

3  understanding was that this lawsuit came somewhere

4  thereafter.

5       Q    Okay.

6       A    Yeah.

7       Q    Okay.

8       A    I believe that there was a previous lawsuit,

9  but -- I understood there was a previous lawsuit, but I

10 didn't know that there was another one going on --

11      Q    Okay.

12      A    -- at the point that I was there.

13      Q    So when you were hired, during your time

14 there, were you told by Lauren or anyone else to

15 preserve your materials because of the existence of a

16 lawsuit?

17      A    I don't recall any conversation like that.

18      Q    Okay.  Do you recall then about when you

19 first learned of the Adler lawsuit against Quintessa?

20      A    It was after I was -- had left Quintessa when

21 I was notified that my name was on --

22      Q    Gotcha.

23      A    -- whatever this document is in here that --

24      Q    In Exhibit 60.  Right?

25      A    Yeah.  I think it was -- you know, that my --
```

1                          J. LOVE

2 that I was named as -- whatever I'm named as in a --

3       Q      Someone with potential knowledge?

4       A      Yeah.  Someone with potential knowledge in

5 the lawsuit.  So that was the extent of --

6       Q      Got it.

7       A      -- what I knew about this -- this lawsuit.

8       Q      And who told you that -- about that?

9       A      Mike did.

10      Q      Did he explain to you what the lawsuit was

11 about?

12      A      It was a short -- pretty short conversation.

13 I don't recall if he got into the specifics of what it

14 was about or not.  I don't recall that.  Just that

15 my -- the thing that I recall about the conversation

16 was my name was -- my name was in it.

17      Q      Got it.  Do you recall ever discussing the

18 Adler lawsuit with Lauren?

19      A      Just to clarify, my understanding was that

20 there was an Adler lawsuit that Quintessa prevailed

21 in --

22      Q      Okay.

23      A      -- prior.  So that, yes.  You know, I

24 understood that there was a prior lawsuit that

25 Quintessa prevailed in.

Case 3:19-cv-02025-JSK-BN Document 19072-1 Filed 08/22/23 Page 166 of 406 PageID 34634

1                              J. LOVE

2        A     You know, just bits and pieces.

3        Q     Okay.  When you say similar to this, what do

4   you mean by that?

5        A     Like you had mentioned with -- maybe like ad

6   placement or things or something.

7        Q     Okay.  When she first told you about that

8   lawsuit, were you concerned for the company by the

9   existence of that lawsuit?

10       A     The lawsuit was over at --

11       Q     Okay.

12       A     -- the point that I knew about it.

13       Q     What about --

14       A     There wasn't anything to be concerned about.

15  It was over.

16       Q     Okay.  Did she tell you -- ever inform you

17  that actually it wasn't over and that, in fact, Adler

18  has appealed that decision?

19       A     That does -- there -- I did hear at some

20  point about an appeal.

21       Q     Okay.

22       A     That might have been late in the employment.

23       Q     Okay.

24       A     But yeah.  I didn't realize this is the

25  same -- this is the same thing.  Like, in my head, it

Case 3:19-cv-02025-K-BN Document 19072-8 Filed 03/22/23 Page 167 of 406 PageID 84635

1                          J. LOVE

2 was kind of two different -- two different things here.

3 Okay.

4        Q    Got it.  Got it.  So Lauren had told you that

5 the company had won what you said was essentially the

6 first lawsuit.  Correct?

7        A    Yes.

8        Q    Okay.  And do you recall who was the one that

9 at some point later on told you about the existence of

10 the appeal?

11       A    I don't remember.  I don't remember

12 specifically.  I do recall hearing something about an

13 appeal but --

14       Q    Okay.

15       A    Yeah.  I really can't formulate around that.

16       Q    Okay.  During your time at the company, did

17 you have any understanding of what Quintessa's position

18 was in this lawsuit?

19       A    What Quintessa's position was on --

20       Q    What their arguments are, yeah, what their

21 position is in their defense of this lawsuit.

22            MS. ADAMS:  Objection, form.

23            You can answer.

24            THE WITNESS:  Okay.  The Quintessa position

25 that, you know, I understood was that, you know, they

1                           J. LOVE

2      Q    Yes.

3      A    I don't recall her ever asking if anybody was

4  ever calling in specifically --

5      Q    Okay.

6      A    -- for any particular law firm.

7      Q    Okay.  Did Lauren ever tell you why the

8  phrase "intake department" was chosen to be said as the

9  first phrase when the intake department identifies

10  themselves to consumers?

11      A    Not that I recall, no.

12      Q    Do you have any understanding of why that

13  would -- that phrase would be chosen over other

14  phrases?

15      A    No.

16      Q    Did you ever have any concern about that

17  phrase potentially misleading callers?

18      A    I was -- I was assured that the scripting

19  that we had would keep us within the legal -- you know,

20  legal bounds.  So I wanted to make sure that we

21  stayed -- you know, stayed there.  So that was my

22  understanding, so that's what we stuck with.

23      Q    Okay.  But were you personally ever concerned

24  that that phrase might mislead consumers?

25      A    Intake department?  Personally, yeah.

Case 3:19-cv-02025-BNK-BN Document 19072-8 Filed 08/22/23/22 Page 469 of 406 PageID 864637

1                         J. LOVE

2 family.  Do you see that?

3       A    I do.

4       Q    Would you agree that it was, during your time

5 there, fast-paced?

6       A    Yes.

7       Q    And to your understanding, what made it

8 fast-paced?

9       A    There's just always something to do.  You can

10 always find something to do.  You don't ever have to

11 just sit.

12      Q    Did any of your -- is it true that the intake

13 specialists, the call center agents reported to you?

14      A    Yes.

15      Q    Did any of them report instances of a caller

16 calling in looking for a non-client law firm?

17      A    I don't know that anybody reported it.  I

18 mean, it was known.

19      Q    Okay.  It was known that that happened at the

20 company?

21      A    Yes.

22      Q    I'm handing you, Mr. Love, what will be

23 marked as Exhibit 63.

24            (Exhibit 63, e-mail Bates stamped

25      Quintessa 002374 through Quintessa 002378, marked

Case 3:19-cv-02025-K-BN Document 1072-8 Filed 03/22/23 Page 170 of 406 PageID 34638

```
 1                         J. LOVE

 2       A    Yes, I do.

 3       Q    And the reason it says here is that PC did

 4 not want to sign up with us, as he was under the

 5 impression that we were Jim Adler, the Texas Hammer.

 6 He was adamant about signing up with Adler, as he

 7 previously had a case with him.  Do you see that?

 8       A    I do, yes.

 9       Q    Does that refresh your recollection at all of

10 seeing this e-mail prior to today?

11       A    No.  I'm afraid not.

12       Q    Okay.  Do you recall that name?

13       A

14       Q    This

15       A                        ?  No, I don't.

16       Q    Okay.  And then if I could point you to the

17 second page of -- actually, it's the first page of this

18 exhibit, the very bottom of Exhibit 63, the first page.

19 August 5th at 5:50, Lauren McNeil,

20 lauren@quintessamarketing.com, writes Jason and Ciara.

21 Do you see that?

22       A    Yes, I do.

23       Q    And then her e-mail is on the next page, and

24 it says, please go through these leads and let's see

25 the status of each of these.  If unresponsive, get them
```

1                          J. LOVE

2 do see that.

3     Q    Okay.  And this is what Lauren was responding

4 to.  Does that refresh your recollection at all as to

5 discussing this specific issue with Ruby?

6     A    Let's see.  Failed to mention -- it still

7 really doesn't ring a bell.

8     Q    Okay.  Lauren had said if Ruby said anything

9 to that nature, it would be addressed and she would be

10 written up.  Do you ever recall, setting aside this

11 specific issue, ever writing Ruby up?

12    A    Yes.

13    Q    Do you recall what that was for?

14    A    I'm not sure.  I don't remember if it was

15 performance or attendance or what it was.  I do

16 recall -- I do remember issuing her a writeup, but I

17 don't -- I don't recall the circumstance around it.

18    Q    Okay.  Do you recall ever writing Ruby or any

19 other call center agent employee up for an issue

20 involving Adler?

21    A    Not specifically.  I don't recall that.

22    Q    Okay.  Do you ever recall writing any call

23 center agent up for an issue involving a third-party

24 law firm that was not a client of Quintessa's?

25    A    Again, not specific to that.  I don't

Case 3:19-cv-02025-BNK-BN Document 19072-8 Filed 08/22/23 Page 172 of 406 PageID 84640

```
 1                          J. LOVE
 2 remember.  I don't remember specifically doing it for
 3 that --
 4      Q    Okay.
 5      A    -- purpose.
 6      Q    The last full paragraph, couple of sentences
 7 there at the end of Lauren's e-mail --
 8      A    On the first page?
 9      Q    Yeah.  On the first page.  She says in the
10 second sentence, Jason and Mike, please review calls
11 first thing and let's speak afterwards.  Do you see
12 that?
13      A    Yeah.
14      Q    Do you recall ever reviewing any of these
15 calls at issue here?
16      A    It looks like I did, but I don't recall the
17 situation.
18      Q    Okay.
19      A    No.  I've listened to a lot of calls.
20      Q    And what is the software that during your
21 time Quintessa used to record the calls?
22      A    Quintessa used Talkdesk.
23      Q    Had you used that prior to your time at
24 Quintessa?
25      A    No, I hadn't.
```

Case 3:19-cv-02025-K-BN Document 190-2 Filed 08/22/23 Page 173 of 406 PageID 9041

```
 1                        J. LOVE

 2 will be marked as Exhibit 65 and 66.

 3            (Exhibit 65, e-mail, Bates stamped Quintessa

 4       00831, marked for identification, as of this

 5       date.)

 6            (Exhibit 66, e-mail Bates stamped Quintessa

 7       00830, marked for identification, as of this

 8       date.)

 9       Q    So I'll give you a minute to look at these,

10 Mr. Love.

11            (Document review.)

12       Q    Exhibits 65 and 6 were also produced by

13 Quintessa.  And they're both, it looks like, on the

14 same date from Wallace to you.  And then --

15       A    Uh-huh.

16       Q    -- title of exhibit -- or the subject line of

17 Exhibit 65 is Adler disengagement, and the subject line

18 of Exhibit 66 is Adler call.  Do you see that?

19       A    Yes.

20       Q    I guess the first question I have for both of

21 these documents sent on December 22nd, 2020, is do you

22 recall them?

23       A    No.  I don't recall them specifically.

24       Q    Okay.  Was it typical -- well, strike that.

25            So these links here that Wallace is e-mailing
```

Case 3:19-cv-02025-BJK-BN Document 1907-2 Filed 08/22/23 Page 174 of 406 PageID 91 4642

1                              J. LOVE

2  you, quintessamarketing.mytalkdesk.com, are these

3  recordings?

4        A    It looks to be, yes.

5        Q    Okay.  So this would be the format in which a

6  recording could be sent to you?

7        A    Yes.

8        Q    Okay.

9        A    Yeah.  Some sort of a link.

10       Q    Okay.  Did you sometimes e-mail with Wallace

11  about disengagements or recording issues?

12       A    With Wallace?  I don't remember any specific

13  instances.  It looks like -- it looks like he e-mailed

14  me for sure.

15       Q    Okay.  And do you recall listening to either

16  of these calls?

17       A    No, I don't.

18       Q    Okay.  Do you recall talking to Wallace about

19  either the Adler call e-mail or about the Adler

20  disengagement e-mail?

21       A    No, I don't.

22       Q    Do you recall the purpose of him sending

23  these to you, what you believe the purpose to be?

24       A    No.  There's not a -- not a description here.

25       Q    Okay.

1                              J. LOVE

2        A    So it would -- the dates wouldn't be specific

3   to the campaign.

4        Q    Got it.  So those are the dates that that

5   contact, essentially, with the individual happened?

6        A    Yes.  So if there was a contact, it would be

7   dated, and there would be a note there about whatever

8   that conversation or contact might have had on that

9   day.

10       Q    Under █████████ on 10/26/2021, the note is,

11  █████████ advised she was told by Samantha that she was

12  speaking with Jim Adler's office.  Do you see that?

13       A    I see that.

14       Q    Do you recall ever listening to this

15  recording?

16       A    I don't.

17       Q    Okay.  Do you recall ever talking to Lauren

18  about these issues -- these specific four Adler issues

19  identified here?

20       A    I don't recall that, no.

21       Q    Anyone else like Leo or Mike?

22       A    No.  I just -- I don't remember these

23  specifically.

24       Q    Okay.  Do you ever recall talking to Samantha

25  about this specific issue with █████████?

```
 1                        J. LOVE
 2      A    I don't.
 3      Q    Okay.  Do you recall whether or not Samantha
 4 was ever written up, if not by you, by anyone else?
 5      A    I don't recall writing her up or if anybody
 6 did.  I don't know.
 7      Q    For either          or          ,
 8              or                , do you recall
 9 listening to the recordings of any of those folks
10 calling?
11      A    I don't.
12      Q    Okay.  Under          , 9/24/2021, it
13 says, transferred to Jose.  Do you know who Jose is?
14      A    I -- no.  I don't know who Jose is.
15      Q    Okay.  Did you personally ever talk to
        or anyone at              about these issues?
17      A    No.  Not that I -- not that I recall.
18      Q    Okay.
19      A    No.
20      Q    Do you recall ever talking to any other
21 Quintessa client law firm about issues involving Adler?
22      A    No.  I rarely spoke to the -- to any
23 attorneys.
24      Q    Okay.  On the second page of Exhibit 67,
25 1249, under              , towards the top --
```

1                          J. LOVE

2 scripts themselves that were there when you came on

3 board?

4      A      I believe that there were some -- some minor

5 changes to the flow.

6      Q      Okay.

7      A      Yeah.

8      Q      But that was it?

9      A      Yeah.

10     Q      Did you ever suggest any changes to the

11 intake department procedures as a response to what we

12 discussed earlier, which was folks calling and looking

13 for a non-client law firm?

14     A      I don't recall any.

15     Q      Okay.  Do you recall any specific

16 conversations with Lauren about that topic?

17     A      No.

18     Q      That was something you testified that had

19 occurred in the -- at the company, correct, folks

20 calling in looking for non-client law firms?

21     A      Yes.

22     Q      And that was known within Quintessa.

23 Correct?

24            MS. ADAMS:  Objection, form.

25            THE WITNESS:  Yes.

Case 3:19-cv-02025-2BNK-BN Document 19072-Filed 08/22/23 22 Page 4 75 of 406 Page ID 954646

1                              J. LOVE

2      Q    Did you discuss that issue, folks calling in

3  and looking for a third-party law firm, with Lauren?

4      A    Did I discuss people calling for a

5  third-party law firm with Lauren?  I don't recall any

6  specific conversation over -- you know, over that.  It

7  was -- yeah.  It was, you know, just addressed in the

8  script.

9      Q    And what do you mean by that?

10     A    I mean, if -- you know, whatever the scenario

11 is, the agents are to stick to the script.

12     Q    Did you personally have any conversations

13 with the intake specialist call center agents about how

14 to handle folks calling and looking for a third-party

15 law firm?

16     A    To telling them to use the script?  Yes.

17     Q    Okay.  Was that question raised to you by

18 those folks?

19     A    I don't recall any specific instance where it

20 was raised to me.  It would be more like a

21 training-type conversation.

22     Q    Okay.  I'm going to show you, Mr. Love, what

23 will be marked as Exhibit 68.

24          (Exhibit 68, training Bates stamped Quintessa

25          000003 through Quintessa 000023, marked for

```
 1                        J. LOVE

 2      Q    If I could point you to Quintessa 8.  After

 3  the commercial, which is the last of the --

 4      A




                                   .   Do you see

10  that?

11      A    Yes.

12      Q    Is that the Slack message that we were

13  discussing earlier?

14      A    Yes, it is.

15
```

```
1                          J. LOVE
2  ██████████████████████████████
   ██████████████████████████████
```

12     Q    Got it.  The next page, Quintessa 9, talks

13 about lead case types.  Do you see that?

14     A    Yes.

15     Q    And there's a number there.  Would you say

16 that the majority of calls during your time at

17 Quintessa were any of these single categories?

18     A    I -- yeah.  I have no idea.  I don't ever

19 recall tracking any of that.

20     Q    Okay.  Would you say it would have been rare

21 to get wrongful death callers?

22     A    Like I said, I didn't actually track it.

23     Q    Okay.  So it's not something that you had

24 much visibility into?

25     A    No.  I wouldn't have data -- data on it.

1                          J. LOVE

2         Q

Correct?

19    A    Correct.

20    Q    Okay.

21         MR. MATTHYSSE:   Okay.   I think that's --

22 thank you.   So just for the record again, that was

23 2490, 2491, and 2492, Quintessa production.

24    Q    And so, Mr. Love, you mentioned that you had

25 left Quintessa in about December of 2021.   Correct?

Case 3:19-cv-02025-JBK-BN Document 1072-8 Filed 08/22/23 Page 182 of 406 PageID 94650

1                          J. LOVE

2      A     That sounds about right, yeah.

3      Q     Okay.   And part of that was to get to do the

4  process improvement area that you enjoyed more and were

5  able to do at Mercy.   Correct?

6      A     Yes.

7      Q     And it's true too, correct, that during your

8  time at Quintessa, that you had learned about the Adler

9  lawsuit?   Right?

10      A     While I was at Quintessa, you know,

11  initially, I learned that Quintessa had prevailed in an

12  Adler lawsuit.

13      Q     Okay.

14      A     I didn't realize that there was, you know,

15  either a continuation or, you know, whatever, you know,

16  this, you know, came to be, until later after I had --

17  after I had left.

18      Q     Okay.   And --

19      A     I didn't realize this was still ongoing.

20      Q     Okay.   But you knew of the existence of an

21  Adler lawsuit?

22      A     An Adler lawsuit, yes.

23      Q     Okay.   And you had testified, I believe, that

24  you had heard of or seen complaints from third-party

25  law firms to Quintessa in regards to Google

1                              J. LOVE

2 any changes made to the script after the appeal came

3 back down to the district court?

4      A    No, I don't.

5           MS. ADAMS:  Those are the only questions I

6 have.

7           MR. MATTHYSSE:  No further questions from our

8 side.

9           THE VIDEOGRAPHER:  We're off the record at

10 2:33 p.m.

11          THE COURT REPORTER:  Read and sign?

12          MS. ADAMS:  Yes, please.

13          (Deposition concluded at 2:33 p.m.)

14

15

16

17

18

19                                 _____

20                                      JASON LOVE

21

22      Subscribed and sworn to before me

23 this _____ day of _____, 2022.

24

25 _____

1

2                           CERTIFICATE

3

4  State of Oklahoma  )
                      )  SS:
5  County of Oklahoma )

6

7         I, Kortney V. Houts, a Certified Shorthand

8  Reporter for the State of Oklahoma, certify that JASON

9  LOVE, was duly sworn by me to testify to the truth;

10 that the videotaped deposition was taken by me in

11 stenotype and thereafter transcribed by computer and is

12 a true and correct transcript of the testimony of the

13 witness; that the deposition totaling 166 pages was

14 taken by me on July 22, 2022, at 9:39 a.m., at 10 N.

15 Broadway Avenue, Oklahoma City, Oklahoma; that I am not

16 a relative, employee, attorney or counsel to any party

17 in this case or a relative or employee to any counsel

18 in this case or otherwise financially interested in

19 this action; and that the witness elected to exercise

20 his right to review the deposition transcript prior to

21 its filing.

22         Witness my hand and seal of office on this 3rd

23 day of August, 2022.      *Kortney V. Houts*
                           _____
24                          KORTNEY V. HOUTS, CSR
                      Oklahoma Certified Shorthand Reporter
25                          Certificate No. 1804
                       Exp. Date:  December 31, 2022

```
1                        ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg.  No. Now Reads      Should Read  Reason
6    ___ ___ _____     _____   _____
7    ___ ___ _____     _____   _____
8    ___ ___ _____     _____   _____
9    ___ ___ _____     _____   _____
10   ___ ___ _____     _____   _____
11   ___ ___ _____     _____   _____
12   ___ ___ _____     _____   _____
13   ___ ___ _____     _____   _____
14   ___ ___ _____     _____   _____
15   ___ ___ _____     _____   _____
16   ___ ___ _____     _____   _____
17   ___ ___ _____     _____   _____
18   ___ ___ _____     _____   _____
19   ___ ___ _____     _____   _____
20                         _____
                              Signature of Deponent
21
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2022.
24   _____
25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

# EXHIBIT 6



EXHIBIT 73
L. MINGEE
4/13/2022
Case No. 3:19-cv-02025-K-BN
Diana M. Bengs, CSR, RPR

| From: | Lauren McNeil |
| Sent: | ▮, 2019 8:56 AM CDT |
| To: | |
| CC: | accidentintakeforms2@gmail.com; intake@quintessamarketing.com; ▮ |
| Subject: | Re: ▮ COMMERCIAL MVA ATTORNEY SIGNED TX |

Not sure, but we all do the same marketing as all of the big attorneys. So we run concurrent marketing.

Let me know any others that say that and I'll look into it

**Lauren V. McNeil**
Founder & CEO
Quintessa Marketing

M: 405-443-9756

"A New Brand of Legal Marketing"



On Aug 6, 2019, at 8:53 AM, ▮ wrote:

Maybe, but it has been an ongoing with some of these PC's and on one of them, she though she sighed up with Jim Adler until she came to meet with us in person. She is a very satisfied client, but I was just wondering why they are under that impression.



*Case Manager*

<image001.png>

ATTORNEYS' EYES ONLY

**From:** Lauren McNeil <lauren@quintessamarketing.com>
**Sent:** Tuesday, August 06, 2019 8:52 AM
**To:** ▮

**Cc:** accidentintakeforms2@gmail.com; intake@quintessamarketing.com ▮

**Subject:** Re: ALTOINEISHA MITCHELL COMMERCIAL MVA ATTORNEY SIGNED TX

We will call and clarify, she said she had spoken with them previously so she may be confused.

**Lauren V. McNeil**
Founder & CEO
Quintessa Marketing

M: 405-443-9756

"A New Brand of Legal Marketing"



On Aug 6, 2019, at 8:47 AM, ▮ wrote:

> I spoke with this lady last night and she kept insisting that Jim Adler referred her to us. I have had several PC's tell me that. Why are they under the impression they are being referred by Jim Adler?





ATTORNEYS' EYES ONLY

-----Original Message-----
From: accidentintakeforms2@gmail.com <accidentintakeforms2@gmail.com>
Sent: Monday, August 05, 2019 7:06 PM
To:

Subject: MVA ATTORNEY SIGNED TX

Sending with updated info

Intake Date/Time: 08/05/2019 06:39 PM

Case Summary: #DOI: 08/05/19 | MVA | Houston, TX

#Incident: PC was the passenger on the Metro Bus. The bus was rear-ended by the DEF at a railroad crossing. The DEF immediately fled the scene after the impact.

#Property Damage: The bus wasn't damaged very badly. The DEF's vehicle was damaged, though.

#Liability: The metro police came to the scene. However, the DEF fled the scene.
#Insurance: Open Investigation

#Injuries/Treatment: PC is currently at the ER. PC stated her neck and back are hurting.

ATTORNEYS' EYES ONLY

PC SSN: Will Prov

PC Emergency Contact Name: x

PC Emergency Contact Phone: x

Incident Date: 08/05/2019

Incident Location: Houston, TX

PC Insurance Company: Metro Bus

PC Ins. Claim #: Will Prov

Private Health Insurance: No Private Health Insurance

Was PC at fault?: No

Was PC injured?: Yes

Is PC Currently Pursuing Treatment?: Yes

If not, is PC willing to do follow-up treatment?: Yes

PC Vehicle Info (Year/Make/Model): Metro Bus

Defendant Vehicle Info (Year/Make/Model): See Police Report

Investigating Police Dept: Metro Police

Injuries and Treatment: PC stated her neck and back are hurting.

Prior Attorney Name: N/A

Prior Settlement?: No

Property Damage Description: The bus wasn't damaged very badly. The DEF's vehicle was damaged, though.

Property Damage Amount: 0

Defendant Name: See Police Report

Adverse Insurance: See Police Report

ATTORNEYS' EYES ONLY

Adverse Ins. Claim #: See Police Report

Who was ticketed for the accident: Unknown

defendantclaimno: See Police Report

Person Ticketed Explanation: DEF fled the scene after the accident.

Passengers:
----------------------------------------

Injured: Yes

Injuries and Treatment: PC's husband is currently at the ER. He stated her neck and back are hurting.

ATTORNEYS' EYES ONLY

L. MINGEE
4/13/2022

Cause No. 3:19-cv-02025-K-BN
Diana M. Bengs, CSR RPR

| From: | |
|---|---|
| Sent: | Monday, September 14, 2020 4:18 PM CDT |
| To: | accidentintakeforms2@gmail.com; intake@quintessamarketing.com |
| CC: | Mike Walker |
| Subject: | Re                    MOTOR VEHICLE ACCIDENT ESIGNED TX |

They are stating that Ji Adler's office called them and that they think they signed contracts with Jim Adler.



NOTICE: This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by telephone                            and delete this message and all copies and backups thereof. Thank you.

IRS Circular 230 Disclosure: The law firm and the attorneys listed above do not provide tax advice. Accordingly, any discussion of U.S. federal tax matters contained herein (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

On 9/14/20, 2:53 PM, "accidentintakeforms2@gmail.com" <accidentintakeforms2@gmail.com> wrote:

PC and all passengers are signed . The client would like direct contact as soon as possible do to immediate treatment required. Thank you.

Intake Date/Time: 09/14/2020 01:52 PM

Intake User: Rosa -

Override Intake Date Time:

Case Summary: DOI: 09/13/2020
San Antonio TX

**The PC is currently very concerned about medical treatment for her and her kids do to the severity of the pain.

Liability: PC was traveling through a parade turning into San Joaquin St with the right of way when DEF riding a motorcycle struck passengers side. San Antonio PD arrived at the scene. Case Number: 20174410. No party was set at fault. No party was transported away via ambulance. PC is 100 percent sure that she is not at fault.

Injuries: PC has pain in her face and she has a knot in her head do to hitting her head somewhere inside the vehicle. PC is also having severe back pain and she has not been able to sleep. PC also hit her elbow somewhere and it may be injured.

Insurance: DEF ; Totaled bicycle / See Police Report
PC: A Max / 2001 Dodge Durango

ATTORNEYS' EYES ONLY

Commercial: No
Passengers: (2)



Case Type: Motor Vehicle Accident

Accident State: TX

PC SSN: x

Incident Date: 09/13/2020

Incident Location: San Antonio

PC Insurance Company: A Max

PC Ins. Claim #: x

Private Health Insurance: None

Was PC at fault?: Unknown

Was PC injured?: Yes

Is PC Currently Pursuing Treatment?: Yes

If not, is PC willing to do follow-up treatment?: Yes

PC Vehicle Info (Year/Make/Model): 2001 Dodge Durango

Defendant Vehicle Info (Year/Make/Model): Motorcycle

ATTORNEYS' EYES ONLY

Investigating Police Dept: San Antonio PD

Injuries and Treatment: PC has pain in her face and she has a knot in her head do to hitting her head somewhere inside the vehicle. PC is also having severe back pain and she has not been able to sleep. PC also hit her elbow somewhere and it may be injured.

Prior Attorney Name: None

Prior Settlement?: No

Property Damage Description: Passenger side, back and front doors are damaged do to the side swipe. The back door is unable to open. The back passenger window broke completely. PC is unaware if there is any further internal damage.

Property Damage Amount: 1

Defendant Name: See Police Report

Adverse Insurance: x

Adverse Ins. Claim #: x

Who was ticketed for the accident: Unknown

defendantclaimno: x

Person Ticketed Explanation: PC is unaware if DEF was cited.

Passengers:
------------------------------------------
Name: Veronica Barber OBO Jaden Barsenas



Injured: Yes

Injuries and Treatment: The passenger is currently having severe pain in his back. The passenger is seeking immediate treatment.

------------------------------------------

ATTORNEYS' EYES ONLY



Injured: Yes

Injuries and Treatment: The passenger was the front passenger. His whole right side is in pain and his back is feeling severe pain. The passenger is seeking immediate treatment.

ATTORNEYS' EYES ONLY

**EXHIBIT 99**

**L. MINGEE**
4/13/2022

Cause No. 3:19-cv-02025-K-BB
Diana M. Sengs, CSR, RPR

| From: | Lauren McNeil |
| Sent: | Friday, February 7, 2020 12:59 PM CST |
| To: | |
| CC: | |
| Subject: | Re:  SEMI ESIGN PENDING TX |

Perfect. We won't follow up. I will continue to pull call and audit

**Lauren V. Mingee**
Founder & CEO
Quintessa Marketing

M: 405-443-9756

"A New Brand of Legal Marketing"



On Feb 7, 2020, at 12:58 PM, ⬛⬛⬛⬛⬛⬛ wrote:

Lauren – Quick follow-up... Once we used our scripting to clarify who we are, and who we are not, this person *did* affirm he wanted to stay with our law firm. Just FYI.



This email message and any attachments are intended solely for the use of the addressee. If you are not the intended recipient, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or otherwise using this transmission. If you have received this message in error, please promptly notify the sender by reply email and immediately delete this message from your system.

This message and any attachments may contain information that is confidential, privileged or exempt from disclosure.

**From:**

**Date:** Friday, February 7, 2020 at 12:53 PM

**To:** Lauren McNeil <lauren@quintessamarketing.com>

**Subject:** FW: TARWAH MERCHANT SEMI ESIGN PENDING TX

Lauren,

Our intake team tells me this signed client thought he had hired Jim Adler even *after* signing our retainer *and* being warm-transferred to us.

You and I are likely on the same page regarding competitor conquest PPC, but we must go the extra mile to ensure there is no ambiguity or confusion about who we are, and who we are not, when a PNC calls on this sort of campaign. Please make this person's intake call recording available to us so we can review and discuss with you on Monday.

Best,



This email message and any attachments are intended solely for the use of the addressee. If you are not the intended recipient, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or otherwise using this transmission. If you have received this message in error, please promptly notify the sender by reply email and immediately delete this message from your system. This message and any attachments may contain information that is confidential, privileged or exempt from disclosure.

**ATTORNEYS' EYES ONLY**

On 2/7/20, 12:14 PM, "accidentintakeforms1@gmail.com" <accidentintakeforms1@gmail.com> wrote:

Resending with completed esign.

Intake Date/Time: 02/07/2020 10:45 AM

Case Summary: Accident happened on I-40 Mile 168 in Oklahoma but PC lives in Dallas, TX

DOI:02/07/2020

Injuries: PC has left ankle pain and is swelling. PC is wanting to be scene by doctor.

Liability: DEF tires fell off and flew at PC hitting his Semi. The steps on Semi broke off causing PC. Police arrived and cited DEF at fault.

Insurance:
PC- ACE American Insurance Company
DEF- See Police Report





Case Type: Semi

ATTORNEYS' EYES ONLY

Incident Date: 02/07/2020

Incident Location: I-40 Mile 168 in Oklahoma

PC Insurance Company: ACE American Insurance Company

PC Ins. Claim #: Will Provide

Private Health Insurance: None

Was PC at fault?: No

Was PC injured?: Yes

Is PC Currently Pursuing Treatment?: No

If not, is PC willing to do follow-up treatment?: Yes

PC Vehicle Info (Year/Make/Model): Semi for Martin Transfer

PC Vehicle Location: At the scene of accident

Defendant Vehicle Info (Year/Make/Model): Semi

Investigating Police Dept: Will Provide

Police Report #: Will Provide

Injuries and Treatment: PC has left ankle pain and is swelling. PC is wanting to be scene by doctor.

Prior Attorney Name: None

Prior Settlement?: No

Property Damage Description: Will Provide but mostly front end damage

Property Damage Amount: 1500

ATTORNEYS' EYES ONLY

Defendant Name: See Police Report

Adverse Insurance: See Police Report

Adverse Ins. Claim #: See Police Report

Who was ticketed for the accident: Defendant

defendantclaimno: See Police Report

Person Ticketed Explanation: See Police Report

ATTORNEYS' EYES ONLY

QUINTESSA_000233



L. MINGEE
4/13/2022
Cause No. 3:19-cv-02025-K-BN
Diana M. Bengs, CSR, RPR

| | |
|---|---|
| **From:** | Lauren McNeil |
| **Sent:** | Friday, February 14, 2020 10:36 AM CST |
| **To:** | |
| **CC:** | accidentintakeforms1@gmail.com; Intake; take@quintessamarketing.com |
| **Subject:** | Re: MOTOR VEHICLE ACCIDENT ESIGN PENDING TX |

We have it clarified and resent it over to

**Lauren V. Mingee**
Founder & CEO
Quintessa Marketing

M: 405-443-9756

"A New Brand of Legal Marketing"



On Feb 14, 2020, at 10:17 AM, ████████ wrote:

Lauren - This PNC kept mentioning "Martillo Tejano" sending her to a clinic. Either she is represented by another firm, thinks she is represented by another firm - and they set up treatment. Or she only called on your PPC ad, your agent set her up with a clinic (unlikely), and she's just confused about who she called. Possibly some combination of all that.

Either way, we need this unraveled and clarified, or returned please.

Thanks!



**ATTORNEYS' EYES ONLY**

This email message and any attachments are intended solely for the use of the addressee. If you are not the intended recipient, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or otherwise using this transmission. If you have received this message in error, please promptly notify the sender by reply email and immediately delete this message from your system. This message and any attachments may contain information that is confidential, privileged or exempt from disclosure.

On 2/14/20, 10:09 AM, "                                   wrote:

    I'm on the phone with           who is advising she signed with Jim Adler and was set up with treatment at a clinic today. She is not sure how she was referred to us, but she is currently signed with Jim Adler.



This email message and any attachments are intended solely for the use of the addressee. If you are not the intended recipient, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or otherwise using this transmission. If you have received this message in error, please promptly notify the sender by reply email and immediately delete this message from your system. This message and any attachments may contain information that is confidential, privileged or exempt from disclosure.

-----Original Message-----
From: accidentintakeforms1@gmail.com <accidentintakeforms1@gmail.com>
Sent: Friday, February 14, 2020 9:54 AM
To:
intake@quintessamarketing.com; lauren@quintessamarketing.com
Subject:                    MOTOR VEHICLE ACCIDENT ESIGN PENDING TX

PC is signed; Live transferring.

Intake Date/Time: 02/14/2020 09:23 AM

Case Summary: Spanish Speaker

ATTORNEYS' EYES ONLY

QUINTESSA_000235

DOI: 02/06/2020 | Houston, TX | MVA

*Wants treatment arranged; if possible*
Injuries: PC was chest pain. Has not gone to the hospital.
Passenger ▮▮▮▮▮▮ has chest pain. Has not gone to the hospital.
Passenger ▮▮▮▮▮▮ has leg pain. Has not gone to the hospital.
Passenger ▮▮▮▮▮▮ has bodily soreness. Has not gone to the hospital.
Passenger ▮▮▮▮▮▮ is being fussy. Has not gone to the hospital.
PC is going to take everyone to get seen by doctor tomorrow.

Liability: PC was going Northbound in lefthand lane. DEF was in righthand lane and side swiped PC on passenger side when trying to merge into her lane. Police were not called but both parties exchanged information at the scene.

Insurance:
PC-Will Provide
DEF- Amax Insurance
Policy # 1388230888

Case Type: Motor Vehicle Accident

PC SSN: 0000000

ATTORNEYS' EYES ONLY

QUINTESSA_000236

Incident Date: 02/06/2020

Incident Location: Houston, TX

PC Insurance Company: Will Provide

PC Ins. Claim #: None

Private Health Insurance: None

Was PC at fault?: Unknown

Was PC injured?: Yes

Is PC Currently Pursuing Treatment?: No

If not, is PC willing to do follow-up treatment?: Yes

PC Vehicle Info (Year/Make/Model): 1998 Honda CRV

Defendant Vehicle Info (Year/Make/Model): 2004 Nissan

Investigating Police Dept: None

Injuries and Treatment: PC was chest pain.

Prior Attorney Name: None

Prior Settlement?: No

Property Damage Description: Passenger side damage

Property Damage Amount: 1500

Defendant Name:

Adverse Insurance: Amax Insurance

Adverse Ins. Claim #: None

Who was ticketed for the accident: Unknown

ATTORNEYS' EYES ONLY

defendantclaimno: None

Person Ticketed Explanation: Both parties exchanged information at the scene.

Passengers:



Injured: Yes

Injuries and Treatment: Passenger (9) has bodily soreness. Has not gone to the hospital.



ATTORNEYS' EYES ONLY



Injured: Yes

Injuries and Treatment: Passenger (4) has leg pain. Has not gone to the hospital.



Injured: Yes

Injuries and Treatment: Passenger (3) is being fussy. Has not gone to the hospital.



ATTORNEYS' EYES ONLY



Injured: Yes

Injuries and Treatment: Passenger (7) has chest pain. Has not gone to the hospital.

ATTORNEYS' EYES ONLY

EXHIBIT 46
L. MINGEE
4/13/2022
Case No. 3:19-cv-02025-K-BN
Diana M. Bengs, CSR, RPR

| From: | Lauren McNeil |
|---|---|
| Sent: | Sunday, May 24, 2020 5:39 PM CDT |
| To: | Intake User |
| CC: | |
| Subject: | Re: ▮▮▮▮▮▮ MOTOR VEHICLE ACCIDENT ESIGNED TX |

We need the letter from the attorney. He needs to call Adler and get the release letter from the office.

**Lauren V. Mingee**
Founder & CEO
Quintessa Marketing

M: 405-443-9756

"A New Brand of Legal Marketing"



On May 24, 2020, at 5:14 PM, Intake User <intake@quintessamarketing.com> wrote:

Good Afternoon. PC did mention he sent an email to his prior attorney that he no longer needs representation from Jim Adler.

On Fri, May 22, 2020 at 12:03 PM ▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
Quintessa team,
I finally connected with ▮▮▮▮ today. He says that he submitted notice to release by posting a review to the Jim Adler website. However, they have not released his case. I let him know we could not represent or proceed until we have an official release letter. He says he is going to get with the case manager and get back to us. I will return in the portal for now. Please re-send if/when he provides a release letter.
Thank you.



**ATTORNEYS' EYES ONLY**



This email message and any attachments are intended solely for the use of the addressee. If you are not the intended recipient, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or otherwise using this transmission. If you have received this message in error, please promptly notify the sender by reply email and immediately delete this message from your system. This message and any attachments may contain information that is confidential, privileged or exempt from disclosure.

**From:**

**Sent:** Thursday, May 21, 2020 9:52 AM
**To:** 'Intake User' <intake@quintessamarketing.com>
**Cc:** accidentintakeforms1@gmail.com <accidentintakeforms1@gmail.com>; Intake
                                                                    lauren@quintessamarketing.com
<lauren@quintessamarketing.com>
**Subject:** RE:                              MOTOR VEHICLE ACCIDENT ESIGNED TX

Got it.

Thank you,



This email message and any attachments are intended solely for the use of the addressee. If you are not the intended recipient, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or

ATTORNEYS' EYES ONLY

otherwise using this transmission. If you have received this message in error, please promptly notify the sender by reply email and immediately delete this message from your system. This message and any attachments may contain information that is confidential, privileged or exempt from disclosure.

**From:** Intake User [mailto:intake@quintessamarketing.com]
**Sent:** Thursday, May 21, 2020 9:51 AM
**To:**
**Cc:** accidentintakeforms1@gmail.com; Intake <Intake@reyeslaw.com>; Angel Reyes III
auren@quintessamarketing.com
**Subject:** Re: MIGUEL MOLINA ESTRADA MOTOR VEHICLE ACCIDENT ESIGNED TX

Good Morning,

PC texted in and wanted a call from you guys. Let me know what we can do to help

Thank you

On Tue, May 19, 2020 at 7:34 PM                          wrote:

Received.

Thank you,



ATTORNEYS' EYES ONLY



On May 19, 2020, at 5:34 PM, "accidentintakeforms1@gmail.com" <accidentintakeforms1@gmail.com> wrote:

PC is signed and aware you will call.

Intake Date/Time: 05/19/2020 04:45 PM

Case Summary: Spanish Speaker
DOI: 05/13/2020

Injury: The PC at the moment is feeling pain on his left leg and neck pain. He is also feeling pain on his upper and lower back. The PC was transported to the hospital via ambulance. They provided X-rays and CT scans as well.

Liability: The PC was on I35 highway when the DEF was traveling over 85mph and was speeding and not paying attention and rear ended the PC which caused the vehicle to spin around a couple of time, then hit the concrete barrier.The Highway Patrol PD arrived at the scene and field a police report. The PC is unsure if the DEF got a ticket cause he left in the ambulance to the hospital.

Insurance:PC- All Integrity insurance
DEF- Farmers



Case Type: Motor Vehicle Accident

ATTORNEYS' EYES ONLY

Incident Date: 05/13/2020

Incident Location: I35 Highway

PC Insurance Company: All Integrity

PC Ins. Claim #: None

Private Health Insurance: None

Was PC at fault?: No

Was PC injured?: Yes

Is PC Currently Pursuing Treatment?: Yes

If not, is PC willing to do follow-up treatment?: Yes

PC Vehicle Info (Year/Make/Model): 2001 Chevy

Defendant Vehicle Info (Year/Make/Model): 2012 Grand Cherokee

Investigating Police Dept: Highway Patrol PD

Injuries and Treatment: The PC at the moment is feeling pain on his left leg and neck pain. He is also feeling pain on his upper and lower back. The PC was transported to the hospital via ambulance. They provided X-rays and CT scans as well.

Prior Attorney Name: None

Prior Settlement?: No

Property Damage Description: Vehicle was totaled.

Property Damage Amount: 2500

ATTORNEYS' EYES ONLY

Defendant Name: Police Report

Adverse Insurance: Farmers

Adverse Ins. Claim #: None

Who was ticketed for the accident: Unknown

defendantclaimno: None

Person Ticketed Explanation: PC is unsure who got a ticket.

<A6D1A47A-CECB-438E-A9AD-3F9600D8EE17.pdf>

<  .jpeg>

ATTORNEYS' EYES ONLY

EXHIBIT 9

L. MINGEE
4/13/2022

Cause No. 3:19-cv-02025-K-BN
Diana M. Songy, CSR, RPR

| | |
|---|---|
| **From:** | |
| **Sent:** | Wednesday, February 24, 2021 9:19 PM CST |
| **To:** | accidentintakeforms2@gmail.com;        lauren@quintessamarketing.com |
| **CC:** | ntake@quintessamarketing.com; |
| | |
| **Subject:** | RE:        COMMERCIAL MVA ESIGNED TX |

Hello,

These clients are currently still under the representation of Jim Adler, and the clients advised that they informed you of this fact. We are currently in the process of assisting the clients with terminating their relationship with Jim Adler. Please be aware that the actions taken that led to these clients being signed under our representation were unethical. Moving forward, please make sure to verify information as important as this. Signing a party who has current active legal representation is a principal violation and can result in extreme consequences for our Attorneys, and our firm. Thank you.



-----Original Message-----
From: accidentintakeforms2@gmail.com <accidentintakeforms2@gmail.com>
Sent: Wednesday, February 24, 2021 2:19 PM
                                    lauren@quintessamarketing.com;

Cc:

Subject:                            COMMERCIAL MVA ESIGNED TX

The PCs are signed and aware you will call.

Intake Date/Time: 02/24/2021 01:25 PM

Intake User: Reagan -

Override Intake Date Time:

Case Summary: DOI: 11/21/20

Injury: Left shoulder and rotator cuff torn and lower back pain . The PC was going to American Family Chiropractic, but all the treatment has been coordinated through the PC's health insurance. He last was seen in January because he's been unable to obtain a negative Covid test to continue treatment. The PC's previous attorney didn't arrange any treatment for the PCs.

ATTORNEYS' EYES ONLY

PC's Driver (Wife) : Lower back pain and neck pain . Last seen in January for the same reason. The PC is pregnant as well.

Liability: PC was on I-35 northbound; they were in the center lane when the DEF swerved into the PC and hit them, pushing them for a little bit before the PC was pushed into the retaining wall. The DEF was a drink driver, he was taken to jail for DWI . The PC went and filed the report with the Dallas County (Carrolton) PD the following day. The DEF insurance has reached out to the PC and paid for the prop damage.

insurance:
PC: Allstate
DEF: Unitrin County Mutual
DEF's Vehicle: Ford F-250



For treatment, the PC provided some information for the treatment facility: American Family Chiropractic in Sanger, TX; Fax #: 940-458-7745



Case Type: Commercial MVA

Accident State: TX



Incident Date: 11/21/2020

ATTORNEYS' EYES ONLY

Incident Location: I-35 North, Dallas, TX

PC Insurance Company: Allstate

PC Ins. Claim #: X

Private Health Insurance: N/A

Was PC at fault?: No

Was PC injured?: Yes

Is PC Currently Pursuing Treatment?: Yes

If not, is PC willing to do follow-up treatment?: Yes

PC Vehicle Info (Year/Make/Model): 2017 Chevy Cruz

Defendant Vehicle Info (Year/Make/Model): Ford F-250

Investigating Police Dept: Dallas PD

Injuries and Treatment: Above.

Prior Attorney Name: Jim Adler

Prior Settlement?: No

Property Damage Description: Vehicle was totaled

Property Damage Amount: 4500

Defendant Name: Police Report

Adverse Insurance: Unitrin County Mutual

Who was ticketed for the accident: Defendant

Person Ticketed Explanation: DEF was arrested

Passengers:
----------------------------------------
Name: Tristin Brown

QUINTESSA_000981



Injured: Yes

Injuries and Treatment: Lower back pain and neck pain . Last seen in January for the same reason. The PC is pregnant as well.

ATTORNEYS' EYES ONLY

QUINTESSA_000982

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C., AND JIM ADLER, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CA NO. 3:19-CV-02025-K-BN** |
| | § | |
| MCNEIL CONSULTANTS, LLC, d/b/a | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | **JURY DEMAND** |
| QUINTESSA MARKETING, LLC, d/b/a | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| AND LAUREN VON MCNEIL, | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:   Plaintiffs Jim S. Adler, P.C., and Jim Adler, by and through their counsels of record:

Jered E. Matthysee and Giulio Yaquinto, PIRKEY BARBER PLLC, 1801 East 6th Street, Suite 300, Austin, Texas 78702;

Kurt Kuhn, KUHN HOBBS PLLC, 2310 Rutland Street, Houston, Texas 77008; and

Garrett W. Mize, JIM S. ADLER AND ASSOCIATES, The Tower at City Place, 2711 North Haskell Avenue, Suite 2500, Dallas, Texas 75204.

Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 33, Defendants McNeil Consultants, LLC,

d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC, d/b/a Accident Injury Legal Center,

and Lauren Von McNeil ("Defendants") make the following objections and answers to Plaintiffs

Jim S. Adler, P.C., and Jim Adler's ("Plaintiffs") First Set of Interrogatories:

## AMENDED OBJECTIONS AND ANSWERS TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any and all current or former owners, directors, and/or officers of McNeil Consultants, LLC, Quintessa Marketing, LLC, and/or any other business operated

DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES                                         PAGE 1

**ANSWER:**

Defendants object to this Interrogatory as overbroad in scope, irrelevant, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and disproportionate to the needs of the case. Defendants further object to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence as it is an impermissible fishing expedition by a current Keyword Advertisement competitor for Defendants' client list, which has no bearing on the causes of action in this case.

Subject to and without waiver of the foregoing objections, Defendants respond that it does not have a way to track revenue from case leads based on the purchase of specific Keyword Advertisements triggered by any of the Adler Marks.

**INTERROGATORY NO. 10**: Describe in reasonable detail any instances in which a caller asked if you were Adler and/or the Texas Hammer, or somehow associated you with Adler and/or the Texas Hammer, including instances where such caller contacted you after clicking on or otherwise encountering one of your Keyword Advertisements. If the answer to this Interrogatory is anything other than a categorical, unqualified negative, identify each person involved and the date of each incident or inquiry, and describe in reasonable detail the nature of each incident or inquiry and what was said, written, or otherwise expressed by each person involved.

**ANSWER:**

Defendants object to this Interrogatory as vague and ambiguous, particularly with respect to the phrase "or otherwise encountering." Defendants further object to this Interrogatory as overbroad in scope, unduly burdensome, seeking irrelevant information, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and disproportionate to the needs of the case.

Subject to and without waiver of the foregoing objections, Defendants respond that pursuant to FRCP 33(d), to the extent that any such instances exist such as described in this Interrogatory, and without conceding the same, the answers to this Interrogatory may be determined by examining Defendants' forthcoming production of business records, including intake logs and call center recordings, if any such responsive documents are found.

**AMENDED ANSWER:**

Subject to and without waiver of the foregoing objections, Defendants respond that, pursuant to Federal Rule of Civil Procedure 33(d)(2), Plaintiffs may determine the answer to this Interrogatory by examining the document produced as QUINTESSA_000001. Defendants are not withholding any information responsive to this interrogatory.

**INTERROGATORY NO. 11:** Identify and describe in reasonable detail any call centers or other segment of your operations dedicated to receiving calls from prospective clients, including any call tracking or call analytics products you use, whether calls from prospective clients are recorded, the length of time you maintain recordings, the number of persons whose primary job is answering such calls, and any training those persons receive.

---

**DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'**
**FIRST SET OF INTERROGATORIES**                                    PAGE 6

**ANSWER:**

Defendants object to this Interrogatory as overbroad in time and scope, irrelevant, not calculated to lead to the discovery of admissible evidence, and disproportionate to the needs of the case. Defendants further object to this Interrogatory as compound on the grounds that it encompasses multiple requests.



**INTERROGATORY NO. 12**: Identify any other lawyers or law firms whose name(s) or trademark(s) you have purchased as keywords.

**ANSWER:**

Defendants object to this Interrogatory as overbroad in scope, harassing, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence as it is an impermissible fishing expedition by a current Keyword Advertisement competitor, and disproportionate to the needs of the case. Defendants further object to this Interrogatory as it requires Defendants to disclose internal trade secret information and other confidential information of the company.

**AMENDED ANSWER:**

Subject to and without waiver of the foregoing objections, after conferring with Plaintiff's Counsel on March 3, 2022 regarding the scope of this request, Defendants intend to produce documents or data identifying the amount Defendants have spent on different categories of keywords (i.e. generic versus non-generic keywords) without disclosing the specific keywords Defendants have bid on outside of Plaintiff's marks. Defendants are still investigating the scope and format of producing this information and will supplement this response once that investigation is complete and the parties have had a chance to further confer on this issue.

**INTERROGATORY NO. 13:** Identify any disputes (demand letters, lawsuits, etc.) between you and any third-party involving (a) allegations of trademark infringement and/or (b) Keyword Advertisements.

**ANSWER:**

Defendants object to this Interrogatory as overbroad in scope, harassing, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence as it is an impermissible fishing expedition, and disproportionate to the needs of the case as any disputes between Defendants and any third party has no bearing on the causes of action in this case.

**AMENDED ANSWER:**

Subject to and without waiver of the foregoing objections, Defendants will identify lawsuits and produce non-privileged demand letters responsive to this request. Investigation is ongoing and Defendants will supplement this response once the responsive disputes have been identified.

**INTERROGATORY NO. 14:** Identify all persons who participated in any way in the preparation of the answers or responses to these interrogatories and state specifically the area of participation of each such person.

**ANSWER:**

Defendants object to this Interrogatory because it seeks information protected from disclosure by the attorney client, work product, and other applicable privileges.

Defendant responds by identifying Lauren Mingee who made and verified these answers. Withholding statement: Information responsive to this request is withheld under the attorney-client and work product privileges.

**AMENDED ANSWER:**

Defendants respond by identifying Lauren Mingee who made and verified these answers with the assistance of her counsel, Christopher Schwegmann, Rebecca Adams, and Barira Munshi.

DATE: March 11, 2022                    Respectfully submitted,

                                        /s/ Rebecca L. Adams
                                        Christopher J. Schwegmann
                                        Texas Bar No. 24051315
                                        cschwegmann@lynnllp.com
                                        Rebecca L. Adams
                                        Texas Bar No. 24098255
                                        radams@lynnllp.com
                                        Barira Munshi

**DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES**                                        **PAGE 8**

Texas Bar No. 24095924
bmunshi@lynnllp.com
LYNN PINKER HURST & SCHWEGMANN, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:    214-981-3800
Facsimile:    214-981-3839

**ATTORNEYS FOR DEFENDANTS
MCNEIL CONSULTANTS, LLC,
D/B/A ACCIDENT INJURY LEGAL
CENTER, QUINTESSA MARKETING,
LLC, D/B/A ACCIDENT INJURY
LEGAL CENTER, AND LAUREN VON
MCNEIL**

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2022, a true and correct of the foregoing document was served *via email* upon all counsel of record:

/s/ *Rebecca L. Adams*
Rebecca L. Adams

## VERIFICATION

STATE OF Oklahoma
COUNTY OF Oklahoma

I, Lauren Mingee, make this Declaration under oath pursuant to 28 U.S.C. Section 1746. I was the sole owner of McNeil Consultants, LLC d/b/a Accident Injury Legal Center, and I am currently the sole owner of Quintessa Marketing, LLC d/b/a Accident Injury Legal Center. I have read the foregoing document, Defendants' First Amended Objections and Answers to Plaintiffs' First Set of Interrogatories. I declare under penalty of perjury that the contents of the foregoing are true and correct.

Executed on this 28 day of March, 2022.

Lauren Mingee

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JIM S. ADLER, P.C., AND JIM ADLER,** | § § § § | |
| *Plaintiff,* | § § § | |
| **v.** | § § § § | CAUSE NO. 3:19-cv-02025-K-BN |
| **MCNEIL CONSULTANTS, LLC, d/b/a ACCIDENT INJURY LEGAL CENTER QUINTESSA MARKETING, LLC, d/b/a ACCIDENT INJURY LEGAL CENTER, AND LAUREN MINGEE,** | § § § § § § § § | |
| *Defendants.* | § | |

**EXPERT REBUTTAL REPORT OF DAVID M. LEATHERS**

_____
David M. Leathers

August 15, 2022

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.     ASSIGNMENT

1.     I have been asked to evaluate the damages, if any, suffered by Jim S. Adler, P.C. and Jim Adler ("Adler") resulting from the alleged actions of McNeil Consultants, LLC, d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC, d/b/a Accident Injury Legal Center, and Lauren Mingee (collectively referred to as "AILC"). Specifically, I have been asked to respond to the July 14, 2022 Expert Report of R. Christopher Anderson (the "Anderson Report") issued on behalf of Adler. My report and the attached exhibits summarize my opinions based on the information reviewed and analysis performed to date. I may update my opinions, analyses and conclusions as additional information is made available to me.

2.     In developing my opinions in this matter, I, and professionals working under my supervision and direction, have reviewed and analyzed documents produced in this matter, additional data provided by AILC, as well as publicly available information as listed on Exhibit 1. The review and analysis of this information and my experience in business and intellectual property valuation and the evaluation of economic damages, including damages resulting from trademark infringement, false advertising, and diminution, form the basis of my opinions.

3.     Alvarez and Marsal ("A&M") is being compensated at a rate of $695 per hour for the work I have performed in connection with this matter. Neither A&M's fees nor my compensation is contingent on the conclusions reached or the ultimate resolution of this case.

4.     I understand that I may be asked to testify regarding my opinions contained in this report as well as other related matters that may arise during trial. I anticipate that I will rely on materials referenced in my report as well as demonstrative exhibits to facilitate explanation of my testimony at trial in this matter.

## II.     QUALIFICATIONS AND EXPERIENCE

5.     I am a Managing Director in the Disputes and Investigations practice at A&M. A&M is a global professional services firm specializing in turnaround and interim management,

1

performance improvement, and business advisory services. I am an Accredited Senior Member of the American Society of Appraisers and a Certified Fraud Examiner. Prior to joining A&M, I led the Legal & Economic Consulting practice for a global boutique management consulting firm. Previously, I was a Managing Director at Huron Consulting Group, a Vice President of Charles River Associates, and a Principal and Senior Consultant at PricewaterhouseCoopers LLP.

6.      I have served as a financial expert witness or consultant in a variety of complex commercial litigation, business valuation and intellectual property matters. My experience includes the analysis of accounting, financial, marketing and other business information to assess the economic impact of business events and negotiation decisions. This experience includes the valuation of intellectual property as well as the determination of economic damages. I often advise these clients on financial and valuation issues that arise during commercial disputes, capital raising activities, merger and acquisitions, and inter-company and other transactions.

7.      A copy of my curriculum vitae, including my current and past employment, professional affiliations and previous expert testimony is included as Exhibit 2 to this report.

## III.     SUMMARY OF OPINIONS

8.      Based on the information reviewed and analysis performed as of the date of this report, I have concluded the following:

- Mr. Anderson's analysis of the harm suffered as a result of the alleged actions in this matter ignores numerous factors and considerations which should be analyzed in connection with a claim of trademark infringement and unfair competition. To ignore such considerations deviates from methodology accepted in the industry for such analysis.

- Mr. Anderson's analysis of the actual damages suffered by Adler are overstated, unsubstantiated, and unreliable.

-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV.      BACKGROUND

### *A. Personal Injury Law*

9.      The personal injury law industry consists of law firms that litigate tort lawsuits for their clients.[1] These personal injury lawsuits include claims filed for motor vehicle, workplace, at-home, defective products, and other accidents.[2] The industry is highly fragmented and varies geographically based on the laws of each specific state.[3] The majority of personal injury lawyers work on a contingency fee basis in which the lawyers receive a portion of the final settlement if they win the case.[4]

10.     Personal injury lawyers compete for clients primarily on the basis of contingency fee percentage, services offered, and reputation.[5] Personal injury lawyers advertise for clients on billboards, buses, benches, TV commercials, radio commercials, and online using search engines.[6] With respect to mobile device marketing, Search Engine Marketing ("SEM") is an effective tool used by many personal injury lawyers and marketers.

### *B. SEM*

11.     SEM is the online advertising of products and services through Google, Bing, and other search engines. Based on the keywords typed into a search engine (e.g., Google), advertisements appear on the search engine results page ("SERP"). In the case of legal representation searches, the SERPs contain links that an individual can click on that will allow them to research and secure legal representation.

---

[1] "Personal Injury Lawyers & Attorneys Industry in the US – Market Research Report"
(https://www.ibisworld.com/united-states/market-research-reports/personal-injury-lawyers-attorneys-industry/).
[2] Ibid.
[3] Ibid.
[4] Ibid.
[5] Ibid.
[6] "6 Tips for Marketing Your Personal Injury Practice" (https://onward.justia.com/6-tips-for-marketing-your-personal-injury-practice/).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

12. Google is the most used search engine and holds approximately 92 percent of the global search engine market.[7] As of April 2021, roughly 63 percent of Google search traffic in the United States originated from mobile devices.[8]

13. For each search performed, regardless of device type, Google performs a process it calls the "Ad Auction". The Ad Auction determines the ads that will display on a SERP and the order in which those ads will appear on the SERP.[9] Each Ad Auction begins with the user entering a search term or keyword into the Google platform.[10] Google then finds all the ads in its system that are similar to the keyword.[11] From there, Google removes any ineligible ads (e.g., an ad for legal representation in California, but the keywords specified legal representation in Dallas, Texas) and ranks the remaining ads according to its "Ad Rank" scoring system.[12] Ad Rank assigns a number to each ad based on six factors:[13]

    1. Bid amount, which is the maximum amount an advertiser is willing to pay for a click on their ad;

    2. Quality of the ad and landing page;

    3. Ad rank thresholds, or the minimum scores that an ad must have to appear in a certain position on a SERP;

    4. Competitiveness of an ad auction;

    5. Context of the keyword search, which includes factors such as the time the search was made and the person's location when the search was made; and

    6. Expected impact related to ad extensions (i.e., a phone number to call) and other ad formats.

---

[7] Ibid.
[8] Ibid.
[9] "The Ad Auction", Google Ads Help (https://support.google.com/google-ads/answer/1704431).
[10] Ibid.
[11] Ibid.
[12] Ibid.
[13] "About Ad Position and Ad Rank", Google Ads Help (https://support.google.com/google-ads/answer/1722122?hl=en&ref_topic=3121771).

The ads with the highest Ad Rank score appear on the SERP, with ads meeting the highest Ad Rank thresholds appearing above the organic search results.[14] Depending on the Ad Ranks for a particular Ad Auction, different numbers of ads may appear above the organic search results and below the organic search results.

14. Google tracks the results of an advertiser's Ad Auctions using its Quality Score, which is a score from one to ten that estimates the quality of an advertiser's ads, keywords, and landing pages.[15] Google calculates this score based on three performance factors: (1) expected clickthrough rate, (2) ad relevance, and (3) landing page experience. Expected clickthrough rate is the probability that an ad will be clicked on. Ad relevance is the measure of how an ad matches the reason for the user's search. Landing Page Experience measures the relevance and usefulness of an ad's landing page.[16] A business with a high Quality Score has demonstrated an ability to place quality ads resulting in more traffic to its business.[17] Because of this, Google places preferential treatment to advertisements with high Quality Scores.[18]

15. Based on the Google AdWords algorithm, improving the relevancy of the keywords being bid on and improving the Quality Score of the advertisements can directly impact the advertiser's CPC.[19] For example, if a competitors' Quality Score increases, and yours stays constant, your CPC will increase to stay in competition.[20]

### i. Keywords and Campaigns

16. Specific keywords and campaigns are important in reaching the desired ad audience. Keywords are a set of words or phrases that align with terms currently being searched by

---

[14] Ibid.

[15] "Quality Score: Definition", Google Ads Help (https://support.google.com/google-ads/answer/140351?hl=en).

[16] "About Quality Score", Google Ads Help (https://support.google.com/google-ads/answer/6167118?hl=en).

[17] "Quality Score: Definition", Google Ads Help (https://support.google.com/google-ads/answer/140351?hl=en).

[18] "Why Are Clicks Becoming More Expensive? Understanding CPC Inflation in Google Ads" (https://www.evoluted.net/thinktank/marketing/cpc-inflation).

[19] "How Much Do Google Ads Cost: 2021 vs. 2022" (https://viduenglobe.com/blog/how-much-do-google-ads-cost-2021-vs-2022).

[20] "3 Trends That Explain Why Your CPC is Rising" (https://postclick.com/blog/why-cpc-rises/).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Google users. The utilization of higher quality or more targeted key words (e.g., "Jim Adler"), will yield a better match between ad results and consumer search.[21]

17. Google offers three different keyword matching processes that an advertiser can utilize: Exact Match, Phrase Match, and Broad Match. Google defines these match types as follows:

- Exact Match is a "keyword match type that allows you to show your ads on searches that have the same meaning or same intent as your keyword. Exact match gives you the most control over who sees your ad, but reaches fewer searches than both phrase and broad match. This allows you to reach only users who make searches with the same meaning as your keywords."[22]

- Phrase Match is a "keyword match type that allows you to show your ads on searches that include the meaning of your keyword. The meaning of the keyword can be implied, and user searches can be a more specific form of the meaning. This allows you to reach more searches than with exact match and fewer searches than with broad match."[23]

- Broad Match is a "keyword match type allows your ad to show on searches that are related to the meaning of your keyword, which can include searches that don't contain the keyword terms. This allows you to reach more searches than with exact and phrase matches."[24]

18. The table below provides examples of the three types of keyword matches based on the keyword "jim adler".

**Table 1**

| Keyword Purchased | Exact Match User Search Term | Phrase Match User Search Term | Broad Match User Search Term |
|---|---|---|---|
| | | | |
| | | son | |

---

[21] "About Keywords in Search Network Campaigns", Google Ads Help (https://support.google.com/google-ads/answer/1704371?hl=en).

[22] "Exact Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407781?hl=en#:~:text=A%20keyword%20match%20type%20that,both%20phrase%20and%20broad%20match.).

[23] "Phrase Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/11586965?hl=en).

[24] "Broad Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407779?hl=en&ref_topic=24936).

19. An Ad Campaign is a group of keywords that allows an advertiser to place ads over a variety of search inquiries. In order to create an Ad Campaign, the user selects a set of keywords to group together. After this selection, they set a budget for bidding. This tells the search engine how much they are willing to bid per keyword.[25]

### ii. *Click-to-call Advertisements*

20. Click-to-call advertisements are strictly for mobile searches and enable a mobile phone user to click on an ad shown on the SERP and initiate a phone call directly to that business.[26] These advertisements are usually short in nature and include the following: a heading, business name, phone number, description, and a URL display path.[27]

21. Introduced by Google in 2010, click-to-call was designed with the belief that consumers preferred to directly call a business rather than visit a business's website.[28] Click-to-call ads evolved over the years following their introduction as the features and technology of mobile phones continued to evolve. For example, setting up a click-to-call ad became simpler, the user ad experience improved, and Google began tracking detailed reporting on calls and clicks.[29]

### iii. *Competition Among Advertisers*

22. Since the creation of Google AdWords in October 2000, the platform has seen a continuous and steep increase in advertising traffic.[30] However, as more businesses utilized keyword bidding, competition for space on the SERP increased, and keyword bidding has become

---

[25] "Create a Search Campaign", Google Ads Help (https://support.google.com/google-ads/answer/9510373#zippy=).
[26] "Click-to-Call Ads" (https://www.marchex.com/feature/click-to-call-ads/#:~:text=Digital%20ads%20that%20drive%20phone,click%20on%20a%20mobile%20device).
[27] "About Call Ads", Google Ads Help (https://support.google.com/google-ads/answer/6341403?hl=en).
[28] "Go Mobile! Series: Introducing Click-to-Call Phone Numbers in Local Ads on Mobile Devices" (https://adwords.googleblog.com/2010/01/introducing-click-to-call-phone-numbers.html).
[29] "A Fast Start to 2017 for Click-to-Call Ads" (https://www.blog.google/products/ads/fast-start-2017-click-to-call-ads/).
[30] "The Evolution of Google AdWords – A $38 Billion Advertising Platform" (https://www.wordstream.com/blog/ws/2012/06/05/evolution-of-adwords#:~:text=October%2023%2C%202000%2C%20will%20be,online%20advertising%20platform%20%E2%80%93%20Google%20AdWords.).

7

more expensive. The following points summarize key changes in the last decade in on-line advertising and the resulting impact on CPC.

- Average CPC increased by approximately 13 percent from January 2012 and January 2013.[31]

- In May 2017, Google removed the cap on Enhanced CPC bidding. Prior to this change, if Google believed that the purchased keyword would perform better at a higher bid, it would initiate an increase in bid price up to 30 percent of the originally selected bid price. After to this change, Google removed the cap resulting in an increase in keyword bidding of up to approximately 75 percent.[32]

- During 2019, Google updated its SERP to limit the amount of advertising space available to AdWords customers. This change resulted in increased competition and increased CPC.[33]

- In 2020, the global COVID-19 pandemic and resulting widespread lockdowns caused a sudden increase in digital advertising driven by changes in the way consumers led their personal and professional lives. In response to this change, businesses shifted their advertising dollars to focus on online (mobile and desktop) digital advertising resulting in additional increases in CPC.[34]

- Google's ad costs increased by an average of 15 to 25 percent in 2021 depending on the industry and are predicted to increase an additional 20 to 40 percent in 2022.[35]

23.     Google AdWords measures ad performance based on a variety of insights, including Search Overlap Rate, Position Above Rate, Search Outranking Share, and Absolute Top of the

---

[31] "Analyzing Cost-per-Click Inflation in the Marketplace" (https://searchengineland.com/analyzing-cost-per-click-inflation-in-the-marketplace-166634).

[32] "Why Are Clicks Becoming More Expensive? Understanding CPC Inflation in Google Ads" (https://www.evoluted.net/thinktank/marketing/cpc-inflation).

[33] Ibid.

[34] "3 Trends that Explain Why Your CPC is Rising" (https://postclick.com/blog/why-cpc-rises/).

[35] "How Much Do Google Ads Cost: 2021 vs 2022" (https://videnglobe.com/blog/how-much-do-google-ads-cost-2021-vs-2022).

Page Rate. Search Overlap Rate is the metric that shows how often your advertisement and a competitor's advertisement acquired an impression at the same time.[36] Position above rate describes how often a competitor's advertisement was shown above yours when both advertisements were shown during a search.[37] Search Outranking Share is a metric that shows how often your advertisement ranked higher in an auction than your competitor's advertisement.[38] Absolute Top of Page Rate details how often your advertisement was shown as the first result in a search.[39]

### C. Parties

#### i. Adler

24.    Jim Adler & Associates is a firm of thirty lawyers based in Houston, TX that has served its clients for over forty years.[40] According to its website, Adler's practice areas include the following types of cases, among others:[41]

- Personal Injury;
- Motorcycle Accidents;
- Pedestrian Accidents; and
- Commercial Vehicle Accidents.

25.    Adler's website indicates that they are "paid only at the end by winning for you, and then only from a part of the settlement, and not from your pocket."[42]

---

[36] "Use Auction Insights to Compare Performance" (https://support.google.com/google-ads/answer/2579754?hl=en#zippy=%2Cposition-above-rate-search-campaigns-only%2Coutranking-share%2Cabsolute-top-of-the-page-rate-search-campaigns-only).
[37] Ibid.
[38] Ibid.
[39] Ibid.
[40] "About Us" (https://www.jimadler.com/about-us/).
[41] "Our Practice Areas" (https://www.jimadler.com/practices/).
[42] "About Us" (https://www.jimadler.com/about-us/).

### ii. AILC

26. Lauren Mingee founded McNeil Consultants ("McNeil") in 2015 to provide marketing development consulting services to West Seegmiller, a California lawyer from The Seegmiller Law Firm, a firm specializing in personal injury law.[43] In 2017, McNeil stopped providing consulting services to West Seegmiller and shifted its focus to Google keyword marketing of personal injury legal services in order to acquire and sell leads to law firms.[44] In 2019, Ms. Mingee wound down McNeil Consulting, LLC and formed a new business, Quintessa Marketing, LLC. ("Quintessa").[45] Currently, Quintessa has approximately 50 employees and is based in Oklahoma City, Oklahoma.[46] According to its website, "Quintessa Marketing delivers comprehensive marketing services for client acquisition to attorneys and law firms."[47]

27. 



AILC provides commercial policy injury ("CPI") and motor vehicle accident ("MVA") leads to client law firms. AILC typically charges its Texas clients

## V. ASSERTED CLAIMS OF ADLER

27. Adler alleges that AILC uses Adler's trademarks, which include "JIM ADLER", "THE HAMMER", "THE TEXAS HAMMER", and "EL MARTILLO TEJANO" (collectively, the "Adler Marks"), to place confusing and misleading advertisements via mobile search

---

[43] Mingee Deposition at 36, 41, 44; "The Seegmiller Law Firm" (https://www.yelp.com/biz/the-seegmiller-law-firm-newport-beach).

[44] Mingee Deposition at 80-81.

[45] Mingee Deposition at 138.

[46] "Quintessa Marketing LinkedIn" (https://www.linkedin.com/company/quintessamarketing/about/).

[47] "Quintessa Marketing Home Page" (http://quintessamarketing.com/).

[48] Mingee Deposition at 74-75.

[49] Mingee Deposition at 73 and 199.

engines, which it alleges divert potential clients from Adler to AILC.[50] Adler alleges that AILC does this through its "Click-to-Call Scheme".[51]

28. Adler alleges that as part of AILC's Click-to-Call scheme it purchases the Adler Marks as keywords for ads on mobile devices because of the likelihood that the consumer will confusedly click on the AILC ad and call their operators.[52] Adler further alleges that these Google advertisements placed by AILC are designed to trick Adler's potential clients into believing that the AILC's website is associated with Adler. Additionally, Adler alleges that AILC is increasingly bidding higher amounts for keywords based on or associated with the Adler Marks, resulting in AILC's ads appearing next to Adler's on the SERP, causing additional confusion to consumers.[53]

29. As a result of the above allegations, Adler has asserted claims for the following:[54]

- Federal Trademark Infringement;
- Violation of Lanham Act Section 43(a);
- Common Law Trademark Infringement;
- Common Law Unfair Competition;
- Dilution Under Texas Law;
- Unjust Enrichment;
- Misappropriation of Name of Likeness;
- Misappropriation of Business Opportunity;
- Tortious Interference with Prospective Business Opportunity; and
- Tortious Interference with Existing Contract.

---

[50] Plaintiff's Third Amended Petition, p. 10-11.
[51] Plaintiff's Third Amended Petition, p. 10.
[52] Plaintiff's Third Amended Petition, p. 11.
[53] Plaintiff's Third Amended Petition, p. 10-12.
[54] Plaintiff's Third Amended Petition, pp. 16-18.

11

30. Adler seeks lost profits and disgorgement of AILC's profits obtained through the so-called Click-to-Call Scheme, among other actions.[55]

## VI. SUMMARY OF DR. STEWART'S OPINIONS

31. Dr. David W. Stewart, Ph.D. issued an expert report on July 11, 2022 (the "Stewart Report") on behalf of Adler. I understand that the Stewart Report includes the results of a survey that focused solely on a Google search for the term "the texas hammer". Dr. Stewart surveyed roughly 400 individuals that were above the age of 18 and that live in Texas.

32. I understand that the survey instructed respondents to imagine they wanted to seek information about or shop for the services of a personal injury attorney. The survey then instructed respondents to imagine that they had heard of a lawyer referred to as "the texas hammer" and to imagine they entered a search for that term. The survey then presented each respondent with a screenshot of three different Google ads for the various groups (an AILC ad, a semi-truck settlement ad, and an Alder ad) and asked respondents to select which advertisement they would click to "obtain those services." Dr. Stewart analyzed the individuals' responses and concluded that 44 percent of the respondents who selected the AILC advertisement were confused by the advertisement.[56]

## VII. SUMMARY OF MR. ANDERSON'S OPINIONS

33. Mr. Anderson asserts that AILC's "unauthorized use of the Adler Marks caused Adler to lose clients and incur higher advertising expenses."[57] Mr. Anderson opines that due to the actions of AILC from April 2019 through June 2022, Adler's advertising costs for its Branded Keywords (keywords that included the Adler Marks) were ▮▮▮▮ more than its advertising costs should have been absent AILC's actions.[58] Additionally, Mr. Anderson estimates that AILC earned revenues from 2019 through 2021 ranging from approximately $▮▮▮ to ▮▮▮ from the use of the Adler Marks.[59]

---

[55] Plaintiff's Third Amended Complaint, p. 19.

[56] Dr. David W. Steward, Ph. D Expert Report dated July 11, 2022 p. 17.

[57] Anderson Report, p. 20.

[58] Anderson Report, p. 23.

[59] Anderson Report, p. 35.

12

### *A. Increased Advertising Expenses*

34.    Mr. Anderson asserts that Adler is entitled to damages based on Adler's increased CPC allegedly caused by the actions of AILC from the second quarter of 2019 ("Q2 2019") through the second quarter of 2022 ("Q2 2022").[60] Mr. Anderson begins his damages period in Q2 2019 because Q2 2019 is when he understood that

[61] Mr. Anderson

estimates increased advertising expenses based on two different methodologies and then concludes that the results of the higher damages calculation, or approximately ▮▮▮▮, best represent Adler's losses.[62]

35.    Mr. Anderson's first method estimates Adler's increased CPC from Q2 2019 through Q2 2022 based on a multiple regression analysis which relies solely on Adler's Google AdWords data (the "Anderson Regression").[63] According to Mr. Anderson, the Anderson Regression measures the increase in Adler's CPC beginning in Q2 2019 "that cannot be explained by general price increases over time, market anomalies such as the COVID19 pandemic, or general differences in individual Keyword prices."[64] Additionally, Mr. Anderson claims that the Anderson Regression "controls for monthly cost trends, observed annual price changes of all Adler's Branded Keywords, generally, and the observed daily price changes of Adler's top seventeen (17) Keywords (by spending)."[65]

36.    Using the Anderson Regression, he estimates that Adler paid $▮▮▮▮ in CPC in each quarter from Q2 2019 through Q2 2022.[66] Mr. Anderson then multiplies ▮▮▮▮ increased CPC by Adler's actual clicks on its Branded Keywords to arrive at a total increased cost of ▮▮▮▮▮▮ which Mr. Anderson then attributes entirely to AILC's actions.[67]

---

[60] Anderson Report, pp. 21-22.

[61] Anderson Report, p. 22.

[62] Anderson Report, pp. 21-23.

[63] Anderson Report, pp. 21-22, Schedule 4.1, Schedule 4.1a, and Schedule 9.0.

[64] Anderson Report, p. 22.

[65] Ibid.

[66] Anderson Report, pp. 21-23.

[67] Anderson Report, Schedule 4.1.

37.     Mr. Anderson's second methodology estimates Adler's increased CPC based on the growth rate in Adler's pre-damages period CPC (from Q1 2018 through Q1 2019) (the "Anderson Average").[68] Mr. Anderson calculates Adler's pre-damages period CPC growth rate to be approximately 1.38 percent.[69] Mr. Anderson then applies this 1.38 percent growth rate to each quarter for the period of between Q2 2019 and Q2 2022 to calculate Adler's but-for CPC on Branded Keywords (the "But-For CPC").[70] The But-For CPC is then subtracted from Adler's actual CPC on Branded Keywords to calculate the change in CPC allegedly attributable to AILC's actions.[71] Mr. Anderson then multiplies the change in CPC by Adler's actual clicks on its Branded Keywords to arrive at a total increased cost of approximately $          which Mr. Anderson then attributes entirely to AILC's actions.[72]

38.     Mr. Anderson opines that the total damages of $          from the Anderson Regression "more precisely accounts for the overall decreases in observed CPCs contemporaneous with the COVID19 pandemic" than the Anderson Average.[73]

### B. Diverted Clients

39.     Mr. Anderson asserts that AILC confused Google mobile users and diverted "potential and/or existing clients" from Adler to Adler's competitors through the use of the Adler Marks.[74] Mr. Anderson claims that AILC was able to exploit the Adler Marks by placing higher bids on Adler keywords, using smart bidding strategies, and implementing click-to-call campaigns on mobile phones.[75] Mr. Anderson concludes the following based on his analysis of AILC's use of the "jim adler" keyword from Q1 2019 through Q2 2022:[76]

---

[68] Anderson Report, pp. 22-23.
[69] Anderson Report, p. 23 and Schedule 4.2.
[70] Ibid.
[71] Ibid.
[72] Ibid.
[73] Anderson Report, p. 32.
[74] Ibid.
[75] Ibid.
[76] Anderson Report, pp. 30-32 and Schedules 14.1-14.4.

14

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C. AILC's Revenues

40.    Mr. Anderson asserts that Adler is entitled to the disgorgement of AILC's revenues and profits resulting from its allegedly unlawful activities. Mr. Anderson estimates AILC's revenues attributed to its unlawful actions to be approximately $       to      from 2019 through 2021.[77]

41.    Mr. Anderson estimates AILC's revenues derived from the Adler Marks based on an allocation of AILC's revenues of approximately $     received from Texas based law firms from 2019 through 2021.[78] Mr. Anderson's allocation is based on AILC's conversion rates from bidding on the Adler Marks and AILC's total Google AdWords

---

[77] Anderson Report, p. 35.
[78] Ibid.

15

spending on the Adler Marks.[79] The table below summarizes Mr. Anderson's estimation of AILC's revenues derived from the Adler Marks from 2019 through 2021.

**Table 2**

| Estimated AILC Revenues from 2019-2021 | Allocation Method | Percent Allocated to Adler | Revenue Estimate |
|---|---|---|---|
| ⬛ | = ⬛ | ⬛ | ⬛ |
| | = ⬛ | ⬛ | ⬛ |

*Source: Anderson Report, p. 35*

## VIII. DAMAGE ANALYSIS

### *A. Forms of Relief*

42.  Damages in trademark infringement, unfair competition, and false advertising matters can be measured using a number of different methodologies, including the infringer's actual profits and the plaintiff's actual damages sustained, including the plaintiff's lost profits, or alternatively, a reasonable royalty for the use of the trademark owner's marks.[80]

### *B. Diverted Clients*

43.  Mr. Anderson asserts that AILC confused Google users and diverted Adler's potential and/or actual clients to Adler's competitors.

### *i. Alleged Confusion*

44.  I understand that Dr. Jeffery Stec has been retained to analyze Dr. Stewart's survey and conclusions on the alleged customer confusion and Dr. Stec has opined that Dr. Stewart's survey is unreliable and materially flawed. I understand that Dr. Stec's opinion is that the

---

[79] Anderson Report, pp. 34-35.

[80] *15 U.S. Code § 1117, Recovery for Violation of Rights*; The use of a reasonable royalty as a measure of the trademark owner's damages is supported by *Sands, Taylor & Wood v. Quaker Oaks Co.*, 34 F.3d (7th Cir. 1994), *corrected, substituted op.*, 44 F.3d 579 (7th Cir. 1995) and *adidas America, Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-Kl, 2008 wl 4279812 (D. Or. Sept. 12, 2008).

16

actual percentage of customers who may have been confused by AILC's click-to-call ads is significantly less than the confusion rate concluded by Dr. Stewart.

45.     In addition, I understand that Dr. Stewart did not test for the likelihood of confusion for the "jim adler" keyword in his survey. This is significant, as Mr. Anderson concluded that, "from Q2 2017 to Q1 2022,

█████████████ The disconnect between the keyword surveyed and the keyword driving Mr. Anderson's damages, illustrates the unreliability of Mr. Anderson's damages conclusion.

46.     Mr. Anderson failed to isolate the portion of AILC's clicks and resulting leads, if any, that directly resulted from the alleged customer confusion. Instead, he incorrectly assumed that 100 percent of AILC's clicks and resulting leads were due to the alleged confusion and that no other factors influenced a consumer's purchasing decision.

### ii. Diverted Clients

47.     Mr. Anderson evaluates a variety of Google performance metrics to show that Adler and AILC directly competed for impressions and clicks from Q1 2019 through Q2 2022. However, the same Google performance metrics that Mr. Anderson evaluates also show that 42 attorneys, law firms, and other marketers (collectively, "Other Competitors") also competed directly with Adler for impressions and clicks. For any given quarter during the alleged damage period, an average of 10 Other Competitors competed with Adler for impressions and clicks.

48.     Adler's Google performance metrics illustrate the significant presence of Other Competitors in Adler's ad auctions from Q1 2019 through Q2 2022:[82]

* ████████████████████████████████████████

---

[81] Anderson Report, p. 24.
[82] Anderson Report, Schedules 14.1-14.4; ADLER_000625.



49.     Mr. Anderson did not consider how the competitive landscape may or may not have
        changed from his pre-damages period (prior to Q2 2019) to his damages period (Q2 2019
        through Q2 2022). For example, Mr. Anderson did not consider the Google performance
        metrics from any years prior to 2019.

50.     In summary, Mr. Anderson's analysis ignores the bidding activities of the Other
        Competitors and the resulting impact on Adler's impressions, clicks, and CPC.

### C. Increased Advertising Expenses

51.     The value of the plaintiff's lost profits should measure the direct impact of the alleged
        harmful acts on the plaintiff. Lost profits represent the difference between the profits the
        Plaintiff would have earned if not for the Defendant's alleged harmful acts and the
        Plaintiff's actual profits. While Mr. Anderson has asserted that AILC diverted potential
        and/or actual clients to Adler's competitors, Mr. Anderson has not calculated Adler's lost
        revenues or resulting lost profits from the allegedly diverted clients.

52.     Mr. Anderson has instead estimated the increased advertising costs that Adler has allegedly
        incurred. The following sections evaluate Mr. Anderson's calculations of the increase in
        Adler's advertising expenses purportedly resulting from the alleged harmful acts of AILC.

### i. Adler's Advertising Expenses

53.     Google CPC for keywords across all industries has increased steadily over the past decade.
        The increase in Adler's CPC for its Branded Keywords ("Adler's Branded CPC") is
        consistent with this general trend, having increased by an average quarterly growth rate of

approximately       Q1 2017 through Q2 2022, as shown in the chart below. See Exhibit 3 for Adler's quarterly CPC amounts and growth rates.



54. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

55. Notably, in the pre-damages time period of Q1 2017 through Q1 2019, ▮▮▮▮▮▮▮▮

56. Table 3 below summarizes the growth in Adler's Branded CPC for the pre-damages period of Q1 2017 through Q1 2019 compared to Mr. Anderson's damages period of Q2 2019 through Q2 2022. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19



**Table 3**

*Source: Anderson Report Schedule 9.0*

57.     Over the past five and a half years,

**Table 4**

*Source: ADLER_000619-000623; ADLER_000689*

58.     During the damage period,

These

statistics further illustrate that other factors contributed to changes in Adler's branded CPC.

### ii. Anderson Regression

59.     The Anderson Regression suffers from a number of deficiencies that result in a speculative
        and unreliable conclusion. First, because the regression only utilizes Adler's data, it does
        not control for exogenous factors, such as changes in CPC across the market, the actions

20

of AILC, or the actions of the Other Competitors. Mr. Anderson does not consider or utilize any market data as a benchmark or baseline to measure CPC price changes that are not affected by AILC's actions. By failing to incorporate this outside data and CPC market price changes, the Anderson Regression deviates from methodology accepted in the industry for such analysis.

60. The Anderson Regression assumes, without explanation, that the full increase in Adler's Branded CPC between Q2 2019 and Q2 2022, after controlling for monthly, yearly, and keyword-specific effects on CPC, is due entirely to AILC's alleged harmful actions. Since AILC's data is not utilized in the Anderson Regression, this assumption doesn't measure the impact on Adler's Branded CPC that may have been caused by AILC's branded keyword bidding, impressions, clicks, and spending by others on Adler's keywords in a given month or period of time.

61. In addition to the failure to control for exogenous factors or consider AILC's actual bidding activity, Mr. Anderson does not account for the number of clicks for a given CPC. For example, certain keywords resulted in far more clicks than others. The Anderson Regression does not account for this volume difference and weight certain keywords more than others in calculating the overall effect on Adler's CPC. Mr. Anderson simply and unilaterally applies an unweighted average CPC to all branded clicks. In addition, the daily CPC data and monthly summaries of the daily CPC data that Mr. Anderson relies on, contain observations that are not equally weighted. For example, some daily observations had only one click, while others had as many as 81 clicks. The number of clicks necessarily affects the ultimate cost to Adler and should be accounted for in the Anderson Regression.

62. The Adler data used in the Anderson Regression excludes CPC data that is not applicable to the top 17 Adler keywords. The remaining Adler keywords, which represent approximately 18 percent of Adler's total spend, were excluded from the Anderson Regression. There is no valid reason for excluding the remaining Adler keywords.

63. In addition to the issues described above, Mr. Anderson's explanation of the Anderson Regression is inconsistent with the actual functionality and results of the regression for the following reasons:

- Anderson states that his model is based on the "daily CPC data from January 2017 to March 2019,"[83] which would suggest that the model's coefficients control for cost trends over months and years and adjust for individual keywords that are based on Q1 2017 through Q1 2019 data. However, the regression model's coefficients are estimated using CPC data from Q1 2017 through Q2 2022 (not ending in Q1 2019), meaning that all of the Anderson Regression's coefficients are based on data in both the pre-damages period and the damages period.

- Anderson states that the Anderson Regression controls for "market anomalies such as the COVID19 pandemic."[84] However, the Anderson Regression simply accounts for the monthly increase in prices over time and if a certain year had abnormal pricing relative to other years. Mr. Anderson did not evaluate or control for decreases in other AdWords costs due to COVID19 or specifically adjust for a period of time in which costs were affected by COVID19.

- Anderson states that his model controls for "the observed <u>daily</u> price changes of Adler's                                    "[85] (emphasis added) However, there is no indication that daily price changes were controlled for in his model as the model relies on a monthly summary of Adler's CPC data.

64. In order to further evaluate the Anderson Regression, I ran a regression model based on AILC's impressions and Adler's Branded CPC, controlling for the month.[86] Presumably, if AILC's impressions were causing Adler's Branded CPC to increase, as Mr. Anderson seems to assert, there should be a positive, statistically significant relationship between the two variables, as demonstrated by the regression results. However, the regression shows no relationship between AILC's impressions and Adler's Branded CPC. The AILC impressions coefficient was 0.002 with an insignificant p-value (0.22), meaning that there was no statistically significant relationship identified between AILC's impressions and

---

[83] Anderson Report, p. 22.
[84] Ibid.
[85] Ibid.
[86] Because only exact matches were available in the AILC data (QUINTESSA_000002), I utilized Adler's Branded CPC for exact matches only for purposes of this regression.

22

Adler's Branded CPC when controlling for the month. See Exhibit 4 to this report for a summary of this regression, which further serves to show the speculative and unreliable nature of the Anderson Regression.

### *iii. Anderson Average*

65. The Anderson Average is a simplistic calculation that also fails to control for exogenous factors, such as changes in CPC across the market, the actions of AILC, or the actions of the Other Competitors. For the Anderson Average to produce a supportable and reliable result, it should consider a market benchmark or yardstick, which when compared to Adler's CPC could indicate the amount by which Adler's CPC was impacted by non-market forces. If Mr. Anderson had evidence that such non-market forces stemmed from AILC's alleged harmful actions, then Mr. Anderson may be able to show that Adler's above market CPC was caused by the alleged actions of AILC. However, Mr. Anderson's simplistic approach fails to consider anything beyond Adler's historical average from only a portion of the pre-damages period.

66. If adjusted to utilize the average quarterly change of ▮▮▮▮ ▮▮▮ from the entire pre-damages period (Q1 2017 through Q1 2019), the Anderson Average model would have resulted in But-For CPC that was higher than Adler's actual CPC. In other words, there would be no damages according to Mr. Anderson's model. Exhibit 5 demonstrates the impact (no damages) from changing the historical average growth rate to the period from Q1 2017 through Q1 2019.

### *iv. Conclusion*

67. Mr. Anderson takes a myopic view of Adler's advertising costs from 2017 through Q2 2022. He does not consider and utilize the entire pre-damages time period in the Anderson Average. The Anderson Regression serves as an echo chamber as it does not incorporate market data, or any data outside of Adler's own data, to quantify the impact on Adler's branded CPC, if any, resulting from AILC's actions.

68. As described above, the Anderson Regression and the Anderson Average both suffer from numerous flaws and deviate from accepted methodology for such analysis. The similar

results from both analysis proport to add validity to the calculated damages and that Adler suffered some harm as a result of AILC's alleged harmful actions. However, the similar results from each methodology only result from the utilization of flawed assumptions. While the mechanics of each approach differ, both models:

- Attempt to control for "normal" changes in Adler's CPC;

- Apply an estimated increase in CPC, allegedly attributable to AILC, unilaterally across all keywords;

- Fail to properly account for changes in CPCs not caused by AILC's activity, such as the impact of Other Competitors and overall market forces; and

- Attribute the full increase in cost above Mr. Anderson's price increase-adjusted expected CPC to AILC.

69.     In summary, Mr. Anderson has failed to show that Adler was harmed as a result of AILC's actions in this matter.

### D.  Accounting of AILC's Profits

70.     In computing the infringer's actual profits, the Lanham Act states that the plaintiff (Adler) must only prove the defendants' (AILC) sales.[87] It is then the responsibility of the defendant to "prove all elements of cost or deduction claimed".[88]

71.     When calculating the disgorgement of profits, the applicable profit is the incremental profit resulting from the alleged harmful acts. Incremental profits are best represented by gross profits, or revenues less cost of goods sold (or direct costs) and other incremental costs, that vary when certain volume levels or thresholds are reached or are removed.

---

[87] Lanham Act § 35(a).
[88] Lanham Act § 35(a).

### *i. Mr. Anderson's Estimation of Revenues Attributable to the Alleged Infringement of the Adler Marks*

72.    Mr. Anderson asserts that Adler is entitled to the disgorgement of AILC's profits resulting from its allegedly unlawful activities. Mr. Anderson estimates that AILC's revenues attributed to its actions ranged from approximately ▮▮▮▮▮ to ▮▮▮▮▮ for the years 2019 through 2021.[89] Mr. Anderson estimates these revenues based on the portion of AILC's revenues received from Texas based law firms for the years 2019 through 2021.[90]

### *ii. Calculation of AILC's Revenues*

73.    AILC earns revenue from the leads that it provides to attorneys and law firms. I understand that AILC's clients pay AILC a deposit which typically ranges from ▮▮▮▮▮▮.[91] When AILC provides a lead to the client, ALIC realizes a per lead fee and deducts the fee from the client's deposit balance. Based on the type of lead, AILC charges its clients fees up to ▮▮▮▮▮, as described above.

74.    AILC tracks its revenue on a campaign basis and does not track revenue at a keyword level. Therefore, the revenue attributable to the Adler keywords must be apportioned from the campaign level revenues. AILC provided revenues for each campaign containing an Adler keyword from January 1, 2019 through August 10, 2022. I have estimated the revenue attributed to the Adler keywords based on the following two methodologies:[92]

- Adler Revenues = Percentage of total clicks resulting from Adler keywords multiplied by total campaign revenues; and

- Adler Revenues = Percentage of total calls resulting from Adler keywords multiplied by total campaign revenues.

---

[89] Anderson Report, p. 35.
[90] Ibid.
[91] Interview with Lauren Mingee.
[92] See Exhibit 6 for the annual calculations of AILC's Adler related revenues from January 1, 2019 through August 10, 2022.

25

75. In estimating AILC's incremental profits below, I have utilized the apportionment methodology based on the percentage of calls as it is more indicative of the number of leads provided.

### iii. *Incremental Expenses*

76. AILC's operating costs primarily include Google advertising expenses and costs associated with operating its call center.[93] Other costs include personnel, general and administrative, and information technology expenses, among others.[94] AILC has only produced its Google advertising expenses. Therefore, my analysis of AILC's incremental costs and profits was limited to a deduction of Google advertising expenses. Exhibit 7 to this report summarizes AILC's Google advertising expenses from January 1, 2019 through August 10, 2022.

### iv. *Summary*

77. During the period from January 1, 2019 through August 10, 2022,

Table 5 summarizes ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ AILC realized during the period.[95] Exhibit 8 to this report provides additional detail.

**Table 5**



| | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|
| Revenue | $ | | | | |
| Ad Expenses | | | | | |
| **Incremental Profit (Loss)** | $ | | | | |



---

[93] Interview with AILC accounting personnel.

[94] Ibid.

[95] I also considered the incremental profits that would have resulted from applying the overall campaign ⬛⬛⬛⬛⬛ (see Exhibit 8). This analysis results in an estimated gross profit of approximately ⬛⬛⬛⬛ , before an adjustment for revenues that did not result from some alleged confusion and a deduction for incremental call center costs. These gross profits would only be relevant if it was determined that leads from the use of Adler keywords contributed to growth in AILC's attorney and law firm clients. I understand and have seen no evidence support such results. Additionally, I understand that AILC was willing to stop bidding on the Adler Marks because they are not profitable (Mingee Deposition at 188-189).

26

78.    These revenues have not been adjusted to account for the fact that Google's broad match
       process often matches AILC's keywords that include the Adler Marks with user search
       terms that are not related to the Adler Marks, and therefore could not have resulted from
       some confusion. For example, Table 6 compares the consumer search terms to broad match
       keywords that resulted in a click on AILC's advertisement.

**Table 6**

| Consumer Search Term | AILC Purchased Keyword | Clicks |
|----------------------|------------------------|--------|
|                      |                        |        |
|                      |                        |        |
|                      |                        |        |
|                      |                        |        |
|                      |                        |        |
|                      |                        |        |
|                      |                        |        |
|                      |                        |        |

*Source: 2019-2022 Adler Keywords and Search terms.xlsm*

79.    Based on the above keyword and search term data for the period from January 1, 2019
       through August 10, 2022,

                                                                                          . Exhibit

       9 to this report includes the calculation of the percentage of AILC's clicks on keywords
       containing the Adler Marks that resulted from search terms unrelated to the Adler Marks.

27

**Exhibit 1**
**Documents Considered**

| Documents |
| --- |

**Adler Produced Documents**

| | | |
| --- | --- | --- |
| ADLER_000001 | ADLER_000422 | ADLER_000626 (Slipsheet) |
| ADLER_000003 | ADLER_000425 | ADLER_000626 |
| ADLER_000004 | ADLER_000428 | ADLER_000627 (Slipsheet) |
| ADLER_000009 | ADLER_000431 | ADLER_000627 |
| ADLER_000018 | ADLER_000434 | ADLER_000628 (Slipsheet) |
| ADLER_000024 | ADLER_000437 | ADLER_000628 |
| ADLER_000077 | ADLER_000440 | ADLER_000629 (Slipsheet) |
| ADLER_000082 | ADLER_000443 | ADLER_000629 |
| ADLER_000087 | ADLER_000446 | ADLER_000630 (Slipsheet) |
| ADLER_000091 | ADLER_000448 | ADLER_000630 |
| ADLER_000100 | ADLER_000450 | ADLER_000631 (Slipsheet) |
| ADLER_000104 | ADLER_000456 | ADLER_000631 |
| ADLER_000116 | ADLER_000462 | ADLER_000632 (Slipsheet) |
| ADLER_000131 | ADLER_000463 | ADLER_000632 |
| ADLER_000134 | ADLER_000468 | ADLER_000633 (Slipsheet) |
| ADLER_000139 | ADLER_000469 | ADLER_000633 |
| ADLER_000142 | ADLER_000472 | ADLER_000634 (Slipsheet) |
| ADLER_000146 | ADLER_000477 | ADLER_000634 |
| ADLER_000151 | ADLER_000481 | ADLER_000635 (Slipsheet) |
| ADLER_000155 | ADLER_000482 | ADLER_000635 |
| ADLER_000159 | ADLER_000486 | ADLER_000636 (Slipsheet) |
| ADLER_000166 | ADLER_000487 | ADLER_000636 |
| ADLER_000167 | ADLER_000491 | ADLER_000637 (Slipsheet) |
| ADLER_000168 | ADLER_000492 | ADLER_000637 |
| ADLER_000169 | ADLER_000493 | ADLER_000638 (Slipsheet) |
| ADLER_000170 | ADLER_000498 | ADLER_000638 |
| ADLER_000175 | ADLER_000501 | ADLER_000639 (Slipsheet) |
| ADLER_000179 | ADLER_000506 | ADLER_000639 |
| ADLER_000183 | ADLER_000507 | ADLER_000640 |
| ADLER_000188 | ADLER_000511 | ADLER_000644 (Slipsheet) |
| ADLER_000189 | ADLER_000516 | ADLER_000644 |
| ADLER_000190 | ADLER_000519 | ADLER_000645 (Slipsheet) |
| ADLER_000191 | ADLER_000520 | ADLER_000645 |
| ADLER_000199 (Slipsheet) | ADLER_000521 | ADLER_000646 |
| ADLER_000200 | ADLER_000522 | ADLER_000649 |
| ADLER_000207 | ADLER_000527 | ADLER_000650 |
| ADLER_000214 | ADLER_000528 | ADLER_000653 (Slipsheet) |
| ADLER_000219 | ADLER_000534 | ADLER_000653 |
| ADLER_000220 | ADLER_000539 | ADLER_000654 (Slipsheet) |
| ADLER_000221 | ADLER_000543 | ADLER_000654 |
| ADLER_000222 | ADLER_000547 | ADLER_000655 (Slipsheet) |
| ADLER_000236 | ADLER_000548 | ADLER_000655 |
| ADLER_000240 | ADLER_000551 | ADLER_000656 (Slipsheet) |
| ADLER_000254 | ADLER_000556 | ADLER_000656 |
| ADLER_000261 | ADLER_000561 | ADLER_000657 (Slipsheet) |
| ADLER_000268 | ADLER_000564 | ADLER_000657 |
| ADLER_000269 | ADLER_000565 | ADLER_000658 (Slipsheet) |
| ADLER_000270 | ADLER_000569 | ADLER_000658 |
| ADLER_000271 | ADLER_000572 | ADLER_000659 (Slipsheet) |
| ADLER_000272 | ADLER_000575 | ADLER_000659 |
| ADLER_000280 | ADLER_000576 | ADLER_000660 (Slipsheet) |
| ADLER_000283 | ADLER_000581 | ADLER_000660 |
| ADLER_000287 | ADLER_000582 | ADLER_000661 (Slipsheet) |
| ADLER_000292 | ADLER_000583 | ADLER_000661 |
| ADLER_000294 | ADLER_000584 | ADLER_000662 |
| ADLER_000295 | ADLER_000585 | ADLER_000666 |
| ADLER_000296 | ADLER_000586 | ADLER_000671 |

Alvarez & Marsal
Adler v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| ADLER_000302 | ADLER_000587 | ADLER_000688 (Slipsheet) |
| ADLER_000303 | ADLER_000588 | ADLER_000688 |
| ADLER_000308 | ADLER_000589 | ADLER_000689 (Slipsheet) |
| ADLER_000316 | ADLER_000590 | ADLER_000689 |
| ADLER_000322 | ADLER_000591 | ADLER_000690 (Slipsheet) |
| ADLER_000323 | ADLER_000592 | ADLER_000690 |
| ADLER_000324 | ADLER_000593 | ADLER_000691 (Slipsheet) |
| ADLER_000326 | ADLER_000594 | ADLER_000691 |
| ADLER_000333 | ADLER_000595 | ADLER_000692 |
| ADLER_000335 | ADLER_000596 | ADLER_000698 |
| ADLER_000341 | ADLER_000597 | ADLER_000700 |
| ADLER_000342 | ADLER_000598 | ADLER_000701 |
| ADLER_000343 | ADLER_000599 | ADLER_000702 |
| ADLER_000345 | ADLER_000600 | ADLER_000703 |
| ADLER_000350 | ADLER_000601 | ADLER_000704 |
| ADLER_000352 | ADLER_000602 | ADLER_000705 |
| ADLER_000358 | ADLER_000603 | ADLER_000706 |
| ADLER_000359 | ADLER_000604 | ADLER_000707 |
| ADLER_000360 | ADLER_000605 | ADLER_000708 |
| ADLER_000361 | ADLER_000606 | ADLER_000709 |
| ADLER_000362 | ADLER_000607 | ADLER_000710 |
| ADLER_000367 | ADLER_000608 | ADLER_000711 |
| ADLER_000375 | ADLER_000609 | ADLER_000712 |
| ADLER_000376 | ADLER_000610 | ADLER_000713 |
| ADLER_000378 | ADLER_000611 | ADLER_000714 |
| ADLER_000379 | ADLER_000614 | ADLER_000715 |
| ADLER_000381 | ADLER_000617 | ADLER_000716 |
| ADLER_000382 | ADLER_000618 (Slipsheet) | ADLER_000717 |
| ADLER_000384 | ADLER_000618 | ADLER_000718 |
| ADLER_000385 | ADLER_000619 (Slipsheet) | ADLER_000719 |
| ADLER_000386 | ADLER_000619 | ADLER_000720 |
| ADLER_000387 | ADLER_000620 (Slipsheet) | ADLER_000724 |
| ADLER_000388 | ADLER_000620 | ADLER_000618 |
| ADLER_000404 | ADLER_000621 (Slipsheet) | ADLER_000624 |
| ADLER_000407 | ADLER_000621 | ADLER_000625 |
| ADLER_000410 | ADLER_000622 (Slipsheet) | ADLER_000626 |
| ADLER_000413 | ADLER_000622 | ADLER_000627 |
| ADLER_000416 | ADLER_000623 (Slipsheet) | ADLER_000628 |
| ADLER_000419 | ADLER_000623 | ADLER_000629 |
| ADLER_000634 | ADLER_000624 (Slipsheet) | ADLER_000630 |
| ADLER_000635 | ADLER_000624 | ADLER_000631 |
| ADLER_000636 | ADLER_000625 (Slipsheet) | ADLER_000632 |
| ADLER_000637 | ADLER_000625 | ADLER_000633 |
| ADLER_000638 | ADLER_000639 | ADLER_000644 |
| ADLER_000645 | ADLER_000657 | ADLER_000688 |
| ADLER_000653 | ADLER_000658 | ADLER_000689 |
| ADLER_000654 | ADLER_000659 | ADLER_000690 |
| ADLER_000655 | ADLER_000660 | ADLER_000691 |
| ADLER_000656 | ADLER_000661 | ADLER_000619 |
| ADLER_000620 | ADLER_000622 | ADLER_000199 |
| ADLER_000621 | ADLER_000623 | |

**Quintessa Produced Documents**

| | | |
|---|---|---|
| QUINTESSA_000001 | QUINTESSA_001479 | QUINTESSA_001618 |
| QUINTESSA_000002 | QUINTESSA_001480 | QUINTESSA_001619 |
| QUINTESSA_000127 | QUINTESSA_001481 | QUINTESSA_001620 |
| QUINTESSA_000164 | QUINTESSA_001482 | QUINTESSA_001621 |
| QUINTESSA_000165 | QUINTESSA_001483 | QUINTESSA_001622 |
| QUINTESSA_000181 | QUINTESSA_001484 | QUINTESSA_001623 |
| QUINTESSA_000486 | QUINTESSA_001485 | QUINTESSA_001624 |

Alvarez & Marsal
Auld F. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_000837 | QUINTESSA_001486 | QUINTESSA_001625 |
| QUINTESSA_001227 | QUINTESSA_001487 | QUINTESSA_001626 |
| QUINTESSA_001229 | QUINTESSA_001488 | QUINTESSA_001627 |
| QUINTESSA_001231 | QUINTESSA_001489 | QUINTESSA_001628 |
| QUINTESSA_001233 | QUINTESSA_001490 | QUINTESSA_001629 |
| QUINTESSA_001395 | QUINTESSA_001491 | QUINTESSA_001630 |
| QUINTESSA_001396 | QUINTESSA_001492 | QUINTESSA_001631 |
| QUINTESSA_001397 | QUINTESSA_001493 | QUINTESSA_001632 |
| QUINTESSA_001398 | QUINTESSA_001494 | QUINTESSA_001633 |
| QUINTESSA_001399 | QUINTESSA_001495 | QUINTESSA_001634 |
| QUINTESSA_001400 | QUINTESSA_001496 | QUINTESSA_001635 |
| QUINTESSA_001956 | QUINTESSA_001497 | QUINTESSA_001636 |
| QUINTESSA_002421 | QUINTESSA_001498 | QUINTESSA_001637 |
| QUINTESSA_002423 | QUINTESSA_001499 | QUINTESSA_001638 |
| QUINTESSA_002425 | QUINTESSA_001500 | QUINTESSA_001639 |
| QUINTESSA_001352 | QUINTESSA_001501 | QUINTESSA_001640 |
| QUINTESSA_001353 | QUINTESSA_001502 | QUINTESSA_001641 |
| QUINTESSA_001354 | QUINTESSA_001503 | QUINTESSA_001642 |
| QUINTESSA_001355 | QUINTESSA_001504 | QUINTESSA_001643 |
| QUINTESSA_001356 | QUINTESSA_001505 | QUINTESSA_001644 |
| QUINTESSA_001357 | QUINTESSA_001506 | QUINTESSA_001645 |
| QUINTESSA_001358 | QUINTESSA_001507 | QUINTESSA_001646 |
| QUINTESSA_001359 | QUINTESSA_001508 | QUINTESSA_001647 |
| QUINTESSA_001360 | QUINTESSA_001509 | QUINTESSA_001648 |
| QUINTESSA_001361 | QUINTESSA_001510 | QUINTESSA_001649 |
| QUINTESSA_001362 | QUINTESSA_001511 | QUINTESSA_001650 |
| QUINTESSA_001363 | QUINTESSA_001512 | QUINTESSA_001651 |
| QUINTESSA_001364 | QUINTESSA_001513 | QUINTESSA_001652 |
| QUINTESSA_001365 | QUINTESSA_001514 | QUINTESSA_001653 |
| QUINTESSA_001366 | QUINTESSA_001515 | QUINTESSA_001654 |
| QUINTESSA_001367 | QUINTESSA_001516 | QUINTESSA_001655 |
| QUINTESSA_001368 | QUINTESSA_001517 | QUINTESSA_001656 |
| QUINTESSA_001369 | QUINTESSA_001518 | QUINTESSA_001657 |
| QUINTESSA_001370 | QUINTESSA_001519 | QUINTESSA_001658 |
| QUINTESSA_001371 | QUINTESSA_001520 | QUINTESSA_001659 |
| QUINTESSA_001372 | QUINTESSA_001521 | QUINTESSA_001660 |
| QUINTESSA_001373 | QUINTESSA_001522 | QUINTESSA_001661 |
| QUINTESSA_001374 | QUINTESSA_001523 | QUINTESSA_001662 |
| QUINTESSA_001375 | QUINTESSA_001524 | QUINTESSA_001663 |
| QUINTESSA_001376 | QUINTESSA_001525 | QUINTESSA_001664 |
| QUINTESSA_001377 | QUINTESSA_001526 | QUINTESSA_001665 |
| QUINTESSA_001378 | QUINTESSA_001527 | QUINTESSA_001666 |
| QUINTESSA_001379 | QUINTESSA_001528 | QUINTESSA_001667 |
| QUINTESSA_001380 | QUINTESSA_001529 | QUINTESSA_001668 |
| QUINTESSA_001381 | QUINTESSA_001530 | QUINTESSA_001669 |
| QUINTESSA_001382 | QUINTESSA_001531 | QUINTESSA_001670 |
| QUINTESSA_001383 | QUINTESSA_001532 | QUINTESSA_001671 |
| QUINTESSA_001384 | QUINTESSA_001533 | QUINTESSA_001672 |
| QUINTESSA_001385 | QUINTESSA_001534 | QUINTESSA_001673 |
| QUINTESSA_001386 | QUINTESSA_001535 | QUINTESSA_001674 |
| QUINTESSA_001387 | QUINTESSA_001536 | QUINTESSA_001675 |
| QUINTESSA_001388 | QUINTESSA_001537 | QUINTESSA_001676 |
| QUINTESSA_001389 | QUINTESSA_001538 | QUINTESSA_001677 |
| QUINTESSA_001390 | QUINTESSA_001539 | QUINTESSA_001678 |
| QUINTESSA_001401 | QUINTESSA_001540 | QUINTESSA_001679 |
| QUINTESSA_001402 | QUINTESSA_001541 | QUINTESSA_001680 |
| QUINTESSA_001403 | QUINTESSA_001542 | QUINTESSA_001681 |
| QUINTESSA_001404 | QUINTESSA_001543 | QUINTESSA_001682 |
| QUINTESSA_001405 | QUINTESSA_001544 | QUINTESSA_001683 |
| QUINTESSA_001406 | QUINTESSA_001545 | QUINTESSA_001684 |
| QUINTESSA_001407 | QUINTESSA_001546 | QUINTESSA_001685 |
| QUINTESSA_001408 | QUINTESSA_001547 | QUINTESSA_001686 |

Alvarez & Marsal
Auditor Questions, et al.
Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001409 | QUINTESSA_001548 | QUINTESSA_001687 |
| QUINTESSA_001410 | QUINTESSA_001549 | QUINTESSA_001688 |
| QUINTESSA_001411 | QUINTESSA_001550 | QUINTESSA_001689 |
| QUINTESSA_001412 | QUINTESSA_001551 | QUINTESSA_001690 |
| QUINTESSA_001413 | QUINTESSA_001552 | QUINTESSA_001691 |
| QUINTESSA_001414 | QUINTESSA_001553 | QUINTESSA_001692 |
| QUINTESSA_001415 | QUINTESSA_001554 | QUINTESSA_001693 |
| QUINTESSA_001416 | QUINTESSA_001555 | QUINTESSA_001694 |
| QUINTESSA_001417 | QUINTESSA_001556 | QUINTESSA_001695 |
| QUINTESSA_001418 | QUINTESSA_001557 | QUINTESSA_001696 |
| QUINTESSA_001419 | QUINTESSA_001558 | QUINTESSA_001697 |
| QUINTESSA_001420 | QUINTESSA_001559 | QUINTESSA_001698 |
| QUINTESSA_001421 | QUINTESSA_001560 | QUINTESSA_001699 |
| QUINTESSA_001422 | QUINTESSA_001561 | QUINTESSA_001700 |
| QUINTESSA_001423 | QUINTESSA_001562 | QUINTESSA_001701 |
| QUINTESSA_001424 | QUINTESSA_001563 | QUINTESSA_001702 |
| QUINTESSA_001425 | QUINTESSA_001564 | QUINTESSA_001703 |
| QUINTESSA_001426 | QUINTESSA_001565 | QUINTESSA_001704 |
| QUINTESSA_001427 | QUINTESSA_001566 | QUINTESSA_001705 |
| QUINTESSA_001428 | QUINTESSA_001567 | QUINTESSA_001706 |
| QUINTESSA_001429 | QUINTESSA_001568 | QUINTESSA_001707 |
| QUINTESSA_001430 | QUINTESSA_001569 | QUINTESSA_001708 |
| QUINTESSA_001431 | QUINTESSA_001570 | QUINTESSA_001709 |
| QUINTESSA_001432 | QUINTESSA_001571 | QUINTESSA_001710 |
| QUINTESSA_001433 | QUINTESSA_001572 | QUINTESSA_001711 |
| QUINTESSA_001434 | QUINTESSA_001573 | QUINTESSA_001712 |
| QUINTESSA_001435 | QUINTESSA_001574 | QUINTESSA_001713 |
| QUINTESSA_001436 | QUINTESSA_001575 | QUINTESSA_001714 |
| QUINTESSA_001437 | QUINTESSA_001576 | QUINTESSA_001715 |
| QUINTESSA_001438 | QUINTESSA_001577 | QUINTESSA_001716 |
| QUINTESSA_001439 | QUINTESSA_001578 | QUINTESSA_001717 |
| QUINTESSA_001440 | QUINTESSA_001579 | QUINTESSA_001718 |
| QUINTESSA_001441 | QUINTESSA_001580 | QUINTESSA_001719 |
| QUINTESSA_001442 | QUINTESSA_001581 | QUINTESSA_001720 |
| QUINTESSA_001443 | QUINTESSA_001582 | QUINTESSA_001721 |
| QUINTESSA_001444 | QUINTESSA_001583 | QUINTESSA_001722 |
| QUINTESSA_001445 | QUINTESSA_001584 | QUINTESSA_001723 |
| QUINTESSA_001446 | QUINTESSA_001585 | QUINTESSA_001724 |
| QUINTESSA_001447 | QUINTESSA_001586 | QUINTESSA_001725 |
| QUINTESSA_001448 | QUINTESSA_001587 | QUINTESSA_001726 |
| QUINTESSA_001449 | QUINTESSA_001588 | QUINTESSA_001727 |
| QUINTESSA_001450 | QUINTESSA_001589 | QUINTESSA_001728 |
| QUINTESSA_001451 | QUINTESSA_001590 | QUINTESSA_001729 |
| QUINTESSA_001452 | QUINTESSA_001591 | QUINTESSA_001730 |
| QUINTESSA_001453 | QUINTESSA_001592 | QUINTESSA_001731 |
| QUINTESSA_001454 | QUINTESSA_001593 | QUINTESSA_001732 |
| QUINTESSA_001455 | QUINTESSA_001594 | QUINTESSA_001733 |
| QUINTESSA_001456 | QUINTESSA_001595 | QUINTESSA_001734 |
| QUINTESSA_001457 | QUINTESSA_001596 | QUINTESSA_001735 |
| QUINTESSA_001458 | QUINTESSA_001597 | QUINTESSA_001736 |
| QUINTESSA_001459 | QUINTESSA_001598 | QUINTESSA_001737 |
| QUINTESSA_001460 | QUINTESSA_001599 | QUINTESSA_001738 |
| QUINTESSA_001461 | QUINTESSA_001600 | QUINTESSA_001739 |
| QUINTESSA_001462 | QUINTESSA_001601 | QUINTESSA_001740 |
| QUINTESSA_001463 | QUINTESSA_001602 | QUINTESSA_001741 |
| QUINTESSA_001464 | QUINTESSA_001603 | QUINTESSA_001742 |
| QUINTESSA_001465 | QUINTESSA_001604 | QUINTESSA_001743 |
| QUINTESSA_001466 | QUINTESSA_001605 | QUINTESSA_001744 |
| QUINTESSA_001467 | QUINTESSA_001606 | QUINTESSA_001745 |
| QUINTESSA_001468 | QUINTESSA_001607 | QUINTESSA_001746 |
| QUINTESSA_001469 | QUINTESSA_001608 | QUINTESSA_001747 |
| QUINTESSA_001470 | QUINTESSA_001609 | QUINTESSA_001748 |

Alvarez & Marsal
Audit v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001471 | QUINTESSA_001610 | QUINTESSA_001749 |
| QUINTESSA_001472 | QUINTESSA_001611 | QUINTESSA_001750 |
| QUINTESSA_001473 | QUINTESSA_001612 | QUINTESSA_001751 |
| QUINTESSA_001474 | QUINTESSA_001613 | QUINTESSA_001752 |
| QUINTESSA_001475 | QUINTESSA_001614 | QUINTESSA_001753 |
| QUINTESSA_001476 | QUINTESSA_001615 | QUINTESSA_001754 |
| QUINTESSA_001477 | QUINTESSA_001616 | QUINTESSA_001755 |
| QUINTESSA_001478 | QUINTESSA_001617 | QUINTESSA_001756 |
| QUINTESSA_001757 | QUINTESSA_000467 | QUINTESSA_001211 |
| QUINTESSA_001758 | QUINTESSA_000468 | QUINTESSA_001213 |
| QUINTESSA_001759 | QUINTESSA_000473 | QUINTESSA_001215 |
| QUINTESSA_001760 | QUINTESSA_000476 | QUINTESSA_001217 |
| QUINTESSA_001761 | QUINTESSA_000479 | QUINTESSA_001226 |
| QUINTESSA_001762 | QUINTESSA_000482 | QUINTESSA_001227 (Slipsheet) |
| QUINTESSA_001763 | QUINTESSA_000483 | QUINTESSA_001228 |
| QUINTESSA_001764 | QUINTESSA_000484 | QUINTESSA_001229 (Slipsheet) |
| QUINTESSA_001765 | QUINTESSA_000485 | QUINTESSA_001230 |
| QUINTESSA_001766 | QUINTESSA_000486 (Slipsheet) | QUINTESSA_001231 (Slipsheet) |
| QUINTESSA_001767 | QUINTESSA_000487 | QUINTESSA_001232 |
| QUINTESSA_001768 | QUINTESSA_000490 | QUINTESSA_001233 (Slipsheet) |
| QUINTESSA_001769 | QUINTESSA_000494 | QUINTESSA_001234 |
| QUINTESSA_001770 | QUINTESSA_000497 | QUINTESSA_001240 |
| QUINTESSA_001771 | QUINTESSA_000500 | QUINTESSA_001246 |
| QUINTESSA_001772 | QUINTESSA_000503 | QUINTESSA_001248 |
| QUINTESSA_001773 | QUINTESSA_000504 | QUINTESSA_001252 |
| QUINTESSA_001774 | QUINTESSA_000505 | QUINTESSA_001255 |
| QUINTESSA_001775 | QUINTESSA_000682 | QUINTESSA_001261 |
| QUINTESSA_001776 | QUINTESSA_000684 | QUINTESSA_001268 |
| QUINTESSA_001777 | QUINTESSA_000685 | QUINTESSA_001276 |
| QUINTESSA_001778 | QUINTESSA_000687 | QUINTESSA_001282 |
| QUINTESSA_001779 | QUINTESSA_000690 | QUINTESSA_001289 |
| QUINTESSA_001780 | QUINTESSA_000697 | QUINTESSA_001297 |
| QUINTESSA_001781 | QUINTESSA_000701 | QUINTESSA_001299 |
| QUINTESSA_001782 | QUINTESSA_000702 | QUINTESSA_001302 |
| QUINTESSA_001783 | QUINTESSA_000704 | QUINTESSA_001306 |
| QUINTESSA_001784 | QUINTESSA_000706 | QUINTESSA_001311 |
| QUINTESSA_001785 | QUINTESSA_000709 | QUINTESSA_001316 |
| QUINTESSA_001786 | QUINTESSA_000713 | QUINTESSA_001321 |
| QUINTESSA_001787 | QUINTESSA_000717 | QUINTESSA_001326 |
| QUINTESSA_001788 | QUINTESSA_000721 | QUINTESSA_001331 |
| QUINTESSA_001789 | QUINTESSA_000725 | QUINTESSA_001337 |
| QUINTESSA_001790 | QUINTESSA_000728 | QUINTESSA_001342 |
| QUINTESSA_001791 | QUINTESSA_000731 | QUINTESSA_001348 |
| QUINTESSA_001792 | QUINTESSA_000734 | QUINTESSA_001352 (Slipsheet) |
| QUINTESSA_001793 | QUINTESSA_000739 | QUINTESSA_001353 (Slipsheet) |
| QUINTESSA_001794 | QUINTESSA_000744 | QUINTESSA_001354 (Slipsheet) |
| QUINTESSA_001795 | QUINTESSA_000747 | QUINTESSA_001355 (Slipsheet) |
| QUINTESSA_001796 | QUINTESSA_000748 | QUINTESSA_001356 (Slipsheet) |
| QUINTESSA_001797 | QUINTESSA_000749 | QUINTESSA_001357 (Slipsheet) |
| QUINTESSA_001798 | QUINTESSA_000753 | QUINTESSA_001358 (Slipsheet) |
| QUINTESSA_001799 | QUINTESSA_000758 | QUINTESSA_001359 (Slipsheet) |
| QUINTESSA_001800 | QUINTESSA_000761 | QUINTESSA_001360 (Slipsheet) |
| QUINTESSA_001801 | QUINTESSA_000762 | QUINTESSA_001361 (Slipsheet) |
| QUINTESSA_001802 | QUINTESSA_000764 | QUINTESSA_001362 (Slipsheet) |
| QUINTESSA_001803 | QUINTESSA_000767 | QUINTESSA_001363 (Slipsheet) |
| QUINTESSA_001804 | QUINTESSA_000770 | QUINTESSA_001364 (Slipsheet) |
| QUINTESSA_001805 | QUINTESSA_000776 | QUINTESSA_001365 (Slipsheet) |
| QUINTESSA_001806 | QUINTESSA_000777 | QUINTESSA_001366 (Slipsheet) |
| QUINTESSA_001807 | QUINTESSA_000781 | QUINTESSA_001367 (Slipsheet) |
| QUINTESSA_001808 | QUINTESSA_000782 | QUINTESSA_001368 (Slipsheet) |
| QUINTESSA_001809 | QUINTESSA_000787 | QUINTESSA_001369 (Slipsheet) |
| QUINTESSA_001810 | QUINTESSA_000790 | QUINTESSA_001370 (Slipsheet) |

Alvarez & Marsal
Auer v. Quintessa, et al.
Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001811 | QUINTESSA_000791 | QUINTESSA_001371 (Slipsheet) |
| QUINTESSA_001812 | QUINTESSA_000792 | QUINTESSA_001372 (Slipsheet) |
| QUINTESSA_001813 | QUINTESSA_000795 | QUINTESSA_001373 (Slipsheet) |
| QUINTESSA_001814 | QUINTESSA_000798 | QUINTESSA_001374 (Slipsheet) |
| QUINTESSA_001815 | QUINTESSA_000802 | QUINTESSA_001375 (Slipsheet) |
| QUINTESSA_001816 | QUINTESSA_000803 | QUINTESSA_001376 (Slipsheet) |
| QUINTESSA_001817 | QUINTESSA_000807 | QUINTESSA_001377 (Slipsheet) |
| QUINTESSA_001818 | QUINTESSA_000810 | QUINTESSA_001378 (Slipsheet) |
| QUINTESSA_001819 | QUINTESSA_000811 | QUINTESSA_001379 (Slipsheet) |
| QUINTESSA_001820 | QUINTESSA_000815 | QUINTESSA_001380 (Slipsheet) |
| QUINTESSA_001821 | QUINTESSA_000820 | QUINTESSA_001381 (Slipsheet) |
| QUINTESSA_001822 | QUINTESSA_000823 | QUINTESSA_001382 (Slipsheet) |
| QUINTESSA_001823 | QUINTESSA_000824 | QUINTESSA_001383 (Slipsheet) |
| QUINTESSA_001824 | QUINTESSA_000829 | QUINTESSA_001384 (Slipsheet) |
| QUINTESSA_001825 | QUINTESSA_000830 | QUINTESSA_001385 (Slipsheet) |
| QUINTESSA_001826 | QUINTESSA_000831 | QUINTESSA_001386 (Slipsheet) |
| QUINTESSA_001827 | QUINTESSA_000832 | QUINTESSA_001387 (Slipsheet) |
| QUINTESSA_001828 | QUINTESSA_000833 | QUINTESSA_001388 (Slipsheet) |
| QUINTESSA_001829 | QUINTESSA_000837 (Slipsheet) | QUINTESSA_001389 (Slipsheet) |
| QUINTESSA_000001 (Slipsheet) | QUINTESSA_000838 | QUINTESSA_001390 (Slipsheet) |
| QUINTESSA_000002 (Slipsheet) | QUINTESSA_000841 | QUINTESSA_001391 |
| QUINTESSA_000003 | QUINTESSA_000844 | QUINTESSA_001392 |
| QUINTESSA_000024 | QUINTESSA_000845 | QUINTESSA_001393 |
| QUINTESSA_000025 | QUINTESSA_000846 | QUINTESSA_001394 |
| QUINTESSA_000059 | QUINTESSA_000849 | QUINTESSA_001395 (Slipsheet) |
| QUINTESSA_000060 | QUINTESSA_000851 | QUINTESSA_001396 (Slipsheet) |
| QUINTESSA_000075 | QUINTESSA_000852 | QUINTESSA_001397 (Slipsheet) |
| QUINTESSA_000076 | QUINTESSA_000854 | QUINTESSA_001398 (Slipsheet) |
| QUINTESSA_000090 | QUINTESSA_000857 | QUINTESSA_001399 (Slipsheet) |
| QUINTESSA_000091 | QUINTESSA_000860 | QUINTESSA_001400 (Slipsheet) |
| QUINTESSA_000105 | QUINTESSA_000870 | QUINTESSA_001401 (Slipsheet) |
| QUINTESSA_000106 | QUINTESSA_000873 | QUINTESSA_001402 (Slipsheet) |
| QUINTESSA_000121 | QUINTESSA_000876 | QUINTESSA_001403 (Slipsheet) |
| QUINTESSA_000122 | QUINTESSA_000877 | QUINTESSA_001404 (Slipsheet) |
| QUINTESSA_000123 | QUINTESSA_000880 | QUINTESSA_001405 (Slipsheet) |
| QUINTESSA_000126 | QUINTESSA_000883 | QUINTESSA_001406 (Slipsheet) |
| QUINTESSA_000127 (Slipsheet) | QUINTESSA_000887 | QUINTESSA_001407 (Slipsheet) |
| QUINTESSA_000128 | QUINTESSA_000888 | QUINTESSA_001408 (Slipsheet) |
| QUINTESSA_000129 | QUINTESSA_000933 | QUINTESSA_001409 (Slipsheet) |
| QUINTESSA_000134 | QUINTESSA_000934 | QUINTESSA_001410 (Slipsheet) |
| QUINTESSA_000137 | QUINTESSA_000935 | QUINTESSA_001411 (Slipsheet) |
| QUINTESSA_000141 | QUINTESSA_000936 | QUINTESSA_001412 (Slipsheet) |
| QUINTESSA_000146 | QUINTESSA_000940 | QUINTESSA_001413 (Slipsheet) |
| QUINTESSA_000153 | QUINTESSA_000945 | QUINTESSA_001414 (Slipsheet) |
| QUINTESSA_000157 | QUINTESSA_000950 | QUINTESSA_001415 (Slipsheet) |
| QUINTESSA_000161 | QUINTESSA_000954 | QUINTESSA_001416 (Slipsheet) |
| QUINTESSA_000163 | QUINTESSA_000959 | QUINTESSA_001417 (Slipsheet) |
| QUINTESSA_000164 (Slipsheet) | QUINTESSA_000961 | QUINTESSA_001418 (Slipsheet) |
| QUINTESSA_000165 (Slipsheet) | QUINTESSA_000963 | QUINTESSA_001419 (Slipsheet) |
| QUINTESSA_000166 | QUINTESSA_000965 | QUINTESSA_001420 (Slipsheet) |
| QUINTESSA_000167 | QUINTESSA_000967 | QUINTESSA_001421 (Slipsheet) |
| QUINTESSA_000173 | QUINTESSA_000969 | QUINTESSA_001422 (Slipsheet) |
| QUINTESSA_000175 | QUINTESSA_000971 | QUINTESSA_001423 (Slipsheet) |
| QUINTESSA_000176 | QUINTESSA_000972 | QUINTESSA_001424 (Slipsheet) |
| QUINTESSA_000177 | QUINTESSA_000973 | QUINTESSA_001425 (Slipsheet) |
| QUINTESSA_000181 (Slipsheet) | QUINTESSA_000975 | QUINTESSA_001426 (Slipsheet) |
| QUINTESSA_000182 | QUINTESSA_000979 | QUINTESSA_001427 (Slipsheet) |
| QUINTESSA_000186 | QUINTESSA_000983 | QUINTESSA_001428 (Slipsheet) |
| QUINTESSA_000190 | QUINTESSA_000988 | QUINTESSA_001429 (Slipsheet) |
| QUINTESSA_000195 | QUINTESSA_000989 | QUINTESSA_001430 (Slipsheet) |
| QUINTESSA_000199 | QUINTESSA_000992 | QUINTESSA_001431 (Slipsheet) |
| QUINTESSA_000202 | QUINTESSA_000998 | QUINTESSA_001432 (Slipsheet) |

Case 2:19-cv-02025-BKN-BND Document 1902-1 Filed 08/22/23 Page 260 of 406 Page ID 14728
Alvarez & Marsal
Auler v. Quintessa, et al.
Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_000205 | QUINTESSA_001000 | QUINTESSA_001433 (Slipsheet) |
| QUINTESSA_000211 | QUINTESSA_001001 | QUINTESSA_001434 (Slipsheet) |
| QUINTESSA_000214 | QUINTESSA_001003 | QUINTESSA_001435 (Slipsheet) |
| QUINTESSA_000218 | QUINTESSA_001004 | QUINTESSA_001436 (Slipsheet) |
| QUINTESSA_000220 | QUINTESSA_001006 | QUINTESSA_001437 (Slipsheet) |
| QUINTESSA_000225 | QUINTESSA_001007 | QUINTESSA_001438 (Slipsheet) |
| QUINTESSA_000229 | QUINTESSA_001010 | QUINTESSA_001439 (Slipsheet) |
| QUINTESSA_000234 | QUINTESSA_001012 | QUINTESSA_001440 (Slipsheet) |
| QUINTESSA_000241 | QUINTESSA_001015 | QUINTESSA_001441 (Slipsheet) |
| QUINTESSA_000243 | QUINTESSA_001017 | QUINTESSA_001442 (Slipsheet) |
| QUINTESSA_000257 | QUINTESSA_001019 | QUINTESSA_001443 (Slipsheet) |
| QUINTESSA_000258 | QUINTESSA_001021 | QUINTESSA_001444 (Slipsheet) |
| QUINTESSA_000259 | QUINTESSA_001023 | QUINTESSA_001445 (Slipsheet) |
| QUINTESSA_000262 | QUINTESSA_001025 | QUINTESSA_001446 (Slipsheet) |
| QUINTESSA_000263 | QUINTESSA_001026 | QUINTESSA_001447 (Slipsheet) |
| QUINTESSA_000274 | QUINTESSA_001029 | QUINTESSA_001448 (Slipsheet) |
| QUINTESSA_000275 | QUINTESSA_001034 | QUINTESSA_001449 (Slipsheet) |
| QUINTESSA_000276 | QUINTESSA_001036 | QUINTESSA_001450 (Slipsheet) |
| QUINTESSA_000282 | QUINTESSA_001039 | QUINTESSA_001451 (Slipsheet) |
| QUINTESSA_000283 | QUINTESSA_001046 | QUINTESSA_001452 (Slipsheet) |
| QUINTESSA_000284 | QUINTESSA_001047 | QUINTESSA_001453 (Slipsheet) |
| QUINTESSA_000285 | QUINTESSA_001049 | QUINTESSA_001454 (Slipsheet) |
| QUINTESSA_000289 | QUINTESSA_001052 | QUINTESSA_001455 (Slipsheet) |
| QUINTESSA_000295 | QUINTESSA_001053 | QUINTESSA_001456 (Slipsheet) |
| QUINTESSA_000299 | QUINTESSA_001055 | QUINTESSA_001457 (Slipsheet) |
| QUINTESSA_000303 | QUINTESSA_001056 | QUINTESSA_001458 (Slipsheet) |
| QUINTESSA_000306 | QUINTESSA_001057 | QUINTESSA_001459 (Slipsheet) |
| QUINTESSA_000309 | QUINTESSA_001059 | QUINTESSA_001460 (Slipsheet) |
| QUINTESSA_000314 | QUINTESSA_001060 | QUINTESSA_001461 (Slipsheet) |
| QUINTESSA_000316 | QUINTESSA_001065 | QUINTESSA_001462 (Slipsheet) |
| QUINTESSA_000321 | QUINTESSA_001070 | QUINTESSA_001463 (Slipsheet) |
| QUINTESSA_000322 | QUINTESSA_001071 | QUINTESSA_001464 (Slipsheet) |
| QUINTESSA_000324 | QUINTESSA_001072 | QUINTESSA_001465 (Slipsheet) |
| QUINTESSA_000327 | QUINTESSA_001073 | QUINTESSA_001466 (Slipsheet) |
| QUINTESSA_000332 | QUINTESSA_001077 | QUINTESSA_001467 (Slipsheet) |
| QUINTESSA_000336 | QUINTESSA_001078 | QUINTESSA_001468 (Slipsheet) |
| QUINTESSA_000339 | QUINTESSA_001080 | QUINTESSA_001469 (Slipsheet) |
| QUINTESSA_000340 | QUINTESSA_001082 | QUINTESSA_001470 (Slipsheet) |
| QUINTESSA_000343 | QUINTESSA_001087 | QUINTESSA_001471 (Slipsheet) |
| QUINTESSA_000344 | QUINTESSA_001088 | QUINTESSA_001472 (Slipsheet) |
| QUINTESSA_000346 | QUINTESSA_001089 | QUINTESSA_001473 (Slipsheet) |
| QUINTESSA_000350 | QUINTESSA_001092 | QUINTESSA_001474 (Slipsheet) |
| QUINTESSA_000354 | QUINTESSA_001095 | QUINTESSA_001475 (Slipsheet) |
| QUINTESSA_000355 | QUINTESSA_001100 | QUINTESSA_001476 (Slipsheet) |
| QUINTESSA_000356 | QUINTESSA_001105 | QUINTESSA_001477 (Slipsheet) |
| QUINTESSA_000357 | QUINTESSA_001111 | QUINTESSA_001478 (Slipsheet) |
| QUINTESSA_000358 | QUINTESSA_001114 | QUINTESSA_001479 (Slipsheet) |
| QUINTESSA_000361 | QUINTESSA_001118 | QUINTESSA_001480 (Slipsheet) |
| QUINTESSA_000363 | QUINTESSA_001119 | QUINTESSA_001481 (Slipsheet) |
| QUINTESSA_000365 | QUINTESSA_001122 | QUINTESSA_001482 (Slipsheet) |
| QUINTESSA_000367 | QUINTESSA_001126 | QUINTESSA_001483 (Slipsheet) |
| QUINTESSA_000371 | QUINTESSA_001127 | QUINTESSA_001484 (Slipsheet) |
| QUINTESSA_000376 | QUINTESSA_001128 | QUINTESSA_001485 (Slipsheet) |
| QUINTESSA_000381 | QUINTESSA_001132 | QUINTESSA_001486 (Slipsheet) |
| QUINTESSA_000385 | QUINTESSA_001135 | QUINTESSA_001487 (Slipsheet) |
| QUINTESSA_000390 | QUINTESSA_001136 | QUINTESSA_001488 (Slipsheet) |
| QUINTESSA_000394 | QUINTESSA_001139 | QUINTESSA_001489 (Slipsheet) |
| QUINTESSA_000399 | QUINTESSA_001143 | QUINTESSA_001490 (Slipsheet) |
| QUINTESSA_000402 | QUINTESSA_001144 | QUINTESSA_001491 (Slipsheet) |
| QUINTESSA_000403 | QUINTESSA_001145 | QUINTESSA_001492 (Slipsheet) |
| QUINTESSA_000404 | QUINTESSA_001147 | QUINTESSA_001493 (Slipsheet) |
| QUINTESSA_000409 | QUINTESSA_001150 | QUINTESSA_001494 (Slipsheet) |

Alvarez & Marsal
Auld v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_000412 | QUINTESSA_001153 | QUINTESSA_001495 (Slipsheet) |
| QUINTESSA_000416 | QUINTESSA_001154 | QUINTESSA_001496 (Slipsheet) |
| QUINTESSA_000417 | QUINTESSA_001156 | QUINTESSA_001497 (Slipsheet) |
| QUINTESSA_000419 | QUINTESSA_001159 | QUINTESSA_001498 (Slipsheet) |
| QUINTESSA_000420 | QUINTESSA_001162 | QUINTESSA_001499 (Slipsheet) |
| QUINTESSA_000424 | QUINTESSA_001168 | QUINTESSA_001500 (Slipsheet) |
| QUINTESSA_000429 | QUINTESSA_001169 | QUINTESSA_001501 (Slipsheet) |
| QUINTESSA_000430 | QUINTESSA_001170 | QUINTESSA_001502 (Slipsheet) |
| QUINTESSA_000432 | QUINTESSA_001171 | QUINTESSA_001503 (Slipsheet) |
| QUINTESSA_000434 | QUINTESSA_001177 | QUINTESSA_001504 (Slipsheet) |
| QUINTESSA_000436 | QUINTESSA_001181 | QUINTESSA_001505 (Slipsheet) |
| QUINTESSA_000439 | QUINTESSA_001184 | QUINTESSA_001506 (Slipsheet) |
| QUINTESSA_000442 | QUINTESSA_001185 | QUINTESSA_001507 (Slipsheet) |
| QUINTESSA_000445 | QUINTESSA_001186 | QUINTESSA_001508 (Slipsheet) |
| QUINTESSA_000446 | QUINTESSA_001187 | QUINTESSA_001509 (Slipsheet) |
| QUINTESSA_000448 | QUINTESSA_001189 | QUINTESSA_001510 (Slipsheet) |
| QUINTESSA_000451 | QUINTESSA_001192 | QUINTESSA_001511 (Slipsheet) |
| QUINTESSA_000452 | QUINTESSA_001194 | QUINTESSA_001512 (Slipsheet) |
| QUINTESSA_000456 | QUINTESSA_001198 | QUINTESSA_001513 (Slipsheet) |
| QUINTESSA_000457 | QUINTESSA_001202 | QUINTESSA_001514 (Slipsheet) |
| QUINTESSA_000460 | QUINTESSA_001206 | QUINTESSA_001515 (Slipsheet) |
| QUINTESSA_000461 | QUINTESSA_001210 | QUINTESSA_001516 (Slipsheet) |
| QUINTESSA_001517 (Slipsheet) | QUINTESSA_001717 (Slipsheet) | QUINTESSA_002184 |
| QUINTESSA_001518 (Slipsheet) | QUINTESSA_001718 (Slipsheet) | QUINTESSA_002194 |
| QUINTESSA_001519 (Slipsheet) | QUINTESSA_001719 (Slipsheet) | QUINTESSA_002195 |
| QUINTESSA_001520 (Slipsheet) | QUINTESSA_001720 (Slipsheet) | QUINTESSA_002198 |
| QUINTESSA_001521 (Slipsheet) | QUINTESSA_001721 (Slipsheet) | QUINTESSA_002205 |
| QUINTESSA_001522 (Slipsheet) | QUINTESSA_001722 (Slipsheet) | QUINTESSA_002206 |
| QUINTESSA_001523 (Slipsheet) | QUINTESSA_001723 (Slipsheet) | QUINTESSA_002209 |
| QUINTESSA_001524 (Slipsheet) | QUINTESSA_001724 (Slipsheet) | QUINTESSA_002214 |
| QUINTESSA_001525 (Slipsheet) | QUINTESSA_001725 (Slipsheet) | QUINTESSA_002217 |
| QUINTESSA_001526 (Slipsheet) | QUINTESSA_001726 (Slipsheet) | QUINTESSA_002224 |
| QUINTESSA_001527 (Slipsheet) | QUINTESSA_001727 (Slipsheet) | QUINTESSA_002229 |
| QUINTESSA_001528 (Slipsheet) | QUINTESSA_001728 (Slipsheet) | QUINTESSA_002230 |
| QUINTESSA_001529 (Slipsheet) | QUINTESSA_001729 (Slipsheet) | QUINTESSA_002235 |
| QUINTESSA_001530 (Slipsheet) | QUINTESSA_001730 (Slipsheet) | QUINTESSA_002239 |
| QUINTESSA_001531 (Slipsheet) | QUINTESSA_001731 (Slipsheet) | QUINTESSA_002244 |
| QUINTESSA_001532 (Slipsheet) | QUINTESSA_001732 (Slipsheet) | QUINTESSA_002247 |
| QUINTESSA_001533 (Slipsheet) | QUINTESSA_001733 (Slipsheet) | QUINTESSA_002249 |
| QUINTESSA_001534 (Slipsheet) | QUINTESSA_001734 (Slipsheet) | QUINTESSA_002254 |
| QUINTESSA_001535 (Slipsheet) | QUINTESSA_001735 (Slipsheet) | QUINTESSA_002260 |
| QUINTESSA_001536 (Slipsheet) | QUINTESSA_001736 (Slipsheet) | QUINTESSA_002261 |
| QUINTESSA_001537 (Slipsheet) | QUINTESSA_001737 (Slipsheet) | QUINTESSA_002266 |
| QUINTESSA_001538 (Slipsheet) | QUINTESSA_001738 (Slipsheet) | QUINTESSA_002267 |
| QUINTESSA_001539 (Slipsheet) | QUINTESSA_001739 (Slipsheet) | QUINTESSA_002271 |
| QUINTESSA_001540 (Slipsheet) | QUINTESSA_001740 (Slipsheet) | QUINTESSA_002276 |
| QUINTESSA_001541 (Slipsheet) | QUINTESSA_001741 (Slipsheet) | QUINTESSA_002277 |
| QUINTESSA_001542 (Slipsheet) | QUINTESSA_001742 (Slipsheet) | QUINTESSA_002282 |
| QUINTESSA_001543 (Slipsheet) | QUINTESSA_001743 (Slipsheet) | QUINTESSA_002284 |
| QUINTESSA_001544 (Slipsheet) | QUINTESSA_001744 (Slipsheet) | QUINTESSA_002285 |
| QUINTESSA_001545 (Slipsheet) | QUINTESSA_001745 (Slipsheet) | QUINTESSA_002286 |
| QUINTESSA_001546 (Slipsheet) | QUINTESSA_001746 (Slipsheet) | QUINTESSA_002287 |
| QUINTESSA_001547 (Slipsheet) | QUINTESSA_001747 (Slipsheet) | QUINTESSA_002288 |
| QUINTESSA_001548 (Slipsheet) | QUINTESSA_001748 (Slipsheet) | QUINTESSA_002291 |
| QUINTESSA_001549 (Slipsheet) | QUINTESSA_001749 (Slipsheet) | QUINTESSA_002294 |
| QUINTESSA_001550 (Slipsheet) | QUINTESSA_001750 (Slipsheet) | QUINTESSA_002297 |
| QUINTESSA_001551 (Slipsheet) | QUINTESSA_001751 (Slipsheet) | QUINTESSA_002300 |
| QUINTESSA_001552 (Slipsheet) | QUINTESSA_001752 (Slipsheet) | QUINTESSA_002306 |
| QUINTESSA_001553 (Slipsheet) | QUINTESSA_001753 (Slipsheet) | QUINTESSA_002312 |
| QUINTESSA_001554 (Slipsheet) | QUINTESSA_001754 (Slipsheet) | QUINTESSA_002313 |
| QUINTESSA_001555 (Slipsheet) | QUINTESSA_001755 (Slipsheet) | QUINTESSA_002317 |
| QUINTESSA_001556 (Slipsheet) | QUINTESSA_001756 (Slipsheet) | QUINTESSA_002320 |

Alvarez & Marsal
Auler F. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001557 (Slipsheet) | QUINTESSA_001757 (Slipsheet) | QUINTESSA_002321 |
| QUINTESSA_001558 (Slipsheet) | QUINTESSA_001758 (Slipsheet) | QUINTESSA_002324 |
| QUINTESSA_001559 (Slipsheet) | QUINTESSA_001759 (Slipsheet) | QUINTESSA_002326 |
| QUINTESSA_001560 (Slipsheet) | QUINTESSA_001760 (Slipsheet) | QUINTESSA_002329 |
| QUINTESSA_001561 (Slipsheet) | QUINTESSA_001761 (Slipsheet) | QUINTESSA_002331 |
| QUINTESSA_001562 (Slipsheet) | QUINTESSA_001762 (Slipsheet) | QUINTESSA_002338 |
| QUINTESSA_001563 (Slipsheet) | QUINTESSA_001763 (Slipsheet) | QUINTESSA_002345 |
| QUINTESSA_001564 (Slipsheet) | QUINTESSA_001764 (Slipsheet) | QUINTESSA_002351 |
| QUINTESSA_001565 (Slipsheet) | QUINTESSA_001765 (Slipsheet) | QUINTESSA_002352 |
| QUINTESSA_001566 (Slipsheet) | QUINTESSA_001766 (Slipsheet) | QUINTESSA_002353 |
| QUINTESSA_001567 (Slipsheet) | QUINTESSA_001767 (Slipsheet) | QUINTESSA_002354 |
| QUINTESSA_001568 (Slipsheet) | QUINTESSA_001768 (Slipsheet) | QUINTESSA_002355 |
| QUINTESSA_001569 (Slipsheet) | QUINTESSA_001769 (Slipsheet) | QUINTESSA_002356 |
| QUINTESSA_001570 (Slipsheet) | QUINTESSA_001770 (Slipsheet) | QUINTESSA_002357 |
| QUINTESSA_001571 (Slipsheet) | QUINTESSA_001771 (Slipsheet) | QUINTESSA_002363 |
| QUINTESSA_001572 (Slipsheet) | QUINTESSA_001772 (Slipsheet) | QUINTESSA_002364 |
| QUINTESSA_001573 (Slipsheet) | QUINTESSA_001773 (Slipsheet) | QUINTESSA_002365 |
| QUINTESSA_001574 (Slipsheet) | QUINTESSA_001774 (Slipsheet) | QUINTESSA_002366 |
| QUINTESSA_001575 (Slipsheet) | QUINTESSA_001775 (Slipsheet) | QUINTESSA_002367 |
| QUINTESSA_001576 (Slipsheet) | QUINTESSA_001776 (Slipsheet) | QUINTESSA_002368 |
| QUINTESSA_001577 (Slipsheet) | QUINTESSA_001777 (Slipsheet) | QUINTESSA_002369 |
| QUINTESSA_001578 (Slipsheet) | QUINTESSA_001778 (Slipsheet) | QUINTESSA_002374 |
| QUINTESSA_001579 (Slipsheet) | QUINTESSA_001779 (Slipsheet) | QUINTESSA_002379 |
| QUINTESSA_001580 (Slipsheet) | QUINTESSA_001780 (Slipsheet) | QUINTESSA_002380 |
| QUINTESSA_001581 (Slipsheet) | QUINTESSA_001781 (Slipsheet) | QUINTESSA_002381 |
| QUINTESSA_001582 (Slipsheet) | QUINTESSA_001782 (Slipsheet) | QUINTESSA_002382 |
| QUINTESSA_001583 (Slipsheet) | QUINTESSA_001783 (Slipsheet) | QUINTESSA_002383 |
| QUINTESSA_001584 (Slipsheet) | QUINTESSA_001784 (Slipsheet) | QUINTESSA_002384 |
| QUINTESSA_001585 (Slipsheet) | QUINTESSA_001785 (Slipsheet) | QUINTESSA_002385 |
| QUINTESSA_001586 (Slipsheet) | QUINTESSA_001786 (Slipsheet) | QUINTESSA_002389 |
| QUINTESSA_001587 (Slipsheet) | QUINTESSA_001787 (Slipsheet) | QUINTESSA_002391 |
| QUINTESSA_001588 (Slipsheet) | QUINTESSA_001788 (Slipsheet) | QUINTESSA_002392 |
| QUINTESSA_001589 (Slipsheet) | QUINTESSA_001789 (Slipsheet) | QUINTESSA_002393 |
| QUINTESSA_001590 (Slipsheet) | QUINTESSA_001790 (Slipsheet) | QUINTESSA_002394 |
| QUINTESSA_001591 (Slipsheet) | QUINTESSA_001791 (Slipsheet) | QUINTESSA_002395 |
| QUINTESSA_001592 (Slipsheet) | QUINTESSA_001792 (Slipsheet) | QUINTESSA_002396 |
| QUINTESSA_001593 (Slipsheet) | QUINTESSA_001793 (Slipsheet) | QUINTESSA_002397 |
| QUINTESSA_001594 (Slipsheet) | QUINTESSA_001794 (Slipsheet) | QUINTESSA_002401 |
| QUINTESSA_001595 (Slipsheet) | QUINTESSA_001795 (Slipsheet) | QUINTESSA_002405 |
| QUINTESSA_001596 (Slipsheet) | QUINTESSA_001796 (Slipsheet) | QUINTESSA_002409 |
| QUINTESSA_001597 (Slipsheet) | QUINTESSA_001797 (Slipsheet) | QUINTESSA_002413 |
| QUINTESSA_001598 (Slipsheet) | QUINTESSA_001798 (Slipsheet) | QUINTESSA_002414 |
| QUINTESSA_001599 (Slipsheet) | QUINTESSA_001799 (Slipsheet) | QUINTESSA_002416 |
| QUINTESSA_001600 (Slipsheet) | QUINTESSA_001800 (Slipsheet) | QUINTESSA_002418 |
| QUINTESSA_001601 (Slipsheet) | QUINTESSA_001801 (Slipsheet) | QUINTESSA_002420 |
| QUINTESSA_001602 (Slipsheet) | QUINTESSA_001802 (Slipsheet) | QUINTESSA_002421 (Slipsheet) |
| QUINTESSA_001603 (Slipsheet) | QUINTESSA_001803 (Slipsheet) | QUINTESSA_002422 |
| QUINTESSA_001604 (Slipsheet) | QUINTESSA_001804 (Slipsheet) | QUINTESSA_002423 (Slipsheet) |
| QUINTESSA_001605 (Slipsheet) | QUINTESSA_001805 (Slipsheet) | QUINTESSA_002424 |
| QUINTESSA_001606 (Slipsheet) | QUINTESSA_001806 (Slipsheet) | QUINTESSA_002425 (Slipsheet) |
| QUINTESSA_001607 (Slipsheet) | QUINTESSA_001807 (Slipsheet) | QUINTESSA_002426 |
| QUINTESSA_001608 (Slipsheet) | QUINTESSA_001808 (Slipsheet) | QUINTESSA_002428 |
| QUINTESSA_001609 (Slipsheet) | QUINTESSA_001809 (Slipsheet) | QUINTESSA_002432 |
| QUINTESSA_001610 (Slipsheet) | QUINTESSA_001810 (Slipsheet) | QUINTESSA_002434 |
| QUINTESSA_001611 (Slipsheet) | QUINTESSA_001811 (Slipsheet) | QUINTESSA_002440 |
| QUINTESSA_001612 (Slipsheet) | QUINTESSA_001812 (Slipsheet) | QUINTESSA_002445 |
| QUINTESSA_001613 (Slipsheet) | QUINTESSA_001813 (Slipsheet) | QUINTESSA_002450 |
| QUINTESSA_001614 (Slipsheet) | QUINTESSA_001814 (Slipsheet) | QUINTESSA_002455 |
| QUINTESSA_001615 (Slipsheet) | QUINTESSA_001815 (Slipsheet) | QUINTESSA_002460 |
| QUINTESSA_001616 (Slipsheet) | QUINTESSA_001816 (Slipsheet) | QUINTESSA_002465 |
| QUINTESSA_001617 (Slipsheet) | QUINTESSA_001817 (Slipsheet) | QUINTESSA_002469 |
| QUINTESSA_001618 (Slipsheet) | QUINTESSA_001818 (Slipsheet) | QUINTESSA_002475 |

Alvarez & Marsal
Auler v. Quintessa, et al.
Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001619 (Slipsheet) | QUINTESSA_001819 (Slipsheet) | QUINTESSA_002480 |
| QUINTESSA_001620 (Slipsheet) | QUINTESSA_001820 (Slipsheet) | QUINTESSA_002486 |
| QUINTESSA_001621 (Slipsheet) | QUINTESSA_001821 (Slipsheet) | QUINTESSA_001923 |
| QUINTESSA_001622 (Slipsheet) | QUINTESSA_001822 (Slipsheet) | QUINTESSA_001925 |
| QUINTESSA_001623 (Slipsheet) | QUINTESSA_001823 (Slipsheet) | QUINTESSA_001930 |
| QUINTESSA_001624 (Slipsheet) | QUINTESSA_001824 (Slipsheet) | QUINTESSA_001931 |
| QUINTESSA_001625 (Slipsheet) | QUINTESSA_001825 (Slipsheet) | QUINTESSA_001933 |
| QUINTESSA_001626 (Slipsheet) | QUINTESSA_001826 (Slipsheet) | QUINTESSA_001934 |
| QUINTESSA_001627 (Slipsheet) | QUINTESSA_001827 (Slipsheet) | QUINTESSA_001937 |
| QUINTESSA_001628 (Slipsheet) | QUINTESSA_001828 (Slipsheet) | QUINTESSA_001943 |
| QUINTESSA_001629 (Slipsheet) | QUINTESSA_001829 (Slipsheet) | QUINTESSA_001944 |
| QUINTESSA_001630 (Slipsheet) | QUINTESSA_001830 | QUINTESSA_001945 |
| QUINTESSA_001631 (Slipsheet) | QUINTESSA_001833 | QUINTESSA_001948 |
| QUINTESSA_001632 (Slipsheet) | QUINTESSA_001838 | QUINTESSA_001949 |
| QUINTESSA_001633 (Slipsheet) | QUINTESSA_001842 | QUINTESSA_001952 |
| QUINTESSA_001634 (Slipsheet) | QUINTESSA_001843 | QUINTESSA_001955 |
| QUINTESSA_001635 (Slipsheet) | QUINTESSA_001846 | QUINTESSA_001956 (Slipsheet) |
| QUINTESSA_001636 (Slipsheet) | QUINTESSA_001850 | QUINTESSA_001957 |
| QUINTESSA_001637 (Slipsheet) | QUINTESSA_001855 | QUINTESSA_001961 |
| QUINTESSA_001638 (Slipsheet) | QUINTESSA_001860 | QUINTESSA_001964 |
| QUINTESSA_001639 (Slipsheet) | QUINTESSA_001864 | QUINTESSA_001966 |
| QUINTESSA_001640 (Slipsheet) | QUINTESSA_001866 | QUINTESSA_001968 |
| QUINTESSA_001641 (Slipsheet) | QUINTESSA_001867 | QUINTESSA_001970 |
| QUINTESSA_001642 (Slipsheet) | QUINTESSA_001871 | QUINTESSA_001972 |
| QUINTESSA_001643 (Slipsheet) | QUINTESSA_001876 | QUINTESSA_001974 |
| QUINTESSA_001644 (Slipsheet) | QUINTESSA_001877 | QUINTESSA_001979 |
| QUINTESSA_001645 (Slipsheet) | QUINTESSA_001878 | QUINTESSA_001982 |
| QUINTESSA_001646 (Slipsheet) | QUINTESSA_001882 | QUINTESSA_001985 |
| QUINTESSA_001647 (Slipsheet) | QUINTESSA_001887 | QUINTESSA_001992 |
| QUINTESSA_001648 (Slipsheet) | QUINTESSA_001892 | QUINTESSA_001998 |
| QUINTESSA_001649 (Slipsheet) | QUINTESSA_001896 | QUINTESSA_002000 |
| QUINTESSA_001650 (Slipsheet) | QUINTESSA_001899 | QUINTESSA_002003 |
| QUINTESSA_001651 (Slipsheet) | QUINTESSA_001904 | QUINTESSA_002008 |
| QUINTESSA_001652 (Slipsheet) | QUINTESSA_001905 | QUINTESSA_002012 |
| QUINTESSA_001653 (Slipsheet) | QUINTESSA_001906 | QUINTESSA_002015 |
| QUINTESSA_001654 (Slipsheet) | QUINTESSA_001907 | QUINTESSA_002018 |
| QUINTESSA_001655 (Slipsheet) | QUINTESSA_001911 | QUINTESSA_002022 |
| QUINTESSA_001656 (Slipsheet) | QUINTESSA_001916 | QUINTESSA_002028 |
| QUINTESSA_001657 (Slipsheet) | QUINTESSA_001920 | QUINTESSA_002031 |
| QUINTESSA_001658 (Slipsheet) | QUINTESSA_001693 (Slipsheet) | QUINTESSA_002036 |
| QUINTESSA_001659 (Slipsheet) | QUINTESSA_001694 (Slipsheet) | QUINTESSA_002039 |
| QUINTESSA_001660 (Slipsheet) | QUINTESSA_001695 (Slipsheet) | QUINTESSA_002043 |
| QUINTESSA_001661 (Slipsheet) | QUINTESSA_001696 (Slipsheet) | QUINTESSA_002046 |
| QUINTESSA_001662 (Slipsheet) | QUINTESSA_001697 (Slipsheet) | QUINTESSA_002050 |
| QUINTESSA_001663 (Slipsheet) | QUINTESSA_001698 (Slipsheet) | QUINTESSA_002055 |
| QUINTESSA_001664 (Slipsheet) | QUINTESSA_001699 (Slipsheet) | QUINTESSA_002059 |
| QUINTESSA_001665 (Slipsheet) | QUINTESSA_001700 (Slipsheet) | QUINTESSA_002065 |
| QUINTESSA_001666 (Slipsheet) | QUINTESSA_001701 (Slipsheet) | QUINTESSA_002070 |
| QUINTESSA_001667 (Slipsheet) | QUINTESSA_001702 (Slipsheet) | QUINTESSA_002075 |
| QUINTESSA_001668 (Slipsheet) | QUINTESSA_001703 (Slipsheet) | QUINTESSA_002080 |
| QUINTESSA_001669 (Slipsheet) | QUINTESSA_001704 (Slipsheet) | QUINTESSA_002094 |
| QUINTESSA_001670 (Slipsheet) | QUINTESSA_001705 (Slipsheet) | QUINTESSA_002103 |
| QUINTESSA_001671 (Slipsheet) | QUINTESSA_001706 (Slipsheet) | QUINTESSA_002112 |
| QUINTESSA_001672 (Slipsheet) | QUINTESSA_001707 (Slipsheet) | QUINTESSA_002125 |
| QUINTESSA_001673 (Slipsheet) | QUINTESSA_001708 (Slipsheet) | QUINTESSA_002133 |
| QUINTESSA_001674 (Slipsheet) | QUINTESSA_001709 (Slipsheet) | QUINTESSA_002144 |
| QUINTESSA_001675 (Slipsheet) | QUINTESSA_001710 (Slipsheet) | QUINTESSA_002151 |
| QUINTESSA_001676 (Slipsheet) | QUINTESSA_001711 (Slipsheet) | QUINTESSA_002158 |
| QUINTESSA_001677 (Slipsheet) | QUINTESSA_001712 (Slipsheet) | QUINTESSA_002168 |
| QUINTESSA_001678 (Slipsheet) | QUINTESSA_001713 (Slipsheet) | QUINTESSA_002175 |
| QUINTESSA_001679 (Slipsheet) | QUINTESSA_001714 (Slipsheet) | QUINTESSA_002181 |
| QUINTESSA_001680 (Slipsheet) | QUINTESSA_001715 (Slipsheet) | QUINTESSA_001685 (Slipsheet) |

Alvarez & Marsal
Auler v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001681 (Slipsheet) | QUINTESSA_001716 (Slipsheet) | QUINTESSA_001686 (Slipsheet) |
| QUINTESSA_001682 (Slipsheet) | QUINTESSA_001688 (Slipsheet) | QUINTESSA_001687 (Slipsheet) |
| QUINTESSA_001683 (Slipsheet) | QUINTESSA_001689 (Slipsheet) | QUINTESSA_001692 (Slipsheet) |
| QUINTESSA_001684 (Slipsheet) | QUINTESSA_001690 (Slipsheet) | QUINTESSA_001691 (Slipsheet) |

Adler v. Quintessa, et al.                                                                                          Privileged & Confidential

## Exhibit 1
### Documents Considered

| Documents |
| --- |

### Court Filings
- Plaintiff's Third Amended Complaint, dated as of May 27, 2022
- Plaintiffs' Designation of Expert Witnesses, dated as of July 14, 2022

### Depositions
- Deposition of Lauren Von McNeil Mingee, dated April 13, 2022

### Data Provided by Quintessa
- 2019-2022 Adler Keywords and Search terms.xlsx
- Campaign Export From Google.xlsx
- CRM Billing Exports.xlsx

### Research
- "Personal Injury Lawyers & Attorneys Industry in the US- Market Research Report" (https://www.ibisworld.com/united-states/market-research-reports/personal-injury-lawyers-attorneys-industry/)

- "6 Tips for Marketing Your Personal Injury Practice" (https://onward.justia.com/6-tips-for-marketing-your-personal-injury-practice/)

- "About Quality Score", Google Ads Help (https://support.google.com/google-ads/answer/6167118?hl=en)

- "Why Are Clicks Becoming More Expensive? Understanding CPC Inflation in Google Ads" (https://www.evoluted.net/thinktank/marketing/cpc-inflation)

- "How Much Do Google Ads Cost: 2021 vs. 2022" (https://videnglobe.com/blog/how-much-do-google-ads-cost-2021-vs-2022)

- "3 Trends that Explain Why your CPC is Rising" (https://postclick.com/blog/why-cpc-rises/)

- "About keywords in Seach Network Campaigns", Google Ads Help (https://support.google.com/google-ads/answer/1704371?hl=en)

- "Exact Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407781?hl=en#:~:text=A%20keyword%20match%20type%20that,both%20phrase%20and%20broad%20match.)

- "Phrase Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/11586965?hl=en)

- "Broad Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407779?hl=en&ref_topic=24936)

- "Create a Search Campaign", Google Ads Help (https://support.google.com/google-ads/answer/9510373?zippy=)

- "Click-to-Call Ads" (https://www.marchex.com/feature/click-to-call-ads/#:~:text=Digital%20ads%20that%20drive%20phone,click%20on%20a%20mobile%20device)

- "About call ads", Google Ads Help (https://support.google.com/google-ads/answer/6341403?hl=en)

- "Go Mobile! Series: Introducing click-to-call phone numbers in local ads on mobile devices" (https://adwords.googleblog.com/2010/01/introducing-click-to-call-phone-numbers.html)

- "A Fast Start to 2017 for Click-to-Call Ads" (https://www.blog.google/products/ads/fast-start-2017-click-call-ads/)

- "The Evolution of Google AdWords- A $38 Billion Advertising Platform" (https://www.wordstream.com/blog/ws/2012/06/05/evolution-of-adwords#:~:text=October%2023%2C%202000%2C%20will%20be,online%20advertising%20platform%20%E2%80%93%20Google%20AdWords.)

- "Analyzing Cost-per-Click Inflation in the Marketplace" (https://searchengineland.com/analyzing-cost-per-click-inflation-in-the-marketplace-166634)

- "Use Auction Insights to Compare Performance" (https://support.google.com/google-ads/answer/2579754?hl=en#zippy=%2Cposition-above-rate-search-campaigns-only%2Coutranking-share%2Cabsolute-top-of-the-page-rate-search-campaigns-only)

- "About Us" (https://www.jimadler.com/about-us/)

- "Our Practice Areas" (https://www.jimadler.com/practices/)

- "Quintessa Marketing LinkedIn" (https://www.linkedin.com/company/quintessamarketing/about/)

- "Quintessa Marketing: Home Page" (http://quintessamarketing.com/)

- "Quality Score: Definition", Google Ads Help (https://support.google.com/google-ads/answer/140351?hl=en).

- "The Ad Auction", Google Ads Help (https://support.google.com/google-ads/answer/1704431).

- "About Ad Position and Ad Rank", Google Ads Help (https://support.google.com/google-ads/answer/1722122?hl=en&ref_topic=3121771).

- *15 U.S. Code § 1117, Recovery for Violation of Rights*

- *Lanham Act § 35(a).*

# David M. Leathers, ASA, CFE

Managing Director – Alvarez and Marsal Disputes and Investigations, LLC

dleathers@alvarezandmarsal.com

700 Louisiana Street
Suite 3300
Houston, TX 77002
Tel: (713) 300-8240
Cell: (713) 505-5022

**Certifications**

Accredited Senior Appraiser (ASA)

Certified Fraud Examiner (CFE)

**Professional Experience**

Managing Director,
Sirius Solutions

Managing Director,
Huron Consulting Group

Vice President,
Charles River Associates

Principal and Senior
Consultant,
PricewaterhouseCoopers

Bank United of Texas

**Education & Credentials**

Bachelor of Business
Administration, Finance,
Hankamer School of
Business, Baylor University

Post graduate studies Bauer
College of Business,
University of Houston, and
Jesse H. Jones Graduate
School of Management,
Rice University

David Leathers brings over 20 years of experience in assisting companies, boards of directors, individuals and legal counsel with the economic, valuation and accounting issues that arise during transactions, disputes and investigations. He has testified in both federal and state courts around the United States as well as in both U.S. and international arbitration matters, and has been appointed as a special master to assist courts on financial and accounting matters.

David's practice focuses on the technology and energy sectors. His experience includes the analysis of accounting, financial, marketing and other business information to assess the economic impact of business events and negotiation decisions. He often advises clients on business valuation and the valuation of oil and gas related entities or intellectual property assets in connection with licensing and joint venture transactions, commercial disputes, fraudulent transfer claims, capital raising activities, merger and acquisitions, and inter-company and other transactions.

Specific to the oil and gas industry, he has significant experience in the valuation of working interests, midstream economics, drilling contract damages, and crude oil trading and exchange agreements.

David's experience has also covered a number of other industries, products and technologies, including real estate, hospitality, media, software, semiconductor, biotechnology and pharmaceutical, medical device, banking and financial services, wireless, satellite and telecommunications, automotive, hazardous waste disposal, healthcare, gaming and various consumer products.

## Transactions

- Prepared valuations to support the reasonableness of proposed purchase and sale agreements, the acquisition or sale of stock, and the spin-off of assets or business entities.

- Prepared valuations and financial analysis for purposes of purchase price allocation, tax reporting, and bankruptcy and solvency related matters.

- Participated in numerous due diligence projects related to an investment or acquisition of businesses, oil and gas assets, or intellectual property.

- Participated in license negotiations for technologies ranging from semiconductor manufacturing to protein therapy.

Note: Alvarez & Marsal employs CPAs but it is not a licensed CPA firm

David M. Leathers, ASA, CFE

**Professional Associations**

Society of Petroleum
Engineers

American Society of
Appraisers

Institute of Business
Appraisers

National Association of
Certified Fraud Examiners

Licensing Executives
Society – Royalty Rate
Survey Chair

Rice Alliance Advisory
Board

- Prepared valuations of a variety of intangible assets, early stage technologies, and oil and gas related entities, including valuation analyses to support a licensing, sale or joint venture transaction.

- Advised clients in a wide-range of strategic consulting assignments related to the management of intellectual property, including the licensing and sale of intangible assets, technology transfer strategies, intellectual property portfolio evaluation, and royalty audits.

- Developed and managed the implementation of reengineering plans; analyzed corporate and business unit profitability; performed financial analysis to support general strategic planning; coordinated a general ledger conversion; and participated in the post-acquisition merger integration process.

## *Disputes*

- Advised corporate counsel and performed financial and economic analysis in numerous breach of contract, business interruption, breach of fiduciary duty, bankruptcy and fraudulent transfer matters, including matters arising from crude oil supply and production agreements, natural gas delivery and storage contracts, off-shore drilling contracts, unconventional and enhance oil recovery projects, and various merger and acquisition transaction disputes.

- Calculated numerous business impairment and lost profit damages.

- Evaluated economic damages, including the determination of reasonable royalties, involving patent, trademark, and copyright infringement matters as well as misappropriation of trade secrets, involving a wide range of industries, products and technologies.

- Performed analysis related to market supply and demand, evaluated product pricing and manufacturing capacity, assessed industry profit margins, investigated the availability of acceptable alternatives, and analyzed fixed, variable and incremental costs.

- Reviewed and analyzed hundreds of patent and technology license agreements.

- Evaluated economic damages and determined the fair value and fair market value of businesses involving various minority shareholder disputes, such as dissenting shareholder, shareholder oppression, breach of fiduciary and breach of contract related matters.

- Provided expert testimony in federal and state court and arbitration proceedings, including testimony related to lost profits, business valuation, various state and federal securities actions, energy supply and production contracts, patent and trademark infringement, reasonable royalty, misappropriation of trade secrets, minority shareholder disputes, and insurance disputes, among others.

### *Investigations*

- Performed investigations regarding allegations of breach of fiduciary responsibility and accounting irregularities.
- Led financial and forensic accounting investigations in various countries around the world resulting from allegations of inappropriate behavior and suspected violations of the Foreign Corrupt Practices Act (FCPA) by U.S. corporations, their agents or partners and foreign executives of operating divisions.
- Developed and implemented audit plans and programs for international investigations and internal control assessments, including employee related taxes and benefits, agent agreements and customs and duty payments, among others.
- Conducted internal investigations on behalf of audit and special committees of Boards of Directors in connection with instances of suspected embezzlement or other related fraudulent activity such as inventory diverting and vendor "kick-back" schemes.

### *Testimony Experience*

- CWC Holdings, LLC v. Michael Christian Kanady and Echo Energy, LLC; District Court of Oklahoma County, State of Oklahoma, Case No. CJ-2021-29.
- Segundo Navarro Drilling, Ltd. v. Johnny Chilton and San Ramon Ranch Mineral Partners, Ltd.; District Court for the District of Dallas County, 160th Judicial District, Cause No. DC-20-18518.
- Jacam Chemical Company 2013, LLC v. Arthur H. Shepard Jr. and GEO Chemicals, LLC; United States District Court for the District of North Dakota, Western Division; Civil Action No. 1:19-cv-00093.
- Fremont Emergency Services (Mandavia), Ltd., et al. v. UnitedHealthGroup, Inc., et al.; District Court Clark County, Nevada, Case No. A-19-792978-B.
- TravelPass Group, LLC, et al. v. Caesars Entertainment Corporation, et al.; United States District Court for the Eastern District of Texas, Texarkana Division; Civil Action No. 5:18-cv-00153.
- SportsPower Ltd., a Hong Kong Limited Company v. Crowntec Fitness Mfg. Ltd., a Taiwanese Limited Company and LI-JU HSIANG, an individual; United States District Court for the Eastern District of Texas, Sherman Division; Civil Action No. 4:19-cv-00066.
- Caprock Permian Processing LLC v. Primoris Services Corporation, and Primoris T&D Services, LLC; District Court of Dallas County, Texas, 14th Judicial District, Cause No. DC-19-16644.
- Linksmart Wireless Technology, LLC v. Panasonic Avionics Corp.; United States District Court Central District of California; Civil Action No. 8:18-cv-00662.
- Saul Horowitz as Sellers' Representative v. National Gas & Electric, LLC and Spark Energy, Inc.; United States District Court for the Southern District of New York; Civil Action No. 17-cv-7742.

- J. Steve Pursley v. Shaun Mooney, Recruitment Partners, L.P., and International Recruitment Corporation; District Court of Harris County, Texas, 281th Judicial District, Cause No. 2017-28294.

- Wayne Harwell v. Texas Next Capital, LP., Texas Next Management, LLC, Texas Next Services, LLC, Steven A. Hassmann, John C. Kerr and Matthew W. Murphy; District Court of Bexar County, Texas, 166th Judicial District, Cause No. 2017CI03737.

- Expedia, Inc. and EAN.Com, LP v. TravelPass Group, LLC, Partner Fusion, Inc. and Reservation Counter, LLC; American Arbitration Association, No. 01-17-002-2312.

- Ace Venture Opportunities for Airbnb, S.P. v. ADIT Ventures, LLC, f/k/a PSP Ventures II, LLC, et al.; American Arbitration Association, No. 01-19-0001-0613, New York, New York.

- M-I L.L.C. d/b/a M-I Swaco v. Q'Max Solutions, Inc., Q'Max America, Inc., and Sanjit Roy; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:18-CV-01099.

- Polygon PNG L.P., et al. v. InterOil Corporation, et al.; American Arbitration Association, No. 01-18-0000-7023, Houston, Texas.

- Finalrod IP, LLC and R2R and D, LLC d/b/a Superod v. John Crane, Inc. and John Crane Production Solutions, Inc., Endurance Lift Solutions, Inc.; United States District Court for the Western District of Texas, Midland/Odessa Division; Civil Action No. 7:15-cv-00097.

- TechnipFMC PLC v. Samik Mukherjee and McDermott International, Inc.; District Court of Harris County, Texas, 164th Judicial District, Cause No. 2018-53084.

- JSC Georgian Oil and Gas Corporation (Georgia) and LEPL State Agency of Oil and Gas (Georgia) v. Frontera Resources Georgia Corporation (Cayman Islands/U.S.A.); Arbitration Under the United Nations Commission on International Trade Law 1976; PCA Case No. 2018-02.

- DynaStudy, Inc. v. Houston Independent School District; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:16-CV-01442.

- Bordelon Marine, Inc. v. Energy XXI GOM, Inc.; United States District Court Eastern District of Louisiana; Civil Action No. 2:15-CV-00815.

- Prisua Engineering Corporation v. Samsung Electronics., Ltd, et al.; United States District Court for the Southern District of Florida; Case No. 16-CV-21761.

- Charles Dresser, IV v. Varun Mishra and Collin King; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:16-CV-1285.

- Newpark Resources, Inc. and Newpark Drilling Fluids, LLC. v. Ecoserv, LLC.; District Court of Harris County, Texas, 80th Judicial District, Cause No. 2015-40104.

- LDHJ, LLC v. Gerardus Smith; District Court of Grayson County, Texas, 15th Judicial District, Cause No. CV-15-1228.

- William Jones, Ameritech College Operations, LLC, Ameritech College Holdings, LLC, Ameritech College, LLC, and Ameritech Manager, LLC v. Main Street Capital Corporation, HMS Income Fund, Inc., Main Street Equity Interests, Inc., HMS Equity Holdings, LLC, and Wasatch Ameritech Holdings, LLC; American Arbitration Association, No. 01-16-00004502, Houston, Texas.

- Khaled Alattar and LuxeYard, Inc. v. Kevan Casey, et al.; District Court of Harris County, Texas, 113th Judicial District, Cause No. 2012-54501.

- Eni US Operating Co. Inc. v. Transocean Offshore Deepwater Drilling, Inc.; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:13-cv-03354.

- Collins, Edmonds, Pogorzelski, Schlather & Tower, PLLC v. Internet Machines, LLC; Steven C. Sereboff; Francis P. Knuettel, II; Internet Machines MC, LLC; and Social IP Law Group, LLP; District Court of Harris County, Texas, 295th Judicial District, Cause No. 2015-25448 (Arbitration by Agreement).

- Michael Brauser, et al. v. Sanders Morris Harris, Inc., et al; District Court of Harris County, Texas, 80th Judicial District, Cause No. 2015-11227.

- Walrus Brands, L.L.C. v. Peaches Uniform, Inc; United States District Court for the Northern District of Illinois; Civil Action No. 1:12-cv-04892.

- NGS Sub Corp., Evolution Petroleum Corporation, and Tertiaire Resources Company v. Denbury Onshore, LLC; District Court of Harris County, Texas, 133rd Judicial District, Cause No. 2013-74863.

- Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:14-cv-01289.

- UltraClean Electropolish, Inc. v. Astro Pak Corporation; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:14-cv-03635.

- Murex, LLC v. Bridger Rail Shipping, LLC and Bridger Group, LLC. American Arbitration Association, No. 01-14-00001314, Houston, Texas.

- In the Matter of the Arbitration Between Hanwha Resources (USA) Corporation, et al. v. O'Ryan Oil and Gas, et al., Houston, Texas.

- John K. Meyer, et al. v. JP Morgan Chase Bank, N.A., Individually/Corporately and as Trustee of the South Texas Syndicate Trust, District Court of Bexar County, Texas, 225th Judicial District, Cause No. 2010-CI-10977.

- Personal Audio, LLC v. CBS Corporation; United States District Court for the Eastern District of Texas, Marshall Division; Civil Action No. 2:13-CV-00270-JPG-RSP.[1]

- North Plains Energy, LLC v. TAM International, Inc., District Court of Harris County, Texas, 234th Judicial District, Cause No. 2012-47659.

- FUNimation Entertainment v. A.D. Vision, Inc., et al., District Court of Harris County, Texas, 151th Judicial District, Cause No. 2011-67220.

- New Process Steel, L.P. v. Jimmy C. Kollaja, District Court of Harris County, Texas, 164th Judicial District, Cause No. 2012-202260.

- Orca Assets, G.P. L.L.C., v. JP Morgan Chase Bank, N.A., et al., District Court Dallas County, Texas B-44th Judicial District, Cause No. DC-12-05303

---

[1] Includes testimony in related cases: 2:13-cv-00577, 2:13-cv-00271, 2:13-cv-00015, and 2:13-cv-00014.

- Susman Godfrey, L.L.P., v. T.C. Petroleum, Inc., JAMS Arbitration No. 1310020051, Houston, Texas.

- West Fork Advisors, LLC v. Sungard Consulting Services, et al., District Court Dallas County, Texas, Cause No. 12-00681.

- Burlington Resources Oil and Gas Company LP and GeoSouthern Dewitt Properties, LLC v. Orca Assets GP, LLC, District Court of Dewitt County, Texas 267th Judicial District, Cause No. 11-08-22,038.

- British American Offshore Limited v. TCW Global Project Fund II, Ltd., TCW Asset Management Company, and Trust Company of the West, District Court Harris County, Texas 189th Judicial District, Cause No. 2005-64490.

- American Senterfitt, Bill Bankston, Donald Neumeyer and Ruben S. Martin, III v. Scott D. Martin, Agreement of Parties in Cause No. 2010-21210, 55th Judicial District Court of Harris County, Texas.

- Shell Trading (US) Company v. Lion Oil Trading & Transportation, Inc., District Court Harris County, Texas, 270th Judicial District, Cause No. 2009-11659.

- GPS Industries, Inc., United States Bankruptcy Court for the Middle District of Florida, Tampa Division, Case No. 09-16766-CPM.

- John M. Hopper et al. v. Asim Zafar et al., District Court Harris County, Texas, 152nd Judicial District, Cause No. 2010-19789.

- Ametek, Inc. et al. v. Eralytics GmbH et al., District Court Harris County, Texas, 157th Judicial District, Cause No. 2007-76056.

- Cambrex Corporation v. Celgene Corporation, Superior Court of New Jersey, Law Division: Bergen County, L-378-08.

- Industrial Recovery Capital Holdings Co., et al. v. Harold C. Simmons et al., District Court Dallas County, Texas, K-192nd Judicial District, Cause No. 07-04855.

- Expro Americas, LLC v. Boots & Coots International Well Control, Inc., Michael L. Clark, Robert T. Hendrix and Glendell S. Hendrix; District Court Harris County, Texas, 281st Judicial District, Cause No. 2007-447397.

- OPTi Inc. v. Advanced Micro Devices, Inc.; United States District Court for the Eastern District of Texas, Marshall Division; Civil Action No. 2:06-CV-00477.

- Mary Kay Inc. v. Amy L. Weber, Scott J. Weber and Touch of Pink Cosmetics; United States District Court for the Northern District of Texas; Civil Action No.3:08-CV-0776-G.

- The Manhattan Life Insurance Company, et al. v. Family Life Corporation, et al.; District Court Harris County, Texas, 215th Judicial District, Cause No. 2007-22937.

- Eugene S. Crist, et al. v. St. James Capital Corp., et al.; District Court Harris County, Texas, 129th Judicial District, Cause No. 2004-7033.

- Personalysis Corp. v. Hardwired, Inc., et al.; District Court Harris County, Texas, 215th Judicial District, Cause No. 2004-31493.

- Abraham's Oriental Rugs, Inc. v. CenterAmerica Property Trust, L.P. and Dutch Plaza Properties, Ltd.; District Court Harris County, Texas, 295th Judicial District; Cause No. 2003-31,693.

- Jeffrey A. Kozak v. Medtronic, Inc., United States District Court for the Southern District of Texas Houston Division; Civil Action No. H-03-4400.

- Forest Hunter Smith v. Anglo-Dutch Petroleum International; District Court of Harris County, Texas; 133rd Judicial District Court Cause No. 2004-48332.

- Biomedical Design, Inc. v. Medtronic, Inc.; American Arbitration Association No: 30 Y 133 00608 04, Atlanta, Georgia.

- Willis Energy, L.L.C. v. El Paso Production Company and El Paso Corporation; District Court of Harris County, Texas, 133rd Judicial District Cause No. 2003-13275.

- DMF Leasing, Inc. v. Budget Rent-A-Car of Maryland, Inc., et al.; In the Circuit Court for Montgomery County, Maryland; Civil Action No. 252952.

- The Maryland Jockey Club, et al., v. ODS Technologies, L.P.; United States District Court for the District of Maryland; Civil Action WMN-03-2124.

- IronPort Systems, Inc. v. Ciphertrust, Inc.; United States District Court Northern District of California San Francisco Division; Case No. C 03-05037 CRB (JCS).

- PJS of San Antonio, Inc. and PJS of Texas, Inc. v. Tim Clark, SweepTx, Inc., et al; District Court of Travis County, Texas, 261st Judicial District; Cause No. GN201499.

- Hilcom Partners, Ltd. v. Moore & Associates, Inc.; American Arbitration Association, Houston Texas.

- Comerica Bank vs. Picus International, Inc., Kenneth J. Swieter and Kent Elsbree; District Court Dallas County, Texas, 95th Judicial District, No. 00-02147.

- E. Peter Healey v. Samuels Jewelers; American Arbitration Association No. 70 160 00034 01, Austin Texas.

- Franklin S. Chow, M.D. v. United States Surgical Corporation; United States District Court for the District of Colorado; Civil Action No. 00-M-1228.

- Parrot-Ice Drink Products of America, Ltd. , and Greg Johnson v. DWS, Inc., d/b/a Selection Unlimited, and Derrick Senior; United States District Court Southern District of Texas; Civil No. H-99-2285.

### *Recent Articles and Presentations*

David has taught numerous Continuing Education courses to outside and in-counsel on economic damages, business valuation, and various accounting and financial issues that arise during transactions, disputes and investigations. He has also lectured at the University of Houston School of Law and the University of Texas IC2 Institute. Recent publications and speaking engagements include the following:

- "Book of Wisdom Refresher and What Implication COVID May have on the Book of Wisdom" – 58th Annual Conference on Intellectual Property Law, Institute for Law and Technology, Plano, Texas, November 10, 2020.

- "Joint Venture Trends" – Institute of Energy Law Merger & Acquisitions in Energy Law Conference, Houston, Texas May 17, 2018.

- "Intellectual Property Valuation and Damages: Nuts and Bolts in 2018" – The Knowledge Group, May 8, 2018.

- "In-House Perspective on Internal Investigations" – 29th Annual International Law Institute, Houston, Texas, February 23-24, 2017

- "Strategic Licensing: Advanced Skills & Tools" Licensing Executives Society, Houston, Texas, February 25-28, 2014.

David M. Leathers, ASA, CFE

- "The Law of Fraudulent Transfer Applied to Intellectual Property" – Licensing Executives Society Houston Chapter Meeting, January 16, 2014.

- "Intellectual Property Valuation" – Licensing Executives Society Austin Chapter Meeting, May 16, 2013.

- "What Rate to Use: LES Royalty Rate Survey Methods and Results" – Licensing Executive Society Webinar, April 10, 2013.

- "Intellectual Property Valuation" – Licensing Executives Society Dallas Chapter Meeting, November 1, 2012.

- "Cloud Computing Primer for the IP Professional" – David Leathers and Shayne Phillips, 28th Annual Institute on Intellectual Property Law, October 4-6, 2012.

- "Lower Costs and Achieve Compliance through Enterprise Content Management" – David Leathers, Marilyn Kibler-Colón, and Derek Hall, Sirius Solutions Legal Advisory, October 2011.

- "Hot Topics in Corporate Disputes and Investigations: Stories from the Trenches" – 2011 Spring Accounting Expo, Houston CPA Society, May 23, 2011.

- "The Importance of the Gulf of Mexico in Determining U.S. Energy Policy" – David Leathers and David Lerman, Sirius Solutions Global Energy Advisory, March 18, 2011.

- "Essential Principles & Tools of Licensing" – Licensing Executives Society Professional Development Series (PDS 200), Houston, Texas, February 28 – March 3, 2011.

- "Chemicals Energy Environmental & Materials Royalty Rate Review" – 2010 Licensing Executives Society Annual Meeting, Chicago, Illinois, September 27, 2010.

- "Growth Areas Emerging in High Tech" – Consulting Magazine, January/February 2010.

- "Accounting for Attorneys and Understanding Financial Statements" – TexasBar CLE: 6th Annual Advanced In-House Counsel Course, In-House Counsel Boot Camp, August 15, 2007.

Alvarez & Marsal
Adler Opposition.com

Privileged & Confidential

**Exhibit 3**



| Pre-Anderson Damage Period | | | | |
|---|---|---|---|---|
| Quarter | Total Spend | Total Clicks | CPC | Percent Change in CPC |

Pre-Anderson Damage Period:



| Anderson Damage Period | | | | |
|---|---|---|---|---|
| Quarter | Total Spend | Total Clicks | CPC | Percent Change in CPC |

Anderson Damage Period:

Q1 2017 through Q2 2022:

*Sources:*
* *ADLER_000619-000623; ADLER_000689*

*Notes:*

Alvarez & Marsal

Privileged & Confidential

## Exhibit 4
**AILC Impressions Regression Analysis - Summary Output**

*Regression Equation:  Adler Branded CPC ~ Month (Trend) + AILC Impressions*



**Regression Statistics**

| ANOVA | | | | | |
|---|---|---|---|---|---|
| | df | SS | MS | F | Significance F |
| Regression | | | | | |
| Residual | | | | | |
| Total | | | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | | | | | | | | |
| Month (Trend) | | | | | | | | |
| AILC Impressions | | | | | | | | |

*Sources:*

* *ADLER_000619-000623; ADLER_000689.*

* *Quintessa_000002*

*Notes:*

*This was performed on a monthly summary of Adler's CPC and AILC's Impressions for the following keywords: ▮▮▮▮▮ ▮▮▮▮▮▮▮ ", ▮▮▮▮▮▮ ", and ▮▮▮▮▮▮ ." The monthly summary was limited to "exact matches" by both Adler and AILC. This regression analysis was limited to the period from June 2017 to December 2021, when data for both AILC Impressions and Adler's CPC were available.*

Alvarez & Marsal
Author's Questions, et al.

Privileged & Confidential

**Exhibit 5**
**Adjusted Anderson Average Calculation (Schedule 4.2)**



Source:
* Anderson Report Schedule 4.2
* Exhibit 1

**Exhibit 6**

**AILC Estimated Revenue from Adler Keywords**



**Campaigns that Included Adler Keywords:**

**Adler Clicks:**

**Adler Calls:**

*Sources:*

* Campaign Export From Google.xlsx

* CRM Billing Exports.xlsx

* 2019-2022 Adler Keywords and Seach terms.xlsx

Abney & Versalo
Adler v. Quintessa, et al.

Privileged & Confidential

# Exhibit 7
## AILC's Google Advertising Expenses for Adler Keywords

| Year | Adler Clicks | Adler Calls | Ad Cost |
|------|--------------|-------------|---------|
| 2019 | | | |
| 2020 | | | |
| 2021 | | | |
| 2022 | | | |
| | | | |

*Source:*

\* *2019-2022 Adler Keywords and Search terms.xlsx*

Alvarez & Marsal

Privileged & Confidential

## Exhibit 8
**AILC Incremental Profit and Loss for Adler Keywords**



<u>**Campaigns that Included Adler Keywords:**</u>

| 2019 | 2020 | 2021 | 2022 | Total |
|------|------|------|------|-------|

<u>**Adler:**</u>

_Sources:_

\* _Campaign Export From Google.xlsx_

\* _CRM Billing Exports.xlsx_

\* _2019-2022 Adler Keywords and Seach terms.xlsx_

\* _Exhibit 6_

\* _Exhibit 7_

Alvarez & Marsal
Highly Confidential
Privileged & Confidential

## Exhibit 9

**AILC's Clicks and Calls for Searched Terms Containing the Adler Marks from January 1, 2019 through August 10, 2022**



*Sources:*

* 2019-2022 Adler Keywords and Seach terms.xlsx

* Exhibit 9a

*Note:*

The total clicks and spend differ between Exhibit 7 and Exhibit 9 because Exhibit 9 is based on a Google download wherein Google does not include searches that do not meet Google's minimum user search volume

Attorney & Client Confidential
Developed as Confidential

Exhibit 9a

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|-----------|--------|------|---------------------------------------------------------------|

Alvarez & Marsal

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|--------------------------------------------------|

Aherm & Marai         Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|---------------------------------------------------------------|

Alonso & Marsal — Privileged & Confidential



| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|-----------------------------------------------------------------|

Ahdani & Marsal
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|----------------------------------------------------------------|



Alvarez & Marsal

Privileged & Confidential



| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|------------------------------------------------------------|

Ahneu & Marai

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|------------------------------------------------------------------|

Alvarez & Marsal

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Alvers & Marsal
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|-------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Alvero & Marsi

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|----------------------------------------------------------------|

Alvens & Marsal
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|---------------------------------------------------------------|

Alvero & Marsi
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------|

Ahmed & Marai
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|-------------------------|-------------------------|------------|--------|------|-----------------------------------------------------------------|

Ahrens & Marsi
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|-----------------------------------------------------------------|

Alonso & Marsal
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Alvarez & Marsal

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|---------------------------------------------------------------|

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|-------------------------|-------------------------|------------|--------|------|------------------------------------------------------------------|

Alvarez & Marsal

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Alvarez & Marsal
Privileged & Confidential



| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and |
|------|------------------------|------------------------|-----------|--------|------|---------------------------------------|

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|-------------------------|-------------------------|------------|--------|------|-----------------------------------------------------------------|

Aireen & Marai
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|-----------|--------|------|----------------------------------------------------------------|

Ahmed & Marai

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|----------------------------------------------------------------|

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|---------------------------------------------------------------|

Alpers & Marsal
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|

Privileged & Confidential



| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|---|---|---|---|---|---|---|

Attorney & Marsai
Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|------------------------|------------|--------|------|----------------------------------------------------------------|

Alvarez & Marsal

Privileged & Confidential

| Year | AILC Purchased Keywords | Google User Search Term | Match type | Clicks | Cost | Search Term Related to Adler Marks and Obtaining Legal Services |
|------|------------------------|-------------------------|------------|--------|------|----------------------------------------------------------------|



# EXHIBIT 9

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                       DALLAS DIVISION

 4   JIM ADLER, P.C. AND            )

 5   JIM ADLER,                     )

 6          Plaintiffs             )

 7                                  )

 8   VS.                            )CIVIL ACTION

 9                                  )NO. 3:19-cv-02025-K-BN

10   MCNEIL CONSULTANTS, LLC,       )

11   D/B/A ACCIDENT INJURY LEGAL    )

12   CENTER, QUINTESSA MARKETING,   )

13   LLC, D/B/A ACCIDENT INJURY     )

14   LEGAL CENTER, AND LAURA        )

15   MINGEE,                        )

16          Defendants            )

17       -------------------------------------------

18               VIDEOTAPED ORAL DEPOSITION OF

19                       LAUREN MINGEE

20                     NOVEMBER 16, 2022

21                ***ATTORNEYS' EYES ONLY***

22       -------------------------------------------

23

24   REPORTED BY KATHRYN R. BAKER, RPR, CSR

25   JOB #219107
```

Case 3:19-cv-02025-K-BN Document 1907-12 Filed 06/22/23 Page 315 of 406 PageID 34783

```
 1              VIDEOTAPED ORAL DEPOSITION OF LAUREN MINGEE,

 2    produced as a witness at the instance of the PLAINTIFFS,

 3    and duly sworn, was taken in the above-styled and numbered

 4    cause on the 16th day of November, 2022, from 9:58 a.m. to

 5    3:19 p.m., before Kathryn R. Baker, CSR, RPR, in and for

 6    the State of Texas, reported by a Texas certified machine

 7    shorthand reporter, at the offices of Lynn, Pinker, Cox,

 8    Hurst & Schwegmann, LLP, 2100 Ross Avenue, Suite 2700, in

 9    the City of Dallas, State of Texas, pursuant to the

10    Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:
      Jered Matthysse, Esq.
 3    Giulio Yaquinto, Esq.
      PIRKEY BARBER PLLC
 4    1801 East 6th Street
      Austin, Texas 78702
 5

 6
      FOR THE DEFENDANTS:
 7    Rebecca Adams, Esq.
      Christopher Schwegmann, Esq.
 8    LYNN PINKER HURST & SCHWEGMANN, LLP
      2100 Ross Avenue
 9    Dallas, Texas 75201

10

11    ALSO PRESENT:
      Mr. Chase Huddleston, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX

 2   Appearances.  .  .  .  .  .  .  .  .  .              3

 3   LAUREN MINGEE

 4        Examination by Mr. Matthysse .  .  .           8

 5   Signature and Changes.  .  .  .  .  .             169

 6   Reporter's Certification .  .  .               171

 7

 8                        EXHIBITS

 9   NO./DESCRIPTION                              PAGE

10   Exhibit 2 (Previously marked).....................    24
         Quintessa Bulk Marketing and Full Service
11       Platform, General Terms of Service
     Exhibit 16 (Previously marked)..................    13
12       Attorney Revenue, 2019-2022
     Exhibit 57 (Previously marked).....................    57
13       December 8, 2022, E-mail from
         QUINTESSA_001297-1298
14   Exhibit 107 (Previously marked)..................    73
         Insurance Call Script
15       QUINTESSA_002490
         ***CONFIDENTIAL***
16   Exhibit 108 (Previously marked)..................    79
         Competitive Call Script
17       QUINTESSA_002595
         ***CONFIDENTIAL***
18   Exhibit 117 (Previously marked)..................    13
         Spreadsheet
19       QUINTESSA_002619
         ***CONFIDENTIAL***
20   Exhibit 129...........................................     9
         Second Amended Notice of Deposition of
21       Quintessa Marketing, LLC
     Exhibit 130...........................................    28
22       August 14, 2020, E-mail from
         accidentintakeforms1@gmail.com
23       QUINTESSA_000339
         ***ATTORNEYS' EYES ONLY***
24

25
```

1                          INDEX

2                        (CONTINUED)

3                         EXHIBITS

4    NO./DESCRIPTION                                    PAGE

5    Exhibit 131...................................      31
            October 5, 2020, E-mail from
6           accidentintakeforms1@gmail.com
            QUINTESSA_000456
7           ***ATTORNEYS' EYES ONLY***
     Exhibit 132...................................      33
8           December 21, 2020, E-mail from
            accidentintakeforms1@gmail.com
9           QUINTESSA_000823
            ***ATTORNEYS' EYES ONLY***
10   Exhibit 133...................................      34
            April 1, 2021, E-mail from
11          accidentintakeforms2@gmail.com
            QUINTESSA_001055
12          ***ATTORNEYS' EYES ONLY***
     Exhibit 134...................................      36
13          April 15, 2021, E-mail from
            accidentintakeforms2@gmail.com
14          QUINTESSA_001088
            ***ATTORNEYS' EYES ONLY***
15   Exhibit 135...................................      37
            June 16, 2021, E-mail from
16          accidentintakeforms2@gmail.com
            QUINTESSA_001143
17          ***ATTORNEYS' EYES ONLY***
     Exhibit 136...................................      40
18          July 6, 2021, E-mail from
            accidentintakeforms2@gmail.com
19          QUINTESSA_001169
            ***ATTORNEYS' EYES ONLY***
20   Exhibit 137...................................      42
            July 21, 2021, E-mail from
21          accidentintakeforms1@gmail.com
            QUINTESSA_001186
22          ***ATTORNEYS' EYES ONLY***
     Exhibit 138...................................      57
23          Settlement Agreement and Release in Full
            of All Claims
24          QUINTESSA_002506
            ***CONFIDENTIAL-ATTORNEYS' EYES ONLY***
25

ATTORNEYS' EYES ONLY

Page 6

```
 1                          INDEX

 2                       (CONTINUED)

 3                        EXHIBITS

 4   NO./DESCRIPTION                                    PAGE

 5   Exhibit 139.....................................    90
         Spreadsheet
 6       QUINTESSA_002596-2598
         ***CONFIDENTIAL***
 7   Exhibit 140.....................................    91
         E-mail Chain
 8       QUINTESSA_002580-2583
         ***CONFIDENTIAL***
 9   Exhibit 141.....................................    96
         E-mail Chain
10       QUINTESSA_002584-2589
         ***CONFIDENTIAL***
11   Exhibit 142.....................................   157
         Defendants' Objections and Responses to
12       Plaintiffs' First Set of Requests for
         Admission
13

14            REQUESTED DOCUMENTS/INFORMATION

15                        (NONE)

16

17              CERTIFIED QUESTIONS

18                        (NONE)

19

20

21

22

23

24

25
```

1    LAUREN MINGEE

2          P R O C E E D I N G S

3          THE VIDEOGRAPHER:  We're now on the record

4    for the video deposition of Lauren Mingee as Quintessa

5    Marketing LLC.  The time is 9:58 a.m. on November 16th,

6    2022, in the matter of Jim Adler, P.C. and Jim Adler vs.

7    McNeil Consultants, LLC, et al., Civil Action Number

8    3:19-cv-02025-K-BN being held in the United States

9    District Court for the Northern District of Texas, Dallas

10   Division.

11          The court reporter is Kat Baker, and the

12   videographer is Chase Huddleston representing TSG

13   Reporting.

14          Today's deposition is being held at Lynn,

15   Pinker, Hurst & Schwegmann in Dallas, Texas.

16          Will counsel please state their appearance

17   for the record.

18          MR. MATTHYSSE:  Jered Matthysse and Giulio

19   Yaquinto with Pirkey Barber, representing plaintiffs.

20          MS. ADAMS:  Rebecca Adams and Chris

21   Schwegmann with Lynn, Pinker, Hurst & Schwegmann, for the

22   defendants.

23          LAUREN MINGEE,

24   having been first duly sworn, testified as follows:

25          (No omissions.)

1                         LAUREN MINGEE

2      the agreement?

3           A.    I don't know that answer.

4           Q.    Okay.

5                      MR. MATTHYSSE:  Let's take a break.

6                      THE VIDEOGRAPHER:  Off the record at

7      11:06 a.m.

8                      (Recess in the proceedings from 11:06 to

9                      11:23 a.m.)

10                     THE VIDEOGRAPHER:  Back on the record at

11     11:23 a.m.

12          Q.    (BY MR. MATTHYSSE)   All right.  Ms. Mingee, are

13     you ready to keep going?

14          A.    Yes, sir.

15          Q.    So I'm going to hand you a document that's on my

16     computer.  It's an Excel spreadsheet.  And this was marked

17     as Quintessa 1 in defendant's document production case.

18     And then I'll ask you some questions about that.

19                     Sound good?

20          A.    Sounds good.

21          Q.    You got it?

22          A.    Yes, sir.

23                     THE REPORTER:  Are you marking this?

24                     MR. MATTHYSSE:  No, it's easier just to

25     reference.

```
 1                        LAUREN MINGEE

 2        Q.   (BY MR. MATTHYSSE)   So Quintessa 1, Ms. Mingee,

 3   it was produced in this case by defendants, and it appears

 4   to be a collection of callers into Quintessa, as

 5   summarized in Quintessa's intake summaries, correct?

 6        A.   Correct.

 7        Q.   Were you involved in collecting and compiling

 8   this data?

 9        A.   No, I was not.

10        Q.   Do you know who was?

11        A.   This was Mike Walker.

12        Q.   Okay.  And so Mike would have, correct, taken

13   this data from your intake -- what was the phrase you-all

14   used for --

15        A.   AI, the accident intake.

16        Q.   -- the accident intake forms that the call

17   center employees fill out, correct?

18        A.   Yes, sir.

19        Q.




24        Q.   Okay.  Okay.  And if you could look around

25   Column E where it says, Description?
```

Case 3:19-cv-02025-K-BN Document 190-12 Filed 08/22/23 Page 323 of 406 PageID 14791

1                      LAUREN MINGEE

2        A.   Yes, sir.

3        Q.   That, correct, is a description provided by a

4   call center employee who spoke on the phone with the PC,

5   right?

6        A.   Yes.

7        Q.   Okay.  And Quintessa 1 appears to be those

8   instances, correct, in which a PC, or at least as

9   summarized by Quintessa's employees, mentioned the word

10  Adler or Hammer, correct?

11       A.   Correct.

12       Q.   And so these are examples of instances in which

13  someone -- a PC called into Quintessa and either mentioned

14  Jim Adler or the Texas Hammer or was looking for Jim

15  Adler, the The Texas Hammer, correct?

16       A.   Correct.

17       Q.   And if a PC -- you understand "PC" as that

18  potential client, right?

19       A.   Yes, sir.

20       Q.   If a PC clicked on one of your -- Quintessa's

21  Google advertisements that appeared after searching for,

22  let's say, Jim Adler, but didn't mention the word Adler or

23  Hammer, they wouldn't be on this list, correct?

24       A.   Correct.

25       Q.   And so if you could look -- you see the bottom

Case 3:19-cv-02025-K-BN Document 192-1 Filed 08/22/23 Page 324 of 406 PageID 14792

1                        LAUREN MINGEE

2     tabs by year?

3          A.    Yes, sir.    The sheets?

4          Q.    Yes.

5          A.    Okay.

6          Q.    And so in -- if you could go to 2018.

7          A.    Yes, sir.

8          Q.    In 2018 there were -- you've got to take away

9     the first line because that is the summary of the columns,

10    and so in 2018 there were 36 such instances, correct?

11         A.    Correct.

12         Q.    And if you go to 2019 and scroll all the way

13    down, there were 454 such instances, correct?

14         A.    Yes.

15         Q.    And then if you could go over to 2020 and scroll

16    all the way down, there were 526 such instances, correct?

17         A.    Correct.

18               THE WITNESS:    Do we have the sheet to

19    reference?    The QM injury.

20               MS. ADAMS:    I can get it.

21               THE WITNESS:    Okay.

22         Q.    (BY MR. MATTHYSSE)    And then if you look at

23    2021 and scroll all the way down, there were 579 such

24    instances, correct?

25         A.    Correct.

Case 3:19-cv-02025-K BN Document 190-1 Filed 08/22/23 Page 325 of 406 PageID 14793

1                        LAUREN MINGEE

2        Q.   And then finally, I believe, this was prepared

3    in February of 2022, so at least at some -- as in January

4    of 2022 there were 28 such instances, right?

5        A.   Correct.

6        Q.   And so stepping back, Ms. Mingee, we talked a

7    bit about this before the break, about folks calling in

8    and looking for or mentioning Jim Adler.

9             Do you recall that?

10       A.   Yes.

11       Q.   And clearly it happens on -- at least multiple

12   times a month; is that right?

13       A.   I don't know the percentage.  That is what I am

14   waiting for to see, how many total QM injury calls were

15   also processing for the year.

16       Q.   Okay.  But I'm asking -- that's not the question

17   I asked.

18             The question I asked is:  That was

19   happening multiple times a month; is that right?

20       A.   Correct.

21       Q.   Okay.  And despite that and the increase from

22   2018 to 2019, Quintessa made no changes to its ad copy; is

23   that right?

24       A.   Correct.

25       Q.   And no changes to your script?

Case 3:19-cv-02025-K-BN Document 190-12 Filed 08/22/23 Page 326 of 406 PageID 14794

1                        LAUREN MINGEE

2        Q.   Okay.  Ms. Mingee, stepping back a bit.

3                  What actions did Quintessa take to preserve

4    documents once it was notified of the lawsuit Adler filed

5    against it?

6        A.   We had not really been in a lawsuit like this

7    before, and when we were notified of it, we started to

8    engage counsel and then started the process of --

9                  MR. SCHWEGMANN:  He's not asking, but don't

10   tell him any conversations that you and I had or you and

11   Becky had about preservation issues.

12                 MR. MATTHYSSE:  Yeah, fair point.

13                 THE VIDEOGRAPHER:  Sorry to interrupt.  Can

14   you move the water bottle over?

15                 THE WITNESS:  So sorry.

16                 MR. MATTHYSSE:  And so, yeah, to be

17   clear --

18                 MR. SCHWEGMANN:  No, you weren't asking,

19   but I just wanted you to be mindful of that.

20                 THE WITNESS:  Okay.

21       Q.   (BY MR. MATTHYSSE)   Yeah.  And so anything that

22   they instructed or you talked to counsel about, I'm not

23   looking for.

24                 But just what did the business do

25   internally once it was notified of the lawsuit, to

1                         LAUREN MINGEE

2    preserve documents?

3         A.   We -- to my knowledge, we didn't start changing

4    any processes or really investigating it until -- until

5    the appeal came through.

6         Q.   Okay.  And that's the Fifth Circuit decision

7    that we discussed?

8         A.   Yes, sir.

9         Q.   And once that happened and you received notice

10   of the Fifth Circuit decision, what did you then do to

11   ensure the documents were -- were being preserved?

12        A.   Once the discovery process came about and we

13   started pulling documentation, we did not know -- we

14   weren't deleting, but we didn't know that things like Top

15   Desk were only keeping data for 14 months.  So once we

16   started trying to pull things for discovery, everything we

17   found out, we then started, of course, correcting.

18                    (Ms. Adams entered the deposition.)

19        Q.   (BY MR. MATTHYSSE)  Okay.

20        A.   If it wasn't preserving.  Unfortunately, we

21   don't have like a head of security or anything like that,

22   so whether it was right or wrong, I thought that

23   everything was just there and not being deleted.

24        Q.   And so when you say "course correcting," what do

25   you mean by course correcting?

Case 3:19-cv-02025-K-BN Document 190-12 Filed 08/22/23 Page 328 of 406 PageID 11796

1                    LAUREN MINGEE

2        A.    When we found out that Top Desk only saves data

3    for 14 months, then we started downloading every month

4    anything that wasn't saving.  If that makes sense.

5        Q.    Okay.  And about when, to the best of your

6    recollection, did Jason Love leave Quintessa?

7                    THE WITNESS:  Do we have that document?

8                    MS. ADAMS:  Yes, we do.

9        A.    I have a document with each one of the start

10   dates.

11                   Jason Love, he left in June of 2020.

12       Q.    (BY MR. MATTHYSSE)  Okay.  Okay.  I think

13   that's when he was hired; is that right?

14       A.    Yep.

15       Q.    Okay.

16       A.    Sorry.

17       Q.    No worries.

18       A.    You are correct.  Thank you for correcting me.

19                   So he started June 15th of 2020.  He left

20   12/8 of 2021.

21       Q.    Okay.  Got it.

22                   And so he left 12/8 of '21.  About

23   when -- well, strike that.

24                   Who is his replacement?

25       A.    We honest -- we didn't end up replacing him

Case 3:19-cv-02025-K-BN Document 190-1 Filed 08/22/23 Page 329 of 406 PageID 14797
ATTORNEYS' EYES ONLY

LAUREN MINGEE

1  until just recently.  So Jason, when he left -- we only

2  have a certain number of Google licenses.  And then after

3  that certain number is up, you have to pay like twice the

4  amount.  So our practice was, if someone left, we would

5  let the e-mail go and create another one.

6         Jason and then his role, everything went

7  through intake.  So all e-mail leads that were processed

8  or anything like that, went through the intake and then

9  the support e-mail.  So that was not something that was

10  preserved.

11         We've now made different changes to where

12  when someone leaves, we can download everything and then

13  add another e-mail address.

14     Q.   Okay.  And so, to your knowledge, how was that

15  not preserved?  Was that -- I believe that it was deleted,

16  I believe, by Mike Walker; is that right?

17     A.   Correct.

18         MS. ADAMS:  Objection to form.

19     Q.   (BY MR. MATTHYSSE)   And do you know about when

20  that happened?

21     A.   No, I do not.

22     Q.   Okay.  What -- I know we talked about this topic

23  a little bit earlier, but what, if anything, has Quintessa

24  done to preserve the Slack messages?

Case 2:19-cv-02025-BKN-BND Document 1902-1 Filed 08/22/23 Page 330 of 406 PageID 14798

1                    LAUREN MINGEE

2        A.    They searched through Slack for anything in

3    regards to Adler.  And there is not.  So that's something

4    that's done on a regular basis.

5                  But as far as the Slack messages, it

6    doesn't allow us -- it doesn't save the data past nine

7    days.

8        Q.    Okay.  And has -- when you say search for Adler,

9    when did that search happen?

10       A.    It's performed routinely by Mike Walker.

11       Q.    Okay.  And when did that -- would that first

12   have happened around the time of the discovery that you

13   mentioned, after the Fifth Circuit decision?

14       A.    Yes.

15       Q.    Okay.  And -- but that would be just a search

16   for the past nine or so days, right?

17       A.    Correct.

18       Q.    And prior to that time, Quintessa -- that Slack

19   data had been -- is gone, permanently deleted, right?

20       A.    Correct.  Slack wasn't used for a -- I know we

21   spoke about this earlier, but it was used as a, here's a

22   potential lead, where does it need to go to.  It's not

23   used as a communication channel amongst the team.  Most

24   companies, when they have Slack, it's for interoffice

25   communication.  And that's not what we use.

 1                     LAUREN MINGEE

 2       Q.   Okay.  But you do have managers, correct, who

 3  use it to figure out where a lead should go with the call

 4  center?

 5       A.   They -- a manager is using Slack to tell them

 6  which attorney to send it to.  But it doesn't have a lead

 7  name or anything associated with it.  It only has the six

 8  things.

 9       Q.   Okay.  And you're -- most of the time, you're

10  not in there on a day-to-day basis, right?

11       A.   No, sir.  If I am, then someone is not doing

12  their job.  So...

13       Q.   Ms. Mingee, is Quintessa's position in this case

14  that the plaintiffs, the Adler Law Firm, has not lost any

15  potential clients as a result of Quintessa's competitive

16  bidding?

17                 MS. ADAMS:  Objection, form.

18       A.   I think Jim Adler had at the time when he sued

19  Quintessa about 15 other firms.  So I don't think he can

20  say equivocally -- unequivocally that I'm the person who

21  did that.  I don't feel like I can answer that.

22       Q.   (BY MR. MATTHYSSE)  What do you mean by I can't

23  say unequivocally?

24       A.   Well, because there's 15 other people that were

25  bidding on him.  And he also controlled how much he bid

ATTORNEYS' EYES ONLY

Page 169

                              ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

Pg.  No. Now Reads      Should Read   Reason

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____

___  ___ _____    _____   _____


                                       _____
                                       Signature of Deponent
SUBSCRIBED AND SWORN BEFORE ME
THIS ____ DAY OF _____, 2022.

_____

(Notary Public)   MY COMMISSION EXPIRES:_____

Case 3:19-cv-02025-KSBN-BND Document 1902-1 Filed 08/22/23 Page 333 of 406 PageID 154801
ATTORNEYS' EYES ONLY

```
 1                      LAUREN MINGEE

 2              ACKNOWLEDGMENT OF DEPONENT

 3           I, _____, do hereby certify that I

 4    have read the foregoing pages, and that the same is a

 5    correct transcription of the answers given by me to the

 6    questions therein propounded, except for the corrections

 7    or changes in form and substance, if any, noted on the

 8    attached Errata.

 9

10           _____

11           WITNESS NAME                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      LAUREN MINGEE
 2            IN THE UNITED STATES DISTRICT COURT
 3            FOR THE NORTHERN DISTRICT OF TEXAS
 4                     DALLAS DIVISION
 5   JIM ADLER, P.C. AND           )
 6   JIM ADLER,                    )
 7            Plaintiffs           )
 8                                 )
 9   VS.                           )CIVIL ACTION
10                                 )NO. 3:19-cv-02025-K-BN
11   MCNEIL CONSULTANTS, LLC,      )
12   D/B/A ACCIDENT INJURY LEGAL   )
13   CENTER, QUINTESSA MARKETING,  )
14   LLC, D/B/A ACCIDENT INJURY    )
15   LEGAL CENTER, AND LAURA       )
16   MINGEE,                       )
17            Defendants           )
18          ***********************************
19                REPORTER'S CERTIFICATION
20           ORAL DEPOSITION OF LAUREN MINGEE
21                   NOVEMBER 16, 2022
22          ***********************************
23         I, Kathryn R. Baker, RPR, a Certified Shorthand
24   Reporter in and for the State of Texas, hereby certify to
25   the following:
```

1                           LAUREN MINGEE

2                    That the witness, LAUREN MINGEE, was duly sworn

3        by the officer and that the transcript of the oral

4        deposition is a true record of the testimony given by the

5        witness;

6                    I further certify that pursuant to FRCP Rule

7        30(f)(1) that the signature of the deponent:

8                    _X_ was requested by the deponent or a party

9        before the completion of the deposition and is to be

10       returned within 30 days from the date of receipt of the

11       transcript.  If returned, the attached Errata contain any

12       changes and the reasons therefor;

13                   ___ was not requested by the deponent or a party

14       before the completion of the deposition.

15                   I further certify that I am neither counsel for,

16       related to, nor employed by any of the parties or

17       attorneys in the action in which this proceeding was

18       taken, and further that I am not financially or otherwise

19       interested in the outcome of the action;

20

21

22

23

24

25

1                    LAUREN MINGEE

2          Subscribed and sworn to on this 30th day of

3    November, 2022.

4

5    _____

6    KATHRYN R. BAKER, RPR, CSR #6955
     Expiration Date:  04/30/2023
7    Firm Registration No. 615
     TSG Reporting
8    228 E. 45th Street
     Suite 810
9    New York, New York 10017
     877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 10

# THE 3 LEG STOOL AND THE 6 THINGS



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000003



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

# THE 6 THINGS



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000005



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000006



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000007

CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000008



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000009





CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000011



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000012



Continued on next page

CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

**QUINTESSA_000013**



Continued on next page

CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000014



Continued on next page

CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000015



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000016



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000017



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000018



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000019



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000020

CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000021



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000022



CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER

QUINTESSA_000023

# EXHIBIT 11

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3   JIM S. ADLER, P.C. and        )
     JIM ADLER,                     )
 4                                  )
                   Plaintiffs,      )
 5                                  )
     VS.                            )  Case No.
 6                                  )  3:19-CV-02025-K-BN
     MCNEIL CONSULTANTS, LLC        )
 7   D/B/A ACCIDENT INJURY LEGAL    )
     CENTER, QUINTESSA MARKETING,   )
 8   LLC D/B/A ACCIDENT INJURY      )
     LEGAL CENTER, and LAUREN       )
 9   MINGEE,                        )
                                    )
10                 Defendants.      )
11
           ** Contains Attorneys Eyes Only Portions  **
12             ORAL AND VIDEOTAPED DEPOSITION OF
13                 LEO VERMONT MINGEE, III
14                    AUGUST 12, 2022
15                       VOLUME 1
           ---------------------------------
16     Job #: 213953
17       ORAL AND VIDEOTAPED DEPOSITION OF LEO VERMONT
18   MINGEE, III, taken on behalf of Plaintiffs and duly
19   sworn, on August 12, 2022, from 9:40 a.m. to 3:04 p.m.,
20   before Amanda Blomstrom, CRR, CLR, RMR, and CSR in and
21   for the States of TX, IL, and CA, reported by machine
22   shorthand, at the law offices of Lynn, Pinker, Hurst &
23   Schwegmann, LLP, 2100 Ross Avenue, Dallas, Texas,
24   pursuant to the Federal Rules of Civil Procedure and the
25   provisions stated on the record or attached hereto.
```

```
 1               A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         PIRKEY BARBER

           BY:  JERED MATTHYSSE, ESQ.

 5         BY:  GIULIO YAQUINTO, ESQ.

           1801 East 6th Street

 6         Austin, Texas 78702

 7

 8

 9

10    FOR THE DEFENDANTS:

11         LYNN PINKER HURST & SCHWEGMANN

           BY: REBECCA ADAMS, ESQ.

12         2100 Ross Avenue

           Dallas, Texas 75201

13

14

15

16

17    VIDEOGRAPHER:  JOSEPH McDERMOTT

18

19

20

21

22

23

24

25
```

1                       I N D E X

                                                    PAGE
2    Appearances.......................................  2
     Stipulations.....................................  --
3
4    LEO VERMONT MINGEE, III
          Examination by Mr. Matthysse..................  4
5
6    Signature and Changes............................ 182
     Reporter's Certificate........................... 184
7
8
9                       EXHIBITS
10   NO.                                               PAGE
11   Exhibit 93    Oklahoma Secretary of State Electronic Filing
          Articles of Organization, Lead Sparke LLC,
12        12/19/19...................................  44
13   Exhibit 94    Oklahoma Secretary of State website printout
          dated June 21, 2022........................  52
14
     Exhibit 95    https://1njuryjustice.com webpage     56
15        printout
     Exhibit 96    https://leadsparke.com webpage printout 61
16
     Exhibit 97    https://leadsparke.com/about webpage   66
17        printout
     Exhibit 98    Facebook @quintessamarketing1 account  68
18        printout
     Exhibit 99    Email string, top email dated 9/10/2019
19        Bates QUINTESSA_000195 through 198........... 106
20   Exhibit 100   Email string, top email dated 1/23/2020
          Bates QUINTESSA_000220 through 224........... 112
21
     Exhibit 101   Email from Google AdWords, 4/14/2019 to
22        lmingee@quintessamarketing.com............... 123
23   Exhibit 102   Email string, top email dated 7/16/2020
          Bates QUINTESSA_000322 through 323........... 130
24
     Exhibit 103   Email string, top email dated 12/8/2020
25        Bates QUINTESSA_000753 through 757........... 149

```
 1                        EXHIBITS (Cont'd)
 2     NO.                                                 PAGE
 3     Exhibit 104    Email string, top email dated 4/14/2021
              Bates QUINTESSA_001078 through 1079..........  156
 4
       Exhibit 105    Email string, top email dated 9/16/2021
 5            Bates QUINTESSA_001217 through 1221..........  164
 6     Exhibit 106    Email string, top email dated 11/22/2021
              Bates QUINTESSA_001225 through 1260..........  172
 7
 8
                       EXHIBITS PREVIOUSLY MARKED
 9
       Exhibit 7      Email, Bates No. QUINTESSA_000343....  139
10
       Exhibit 28     Email string, top email dated 7/6/2020
11            Bates QUINTESSA_000314 through 315...........  126
12     Exhibit 32     Email, Bates No. QUINTESSA_000416.....  137
13     Exhibit 41     Email string, top email dated 3/6/2020
              Bates QUINTESSA_000241 through 242...........  116
14
       Exhibit 44     Email string, top email dated 9/4/2020
15            Bates QUINTESSA_000376 through 380...........  143
16
17
18
                       ATTORNEYS' EYES ONLY PORTION
19
                            Pages 43-44
20
21
22
23
24
25
```

```
 1                        LEO MINGEE

 2              THE VIDEOGRAPHER:  All right.  We are now

 3   on the record.  Today's date is August 12th, 2022, and

 4   the time on the video monitor is 9:40 a.m.

 5              This is the action entitled Jim S. Adler

 6   PC, et al. versus McNeil Consultants, et al., for the

 7   United States District Court for the Northern District of

 8   Texas, Dallas Division.  The deponent today is LEO

 9   VERMONT MINGEE, III.

10              Will counsel please identify themselves at

11   this time; afterwards, the court reporter will swear in

12   the witness.

13              MR. MATTHYSSE:  Jered Matthysse with

14   Pirkey Barber, on behalf of plaintiffs.

15              MR. YAQUINTO:  Giulio Yaquinto, also of

16   Pirkey Barber, on behalf of plaintiffs.

17              MS. ADAMS:  Rebecca Adams with Lynn,

18   Pinker, Hurst & Schwegmann, for defendants.

19              LEO VERMONT MINGEE, III,

20   having been first duly sworn, testified as follows:

21                        EXAMINATION

22   BY MR. MATTHYSSE:

23        Q.  Good morning.

24        A.  Good morning.

25        Q.  Could you state your full name for the record.
```

```
 1                        LEO MINGEE

 2        A.   It's Leo Vermont Mingee, III.

 3        Q.   Mr. Mingee, have you been deposed before?

 4        A.   I have not.

 5        Q.   Have you testified in a case before?

 6        A.   I have not.

 7        Q.   Okay.  So, just go over a couple ground rules

 8   for today.  Sound good?

 9        A.   Sounds good.

10        Q.   Okay.  You do realize, correct, that you're

11   under oath and you must fully answer all of my questions

12   to the best of your ability, correct?

13        A.   Correct.

14        Q.   Okay.  If any of my questions are unclear, just

15   let me know and I can rephrase them for you.  Sound good?

16        A.   Sounds good.

17        Q.   And if you need a break, just let me know and

18   we can take one.  Okay?

19        A.   Yeah.

20        Q.   Mr. Mingee, is there any condition or other

21   reason that you could not give complete and accurate

22   testimony today?

23        A.   No.

24                  MS. ADAMS:  Speak up.

25                  THE WITNESS:  Oh, no.
```

```
 1                      LEO MINGEE
 2      Q.  All right.  Do you have any role in those
 3   emails?
 4      A.  No.
 5      Q.  Do you know if the firm, other than those
 6   accident intake Gmail addresses, have any other Gmail
 7   addresses that it uses?
 8      A.  I don't know.  What are you asking?
 9      Q.  If the firm owns and uses any other Gmail email
10   addresses other than those accident intake ones.
11      A.  Not that I'm aware of, no.
12      Q.  Okay.  Internally at the company, do y'all use
13   Slack?
14      A.  Yes, there's Slack.  Yes.
15      Q.  Okay.  How do you use Slack at the company?
16      A.  ████████████     ████████████████
     ██████████████████████████████████████████
     ███████████████████████████████
19      Q.  Okay.
20      A.  So, yeah.
21      Q.  ██████████████████████████████████████
     ████████████████████████████████
     ████  ████
24      Q.  Okay.  Are you involved in any channels on that
25   Slack?
```

Page 185

1            CHANGES AND SIGNATURE

2    WITNESS: LEO VERMONT MINGEE, III    DATE: AUGUST 12, 2022

3    PAGE LINE     CHANGE              REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

 1          I, LEO VERMONT MINGEE, III, have read the

     foregoing deposition and hereby affix my signature that

 2   same is true and correct, except as noted above.

 3

 4


                         _____

 5                       LEO VERMONT MINGEE, III

 6

 7   THE STATE OF _____)

 8   COUNTY OF _____)

 9

10       Before me, _____, on this day

11   personally appeared LEO VERMONT MINGEE, III, known to me

12   (or proved to me under oath or through

13   _____) (description of identity

14   card or other document) to be the person whose name is

15   subscribed to the foregoing instrument and acknowledged

16   to me that they executed the same for the purposes and

17   consideration therein expressed.

18       Given under my hand and seal of office this

19   _____ day of _____, _____.

20

21

22                       _____

                         NOTARY PUBLIC IN AND FOR

23                       THE STATE OF _____

                         COMMISSION EXPIRES: _____

24

25

Case 3:19-cv-02025-K-BN Document 192-14 Filed 08/22/23 Page 369 of 406 PageID 18837

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION

3   JIM S. ADLER, P.C. and          )
    JIM ADLER,                       )
4                                    )
                 Plaintiffs,         )
5                                    )
    VS.                              ) Case No.
6                                    ) 3:19-CV-02025-K-BN
    MCNEIL CONSULTANTS, LLC          )
7   D/B/A ACCIDENT INJURY LEGAL      )
    CENTER, Quintessa Marketing,     )
8   LLC D/B/A ACCIDENT INJURY        )
    LEGAL CENTER, and LAUREN         )
9   MINGEE,                          )
                                     )
10               Defendants.         )

11

12            REPORTER'S CERTIFICATION
13      DEPOSITION OF LEO VERMONT MINGEE, III
14              AUGUST 12, 2022

15

16      I, Amanda Blomstrom, Certified Shorthand Reporter in
17  and for the State of Texas, hereby certify to the
18  following:
19      That the witness, LEO VERMONT MINGEE, III, was duly
20  sworn by the officer and that the transcript of the oral
21  deposition is a true record of the testimony given by the
22  witness;
23      That the deposition transcript was submitted on
24  August 25 2022 to the witness or to the attorney
25  for the witness for examination, signature and return to

 1    me by September 24 2022;

 2         That the amount of time used by each party at the

 3    deposition is as follows:

 4    MR. MATTHYSSE.....4 HOUR(S)43 MINUTE(S)

      MS. ADAMS.........00 HOUR(S):00 MINUTE(S)

 5

 6         That pursuant to information given to the deposition

 7    officer at the time said testimony was taken, the

 8    following includes counsel for all parties of record:

 9    FOR THE PLAINTIFFS:

10         PIRKEY BARBER PLLC

           BY:  JERED MATTHYSSE, ESQ.

11         BY:  GIULIO YAQUINTO, ESQ.

           1801 East 6th Street

12         Austin, Texas 78702

13

14

15

16    FOR THE DEFENDANTS:

17         LYNN PINKER HURST & SCHWEGMANN

           BY: REBECCA ADAMS, ESQ.

18         2100 Ross Avenue

           Dallas, Texas 75201

19

20

21

22

23

24         That $_____ is the deposition officer's charges

25    to the Plaintiff for preparing the original deposition

1    transcript and any copies of exhibits;

2          I further certify that I am neither counsel for,

3    related to, nor employed by any of the parties or

4    attorneys in the action in which this proceeding was

5    taken, and further that I am not financially or otherwise

6    interested in the outcome of the action.

7          Certified to by me this 25th day of August, 2022.

8

9          _____

10         Amanda Blomstrom, CRR, RMR, CLR
           Texas CSR 8785

11         Illinois CSR 84-3634
           California CSR 12681

12         Expiration Date:  5/31/24
           TSG REPORTING, INC.

13         Firm Registration No. 615
           747 Third Avenue, 10th Floor

14         New York, New York  10017

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 12




Ready to outsource your HR?   GET YOUR E-BOOK

# Quintessa Marketing's CEO Lauren Mingee Nominated for Journal Record's 2022 Woman of the Year

by PRNewswire
July 20, 2022 5:20 PM | 3 min read



**10X Potential From This Bear Market:** Former hedge-fund trader Chris Capre's been sending thousands of traders 2 trades every month since the bear market started. If you're looking for potentially profitable trade ideas, join this 22-year trading veteran now. Click Here to Get His Next 2 trades for ONLY $0.99!

Lauren Mingee, CEO of Quintessa Marketing, has been nominated as one of the 50 Making a Difference for her successful career and for giving back to her community. Journal Record's Woman of the Year, one of the most sought-after awards in Oklahoma, is being announced in October of this year.

OKLAHOMA CITY, July 20, 2022 /PRNewswire-PRWeb/ -- Lauren Mingee, CEO of Quintessa Marketing, has been selected as one of Journal Record's 50 Making a Difference nominees. The award recognized Oklahoma's prominent women who epitomize leadership in their professional endeavors and in the communities they are a part of for the last 42 years. Journal Record's Woman of the Year was created to celebrate the brilliance and success of women across the state of Oklahoma.

Lauren is a successful businesswoman as the founder and CEO of Quintessa Marketing, volunteer, mentor, and longtime advocate for women. One of her most notable accomplishments is building an expansive business and using her resources to give back to her community. She created Quintessa Marketing to bridge the gap between lawyers and people who have been injured in an accident, which generated more than $22 million in revenue last year. She is a firm believer in doing good often and investing in others, which has allowed her to empower others and provide employment opportunities to people from all walks of life.

**This is how you can potentially earn $3,000 in extra income every single month...**

Former leading hedge-fund trader Chris Capre is the real deal. With his simple options trading strategy, he's helping thousands of traders by sharing his trade signals in real-time. **Click Here to Get his Trades for only $0.99.** ☆☆☆☆☆ "My only regret is I wish I joined earlier..."



Learn more
Insperity HR
by hr-solutions.insperity.com
Skip Ad ▶

While Lauren takes pride in her professional achievements, she also makes a point to utilize her resources to help her community. She has donated millions of dollars to nonprofits across Oklahoma City, the Regional Food Bank of Oklahoma, Oklahoma Dream Centers, and a global Bible app, YouVersion. Lauren also spends her time volunteering with ReMerge, a program that serves the needs of Oklahoma mothers facing non-violent felony offenses.

When asked about the nomination, Mingee replied, "It is an honor to be nominated in the company of such incredible women and pillars of the Oklahoma community. The work and passion of these individuals make a difference in people's lives."

Previous recipients of this award include Tammy Powell, receiving the honor of Journal Record's Woman of the Year in 2021. Tammy is the president of SSM Health St. Anthony's Hospital. She was recognized for being at the forefront of pandemic management during the hardships of COVID-19. Joe Dowd, Journal Record editor, stated that she was the backbone of healthcare during one of Oklahoma's most challenging times. During her presidency, OKC has expanded from one emergency room location to five additional freestanding locations.

## Create a Watchlist

FREE: Follow your stocks and cryptocurrencies with the most actionable alerts on the internet.

CLICK TO GET STARTED



**HR Outsourcing Guide**

[Free Guide] Find out if a PEO is the right HR strategy for your business

>

### Top Stories


1. (WAC.) Trump's Former Secretary Of State Tillerson Says Unaware That Indicted Ally Was Privy To 'Sensitive' Discussions


2. TSLA : Elon Musk Tells Zelenskyy, 'I Still Very Much Support Ukraine, But...'


3. CS, DB : As Credit Suisse's Credit Default Swaps Spike To Near 2008 Levels, Rumors Of Lehman-Like Collapse Floated, Bank Steps In To...


4. DeSantis Calls Trump 'A Moron Who Has No Business Running For President,' Former Staffers Say: Report


5. Trump's 'Love Letters' To Kim Jong Un Reportedly Reveal North Korean Leader Was 'Ready To Work' With US On Denuclearization

### News from Cision PR Newswire

Provenance Blockchain Foundation Appoints Financial Services and Marketing Veteran Dan Garzia as Chief Marketing Officer

Fluency's CBDC technology meets all key ECB foundation design aspects for a digital euro

Halcyon Stops Emotet Crimeware at US Insurance Company

Provenance Blockchain Foundation Announces Appointment of Joshua Maddox as Director of Developer Community

FOUNDED IN IRELAND, INTERNATIONAL HUMANITARIAN ORGANIZATION CONCERN WORLDWIDE EXPANDS U.S. PRESENCE TO BOSTON

DARPA Launches Crypto Project with Inca Digital

Quintessa Marketing's CEO Lauren Minger Nominated for Journal Record's 2022 Woman of the Year - Benzinga
https://www.benzinga.com/pressreleases/22/07/n28142671/quintessa-marketings-ceo-lauren-minger-nominated-for-journal-records-2022-woman-of-the-year



One woman of 50 will be selected at the 2022 Woman of the Year gala event on October 20th at the National Cowboy and Western Heritage Museum in Oklahoma City. Four of the 2022 honorees will also be inducted into the Circle of Excellence at the ceremony, which honors individuals that have been nominated for the third time. Susan Agel will be the keynote speaker at the event.

**Media Contact**

Caitlin Woods, Quintessa Marketing, 1-888-231-9722, publicrelations@quintessamarketing.com

SOURCE Quintessa Marketing

**URGENT ALERT:** Matt Maley has been calling the ups and downs in the market perfectly for the last several years. What he sees now is a HUGE potential opportunity to make money in the markets. With high volatility, comes high opportunity. **Click Here to Request a Seat to His LIVE session tomorrow at 6 pm ET.**



**Time is running out...** to get access to our #1 rated options trading alerts for only $0.99. Think of all the things you buy that are more than $0.99, perhaps an extra cup of coffee, or a subscription to a streaming service. But ask yourself, are those purchases really driving you to build wealth or distract you from your goals? If you are reading this then you are most likely interested in earning more to secure your financial future for your family. Click Here to Start getting Real-time Options Trade Alerts from Full-time Trader Chris Capre for Only $0.99! ⭐⭐⭐⭐⭐

**Get Options Trade for $0.99 Right Now >>**



© 2022 Benzinga.com. Benzinga does not provide investment advice. All rights reserved.

Posted In: advertising · Stocks · Press Releases

## Meet The Company Finding Novel Applications For The Revolutionary Power Of AI

by Johnny Rice, Benzinga Contributor
October 3, 2022 8:23 AM | 1 min read



Sign up for this week's All Access giveaway here!

David Styhr, CEO of Livento Group, Inc. NUGN, was a guest on Benzinga's All Access on September 30, 2022.

Livento Group develops proprietary artificial intelligence (AI) & machine learning products that incorporate risk analysis, predictive maintenance and operational forecasting into its decision making process. The company has thus far applied these products primarily to real estate and film production.

Captured by FireShot Pro: 05 October 2022, 13:54:18
https://getfireshot.com

Page 3
Quintessa Marketing's CEO Lauren Mingee Nominated for Journal Record's 2022 Woman of the Year - Benzinga
https://www.benzinga.com/pressreleases/22/07/n28142671/quintessa-marketings-ceo-lauren-mingee-nominated-for-journal-records-2022-woman-of-the-year

Watch the full interview here:



This post contains sponsored advertising content. This content is for informational purposes only and is not intended to be investing advice.



© 2022 Benzinga.com. Benzinga does not provide investment advice. All rights reserved.

Posted In:   Benzinga All Access    Lowell Group    Partner Content    Movers & Shakers    Interview
         Eventual

### Trending Articles


**Exclusive: M&A Expert Julian Klymochko Says This Was 'The Dagger' To Elon Musk's Case Against Twitter**
Big news came out Tuesday that Tesla Inc (NASDAQ: TSLA) CEO Elon Musk has had a change of heart and submitted a renewed offer to acquire social media p


**Facing A Trial With Twitter, Elon Musk Offers Original $54.20/Share Buyout Price: Report**
Elon Musk has reportedly proposed a buyout of Twitter Inc (NYSE: TWTR) at his original offer price of $54.20 per share Tuesday


**Private Sector Employment Jumps By 208,000 In September, Topping Expectations: What Investors Need To Know**
Job growth in the private sector rose in September in a sign of strength in the U.S. labor market


**OPEC+ Cuts Oil Production On The High End Of Analyst Expectations; Is The Energy Trade Back On?**
The OPEC+ coalition announced a 2 million barrel per day reduction in oil output on Wednesday. This reduction could reverse weeks of declining oil and gas prices, according to Reuters, despite the U.S.'s


**Apple Suppliers Slowly Boosting US Presence To Cut China Reliance**
Apple Inc. (NASDAQ: AAPL) suppliers are gradually establishing new production facilities in the U.S. with a focus on California, to move more manufacturing out of China.



# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| QUINTESSA MARKETING, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| and LAUREN VON MCNEIL, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION

Plaintiffs Jim S. Adler, P.C. and Jim Adler ("Adler"), in accordance with Federal Rule of Civil Procedure 34, requests that Defendants McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren Von McNeil ("Defendants") produce the following documents and other tangible things within the possession, custody, or control of Defendants. Adler requests that Defendants send copies or samples of the requested documents, including electronically stored information, to Adler's counsel, Pirkey Barber PLLC, accompanying service of Defendants' responses to these requests, or as otherwise agreed by the parties.

## DEFINITIONS AND INSTRUCTIONS

The definitions forming part of Plaintiffs' First Set of Interrogatories, served concurrently, are hereby incorporated by reference.

These document requests shall be deemed continuing in nature and, to the extent that your responses may be enlarged, diminished, or otherwise modified by information acquired subsequent to

the production of your initial responses, you are required, to the extent set forth in Rule 26(e), to promptly serve supplemental responses reflecting such changes.

These requests require you to produce all documents and electronically stored information in your "possession, custody, or control" within the broadest meaning of that phrase permitted by the Federal Rules of Civil Procedure, including documents and electronically stored information in the possession, custody, or control of any other person acting or purporting to act on behalf of you or under your direction or control. If documents and electronically stored information called for in any request cannot be produced in full after exercising due diligence to secure them, you should so state and specify why the requested documents or information cannot be produced.

If there are no documents responsive to a particular document Request, disclose such information in written response to the Request. If any document requested was previously but no longer is in your possession, custody, or control or is no longer in existence, state whether it is missing, lost, destroyed, transferred (voluntarily or involuntarily) to others and state the date, facts and circumstances of such destruction.

If, in answering any of these requests, any ambiguity in construing either the request or a definition or instruction relevant to the inquiry contained within the request is encountered, identify the ambiguous matter and set forth the construction chosen or used in responding to the request.

Except as otherwise specified, each and every non-identical copy of a document (whether different from the original because of stamps, indications of receipt, handwritten notes, marks, attachment to different documents, or any other reason) is a separate document to be produced.

If you withhold from production any of the requested documents on the basis of a claim of attorney-client privilege or work product immunity, Plaintiffs request that you provide, at a time mutually acceptable to the parties, a list identifying each withheld document by specifying:

    a.    the identity of all persons who prepared, authored, signed, or received any copy of the document;

b.      the identity of all persons designated as addressees, "copied," "cc," or "bcc" recipients;

c.      the date of the document;

d.      the subject matter of the document;

e.      the nature of the document (e.g. letter, interoffice memo, telegram, notes, report, etc.);

f.      the identity of any and all attachments or enclosures appurtenant to such documents;

g.      the number of the request to which the document is responsive; and

h.      the basis for withholding the document.

Notwithstanding the assertion of your claim of privilege, any requested document which you object to producing but which also contains non-privileged matter which is responsive to this request must be produced, but that portion of the document for which privilege is asserted must be redacted, provided that the above-requested information is furnished.

Where a produced document is in a language other than English, state whether an English translation of such document exists. If a produced document is in a language other than English and an English translation thereof does exist, produce both the original and the English-language translation.

If you object to or otherwise decline to answer any portion or aspect of a request, provide all information requested by the remainder of the request and state with particularity the nature of and complete factual basis for such objection. If you object to a request for the reason that it is too broad, provide all information that you concede is relevant. If you are providing less than a complete response to any request, your written response should clearly indicate any limitation on your production.

## **REQUESTS FOR PRODUCTION**

### **REQUEST NO. 1**

Documents sufficient to show each and every Keyword Advertisement you have purchased triggered by search terms incorporating any of the Adler Marks.

**REQUEST NO. 2**

Documents showing your monthly expenditures on purchasing Keyword Advertisements triggered by search terms incorporating any of the Adler Marks.

**REQUEST NO. 3**

Documents showing your revenues from case leads based on your purchase of Keyword Advertisements triggered by search terms incorporating any of the Adler Marks.

**REQUEST NO. 4**

All documents that relate to your intake process, including documents that show how you track which Keyword Advertisement caller clicked on or otherwise encountered before contacting you.

**REQUEST NO. 5**

All documents that contain or refer to questions, comments, or communications from callers who express that they called you by mistake and intended to contact someone other than you.

**REQUEST NO. 6**

All documents that show or refer to instances in which a caller asked if you were Adler and/or the Texas Hammer, or if you were somehow associated with Adler and/or the Texas Hammer, including instances where such caller contacted you after first clicking on or otherwise encountering your Keyword Advertisements triggered by search terms incorporating any of the Adler Marks.

**REQUEST NO. 7**

Documents sufficient to identify any third parties or persons you consult with on to create and/or manage your Keyword Advertisements.

**REQUEST NO. 8**

All documents between you and Google related to Keyword Advertisements triggered by search terms incorporating any of the Adler Marks.

**REQUEST NO. 15**

    All documents identifying each lawyer or law firm whose name you have purchased as keywords.

**REQUEST NO. 16**

    All documents, correspondence, or communications, either internal or external, that concern, refer, or relate to your purchase and/or use of any of the Adler Marks as keywords.

**REQUEST NO. 17**

    All documents concerning Plaintiffs.

**REQUEST NO. 18**

    All documents, correspondence, or communications, either internal or external, that concern, refer, or relate to revenues you earned from consumers who contacted you after clicking on or otherwise encountering your Keyword Advertisements triggered by search terms incorporating any of the Adler Marks.

**REQUEST NO. 19**

    All documents, correspondence, or communications, either internal or external, that concern, refer, or relate to any disputes between you and third parties (e.g., demand letters, lawsuits, etc.) involving Keyword Advertisements and/or allegations of trademark infringement.

**REQUEST NO. 20**

    All documents that support or refute your denial of the allegations in paragraph 37 in Adler's Second Amended Complaint.

**REQUEST NO. 21**

    All documents that support or refute your denial of the allegations in paragraph 38 in Adler's Second Amended Complaint.

**REQUEST NO. 30**

All documents created, reviewed, or relied on for the purposes of this proceeding by any person you intend to call as an expert witness during the proceeding.

**REQUEST NO. 31**

All documents identified in your response to any interrogatory or request for admission served by Plaintiffs in this case.

**REQUEST NO. 32**

All documents reviewed or consulted, or on which you relied, in responding to any interrogatory or request for admission served by Plaintiffs in this case.

**REQUEST NO. 33**

All documents reviewed or consulted, or on which you relied, to draft your Answer.

**REQUEST NO. 34**

All documents you intend to rely on in defending the claims asserted in Adler's Second Amended Complaint.


Dated: November 11, 2021                    Respectfully submitted,


                                            */s/ Jered E. Matthysse*
                                            Jered E. Matthysse
                                               Texas Bar No. 24007226
                                               jmatthysse@pirkeybarber.com
                                            Giulio Yaquinto
                                               Texas Bar No. 24107292
                                               gyaquinto@pirkeybarber.com
                                            PIRKEY BARBER PLLC
                                            1801 East 6th Street, Suite 300
                                            Austin, Texas 788702
                                            (512) 322-5200
                                            (512) 322-5201 (fax)

                                            Kurt Kuhn
                                               Texas Bar No. 24002433

8

Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
2310 Rutland Street
Houston, Texas 77008
(713) 344-1530
(833) 514-6755 (fax)

and

Garrett W. Mize
  Texas Bar No. 24089610
  gmize@jimadler.com
JIM S. ADLER and ASSOCIATES
The Tower at City Place
2711 North Haskell Avenue, Suite 2500
Dallas, TX 75204
(214) 220-3224
(214) 220-3233 (fax)

COUNSEL FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on November 11, 2021, the foregoing was served via email per the parties' agreement on the following counsel of record for Defendants:

Christopher J. Schwegmann
Lynn Pinker Hurst & Schwegmann LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
cschwegmann@lynnllp.com

*/s/ Jered E. Matthysse*
Jered E. Matthysse

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | **JURY DEMANDED** |
| QUINTESSA MARKETING, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| and LAUREN MINGEE, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' FOURTH SET OF REQUESTS FOR PRODUCTION

Plaintiffs Jim S. Adler, P.C. and Jim Adler ("Adler"), in accordance with Federal Rule of Civil

Procedure 34, request that Defendants McNeil Consultants, LLC d/b/a Accident Injury Legal Center,

Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren Mingee ("Defendants")

produce the following documents and other tangible things within the possession, custody, or control

of Defendants. Adler requests that Defendants send copies or samples of the requested documents,

including electronically stored information, to Adler's counsel, Pirkey Barber PLLC, accompanying

service of Defendants' responses to these requests, or as otherwise agreed by the parties.

## DEFINITIONS AND INSTRUCTIONS

The definitions and instructions forming part of Plaintiffs' First Set of Requests of Production,

served November 11, 2021, are hereby incorporated by reference.

## REQUESTS FOR PRODUCTION

### REQUEST NO. 64

All documents and communications that concern or refer to Jason Matcek, including but not

limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop

letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 65**

All documents and communications that concern or refer to Andrew Mahan, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 66**

All documents and communications that concern or refer to Sonja Prewett, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 67**

All documents and communications that concern or refer to Jacoby Paul, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 68**

All documents and communications that concern or refer to Ayo Dehinde, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 69**

All documents and communications that concern or refer to Gordon Schmidt, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and

drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 70**

All documents and communications that concern or refer to Maximo Leija, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 71**

All documents and communications that concern or refer to Sheila Jenkins or Steven Wayne Murphy, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 72**

All documents and communications that concern or refer to Joe Nieto, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 73**

All documents and communications that concern or refer to Ama Obialor, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 74**

All documents and communications that concern or refer to Roosevelt Cason, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and

drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

## REQUEST NO. 75

All documents and communications that concern or refer to Thomas Martel, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

## REQUEST NO. 76

All documents and communications that concern or refer to Louis Henry, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

## REQUEST NO. 77

All documents and communications that concern or refer to Kendrick Williams, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

## REQUEST NO. 78

All documents and communications that concern or refer to Luz Cramer, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

## REQUEST NO. 79

All documents and communications that concern or refer to Maria Rojas, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop

letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 80**

All documents and communications that concern or refer to Lucille Hall, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 81**

All documents and communications that concern or refer to Kenneth Mallard, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 82**

All documents and communications that concern or refer to Albert Williams, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 83**

All documents and communications that concern or refer to Alejandro Padilla, including but not limited to emails, slack messages, call recordings, call transcripts, signed engagement letters, and drop letters. To the extent Defendants have already produced any such call recording(s), identify the corresponding Bates Number.

**REQUEST NO. 84**

All documents and communications that contain or refer to the "dropped MVC case data" identified in QUINTESSA_000833.

5

**REQUEST NO. 85**

All documents and communications that concern or refer to Cesar Barrientos, including but not limited to the call recording identified in QUINTESSA_001907.

Dated: July 1, 2022                          Respectfully submitted,

*/s/ Jered E. Matthysse*
Jered E. Matthysse
 Texas Bar No. 24007226
 jmatthysse@pirkeybarber.com
Giulio Yaquinto
 Texas Bar No. 24107292
 gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 788702
(512) 322-5200
(512) 322-5201 (fax)

Kurt Kuhn
 Texas Bar No. 24002433
 Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
2310 Rutland Street
Houston, Texas 77008
(713) 344-1530
(833) 514-6755 (fax)

and

Garrett W. Mize
 Texas Bar No. 24089610
 gmize@jimadler.com
JIM S. ADLER and ASSOCIATES
The Tower at City Place
2711 North Haskell Avenue, Suite 2500
Dallas, TX 75204
(214) 220-3224
(214) 220-3233 (fax)

COUNSEL FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2022, the foregoing was served via email per the parties' agreement on the following counsel of record for Defendants:

Christopher J. Schwegmann
Rebecca L. Adams
Lynn Pinker Hurst & Schwegmann LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
cschwegmann@lynnllp.com
radams@lynnllp.com

*/s/ Jered E. Matthysse*
Jered E. Matthysse

# EXHIBIT 15

1

2              IN THE UNITED STATES DISTRICT COURT

3               FOR THE NORTHERN DISTRICT OF TEXAS

4                       DALLAS DIVISION

5     JIM S. ADLER, P.C., and
      JIM ADLER,
6
              Plaintiffs,
7
      VS.                                 Case Number
8                                         3:19-cv-02025-K-BN

      MCNEIL CONSULTING, LLC, d/b/a
9     ACCIDENT INJURY LEGAL CENTER;
      QUINTESSA MARKETING, LLC,
10    d/b/a ACCIDENT INJURY LEGAL
      CENTER; and LAUREN MINGEE,
11
              Defendants.
12

13

14

15                      * * * * *

16        VIDEOTAPED DEPOSITION OF WALLACE KITTREDGE

17                  ON SEPTEMBER 30, 2022

18              IN OKLAHOMA CITY, OKLAHOMA

19                      * * * * *

20

21

22

23

24    REPORTED BY:  Cheryl D. Rylant, CSR, RPR

25    TSG Job No. 217460

```
 1

 2

 3

 4
                        SEPTEMBER 30, 2022
 5
                           9:31 A.M.
 6

 7

 8

 9          Videotaped Deposition of WALLACE KITTREDGE,

10   held at Regus, 101 Park Avenue, Suite 1300,

11   Oklahoma City, Oklahoma, before Cheryl D. Rylant, a

12   Certified Shorthand Reporter of the State of

13   Oklahoma.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1

2    A P P E A R A N C E S:

3

4          PIRKEY BARBER PLLC

5          Attorneys for Plaintiffs

6    BY:   GIULIO YAQUINTO, ESQ.
           JERED MATTHYSSE, ESQ.
7          1801 East 6th Street
           Austin, Texas 78702
8

9

10

11         LYNN PINKER HURST & SCHWEGMANN, LLP

12         Attorney for Defendants

13   BY:   REBECCA ADAMS, ESQ.
           BARIRA MUNSHI, ESQ. (via Zoom)
14         2100 Ross Avenue
           Dallas, Texas 75201
15

16

17

18

19

20

21

22

23

24

25   VIDEOGRAPHER:   Mark Von Lanken - TSG Reporting
```

1

2          IT IS HEREBY STIPULATED AND AGREED by and

3     between the attorneys for the respective parties

4     herein, that filing and sealing be and the same are

5     hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED that all

7     objections, except as to the form of the question,

8     shall be reserved to the time of the trial.

9          IT IS FURTHER STIPULATED AND AGREED that the

10    within deposition may be sworn to and signed before

11    any officer authorized to administer an oath, with

12    the same force and effect as if signed and sworn to

13    before the Court.

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | W. KITTREDGE |

2      VIDEO TECHNICIAN:  This is the start of

3  media labeled number 1 of the video recorded

4  deposition of Wallace Kittredge, in the matter

5  Jim S. Adler, P.C., et al., versus McNeil

6  Consultants, LLC, et al., in the United States

7  District Court for the Northern District of Texas,

8  Dallas Division, Civil Action Number

9  3:19-cv-02025-K-BN.

10      This deposition is being held at Regus,

11  101 Park Avenue, Suite 1300, Oklahoma City, Oklahoma,

12  on Friday, September 30th, 2022, at approximately

13  9:31 a.m. Central Time Zone.

14      My name is Mark Von Lanken.  I am a Certified

15  Legal Videographer, in association with

16  TSG Reporting, Inc., headquartered at 228 East

17  45th Street, Suite 810, New York, New York.

18      The court reporter is Cheryl Rylant, in

19  association with TSG Reporting.

20      Counsel, will you please introduce

21  yourselves.

22      MR. YAQUINTO:  Giulio Yaquinto,

23  Pirkey Barber, for the Plaintiff.

24      MR. MATTHYSSE:  Jered Matthysse, also with

25  Pirkey Barber, for Plaintiffs.

```
 1                    W. KITTREDGE

 2          MS. ADAMS:  Rebecca Adams with Lynn,

 3   Pinker, Hurst, & Schwegmann, for Defendants.

 4          And also attending remotely is Barira Munshi,

 5   also with Lynn, Pinker, Hurst, & Schwegmann, for the

 6   Defendants.

 7          VIDEO TECHNICIAN:  Will the court reporter

 8   please swear in the witness.

 9          (Oath administered.)

10                 WALLACE KITTREDGE,

11   having been first duly sworn, deposes and says in

12   reply to the questions propounded as follows:

13                 * * * * * *

14                 EXAMINATION

15   BY MR. YAQUINTO:

16      Q. Will you please state your full name for the

17   record?

18      A. Wallace Randall Kittredge.

19      Q. And so, the last name is pronounced

20   "Kittredge" or "Kittredge"?

21      A. "Kittredge."

22      Q. "Kittredge."  All right.  That'll make it

23   easier for me.  That's how I've been saying it in my

24   head.

25          Have you ever been deposed before,
```

Case 3:19-cv-02025-BN Document 1907-1 Filed 06/22/23 Page 400 of 406 PageID 14868

1                              W. KITTREDGE

2      Mr. Kittredge?

3              A. No.

4              Q. Are you at all familiar with the process in

5      terms of -- I'm going to ask you some questions,

6      you'll answer them to the best you can based on your

7      personal knowledge.  Whenever I ask you a question,

8      we'll pause in between, give Ms. Adams an opportunity

9      to object if there are going to be any objections.

10     We'll do our best not to talk over each other, but it

11     should be pretty straightforward.

12             A. Sounds good.

13             Q. Okay.  And you realize that you are under

14     oath and you have to fully answer all of my questions

15     to the best of your ability?

16             A. Yes.

17             Q. Is there any condition or other reason why

18     you can't give full and complete testimony today?

19             A. No.

20             Q. You're not on any medications or anything

21     like that?

22             A. No.

23             Q. Where do you currently live?

24             A. Oklahoma City.

25             Q. Is it in a house, an apartment, or...

1                    W. KITTREDGE

2          A. It's a house.

3          Q. Are you originally from Oklahoma City?

4          A. No.

5          Q. Where were you born and raised?

6          A. I was born in Columbus, Ohio, raised in

7     Boston, Massachusetts.

8          Q. So, when did you move to Oklahoma City?

9          A. That was July of 2015.

10          Q. And what brought you here?

11          A. My wife wanted to get her master's in piano

12     pedagogy and performance and the best program that

13     she found was at OU.

14          Q. Okay. And so, she finished the program,

15     I take it?

16          A. Yeah.

17          Q. And you guys decided to stick around?

18          A. So far, so good.

19          Q. And what is your current occupation or job

20     title?

21          A. Well, I recently resigned from Quintessa and

22     my job title was director of digital marketing.

23          Q. And when did you resign?

24          A. Tuesday was my last day.

25          Q. That was the 27th? Or the 26th -- the 27th.

Case 3:19-cv-02025-K-BN Document 190-18 Filed 08/22/23 Page 402 of 406 PageID 21487

1                        W. KITTREDGE

2        Q. Okay.  And you have no idea about when?

3        A. No.

4        Q. Do you think you had been at the company more

5    than a year at that point?

6        A. I honestly don't recall.

7        Q. And then, to the best of your knowledge, has

8    Lauren or Mike or anybody else asked you to preserve

9    any specific documents in this case?

10       A. Again, I've -- they didn't ask me to do

11   anything for this case.  So, no document creation or

12   anything.

13       Q. And you're not aware of any steps

14   specifically taken to preserve documents in this case

15   by the company?

16            MS. ADAMS:  Objection, form.

17            THE WITNESS:  I have no idea what -- how

18   they've handled anything.

19       Q. (By Mr. Yaquinto)  All right.  Let's look at

20   a few more documents.  I'm going to hand you what has

21   not been marked as an exhibit previously.

22        And, for the record, this is Quintessa 934.

23            (Exhibit 121 marked.)

24       Q. (By Mr. Yaquinto)  Okay.  So, Mr. Kittredge,

25   have you ever seen this document before?

1                    W. KITTREDGE

2                  C E R T I F I C A T E

3    STATE OF OKLAHOMA

4    SS

5    OKLAHOMA COUNTY

6         I, Cheryl D. Rylant, Certified Shorthand

7    Reporter within and for the State of Oklahoma,

8    certify that WALLACE KITTREDGE was by me sworn to

9    testify the truth; that the videotaped deposition was

10   taken by me in stenotype and thereafter transcribed

11   by computer and is a true and correct transcript of

12   the testimony of the witness; totaling 151 pages;

13   that the deposition was taken by me on

14   September 30, 2022, at 9:31 a.m., at 101 Park Avenue,

15   Suite 1300, Oklahoma City, Oklahoma; that I am not a

16   relative, employee, attorney or counsel to any party

17   in this case or otherwise financially interested in

18   this action; and that the witness elected to exercise

19   his right to review the deposition transcript prior

20   to its filing.

21        Witness my hand and seal of office on this

22   the 12th day of October, 2022.

23
                    *Cheryl Rylant*
24
                    Cheryl D. Rylant, CSR
25                  Oklahoma CSR No. 1448

Case 3:19-cv-02075-SBK-BND Document 1972-18 Filed 08/22/23 Page 404 of 406 PageID 224872

1                              ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No.  Now Reads      Should Read  Reason

6    ___  ___  _____     _____   _____

7    ___  ___  _____     _____   _____

8    ___  ___  _____     _____   _____

9    ___  ___  _____     _____   _____

10   ___  ___  _____     _____   _____

11   ___  ___  _____     _____   _____

12   ___  ___  _____     _____   _____

13   ___  ___  _____     _____   _____

14   ___  ___  _____     _____   _____

15   ___  ___  _____     _____   _____

16   ___  ___  _____     _____   _____

17   ___  ___  _____     _____   _____

18   ___  ___  _____     _____   _____

19   ___  ___  _____     _____   _____

20                            _____

                                       Signature of Deponent

21

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2022.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

JIM S. ADLER, P.C. and JIM ADLER,      §

          Plaintiffs,      §

                        §

v.                         §      Civil Action No.: 3:19-cv-02025-K-BN

MCNEIL CONSULTANTS, LLC D/B/A      §
ACCIDENT INJURY LEGAL CENTER,      §    **SEALED DOCUMENT**
QUINTESSA MARKETING, LLC D/B/A      §
ACCIDENT INJURY LEGAL CENTER,      §    **JURY DEMANDED**
and LAUREN MINGEE,             §

                        §

          Defendants.      §

**[PROPOSED] ORDER GRANTING PLAINTIFFS'**
**MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

After considering Plaintiffs' Motion for Sanctions for Spoliation of Evidence, the Court finds

that the motion should be GRANTED.

IT IS HEREBY ORDERED that Defendants are deemed to have admitted that they caused

substantial instances of confusion among an appreciable number of consumers searching for Adler

online and that Defendants took no action to address the ongoing confusion.

IT IS HEREBY ORDERED that Plaintiffs are entitled to an adverse-inference instruction,

the language of which will be determined at the jury-charge conference or another appropriate time.

IT IS HEREBY ORDERED that Defendants' equitable defenses are stricken.

IT IS HEREBY ORDERED that Adler is entitled to an award of attorney's fees incurred in

connection with the sanctions motion, in an amount to be determined upon supplemental briefing

as ordered by the Court.

IT IS SO ORDERED.

Dated: _____                   _____

                                   Judge David L. Horan
                                   U.S. Magistrate Judge

Dated: December 20, 2022                    Respectfully submitted,

*/s/ Jered E. Matthysse*
Jered E. Matthysse
 Texas Bar No. 24072226
 jmatthysse@pirkeybarber.com
Giulio Yaquinto
 Texas Bar No. 24107292
 gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 788702
(512) 322-5200
(512) 322-5201 (fax)

Kurt Kuhn
 Texas Bar No. 24002433
 kurt@kuhnhobbs.com
KUHN HOBBS PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731
(512) 476-6000
(512) 476-6002 (fax)

and

*/s/ Garrett W. Mize*
Garrett W. Mize
 Texas Bar No. 24089610
 gmize@jimadler.com
JIM S. ADLER & ASSOCIATES
The Tower at City Place
2711 North Haskell Avenue, Suite 2500
Dallas, Texas 75204
(214) 220-3224
(214) 220-3233 (fax)

**COUNSEL FOR PLAINTIFFS**