IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | **FILED UNDER SEAL** |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL NO. 3:19-CV-2025-K |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| QUINTESSA MARKETING, LLC D/B/A | § | |
| ACCIDENT INJURY LEGAL CENTER | § | |
| and LAUREN VON MCNEIL, | § | |
| | § | |
| Defendants. | § | |

---

APPENDIX TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
SANCTIONS FOR SPOILATION OF EVIDENCE
(FILED UNDER SEAL)

---

1.  Ex. A – Barira Munshi Declaration ................................................................. App. 1-2

2.  Ex. A-1 – Google Trademarks-Advertising policies help page ................... App. 3-5

4.  Ex. A-2 – State Bar of Texas Opinion 661 ...................................................... App. 6-8

5.  Ex. A-3 – Quintessa corporate representative deposition excerpts .......... App. 9-31

6.  Ex. A-4 – Lauren Mingee deposition excerpts ........................................... App. 32-39

7.  Ex. A-5 – David Walker deposition excerpts ............................................. App. 40-57

8.  Ex. A-6 – Jason Love deposition excerpts .................................................. App. 58-65

9.  Ex. A-7 – Quintessa_000001 (document manually filed with Court) ........... App. 66

10. Ex. A-8 – Quintessa 002622 (document manually filed with Court) ........... App. 67

DATE: January 10, 2023

Respectfully submitted,

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com
Rebecca L. Adams
Texas Bar No. 24098255
radams@lynnllp.com
Barira Munshi
Texas State Bar No. 24095924
bmunshi@lynnllp.com
LYNN PINKER HURST & SCHWEGMANN, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3829 – Facsimile

**ATTORNEYS FOR DEFENDANTS MCNEIL CONSULTANTS, LLC D/B/A ACCIDENT INJURY LEGAL CENTER, QUINTESSA MARKETING, LLC D/B/A ACCIDENT INJURY LEGAL CENTER and LAUREN VON MCNEIL**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via ECF on counsel of record on January 10, 2023.

*/s/ Barira Munshi*
Barira Munshi

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JIM S. ADLER, P.C., AND JIM ADLER,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CA NO. 3:19-CV-02025-K-BN** |
| | § | |
| **MCNEIL CONSULTANTS, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | **JURY DEMAND** |
| **QUINTESSA MARKETING, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | |
| **AND LAUREN VON MCNEIL,** | § | |
| | § | |
| *Defendants.* | § | |

---

**DECLARATION OF BARIRA MUNSHI**

---

My name is Barira Munshi, my date of birth is March 30, 1989, and my business address is 2100 Ross Avenue, Suite 2700, Dallas, Texas 75201.

I declare under penalty of perjury that the foregoing and the following facts stated in this Declaration are true and correct and are within my personal knowledge:

1.      I am over the age of eighteen (18) years, of sound mind, have never been convicted of a felony, and am fully competent to testify to the facts contained herein. Every statement made in this declaration is made on my personal knowledge and is true and correct. I make this declaration in support of Defendant's Response to Plaintiffs' Motion for Sanctions for Spoliation of Evidence (the "Motion").

2.      I am an attorney licensed to practice in Texas and a member in good standing with the State Bar of Texas. I am an Associate at the law firm Lynn Pinker Hurst and Schwegmann ("LPHS"). LPHS represents McNeil Consultants, LLC, a Defendant in the above captioned lawsuit, *Jim S. Adler, P.C., and Jim Adler v. McNeil Consultants, LLC, d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC, d/b/a Accident Injury Legal Center, and Lauren Von McNeil*, Cause No. 3:19-CV-02025-K-BN, pending in the Northern District of Texas (the "Lawsuit").

3.      I am personally familiar with the depositions taken and the documents produced in this matter.

**DECLARATION OF BARIRA MUNSHI**                                                   **Page 1**

4.      A true and correct copy of Google's Trademarks-Advertising Policies Help page is attached hereto as Exhibit A-1.

5.      A true and correct copy of the Professional Ethics Committee for the State Bar of Texas Opinion 661 is attached hereto as Exhibit A-2.

6.      On November 16, 2022, Lauren Mingee was deposed as the corporate representative of Quintessa Marketing, LLC. A true and correct copy of excerpts of that deposition are attached hereto as Exhibit A-3.

7.      One April 13, 2022, Lauren Mingee was deposed in her personal capacity. A true and correct copy of the excerpts of that deposition are attached hereto as Exhibit A-4.

8.      On September 28, 2022, Michael Walker was deposed in his personal capacity. A true and correct copy of the excerpts of that deposition are attached hereto as Exhibit A-5.

9.      On July 22, 2022, Jason Love was deposed in his personal capacity. A true and correct of the excerpts of that deposition are attached hereto as Exhibit A-6.

10.     Exhibit A-7 is a true and correct copy of the document Bates stamped Quintessa_000001 that has been manually filed with the Court .

11.     Exhibit A-8 is a true and correct copy of the document Bates stamped Quintessa_002622 that has been manually filed with the Court.

Executed in Dallas County, Texas, on January 10, 2023.

Barira Munshi

**DECLARATION OF BARIRA MUNSHI**                                    **Page 2**

# Trademarks

Google provides translated versions of our Help Center as a convenience, though they are not meant to change the content of our policies. The English version is the official language we use to enforce our policies. To view this article in a different language, use the language dropdown at the bottom of the page.

Display & Video 360 users must comply with this Google Ads policy. Visit the Display & Video 360 help center for additional restrictions.

Google abides by local trademark laws and requires that Google Ads ads don't infringe third party trademarks. We recognize that third parties may properly use trademarks in certain situations, such as by resellers to describe products.

If a trademark owner submits a complaint to Google about the use of their trademark in Google Ads ads, we will review it and may enforce certain restrictions on use of the trademark.

**If you are a trademark owner concerned with the use of your trademark, please review the policy outlined on this page and see the Help for trademark owners page for more information about how to submit a complaint.**

**If you are an advertiser and have questions about how this policy may affect your ads, please visit the Trademark help for advertisers page.**

## Trademarks in search ads

The following policies apply to text ads    appearing on the Google Search Network    , or in response to a search query on the Display Network    , and they are enforced when a trademark owner submits a valid complaint to Google.

### Trademarks in ad text

In response to trademark owner complaints, we may restrict the use of trademarks in ad text.

There are specific requirements for resellers, informational sites, and authorized advertisers who want to use trademarks that would otherwise be restricted.

#### Reseller and informational site policy

Ads may use the trademark in ad text if they meet the following requirements:

**Resellers:** The ad's landing page is primarily dedicated to selling (or clearly facilitating the sale of) products or services, components, replacement parts, or compatible products or services corresponding to the trademark. The landing page must clearly provide a way to purchase the products or services and display commercial information about them, such as rates or prices.

**Informational sites:** The primary purpose of the ad's landing page is to provide informative details about products or services corresponding to the trademark.

The following is not allowed under the Reseller and informational site policy:

- Ads referring to the trademark for competitive purposes.
- Ads with landing pages that require users to provide extensive information before displaying commercial information.
- Ads that are unclear as to whether the advertiser is a reseller or informational site.

**EXHIBIT A-1**                              **App. 003**

### Authorized advertisers

Advertisers may use the trademark in ad text if the trademark owner has authorized them. If you are a trademark owner and would like to authorize an advertiser, please see the Help for trademark owners page. If you are an advertiser seeking authorization, please follow the instructions on the Trademark help for advertisers page.

#### Term not used in reference to a trademark

The following types of ads may use the term in ad text:

- Ads using the term descriptively in its ordinary meaning rather than in reference to the trademark.
- Ads referring to goods or services that do not correspond to the trademark.

#### Ad assets and other ad formats

For certain ad assets and formats only, ads may use a trademark in ad text when referring to the trademark to provide additional information about the advertised products or services.

## Trademarks as keywords

We don't investigate or restrict trademarks as keywords .

## Trademarks in EU and EFTA policy

For ad campaigns targeting the European Union and European Free Trade Association regions, the policy for trademarks in ad text and keywords applies. However, in response to a valid complaint in these regions, we will conduct a limited investigation as to whether a combination of keyword and ad featuring a trademark is confusing as to the origin of the advertised goods and services. If we find that the combination of keyword and ad is confusing, we will disapprove it.

The following types of ads targeting the EU and EFTA regions may use the trademark as a keyword, provided that the combination of the keyword and ad is not confusing. These are examples, and not an exhaustive list:

- Ads using a term descriptively or generically rather than in reference to the trademark.
- Ads for competing products or services.
- Ads for the sale of products or services, replacement parts, or compatible products or services corresponding to the trademark.
- Ads for sites that provide informative details about products or services corresponding to the trademark.
- For certain ad assets and formats only: Ads referring to the trademark to provide additional information about the advertised products or services.

## Trademarks in display URLs

In response to trademark owner complaints, we may restrict trademarks from appearing in the subdomains of display URLs . We don't investigate or restrict trademarks in the second-level domains or post-domain paths of display URLs.

## Trademarks in business assets

In response to trademark owner complaints, we may restrict a trademark from appearing in business assets such as business names and business logos.

## Trademarks in other types of ads

Google may remove specific ads on the Google Network in response to trademark owner complaints.

App. 004

Case 3:19-cv-03025-RN-BND Document 108   Filed 08/22/23   Page 7 of 69   PageID 54905

## Trademarks in ad disclosures

In response to a complaint, we may restrict a trademark from appearing within the 'Advertiser Name' in ad disclosures, and show an advertiser's payments profile name instead. This includes 'About the Advertiser' disclosures.

**App. 005**

THE PROFESSIONAL ETHICS COMMITTEE
FOR THE STATE BAR OF TEXAS
Opinion No. 661

July 2016

QUESTION PRESENTED

Does a lawyer violate the Texas Disciplinary Rules of Professional Conduct by using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company?

STATEMENT OF FACTS

Recognizing that many potential clients search for a lawyer by using internet search engines, Lawyer A uses various search-engine optimization techniques to try to ensure that his name appears on the first page of the search results obtained when a potential client uses a search engine to seek a lawyer. One way Lawyer A seeks to achieve this goal is by participating in internet search-based advertising programs offered by search engines that are in widespread use by many types of businesses.

These search-based advertising programs allow a business to select specific words or phrases ("keywords") that will cause the business's advertisement to pop up in the search results of someone using that keyword in a search. The advertiser does not purchase exclusive rights to specific keywords; the same keywords can be used by a number of advertisers.

Lawyer B is a competing lawyer in Lawyer A's town. Lawyer B's area of practice is similar to Lawyer A's. Lawyer A and Lawyer B have never been law partners or engaged in joint representation in any case.

One of the keywords selected by Lawyer A is the name of Lawyer B. Lawyer A's keyword selection causes Lawyer A's name and a link to his website to be displayed on the search engine's search results page any time an internet user searches for Lawyer B using the search engine. Lawyer A's advertisement will appear to the side of or above the search results in an area designated for "ads" or "sponsored links." In addition to displaying Lawyer A's name and a link to Lawyer A's website, the ad or sponsored link may contain additional text concerning Lawyer A and his practice. Usually Lawyer B's name would also be listed in the search results. Moreover, if Lawyer B had also purchased similar advertising services from the search engine and had used his own name as a keyword, Lawyer B's name would also be listed in the ad or sponsored link section as well as in the regular search results when Lawyer B's name was used by a potential client as a search term.

1

Lawyer A's keyword advertisement or sponsored link does not indicate whether or not Lawyer A and Lawyer B are affiliated. Lawyer B did not authorize Lawyer A to use Lawyer B's name in connection with Lawyer A's keyword advertisement.

**DISCUSSION**

Advertising, including internet advertising, is addressed in Part VII of the Texas Disciplinary Rules of Professional Conduct. The Texas Disciplinary Rules do not specifically address the question of whether it is permissible for a lawyer to use a competitor's name to enhance the lawyer's internet advertising. However, several provisions of the Texas Disciplinary Rules must be considered with respect to this question.

Rule 7.01(d) states that "[a] lawyer shall not hold himself or herself out as being a partner, shareholder, or associate with one or more other lawyers unless they are in fact partners, shareholders, or associates."

Rule 7.02(a) prohibits a lawyer from making or sponsoring "a false or misleading communication about the qualifications or the services of any lawyer or firm." A communication is false or misleading if it "contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading[.]" Rule 7.02(a)(1). Comment 3 to Rule 7.02 explains the standard set forth in Rule 7.02(a)(1) as follows:

> "Sub-paragraph (a)(1) recognizes that statements can be misleading both by what they contain and what they leave out. Statements that are false or misleading for either reason are prohibited. A truthful statement is misleading if it omits a fact necessary to make the lawyer's communication considered as a whole not materially misleading. A truthful statement is also misleading if there is a substantial likelihood that it will lead a reasonable person to formulate a specific conclusion about the lawyer or the lawyer's services for which there is no reasonable factual foundation."

Under these Rules, if Lawyer A's use of Lawyer B's name as a keyword in search-engine advertising results in an advertisement that holds out Lawyer A to be a shareholder, partner, or associate of Lawyer B, then Lawyer A's use of Lawyer B's name would violate Rule 7.01(d). Furthermore, if such use of Lawyer B's name would lead a reasonable person to believe that Lawyer A and Lawyer B are associated in some way, then the use of Lawyer B's name as a keyword would be a misleading communication in violation of Rule 7.02(a).

In the opinion of this Committee, the use of a competitor's name as a keyword in the factual circumstances here considered would not in normal circumstances violate either Rule 7.01(d) or Rule 7.02(a). The advertisement that results from the use of Lawyer B's name does not state that Lawyer A and Lawyer B are partners, shareholders, or associates of each other. Moreover, since a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results, it appears highly unlikely that a reasonable person using an internet search engine would be misled into thinking

2

**App. 007**

that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search. Compare *Habush v. Cannon*, 828 N.W.2d 876 (Wis. Ct. App. 2013) (finding no violation of Wisconsin right-of-privacy statute when one law firm used the name of a competing law firm as a keyword in search-engine advertising).

In addition to Rules 7.01(d) and 7.02(a), Rule 8.04(a)(3) must also be considered. Rule 8.04(a)(3) prohibits a lawyer from engaging in conduct "involving dishonesty, fraud, deceit or misrepresentation." In the opinion of the Committee, given the general use by all sorts of businesses of names of competing businesses as keywords in search-engine advertising, such use by Texas lawyers in their advertising is neither dishonest nor fraudulent nor deceitful and does not involve misrepresentation. Thus such use of a competitor's name in internet search-engine advertising is not a violation of Rule 8.04(a)(3). In reaching this conclusion, this Committee has considered but does not concur with 2010 Formal Ethics Opinion 14 of the Ethics Committee of the North Carolina State Bar (April 27, 2012) (ruling that a lawyer's use of a competitor's name as a keyword in a search-engine advertising program violates the equivalent of Texas Disciplinary Rule 8.04(a)(3) because such use constitutes "conduct involving dishonesty" in that the conduct shows "a lack of fairness or straightforwardness").

It should be noted that this opinion addresses only whether the use of a competitor's name in internet search-engine advertising programs violates the Texas Disciplinary Rules of Professional Conduct. Although such use of a competitor's name as a keyword in advertising programs does not in the opinion of the Committee involve a violation of the Texas Disciplinary Rules, a Texas lawyer's participation in such an advertising program must comply with the other provisions of the Texas Disciplinary Rules applicable to advertising, in particular Disciplinary Rule 7.04 on advertisements in the public media. Moreover, depending on the circumstances, a Texas lawyer advertising through keywords on internet search engines may be subject to other requirements or prohibitions imposed by federal or state law or by professional ethics rules of other jurisdictions.

**CONCLUSION**

A lawyer does not violate the Texas Disciplinary Rules of Professional Conduct by simply using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company. The lawyer's statements included in this advertising program must not contain false or misleading communications and must comply in all respects with applicable rules on lawyer advertising.

3

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF TEXAS

 3                    DALLAS DIVISION

 4    JIM ADLER, P.C. AND          )

 5    JIM ADLER,                   )

 6           Plaintiffs           )

 7                                 )

 8    VS.                          )CIVIL ACTION

 9                                 )NO. 3:19-cv-02025-K-BN

10    MCNEIL CONSULTANTS, LLC,     )

11    D/B/A ACCIDENT INJURY LEGAL  )

12    CENTER, QUINTESSA MARKETING, )

13    LLC, D/B/A ACCIDENT INJURY   )

14    LEGAL CENTER, AND LAURA      )

15    MINGEE,                      )

16           Defendants           )

17        ----------------------------------------

18              VIDEOTAPED ORAL DEPOSITION OF

19                    LAUREN MINGEE

20                  NOVEMBER 16, 2022

21              ***ATTORNEYS' EYES ONLY***

22        ----------------------------------------

23

24    REPORTED BY KATHRYN R. BAKER, RPR, CSR

25    JOB #219107
```

**EXHIBIT A-3**

```
1              VIDEOTAPED ORAL DEPOSITION OF LAUREN MINGEE,
2    produced as a witness at the instance of the PLAINTIFFS,
3    and duly sworn, was taken in the above-styled and numbered
4    cause on the 16th day of November, 2022, from 9:58 a.m. to
5    3:19 p.m., before Kathryn R. Baker, CSR, RPR, in and for
6    the State of Texas, reported by a Texas certified machine
7    shorthand reporter, at the offices of Lynn, Pinker, Cox,
8    Hurst & Schwegmann, LLP, 2100 Ross Avenue, Suite 2700, in
9    the City of Dallas, State of Texas, pursuant to the
10   Federal Rules of Civil Procedure.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                 A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:
     Jered Matthysse, Esq.
 3   Giulio Yaquinto, Esq.
     PIRKEY BARBER PLLC
 4   1801 East 6th Street
     Austin, Texas 78702
 5

 6
     FOR THE DEFENDANTS:
 7   Rebecca Adams, Esq.
     Christopher Schwegmann, Esq.
 8   LYNN PINKER HURST & SCHWEGMANN, LLP
     2100 Ross Avenue
 9   Dallas, Texas 75201

10

11   ALSO PRESENT:
     Mr. Chase Huddleston, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    LAUREN MINGEE

2       Q.   And then finally, I believe, this was prepared

3   in February of 2022, so at least at some -- as in January

4   of 2022 there were 28 such instances, right?

5       A.   Correct.

6       Q.   And so stepping back, Ms. Mingee, we talked a

7   bit about this before the break, about folks calling in

8   and looking for or mentioning Jim Adler.

9                    Do you recall that?

10      A.   Yes.

11      Q.   And clearly it happens on -- at least multiple

12  times a month; is that right?

13      A.   I don't know the percentage.  That is what I am

14  waiting for to see, how many total QM injury calls were

15  also processing for the year.

16      Q.   Okay.  But I'm asking -- that's not the question

17  I asked.

18                    The question I asked is:  That was

19  happening multiple times a month; is that right?

20      A.   Correct.

21      Q.   Okay.  And despite that and the increase from

22  2018 to 2019, Quintessa made no changes to its ad copy; is

23  that right?

24      A.   Correct.

25      Q.   And no changes to your script?

1                            LAUREN MINGEE

2          A.    I don't know about from '18 to '19 what was

3    changed on the script.

4          Q.    What do you mean by that?

5          A.    I don't have copies from 2018 what script was

6    being used then.  So I know that anything that happened

7    it -- we were constantly refining our process of intake

8    and trying to make it better.

9                 When we started this in '16, I started with

10   one employee.  As we continued to grow and establish our

11   C Suite in 2019, we had more people able to do more things

12   and help with establishing more processes and procedures.

13         Q.    Okay.  And so do you recall whether the script

14   was changed at all in that time period?

15         A.    The script was changed multiple times.

16         Q.    How so?

17         A.    I don't know the answer to that.  I just know

18   what started in '16 is not what is today.

19         Q.    Okay.  But '18 to '19 was the competitive script

20   changed?

21         A.    I don't know that answer.

22         Q.    At that time, from 2018 to 2019, as -- it looks

23   like those calls increased, did you ever -- did the

24   company ever consider stopping its bidding on the Jim

25   Adler name?

1                     LAUREN MINGEE

2              But the call center employees will answer

3     the phone and then summarize -- as we saw in Quintessa 1,

4     their description of the call, right?

5          A.    Yes.

6          Q.    Okay.  And while that is happening in real time,

7     Quintessa uses a software called Slack, correct?

8          A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17         Q.    And I believe we talked about that last time.

18    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

21         A.    Correct.

22         Q.    And once the call center employee gathers those

23    that is then inputted into Slack?

24         A.    Correct.

25    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1                          LAUREN MINGEE

10       Q.    And who has access to Slack?

11       A.    All of the intake reps and then the management.

12       Q.    Who's the management?

13       A.    Actually, the VP of intake and then any of her

14    managers underneath her.  And then Mike Walker and I have

15    access.  And then -- I think that is it.

16       Q.    Okay.  And what does management -- how does

17    management use Slack?

18       A.    They don't.

19       Q.    So -- but you have access to it?

20       A.    Correct.

21       Q.    You've never gone into it?

22       A.    No, I use it.

23       Q.    Okay.

24       A.    So, for instance, if they had -- let's say that

25    our management is in a meeting -- intake managers are in a

```
 1                        LAUREN MINGEE
 2    meeting, and they need to know where to send a case, then
 3    I will answer if need be.   But I am a 1 percent.   I'm not
 4    really in it.
 5         Q.    Okay.
 6         A.    The managers are using it on the day-to-day
 7    solely for directing them on where to send a potential
 8    lead.
 9         Q.    Okay.   And so the info that we saw in
10    Quintessa 1 in the description column, would that
11    description of the call be included in the Slack
12    messaging?
13         A.    No.
```

```
1                          LAUREN MINGEE

2                Thank you.

3        Q.    As you can see, Ms. Mingee, this was previously

4   marked at a different deposition, and it's called,

5   Insurance call script.

6                Do you see that?

7        A.    Yes.  Yes.

8        Q.    Do you recognize this script?

9        A.    I do.

10       Q.    Who wrote this script?

11       A.    I don't know who wrote this script.

12       Q.    Okay.  Do you know about when this script began

13   being used by the company?

14       A.    It would have been whenever we were bidding

15   things like injury claims and things of that nature.  So

16   it would have been either in 2019 or 2020.

17       Q.    What is the purpose of having injury

18   call -- sorry -- an insurance call script?

19       A.    ██████████████████████  ████████████████

    ████████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ████████████████████████████████

24       Q.    Okay.  So you had a script for the insurance

25   side of it essentially?
```

```
 1                    LAUREN MINGEE

 2       A.    ████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ██████████████████████████████████████

 9       Q.    Okay.  It says here in the script, ████

   ████████████████████████.  I assume depending on the time of day,

11    right?

12       A.    Yes, sir.

13       Q.    It says, This is your name.  ████████████

   ███████████████████████████████████████████

15       A.    Yes.

16       Q.    It says, ████████████████████████████████

   ████████████████████████████████████████████

   ██████████████████████

19
```

                              .

1                         LAUREN MINGEE

2

5        Q.   Okay.  So did Quintessa have folks calling in

6   asking if Quintessa was GEICO, for instance?

7        A.   They would ask a myriad of things.  So we get

8   asked for the courthouse sometimes.  So -- but with the

9   injury claims, we were being asked more if we were either

10  a property damage help line, or if this is the claims

11  department, or there is just a bunch different things that

12  we would be asked.

13       Q.   ███████████████████████████████████

14  ███████

15       A.   To my knowledge, no.  That is not one of our

16  practices.  ███████████████████████████

    ███████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████

21       Q.   Okay.  But have you discussed it?

22       A.   Not really.  That's not been a real big point.

23  ████████████████████████████████████████

24  ████████████████████████████████

25       Q.   And so the -- strike that.

```
 1                      LAUREN MINGEE

 2              So the next portion of the script says,

 3      ████████████████████████████████████████.

 4                  Do you see that?

 5          A.   I do.

 6          Q.   Who came up with the name, Injury claims

 7      department?

 8          A.   I -- I do not recall who did.

 9          Q.   Okay.  Do you know how or why that phrase was

10      chosen?

11          A.
```

```
20          Q.   Got it.  So it's to help them -- is that to help

21      ███████████████████████████████████████

22          A.   Correct.

23          Q.   And you said "establish a d/b/a," what do you

24      mean by that?

25          A.   Doing business as.
```

```
 1                      LAUREN MINGEE

 2        A.   Yes.

 3        Q.   Okay.   What do you mean -- what does the company

 4   mean by existing claim?

 5        A.   Our goal was to help them set up an injury claim

 6   through the use of an attorney.   So when we were asking

 7   them if they had already had an injury claim set up,

 8   because sometimes what we see is that these -- and I'm

 9   sure Mr. Adler says that -- whenever someone has been in

10   an accident, they contact insurance to let them know,

11   they're immediately trying to settle.

12             So our goal was to help them before they're

13   getting offered something really low, get them assistance

14   with an attorney if we could.

15        Q.   Okay.   I am going to hand you, Ms. Mingee, what

16   will be marked as Exhibit 139 -- I take that back.   It's

17   Exhibit 108.

18        A.   Okay.

19             (Exhibit 108 previously marked.)

20        A.   Thank you.

21        Q.   (BY MR. MATTHYSSE)
```

1                    LAUREN MINGEE

2            Do you see that?

3        A.   I do.

4        Q.

1    LAUREN MINGEE

2    ████████████████████████████████████████

  ████████████████████████████████████████.

4            Do you see that?

5        A.   Yes.

6        Q.   What -- the first question there is:  Who came

7    up with the name "intake department"?

8        A.   This was something that was used at Exclusive

9    Legal Marketing.  So as -- in part of my agreement with

10   Cody Bryant was to help him on his intake because that is

11   what I used to run for him was the intake department.  And

12   so this was a script that they had come up with at

13   Exclusive Legal.  And so when we were operating intake for

14   them, this was the script that was given, and that we

15   operated under.

16       Q.   Okay.  So this script you took to McNeil

17   Consultants and then in 2019 to Quintessa Marketing,

18   correct?

19       A.   I believe it was changed in 2019.  But, yes, it

20   is what was used at McNeil Consultants when we were

21   adver- -- or doing advertising and the intake for

22   Exclusive Legal.

23       Q.   How was it changed in 2019?

24       A.   This formatting doesn't look the same like it

25   was, I believe, in '19.  I think it was just more robust.

```
 1                      LAUREN MINGEE
 2   I think it had different language in it.
 3        Q.   Okay.  So in 2019 if someone asked, Is this the
 4   Adler Law ███████████████████████████████████████
      ████████████████████████████████████████████████
      ██████████████████████████
 7        Q.   Okay.  And so when you moved over to McNeil
 8   Consultants and began using this script, did you consider
 9   changing it?
10        A.   No.
11        Q.   Why not?
12        A.   It was a script that we had used, and we just
13   continued to use it.
14        Q.   Did you give any thought to changing it at that
15   time?
16        A.   I was one woman with like 27 employees.  I
17   wasn't thinking much about the little things on that side,
18   unfortunately.
19        Q.   Okay.  And so the script specifically
20   says -- well, let's step back for a minute.
21             I believe you mentioned for the insurance
22   call script that you filed for a d/b/a for Injury Claims
23   Department; is that right?
24        A.   Yes, sir.
25        Q.   Did you do the same for Intake Department?
```

1              LAUREN MINGEE

2    preserve documents?

3         A.    We -- to my knowledge, we didn't start changing

4    any processes or really investigating it until -- until

5    the appeal came through.

6         Q.    Okay.  And that's the Fifth Circuit decision

7    that we discussed?

8         A.    Yes, sir.

9         Q.    And once that happened and you received notice

10   of the Fifth Circuit decision, what did you then do to

11   ensure the documents were -- were being preserved?

12        A.    Once the discovery process came about and we

13   started pulling documentation, we did not know -- we

14   weren't deleting, but we didn't know that things like Top

15   Desk were only keeping data for 14 months.  So once we

16   started trying to pull things for discovery, everything we

17   found out, we then started, of course, correcting.

18              (Ms. Adams entered the deposition.)

19        Q.    (BY MR. MATTHYSSE)  Okay.

20        A.    If it wasn't preserving.  Unfortunately, we

21   don't have like a head of security or anything like that,

22   so whether it was right or wrong, I thought that

23   everything was just there and not being deleted.

24        Q.    And so when you say "course correcting," what do

25   you mean by course correcting?

ATTORNEYS' EYES ONLY

```
 1                         LAUREN MINGEE

 2        A.   When we found out that Top Desk only saves data

 3   for 14 months, then we started downloading every month

 4   anything that wasn't saving.  If that makes sense.

 5        Q.   Okay.  And about when, to the best of your

 6   recollection, did Jason Love leave Quintessa?

 7                  THE WITNESS:  Do we have that document?

 8                  MS. ADAMS:  Yes, we do.

 9        A.   I have a document with each one of the start

10   dates.

11                  Jason Love, he left in June of 2020.

12        Q.   (BY MR. MATTHYSSE)   Okay.  Okay.  I think

13   that's when he was hired; is that right?

14        A.   Yep.

15        Q.   Okay.

16        A.   Sorry.

17        Q.   No worries.

18        A.   You are correct.  Thank you for correcting me.

19                  So he started June 15th of 2020.  He left

20   12/8 of 2021.

21        Q.   Okay.  Got it.

22                  And so he left 12/8 of '21.  About

23   when -- well, strike that.

24                  Who is his replacement?

25        A.   We honest -- we didn't end up replacing him
```

1                    LAUREN MINGEE

2   until just recently.  So Jason, when he left -- we only

3   have a certain number of Google licenses.  And then after

4   that certain number is up, you have to pay like twice the

5   amount.  So our practice was, if someone left, we would

6   let the e-mail go and create another one.

7                    Jason and then his role, everything went

8   through intake.  So all e-mail leads that were processed

9   or anything like that, went through the intake and then

10  the support e-mail.  So that was not something that was

11  preserved.

12                   We've now made different changes to where

13  when someone leaves, we can download everything and then

14  add another e-mail address.

15       Q.   Okay.  And so, to your knowledge, how was that

16  not preserved?  Was that -- I believe that it was deleted,

17  I believe, by Mike Walker; is that right?

18       A.   Correct.

19                   MS. ADAMS:  Objection to form.

20       Q.   (BY MR. MATTHYSSE)   And do you know about when

21  that happened?

22       A.   No, I do not.

23       Q.   Okay.  What -- I know we talked about this topic

24  a little bit earlier, but what, if anything, has Quintessa

25  done to preserve the Slack messages?

LAUREN MINGEE

1

2     A.   They searched through Slack for anything in

3  regards to Adler.  And there is not.  So that's something

4  that's done on a regular basis.

5          But as far as the Slack messages, it

6  doesn't allow us -- it doesn't save the data past nine

7  days.

8     Q.   Okay.  And has -- when you say search for Adler,

9  when did that search happen?

10     A.   It's performed routinely by Mike Walker.

11     Q.   Okay.  And when did that -- would that first

12  have happened around the time of the discovery that you

13  mentioned, after the Fifth Circuit decision?

14     A.   Yes.

15     Q.   Okay.  And -- but that would be just a search

16  for the past nine or so days, right?

17     A.   Correct.

18     Q.   And prior to that time, Quintessa -- that Slack

19  data had been -- is gone, permanently deleted, right?

20     A.   Correct.

```
 1                    LAUREN MINGEE

 2          IN THE UNITED STATES DISTRICT COURT

 3          FOR THE NORTHERN DISTRICT OF TEXAS

 4                   DALLAS DIVISION

 5   JIM ADLER, P.C. AND          )

 6   JIM ADLER,                   )

 7          Plaintiffs            )

 8                                )

 9   VS.                          )CIVIL ACTION

10                                )NO. 3:19-cv-02025-K-BN

11   MCNEIL CONSULTANTS, LLC,     )

12   D/B/A ACCIDENT INJURY LEGAL  )

13   CENTER, QUINTESSA MARKETING, )

14   LLC, D/B/A ACCIDENT INJURY   )

15   LEGAL CENTER, AND LAURA      )

16   MINGEE,                      )

17          Defendants            )

18       **********************************

19            REPORTER'S CERTIFICATION

20         ORAL DEPOSITION OF LAUREN MINGEE

21               NOVEMBER 16, 2022

22       **********************************

23        I, Kathryn R. Baker, RPR, a Certified Shorthand

24   Reporter in and for the State of Texas, hereby certify to

25   the following:
```

1            LAUREN MINGEE

2        That the witness, LAUREN MINGEE, was duly sworn

3    by the officer and that the transcript of the oral

4    deposition is a true record of the testimony given by the

5    witness;

6        I further certify that pursuant to FRCP Rule

7    30(f)(1) that the signature of the deponent:

8        _X_ was requested by the deponent or a party

9    before the completion of the deposition and is to be

10   returned within 30 days from the date of receipt of the

11   transcript.  If returned, the attached Errata contain any

12   changes and the reasons therefor;

13       ___ was not requested by the deponent or a party

14   before the completion of the deposition.

15       I further certify that I am neither counsel for,

16   related to, nor employed by any of the parties or

17   attorneys in the action in which this proceeding was

18   taken, and further that I am not financially or otherwise

19   interested in the outcome of the action;

20

21

22

23

24

25

1               LAUREN MINGEE

2          Subscribed and sworn to on this 30th day of

3     November, 2022.

4

5
                  _____
                  KATHRYN R. BAKER, RPR, CSR #6955
6                 Expiration Date:  04/30/2023
                  Firm Registration No. 615
7                 TSG Reporting
                  228 E. 45th Street
8                 Suite 810
                  New York, New York 10017
9                 877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3    JIM S. ADLER, P.C. and     )
     JIM ADLER,                 )
4        Plaintiffs,            )
                                )
5    VS.                        ) CA NO. 3:19-cv-02025-K-BN
                                )
6    MCNEIL CONSULTANTS, LLC    )
     D/B/A ACCIDENT INJURY      )
7    LEGAL CENTER, QUINTESSA    )
     MARKETING, LLC D/B/A       )
8    ACCIDENT INJURY LEGAL      )
     CENTER, and LAUREN VON     )
9    MCNEIL,                    )
         Defendants.            )
10        *****************************************
             ORAL AND VIDEOTAPED DEPOSITION OF
11
             LAUREN VON MCNEIL MINGEE
12
                      CONFIDENTIAL
13
                    April 13, 2022
14        *****************************************
         ORAL AND VIDEOTAPED DEPOSITION OF LAUREN VON MCNEIL
15
     MINGEE, produced as a witness at the instance of the
16
     Plaintiffs, and duly sworn by me, taken in the above-
17
     styled and numbered cause on April 13, 2022, from
18
     10:08 a.m. to 7:29 p.m., before DIANA BENGS, CSR, RPR,
19
     Texas CSR No. 4907, in and for the State of Texas,
20
     reported by machine shorthand, at the offices of Lynn,
21
     Pinker, Hurst & Schwegmann, 2100 Ross Avenue, Suite 2700,
22
     Dallas, Texas, pursuant to the Federal Rules of Civil
23
     Procedure and provisions stated on the record.
24
     Reported By: DIANA M. BENGS, CSR, RPR
25   Job No. 207160
```

**EXHIBIT A-4**

Confidential

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
         Jered Matthysse, Esq.
 4       Giulio Yaquinto, Esq.
         Pirkey Barber
 5       1801 East 6th Street
         Austin, TX 78702
 6

 7

 8

 9
     FOR THE DEFENDANTS:
10       Christopher Schwegmann, Esq.
         Rebecca Adams, Esq.
11       Lynn Pinker Hurst & Schwegmann
         2100 Ross Avenue
12       Dallas, TX 75201

13

14

15

16   VIDEOGRAPHER:
         MR. MICHAEL MOORE
17

18

19

20

21

22

23

24

25
```

```
 1  page 7 that, "Defendants respond that Quintessa uses a
 2  cloud-based call center software program called
 3  Talkdesk, which records incoming calls that are kept in
 4  the regular course of business for 13 months."
 5              Do you see that?
 6      A.   Yes, sir.
 7      Q.   First, I guess, what is Talkdesk?
 8      A.   It is a VoIP, so V-o-I-P -- I don't even know
 9  what it -- Voice Over Internet.  I'm not sure of the
10  definition.
11      Q.   Okay.  And how long have you used Talkdesk
12  for?
13      A.   I believe since 2016.
14      Q.   Okay.  And you used them primarily to record
15  the calls, or is there other purposes that Talkdesk --
16  services that Talkdesk offers?
17      A.   We use Talkdesk just for -- as a platform to
18  be able to answer calls through.
19      Q.   Okay.  So the call comes through, and it is
20  over their VoIP?
21      A.   Yes, sir.
22      Q.   And it says here that the calls are "kept in
23  the regular course of business for 13 months."
24              Do you see that?
25      A.   Yes, sir.
```

1    Q.    Where does that 13-month figure come from?

2    A.    So when we spoke with Talkdesk, they said that

3  they -- so whether we said one month or three months or

4  10 years in the -- you know, they only keep them for 13

5  months.  So even if we selected a shorter time, the

6  only -- the amount of time that they store them is for

7  13 months.

8    Q.    No matter what?

9    A.    No matter what.

10    Q.    When did you speak to them about that?

11    A.    Mike speak -- Mike spoke with them, and I

12  believe it was just a few weeks ago, to confirm that.

13    Q.    And so you are saying Talkdesk told Mike that

14  no matter what you-all have said, they'll only keep

15  things for 13 months?

16    A.    So if we set it for a lesser time than 13

17  months, they would keep them for 13 months.  The max

18  that we can select them for is, I believe, two years,

19  one year, one of the two.

20    Q.    Okay.  So you could select longer?

21    A.    I believe so.

22    Q.    Is there an option for you to download the

23  recordings and keep them yourself?

24    A.    Yes.

25    Q.    Okay.  Why did you choose 13 months?

1    A.    I didn't.

2    Q.    So Talkdesk chose that?

3    A.    I believe it is just an -- either an auto

4  setting, like once you set up your account, that it

5  just selects that.

6    Q.    Okay.  And it says in that same response that

7  "Quintessa uses one phone number for the Texas search

8  engine marketing campaign."

9          Has that always been the case?

10   A.    I don't know about always; but generally

11 speaking, all Texas -- the bulk of our Texas campaign

12 came through the QM Injury phone number.

13   Q.    Okay.  It also says there, in this answer to

14 Interrogatory No. 11, in Exhibit 5, that (Reading:)

15 The number of call center agents have -- has grown from

16 1 to 25 since 2016.

17         Do you see that?

18   A.    Yes, sir.

19   Q.    Were you originally -- I remember you talked

20 about how you might have answered the phone sometimes.

21 Did you ever consider yourself one of these agents?

22   A.    No, sir.

23   Q.    So that was a different employee originally?

24 Not yourself in the beginning?  It says one agent.

25   A.    Oh, I see.  Yes, sir.

1    keep types of documents in the company.

2        A.    No, sir.

3        Q.    What have you done to retain documents since

4    the Adler lawsuit was filed in 2019?

5        A.    We've -- a memo was sent out to everyone about

6    not deleting any e-mails or things of that nature.  We

7    haven't deleted e-mails.  Our e-mails were pulled from,

8    like, 2016.

9        Q.    Okay.

10       A.    But we wanted to make sure that -- that

11   everyone was clear on that.

12       Q.    And that was sent in 2019?

13       A.    I'm unsure --

14       Q.    Okay.

15       A.    -- on the exact date.

16       Q.    And what have you done since the lawsuit was

17   filed to make sure the Talkdesk recordings have not

18   been deleted?

19       A.    They have been -- since it was -- since it was

20   turned over, they have been -- Mike has downloaded them

21   to make sure that they are being preserved.

22       Q.    What do you mean "since it was turned over"?

23       A.    Since the Fifth Circuit.

24       Q.    Okay.  So there's Talkdesk recordings that

25   have been -- that are no longer there or that you did

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3   JIM S. ADLER, P.C. and        )
     JIM ADLER,                     )
 4        Plaintiffs,              )
                                    )
 5                                  )
     VS.                            ) CA NO. 3:19-cv-02025-K-BN
 6                                  )
                                    )
 7   MCNEIL CONSULTANTS, LLC        )
     D/B/A ACCIDENT INJURY          )
 8   LEGAL CENTER, QUINTESSA        )
     MARKETING, LLC D/B/A           )
 9   ACCIDENT INJURY LEGAL          )
     CENTER, and LAUREN VON         )
10   MCNEIL,                        )
          Defendants.               )
11
12                    REPORTER'S CERTIFICATION
13          DEPOSITION OF LAUREN VON MCNEIL MINGEE
14                      April 13, 2022
15                    (REPORTED REMOTELY)
16
17              I, DIANA M. BENGS, Certified Shorthand
18   Reporter in and for the State of Texas, hereby certify
19   to the following:
20              That the witness, LAUREN VON MCNEIL
21   MINGEE, was duly sworn by the officer and that the
22   transcript of the oral deposition is a true record of
23   the testimony given by the witness;
24              I further certify that pursuant to
25   FRCP Rule 30(f)(1) that the signature of the deponent:
```

Confidential

1          XXX was requested by the deponent or a

2  party before the completion of the deposition and that

3  the signature is to be before any notary public and

4  returned within 30 days from the date of receipt of the

5  transcript.  If returned, the attached Changes and

6  Signature Pages contains any changes and the reasons

7  therefore;

8          ___ was not requested by the deponent or

9  a party before the completion of the deposition.

10          I further certify that I am neither

11  counsel for, related to nor employed by any of the

12  parties or attorneys in the action in which this

13  proceeding was taken, and further that I am not

14  financially or otherwise interested in the outcome of

15  the action.

16          SWORN TO AND SUBSCRIBED by me in Tarrant

17  County, Texas, on this 25th day of April, 2022.

18

19          *Diana Bengs*

20  _____

21  DIANA M. BENGS, CSR, RPR
    Texas CSR No. 4907
    Certification Expires:  January 31, 2024

22  TSG REPORTING, INC.
    747 Third Avenue, 10th Floor

23  New York, New York 10017
    877.702.9580 (Office)

24

25

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    FOR THE NORTHERN DISTRICT OF TEXAS

4                              DALLAS DIVISION

5

6    JIM S. ADLER, P.C. AND JIM        )
     ADLER,                            )
7                                      )
           Plaintiffs,                 )
8                                      )
     VS.                               )
9                                      ) CIVIL ACTION NO.
     MCNEIL CONSULTANTS, LLC D/B/A     ) 3:19-CV-02025-K-BN
10   ACCIDENT INJURY LEGAL CENTER,     )
     QUINTESSA MARKETING, LLC D/B/A    )
11   ACCIDENT INJURY LEGAL CENTER,     )
     AND LAUREN MINGEE,                )
12                                     )
           Defendants.                 )
13

14

15

16

17                ORAL AND VIDEOTAPED DEPOSITION OF

18                            MICHAEL WALKER

19                         SEPTEMBER 28, 2022

20

21

22

23

24   REPORTED BY : Therese J. Casterline

25   JOB NO. 217612

EXHIBIT A-5

```
 1
 2                ORAL AND VIDEOTAPED DEPOSITION of
 3    MICHAEL WALKER, produced as a witness at the instance
 4    of the Plaintiffs, and duly sworn, was taken in the
 5    above-styled and -numbered cause on the 28th of
 6    September, 2022, from 9:36 a.m. to 4:03 p.m., before
 7    Therese J. Casterline, CSR in and for the State of
 8    Texas, reported by machine shorthand, at the offices
 9    of Lynn Pinker Hurst & Schwegmann LLP, 2100 Ross
10    Avenue, Suite 2700, in the City of Dallas, County of
11    Dallas, State of Texas, pursuant to the Federal Rules
12    of Civil Procedure and the provisions stated on the
13    record.
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT A-5

```
 1

 2              A P P E A R A N C E S

 3

 4   FOR THE PLAINTIFFS:

 5           Jered Matthysse, Esq.
             Giulio Yaquinto, Esq.
 6           Pirkey Barber
             1801 East 6th Street
 7           Austin, TX 78702

 8

 9

10
     FOR THE DEFENDANTS:
11
             Rebecca Adams, Esq.
12           Barira Munshi, Esq.
             Lynn Pinker Hurst & Schwegmann
13           2100 Ross Avenue
             Dallas, TX 75201
14

15

16

17   ALSO PRESENT:

18           Ms. Erica Taylor, Videographer

19

20

21

22

23

24

25
```

```
 1                   WALKER

 2      A.     No.

 3      Q.     And do you have any knowledge of

 4  whether or not, in response to those instances

 5  that you discussed, Quintessa changed its keyword

 6  bidding?

 7      A.     No idea.

 8      Q.     Okay.  And do you know whether or not

 9  Quintessa changed its script after hearing of

10  those instances?

11      A.     We did change scripts recent.

12      Q.     Okay.  But during that time period I'm

13  talking about, '20 to '21.

14      A.     No.

15      Q.     Okay.  So you're familiar with scripts

16  at the call center, right?

17      A.     Yes.

18      Q.     Okay.  Were those in existence when

19  you started at the company?

20      A.     Yes.

21      Q.     Okay.  And for the inbound calls, are

22  you familiar with a script called Insurance Call

23  Script?

24      A.     Yes.

25      Q.     And are you familiar with a script
```

EXHIBIT A-5

called competitive call script?

A. I don't know. I don't know if -- if that was the name of it.

Q. Okay. To your knowledge, how many different scripts are there at the call center?

A. When I look at scripts, they -- to me, they almost all look the same.

Q. Okay.

A. They're -- I could -- like I don't know. There's not like a -- to me there's not a quantified number of scripts. To me they -- they -- they repeat itself.

Q. Okay. As -- so would it be fair to say to you they're just variations of the same script?

A. Yes.

Q. Okay. And, to your knowledge, when you got there, you said that -- that some of them had already been in place.

Who -- do you have any knowledge of who drafted those scripts?

A. No.

Q. I'm going to hand you, Mr. Walker, what will be marked as Exhibit 107.

```
 1                    WALKER

 2        A.    Okay.

 3              (Exhibit Number 107 marked.)

 4        Q.    As you can see, Mr. Walker, this is a

 5   document produced by Quintessa from the Bates

 6   number on the bottom right-hand side, QUINTESSA

 7   2490.

 8              Do you see that?

 9        A.    Yes.

10        Q.    And the title's Insurance Call Script.

11              Do you see that?

12        A.    Yes.

13        Q.    Do you rec- -- do you recognize this

14   as the Insurance Call Script used by Quintessa?

15        A.    Yes.

16        Q.    Okay.  And to your knowledge, is this

17   still in place at the company?

18        A.    Yes.

19        Q.    Okay.  And why does the company have

20   an insurance call script?  What is the purpose of

21   this script?

22        A.    ███████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████████
   ██████████████████████████████████████
```

**EXHIBIT A-5**

1      WALKER

2

**EXHIBIT A-5**

1                    WALKER

2

**EXHIBIT A-5**

```
                            WALKER
 1
 2    right?
 3         A.    Yes.
 4         Q.    Okay.  And forgive me if I've already
 5    asked this.  Do you know who chose that phrase?
 6         A.    I do not.
 7         Q.    Okay.  What is your understanding of
 8    injury claims department?
 9         A.    You know, it's a -- it's a call
10    center.  It's, you know, there to -- to help
11    somebody if they're -- if they're in need.
12         Q.    Did you have any -- do you have any
13    knowledge of why there would be a script needed
14    for when someone asks, is this insurance company?
15         A.    No.
16         Q.    To your knowledge, would folks call in
17    asking, is this blank insurance company?
18         A.    I think it -- it happens.
19         Q.    Okay.  I'm showing you, Mr. Walker,
20    what will be marked as Exhibit 108.
21               (Exhibit Number 108 marked.)
22         Q.    I'll give you a minute to take a look
23    at this, Mr. Walker.  But as you are -- just note
24    for the record, that this is another document
25    produced by Quintessa as 2595.
```

```
1                    WALKER

2            Do you see that on the bottom right?

3       A.   Yes.

4       Q.
```

EXHIBIT A-5

```
 1                    WALKER
 2          Do you see that?
 3     A.    Yes.
 4     Q.    And so is this something that happens
 5   sometimes at Quintessa where potential clients
 6   were calling in asking that question?
 7     A.    I mean, it can happen, yes.
 8     Q.    Okay.  Well, does it happen?
 9     A.    Yes.
10
```

?

**EXHIBIT A-5**

```
 1                    WALKER

 2        A.    I believe Lauren.

 3        Q.    So Lauren created a d/b/a for this

 4   name?

 5        A.    I believe so.

 6        Q.    What did you understand that to

 7   mean?

 8        A.    That's what we called the department,

 9   the intake department.

10        Q.    But only when someone's looking for a

11   specific law firm?

12        A.    It was the intake department for

13   everything.

14        Q.    But not for insurance?

15        A.    True.  No.

16        Q.    So only when someone's calling --

17        A.    Yeah.

18        Q.    -- for a specific law firm?

19        A.    If it was for this here, this is when

20   we would use the intake department.

21        Q.    Okay.  So when someone's calling for a

22   specific law firm, that was when you would use

23   intake department?

24        A.    Yes.

25              MS. ADAMS:  Objection, form.
```

**EXHIBIT A-5**

```
1                      WALKER
2        Q.    Do you know who chose that phrase?
3        A.    I do not.
4        Q.    Okay.  When did Lauren tell you that
5   was a d/b/a?
6        A.    I think it was hearsay or it could
7   have just been an understanding that -- I -- I
8   don't think she told me exactly.  I -- I hear a
9   lot of things.
10       Q.    Okay.  How did you hear that?
11       A.    I don't recall like when or how it
12  came up.
13       Q.    What were the circumstances?
14       A.    I guess with these scripts -- I really
15  don't know.
16       Q.    Okay.  And so when you started at the
17  company, this script was in place.
18             And did you ever raise any concerns
19  about the script?
20       A.    No.
21       Q.    Why not?
22       A.    It was a preexisting process.
23       Q.    Okay.  But I thought you were hired to
24  help improve the processes.
25       A.    It was a process that was preexisting
```

**EXHIBIT A-5**

Page 259

```
 1                    WALKER

 2       Q.    Okay.  And so you said the emails that

 3  were searched -- did you conduct the email

 4  search?

 5       A.    I did not.

 6       Q.    Okay.

 7       A.    No.

 8       Q.    Was that -- who -- who conducted the

 9  email search?

10       A.    Our CTO, Austin Greenfield.

11       Q.    Do you have any knowledge of what --

12  which emails he searched?

13       A.    Yes.  Mine, Wallace, Lauren, I believe

14  Leo, intake@quintessa.  I think that's it.

15       Q.    All right.  Do you have any knowledge

16  of Jason Love's emails being searched or not?

17       A.    They were not.

18       Q.    And why is that?

19       A.    That was -- that was my error.

20  When -- when an employee leaves, I remove from

21  Google the -- the -- the license, not realizing

22  that everything disappears.  But since then,

23  we've -- we've tried to improve that process.

24       Q.    Okay.  So -- so when Jason left, you

25  removed the license from Google.  What do you
```

**EXHIBIT A-5**

1                      WALKER

2    mean by that?

3         A.     So with Google you're -- you can buy

4    it -- you can buy the -- a certain amount of

5    licenses.  And we were at the top -- we were

6    pretty much maxed -- we were pretty much maxed

7    out on our licenses.

8                 And so when an employee leaves, in

9    order to continue if -- with a new -- onboarding

10   in a new person, removing that other -- the past

11   employee allows for -- for a new one to be

12   created.

13        Q.     Did you look into recovering the

14   information?

15        A.     I did.

16        Q.     And what -- how did you look into

17   that?

18        A.     There's a -- there's a time frame, and

19   I can't remember what exactly the time frame is.

20   It -- once -- once you delete a user, you have a

21   certain amount of time to retract that

22   information.

23        Q.     And so obviously his emails were not

24   searched because they were deleted, correct?

25        A.     Correct.

```
 1                     WALKER

 2       Q.    And what about the intake system?

 3       A.    Intake was.

 4       Q.    Okay.

 5       A.    Yeah.

 6       Q.    And were you involved in that search?

 7       A.    I -- I did not do the search.

 8       Q.    Okay.

 9       A.    That was done by Austin.

10       Q.    Okay.  What about Slack?  Do you know

11  if Slack was searched?

12       A.    Now, Slack is -- Slack was searched.

13  Its recording history is like nine days.

14       Q.    Okay.  And, to your knowledge, is

15  there a way to increase that history?

16       A.    I think so, by a paid subscription.

17       Q.    Okay.  And -- and Quintessa, to your

18  knowledge, did not do so?

19       A.    No.

20       Q.    Okay.  And what about Talkdesk?  Did

21  you have any role in collecting recordings in

22  this case for -- from Talkdesk?

23       A.    The in- -- yeah, the in- -- most of

24  the initial recordings, yes.

25       Q.    Okay.  And was there a time in which
```

EXHIBIT A-5

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3            FOR THE NORTHERN DISTRICT OF TEXAS

 4                      DALLAS DIVISION

 5   JIM S. ADLER, P.C. AND JIM      )
     ADLER,                          )
 6                                   )
          Plaintiffs,                )
 7                                   )
     VS.                             ) CIVIL ACTION NO.
 8                                   ) 3:19-CV-02025-K-BN
     MCNEIL CONSULTANTS, LLC D/B/A   )
 9   ACCIDENT INJURY LEGAL CENTER,   )
     QUINTESSA MARKETING, LLC D/B/A  )
10   ACCIDENT INJURY LEGAL CENTER,   )
     AND LAUREN MINGEE,              )
11                                   )
          Defendants.                )
12

13              REPORTER'S CERTIFICATION

14   ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL WALKER

15                 SEPTEMBER 28, 2022

16

17          I, Therese J. Casterline, Registered Merit

18      Reporter, Certified Realtime Reporter, Certified

19      Shorthand Reporter, do hereby certify that there

20      came before me on the 28th day of September,

21      2022, at the offices of Lynn Pinker Hurst &

22      Schwegmann LLP, located at 2100 Ross Avenue,

23      Suite 2700, Dallas, Texas, the following named

24      person, to wit:  MICHAEL WALKER, who was duly

25      sworn to testify the truth, the whole truth, and
```

**EXHIBIT A-5**

 1

 2    nothing but the truth of knowledge touching and

 3    concerning the matters in controversy in this

 4    cause; and that he was thereupon examined upon

 5    his oath and his examination reduced to

 6    typewriting under my supervision; that the

 7    deposition is a true record of the testimony

 8    given by the witness, that review by the witness

 9    was requested on the record, and signature of the

10    witness is to be signed before any notary public.

11         I further certify that I am neither attorney

12    nor counsel for nor related to any of the parties

13    to the action in which this deposition is taken,

14    and further that I am not a relative or employee

15    of any attorney or counsel employed by the

16    parties hereto, or financially interested in this

17    action.

18         Given under my hand on this the 10th day of

19    October, 2022.

20                    *Therese J. Casterline*

21                    Therese J. Casterline, RMR, CRR, CSR
                      TSG Reporting - Worldwide
22                    228 E. 45th Street, Suite 810
                      New York, New York 10017
23                    (877) 702-9580

24

25

EXHIBIT A-5

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3           FOR THE NORTHERN DISTRICT OF TEXAS

 4                     DALLAS DIVISION

 5

 6

 7 JIM S. ADLER, P.C., and JIM    )
   ADLER,                         )
 8                                )
          Plaintiffs,             )
 9                                )
   VS.                            )Case No.
10                                )3:19-CV-02025-K-BN
                                  )
11 MCNEIL CONSULTANTS, LLC,       )
   d/b/a ACCIDENT INJURY LEGAL    )
12 CENTER; QUINTESSA MARKETING,   )
   LLC, d/b/a ACCIDENT INJURY     )
13 LEGAL CENTER; and LAUREN       )
   MINGEE,                        )
14                                )
          Defendants.             )
15

16

17

18                   *  *  *  *  *

19        VIDEOTAPED DEPOSITION OF JASON LOVE

20                ON JULY 22, 2022

21            IN OKLAHOMA CITY, OKLAHOMA

22                   *  *  *  *  *

23

24 REPORTED BY: KORTNEY V. HOUTS, CSR

25 TSG Job No. 212449
```

**EXHIBIT A-6**

 1

 2

 3

 4

 5                        JULY 22, 2022

 6                         9:39 A.M.

 7

 8

 9            Videotaped Deposition of JASON LOVE, held at

10 the Wyndham Grand, 10 North Broadway Avenue, Oklahoma

11 City, Oklahoma, before Kortney Houts, a Certified

12 Shorthand Reporter of the State of Oklahoma.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2 A P P E A R A N C E S:

 3

 4

        PIRKEY BARBER PLLC
 5      Attorneys for Plaintiffs
        BY:    JERED MATTHYSSE, ESQ.
 6             GIULIO YAQUINTO, ESQ.
               1801 East 6th Street
 7             Austin, Texas 78702

 8

 9

10

11      LYNN PINKER HURST & SCHWEGMANN, LLP
        Attorney for Defendants
12      BY:    REBECCA ADAMS, ESQ.
               2100 Ross Avenue
13             Dallas, Texas 75201

14

15

16

17

18

19

20

21

22

23

24

25 VIDEOGRAPHER: Dan Willis - TSG Reporting
```

```
 1                         J. LOVE

 2      Q     And it says that Jason Love -- that's you,

 3 correct --

 4      A     I am.

 5      Q     -- has knowledge concerning the business and

 6 operations of the call center.  Do you see that?

 7      A     I do.

 8      Q     Would you agree that you had knowledge of

 9 Quintessa's business and operations of the call center?

10      A     Yes.

11      Q     Okay.  And so when you joined Quintessa, I

12 believe that was June of '20.  Is that right?

13      A     That sounds probable.

14      Q     Okay.  What was your -- what was the -- what

15 was your title when you joined?

16      A     I believed that my initial title was manager

17 of intake operations.

18      Q     Was that your title the entire time you were

19 there?

20      A     No.

21      Q     What different titles did you have at

22 Quintessa?

23      A     Director of intake operations.

24      Q     So from manager to director?

25      A     Uh-huh.  Yes.
```

```
 1                      J. LOVE

 2      Q     Okay.  About when did your title change?

 3      A     I don't recall.  It wasn't a very long time I

 4 was there.

 5      Q     Okay.  And did you request the title change?

 6      A     No.

 7      Q     Who made that decision?

 8      A     I believe it was Leo.

 9      Q     Did he explain to you why he made that

10 decision?

11      A     No.

12      Q     Did it involve a salary increase?

13      A     No.

14      Q     Were there other managers of intake

15 operations there?

16      A     No.

17      Q     So you were the only manager of intake

18 operations, and then you became the only director of

19 intake operations.  Is that correct?

20      A     Yes.

21      Q     When you came on board in June of 2020,

22 that's, obviously, shortly after the pandemic started.

23 Were you all going in to the office at that point?

24      A     When I started, yes.

25      Q     Okay.  And did you go in every day?
```

Page 157

```
 1                    J. LOVE

 2      Q     What is your knowledge of what E-sign

 3 agreement is?

 4      A     My knowledge of what an E-sign agreement is

 5 the -- I don't recall the legal term for it, but it's

 6 what a potential client would sign -- like a PDF

 7 document that they would sign that would come back, and

 8 that would be an agreement to work with, you know, the

 9 specific attorney.

10      Q     Okay.  And so this was, to your knowledge,

11 the instructions for call center agents on how to

12 handle the E-signs?

13      A     Yes.

14      Q     Okay.  And then from these -- those first

15 three that you saw -- insurance call script, the e-mail

16 lead script in Spanish, and the E-sign, those three are

17 not the intake department ones that you had mentioned

18 for inbound calls.  Correct?

19      A     Correct.

20      Q     Okay.

21            MR. MATTHYSSE:  Okay.  I think that's --

22 thank you.  So just for the record again, that was

23 2490, 2491, and 2492, Quintessa production.

24      Q     And so, Mr. Love, you mentioned that you had

25 left Quintessa in about December of 2021.  Correct?
```

```
1                          J. LOVE

2        A     That sounds about right, yeah.

3        Q     Okay.  And part of that was to get to do the

4  process improvement area that you enjoyed more and were

5  able to do at Mercy.  Correct?

6        A     Yes.

7        Q     And it's true too, correct, that during your

8  time at Quintessa, that you had learned about the Adler

9  lawsuit?  Right?

10       A     While I was at Quintessa, you know,

11 initially, I learned that Quintessa had prevailed in an

12 Adler lawsuit.

13       Q     Okay.

14       A     I didn't realize that there was, you know,

15 either a continuation or, you know, whatever, you know,

16 this, you know, came to be, until later after I had --

17 after I had left.

18       Q     Okay.  And --

19       A     I didn't realize this was still ongoing.

20       Q     Okay.  But you knew of the existence of an

21 Adler lawsuit?

22       A     An Adler lawsuit, yes.

23       Q     Okay.  And you had testified, I believe, that

24 you had heard of or seen complaints from third-party

25 law firms to Quintessa in regards to Google
```

```
 1
 2                    CERTIFICATE
 3
 4 State of Oklahoma )
                     )  SS:
 5 County of Oklahoma )
 6
 7      I, Kortney V. Houts, a Certified Shorthand
 8 Reporter for the State of Oklahoma, certify that JASON
 9 LOVE, was duly sworn by me to testify to the truth;
10 that the videotaped deposition was taken by me in
11 stenotype and thereafter transcribed by computer and is
12 a true and correct transcript of the testimony of the
13 witness; that the deposition totaling 166 pages was
14 taken by me on July 22, 2022, at 9:39 a.m., at 10 N.
15 Broadway Avenue, Oklahoma City, Oklahoma; that I am not
16 a relative, employee, attorney or counsel to any party
17 in this case or a relative or employee to any counsel
18 in this case or otherwise financially interested in
19 this action; and that the witness elected to exercise
20 his right to review the deposition transcript prior to
21 its filing.
22      Witness my hand and seal of office on this 3rd
23 day of August, 2022.   Kortney V. Houts
                         _____
24                         KORTNEY V. HOUTS, CSR
                         Oklahoma Certified Shorthand Reporter
25                            Certificate No. 1804
                          Exp. Date:  December 31, 2022
```

**EXHIBIT A-7:**
**SEE NATIVE FILE A-7 QUINTESSA_000001**
**CONFIDENTIAL**
**MANUALLY FILED WITH COURT**

**EXHIBIT A-8:**
**SEE NATIVE FILE A-7 QUINTESSA_000001**
**CONFIDENTIAL**
**MANUALLY FILED WITH COURT**