# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC D/B/A | § | **SEALED DOCUMENT** |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| QUINTESSA MARKETING, LLC D/B/A | § | **JURY DEMANDED** |
| ACCIDENT INJURY LEGAL CENTER, and | § | |
| LAUREN MINGEE, | § | |
| | § | |
| Defendants. | § | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated: January 13, 2023

*/s/ Jered E. Matthysse*
Jered E. Matthysse
Texas Bar No. 24072226
jmatthysse@pirkeybarber.com
Giulio Yaquinto
Texas Bar No. 24107292
gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 788702

Kurt Kuhn
Texas Bar No. 24002433
kurt@kuhnhobbs.com
KUHN HOBBS PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731

*/s/ Garrett W. Mize*
Garrett W. Mize
Texas Bar No. 24089610
gmize@jimadler.com
JIM S. ADLER & ASSOCIATES
2711 North Haskell Avenue, Suite 2500
Dallas, Texas 75204

**COUNSEL FOR PLAINTIFFS**

## Table of Contents

INTRODUCTION .................................................................................................................................. 1

I.    BACKGROUND ........................................................................................................................ 1

  A.  Jim Adler, a Texas Legend .............................................................................................. 1

  B.  Lauren Mingee and the Origin of Defendants' Scheme ........................................... 3

  C.  Lauren Mingee Brings Defendants' Scheme to Texas ............................................... 5

      1.  Buy Lawyers' Names (but Mostly Adler's) .......................................................... 5

      2.  Maintain the First Position ..................................................................................... 6

      3.  Display Non-Distinctive, Generic Ads .................................................................. 6

      4.  Use Mobile, Call-Only Ads ..................................................................................... 7

      5.  Stick to the Script ..................................................................................................... 7

      6.  Close Quickly ............................................................................................................ 8

  D.  Nearly 2,000 Instances of Actual Confusion .............................................................. 8

      1.  Defendants' Intake Descriptions ............................................................................ 8

      2.  Complaints from Defendants' Referral Attorneys ............................................ 10

      3.  Defendants' Call Recordings ................................................................................. 15

  E.  Defendants Think Actual Confusion is the "Cost of Doing Business" ................. 17

II.    ARGUMENT ........................................................................................................................... 18

  A.  Defendants Are Liable for Trademark Infringement and Unfair Competition as a Matter of Law ....................................................................................................................... 18

      1.  The Overwhelming Amount of Actual Confusion Requires a Finding of Likely Confusion (Factor 7) ....................................................................................................... 20

      2.  Defendants Intended to Capitalize on Adler's Popularity (Factor 6) ............. 22

      3.  The Adler Marks are Strong, Inherently Distinctive Marks (Factor 1) ......... 24

      4.  The Marks at Issue are Identical (Factor 2) ....................................................... 25

      5.  The Parties' Products, Purchasers and Outlets, and Advertising Media are Identical (Factors 3-5) .......................................................................................................................... 26

      6.  Defendants Exploit Accident Victims' Vulnerable Position and Lack of Familiarity with the Legal System (Factor 8) ........................................................................................... 27

  B.  Adler is Entitled to Injunctive Relief and Disgorgement of Defendants' Profits ..................... 28

CONCLUSION .................................................................................................................................. 30

# Table of Authorities

## Cases

*Abbott Lab'ys v. Adelphia Supply USA*,
   No. 15-CV-5826, 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) ..........................................24

*Abraham v. Alpha Chi Omega*,
   708 F.3d 614 (5th Cir. 2013) .............................................................................................28

*All. for Good Gov't v. Coal. for Better Gov't*,
   901 F.3d 498 (5th Cir. 2018) ........................................................................... 18, 19, 20, 25

*Bd. of Regents of the Univ. of Houston v. Houston Coll. of L., Inc.*,
   214 F. Supp. 3d 573 (S.D. Tex. 2016) ..........................................................................21, 25

*Bd. of Regents of Univ. of Texas Sys. v. Reynolds*,
   No. 18-CV-182, 2019 WL 7758920 (W.D. Tex. Sept. 18, 2019) .......................................30

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
   550 F.3d 465 (5th Cir. 2008) ......................................................................................*passim*

*Beef/Eater Restaurants, Inc. v. James Burrough Ltd.*,
   398 F.2d 637 (5th Cir. 1968) .............................................................................................19

*Brunswick Corp. v. Spinit Reel Co.*,
   832 F.2d 513 (10th Cir. 1987) ...........................................................................................29

*Cachet Fin. Servs. v. Cachet Fin. Sols., Inc.*,
   No. 13-CV-1546, 2016 WL 10077328 (C.D. Cal. Sept. 30, 2016) .....................................30

*Choice Hotels Int'l, Inc. v. Gosla Fam. Tr.*,
   No. 5:18-CV-00648-ADA, 2022 WL 4295362 (W.D. Tex. Sept. 16, 2022).........................29

*Diageo N. Am., Inc. v. Mexcor, Inc.*,
   661 F. App'x 806 (5th Cir. 2016) .......................................................................................28

*Edible Arrangments, LLC v. Provide Com., Inc.*,
   No. 3:14-CV-00250 (VLB), 2016 WL 4074121 (D. Conn. July 29, 2016) ...................26, 27

*Elvis Presley Enters., Inc. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) .................................................................................18, 24, 25

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*,
   628 F.2d 500 (5th Cir. 1980) .........................................................................................22, 26

*Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*,
   725 F.2d 336 (5th Cir. 1984) .........................................................................................20, 22

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*,
    507 F. App'x 26, (2d Cir. 2013) ....................................................................24

*Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*,
    397 F. Supp. 3d 847 (N.D. Tex. 2019) .........................................................25

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) ......................................................................................27

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*,
    670 F.2d 642 (6th Cir. 1982) ........................................................................20

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*,
    982 F.3d 280 (5th Cir. 2020) ................................................................. 19, 22

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
    921 F.3d 1343 (11th Cir. 2019) ....................................................................29

*Hearts on Fire Co., LLC v. Blue Nile, Inc.*,
    603 F. Supp. 2d 274 (D. Mass. 2009) ..........................................................26

*Holiday Inns, Inc. v. Airport Holiday Corp.*,
    493 F. Supp. 1025 (N.D. Tex. 1980) ............................................................29

*Holiday Inns, Inc. v. Alberding*,
    683 F.2d 931 (5th Cir. 1982) ........................................................................29

*Jim S. Adler, P.C. v. Angel L. Reyes & Assocs. PC*,
    No. 3:19-CV-2027, 2020 WL 5099596 (N.D. Tex. Aug. 7, 2020) ........ 19, 26

*Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*,
    10 F.4th 422 (5th Cir. 2021) ............................................................20, 23, 26

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
    735 F.3d 735 (7th Cir. 2013) ........................................................................28

*Mary Kay, Inc. v. Weber*,
    661 F. Supp. 2d 632 (N.D. Tex. 2009) .........................................................28

*Nat. Ass'n of Realtors v. Champions Real Est. Servs. Inc.*,
    812 F. Supp. 2d 1251 (W.D. Wash. 2011)....................................................30

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) ......................................................................................27

*Pebble Beach Co. v. Tour 18 I Ltd.*,
    155 F.3d 526 (5th Cir. 1998) ........................................................................29

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*,
  354 F.3d 1020 (9th Cir. 2004) ........................................................................20

*Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*,
  83 F. Supp. 2d 810 (S.D. Tex. 1999) ..............................................................28

*S & H Indus., Inc. v. Selander*,
  932 F. Supp. 2d 754 (N.D. Tex. 2013) ............................................................28

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
  983 F.3d 1273 (11th Cir. 2020) ......................................................................25

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*,
  851 F.3d 440 (5th Cir. 2017) ..............................................................21, 22, 25

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*,
  932 F.2d 1113 (5th Cir. 1991) ........................................................................29

*Texas Tech Univ. v. Spiegelberg*,
  461 F. Supp. 2d 510 (N.D. Tex. 2006) ............................................................29

*Venture Tape Corp. v. McGills Glass Warehouse*,
  540 F.3d 56 (1st Cir. 2008) ............................................................................29

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*,
  891 F.3d 178 (5th Cir. 2018) ..............................................................20, 22, 25

*World Carpets, Inc. v. Dick Littrell's New World Carpets*,
  438 F.2d 482 (5th Cir. 1971) ..................................................................20, 22

*WSM, Inc. v. Tennessee Sales Co.*,
  709 F.2d 1084 (6th Cir. 1983) ........................................................................29

*Zapata Corp. v. Zapata Trading Int'l, Inc.*,
  841 S.W.2d 45 (Tex. App.—Houston [14th Dist.] 1992, no writ) ....................18

*Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*,
  103 F. Supp. 3d 1032 (D. Minn. 2015) ............................................................30

**Statutes**

15 U.S.C. § 1115(b) ..............................................................................................19

15 U.S.C. § 1116 ..................................................................................................28

15 U.S.C. § 1116(a) ..............................................................................................28

15 U.S.C. §1117(a) ...............................................................................................28

**Other Authorities**

J. Thomas McCarthy,
 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2018) ............ 19, 21, 25, 28, 29

## INTRODUCTION

This is not an ordinary trademark lawsuit in which two parties dispute whether their marks are likely to cause confusion. Defendants admit that they are using Adler's federally registered marks and that there have been hundreds—if not thousands—of instances of actual confusion among Adler's potential and existing clients. The dispute in this case is whether Defendants can use Adler's marks to intentionally confuse accident victims searching for Adler into mistakenly calling Defendants instead, and then claim it is just the "cost of doing business."

Defendants use Adler's marks in a bait-and-switch scheme to confuse vulnerable accident victims trying to reach Adler on their phone into calling Defendants, who get paid to refer the victim to another attorney. Defendants have spent more than ███████████████████████ buying Adler's marks as keywords so their generic, call-only ads appear first when a victim searches for Adler. When a confused accident victim mistakenly calls and asks whether they reached the Adler firm, Defendants train their employees to identify themselves as the "intake department." Defendants' own records show their scheme has caused substantial actual confusion, which continues to this day.

The undisputed facts show that Adler is entitled to judgment as a matter of law for willful trademark infringement and unfair competition. The Court should grant Adler's motion and order supplemental briefing on the appropriate scope of the injunction and the amount of profits to be disgorged.

## I.   BACKGROUND

### A.   Jim Adler, a Texas Legend

Jim Adler is a living legend in Texas, both among the personal-injury bar and the public alike. For over fifty years, Adler has represented injured parties in all types of personal-injury cases, with a particular focus on auto accidents. *See* Appx. 2 ¶¶ 3-4. He has grown his firm into one of the most widely recognized and successful personal-injury firms in Texas. *Id.* Adler operates four offices across

the state (Dallas, Houston, San Antonio, and Channelview) and employs hundreds in the pursuit of his clients' interests. *Id.*

Adler's success is the result of decades of hard work and significant investment in his brand. As detailed in a recent episode on CBS News' nationally syndicated Sunday Morning program, Adler was one of the first attorneys in the country to start advertising after he opened his firm in 1973. Appx. 14-16. At the time, Adler's choice was unpopular. Recounting his experience for CBS, Adler explained it was not a decision he made lightly: "Would it be proper? What would my friends say?" *Id.* 14. And sure enough, Adler paid a price. "I was a pariah. People couldn't believe that I advertised." *Id.* But the public caught on, and Adler's business took off. *Id.* ("The phone started ringing off the hook.").

Adler has used several trademarks to promote his legal services over the years, including Jim Adler, The Texas Hammer, The Hammer, and El Martillo Tejano (the "Adler Marks"). *See id.* 3 ¶ 6. He filed to register the Adler Marks at the Patent and Trademark Office, obtaining federal registrations that are now incontestable under the Lanham Act. *Id.* 18-21. And he frequently uses the Adler Marks— individually and together—in television, radio, billboard, and digital advertising. *See id.* 23-75.

Adler's advertising spend across all media between 2012 and 2022 exceeded ▮▮▮▮. *Id.* 3 ¶ 10; *id.* 6. That includes approximately ▮▮▮▮ for television, ▮▮▮▮ for radio, ▮▮▮▮ for billboards, and ▮▮▮▮ for digital. *See id.* Broken down by market, Adler has spent at least ▮▮▮▮ in Dallas, ▮▮▮▮ in Houston, and ▮▮▮▮ in San Antonio over the past ten years. *Id.* And Adler has made over ▮▮▮▮ over those ten years. *See id.* 3 ¶ 9; *id.* 5. Adler and his son Bill Adler are also fixtures in the community, often appearing at schools, civic functions, and charitable events. *See id.* 3 ¶ 11; *id.* 76-90. In recognition of those acts and years of philanthropic efforts, the City of Houston proclaimed July 31, 2021, "Jim Adler Day." *See id.* 3 ¶ 11.

Texas media outlets likewise recognize Adler's renown, both as a lawyer and a public figure. The Dallas Business Journal proclaimed in 2015: "As far as personal injury lawyers go, Jim Adler might

be the most well known in Texas." *Id.* 103-04. Other media outlets in Dallas and Houston have observed Adler's ubiquitous stature. *Id.* 109 (Adler's advertising is "stuck in the heads of every Dallas resident with a TV or Internet connection"), 117 ("To anyone who has spent more than an hour watching TV in Houston you know . . . Jim Adler is the 'Texas Hammer.'"); *see also id.* 91-101 (additional television and radio appearances). Adler's renown goes beyond Texas—in addition to CBS's Sunday Morning profile, Adler has been featured twice on *Last Week Tonight* with John Oliver, an Emmy-award winning HBO news satire program broadcast around the globe. *See id.* 3-4 ¶ 12.

Ultimately, one need go no further than Defendants to confirm Adler's renown—they agree that Adler is "well-known" in Texas. *Id.* 147:21-23. And of greater significance, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

## B.    Lauren Mingee and the Origin of Defendants' Scheme

Defendant Lauren Mingee found her way into attorney advertising in 2009 when she met Coety Bryant at an AT&T store in Oklahoma where Lauren worked. *Id.* 183:15-184:11. Impressed by her sales abilities, Coety asked Lauren to come work for his company, PI Collision. The company folded less than a year after Lauren's arrival, but a year later, she was working with Coety at his brother Jerry's advertising firm, PI Advertising. *Id.* 185:13-186:11.

PI introduced Lauren to online attorney advertising and search-engine optimization (SEO). *Id.* 187:3-188:22. By 2012, Lauren was performing SEO for 15-20 of PI's clients. *Id.* 189:10-190:4. Two years later, Coety left PI to form Exclusive Legal Marketing and handle SEO separately. *Id.* 192:15-22, 193:10-13. Lauren went with him. *Id.* 191:11-25. In Exclusive's early days, Lauren thought pay-per-click advertising—the form of advertising this suit centers on—was a "waste of time." *Id.*

194:9-18. SEO could still outperform Google's paid ads. *Id.* But when that changed in 2015, Lauren took note: "[I]f someone was typing in 'car accident lawyer,' they weren't going to see the No. 1 spot. You would see three competitors who could pay for that." *Id.* 194:23-195:8. By 2016, Lauren had formed McNeil Consultants, LLC and struck out on her own. *Id.* 196:19-21. She began consulting with a former client of PI in California and familiarized herself with attorney call-center procedures. *See id.* 197:12-200:21.

When she stopped consulting with the California attorney, she pivoted to offering her pay-per-click services to other attorneys, operating her own call center, and generating potential-client (PC) leads on her own by running keyword ads on Google as "Accident Injury Legal Center" and ███ ███████████ *Id.* 203:4-23, 214:9-19, 215:5-11, 225:4-9; *id.* 243 (Answer No. 3). It was during this time when Lauren learned several of the tactics underlying Defendants' current scheme.

*First*, Lauren realized the power of bidding on other attorneys' names and marks as keywords. *Id.* 222:12-18. *Second*, Lauren learned that accident victims searching for a specific attorney on their phone could be confused into calling her instead. Calls from confused accident victims started in 2016 during her time with the California attorney and continued through 2017 and 2018. *See id.* 201:7-11, 206:7-11, 217:23-218:3. *Third*, Lauren learned the importance of using only generic terms in her ads and call-center scripts. Rather than identify herself as "McNeil Consultants," she chose "Accident Injury Legal Center" and used "very generic" ad copy. *See id.* 203:4-205:13. She also used generic terms in her call script, instructing call-center employees to tell accident victims looking for a specific attorney that they had reached the "intake department." *See id.* 140:6-22.

Unsurprisingly, these tactics led to multiple lawsuits. Lauren and McNeil Consultants were sued in 2017 by a New York law firm for trademark infringement based on Defendants' use of the firm's trademark as a keyword. *See id.* 248-53; *id.* 210:7-211:18. ███████████████████████████
███████████████████████████████████████████████

4

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ *id.*

### C.  Lauren Mingee Brings Defendants' Scheme to Texas

Lauren eventually took what she learned in those initial years to Texas, a market she was not "heavily engaged" in before. *See id.* 231:7-22. Starting in 2019, Lauren rapidly increased her ad budget in Texas and professionalized Defendants' scheme. *Id.* 186:7-13. She also formed Defendant Quintessa Marketing, LLC as a new platform for her services. *Id.* 224:22-226:11.[1] █████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

### 1.  Buy Lawyers' Names (but Mostly Adler's)

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████. 

---

[1] ██████████████████████████████████████

██████████████████████████████

2.



.

### 3. Display Non-Distinctive, Generic Ads

Defendants never use their own name (*e.g.*, Quintessa Marketing) in competitive keyword ads. Instead, Defendants intentionally use a rotation of generic terms—*e.g.,* "Accident Injury Legal Center," ███████████████████████████████████████ and generic ad copy, such as "Texas Car Accident Lawyers" and "Get The Money You Deserve! Let Us Fight On Your Behalf." *See id.* 274:14-18; *see also id.* 292-94. Examples of Defendants' generic Google ads triggered by an accident victim's search for Adler are shown below.




---

2 The "Absolute Top" metric refers to the overall percentage of Google ads triggered by the bidder's keywords that reach the top spot.

### 4. Use Mobile, Call-Only Ads

Defendants' competitive keyword advertisements appear almost exclusively on mobile devices as "call-only" ads. *See id.* 145:25-146:12. "Call-only" means that when accident victims touch Defendants' ad on their phone, it brings up a prompt to automatically call a number belonging to Defendants. The prompt does not identify who the number belongs to and contains no information other than an unidentified number. There is no opportunity to visit a website or learn any information about the source of the ad, and the text appears smaller and harder to read than on a desktop. Victims are then connected to Defendants' call center. *See id.* 203:4-17, 216:8-15, 228:4-17, 230:2.

5. ███████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████":



Asked why Defendants' intake specialists are not instructed to respond "No, we are not Adler," Lauren explained that "intake department" was "a business name." *Id.* 141:8-142:21. She testified that, given Defendants' alleged ownership of a d/b/a for "intake department," telling callers they were speaking to the "intake department" was "telling them who our name was and what we were," so "I considered that saying 'no'" when a caller asked if they were speaking with a specific firm. *See id.* But Jason Love (Defendants' former Director of Intake) testified he had been concerned that Defendants' use of "intake department" in this manner could mislead the victims. *See id.* 326:16-25.

6. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

### D. Nearly 2,000 Instances of Actual Confusion

The undisputed evidence shows that these tactics have caused hundreds—if not thousands—of instances of actual confusion among accident victims seeking Adler. Defendants admit as much. Some of the evidence of the actual confusion caused by Defendants' scheme include: (1) descriptions from Defendants' intake specialists of their incoming and outgoing phone calls; (2) emails from Defendants' referral attorneys complaining about the confusion; and (3) call recordings where accident victims repeatedly ask if they are speaking with Adler and are misled by Defendants' intake specialists.

### 1. Defendants' Intake Descriptions

Defendants produced intake descriptions for what they claim were each separate phone call they received in which a victim "either mentioned Jim Adler or the Texas Hammer or was looking for

Jim Adler, The Texas Hammer" after clicking on Defendants' Google ad. *See id.* 134:2-135:11; *id.* 366

(manually filed Excel spreadsheet with Defendants' intake data from 2018 to January 2022); *id.* 367-

69 (Defendants' March-August 2022 intake data). These descriptions from Defendants' own records

show **over 1,600** such calls between 2018 and mid-2022. Below are a few such descriptions:

| Intake Date/Time | Description |
|---|---|
| 2/9/2019 at 9:36am | "PC is unclear and confused/ Tried to match him with attorney/ **He thought he was speaking to Jim Adler** who he's meeting with today to sign." |
| 2/14/2019 at 9:09am | "0:50 PC hung up and got **angry that I wouldn't tell him whether or not we were Jim Adler**. That is who he wanted." |
| 9/19/2019 at 8:43am | "PC was calling in for Jim Adler/Told him we were the intake department / Would not tell me anything else/**Just kept asking if we were Jim Adler**" |
| 7/1/2020 at 10:44am | "CC of Adler-Called PC back stated she had already signed with Adler and **thought she was talking to his office**" |
| 8/11/2020 at 9:26am | "Denied-Signed with Jim Adler/PC **thought that he was speaking to Adler** and is wanting to continue with them-No 2nd Opinion" |
| 8/17/2020 at 12:15pm | "PC hung up/**Kept asking if we were the Adler** firm-Asking Tiahna to call him back" |
| 4/22/2021 at 3:32pm | "Michael calling as PC called **upset stating that she thought she was providing info to Jim Adler's office**" |
| 6/24/2021 at 2:04pm | PC called in **asking for Jim Adler**, I stated multiple times that we are with the intake department and he said he wanted to speak with a specific person at the office. Went in a circle for a bit until he finally said he didn't want to speak with me and hung up" |
| 10/5/2021 at 4:22pm | "**Kept asking if we were Jim Adler** then hung up." |
| 1/7/2022 at 10:54am | "Denied- per lauren do not follow up serious case<br>one person died, 2 people life flighted, PC was charged with man slaughter due, pc had a sobriety test done<br>mom called for pc for accident that just happened CTC pc<br>DOI: 01/07/2022 \| live accident \| **thinks we are jim adler** \|oak cliff, tx" |
| 1/10/2022 at 1:55pm | "PC is **only wanting Jim Adler** \| Having Mistie Reach out" |
| 6/22/2022 at 2:30pm | "Potential – **calling for Jim Adler** and did not want me to ask him questions. Gave him mine phone number in case he wants a second opp" |

Lauren testified that these descriptions are written by the intake specialist who speaks with the

caller. *See id.* 135:3-6, 138:2-5. The descriptions show Defendants had already received over 500 calls

from confused victims looking for Adler prior to their motion to dismiss Adler's claims in January

2020. *Id.* 366. Defendants would go on to receive over 1,000 more such calls in 2020 and 2021, *id.*; *see*

*id.* 136:16-25, and calls from confused accident victims continue to this day, *see id.* 367-69.

Importantly, these numbers underreport the amount of actual confusion—they only include cases in which Defendants self-report that the caller mentioned Adler by name. While the descriptions establish extensive confusion over many years, even Defendants admit that absent from these records are instances in which an accident victim assumed they reached the Adler firm but did not reference "Adler" or "The Texas Hammer" on the call. *See id.* 135:7-24.

In one such instance Adler was able to discover, Defendants received a call from a 17-year-old accident victim whose mother hired Adler. *Id.* 371-72. The minor victim searched Google to find Adler's phone number for an update on his case and clicked Defendants' ad believing it was Adler's number. *Id.* 371-72 ¶¶ 5-6; *see also id.* 373-78. After speaking with Defendants' intake specialist, he signed a retainer agreement with one of Defendants' referral attorneys, believing it was related to his representation with Adler. *Id.* 372; *see also id.* 373-78. Complaints from Defendants' referral attorneys prove that many instances like this have occurred when accident victims assume they reached the Adler firm but do not use his name on the call. *See infra* Part I.D.2.

### 2. Complaints from Defendants' Referral Attorneys

Starting as early as 2018 and through today, Defendants received dozens of reports from the attorneys to whom they refer leads, complaining or asking about leads Defendants sent them, including victims who wrongly believed Adler had referred them or that they had signed with Adler. These complaints came from at least ten different firms, and many of those firms submitted multiple complaints detailing the instances of actual confusion. The chart below highlights a handful of these emails, which establish that Defendants knew the impact of their scheme from the outset, and that widespread confusion has continued throughout this lawsuit.

| From | Date/Time | Email |
|------|-----------|-------|
| ■■■■■ | 6/13/2018 at 2:01pm | "Disengaged. This one is bizarre. Y'all e-signed him for us, but when we spoke with him *he said that he already signed with Jim Adler.*" |

| | 8/6/2019 at 8:47am | "I spoke with this lady last night and she kept insisting that Jim Adler referred her to us. I have had several PC's tell me that. **Why are they under the impression they are being referred by Jim Adler?**" |
| | 2/7/2020 at 12:53pm | "Our intake team tells me **this signed client thought he had hired Jim Adler** even *after* signing our retainer *and* being warm-transferred to us." |
| | 12/8/2020 at 12:23pm | ". . . _____ wants to disengage us because **they thought they were hiring the Jim Adler law firm.**" |
| | 6/15/2021 at 12:18pm | ". . . PC mention **she signed with Jim Adler and does not understand why we keep trying to communicate with her.**" |
| | 7/21/2021 at 12:51pm | "[Client] stated that he was referred to our firm by Ruby who works for Jim Adler. I confirmed what he said and he repeated that **he was under the belief that Ruby works for Jim Adler and she referred him to us.**" |
| | 12/3/2021 at 11:10pm | "It is no coincidence that these same issues pop up over and over again and it **eerily echoes what has been alleged by Jim Adler** in the present lawsuit you are defending in Texas." |
| | 6/21/2022 at 1:33pm | "We spoke to [client] after she got out of the hospital and you guys let us know she was out. **She said we are not her attorney. She said Jim Adler is whom she had hired not us.**" |

*See id.* 380, 386, 391, 421, 441, 448, 461, 479.

A chain of emails between Defendants and their referral attorney _____ from July to December 2020 shows how Defendants knew of the confusion and sought to minimize their role in creating it. *See id.* 402-07, 420. On July 6, _____ emailed Defendants about the quality of leads his firm was receiving: "One other thing has happened today, I had PCs that I called and one asked if I was from Jim Adler because they thought they signed with Adler and then an Austin case said they thought they had signed with Thomas J. Henry and not us." *Id.* One week later, ____ reached out to Defendants to address a payment issue and ask about continued instances of confusion:

> Additionally on the new case _____, he says that he called Jim Adler and then Michael there referred him to the Turnbull firm, he signed with Turnbull firm (Reagan) and then was referred to us by Turnbull? I am a little confused by all of this and have nothing showing any attorneys have released their claim. Can you shed some light on this?

*See id.* 404. Two days after that, ▓ emailed Defendants again: "I have some questions and would like some follow up please. We continue to have Clients tell us they signed with Adler or Thomas Henry or other law firms." *See id.* 405. Lauren's husband (Leo Mingee) responded to ▓ falsely claiming: "We do tell callers who we are, and if ever asked for another firm we state that we are not affiliated with any firm [sic] match them to a local lawyer that can help right away." *See id.* 406-07.[3]

On September 14, after receiving a lead from Defendants indicating that the victim was "very concerned about medical treatment for her and her kids do [sic] to the severity of the pain," ▓ responded that the victims "are stating that Ji [sic] Adler's office called them and that they think they signed contracts with Jim Adler." *See id.* 468. A week later, ▓ emailed Defendants again to highlight problems with the leads he was receiving, saying: "It seems like we have gotten a push of cases that have lawyers already." *Id.* 420. On October 5, ▓ emailed Defendants about yet another confused lead who was specifically looking for Adler and claimed Defendants intentionally misled him:

> Sorry to bother you with this but here is another one that says he was told he was signing with Adler and he is cancelling the contract and wants Adler. *Specifically, PC claims he was called by "Dee" and has no idea how she knew he was in an accident and that he was signing with Jim Adler.* Claims he did not want to sign with us and did not know who we are, was told he was signing with Jim Adler's office.
>
> *We seem to be getting this a lot* and I think that we need to find out what is happening because it is not productive to anyone.

*Id.* 472 (emphases added). The problems for ▓ continued, and on December 17, he asked for Defendants' call recordings to determine why he was getting so many confused leads. *See id.* 475. Lauren refused ▓ request, explaining "we don't give out recordings." *Id.*

Defendants received similar complaints from their referral attorney ▓. In February 2020, the ▓ firm emailed Defendants: "I'm on the phone with ▓ who is advising she signed with Jim Adler and was set up with treatment at a clinic today. She is not sure how she was

---

[3] Of course, Defendants did no such thing and in fact repeatedly told callers they were the "intake department" while refusing to clarify their lack of affiliation with Adler. *See supra* Part I.C.5.

referred to us, but she is currently signed with Jim Adler." *See id.* 396. ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ ████████████████████████████████

    Numerous other referral attorneys reported to Defendants similar instances of confusion. The next month, in January 2021, a referral attorney called ████████ told Defendants that, after talking to one of Defendants' leads, the victim thought "he might have already hired Jim Adler to handle this case." *Id.* 426. Another referral attorney called ██████████████ told Defendants in late February 2021 two of Defendants' leads were "currently still under the representation of Jim Adler, *and the clients advised that they informed you of this fact.*" *Id.* 430 (emphasis added). ████████ told Defendants they were

---

[4] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

"in the process of assisting the client with terminating their relationship with Jim Adler," but "that the actions taken that led to these clients being signed under our representation were unethical." *Id.*

Defendants received similar complaints in April 2021. One from ████████ said a lead "thought they were singing [sic] up with Jim Adler." *Id.* 434. Another from ████████ addressed to Lauren specifically—said: "I just spoke to this client and *she told me that she was connected to me by Law Offices of Jim Adler*, and didn't know what was going on here and was confused. It appears to me that there is a connection here, because *this is not the first time this has happened.*" *Id.* 435 (emphasis added).

The next month, ████████ again told Defendants that a lead "spoke with your department and 'requested Jim Adler as the attorney for this case.' Client is not interested in our legal representation." *Id.* 437. Another email from ████████ in June 2021 explained that a confused lead who signed with the firm refused to speak to the firm's case manager because she only wanted Adler. *Id.* 441. The next day, another referral attorney, ████████, sent the below complaint to Defendants, accusing them of dishonesty:

> *Quintessa misrepresented this case and had confirmed that the PCs are signing up with Jim Adler.* That is the only law firm ████████ wanted to sign up with and according to her, *she had repeatedly asked if that is the law firm they are signing up and was told yes by Quintessa.* I explained what our law firm can do for them and how they will have access to me directly and how our law firm is different. *Her response was that she has always wanted to have a case with Jim Adler and that was the firm being represented to her.* Please disengage and provide refund.

*Id.* 445 (emphases added).

The complaints did not stop. In July 2021, a "disengagement request" from ████████ stated: "This PNC stated that he was mislead [sic] into signing with our office. He stated that whoever he spoke with said he would be signing Jim Adler." *Id.* 446. ████████ also complained that a lead "advised that he did sign our contract on Saturday but *he says he thought we were Jim Adler* and is not interested in ████████ representing him." *Id.* 447 (emphasis added). An attorney from ████████ likewise told Defendants about "a very concerning conversation" he had with

a lead who was confused about hiring Adler. *Id.* 448. The attorney advised: "It seems to me like Ruby, who is a Quintessa employee, deliberately mislead Mr. Hubbard in her conversation." *Id.*

While some of Defendants' referral attorneys kept accepting leads, others eventually tried to part ways. In November 2021, ███████████ notified Defendants it was terminating its agreement in an email that included eight examples of confused leads, four of whom believed they had hired Adler. *Id.* 452-57. One lead claimed Defendants told her "that she was speaking with Jim Adler's office." *Id.* 453. Another lead "was very upset because she doesn't know how she ended up signed with ██████ because she wanted to be signed up with Adler." *Id.* Defendants responded to ██████ termination notice by threatening legal action. *Id.* 452.

The end of Defendants' relationship with another referral attorney, ████████████ was similar. ████████ complained on December 3, 2021:

> Another Quintessa lead wherein the client claims to have never heard of us and didn't believe they were signing a contract with ████████████ We have seen over 15 cases in three months in which a client signed a contract with █████ and then subsequently claims to have not heard of us from the initial call.

*Id.* 463. ████████ noted that the level of confusion among leads sent by Defendants "defies explanation" and that "unsophisticated clients were deceived into signing" with ██████ *Id.* 462. Lauren responded by accusing ██████ of inventing problems, asserting "We will move forward as normal." *Id.* 461. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

### 3. Defendants' Call Recordings

Likewise, Defendants' call recordings that were not destroyed make plain the predatory nature of their bait-and-switch scheme. Adler has submitted a sample of those recordings for the Court to review. The recordings speak for themselves, shining a bright light on Defendants' scheme.

Defendants receive calls not only from Adler's prospective clients but also his existing clients. *See, e.g.*, *id.* 525 (at 1:49: "***We end up getting [Adler's] clients on accident all the time***"). When Adler's existing clients reach Defendants thinking they were calling Adler, Defendants keep them on the phone and try to sell them on one of Defendants' referral attorneys, often calling Adler's client back, if necessary. *See, e.g.*, *id.* 512, 540. Often, these clients are dealing with serious medical issues. *See, e.g.*, *id.* 507 (calling to ask Adler a "pretty important question about our doctors appointment my husband is about to go into"); *id.* 508 (looking for advice from Adler on surgery); *see also id.* 545.

By design, Defendants press victims for information about their case even after the victim has asked *multiple times* whether they are speaking with the Adler firm. *See, e.g.*, *id.* 513, 516, 532, 544. Accident victims who ask if they have reached Adler and are told "this is the intake department" often remain confused and do not understand that they are, in fact, talking to Defendants, not Adler's intake department. *See, e.g.*, *id.* 518, 522, 524, 528-29 (same caller), 533, 540, 546, 547, 549-50 (same caller). Even if Defendants eventually indicate that a victim has reached the wrong number, they do not disclose their lack of affiliation and may instead offer a "better" or "more direct" number. *See, e.g.*, *id.* 515, 519, 522, 530, 535-36, 542. Defendants have also received calls from confused providers who work in the personal-injury field and are trying to reach Adler. *See, e.g.*, *id.* 531 (insurance adjuster).

Accident victims have also told Defendants they clicked on the phone number in Defendants' ad believing it was Adler's phone number. *See, e.g.*, *id.* 526 ("I thought this was another number for Jim Adler"), 534 ("This is the phone number that came up"). Several victims have spent significant periods of time speaking with Defendants before realizing they were not speaking with Adler. *See id.* 510 (at 8:47: "You're not Jim Adler?"), 511 (at 9:13: "This Jim Adler right?"); *see also id.* 546. In one instance, a caller spoke with Defendants for *more than twenty-five minutes* believing Defendants' services were being offered "in conjunction with Jim Adler" before realizing Defendants were neither Adler nor a law firm. *See id.* 520 (at 26:27: "Who am I talking to? I thought I called Jim Adler").

16

### E. Defendants Think Actual Confusion is the "Cost of Doing Business"

Lauren admits she knew of the ongoing actual confusion at her business between 2016 and 2018, including callers looking for specific attorneys after clicking on Defendants' mobile ads. *See id.* 201:7-11, 55:25-56:4, 206:7-10, 209:12-21, 217:23-98:3. And she admits that the confusion among Adler's potential and existing clients continued from 2018 into 2022. *See id.* 236:21-24; *see also id.* at 133:15-137:20. Mike Walker similarly admitted to numerous instances of actual confusion among Adler's clients into 2022. *See id.* 311:20-312:6, 243:6-25. Like Lauren, he did not see this as a problem. *See id.* 310:14-18. As he explained while reviewing emails from Defendants' referral attorneys complaining about the ongoing confusion:

> Q. So now we – we've seen at least – three times in which a client law firm has claimed that a PC has thought they were signing with someone else. At that point in time, in September 2020, a few months after starting at Quintessa, did that concern you?
>
> A. No, it did not. ████████ received hundreds and hundreds of leads from us, and we send thousands of leads. So, to me, it's – it's a – that's just a very small percentage.
>
> Q. ***Just the cost of doing business***?
>
> A. ***Yeah***.

*See id.* 309:4-17 (emphases added). And Jason Love testified that confusion among callers was "known" within Defendants' business, to the point where no one bothered reporting it. *See id.* 327:15-18 ("Q. Did any [intake specialists] report instances of a caller calling in looking for a non-client law firm? A. I don't know that anybody reported it. I mean, it was known. Q. Okay. It was known that that happened at the company? A. Yes.").

Defendants never truly addressed, let alone tried to stop, the confusion caused by their bait-and-switch scheme, even after Adler filed suit. Lauren admitted that Defendants never re-considered buying the Adler Marks as keywords due to Adler's lawsuit, nor did they ever consider identifying themselves in their ads, changing their ad copy, or ceasing their use of "intake department" until the Fifth Circuit decision in late 2021. *See id.* 129:19-20, 137:21-24, 143:16-90:3. Even then, Defendants

merely appended the term "third party" to "intake department" in small font at the bottom of their call-only, generic ads that still run when a victim searches for Adler. *Id.*

Unsurprisingly given the minimal nature of these changes, actual confusion has continued to occur. To take just one example—in a call recording from July 11, 2022, a victim who searched for Adler and clicked on Defendants' call-only ad immediately told Defendants that he has "a case with Jim Adler." *See id.* 551. Rather than disclose that the victim reached the wrong number, Defendants responded by asking for "the name on [the victim's] file" and information about the victim's case, including the date of the accident "to best look up [the victim's] file." ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

## II.    ARGUMENT

The undisputed facts show that Defendants' use of the Adler Marks creates a likelihood of confusion. Indeed, there is widespread actual confusion. Adler is entitled to summary judgment on his federal and state claims for trademark infringement and unfair competition.

### A.    Defendants Are Liable for Trademark Infringement and Unfair Competition as a Matter of Law

The elements for trademark infringement and unfair competition are substantively the same. Adler must show: (1) ownership of the Adler Marks; and (2) a likelihood of confusion created by Defendants' scheme. *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 505 (5th Cir. 2018).[5]

---

[5] The standards are the same for Adler's state and federal claims for infringement and unfair competition. *See, e.g., Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998); *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ).

Adler indisputably owns valid rights in the Adler Marks given his ownership of incontestable federal trademark registrations for those marks. *See* Appx. 18-21. These registrations are "*conclusive* evidence of the validity of the" Adler Marks, "of [Adler's] ownership of the" marks, and "of [Adler's] exclusive right to use" the marks in commerce. *See* 15 U.S.C. § 1115(b) (emphasis added). Defendants assert no affirmative defenses contesting the validity of the Adler Marks. *See* ECF No. 47. Thus, the first element of Adler's infringement and unfair competition claims is met.

On the second element, the Lanham Act "protects against several types of consumer confusion, including point-of-sale confusion, initial interest confusion, and post-sale confusion." J. Thomas McCarthy, 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:32 (5th ed. 2018). Adler's claims implicate both initial-interest and point-of-sale confusion. Courts in the Fifth Circuit analyze eight factors to gauge the likelihood of confusion in either situation: (1) mark strength; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *See, e.g., Good Gov't*, 901 F.3d at 505. "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). However, two factors "possess particular prominence"—actual confusion and intent. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020). Each of the eight factors weigh in Adler's favor, proving a likelihood of confusion as a matter of law. *Cf. Jim S. Adler, P.C. v. Angel L. Reyes & Assocs. PC*, No. 3:19-CV-2027, 2020 WL 5099596, at *8 (N.D. Tex. Aug. 7, 2020) (finding at the dismissal stage that each weighed factor favored Adler, but that consideration of actual confusion was "premature").

The Fifth Circuit regularly affirms findings of likely confusion at summary judgment where, as here, the facts "are not in dispute" and "conclusions from such facts are required as a matter of law." *See Beef/Eater Restaurants, Inc. v. James Burrough Ltd.*, 398 F.2d 637, 640 (5th Cir. 1968); *accord*

19

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 198 (5th Cir. 2018); *Good Gov't*, 901 F.3d at 513; *Smack Apparel*, 550 F.3d at 483-84. Importantly, "very little proof of actual confusion" is "necessary to prove the likelihood of confusion" and "an almost overwhelming amount of proof would be necessary to refute" proof of actual confusion. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971); *accord Viacom*, 891 F.3d at 198. As the Fifth Circuit has observed, "a showing of actual confusion probably requires a finding of likelihood of confusion even in the absence of other proof." *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir. 1984) (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 n.5 (6th Cir. 1982) ("Indeed, it is difficult to conceive of a situation where a showing of substantial actual confusion would not result in a legal conclusion of likelihood of confusion.")).

### 1. The Overwhelming Amount of Actual Confusion Requires a Finding of Likely Confusion (Factor 7)

While "not necessary" to show likely confusion, actual confusion is "the best evidence." *Good Gov't*, 901 F.3d at 513. Here, the undisputed evidence showing hundreds—if not thousands—of instances of actual confusion establishes that Defendants' scheme is likely to cause confusion.

*First*, Defendants' intake descriptions alone establish an overwhelming amount of initial-interest confusion. "Initial interest confusion is confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 427 (5th Cir. 2021). Agreeing with Ninth Circuit precedent, the Fifth Circuit in this case held that initial-interest confusion is actionable in the keyword advertising context if "consumers searching for trademark terms initially believe that 'unlabeled banner advertisements' are links to sites that belong to or are affiliated with the trademark owner." *Id.* at 428 (quoting *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004)). "[T]he critical issue is whether there is consumer confusion" evidenced by the accident victim clicking on Defendants' ad

while mistakenly believing the ad belonged to Adler and would connect them to Adler rather than Defendants. *See id.* (citing McCarthy, *supra*, § 25A:8).

Defendants' own records show that accident victims "thought" Defendants were Adler even after clicking on Defendants' ad, "kept asking if [Defendants] were" Adler, and became "upset" when they learned Defendants were not Adler. *Supra* Part I.D.1. Defendants cannot genuinely dispute that they are liable for trademark infringement and unfair competition given the substantial amount of initial-interest confusion *recorded by Defendants' own employees*. Defendants' call recordings underscore the point. Hundreds of recordings involve victims asking if they are speaking with Adler. Additional call recordings show that victims were surprised to learn they had not reached Adler. In yet other call recordings, victims state that they believed they had reached Adler, despite being told otherwise. *Supra* Part I.D.3.

*Second*, emails from Defendants' referral attorneys show Defendants' scheme causes point-of-sale confusion. Point-of-sale confusion asks "whether a prospective purchaser will likely be confused as to a product's source at the time he purchases the product," *Bd. of Regents of the Univ. of Houston v. Houston Coll. of L., Inc.*, 214 F. Supp. 3d 573, 598 (S.D. Tex. 2016), and is the "most common and widely recognized type of confusion that creates infringement," *see* McCarthy, *supra*, § 23:5. Point-of-sale confusion requires only that the confusion "sway consumer purchases." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017).

Defendants' *own documents* unambiguously establish point-of-sale confusion. *See supra* Part I.D.2. Defendants' attorneys' emails and disengagement requests show that numerous victims believed they were hiring Adler when they signed retainer agreements with Defendants' attorneys. Accident victims repeatedly told Defendants' referral attorneys that they "thought [the attorneys] were Jim Adler" and did not understand how they ended up with Defendants' attorneys. *Id.* These incidents included victims who were already existing Adler clients.

*Third*, Adler's survey expert Dr. David Stewart conducted a survey analyzing Defendants' use of "The Texas Hammer" as a keyword, which yielded a 44% net confusion rate. *See* Appx. 569-70. Dr. Stewart observed: "Even with the correct response among the alternatives . . . more respondents selected the alleged infringing advertisement than the correct advertisement associated with Adler." *Id.* Significant percentages of respondents believed that "Accident Injury Legal Center" was associated with "The Texas Hammer." *See id.* Consumer surveys qualify as evidence of actual confusion, *Viacom*, 891 F.3d at 197, and the Fifth Circuit has found a survey showing a 15% confusion rate to be "strong evidence indicating a likelihood of confusion," *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980). Dr. Stewart's survey strongly supports what Defendants own documents already show—that Defendants' use of the Adler Marks is causing actual confusion in the marketplace.

Given that "very little proof of actual confusion" is "necessary to prove the likelihood of confusion," *World Carpets*, 438 F.2d at 489, this evidence alone demonstrates that Adler is entitled to judgment as a matter of law, *see Falcon Rice*, 725 F.2d at 345 ("a showing of actual confusion probably requires a finding of likelihood of confusion even in the absence of other proof").

### 2. Defendants Intended to Capitalize on Adler's Popularity (Factor 6)

Like actual confusion, an infringer's intent has "special importance" in the likelihood-of-confusion analysis. *See Future Proof*, 982 F.3d at 298. While not necessary to a finding of likelihood of confusion, bad-faith intent "may alone be sufficient to justify an inference that there is a likelihood of confusion." *Id.* at 289. The Fifth Circuit has found bad-faith intent where "the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity." *Streamline*, 851 F.3d at 456. Likewise, bad-faith intent may be found where "the defendant did not choose the mark with intent to confuse but subsequently used the mark in a way that evidenced an intent to trade on the senior user's reputation." *Id.*

The evidence here demonstrates that Defendants "intended to capitalize on the potential for confusion" among victims searching for Adler. *See Smack Apparel Co.*, 550 F.3d at 482. Defendants admit Adler is "well-known" in Texas. Defendants sought to exploit Adler's popularity and goodwill by spending over ███████ on the Adler Marks as keywords and running what they call "very generic" ads directly under the Adler Marks, which "enhances rather than dispels" the potential for confusion. *See Adler*, 10 F.4th at 429. Defendants further capitalize on that confusion by obscuring their identity as the "intake department" and refusing to state that they are not associated with Adler. *See supra* Part I.C.5. Defendants' generic, call-only ads and deceptive script, combined with their knowledge of the strength of the Adler Marks in Texas, prove bad-faith intent as a matter of law.

Other undisputed evidence strongly supports the same conclusion. Defendants have known about actual confusion among accident victims since 2016. Defendants knew in January 2020 when they sought to dismiss Adler's claims that more than 500 victims had called looking for Adler. Defendants also knew in August 2021 before the Fifth Circuit decision that nearly another 1,000 victims had called looking for Adler. Defendants further knew in August 2021 that nearly a dozen of their referral attorneys who purchased Defendants' leads had reported confusion among those leads, many of whom thought they signed with Adler and did not understand why a different firm was contacting them. And Defendants admit they took no steps—*none*—to address that confusion until the Fifth Circuit's decision. Even then, the entirety of their effort consists of using the phrase "third party" before "intake department." *Supra* Parts I.D.-E. Unsurprisingly, actual confusion has continued.

Moreover, throughout that time period, Defendants' own referral attorneys repeatedly accused Defendants of having misled victims. ████████ claimed that "Quintessa misrepresented" a case. ██. ████ told Defendants their process was "unethical." ████████████ warned Defendants that their employee "deliberately mislead [sic]" a victim. So, too, did ████████████ ("PC claims he was called by 'Dee' and has no idea how she knew he was in an accident and that he was signing with Jim Adler")

23

and ▮▮▮▮▮ ("It would appear that these unsophisticated clients were deceived into signing with us").
*Supra* Part I.D.2.

Nor is this the first time Defendants have been sued for the unlawful use of attorneys' names in keyword advertising. *See supra* Part I.B. (discussing prior trademark lawsuits against Defendants). The prior suits against Defendants by other attorneys ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is yet more evidence establishing willful infringement. *See, e.g., Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826, 2019 WL 5696148, at *24 (E.D.N.Y. Sept. 30, 2019) (willful infringement at summary judgment; "H&H was previously sued by Johnson & Johnson for the exact same conduct at issue in this case . . . . Although H&H points out that the circumstances of the settlement were favorable and did not require H&H to admit liability, that does not erase the fact that H&H was on notice that, at minimum, a manufacturer might consider the diversion of international test strips to be unlawful and grounds for suit."); *accord Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (willful infringement at summary judgment; "Ashley Reed was clearly on notice that it might be infringing trademarks after Fendi's 2001 cease and desist letter and multiple lawsuits filed by other designers in 2000 and 2001.").

The undisputed facts support only one conclusion—Defendants' scheme seeks to capitalize on Adler's popularity and goodwill by tricking accident victims looking for Adler into calling them instead. The scope of actual confusion in this case, alongside Defendants' years of inaction and "intent to profit from [Adler's] reputation," compel a finding of infringement. *Smack Apparel*, 550 F.3d at 483.

### 3. The Adler Marks are Strong, Inherently Distinctive Marks (Factor 1)

"The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Elvis*, 141 F.3d at 201. Here, there is no dispute that the Adler Marks are both conceptually and commercially strong. *See*

*Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 397 F. Supp. 3d 847, 860 (N.D. Tex. 2019) (mark strength turns on "conceptual strength" and "commercial strength").

Adler's federal trademark registrations create a presumption of conceptual strength. *See Good Gov't*, 901 F.3d at 507-08. On commercial strength ("the more important of the two"), Adler has practiced for over fifty years in Texas, spent over ███████ in just the past ten years advertising his services, earned over ███████ in that same time period, and has repeatedly received unsolicited media attention. *See supra* Part I.A.; *see also Univ. of Houston*, 214 F. Supp. 3d at 585 ($5.5-$7 million ad budget, decades of use, and media recognition support finding of commercial strength); *Viacom*, 891 F.3d at 190-93 (18 years of use and millions in revenue support finding of strength); *Smack Apparel*, 550 F.3d at 472, 479 (annual sales exceeding $93 million "in recent years" supports finding of strength). The Adler Marks are strong and entitled to a significant scope of protection. *See Elvis*, 141 F.3d at 201.

Indeed, there is a direct line between the actual confusion in this case and the Adler Marks' strength. *See McCarthy, supra*, § 15:11 ("If buyers are confused between two sources, then this also means that they must have recognized plaintiff's designation as a trademark and associated it only with plaintiff."). Accident victims looking for personal-injury services online do not search for "Quintessa Marketing" or "Accident Injury Legal Center." Defendants admit as much. *See* Appx. 275:2-7, 276:3-11. Adler's brand, on the other hand, is strongly associated with such services. *See supra* Part I.A. ███
████████████████████████████████████████████████████████ *See Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1283 (11th Cir. 2020). The Adler Marks' strength heavily favors a finding of likely confusion as a matter of law. *See Viacom*, 891 F.3d at 193.

### 4. The Marks at Issue are Identical (Factor 2)

"The more similar the marks, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 454. That Defendants refrain from using Adler's marks in the text of their ads is irrelevant, particularly given that accident victims had to have those marks in mind to conduct a search leading them to

Defendants' deceptive ads in the first place. *See Adler*, 10 F.4th at 430; *see also Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 288 (D. Mass. 2009) ("A consumer who had just entered a search for Hearts on Fire diamonds might easily believe that the Defendant was one such authorized retailer when presented with Blue Nile's sponsored link, even if the accompanying text did not contain the trademarked phrase."). Thus, Defendants' use of keywords identical to and incorporating the Adler Marks, in conjunction with ads that are substantively and visually similar, "weighs heavily" in favor of finding confusion. *See Edible Arrangments, LLC v. Provide Com., Inc.*, No. 3:14-CV-00250 (VLB), 2016 WL 4074121, at *8 (D. Conn. July 29, 2016).

### 5. The Parties' Products, Purchasers and Outlets, and Advertising Media are Identical (Factors 3-5)

These three factors address the level of competition between the parties in the marketplace. Defendants admit all three, which weigh in favor of a finding of likely confusion. *See* ECF No. 55-1 at 8 ("Quintessa competes directly with Adler in online search engine marketing to develop leads for personal injury cases."); Appx. 574 (Resp. No. 2) ("Defendants admit that Quintessa competes directly with Adler in some, but not all, auctions for certain search engine keywords in online search engine marketing to develop leads for personal injury cases."), *id.* (Resp. No. 3) ("Defendants admit that Quintessa competes directly with Adler in some, but not all, auctions for the Adler Marks as search engine keywords in online search engine marketing to develop leads for personal injury cases.").

Defendants are middlemen between accident victims and Adler's "competitor[s] providing the same class of services." *See Reyes*, 2020 WL 5099596, at *8; *see also Exxon*, 628 F.2d at 505 (finding "strong similarity" between gas-station services and auto-repair services based on common relation to "car care"). There is no dispute the parties "compete to reach the same consumers: Texas personal injury plaintiffs and their families." *See Reyes*, 2020 WL 5099596, at *8. Additionally, both parties advertise their services using Google and other online media. *See id.* ("Plaintiffs and Defendant both purchase and display keyword ads on mobile devices"). In fact, among those confused by Defendants

are Adler's existing clients, which Defendants then try to lure away. Ultimately, Defendants are a "direct competitor selling [services] within the same general class" as Adler's that "serv[e] the same purpose." *See Edible Arrangments*, 2016 WL 4074121, at *8. As such, the similarity of the parties' services, outlets and purchasers, and advertising media strongly favor a finding of likely confusion as a matter of law.

6. **Defendants Exploit Accident Victims' Vulnerable Position and Lack of Familiarity with the Legal System (Factor 8)**

The Supreme Court has repeatedly acknowledged the interest in protecting "unsophisticated, injured, or distressed lay person[s]" whose "very plight" makes them "more vulnerable to influence" from deceptive forms of attorney advertising. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 465 (1978); *accord Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (crediting petitioner's argument concerning the "special vulnerability" of "victims or their families"). The Court has also recognized that certain forms of attorney advertising may invade accident victims' privacy, "even when no other harm materializes." *Ohralik*, 436 U.S. at 465-66. The undisputed facts here establish that both concerns are well-founded. Defendants' intake descriptions, attorney complaints, and call recordings confirm the same thing—numerous accident victims thought they were speaking with Adler, shared private, attorney-client information with Defendants, thought they had signed agreements with Adler, and became upset once they realized Defendants had tricked them.

Nor is there any question that Defendants knew of these vulnerabilities. Lauren has worked in the personal-injury field for over a decade. It has been at least six years since she first encountered instances of confused victims reaching her intake center, and she has been sued for the very conduct at issue in this case on multiple occasions. The lack of consumer sophistication—confirmed to exist not least by Defendants' efforts to exploit it—heavily favors a finding of confusion as a matter of law.

27

**B.      Adler is Entitled to Injunctive Relief and Disgorgement of Defendants' Profits**

The Lanham Act provides a suite of remedies "upon a finding of a violation" of its trademark infringement and unfair competition provisions. 15 U.S.C. §§ 1116(a), 1117(a). The undisputed facts show Adler is entitled to injunctive relief and disgorgement of Defendants' profits as a matter of law.

"A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment." *Diageo N. Am., Inc. v. Mexcor, Inc.*, 661 F. App'x 806, 813 (5th Cir. 2016). An injunction requires a showing: (1) of irreparable harm; (2) that legal remedies are inadequate; (3) that the balance of hardships favors an injunction; and (4) that an injunction serves the public interest. *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013). Those elements are met.

The Lanham Act imposes a rebuttable presumption of irreparable harm that Defendants cannot overcome. *See* 15 U.S.C. § 1116; *see also* McCarthy, *supra*, § 30:46. Indeed, "[t]he same evidence [establishing] a likelihood of confusion" as a matter of law also "demonstrates the necessary irreparable harm." *S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 765 (N.D. Tex. 2013); *see also Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services."); *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) ("irreparable harm is especially likely in a trademark case" where "a nontrivial period of consumer confusion" gives rise to "the difficulty of quantifying the likely effect on a brand"). Adler's "loss of control also demonstrates that money damages cannot adequately compensate [Adler] for [Defendants'] unauthorized use" of the Adler Marks. *See S & H Industries*, 932 F. Supp. 2d at 765. Additionally, Defendants cannot credibly claim that the balance of hardships or the public interest weighs against injunctive relief given the scope of actual confusion and indisputable proof of Defendants' bad faith. *See Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 640 (N.D. Tex. 2009)

("a permanent injunction will only require the defendants to bring their business into line with the requirements of the law" and ensures "there [will] be no confusion" in the marketplace). Adler is thus entitled to injunctive relief.

Turning to profits, disgorgement is an equitable remedy decided by the Court. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1359 (11th Cir. 2019) ("[A]n accounting and disgorgement of a defendant's profits in a trademark infringement case is equitable in nature and does not carry with it a right to a jury trial."). Courts regularly grant profits at summary judgment where, as here, the undisputed facts show willful infringement. *See, e.g., Texas Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 525 (N.D. Tex. 2006); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1026 (N.D. Tex. 1980), *aff'd sub nom. Holiday Inns, Inc. v. Alberding*, 683 F.2d 931 (5th Cir. 1982).[6] The Fifth Circuit considers six non-exclusive factors to determine whether disgorgement is equitable: (1) defendant's intent; (2) scope of actual damages; (3) adequacy of other remedies; (4) any unreasonable delay by the plaintiff; (5) the public interest; and (6) whether it is a case of palming off. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998). Each of these factors favors disgorgement.

Defendants are using the Adler Marks to exploit Adler's popularity and confuse consumers. *See supra* Part II.A.2. That bad faith is alone sufficient to impose disgorgement even absent evidence of actual confusion. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1126 (5th Cir. 1991) (proof of actual confusion not necessary for disgorgement). Nevertheless, the undisputed evidence of actual confusion, which is overwhelming, establishes that Adler has been damaged. *See, e.g., Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987) ("actual consumer confusion or deception resulting from the violation" establishes proof of actual damages); *see also* McCarthy, *supra*, § 30:74.

---

[6] *See also Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 62-63 (1st Cir. 2008) (affirming profits award at summary judgment); *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1087 (6th Cir. 1983) (same); *Choice Hotels Int'l, Inc. v. Gosla Fam. Tr.*, No. 5:18-CV-00648-ADA, 2022 WL 4295362, at *4 (W.D. Tex. Sept. 16, 2022) ("[I]t is undisputed that Defendants undertook no efforts to remove the Comfort name from the hotel prior to this case being filed.").

Further, Adler did not unreasonably delay, having filed suit in August 2019 shortly after Defendants began using the Adler Marks in earnest. *See supra* Part I.C. And Defendants are clearly trying to palm off their services as if they are Adler. *See, e.g.*, Part I.D.2. ("It would appear that these unsophisticated clients were deceived into signing with us"). Adler is therefore entitled to disgorgement of Defendants' profits as a matter of law. *See Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1043, 1049 (D. Minn. 2015) (awarding profits at summary judgment where infringer's use included purchase of plaintiff's mark as keyword and deceptive call-center practices; "Distinctive was advertising with near identical terms to the 'Zerorez' mark knowing, as evidenced through the testimony of its call center manager, that its campaign was causing confusion.").

The Court should enter summary judgment against Defendants regarding Adler's entitlement to injunctive relief and disgorgement. The Court should also order supplemental briefing on the scope of the injunction and the amount of profits to be disgorged, as is commonly done once courts find infringement and unfair competition as a matter of law in trademark cases. *See, e.g.*, *Bd. of Regents of Univ. of Texas Sys. v. Reynolds*, No. 18-CV-182, 2019 WL 7758920, at *2 (W.D. Tex. Sept. 18, 2019) (ordering supplemental briefing on remedies, including profits, upon finding of infringement and unfair competition as a matter of law); *Cachet Fin. Servs. v. Cachet Fin. Sols., Inc.*, No. 13-CV-1546, 2016 WL 10077328, at *1 (C.D. Cal. Sept. 30, 2016); *Zerorez*, 103 F. Supp. 3d at 1049; *Nat. Ass'n of Realtors v. Champions Real Est. Servs. Inc.*, 812 F. Supp. 2d 1251, 1263 (W.D. Wash. 2011).

## CONCLUSION

The undisputed facts show that Defendants' use of the Adler Marks in a bait-and-switch scheme targeting Adler's clients is likely to cause confusion. The Court should grant Adler's motion and order supplemental briefing on the scope of the injunction and amount of profits to be disgorged.

## CERTIFICATE OF SERVICE

  I hereby certify that on January 13, 2023, a true and correct copy of the foregoing was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the court's local rules. I have also served a copy of the foregoing via email on the following:

    radams@lynnllp.com
    cschwegmann@lynnllp.com
    bmunshi@lynnllp.com
    ssmoot@lynnllp.com
    nstallbohm@lynnllp.com
    dholmes@lynnllp.com

       */s/ Jered E. Matthysse*
       Jered E. Matthysse