

ADLER_000539

Appx. 96



ADLER_000551
Appx. 97



ADLER_000556
Appx. 98



ADLER_000572
Appx. 99

Captured by FireShot Pro [27-01-2021, 00:17:55]
https://www.instagram.com/p/BzL1i8FA7c_/



Captured by FireShot Pro [27-01-2021, 00:17:55]

ADLER_000590
Appx. 100

Captured by FireShot Pro [27-01-2021, 00:21:40]
https://www.instagram.com/p/B3IGjmvglNu/



ADLER_000591
Appx. 101

# EXHIBIT 5
## (To the Declaration of Diana Rausa)



## The Texas Hammer: Lawyer Jim Adler talks advertising and the law



Jim S. Adler & Associates, The Texas Hammer, City Place Offices, Dallas

By Melissa Wylie – Staff Writer, Dallas Business Journal
Jun 12, 2015 **Updated** Jun 12, 2015, 1:03pm CDT

As far as personal injury lawyers go, Jim Adler might be the most well known in Texas.

IN THIS ARTICLE

Jim Adler, "The Texas Hammer," has used an aggressive, memorable advertising campaign to make his law firm a household name in several areas of the state. Since 1973, Jim Adler & Associates has established offices in Dallas, Houston, San Antonio and Channelview.

### UNLOCK EVERY ARTICLE
#### Get Started For Only $4
GAIN ACCESS TO EVERY LOCAL INSIGHT, LEAD AND MORE!

**Become A Member**

Adler's specialty is television advertising, where he can be seen scowling and shouting into the camera, letting Texans know he'll fight to get them the settlement they deserve. Sometimes, he's yelling from the top of an 18-wheeler.

Adler's ads have produced a fair number of critics, but they've also helped him grow his business. Jim Adler & Associates employs 311 people, with 80 to 90 employees working at the 32,000-square-foot Dallas office inside the Tower at CityPlace.

Whitehardt Attorney Advertising & Consultants produces the advertisements, which run in five markets near each of the firm's locations. The law offices get calls from people needing a wide range of help, but they're only able to take about 10 percent of the cases.

Adler started filming ads in the 1980s and added Spanish commercials shortly after. He's fluent in

**RECOMMENDED**

MONEY/LIFESTYLE
'It's gotta be the shoes': Why are Scottsdale nightclubs prohibiting retro sneakers?

COMMERCIAL REAL ESTATE
2022 Building San Antonio Awards: CyrusOne Texas Research Park

RESIDENTIAL REAL ESTATE
Tudor-style Elm Grove mansion hits the market for $4.3M: Open House

BANKING/FINANCIAL SERVICES
Humana market president on humility and service to others

Captured by FireShot Pro: 27 May 2022, 13:38:20
https://getfireshot.com

ADLER_000100

Appx. 103

Page 3
The Texas Hammer: Lawyer Jim Adler talks advertising and the law - Dallas Business Journal
https://www.bizjournals.com/dallas/news/2015/06/12/the-texas-hammer-lawyer-jim-adler-talks.html

Spanish, having learned the language at St. Mark's School of Texas from a British instructor who taught Spanish courses.

He initially took acting lessons to craft his on-air persona. After decades of being in front of the camera, Adler has grown accustomed to most aspects of production. But spending 15 minutes in the make-up chair before each shoot is still his least favorite part.

While marketing is important to Adler, he said his priority is the clients and visiting each office on a regular basis.

"Just because you advertise doesn't mean you can neglect your clients," he said. "I can go on TV and make the best commercial in the world, but if I don't provide top-quality service to my clients and call them back and meet their needs in terms of professionalism...they're going to get a raw deal."



Your vision,
built-to-suit.
Cawley Partners
DISCOVER MORE

### How often do you film commercials?

I usually go to Nashville where Whitehurst is two or three times a year to shoot 10 English and 10 Spanish commercials. I have a friend in Hollywood who owns a Spanish network and I shoot Spanish commercials there. He knows a lot of novella stars so he allows me to engage with the novella stars in my commercials. I go out there about once a year.

### How much does it cost to make one commercial?

The big productions can cost $50,000 to $100,000. The smaller commercials are around $5,000 or $6,000. It just depends. Like on the 18-wheeler cases, they're shot on location with huge crews and lots of equipment. They're really costly.

If I do a commercial in English, I want to do the same commercial in Spanish for Spanish-speaking clients. Basically, the same ad just translated into Spanish.

### Why did you start marketing toward that community?

I started seeing Spanish TV commercials, and Texas being so immediately adjacent to Mexico, I felt like I was neglecting a huge percentage of the population. And the Spanish community is just huge in terms of economic impact, so I felt they had a huge damage model. It's all about helping people understand their legal rights, so I felt like the community was underserved.

Back in the 1980s I was in partnership with a former U.S. District Judge Robert O'Conor and he was half Hispanic. He and I decided to start advertising on Spanish TV. Univision then became such a powerful network. It was a good way to serve an underserved portion of the community.

### Your TV personality comes across as aggressive and angry when in reality you're friendly and welcoming. Is that on purpose?

I think people want a lawyer that they feel is going to fight for them and be tough for them. One thing clients get really mad about is if they even think that you're accepting the insurance company's position, they think you've sold out to the other side or you're taking money under the table from the insurance company. So I portray the image that I'm the tough, smart lawyer. I don't need to sell out to anybody because I'm in the right, and I'm going to fight for you. I think that's what the public wants.

On the other side of the coin, with respect to our clients, I want them treated in a respectful manner and as nice as humanly possible. No one is to be rude our clients.

### Do you have any critics of your commercials?

Oh, lots. There's an age-old issue of professionalism in business. How does a lawyer remain professional and yet get business? A long time ago I was a young lawyer and I had four kids and I had an issue of how I was going to put bread on the table. That's where business intersects with professionalism.

The theory behind lawyer advertising is to inform people of their legal rights. People are not educated to what their rights are and there's a big mystery about the law. It's sad. People just don't know their legal rights. Of course, if they did, I'd be out of a job.

### What are your strategies for growth?

I'm always trying to grow, trying to do better commercials, trying to reach more people, find out where the audience is, trying to do well on social media. We have a whole Internet department in the firm. Another form of marketing is charity work, return to the community, go out and meet humble people that we can help.

### There are talks of your son, Bill, taking over the firm. Are there any transition plans in the works?

He's been a lawyer at the firm for four years. I'm kind of grooming him to take over the firm someday, though I'll probably work another 15 or 20 years. I'm in no mood or hurry to retire because I love what I'm doing.

He likes handling his own clients and settling his own cases, but he's getting more involved in management and going to different offices. The next step is getting him transitioned into some of the commercials. I'm really excited about that. Right now, he's a little nervous about being in the public spotlight. I guess there's a certain advantage to being anonymous in society and not having people know who you are. There are even lawyers who don't want to go before a jury and be known as an advertising lawyer because they're afraid there may be a certain stigma to that.

### What are the downsides to being so well known through advertising?

People would think the downside is being recognized in public, but people are very respectful of me. They know who I am and I can tell when I'm recognized, but they don't come up to me or bother me or ask for autographs. I think that's a Texas thing. People are very gentlemanly and ladylike and they don't want to impose. They respect my privacy.

ADLER_000101

Appx. 104





Page 4
The Texas Harmover: Lawyer Jim Adler talks advertising and the law - Dallas Business Journal
https://www.bizjournals.com/dallas/news/2015/06/12/the-texas-harmover-lawyer-jim-adler-talks.html



ADLER_000103
Appx. 106

# EXHIBIT 6

(To the Declaration of Diana Rausa)



Page 1
The 10 Funniest Local Commercials Ever to Grace Your TV Screen | Dallas Observer
https://www.dallasobserver.com/arts/the-10-funniest-local-commercials-ever-to-grace-your-tv-screen-11984278

| LISTS |

## The 10 Funniest Local Commercials to Ever Grace Our TV Screens

DANNY GALLAGHER | FEBRUARY 16, 2021 | 4:00AM

Bryan Wilson, aka The Texas Law Hawk, torches an ice sculpture for justice or something. Screenshot by Danny Gallagher

We get it. Making a list about the weirdest and funniest local commercials is doing exactly what advertisers want us to do, sharing their pieces of digital celluloid so more people will see them. In this day and age, when videos of cats juggling, skateboard accidents and unhinged rants from the My Pillow guy dominate our feeds, local commercial filmmakers have got to up the crazy in order to go viral.

We don't care. We still want to celebrate the gems that still make us laugh, intentionally or not.

1. The Texas Hammer

Captured by FireShot Pro: 27 May 2022, 13:46:36
https://getfireshot.com

ADLER_000116

Appx. 108

There's only one place to start when it comes to local commercials. The ads for the personal injury law firm of Jim Adler & Associates are stuck in the heads of every Dallas resident with a TV or Internet connection. Adler appears in every ad carrying his special sledgehammer IN A HOLSTER because, of course, he's "The Texas Hammer.' Duh. And to his credit, the ads work because they always go viral and even once got an entire "And now..." segment on John Oliver's *Last Week Tonight*.

Adler speaks with the confidence of a coked up high school quarterback just before he takes the field; his personal iambic pentameter requires him to emphasize the word "hammer" regardless of the context. Practically all of his commercials feature him – and sometimes his son and law partner Bill Adler – screaming near the top of their lungs at semi-trucks who are too frightened to run him down or even be in his presence. We don't know what semi-trucks did to him to when he was a kid, and frankly, we never want to know.

### RELATED STORIES
- 7 Great Movies You Forgot About That Have Nothing to Do With Global Pandemics
- 8 Seriously Good Movies About Comedy
- 10 Shows That Should Have Their Own 24-Hour Pluto TV Channel





ADLER_000117

Appx. 109

### 2. The Texas Law Hawk

Adler has a competitive adversary who also thirsts so much for justice that he has to get it out of his system or he'll explode like the bus in *Speed*. Criminal defense attorney Bryan Wilson of Fort Worth calls himself "The Texas Law Hawk" and his commercials play like a PG-version of the film Alex had to watch to cleanse himself of his homicidal tendencies in *A Clockwork Orange*.

Wilson is a DFW fixture, and has even gained international fame thanks to a BBC News story that called him "the loudest lawyer in America" and an appearance in a Taco Bell commercial that ran during the Super Bowl. His commercials aren't just promises to get his clients ... actually, it's not quite clear what, or how he'll even do that. Unless, of course, part of the American judicial system involves yelling every opening and closing statement like a professional wrestler and taking a flamethrower to an ice sculpture of a hawk. Wilson calls himself a "hawk" but by torching one, is he saying he'll fight other legal hawks or is he expressing some kind of repressed self-hostility at his judicial spirit guide? Either way, it's one of the most hilarious cries for help we've ever seen.



### 3. Westway Ford's Joe Greed and The Ultimate Warrior

The late 1980s featured one of the strangest Dallas partnerships since the Texas Rangers partnered with Death by selling a literal stack of nachos to fans. Car-selling spokesman and oversized novelty sunglasses wearer Joe Greed somehow contracted WWF superstar wrestler The Ultimate Warrior to appear in a series of bizarre commercials for his Westway Ford dealership.

The commercials feature the pair testing out hypnosis, pulling off a jail break and begging customers to buy cars that have been stained in a sudden snail attack. This will make complete sense if you watch it all the way to the end (sort of). We won't be held responsible when your shoulders cave in on themselves during the big reveal.



Captured by FireShot Pro: 27 May 2022, 13:46:36
https://getfireshot.com

ADLER_000118

**Appx. 110**

Page 4
The 10 Funniest Local Commercials Ever to Grace Your TV Screen | Dallas Observer
https://www.dallasobserver.com/arts/the-10-funniest-local-commercials-ever-to-grace-your-tv-screen-11984278

### 4. Rodney D. Young's Young Amigos

Watching a local commercial try to capture the magic of a hit movie is like watching your dad dance to his favorite song when you're a kid. You can't tell if you want it to stop or study it closer so you'll hold the memory forever.

The local insurance agency tried to recreate *The Three Amigos*, the Western comedy starring Steve Martin, Chevy Chase and Martin Short, with its own bedazzled sombrero wearing trio called (wait for it) The Young Amigos. Instead of using their showmanship talent to save a small village from a mad Mexican bandit, these Amigos use their knowledge of monetary threshold trends and the maximum assessment rate of the gross premium (it's **.2 percent**, by the way) to make high premiums die like dogs. Yeah, it doesn't stick the landing well but the attempt is hilarious.



### 5. The Trophy Nissan Rap

Every major advertising market in the country has at least one car dealership, worship center, notary public, gun store or actuarial firm that attempted to cash in on the rise of hip-hop in the '80s by doing a "rap" about what it can do for its customers.

Dallas had its own when Trophy Nissan rapped about its car dealership in a manner so cringeworthy it could make Jake Paul question the musical motives that birthed their now famous crowd-shouting jingle. There's no need to describe it because everyone who's been to a karaoke night on a weekday has seen some from of this already. Some drunk guy in a suit gets up and grabs the mic because the 12 whiskey sours inside him are telling him he can take on Eminem's "Rap God" if he just focuses hard enough and reduces his vision from double to single. It's basically that, but the rhythm is waaaaaay slower and all the lyrics are about cars and low prices.



Captured by FireShot Pro: 27 May 2022, 13:46:36
https://getfireshot.com

ADLER_000119

**Appx. 111**

**6. Dallas Dodge's Skateboarding Bulldog**

Animals using vehicles is a trend almost as old as television itself – and it never ages. It's still just as amusing to see that intrepid, water skiing squirrel, whether it's filler for a local news broadcast or a hallucination brought on by a lack of sleep.

Dallas Dodge employed this time honored tactic in one of its more recent ads. They found a bulldog that can skateboard! That's pretty much the whole hook and, to their credit, they don't see the need to add anymore to it. They didn't dress it up in a Hawaiian tourist outfit and make it look like its surfing or stick it in front of a green screen and make it look like he's competing with Tony Hawk in the X Games. It's just a skateboardin' bulldog followed by the usual car dealership pitch. If The Texas Hammer found this little guy or gal, he'd go overboard and make it fight a semi-truck, which would completely miss the point.



For whatever's ahead,
we're with you all the way.

Texas Children's Hospital



Anderson Cooper 360 : CNN : May 19, 2011 1:00am EDT

**LATEST STORIES**

A Travel Blogger's Picks For the Best Beaches Closest To Dallas

The Best Things To Do In Dallas, May 25 – June 1

Dallas Will Get a Chance To See Banksy Art in Person With *Banksyland* Exhibition

**7. Debbie Georgatos' Dallas Republican Party Chair Ad**

This one was hard to find and when you watch it, you'll realize why. Debbie Georgatos ran for the Dallas GOP Chair seat back in 2011 and the ad she chose to run veers back and forth from hilarious to horrifying, like a lost driver trying to pick an exit at the very last minute.

She starts by talking while not looking into the camera – even though there either two cameras in the room – with one camera filming her from every possible wrong angle except from the view of the ceiling. The first half (which you can see on Archive.org) features footage of a baby elephant getting sprayed with a hose and the creepiest parts of Charlie Chaplin's *Modern Times* to illustrate ... those dang Democrats? We don't know. It looks like a last-minute student film for a graduate student with poor planning skills. Apparently, we're

Captured by FireShot Pro: 27 May 2022, 13:46:36
https://getfireshot.com

not alone in our impressions because Georgatos lost the election after the video grabbed the attention of the national media, including CNN's Anderson Cooper who put it on his "Ridiculist," and even global media like the Canadian Broadcasting Company's **George Stroumboulopoulos.**



### 8. Supermart Furniture

The 1212 Loop 12 guy is revered in Dallas media culture for more than just his catchy address. It appears to be a simple, locally produced commercial for a furniture store – but there are so many fascinating layers to peel off, like a tie-dyed onion.

For starters, the spokesman seems to be trying to make "gotta gotta gotta" his catchphrase when the address just overshadows it. His arm movements are strange and almost hypnotic; they only move at the elbow and seem like he's been instructed to do a robot dance instead of using public speaking skills, through some kind of bizarre night school mixup. Then, he just topples over and lets the mattresses he's hawking break his fall. He doesn't say anything about "dropping prices" or how deals are just "falling out of the sky." He just falls over while reciting his script. Did he do it on purpose? Was it an accident the editors just left in the final cut on purpose? Why are our heads hurting right now?



### 9. Zak's

Bizarre is just the foundational description for this arts and craft supply store ad with "three convenient locations." Bewildering doesn't begin to describe it. In fact, there isn't a word in the English language that can conceptualize it altogether so we'll just make one up: "incredulumonescent."

The ad features composer John Williams' iconic *Jaws* theme playing in the background from beginning to end even though there are no sharks anywhere to be seen in any frame of the ad ... unless that's what they want you to think. Then there's the whole hook about how the store's prices are so low that "it hurts" and

Captured by FireShot Pro: 27 May 2022, 13:46:36
https://getfireshot.com

ADLER_000121
Appx. 113

Page 7
The 10 Funniest Local Commercials Ever to Grace Your TV Screen | Dallas Observer
https://www.dallasobserver.com/arts/the-10-funniest-local-commercials-ever-to-grace-your-tv-screen-11984278

which apparently causes the ad's star to be impaled in the head with an oversized novelty pencil. Maybe this isn't an invitation to come to the store but a thin attempt at warning people to stay away – the way a hostage might try to communicate cryptically in a recorded ransom demand. Maybe he's really saying, "Stay away! For the love of God! Zak's is cursed! Not only will you be impaled with sharp arts and crafts that are as low as 90 percent off but you'll be required to pay for them before paramedics can take you out of the store!"



**10. Fast Forward**
There is nothing that sums up societal values in America in the 1980s better than this ad for a mall clothing store. Move over *Wall Street*.

The guy's a nerd and society shuns him for being an individual who values knowledge and enlightenment over flashy excess. The only thing that can save him is a store selling flashy excess in the form of poofy jackets, day-glo t-shirts and horizontally stitched sports jackets that can magically give him a cool car, a hot girlfriend and a blow-dried man-perm. This ad is one of the chief reasons we have anti-depressants now.

**KEEP THE DALLAS OBSERVER FREE...** Since we started the *Dallas Observer*, it has been defined as the free, independent voice of Dallas, and we'd like to keep it that way. With local media under siege, it's more important than ever for us to rally support behind funding our local journalism. You can help by participating in our 'I Support' program, allowing us to keep offering readers access to our incisive coverage of local news, food and culture with no paywalls.

Make a one-time donation today for as little as $1.



**DANNY GALLAGHER** has been a regular contributor to the *Dallas Observer* since 2014. He has also written features, essays and stories for MTV, the *Chicago Tribune, Maxim, Cracked, Mental_Floss, The Week*, CNET and The Onion AV Club.
**FOLLOW:** Facebook: Danny Gallagher  Twitter: @thisisdannyg

**TRENDING ARTS**

- A Vicious Fight at Arlington Mall Goes Viral and Turns Into Rumors About a Shooting
- A Dallas Drag Queen Outdid the Thunderstorm By Performing in the Rain
- Women in Texas Are Choosing to Remove Their Fallopian Tubes Now
- Gifts For Grads

SPONSORED CONTENT FROM NRE

**REVCONTENT**



Diabetics: Keep Your Blood Sugar Under 90 (Doing This)



MD: If You Have Dark Spots, Do This Immediately (It's Genius!)

Captured by FireShot Pro: 27 May 2022, 13:46:36
https://getfireshot.com

# EXHIBIT 7

(To the Declaration of Diana Rausa)



# Mattress Mack Is The New Rockets Owner Houston Deserves

0 COMMENTS

*Mattress Mack's anything for Houston hurricane response proves he's the new owner the Rockets deserve.*

By Max Croes | @CroesFire | Aug 31, 2017, 3:11pm CDT |

f    SHARE



**MOST READ**



DeSagana Diop heads to Knicks, Rockets to have three new assistant coaches



Gallery Furniture saves the city of Houston



Listen to this article

Gallery Furniture **saves you money** the City of Houston?

There's countless heroes of the most damaging flood in American history. From first responders working without rest, to stranded health care professionals who stayed with their patients, to community heroes who turned jet skis, inner tubes and blowup mattresses into a means of rescue.

Somewhere in this mix of heroics, kinship and help-thy-neighbor is Jim McIngvale, or as Houston knows him... Mattress Mack.

To anyone who has spent more than an hour watching TV in Houston you know Gallery Furniture "saves you money."

Same that you know **Casa Ole is "fresh today,"** **Suit Mart has "suits and a whole lot** more," **Hilton Furniture declares "that's a fact jack"** and **Jim Adler is the "Texas Hammer**."

If Mattress Mack has an undeniable claim to fame it's his three decades of local commercials which rest somewhere between **Chuck Testa** and the **Micro Machines guy**.

This week the ubiquitous TV commercial personality **with a panache for headlines** reached new heights when he opened the doors to his furniture showrooms. Doing so transformed his local celebrity into housing for displaced families, a place for National Guard members to sleep and hot meals for first responders.

Suddenly Mack's name is in the headlines of **CNN**, **NPR** and **Esquire** (despite his known **willingness to wear a mattress suit**).

And now it's clear as day... Mattress Mack is the **Houston Rockets** owner the city deserves (other than Les Alexander of course).

The multimillionaire has spent nearly his entire career catering to Houston. So much so, he's never left the market. Despite owning the nation's highest grossing per-square-foot independent furniture store he's stayed in the Bayou City and given back to it.

Seemingly distraught by the cultural relevance of Dallas' Cotton Bowl, Mack



Jalen Green and Bill Simmons "Clear The Air"



Is Paolo Banchero a fitting choice for Rockets?



Should the Rockets trade down?



The Dream Take Podcast: Jalen Green and Bill Simmons Podcast Reaction #PrayForUvalde

helped establish a college football bowl game in Houston, the **Galleryfurniture.com** Bowl now know as the Texas Bowl.

When the Houston Dynamo made the 2006 MLS Cup Final in Dallas Mack paid for buses to take fans to and from the game free of charge.

When an arsonist tried to burn one of Mack's properties he responded **by offering $300,000 worth of furniture** to the Houston Fire Department as a thank you.

Chances are you've come across a USO station in an airport refurbished by Mattress Mack who made it a pet project to provide better accommodations for traveling military members. His philanthropic efforts **were even recognized by President George H.W. and Barbara Bush** when he was awarded a Point of Light Award.

The showman **once lost $4 million to his own customers** who he bet the dismal Astros wouldn't win 63 games. They did and Mack refunded 500 customers their entire purchase.

Mattress Mack fits the bill of the ideal owner. He has Steve Ballmer enthusiasm, a love of Houston and a willingness to lose money if it puts on a good show. He arguably deserves to own the Houston Rockets.

This thought comes with a million corollaries. Perhaps he'd meddle too much or wouldn't trust Daryl Morey. His affinity for the outrageous could include **a pitch for playing 4-on-5 defense**. All these things and countless more could be true.

But right now it's tough to think of someone who has their heart and soul in the right place more than Mack.

There of course is a catch. Mack **declared his interest in buying the team** when the sale was announced, but was realistic about his need for a large ownership group.

At an estimated net worth of $70 million Mack could only fit into a complex and sprawling ownership group, not buy the team as an outright owner. Perhaps an irony of staying exclusive to Houston is not having the means to own the Rockets.

The unannounced price for the Rockets is hovering at $2 billion. And while Mack has done quite well, nearly 40 years of selling affordable furniture in a single metropolitan area can't be turned into a professional sports team.

This reality doesn't mean he's not the owner the Rockets deserve at this point.

*Full disclosure. The author of this article owned Gallery Furniture furniture*

ADLER_000136

**Appx. 118**

*Full disclosure: The author of this article owned Gallery Furniture furniture growing up. Yes, it arrived the night it was purchased. Yes, it saved us money. And, yes, I got a free Houston Rockets basketball with the desk and dresser.*

## MORE FROM THE DREAM SHAKE

DeSagana Diop heads to Knicks, Rockets to have three new assistant coaches

Jalen Green and Bill Simmons "Clear The Air"

The Dream Take Podcast: Jalen Green and Bill Simmons Podcast Reaction #PrayForUvalde

Is Paolo Banchero a fitting choice for Rockets?

The Dream Take Podcast: Our 300th Episode Celebration!!!

Should the Rockets trade down?



The Dream Shake: for Houston Rockets fans
TDT #201: Jalen Green and Bill Simmons Podcast Reacti...
TDT #201: Jalen Green and Bill Simmons Podcast Reaction #PrayForUvaldo

00:30:18

SHARE   SUBSCRIBE   COOKIE POLICY                                            ᴵᴵ Megaphone

## Recommended





**Opinion: Sports Illustrated's swimsuit issue is a step back in time. And not in a good way**



**Opinion: The trolling of Amber Heard sends a perilous message to women**



**Jalen Green and Bill Simmons "Clear The Air"**









Opinion: Pete Davidson's 'SNL' signoff calls out this raging hypocrisy

Russia will cut electricity to Finland starting on Saturday, Finnish transmission system operator says

Fact check: Herschel Walker falsely claims he never falsely claimed he graduated from University of Georgia

**Comments**

**Archived**

Be respectful in your interactions with contributors and fellow fans. **Go here to read our full community guidelines.**

Some tips for using this platform:

• Your comment history now lives under the My Profile tab above this message. You can also select 'auto-unfurl all gifs/images' there
• Switch to Oldest First / Most Rec'd First by changing the 'Sort By' option
• To embed Twitter/YouTube, just paste the URL and select ADD TWEET/VIDEO
• Control-b = Bold. Control-i = Italics. Control-Enter submits your comment
• Click/tap on the username of someone who annoys you to Ignore them
• Click/tap "in reply to" to see the comment it's replying to
• C key lets you scroll forwards through the comments / shift-C to scroll backwards
• Z key lets you jump to Next Unread / shift-A marks all comments on your screen as read

If you'd like to report a bug or issue, email us at **support@sbnation.com**

Comments are now closed for this story.

**All Comments** 0

Newest  ⌄

There are no comments on this story.

Top of comments     Top of article

| **Google Chrome** | 11:00:11 AM 5/27/2022 |
| 101.0.4951.67 | Windows 10 Pro 64-bit Build 19044 |

# EXHIBIT 8

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF TEXAS

 3                        DALLAS DIVISION

 4    JIM ADLER, P.C. AND           )

 5    JIM ADLER,                    )

 6          Plaintiffs             )

 7                                  )

 8    VS.                           )CIVIL ACTION

 9                                  )NO. 3:19-cv-02025-K-BN

10    MCNEIL CONSULTANTS, LLC,      )

11    D/B/A ACCIDENT INJURY LEGAL   )

12    CENTER, QUINTESSA MARKETING,  )

13    LLC, D/B/A ACCIDENT INJURY    )

14    LEGAL CENTER, AND LAURA       )

15    MINGEE,                       )

16          Defendants            )

17        ----------------------------------------

18             VIDEOTAPED ORAL DEPOSITION OF

19                    LAUREN MINGEE

20                  NOVEMBER 16, 2022

21             ***ATTORNEYS' EYES ONLY***

22        ----------------------------------------

23

24    REPORTED BY KATHRYN R. BAKER, RPR, CSR

25    JOB #219107
```

Page 2

1          VIDEOTAPED ORAL DEPOSITION OF LAUREN MINGEE,

2   produced as a witness at the instance of the PLAINTIFFS,

3   and duly sworn, was taken in the above-styled and numbered

4   cause on the 16th day of November, 2022, from 9:58 a.m. to

5   3:19 p.m., before Kathryn R. Baker, CSR, RPR, in and for

6   the State of Texas, reported by a Texas certified machine

7   shorthand reporter, at the offices of Lynn, Pinker, Cox,

8   Hurst & Schwegmann, LLP, 2100 Ross Avenue, Suite 2700, in

9   the City of Dallas, State of Texas, pursuant to the

10  Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ATTORNEYS' EYES ONLY

```
                                                                    Page 3
  1                   A P P E A R A N C E S

  2     FOR THE PLAINTIFFS:
        Jered Matthysse, Esq.
  3     Giulio Yaquinto, Esq.
        PIRKEY BARBER PLLC
  4     1801 East 6th Street
        Austin, Texas 78702
  5

  6
        FOR THE DEFENDANTS:
  7     Rebecca Adams, Esq.
        Christopher Schwegmann, Esq.
  8     LYNN PINKER HURST & SCHWEGMANN, LLP
        2100 Ross Avenue
  9     Dallas, Texas 75201

 10

 11     ALSO PRESENT:
        Mr. Chase Huddleston, Videographer
 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

**Appx. 124**

Page 4

```
 1                          INDEX

 2   Appearances. . . . . . . . .                              3

 3   LAUREN MINGEE

 4        Examination by Mr. Matthysse . . .                   8

 5   Signature and Changes. . . . .                          169

 6   Reporter's Certification . . .                          171

 7

 8                         EXHIBITS

 9   NO./DESCRIPTION                                        PAGE

10   Exhibit 2 (Previously marked)...................         24
         Quintessa Bulk Marketing and Full Service
11       Platform, General Terms of Service
     Exhibit 16 (Previously marked)..................         13
12       Attorney Revenue, 2019-2022
     Exhibit 57 (Previously marked)..................         57
13       December 8, 2022, E-mail from █████████
         QUINTESSA_001297-1298
14   Exhibit 107 (Previously marked)................         73
         Insurance Call Script
15       QUINTESSA_002490
         ***CONFIDENTIAL***
16   Exhibit 108 (Previously marked)................         79
         Competitive Call Script
17       QUINTESSA_002595
         ***CONFIDENTIAL***
18   Exhibit 117 (Previously marked)................         13
         Spreadsheet
19       QUINTESSA_002619
         ***CONFIDENTIAL***
20   Exhibit 129......................................         9
         Second Amended Notice of Deposition of
21       Quintessa Marketing, LLC
     Exhibit 130.....................................         28
22       August 14, 2020, E-mail from
         accidentintakeforms1@gmail.com
23       QUINTESSA_000339
         ***ATTORNEYS' EYES ONLY***
24

25
```

Page 5

```
 1                          INDEX

 2                       (CONTINUED)

 3                        EXHIBITS

 4    NO./DESCRIPTION                                        PAGE

 5    Exhibit 131.....................................        31
           October 5, 2020, E-mail from
 6         accidentintakeforms1@gmail.com
           QUINTESSA_000456
 7         ***ATTORNEYS' EYES ONLY***
      Exhibit 132.....................................        33
 8         December 21, 2020, E-mail from
           accidentintakeforms1@gmail.com
 9         QUINTESSA_000823
           ***ATTORNEYS' EYES ONLY***
10    Exhibit 133.....................................        34
           April 1, 2021, E-mail from
11         accidentintakeforms2@gmail.com
           QUINTESSA_001055
12         ***ATTORNEYS' EYES ONLY***
      Exhibit 134.....................................        36
13         April 15, 2021, E-mail from
           accidentintakeforms2@gmail.com
14         QUINTESSA_001088
           ***ATTORNEYS' EYES ONLY***
15    Exhibit 135.....................................        37
           June 16, 2021, E-mail from
16         accidentintakeforms2@gmail.com
           QUINTESSA_001143
17         ***ATTORNEYS' EYES ONLY***
      Exhibit 136.....................................        40
18         July 6, 2021, E-mail from
           accidentintakeforms2@gmail.com
19         QUINTESSA_001169
           ***ATTORNEYS' EYES ONLY***
20    Exhibit 137.....................................        42
           July 21, 2021, E-mail from
21         accidentintakeforms1@gmail.com
           QUINTESSA_001186
22         ***ATTORNEYS' EYES ONLY***
      Exhibit 138.....................................        57
23         Settlement Agreement and Release in Full
           of All Claims
24         QUINTESSA_002506
           ***CONFIDENTIAL-ATTORNEYS' EYES ONLY***
25
```

ATTORNEYS' EYES ONLY

```
 1                        INDEX

 2                     (CONTINUED)

 3                      EXHIBITS

 4   NO./DESCRIPTION                                    PAGE

 5   Exhibit 139....................................    90
         Spreadsheet
 6       QUINTESSA_002596-2598
         ***CONFIDENTIAL***
 7   Exhibit 140....................................    91
         E-mail Chain
 8       QUINTESSA_002580-2583
         ***CONFIDENTIAL***
 9   Exhibit 141....................................    96
         E-mail Chain
10       QUINTESSA_002584-2589
         ***CONFIDENTIAL***
11   Exhibit 142....................................   157
         Defendants' Objections and Responses to
12       Plaintiffs' First Set of Requests for
         Admission
13

14              REQUESTED DOCUMENTS/INFORMATION

15                       (NONE)

16

17                 CERTIFIED QUESTIONS

18                       (NONE)

19

20

21

22

23

24

25
```

**Appx. 127**

ATTORNEYS' EYES ONLY

Page 7

1                          LAUREN MINGEE

2                     P R O C E E D I N G S

3                THE VIDEOGRAPHER:  We're now on the record

4     for the video deposition of Lauren Mingee as Quintessa

5     Marketing LLC.  The time is 9:58 a.m. on November 16th,

6     2022, in the matter of Jim Adler, P.C. and Jim Adler vs.

7     McNeil Consultants, LLC, et al., Civil Action Number

8     3:19-cv-02025-K-BN being held in the United States

9     District Court for the Northern District of Texas, Dallas

10    Division.

11                The court reporter is Kat Baker, and the

12    videographer is Chase Huddleston representing TSG

13    Reporting.

14                Today's deposition is being held at Lynn,

15    Pinker, Hurst & Schwegmann in Dallas, Texas.

16                Will counsel please state their appearance

17    for the record.

18                MR. MATTHYSSE:  Jered Matthysse and Giulio

19    Yaquinto with Pirkey Barber, representing plaintiffs.

20                MS. ADAMS:  Rebecca Adams and Chris

21    Schwegmann with Lynn, Pinker, Hurst & Schwegmann, for the

22    defendants.

23                          LAUREN MINGEE,

24    having been first duly sworn, testified as follows:

25                          (No omissions.)

1          LAUREN MINGEE

2    at?

3          A.    Yes, sir.

4          Q.    Okay.  And so remind me, when Quintessa received

5    those types of e-mails or these types of disengagement

6    requests, did it do anything to look into the allegations

7    internally?

8          A.    It did.  The process was to pull the phone call,

9    review that phone call.  See if anything was ever

10   mentioned about Adler or anything like that.  And then it

11   was to call the PC, the potential client, and then some

12   instances, too, we would also speak with the law firm,

13   seeing who did they speak with, did they have a recording

14   of that, and just pretty much gather all those facts and

15   information.

16         Q.    Okay.  And then once you've done that, in those

17   instances, did Quintessa make any changes to its ad copy,

18   for instance, its Google Ads copy?

19         A.    No, we would not have made changes from the ad

20   copy.

21         Q.    Okay.

22         A.    Because for us to make changes to the ad copy or

23   any advertising changes or internal changes, if there were

24   any issues that were happening consistently, then we would

25   look into that and see how that procedure or process

1                    LAUREN MINGEE

2  ███████████████████████████████████████████

   ██████████

4        Q.   Got it.

5             You mentioned Quintessa's Google Ads copy

6  and you used the word "generic."

7             Do you recall that?

8        A.   I do.

9        Q.   Were you the individual who came up, at least

10  originally, with the ad copy for Accident Injury Legal

11  Center?

12       A.   Yes.

13       Q.   And how did you -- how did you come up with that

14  ad copy?

15       A.    It was -- they were very generic terms that we

16  had used in TV commercials, and so I just used different

17  phrases that we had developed for different TV commercials

18  into the ad copy for -- for the potential clients

19  searching on Google.

20       Q.   Okay.  And have you ever run any ads -- was that

21  at McNeil Consultants?

22       A.    I developed that at McNeil and at Quintessa.

23       Q.   Okay.  And did you ever consider using branded

24  advertisements, for instance, Quintessa or McNeil or

25  another name like that?

1       LAUREN MINGEE

2       A.    No.

3       Q.    Why not?

4       A.    It doesn't tell people what we do.

5       Q.    Okay.  And so you believe that the generic

6   advertisements tell people what you do?

7       A.    I believe our URL and the ad copy tells them

8   what we do.

9       Q.    Okay.  How so?

10      A.    ███████████████████ is pretty clear that we're

11  a car accident helpline.  And so Accident Injury Legal

12  Center, when it was first developed, it was for helping

13  improve our quality score when people were typing in

14  things like car accident help or car accident attorney or

15  personal injury lawyer, because Google's algorithm used to

16  be that it would help your quality score if it was in a

17  URL.

18            And so that's why the URL was trying to --

19  how can I put -- fit in accident injury legal, all of the

20  things.

21      Q.    Okay.  And so you mentioned Accident Injury

22  Legal Center is one name or domain that you use in

23  Quintessa's advertisements, correct?

24      A.    Correct.

25      Q.    And Car Accident Helpline, is that another?

```
 1                         LAUREN MINGEE
 2        A.    Yes.
 3        Q.    Okay.  Are there any others that you can think
 4   of?
 5        A.    ███████████████████████████
 6        Q.    Okay.  What about ██████████████████████
 7        A.    Yes.
 8        Q.    Okay.  So those four.  Any others?
 9        A.    ████████████████████████████████████████
██████████████████████████████████████
11        Q.    Okay.
12        A.    And those are the four that I know that we use.
13        Q.    How did you know -- did you come up with the
14   name Accident Injury Legal Center?
15        A.    Yes.
16        Q.    How did you come up with that name?
17        A.    It was -- just for the reasons before, just
18   trying to come up with a domain that had accident and
19   injury in it and that didn't cost $10,000 to buy.
20        Q.    And so did you ever consider running different
21   types of ad copy in competitive bidding than you do in
22   generic bidding?
23        A.    Can you ask the question a different way?
24        Q.    Yeah.  So step back a second.
25              So Quintessa, correct, engages in both
```

ATTORNEYS' EYES ONLY

Page 61

1                    LAUREN MINGEE

2     the agreement?

3          A.   I don't know that answer.

4          Q.   Okay.    ATTORNEYS' EYES ONLY

5               MR. MATTHYSSE:  Let's take a break.

6               THE VIDEOGRAPHER:  Off the record at

7     11:06 a.m.

8               (Recess in the proceedings from 11:06 to

9               11:23 a.m.)

10              THE VIDEOGRAPHER:  Back on the record at

11    11:23 a.m.

12         Q.   (BY MR. MATTHYSSE)   All right.  Ms. Mingee, are

13    you ready to keep going?

14         A.   Yes, sir.

15         Q.   So I'm going to hand you a document that's on my

16    computer.  It's an Excel spreadsheet.  And this was marked

17    as Quintessa 1 in defendant's document production case.

18    And then I'll ask you some questions about that.

19              Sound good?

20         A.   Sounds good.

21         Q.   You got it?

22         A.   Yes, sir.
                TSG Reporting - Worldwide    877-702-9580

23              THE REPORTER:  Are you marking this?

24              MR. MATTHYSSE:  No, it's easier just to

25    reference.

ATTORNEYS' EYES ONLY

Page 62

1    LAUREN MINGEE

2        Q.   (BY MR. MATTHYSSE)   So Quintessa 1, Ms. Mingee,

3    it was produced in this case by defendants, and it appears

4    to be a collection of callers into Quintessa, as

5    summarized in Quintessa's intake summaries, correct?

6        A.   Correct.

7        Q.   Were you involved in collecting and compiling

8    this data?

9        A.   No, I was not.

10       Q.   Do you know who was?

11       A.   This was Mike Walker.

12       Q.   Okay.  And so Mike would have, correct, taken

13   this data from your intake -- what was the phrase you-all

14   used for --

15       A.   AI, the accident intake.

16       Q.   -- the accident intake forms that the call

17   center employees fill out, correct?

18       A.   Yes, sir.

19       Q.   And so for this document, Quintessa 1, this

20   information comes from that -- is it software that

21   Quintessa uses?

22       A.   It's a software that was developed in-house,

23   yes, sir.

24       Q.   Okay.  Okay.  And if you could look around

25   Column E where it says, Description?

Page 63

1          LAUREN MINGEE

2      A.   Yes, sir.

3      Q.   That, correct, is a description provided by a

4  call center employee who spoke on the phone with the PC,

5  right?

6      A.   Yes.

7      Q.   Okay.  And Quintessa 1 appears to be those

8  instances, correct, in which a PC, or at least as

9  summarized by Quintessa's employees, mentioned the word

10  Adler or Hammer, correct?

11      A.   Correct.

12      Q.   And so these are examples of instances in which

13  someone -- a PC called into Quintessa and either mentioned

14  Jim Adler or the Texas Hammer or was looking for Jim

15  Adler, the The Texas Hammer, correct?

16      A.   Correct.

17      Q.   And if a PC -- you understand "PC" as that

18  potential client, right?

19      A.   Yes, sir.

20      Q.   If a PC clicked on one of your -- Quintessa's

21  Google advertisements that appeared after searching for,

22  let's say, Jim Adler, but didn't mention the word Adler or

23  Hammer, they wouldn't be on this list, correct?

24      A.   Correct.

25      Q.   And so if you could look -- you see the bottom

ATTORNEYS' EYES ONLY

Page 64

```
 1                      LAUREN MINGEE

 2   tabs by year?

 3        A.   Yes, sir.  The sheets?

 4        Q.   Yes.        ATTORNEYS' EYES ONLY

 5        A.   Okay.

 6        Q.   And so in -- if you could go to 2018.

 7        A.   Yes, sir.

 8        Q.   In 2018 there were -- you've got to take away

 9   the first line because that is the summary of the columns,

10   and so in 2018 there were 36 such instances, correct?

11        A.   Correct.

12        Q.   And if you go to 2019 and scroll all the way

13   down, there were 454 such instances, correct?

14        A.   Yes.

15        Q.   And then if you could go over to 2020 and scroll

16   all the way down, there were 526 such instances, correct?

17        A.   Correct.

18             THE WITNESS:  Do we have the sheet to

19   reference?  The QM injury.

20             MS. ADAMS:  I can get it.

21             THE WITNESS:  Okay.

22        Q.   (BY MR. MATTHYSSE)  And then if you look at
                    TSG Reporting - Worldwide    877-702-9580
23   2021 and scroll all the way down, there were 579 such

24   instances, correct?

25        A.   Correct.
```

ATTORNEYS' EYES ONLY

Page 65

 1                    LAUREN MINGEE

 2        Q.   And then finally, I believe, this was prepared

 3   in February of 2022, so at least at some -- as in January

 4   of 2022 there were 28 such instances, right?

 5        A.   Correct.

 6        Q.   And so stepping back, Ms. Mingee, we talked a

 7   bit about this before the break, about folks calling in

 8   and looking for or mentioning Jim Adler.

 9             Do you recall that?

10        A.   Yes.

11        Q.   And clearly it happens on -- at least multiple

12   times a month; is that right?

13        A.   I don't know the percentage.  That is what I am

14   waiting for to see, how many total QM injury calls were

15   also processing for the year.

16        Q.   Okay.  But I'm asking -- that's not the question

17   I asked.

18             The question I asked is:  That was

19   happening multiple times a month; is that right?

20        A.   Correct.

21        Q.   Okay.  And despite that and the increase from

22   2018 to 2019, Quintessa made no changes to its ad copy; is

23   that right?

24        A.   Correct.

25        Q.   And no changes to your script?

1                        LAUREN MINGEE

2              But the call center employees will answer

3    the phone and then summarize -- as we saw in Quintessa 1,

4    their description of the call, right?

5         A.    Yes.

6         Q.    Okay. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

17        Q.    ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

█████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

██████████████████████

████████████████████████████████████████████████

1                       LAUREN MINGEE

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

17      Q.   Okay.  I am going to hand you, Ms. Mingee, what

18  was previously marked as Exhibit 107.

19              (Exhibit 107 previously marked.)

20      A.   Do you want this back or do you want me to --

21      Q.   (BY MR. MATTHYSSE)  Yes.  I do.  Sorry about

22  that.

23      A.   No, you're fine.  I just wanted to make sure.

24              I have too many laptops.  I don't need

25  another one.

ATTORNEYS' EYES ONLY

1                   LAUREN MINGEE

2   is -- is that, This is the intake department.  Are you

3   calling in regards to a new case or an existing case.

4                Do you see that?

5        A.   Yes.

6        Q.   What -- the first question there is:  Who came

7   up with the name "intake department"?

8        A.   This was something that was used at Exclusive

9   Legal Marketing.  So as -- in part of my agreement with

10  Cody Bryant was to help him on his intake because that is

11  what I used to run for him was the intake department.  And

12  so this was a script that they had come up with at

13  Exclusive Legal.  And so when we were operating intake for

14  them, this was the script that was given, and that we

15  operated under.

16       Q.   Okay.  So this script you took to McNeil

17  Consultants and then in 2019 to Quintessa Marketing,

18  correct?

19       A.   I believe it was changed in 2019.  But, yes, it

20  is what was used at McNeil Consultants when we were

21  adver- -- or doing advertising and the intake for

22  Exclusive Legal.

23       Q.   How was it changed in 2019?

24       A.   This formatting doesn't look the same like it

25  was, I believe, in '19.  I think it was just more robust.

ATTORNEYS' EYES ONLY

1    LAUREN MINGEE

2    A.    Yes, sir.

3    Q.    And for the same reasons you mentioned as for

4    the insurance call script?

5    A.    For -- if we were ever referencing ourselves as

6    another name, then we were advised by counsel to put it

7    under as a d/b/a with the secretary of state.

8    Q.    Okay.  So you take Intake Department to be the

9    name of your company in that instance?

10   A.    Yes.

11   Q.    How so?

12   A.    It was a business name that we filed for a d/b/a

13   and accepted by the state of Oklahoma, and that was a

14   company that we were doing business as.

15   Q.    So you believe that customers would understand

16   the Intake Department to be the name of your business?

17   A.    I can't speak to what the consumer understood.

18   I can speak to -- that we were operating as an intake

19   department for multiple law firms.  And whenever someone

20   would call in, we were not -- we didn't know what the

21   caller was calling in for.  So we weren't doing marketing

22   for that actual law firm.  So we weren't answering as that

23   law firm's name.

24   Q.    And so why didn't you say instead, This is the

25   intake department for multiple law firms, like you just

LAUREN MINGEE

1
2    said?

3         A.    I don't know.  That's just what we decided was

4    to use the Intake Department, because it was just short

5    and sweet and to the point.

6         Q.    And if the caller asked for the second time, But

7    is this the blank, so, for instance, Adler Law Firm, the

8    scripts -- the call is for them to say, Sir/Ma'am, this is

9    the Intake Department.  If this is regarding an existing

10   case, I can give you the correct number to call.

11              Do you see that?

12        A.    Yes.

13        Q.    Did you consider at that time, when this script

14   was written and being used in either that first or second

15   instance where the caller asks this question, saying, No,

16   we are not that law firm?

17        A.    In this instance, when we were telling them who

18   we were, I felt like we were saying -- that was telling

19   them who our name was and what we were -- the name of our

20   business.  So that was telling them who we were.  So I

21   considered that saying "no."

22        Q.    Did you have knowledge when that script was

23   being used that law firms, like your clients, had their

24   own intake departments?

25        A.    Can you say that again, please?

1              LAUREN MINGEE

2    you?

3         A.   No, not to my knowledge.

4         Q.   So you never had any conversations internally

5    about whether or not the use of intake of -- that the

6    phrase "intake department" might be misleading to

7    consumers?

8         A.   When the Fifth Circuit appealed -- or when this

9    appeal came about, when we started having internal

10   conversations, was at that point.

11        Q.   Okay.  So prior to that you had not?

12        A.   I can't say we never did.  I just know at that

13   point we had more of a robust leadership team.  And so

14   that is when we sat down and started having more

15   communication.

16        Q.   And you mentioned that change where they say,

17   Just to make sure there is no confusion, we're a

18   third-party intake department, when folks do call in, for

19   instance, looking for the Adler Law Firm.

20             Do you recall that?

21        A.   Yes.

22        Q.   About when was that change made?

23        A.   I don't know the exact time.  It was after the

24   opinion came down we consulted with counsel.  And we, as a

25   leadership team, agreed, and then we rolled that out.  So

LAUREN MINGEE

1   I would assume within 90 days, but I can't -- I can't

2   expressly give you the exact date.

3       Q.    I am going to hand you, Ms. Mingee, what will be

4   marked as Exhibit 140 -- no, 139.

5                  (Exhibit 139 marked.)

6       A.    Thank you.

7       Q.    (BY MR. MATTHYSSE)   One -- I will give you a

8   second, Ms. Mingee, to take a look at this.  But as you

9   can see, this is another Excel.  It was a little smaller

10  so we were able to print it.  But it's an Excel produced

11  by Quintessa in this case in the same format.

12                 Do you recognize this format as similar to

13  Quintessa 1 that we reviewed on the computer?

14      A.    Yes, sir.

15      Q.    And so this appears to be additional examples of

16  folks calling in, correct, and mentioning or asking for

17  Jim Adler or Texas Hammer; is that right?

18      A.    Yes.

19      Q.    And so that has continued to occur this year,

20  correct?

21      A.    Yes.

22      Q.    And these are summaries written by the call

23  center employees describing the conversation as it's

24  happening, correct?

Page 104

1                        LAUREN MINGEE

2          A.    Yes.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

  -

22         Q.    Okay.

23         A.    -- advertisement as well.

24         Q.    Sorry.

25

**Appx. 145**

ATTORNEYS' EYES ONLY

Page 105

1                    LAUREN MINGEE

2    ███████████████████████████████████████

███████████████████████

███████████████████████████████████████

██████████████

█████████████████████████████████████████████

█████████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████

██████████████████

█████████████████████████████████████████████

███████████████████████████████████

**Appx. 146**

Page 113

1                           LAUREN MINGEE

2    previously testified, in 2017?

3          A.    I believe so.

4          Q.    And at this point you continued to bid on the

5    Adler marks, correct?

6          A.    Correct.

7          Q.    Did you, at any point at Elm or then moving into

8    the McNeil Consultants on your own, check to see if the

9    Adler marks, for instance, were registered trademarks at

10   the Patent and Trademark Office?

11         A.    I believe that Elm did.  That they had -- there

12   was a trademark Web site that you could check and see

13   different trademark copy.  But they were using that to see

14   if they could do keyword insertion with non-trademark

15   terms.

16         Q.    Got it.

17         A.    That wasn't something that I did.

18         Q.    Okay.  And so do you recall yourself

19   ever -- ever checking that?

20         A.    It's been a long time, but I don't believe so.

21         Q.    Would you agree, Ms. Mingee, that Jim Adler is

22   well-known in Texas?

23         A.    Yes.

24         Q.    Was there a point in which Quintessa began

25   bidding higher amounts on the Jim Adler trademarks in late

```
 1                    LAUREN MINGEE

 2      A.   Yes.  Anything under the master billing account

 3  was produced in your subpoena to Google.

 4      Q.   Okay.  And so that master account data that

 5  Google produced is accurate as to your master accounts

 6  purchasing -- purchased in Google, correct?

 7      A.   Correct.

 8  ████████████████████████████████████████
```

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

██████████████

████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████

███████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████

█████████████████████████████████████

1          LAUREN MINGEE

2

5     Q.   Okay.  So it's a "yes"?

6     A.   To my knowledge.

7     Q.   I am going to show you, Ms. Mingee, another

8  Excel spreadsheet.  So let me -- give me one quick minute

9  to open this up.

10          Here you go, Ms. Mingee.

11          So what I have handed you is another Excel

12  spreadsheet produced by -- it's Quintessa, in this case,

13  and it's Quintessa 2.

14          And this was the original information we

15  received from Quintessa as to its purchases of the Adler

16  marks in Texas.

17          Do you recall this document?

18          MS. ADAMS:  Objection, form.

19     A.   This document was produced by someone else

20  besides me.  So I wouldn't be able to tell you if it

21  matched exactly.

22          But, yes, to the best of my knowledge this

23  is.

24     Q.   (BY MR. MATTHYSSE)  Okay.  That is fair.

25          So this document -- as through -- do you

1              ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads      Should Read   Reason

6    ___  ___ _____     _____    _____

7    ___  ___ _____     _____    _____

8    ___  ___ _____     _____    _____

9    ___  ___ _____     _____    _____

10   ___  ___ _____     _____    _____

11   ___  ___ _____     _____    _____

12   ___  ___ _____     _____    _____

13   ___  ___ _____     _____    _____

14   ___  ___ _____     _____    _____

15   ___  ___ _____     _____    _____

16   ___  ___ _____     _____    _____

17   ___  ___ _____     _____    _____

18   ___  ___ _____     _____    _____

19   ___  ___ _____     _____    _____

20

21                               _____

22                               Signature of Deponent

     SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2022.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____

1                          LAUREN MINGEE

2                ACKNOWLEDGMENT OF DEPONENT

3          I, _____, do hereby certify that I

4    have read the foregoing pages, and that the same is a

5    correct transcription of the answers given by me to the

6    questions therein propounded, except for the corrections

7    or changes in form and substance, if any, noted on the

8    attached Errata.

9

10          _____

11          WITNESS NAME                              DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    LAUREN MINGEE

 2          IN THE UNITED STATES DISTRICT COURT

 3          FOR THE NORTHERN DISTRICT OF TEXAS

 4                    DALLAS DIVISION

 5   JIM ADLER, P.C. AND              )

 6   JIM ADLER,                       )

 7           Plaintiffs              )

 8                                    )

 9   VS.                             )CIVIL ACTION

10                                    )NO. 3:19-cv-02025-K-BN

11   MCNEIL CONSULTANTS, LLC,         )

12   D/B/A ACCIDENT INJURY LEGAL      )

13   CENTER, QUINTESSA MARKETING,     )

14   LLC, D/B/A ACCIDENT INJURY       )

15   LEGAL CENTER, AND LAURA          )

16   MINGEE,                          )

17           Defendants              )

18        ***********************************

19             REPORTER'S CERTIFICATION

20        ORAL DEPOSITION OF LAUREN MINGEE

21                 NOVEMBER 16, 2022

22        ***********************************

23        I, Kathryn R. Baker, RPR, a Certified Shorthand

24   Reporter in and for the State of Texas, hereby certify to

25   the following:
```

Page 172

```
 1                          LAUREN MINGEE

 2               That the witness, LAUREN MINGEE, was duly sworn

 3     by the officer and that the transcript of the oral

 4     deposition is a true record of the testimony given by the

 5     witness;

 6               I further certify that pursuant to FRCP Rule

 7     30(f)(1) that the signature of the deponent:

 8               _X_ was requested by the deponent or a party

 9     before the completion of the deposition and is to be

10     returned within 30 days from the date of receipt of the

11     transcript.  If returned, the attached Errata contain any

12     changes and the reasons therefor;

13               ___ was not requested by the deponent or a party

14     before the completion of the deposition.

15               I further certify that I am neither counsel for,

16     related to, nor employed by any of the parties or

17     attorneys in the action in which this proceeding was

18     taken, and further that I am not financially or otherwise

19     interested in the outcome of the action;

20

21

22

23

24

25
```

1                        LAUREN MINGEE

2            Subscribed and sworn to on this 30th day of

3    November, 2022.

4

5                        _____
                         KATHRYN R. BAKER, RPR, CSR #6955
6                        Expiration Date:  04/30/2023
                         Firm Registration No. 615
7                        TSG Reporting
                         228 E. 45th Street
8                        Suite 810
                         New York, New York 10017
9                        877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx. 154

# EXHIBIT 9

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| JIM S. ADLER, P.C., AND JIM ADLER, | |
| Plaintiffs, | Case No. 3:19-cv-02025-K-BN |
| vs. | |
| MCNEIL CONSULTANTS, LLC, d/b/a ACCIDENT INJURY LEGAL CENTER, QUINTESSA MARKETING, LLC, d/b/a ACCIDENT INJURY LEGAL CENTER, AND LAUREN MINGEE, | **EXPERT REPORT OF** **R. CHRISTOPHER ANDERSON** **WITH RESPECT TO DAMAGES** |
| Defendants. | |

Respectfully submitted this 14th day of July, 2022

R. Christopher Anderson

**CONFIDENTIAL**

**ATTORNEYS' EYES ONLY**

## Table of Contents

I.   INTRODUCTION ........................................................................................................1

II.  ASSIGNMENT..........................................................................................................3

III. INFORMATION CONSIDERED ..............................................................................4

IV.  BACKGROUND ........................................................................................................4
     A. Parties......................................................................................................................4
         i.   Jim S. Adler, P.C. and Jim S. Adler...............................................................4
              a)  Legal Services Market and Business Model.........................................4
              b)  Investments in Advertising ...................................................................5
         ii.  Accident Injury Legal Center ("AILC") ........................................................5
              a)  Legal Entities Using AILC Moniker......................................................6
              b)  Subscription Service and Price Per Lead Business Model ...................7
              c)  Non-Branded Advertising ......................................................................8
              d)  Google AdWords and Affiliate Marketing ............................................8
     B. Google AdWords ("AdWords") Advertisement Auction Framework........................9
         i.   Ad Rank Algorithm.........................................................................................9
         ii.  Costs-Per-Click and Conversion Actions .....................................................10
         iii. Campaigns, Ad Groups, and Search Keywords.............................................11
              a)  Campaigns............................................................................................11
              b)  Ad Groups ............................................................................................11
              c)  Keywords..............................................................................................12
     C. "Click-to-Call" Campaigns.....................................................................................12
     D. Auction Bidding Strategies .....................................................................................12
         i.   Manual Cost-Per-Click ("CPC")...................................................................13
         ii.  Target Impression Share ...............................................................................13
              a)  Placement Options ...............................................................................13
              b)  Bid Limits ............................................................................................14
         iii. Enhanced Cost-Per-Click ("eCPC") .............................................................14
         iv.  Target Cost Per Action ("tCPA") ..................................................................15
         v.   Bid Adjustments............................................................................................15

V.   SUMMARY OF ADLER'S ALLEGATIONS AGAINST DEFENDANTS .....................16
     A. Understanding of Adler's Trademarks......................................................................16
     B. Trademark Infringement and Unfair Competition Allegations .................................16
     C. Tortious Interference................................................................................................16
     D. Misappropriation of Business Opportunity...............................................................17

VI.  UNDERSTANDING OF POTENTIAL DAMAGES ...........................................................17
     A. Laws Governing Adler's Lanham Act Damages Claims..............................................17
         i.   Lanham Act.....................................................................................................17

i

ii. Texas Common Law ..................................................................................17
B. Proximate Cause Prerequisites...............................................................................17
C. Damages Sustained by the Plaintiff .......................................................................18
D. Accounting of Defendant's Profits .........................................................................19
E. Laws Governing Adler Misappropriation of Business Opportunity Claims .................19

VII. ANALYSIS OF DAMAGES...........................................................................................20
A. Framework for Evaluating Adler's Damages .........................................................20
B. Adler's Advertising Costs Increased .....................................................................20
    i. Adler Advertising Expenses for Branded Campaigns .........................................20
    ii. Increase in AdWords Advertising Expenses...........................................................21
        a) Econometric Model of Price Changes ...................................................21
        b) Analytical Model of Price Changes ..................................................22
        c) Damages Conclusion ...................................................................23
C. AILC Keyword Bidding Directed to Adler Clients ...............................................23
    i. AILC AdWords Records Produced by Defendants ...............................................24
    ii. AILC AdWords Records Produced by Google..................................................25
D. AILC's Use of Adler Marks Confused Google Users ...........................................25
E. AILC Ad Campaigns Directed to Mobile Phone Users..........................................26
F. AILC Successfully Bid Against Adler for Keywords.............................................26
    i. AILC Bid More Than Adler Paid for Keywords ...................................................27
    ii. AILC Paid More Than Adler for Keywords ..........................................................27
    iii. Potential Impact of Smart Bidding Strategies.......................................................28
    iv. AILC Paid More Per Conversion...........................................................................28
G. AILC Diverted Adler Clients to Adler Competitors..............................................29
    i. Search Overlap Rate ............................................................................................30
    ii. Position Above Rate .............................................................................................30
    iii. Search Outranking Share .....................................................................................31
    iv. Absolute Top of Page Rate ...................................................................................32
    v. Conclusion ...........................................................................................................32

VIII. ANALYSIS OF AILC'S PROFITS FROM ALLEGED INFRINGEMENT .......................33
A. Accounting of AILC Profits Is Appropriate ..........................................................33
B. AILC Profits Attributable to Use of the Adler Marks ...........................................33
    i. AILC's Revenues and Profits in Texas................................................................34
    ii. Revenues Attributable to Infringement of Adler Marks........................................34

IX. PREJUDGMENT INTEREST ........................................................................................35

List of Schedules

| Schedule Number | Description |
| --- | --- |
| 1.0 | Curriculum Vitae of Christopher Anderson |
| 2.0 | Expert Designations & Testimony of Christopher Anderson |
| 3.0 | Documents Considered |
| 4.0 | AILC Revenue Attributable to Use of Adler Marks |
| 4.1 | Adler's Increased Costs on Branded Campaigns - Econometric Model |
| 4.1a | Adler's Increased CPC based on Econometric Model |
| 4.2 | Adler's Increased Costs on Branded Campaigns - Analytical Model |
| 5.0 | Adler's Annual AdWords Spend on All Campaigns |
| 5.1 | Adler's Annual AdWords Spend on Branded Campaigns |
| 5.2 | Adler AdWords Spend on Keywords by Associated Trademark |
| 5.3 | Top Adler Branded Campaign Keywords by Total Spend |
| 5.4 | Adler Branded Campaign Keywords by Total Spend: January 1, 2017 - June 9, 2022 |
| 6.0 | AILC Spend on Keywords Associated with the Adler Marks: November 24, 2018 - July 7, 2022 |
| 7.0 | Summary of AILC Campaigns Using Adler Marks by Source |
| 8.0 | AILC's Top Ten Branded Keywords by Spend in Texas |
| 8.1 | AILC's Top Ten Keywords Nationally |

iii

| Schedule Number | Description |
|---|---|
| 9.0 | Adler's Quarterly Cost Per Click on Branded Campaigns |
| 10.0 | Summary of AILC's Conversions on Adler Marks |
| 10.1 | Summary of AILC's Clicks on Adler Marks |
| 10.2 | Summary of AILC's Impressions on Adler Marks |
| 11.0 | AILC Conversions on Certain Adler Keywords and Calls Logged |
| 11.1 | Summary of AILC's Logged Calls Referencing Jim Adler |
| 12.0 | AILC's Highest and Lowest Maximum CPC on Adler's Top Ten Adler Keywords |
| 13.1 | AILC's and Adler's Cost per Click on "jim adler" Keyword |
| 13.2 | AILC's Spend and CPC for "jim adler" Keyword |
| 13.3 | AILC's and Adler's Cost per Conversion on "jim adler" Keyword |
| 13.4 | AILC's Impressions on "jim adler" Keyword |
| 14.1 | Search Overlap Rate of Adler's Auction Insights Competitors for "jim adler" Keyword (Mobile Phone Platform) |
| 14.2 | Position Above Rate of Adler's Auction Insights Competitors for "jim adler" Keyword (Mobile Phone Platform) |
| 14.3 | Search Outranking Share of Adler's Auction Insights Competitors for "jim adler" Keyword (Mobile Phone Platform) |
| 14.4 | Absolute Top of Page Rate of Adler's Auction Insights Competitors for "jim adler" Keyword (Mobile Phone Platform) |
| 15.1 | AILC's Search Overlap Rate by Adler Top Ten Keyword |

| Schedule Number | Description |
|---|---|
| 15.2 | AILC's Position Above Rate by Adler Top Ten Keyword |
| 15.3 | AILC's Search Outranking Share by Adler Top Ten Keyword |
| 15.4 | AILC's Absolute Top of Page Rate by Adler Top Ten Keyword |
| 16.0 | AILC's Total Spend, Clicks, and Conversions Using the Adler Marks in Texas |
| 17.0 | Workpaper of Google-Produced AILC Keyword Data |

v

*Jim S. Adler, P.C. et. Al. v. McNeil Consultants, LLC et. al.*

**SCHEDULE 8.0: AILC's Top Ten Branded Keywords by Spend in Texas (a)**

| Term | Brand | Total Spend |
|------|-------|-------------|



**Notes:**

(a) ADLER_000633; ADLER_000636; ADLER_000639; ADLER_000655; ADLER_000658; ADLER_000661. See also Schedule 17.0. For certain Campaigns, I have determined the geography using Metro_Area_Geographic field provided in Googles Campaign reports See ADLER_000632; ADLER_000635; ADLER_000638. For Campaigns not listed in the Google campaign reports, I have determined geography based on the location of conversions and geographic indicators in the Campaign name, Ad Groups, and Keywords. Campaigns with multiple states, or Campaigns without any indicators of geography have been excluded.

*Jim S. Adler, P.C. et. Al. v. McNeil Consultants, LLC et. al.*

**SCHEDULE 8.1: AILC's Top Ten Keywords Nationally (a)**

| Term | Brand | Total Spend |
|------|-------|-------------|



**Notes:**

(a) ADLER_000633; ADLER_000636; ADLER_000639; ADLER_000655; ADLER_000658; ADLER_000661.  See also Schedule 17.0.

**SCHEDULE 14.4: Absolute Top of Page Rate of Adler's Auction Insights Competitors for "jim adler" Keyword (Mobile Phone Platform)**



Q1 2019  Q2 2019  Q3 2019  Q4 2019  Q1 2020  Q2 2020  Q3 2020  Q4 2020  Q1 2021  Q2 2021  Q3 2021  Q4 2021  Q1 2022  Q2 2022  Average

**Notes:**

(a) ADLER_000625. Includes Mobile Phone platform only. Sorted by highest Absolute Top of Page Rate from Q1 2019-Q2 2022. Excludes URLs with no non-zero values from Q1 2019 - Q2 2022.

(b) Average calculated as the sum of Absolute Top of Page Rate divided by the number of periods with data for each URL.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

*Jim S. Adler, P.C. et. Al. v. McNeil Consultants, LLC et. al.*

**SCHEDULE 15.4: AILC's Absolute Top of Page Rate by Adler Top Ten Keyword (a)**

Q1 2019  Q2 2019  Q3 2019  Q4 2019  Q1 2020  Q2 2020  Q3 2020  Q4 2020  Q1 2021  Q2 2021  Q3 2021  Q4 2021  Q1 2022  Q2 2022  Average (b)



**Notes:**

(a) ADLER_000618;ADLER_000624-630; ADLER_000690-691. I note that in certain periods and for certain keywords, multiple entries were recorded for the same quarter. In those instances, I have utilized an average of all values in that quarter.

(b) "+" symbols are associated with the "modified broad match" match type. I understand that Google phased out this match type in 2021 and Adler transitioned to phrase match.

(c) Average calculated as the sum of search overlap divided by the number of periods with data.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

**Appx. 165**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

JIM S. ADLER, P.C. AND JIM ADLER,

     Plaintiffs,

vs.

MCNEIL CONSULTANTS, LLC d/b/a
ACCIDENT INJURY LEGAL CENTER,
QUINTESSA MARKETING, LLC d/b/a
ACCIDENT INJURY LEGAL CENTER,
AND LAUREN MINGEE,

     Defendants.

Case No. 3:19-cv-02025-K-BN

**SUPPLEMENTAL EXPERT REPORT OF
R. CHRISTOPHER ANDERSON
WITH RESPECT TO DAMAGES**

Respectfully submitted this 29th day of December, 2022

_____
R. Christopher Anderson

**CONFIDENTIAL**

**ATTORNEYS' EYES ONLY**

# Table of Contents

I. PRIOR OPINIONS ...........................................................................................................1

II. BASIS FOR SUPPLEMENTING PRIOR OPINIONS ...................................................1

III. SUMMARY OF SUPPLEMENTAL OPINIONS .........................................................1

IV. ANALYSIS OF AILC SUPPLEMENTAL PRODUCTION ..........................................3
   A. AILC AdWords Spending Records ........................................................................ 3
   B. Google Search Term Records ................................................................................ 3
   C. Lack of AILC AdWords Cost Records .................................................................. 3
   D. AILC Revenue Records ......................................................................................... 4

V. SUPPLEMENTAL ANALYSIS OF DAMAGES .........................................................4
   A. Adjustments to Econometric Model ...................................................................... 4
      i.    Control for COVID-19 Pandemic ...........................................................5
      ii.   Weighting of Indicator Variables ............................................................5
      iii.  Addition of Remaining Branded Keywords ............................................6
      iv.  Cumulative Impact of Updates to Econometric Model .........................6
   B. Adler's Advertising Costs Increased ...................................................................... 7
      i.    Econometric Model Price Changes .........................................................7
      ii.   Analytical Model Price Changes .............................................................7
   C. Analysis of AILC's Profits from Alleged Infringement ........................................ 7
      i.    AILC Revenues Attributable to Use of the Adler Marks .......................7
      ii.   AILC's Costs Attributable to Use of the Adler Marks ...........................8
   D. Framework for Evaluating Adler's Damages ......................................................... 13
   E. Qualitative Support for Causal Nexus ................................................................... 15

i

## List of Supplemental Schedules

| Schedule Number | Description |
|---|---|
| 3.0 | Documents Considered |
| 4.0 | Calculation of AILC Profit from Adler Keywords |
| 4.1 | Adler Share of AILC Conversions and Cost |
| 5.0 | Adler's Increased Costs on Branded Campaigns – Econometric Model |
| 5.1 | Adler's Increased CPC Based on Individual Adjustments to the Econometric Model |
| 5.2 | Adler's Increased CPC Based on Cumulative Adjustments to the Econometric Model |
| 6.0 | AILC Keywords and Search Terms |
| 7.0 | AILC's Revenue from Competitive Texas Campaigns |

*Jim S. Adler, P.C. et. Al. v. McNeil Consultants, LLC et. al.*

**SUPPLEMENTAL SCHEDULE 4.1: Adler Share of AILC Conversions and Spend**

| | 2019 | 2020 (c) | 2021 | 2022 | Total |
|---|---|---|---|---|---|



**Notes:**

(a) QUINTESSA_002620 tabs "2019 Keywords," "2020 Keywords," "2021 Keywords," and "2022 Keywords."

(b) QUINTESSA_002621.

(c) 2020 excludes observations for the campaign "USA [Michigan do not touch]" which does not appear to be a Texas competitive campaign. I note that this campaign contained over 175% of all other listed campaigns combined in 2020. Further, this observation was not included in previously produced cost data see (QUINTESSA_002574 AND QUINTESSA_002575).

*Jim S. Adler, P.C. et. Al. v. McNeil Consultants, LLC et. al.*

**SUPPLEMENTAL SCHEDULE 7.0: AILC's even e fro Co petitive Te as Ca pai ns (a)**

**2022**



**Notes:**

(a)  QUINTESSA_002576 and QUINTESSA_002624. 2022 excludes one entry mar ed as denied with no billables.

# EXHIBIT 10

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3   JIM S. ADLER, P.C. and      )
     JIM ADLER,                  )
 4      Plaintiffs,              )
                                 )
 5   VS.                         ) CA NO. 3:19-cv-02025-K-BN
                                 )
 6   MCNEIL CONSULTANTS, LLC     )
     D/B/A ACCIDENT INJURY       )
 7   LEGAL CENTER, QUINTESSA     )
     MARKETING, LLC D/B/A        )
 8   ACCIDENT INJURY LEGAL       )
     CENTER, and LAUREN VON      )
 9   MCNEIL,                     )
        Defendants.              )
10      *****************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
11
                LAUREN VON MCNEIL MINGEE
12
                       CONFIDENTIAL
13
                      April 13, 2022
14      *****************************************
        ORAL AND VIDEOTAPED DEPOSITION OF LAUREN VON MCNEIL
15
     MINGEE, produced as a witness at the instance of the
16
     Plaintiffs, and duly sworn by me, taken in the above-
17
     styled and numbered cause on April 13, 2022, from
18
     10:08 a.m. to 7:29 p.m., before DIANA BENGS, CSR, RPR,
19
     Texas CSR No. 4907, in and for the State of Texas,
20
     reported by machine shorthand, at the offices of Lynn,
21
     Pinker, Hurst & Schwegmann, 2100 Ross Avenue, Suite 2700,
22
     Dallas, Texas, pursuant to the Federal Rules of Civil
23
     Procedure and provisions stated on the record.
24
     Reported By: DIANA M. BENGS, CSR, RPR
25   Job No. 207160
```

```
 1                  A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
          Jered Matthysse, Esq.
 4        Giulio Yaquinto, Esq.
          Pirkey Barber
 5        1801 East 6th Street
          Austin, TX 78702
 6

 7

 8

 9
     FOR THE DEFENDANTS:
10        Christopher Schwegmann, Esq.
          Rebecca Adams, Esq.
11        Lynn Pinker Hurst & Schwegmann
          2100 Ross Avenue
12        Dallas, TX 75201

13

14

15

16   VIDEOGRAPHER:
          MR. MICHAEL MOORE
17

18

19

20

21

22

23

24

25
```

**Appx. 173**

Page 3

1                          INDEX

2                                                    PAGE

3   Appearances                                        2

4   Stipulations                                       9

5

6   LAUREN VON MCNEIL MINGEE

7   EXAMINATION BY MR. MATTHYSSE                        9

8

9   CHANGES AND SIGNATURE                             352

10

11  REPORTER'S CERTIFICATION                          354

12

13                       EXHIBITS

14  NO.  DESCRIPTION                                  PAGE

15

16  Exhibit 1    Settlement and Mutual Release Agreement    62

17  Exhibit 2    Quintessa Bulk Marketing and Full Service  70

18               Platform General Terms of Service

19  Exhibit 3    Quintessa Marketing Printout              94

20  Exhibit 4    The Three Leg Stool and The Six Things    107

21  Exhibit 5    Defendants' First Amended Objections and  135

22               Answers to Plaintiffs' First Set Of

23               Interrogatories

24  Exhibit 6    E-mail, Bates No. Quintessa_000121        140

25  Exhibit 7    E-mail, Bates No. Quintessa_000343        152

Page 4

| 1  | Exhibit 8  | Google Invoice, Bates | 160 |
| 2  |            | Nos. Quintessa_001001 to 001002 | |
| 3  | Exhibit 9  | Google Invoice, Bates | 160 |
| 4  |            | Nos. Quintessa_001017 Through 001018 | |
| 5  | Exhibit 10 | E-mail, Google Ads Bates | 170 |
| 6  |            | Nos. Quintessa_000959 Through 000960 | |
| 7  | Exhibit 11 | E-mail, Google Ads, Bates | 172 |
| 8  |            | Nos. Quintessa_000961 Through 000962 | |
| 9  | Exhibit 12 | E-mail, Google Ads, Bates | 174 |
| 10 |            | Nos. Quintessa_000965 Through 000966 | |
| 11 | Exhibit 13 | E-mail Chain, Bates Nos. Quintessa_001252 | 175 |
| 12 |            | Through 001254 | |
| 13 | Exhibit 14 | E-mail Chain, Bates Nos. Quintessa_000704 | 179 |
| 14 |            | Through 000705 | |
| 15 | Exhibit 15 | List of Texas Law Firms, Bates | 195 |
| 16 |            | No. Quintessa_001395 | |
| 17 | Exhibit 16 | Attorney Revenues, Bates | 196 |
| 18 |            | No. Quintessa_001396 | |
| 19 | Exhibit 17 | Defendant's Original Answer | 202 |
| 20 | Exhibit 18 | Defendants' Rule 26(a)(1) Initial | 213 |
| 21 |            | Disclosures | |
| 22 | Exhibit 19 | Defendants' First Amended Objections and | 232 |
| 23 |            | Answers to Plaintiffs' Interrogatories 4 | |
| 24 |            | and 5 | |
| 25 |            | | |

| 1  | Exhibit 20 | Defendants' Objections and Answers to | 234 |
|----|-----------|---------------------------------------|-----|
| 2  |           | Plaintiffs' Second Set of Interrogatories | |
| 3  | Exhibit 21 | E-mail Chain, Bates Nos. Quintessa_000129 | 243 |
| 4  |           | Through 000133 | |
| 5  | Exhibit 22 | E-mail Chain, Bates Nos. Quintessa_000146 | 248 |
| 6  |           | Through 000152 | |
| 7  | Exhibit 23 | E-mail Chain, Bates Nos. Quintessa_000190 | 252 |
| 8  |           | Through 000194 | |
| 9  | Exhibit 24 | E-mail Chain, Bates Nos. Quintessa_001100 | 257 |
| 10 |           | Through 001104 | |
| 11 | Exhibit 25 | E-mail Chain, Bates Nos. Quintessa_000295 | 260 |
| 12 |           | Through 000298 | |
| 13 | Exhibit 26 | Attorney-Client Contingency Fee | 262 |
| 14 |           | Contract/HIPAA Authorization | |
| 15 | Exhibit 27 | E-mail Chain, Bates Nos. Quintessa_000305 | 263 |
| 16 |           | Through 000307 | |
| 17 | Exhibit 28 | E-mail Chain, Bates Nos. Quintessa_000314 | 264 |
| 18 |           | Through 000315 | |
| 19 | Exhibit 29 | E-mail, Bates No. Quintessa_000321 | 266 |
| 20 | Exhibit 30 | E-mail, Bates Nos. Quintessa_000365 | 268 |
| 21 |           | Through 000366 | |
| 22 | Exhibit 31 | E-mail Chain, Bates Nos. Quintessa_000390 | 271 |
| 23 |           | Through 000393 | |
| 24 | Exhibit 32 | E-mail, Bates No. Quintessa_000416 | 273 |
| 25 |           | | |

|    |            |                                                           | Page 6 |
|----|------------|-----------------------------------------------------------|--------|
| 1  | Exhibit 33 | ████████████████ Power of Attorney and                    | 275    |
| 2  |            | Contingency Fee Contract                                  |        |
| 3  | Exhibit 34 | E-mail, Bates No. Quintessa_000456                        | 275    |
| 4  | Exhibit 35 | E-mail, Bates Nos. Quintessa_000457                       | 277    |
| 5  |            | Through 000459                                            |        |
| 6  | Exhibit 36 | E-mail, Bates No. Quintessa_000810                        | 280    |
| 7  | Exhibit 37 | E-mail Chain, Bates Nos. Quintessa_000214                 | 282    |
| 8  |            | Through 000217                                            |        |
| 9  | Exhibit 38 | E-mail, Bates Nos. Quintessa_000220                       | 284    |
| 10 |            | Through 000224                                            |        |
| 11 | Exhibit 39 | E-mail Chain, Bates Nos. Quintessa_000229                 | 291    |
| 12 |            | Through 000233                                            |        |
| 13 | Exhibit 40 | E-mail, Bates Nos. Quintessa_ 000234                      | 302    |
| 14 |            | Through 000240                                            |        |
| 15 | Exhibit 41 | E-mail Chain, Bates Nos. Quintessa_000241                 | 306    |
| 16 |            | Through 000242                                            |        |
| 17 | Exhibit 42 | E-mail Chain, Bates Nos. Quintessa_000289                 | 308    |
| 18 |            | Through 000294                                            |        |
| 19 | Exhibit 43 | E-mail Chain, Bates Nos. Quintessa_000309                 | 310    |
| 20 |            | Through 000313                                            |        |
| 21 | Exhibit 44 | E-mail Chain, Bates Nos. Quintessa_000376                 | 311    |
| 22 |            | Through 000380                                            |        |
| 23 | Exhibit 45 | E-mail Chain, Bates Nos. Quintessa_000412                 | 317    |
| 24 |            | Through 000415                                            |        |
| 25 |            |                                                           |        |

Page 7

| 1  | Exhibit 46 | E-mail Chain, Bates Nos. Quintessa_000762 | 319 |
| 2  |            | Through 000763 | |
| 3  | Exhibit 47 | E-mail Chain, Bates Nos. Quintessa_000758 | 320 |
| 4  |            | Through 000760 | |
| 5  | Exhibit 48 | E-mail Chain, Bates Nos. Quintessa_000940 | 322 |
| 6  |            | Through 000944 | |
| 7  | Exhibit 49 | E-mail Chain, Bates Nos. Quintessa_000685 | 324 |
| 8  |            | Through 000686 | |
| 9  | Exhibit 50 | E-mail Chain, Bates Nos. Quintessa_000336 | 328 |
| 10 |            | Through 000338 | |
| 11 | Exhibit 51 | E-mail Chain, Bates Nos. Quintessa_000979 | 330 |
| 12 |            | Through 000982 | |
| 13 | Exhibit 52 | E-mail Chain, Bates Nos. Quintessa_001128 | 333 |
| 14 |            | Through 001131 | |
| 15 | Exhibit 53 | E-mail Chain, Bates Nos. Quintessa_001147 | 335 |
| 16 |            | Through 001149 | |
| 17 | Exhibit 54 | E-mail Chain, Bates Nos. Quintessa_001177 | 335 |
| 18 |            | Through 001180 | |
| 19 | Exhibit 55 | E-mail Chain, Bates Nos. Quintessa_001234 | 338 |
| 20 |            | Through 001239 | |
| 21 | Exhibit 56 | E-mail Chain, Bates Nos. Quintessa_001289 | 342 |
| 22 |            | Through 001296 | |
| 23 | Exhibit 57 | E-mail Chain, Bates Nos. Quintessa_001297 | 347 |
| 24 |            | Through 001298 | |
| 25 |            | | |

```
 1                  P R O C E E D I N G S
 2                  THE REPORTER:  Would you like to state
 3  your stipulations for the record?
 4                  MR. SCHWEGMANN:  Just by the Rules.
 5                  THE VIDEOGRAPHER:  And good morning.  We
 6  are now on the record at 10:08 a.m. on April the 13th,
 7  2022.
 8                  THE REPORTER:  I am Diana Bengs, Texas
 9  Certified Shorthand Reporter, CSR No. 4907, here for
10  the court reporting firm TSG Reporting, Inc., 747 Third
11  Avenue, 10th Floor, New York, New York 10017.
12                  Today's date is April 13, 2022.  The
13  time is 10:08 a.m.  We are in the offices of Lynn,
14  Pinker, Hurst & Schwegmann, 2100 Ross Avenue,
15  Suite 2700, Dallas, Texas 75201.  This is the
16  deposition of Lauren Mingee in the matter of Jim S.
17  Adler, P.C. and Jim Adler, Plaintiffs, vs. McNeil
18  Consultants, LLC, et al, in the United States District
19  Court for the Northern District, Dallas Division, Cause
20  No. 3:19-cv-02025-K-BN.
21                  LAUREN VON MCNEIL MINGEE,
22  having been first duly sworn/affirmed, testified as
23  follows:
24
25
```

Page 9

```
 1                    EXAMINATION
 2   BY MR. MATTHYSSE:
 3        Q.   Good morning.
 4        A.   Good morning.
 5        Q.   Could you state your full name for the record.
 6        A.   Lauren Von Mingee.
 7        Q.   Ms. Mingee, just to clarify for the record,
 8   was your prior married name Lauren Von McNeil?
 9        A.   Yes, sir.
10        Q.   Okay.  And -- and so you recognize that you
11   are one of the defendants in this case under the name
12   Lauren Von McNeil, but today you've since been married.
13   Your name is Lauren Mingee; correct?
14        A.   Yes, sir.
15        Q.   Have you been deposed before, Ms. Mingee?
16        A.   Yes, sir.
17        Q.   About how many times?
18        A.   I believe three times.
19        Q.   When was the first time you were deposed?
20        A.   I don't remember the exact...
21        Q.   Do you remember what the case was about?
22        A.   It was a -- it was for a lawsuit against a
23   former employer.
24        Q.   Was that the Azar lawsuit?
25        A.   The Azar lawsuit?
```

```
 1      Q.   If any of my questions are unclear, just

 2  let -- let me know.  I can clarify them for you.  Okay?

 3      A.   Okay.

 4      Q.   And if you need a break, just let us know; and

 5  we can work one in.  Sound good?

 6      A.   Sounds good.

 7      Q.   Ms. Mingee, is there any condition or other

 8  reason you could not give complete and accurate

 9  testimony today?

10      A.   No.

11      Q.   Where do you currently live?

12      A.   I'm actually in the process of moving.  So

13  right now I'm at 2932 Spring Crest Circle in Jones,

14  Oklahoma.

15      Q.   And where are you moving to?

16      A.   I don't have the new address memorized.

17      Q.   Okay.  Still in Jones?

18      A.   No.  It is in Edmond.

19      Q.   Are you selling that home in Spring Crest?

20      A.   Yes.

21      Q.   And so Edmond would be the only home that you

22  own, your residence; is that right?

23      A.   Yes.

24      Q.   Ms. Mingee, what is your current occupation?

25      A.   I'm the CEO of Quintessa.
```

Confidential

```
 1       Q.    And is that the defendant, Quintessa

 2   Marketing, LLC?

 3       A.    Quintessa Marketing, LLC, doesn't actually

 4   exist.  Quintessa, LLC, is the actual name for it.

 5   Quintessa Marketing is a D/B/A.

 6       Q.    So Quintessa, LLC, is the company that you are

 7   the CEO of?

 8       A.    Yes, sir.

 9       Q.    And Quintessa Marketing, LLC, is a D/B/A, you

10   said?

11       A.    Quintessa Marketing just by itself --

12       Q.    Okay.

13       A.    -- is a D/B/A.

14       Q.    Was there a time in which you ever registered

15   Quintessa Marketing, LLC, as a company in Oklahoma?

16       A.    I don't believe so.

17       Q.    And are you the sole owner of Quintessa?

18       A.    Yes.

19       Q.    Ms. Mingee, you understand that you are here

20   today pursuant to our notice of deposition; correct?

21       A.    Yes, sir.

22       Q.    Are you prepared to testify today as to the

23   topic of, obviously, the case of Adler versus

24   Quintessa?

25       A.    Yes.
```

1    Q.    Okay.  Well, what was your responsibilities

2  there?

3    A.    I helped manage the store and do phone sales.

4    Q.    So you worked at an AT&T store?

5    A.    I did.

6    Q.    Gotcha.  Did your job title or

7  responsibilities change during the duration of your

8  employment with AT&T?

9    A.    No.  It encompassed those two things.

10    Q.    Gotcha.  So you were at AT&T in about '08 or

11  '09; is that right?

12    A.    I believe so.  Again, it's been a long time

13  since I've been there.

14    Q.    Okay.  When did you leave AT&T?

15    A.    I'd say in early 2009.  I believe so.  It was

16  around that time.

17    Q.    What caused you to leave?

18    A.    I ended up getting a job with another company.

19    Q.    What company was that?

20    A.    It was PI Collision.

21    Q.    How did you get the job with PI Collision?

22    A.    I met someone, Coety Bryant, at an AT&T store;

23  and he -- he was impressed with how I was able to sell

24  as many phones as I was.  And so he asked if I had ever

25  looked at doing sales or being an assistant for

Page 16

```
 1   somebody.

 2       Q.    Gotcha.  And was he a customer at the time?

 3       A.    Yes.

 4       Q.    About when did you start working for PI

 5   Collision?

 6       A.    In 2009.  I don't remember the exact month.

 7       Q.    What -- do you recall what your job title was

 8   initially in '09 at PI Collision?

 9       A.    It was just an assistant.

10       Q.    Okay.  For Coety?

11       A.    Uh-huh.  Yes, sir.

12       Q.    What were your responsibilities as an

13   assistant for Coety at that time?

14       A.    It was just to help with kind of anything and

15   everything; so it could be running errands or getting

16   lunch, sending e-mails.

17       Q.    And you've mentioned PI Collision.  What was

18   PI Collision?  What type of business was that?

19       A.    It was a -- or supposed to be a place where

20   rental cars would be given to people that have been

21   injured in accidents with a -- not a letter of

22   protection but -- but from the attorney saying -- a

23   personal injury lawyer saying that it's -- this is a

24   valid case and so they need a rental car.

25       Q.    Gotcha.
```

Confidential

```
 1      A.     So it was supposed to help the law firm with
 2 their clients.
 3      Q.     Okay.  And where you based when you were doing
 4 that work?
 5      A.     In Moore, Oklahoma.
 6      Q.     Okay.
 7      A.     And he -- it was with an attorney in Dallas.
 8      Q.     Was that Brian Loncar?
 9      A.     Yes, sir.
10      Q.     How long did you work at PI Collision for?
11      A.     It -- it was under a year, I believe.
12      Q.     Okay.  And why did you leave PI Collision?
13      A.     It just didn't work.  His CFO, Toby, I don't
14 remember his last name, was just not -- he just didn't
15 like it; and so it was very hard to work with a law
16 firm that didn't want to be able to do it, so...
17      Q.     So did you leave on your own accord?
18      A.     Yes.
19      Q.     Where did you go after working at PI Collision
20 as an assistant for Coety?
21      A.     I worked for my father.
22      Q.     Okay.  And what sort of work did that involve?
23      A.     He's a real estate appraiser.  He owns his own
24 business, so I helped him with that.
25      Q.     Gotcha.  And that was still in Oklahoma?
```

Confidential

Page 18

```
 1      A.    Yes, sir.

 2      Q.    About how long did you work for your dad?

 3      A.    I believe about a year.

 4      Q.    Where did you go after working for your dad?

 5      A.    I went to work with -- my boyfriend at the

 6  time went to work for Jerry Bryant at PI Advertising as

 7  an editor, and I went to work with him shortly

 8  thereafter as an executive assistant.

 9      Q.    Who hired you at that time at PI Advertising?

10      A.    Coety Bryant asked me to come down and to

11  interview, but both Jerry and Coety hired me.

12      Q.    And what was -- we said "PI Advertising."

13  What was PI Advertising?  What was the business?

14      A.    They developed commercials for personal injury

15  lawyers; and they also did -- about a year later, they

16  did search engine optimization for personal injury

17  lawyers, as well.

18      Q.    So you said you started -- sorry.  Back --

19  backing up.  Your boy- -- you mentioned boyfriend.  Was

20  that Daniel McNeil?

21      A.    Yes, sir.

22      Q.    Okay.  And so he had gotten a job at the

23  company, and then you interviewed with Coety and Jerry

24  and were hired as an executive assistant; correct?

25      A.    Correct.
```

1    Q.    And that was about 2010?

2    A.    Either late 2009, early 2010.

3    Q.    Okay.  And you said at that time when you were

4  hired, they primarily did commercials for personal

5  injury attorneys; correct?

6    A.    Yes, sir.

7    Q.    So is it fair to say, you said about a year

8  later, that about 2011 is when the SEO started for the

9  company?

10    A.    2010, 2011, yes, sir.

11    Q.    Okay.  To your knowledge, how did the company

12  start getting into SEO?

13    A.    Our attorneys asked us to.  It was the new,

14  bright, shiny thing that was out in advertising; and

15  they asked what we knew about it.

16    Q.    And who at -- to your knowledge, who at PI

17  Advertising started doing the SEO work for the personal

18  injury attorneys?

19    A.    We hired outside.

20    Q.    Do you recall who PI Advertising hired at

21  first?

22    A.    Steve Wiideman.

23    Q.    Do you know how to spell his last name?

24    A.    W-i-i-d-e-m-a-n.  There might be an extra N.

25          MR. SCHWEGMANN:  Not how I would have

```
 1   guessed.

 2                   MR. MATTHYSSE:  Agreed.

 3                   THE WITNESS:  I know.

 4        Q.   (BY MR. MATTHYSSE)  Okay.  Do you recall if he

 5   was with a company?

 6        A.   I don't remember the name of it.

 7        Q.   And so Steve Wiideman, within PI Advertising

 8   at that time, in around 2011 was doing the SEO; is that

 9   correct?

10        A.   Yes, sir.

11        Q.   Do you know how long Steve Wiideman did the

12   SEO at PI Advertising?

13        A.   I don't.  He was a consultant.

14        Q.   Okay.  Did anyone else at that time for PI

15   Advertising do the SEO work?

16        A.   I started learning it.

17        Q.   Where -- did you learn it from Steve Wiideman?

18        A.   Yes and no.  I saw what he was doing and just

19   started doing research on my -- on my own and looking

20   at successful sites.

21        Q.   And this is around 2011, approximately?

22        A.   I believe so.

23        Q.   Do you recall, other than speaking with Steve

24   Wiideman, what types of websites you looked at to study

25   SEO?
```

```
 1  higher on search engines such as Google; is that

 2  correct?

 3       A.   Yes, sir, for certain keywords.

 4       Q.   For certain keywords.

 5            So if someone, for instance, was searching

 6  "personal injury attorney in Houston," you would want

 7  your client to be ranked higher when that came up;

 8  correct?

 9       A.   Yes, sir.

10       Q.   Okay.  Was there a point at PI Advertising in

11  which you took over for Mr. Wiideman in running the SEO

12  work?

13       A.   I don't know if we ever fired him or just

14  reduced his consulting, if that makes sense.

15       Q.   Okay.

16       A.   I -- I took over more of the work.

17       Q.   Do you know about when that was?

18       A.   I don't.

19       Q.   So around some point in 2012 or so, you're

20  starting to do most of the SEO work.  Are you also

21  doing anything else for PI Advertising?

22       A.   Yes, sir.  I was still maintaining being an

23  assistant and helping with anything and everything that

24  they needed help with.

25       Q.   Okay.  Do you recall about how many clients
```

Confidential

```
 1  that PI Advertising had when you were there running the

 2  SEO work?

 3      A.   It was quite a few.  I think around 15, maybe

 4  20; but I don't remember the exact amount.

 5      Q.   Do you recall where most of them were based,

 6  those clients?

 7      A.   Across the nation.

 8      Q.   Were you privy to PI Advertising's revenue at

 9  the time?

10      A.   Yes, but I don't remember what it was.

11      Q.   Okay.  Would -- do you think it would be safe

12  to say that the company was profitable at the time that

13  you were doing the SEO work in approximately 2012?

14      A.   No, because it was treated like a piggy bank

15  by the owners; so it was normally very depleted of

16  cash.

17      Q.   Gotcha.  But they -- but the owners at that

18  time were bringing in a good amount of revenue.  They

19  were just spending a lot; is that correct?

20      A.   Yes, sir.

21      Q.   At any point in your time at PI Advertising,

22  was the company actually sending leads to the personal

23  injury attorneys?

24      A.   To my knowledge, no.

25      Q.   Okay.  So is it fair to say to your
```

 1      Q.    Okay.

 2      A.    But I did grow throughout the company.

 3      Q.    Do you know approximately how many folks were

 4  employed at the time -- or before you left PI

 5  Advertising?

 6      A.    I don't recall the exact number.  It wasn't --

 7  it was a handful.

 8      Q.    Okay.  So more than 10 -- double digit?

 9      A.    I would say under 10 because we had more

10  subcontractors.

11      Q.    Okay.  How long did you work at PI Advertising

12  for?

13      A.    It was up until Exclusive Legal started.  So

14  whenever the formation date was of Exclusive Legal, it

15  was that year.

16      Q.    Okay.  Can you explain what -- what is

17  Exclusive Legal?

18      A.    Exclusive Legal was a company started by Coety

19  Bryant for just the search engine optimization for

20  attorneys.

21      Q.    Did Coety ask you to join the company?

22      A.    Yes.

23      Q.    What was your position when you started there

24  in approximately, I believe, 2014?  Does that sound

25  right?

Page 26

```
 1      A.    Yes, I believe so.  I didn't have an
 2 official -- again, we were a very small company; so we
 3 didn't really have titles.  But I was a manager.  I
 4 helped manage the day-to-day.
 5      Q.    And what did you do day to day at Exclusive
 6 Legal?
 7      A.    I helped with the intake side of handling
 8 after-hours calls; and I helped with the billing and
 9 with the -- just the client side, speaking and
10 communicating with clients.
11      Q.    Did you do any SEO strategy?
12      A.    Yes.
13      Q.    Did Coety tell you why they were moving the
14 SEO from PI Advertising to Exclusive Legal?
15      A.    Jerry had gotten himself in just trouble with
16 Frank Azar and with Brian Loncar and they ended up
17 having a judgment against him and Coety didn't want to
18 live with that over the company because the SEO was so
19 much bigger than the TV commercial side.  It
20 overpowered it.  And he was the one running that, and
21 so he just told him he was going to start that on his
22 own.
23      Q.    Do you know when -- so stepping back.  You
24 said it was around 2011 when PI Advertising started
25 getting into SEO; is that right?
```

```
 1     A.    I believe so.

 2     Q.    Do you have any knowledge of when SEO became

 3  bigger than the TV advertising component of PI

 4  Advertising?

 5     A.    I do not.

 6     Q.    Okay.  But at some point, SEO became more --

 7  brought in more revenue than the TV advertising; is

 8  that correct?

 9     A.    Yes, sir.

10     Q.    When you started at Exclusive Legal, what sort

11  of SEO was the company doing for its law firm clients?

12     A.    The same as before --

13     Q.    Okay.

14     A.    -- just helping them rank.

15     Q.    So intake call -- after-hour intake calls;

16  correct?

17     A.    Yes, sir.

18     Q.    And trying to get them ranked higher on a

19  search engine platform like Google; correct?

20     A.    Yes, sir.

21     Q.    At that point in 2014 when you were at

22  Exclusive Legal, was the company purchasing keywords on

23  behalf of its client law firms?

24     A.    I don't -- I don't remember if they were or

25  not.
```

Page 29

1  website that it used to promote its business?

2      A.   Yes.  I believe it was personalinjurycare.net.

3      Q.   And do you recall how Exclusive held

4  themselves out to the public on that website?

5      A.   I do not.

6      Q.   So in around 2015, you heard that Exclusive

7  Legal and Coety were looking into this pay-per-click.

8  Had you looked into that at all prior to that point?

9      A.   No.  It was a waste of time, honestly, before,

10 because SEO was much more powerful than pay-per-click.

11 And then in 2015, I believe, Google released an

12 algorithm update that allowed pay-per-click to be

13 more -- show more frequently than SEO.

14     Q.   What do you mean by "show more frequently"?

15     A.   Before Google Ads, the way they were

16 displayed, it would be hit-and-miss; and for whatever

17 reason, they made it to where the algorithm would allow

18 you to be -- rank above SEO more frequently.

19     Q.   Okay.  So is it right to say that prior to

20 '15, usually organic links would appear prior to the

21 Google advertisements; is that correct?

22     A.   In my opinion.

23     Q.   Okay.  And then at some point in '15, Google

24 changed the algorithm; and the Google Ad -- the

25 pay-per-click Google Ads could appear above the organic

1  links; is that right?

2      A.   Yes, sir.

3      Q.   And so why did that make it less of a waste of

4  time?

5      A.   Because it became the -- it became the way --

6  now, if someone was typing in "car accident lawyer,"

7  they weren't going to see the No. 1 spot.  You would

8  see three competitors who could pay for that --

9      Q.   Got it.

10     A.   -- above that one.

11     Q.   Do you know if Exclusive started dabbling in

12  pay-per-click in 2015?

13     A.   I believe --

14     Q.   Okay.  Were you --

15     A.   -- it was.

16     Q.   Sorry.

17              Were you involved in that?

18     A.   Yes.

19     Q.   Okay.  What was your involvement in that?

20     A.   Just research, keyword research.

21     Q.   What sort of research did you do?  Where did

22  you look?

23     A.   Coety found -- or I can't say Coety found.

24  Someone found a company named -- I believe it was

25  Tessera Marketing, and they spoke with -- they looked