```
 1       Q.    Do you recall if they were doing the

 2  competitive pay-to-click when you -- by the time you

 3  left Exclusive?

 4       A.    I'm unsure.  There's broad match.  And in

 5  broad match, we would be broad matched to a term like

 6  "Jim Adler" because Google is a -- sees "car accident

 7  lawyers" as a synonym for a personal injury lawyer's

 8  name.

 9       Q.    Okay.

10       A.    So when we did broad match, it would probably

11  have broad matched to different attorneys' names.

12       Q.    Okay.  Did -- to your knowledge, did broad

13  match exist in '15 and '16?

14       A.    Yes.

15       Q.    Okay.  And to your knowledge, was ELM ever --

16  Exclusive Legal ever purchasing the actual competitor's

17  name by the time you left?

18       A.    I'm unsure.

19       Q.    Okay.  Do you recall approximately when you

20  left Exclusive?

21       A.    I believe it was in '16.

22       Q.    Okay.

23       A.    I believe it was in '16.

24       Q.    Okay.  What led to you leaving Exclusive?

25       A.    Coety was just an -- he was an alcoholic; and
```

1  the agreement was that if -- if it didn't stop, because

2  it kind of consumed everyone's lives, then I would just

3  not work there anymore.

4      Q.   And so it didn't stop, and you left?

5      A.   Yes, sir.

6      Q.   When you left ELM, did you immediately go to

7  another company or did you take time off?

8      A.   I took a -- I don't know, probably 30 days, 30

9  days off.  I'm not sure how long it was.

10     Q.   After taking those 30 or so days off, what did

11 you do next?

12     A.   I worked for a former client of Exclusive

13 Legal.

14     Q.   What client was that?

15     A.   That was West Seegmiller.

16     Q.   How do you spell that?

17     A.   S-e-e-g-m-i-l-l-e-r.

18     Q.   What did you do for that company?

19     A.   I helped him develop his marketing in

20 California.

21     Q.   You were still in Oklahoma at the time;

22 correct?

23     A.   Yes, sir.

24     Q.   And you knew that company because they were a

25 client at Exclusive; correct?

Page 37

```
 1      A.    Correct.

 2      Q.    Did you reach out to them, or did they reach

 3 out to you?

 4      A.    They reached out to me.

 5      Q.    Do you recall what your position was?

 6      A.    He -- he put me -- he brought me in initially

 7 as a consultant to tell -- to help with their marketing

 8 and then with their paralegals.  And then he wanted to

 9 move me into a COO role, but my time was just -- it was

10 really hard there because I would spend a week there

11 and a week in Oklahoma.

12      Q.    Oh, wow.  So you were traveling to California?

13      A.    I was.

14      Q.    Okay.

15      A.    And I had a 1-year-old or almost 1-year-old,

16 so --

17      Q.    That's tough.

18      A.    -- it was very difficult.

19      Q.    Yeah.  So about how long -- well, sorry.

20            Stepping back, you mentioned that you were

21 helping to develop marketing.  What do you mean by

22 "marketing"?

23      A.    Marketing for his law firm, whether it be

24 social media or pay-per-click or SEO or blogging.

25      Q.    So were you in charge of the firm's Google
```

Page 38

1   AdWords account?

2       A.   No.  Someone else did the -- I wasn't in

3   charge of.  I was a -- I guess, a custodian of it.

4       Q.   Okay.  So you get -- would you get e-mails

5   from Google?

6       A.   Yes.

7       Q.   Okay.  And what time period were you at that

8   firm?

9       A.   2016.  I think it was just in 2016.

10      Q.   Do you recall about how many months?

11      A.   Probably nine.

12      Q.   Okay.  And you would go one week to California

13  and one week back to Oklahoma?

14      A.   Uh-huh.

15      Q.   For the pay- -- pay-to-click side of it, was

16  that -- you -- you mentioned that you had dabbled in it

17  at Exclusive.  Was this the first time that you had

18  actually been hands-on engaged in pay-to-click

19  advertising?

20      A.   More engaged in it; but I was working with

21  another person who did it, Kevin Quinlan.

22      Q.   Did you engage on behalf of the law firm in

23  competitive pay-to-click?

24      A.   Yes.

25      Q.   And were those law firms' or lawyers' names

1 you were purchasing just California law firms?

2    A.    Yes.

3    Q.    In that time, do you recall if those were

4 website-linked-type ads; or were they optional click or

5 call ads?

6    A.    I don't remember the mix, but I know that it

7 was a mix of call extensions and desktop.

8    Q.    And did the firm then use their call center to

9 receive those calls?

10    A.    Yes, sir.

11    Q.    Were you involved in the intake process at

12 all?

13    A.    Yes, sir.

14    Q.    What was your involvement there?

15    A.    I helped in hiring intake people.

16    Q.    Did you train them?

17    A.    Yes.

18    Q.    Did you ever answer phones at all?

19    A.    I'm sure I did.  I don't remember if it was a

20 normal occasion or -- I think it was if someone was

21 missing or gone for the day.

22    Q.    Okay.  During your time -- remind me how to

23 pronounce the firm's name?

24    A.    West Seegmiller.

25    Q.    Seegmiller.  Okay.

```
 1                     During your time at Seegmiller, were you

 2  ever made aware of personal injury victims calling in

 3  to the intake center thinking they were calling a

 4  different attorney?

 5      A.    I guess can you ask your question a different

 6  way?

 7      Q.    To your knowledge, during your time at

 8  Seegmiller, did any car accident victim or any personal

 9  injury victim call in to the intake center asking or

10  mentioning another attorney's name?

11      A.    Yes.

12      Q.    And do you recall about how often that

13  happened?

14      A.    No, sir.

15      Q.    Was that a concern of -- that you had?

16      A.    My concern was over the firm as a whole, so I

17  didn't really do a ton in the intake side.  But it was

18  always in improving the process.  I mean, that was

19  always the concern.

20      Q.    In your conversations with that firm, were

21  they ever concerned that there were folks calling and

22  asking for different attorneys?

23      A.    I'm not sure.  I don't remember every

24  conversation I had with them.

25      Q.    Do you have any knowledge of whether those
```

1    Q.   Okay.  When you left Exclusive, was McNeil

2  Consultants engaged in any sort of business activity?

3    A.   I am unsure on that.  My ex-husband may have

4  been doing some side projects.

5    Q.   Okay.  So -- and that's Daniel McNeil;

6  correct?

7    A.   Yes, sir.

8    Q.   Was he a co-owner of McNeil Consultants with

9  you?

10    A.   No, sir.

11    Q.   So you were the sole owner of McNeil

12  Consultants?

13    A.   Yes, sir.

14    Q.   Just as you are the sole owner of Quintessa;

15  correct?

16    A.   Yes, sir.

17    Q.   But explain for me, what did Mr. McNeil do as

18  a subcontractor of McNeil Consultants?

19    A.   He had experience with postproduction and with

20  developing TV commercials and with -- I believe it's

21  Final Cut Pro, so editing commercials; and so once we

22  decided to leave Exclusive, he was wanting to do

23  editing for other companies.

24    Q.   Gotcha.  And so he would get paid through

25  McNeil Consultants; correct?

```
1      Q.    Anything else?

2      A.    I do not believe so.  Intake training was

3  available, but I started shying away from that.

4      Q.    So at that point in '16, you were offering

5  pay-to-click to these personal injury law firms.  Did

6  you have your own call center at that time?

7      A.    Yes, I did.

8      Q.    And how many folks were in the call center at

9  that time?

10     A.    It would range -- with call centers, they --

11 they are not the best individuals sometimes; so we

12 would range from 3 to 10.

13     Q.    Where was -- at that point, 2016, where was

14 Quintessa based out of?

15     A.    Midwest City.

16     Q.    And is that where the call center was?

17     A.    Yes, sir.

18     Q.    Did you answer calls?

19     A.    On rare occasions.  If someone called in, then

20 yes.

21     Q.    And at that point in 2016, was yourself and

22 Quintessa engaged in competitive keyword bidding?

23     A.    Yes, sir.

24     Q.    When your advertisements showed up on behalf

25 of your clients in 2016, what -- how did they typically
```

1  appear?  What was the language in the Google

2  advertisements?

3      A.    It was something very generic.  So "Injured in

4  accident, call today for help."  That was one of

5  them -- one of our advertisements.

6      Q.    Okay.  And were they desktop, to your

7  knowledge?

8      A.    They were a blend of desktop and call --

9      Q.    Okay.

10      A.    -- extensions.

11      Q.    And today is it primarily mobile?

12      A.    No.  We have both.

13      Q.    Is one larger than the other, mobile versus

14  desktop?

15      A.    I don't have the numbers in front of me, so I

16  couldn't...

17      Q.    Okay.  And you said that you used generic

18  terms in the advertisements.  What was the reason for

19  using those types of terms?

20      A.    It wasn't flashy like some of the personal

21  injury lawyers, the larger ones we worked with; and I

22  didn't feel like you needed that to be able to get

23  someone to call in for help.

24      Q.    Did you test other types of advertisements to

25  see how they'd perform?

Page 54

```
1       A.    Yes, sir.

2       Q.    Did you use any ones that used more

3   distinctive language like Quintessa or McNeil

4   Consultants?

5       A.    No, sir.

6       Q.    Why not?

7       A.    Every incorporation has D/B/As for different

8   reasons; and just because Quintessa or McNeil

9   Consultants was a parent company, the D/B/As would be

10  used for the certain type of ad that we were going

11  after to be relevant.

12      Q.    And at that point, do you recall if you were

13  using Accident Injury Legal Center?

14      A.    Yes, sir, I believe so.

15      Q.    Okay.  Was that the main domain that you used

16  at the time for -- for personal injury accidents?

17      A.    Yes, sir, I believe so.

18      Q.    Do you recall when you started the business

19  around 2016 if you owned any domains other than

20  accidentinjurylegalcenter.com?

21      A.    We owned hundreds.

22      Q.    Okay.  So -- and you still own hundreds of

23  domain names?

24      A.    Yes, sir.

25      Q.    And what's the purpose of owning hundreds of
```

Page 55

1  domain names?

2      A.   If they look like a pretty domain with a

3  really nice title, then we don't want someone else

4  having that one.

5      Q.   What do you mean by "pretty domain with a

6  really nice title"?

7      A.   So "Accident Injury Legal Center," we would

8  probably have bought a pleural of that.

9      Q.   Okay.  What other types of domains, just

10 examples, do you own?

11     A.   Caraccidenthelp.com.

12     Q.   And do you use those different domains in your

13 Google advertisements?

14     A.   Not always.

15     Q.   How do you decide when to use those domain

16 names?

17     A.   I don't believe we have a rhyme or reason.

18     Q.   And at that point, when you were starting to

19 engage on behalf of ▇▇▇▇ and other personal injury

20 law firms in competitive keyword advertising, did your

21 call center ever get any folks calling in looking for

22 an attorney different than the one that you were

23 engaged in -- with?

24     A.   Can you rephrase that?

25     Q.   Yeah.  In 2016 when you were working with

Page 56

```
 1        and other personal injury law firms, did your

 2  call center ever get calls from victims calling in for

 3  a law firm that you were not engaged with?

 4       A.   Yes, sir.

 5       Q.   Do you know why that was?

 6       A.   I guess I'm -- why we received phone calls?

 7       Q.   Why you received those types of phone calls,

 8  yeah.

 9       A.   I can't speak to Google's algorithm, but it

10  found our keywords relevant for different law firms.

11       Q.   What do you mean by that?

12       A.   Broad match.

13       Q.   Okay.  But you were purchasing competitors'

14  keywords; right?

15       A.   Yes, sir.

16       Q.   And so it is conceivable that folks were

17  clicking on your advertisement thinking that they were

18  looking for that competitor; correct?

19       A.   Google in different match types with broad.

20  So for instance, you could put "                    "

21  in broad, and you would get other terms like "car

22  accident lawyer," people looking for that.  Google

23  views law firms sometimes synonymous with those terms,

24  if that makes sense.

25       Q.   Fair.  I'm saying you were purchasing directly
```

Page 57

```
 1   some competitors' keywords; right?

 2        A.    Yes.

 3        Q.    Okay.

 4        A.    But even in broad match, it wasn't just

 5   pulling law firm -- that law firm.  It was pulling in

 6   synonyms.

 7        Q.    Yeah.  So you were, though, purchasing

 8   competitors' keywords and had, at that point in 2016,

 9   folks calling in looking for other law firms that you

10   weren't engaged with; right?

11        A.    Yes, sir.

12        Q.    At that point, did you do anything to try to

13   look into why that was happening?

14        A.    Well, it was happening because of Google

15   advertising.

16        Q.    But you were purchasing the keywords; right?

17        A.    Yes, sir.

18        Q.    And you didn't look into try to fix -- to see

19   if there was anything you could do to fix what was

20   happening?

21              MR. SCHWEGMANN:  Objection to form.

22              But you can answer.

23        A.    I guess I'm just not understanding.

24        Q.    (BY MR. MATTHYSSE)  Fair.  Did that concern

25   you that folks were calling in looking for other law
```

1      A.    So exact match?

2      Q.    Yes.

3            MR. SCHWEGMANN:   And what's the question

4  again?

5            MR. MATTHYSSE:   Fair.

6      Q.    (BY MR. MATTHYSSE)   You were engaging in

7  2016 -- we're just in that time period right now.   You

8  were engaging in for some client -- personal injury law

9  firm clients, exact match competitive keyword bidding;

10 right?

11     A.    I believe so, yes, sir.

12     Q.    And you said that folks -- personal injury

13 victims were calling into your call center looking for

14 nonclient law firms; right?

15     A.    Yes, sir.

16     Q.    And because you believe that Google allows for

17 that, that did not concern you.   Is that what you are

18 saying?

19     A.    I'm not saying it didn't concern me.   I would

20 address the concern; and let them know that we could

21 get them some help, if that makes sense.

22     Q.    How did you train your call center to deal

23 with those types of calls at that point in 2016?

24     A.    I don't remember the exact training.   It was

25 never to misrepresent themselves.

Page 61

```
 1   personal injury field in 2016.  Do you recall that?

 2        A.   Yes, sir.

 3        Q.   ████████████████████████████████████████

     ████████████████████████████████████████████████

     ████████████████████████████████████

     ████████████████████████████████

 7        Q.   Was there ever a lawsuit filed in regards to

 8   your work on behalf of ████████?

 9        A.   Yes, sir.

10        Q.   And who was that filed by?

11        A.   I don't know if I'm going to say his name

12   correct, but the Gorayeb & Associates.

13        Q.   Okay.  So Gorayeb, do you -- do you recall

14   approximately when that lawsuit was filed?

15        A.   I do not.

16        Q.   Do you recall what Gorayeb alleged in the

17   lawsuit?

18        A.   Yes.  It was for keyword insertion in the ad

19   copy.

20        Q.   Okay.  So both the competitive keyword bidding

21   and then also the ad copy itself?

22        A.   I am unsure as to the keyword bidding.  I just

23   know it was because his name was appearing in the ad

24   copy.

25        Q.   So McNeil Consultants had put Gorayeb's firm's
```

```
1   name in the ad copy itself?

2       A.   Mistakenly, yes.

3       Q.   Okay.  How did that happen?

4       A.   It was a vendor who was trying to raise

5   quality score on the ad copy, and there was a Google

6   suggestion to -- I don't remember the exact

7   terminology, but of keyword insertion in the ad copy.

8       Q.   Had that happened before?

9       A.   No, sir.

10      Q.   Has it happened since?

11      A.   No, sir.

12      Q.   Did you deny Gorayeb's claims?

13      A.   I did, yes.

14      Q.   Did you settle with that -- with Gorayeb law

15  firm?

16      A.   Yes, sir.

17      Q.   What were the terms of that settlement?

18  ████████████████████████████

19      Q.   I'm handing you what will be marked as

20  Exhibit 1.

21              (Exhibit No. 1 was marked.)

22              (Discussion off the record.)

23      Q.   (BY MR. MATTHYSSE)  I'll give you a minute to

24  take a look at this, Ms. Mingee; but let me know if you

25  recognize this document.
```

1    shouldn't have been done.

2        Q.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████

6        Q.    Have -- since -- so we've talked about the

7    Exclusive Legal lawsuit filed against McNeil

8    Consultants and yourself, this Gorayeb lawsuit filed

9    against your company and yourself, and the Azar

10   lawsuit.  Since -- since those three, have there been

11   any other lawsuits filed against you or your company

12   alleging trademark infringement?

13       A.    I am unsure.  We have other lawsuits right

14   now, but I don't know every allegation in there.

15       Q.    Okay.  Do you recall being sued by Ben Abbott?

16       A.    Yes, sir.

17       Q.    What were the -- what was that lawsuit about?

18       A.    I'm not sure what he alleged.  I don't have an

19   exact copy of the lawsuit.

20       Q.    But you don't recall what the claims were in

21   that lawsuit?

22       A.    I don't know every claim.  I know that there

23   was something about keywords, about us bidding on him

24   or broad matching to him.

25       Q.    So as part of -- to your -- to the best of

Page 67

```
 1   your recollection, was part of the complaint in the
 2   Abbott lawsuit your purchase of his name as a keyword?
 3        A.   I believe so, yes.
 4        Q.   Do you recall if you denied those claims?
 5        A.   I'm unsure.  I never spoke with Ben Abbott.
 6        Q.   Did you settle that case?
 7        A.   I did.
 8        Q.   What were the terms of that settlement?
 9        A.   I'm -- I don't have all the terms.  I'd have
10   to refer to counsel on that.
11        Q.   ███████████████████████████████████████
     █████████████████
     ██████████████████████████
     ████████████████████████████████████████
     ██████████████████████
16        Q.   Do you recall a lawsuit filed, and I believe
17   still ongoing, by ERB against your company?
18        A.   Yes, sir.
19        Q.   Do you know what that lawsuit is about?
20        A.   Yes.  We sued him first in Oklahoma; and he
21   sued us, as well; and it was moved to Missouri.
22        Q.   And what are ERB's claims in that lawsuit?
23        A.   Every claim has been dismissed except for one,
24   and that is on an unlimited time of disengaging leads.
25        Q.   And what did -- to the best of your
```

Page 80

```
 1    A.   Yes, sir.

 2    Q.   Why did you form --

 3         MR. SCHWEGMANN:  I'm going to object to

 4  form.

 5         But you -- you can answer.

 6         THE WITNESS:  Sorry.

 7    Q.   (BY MR. MATTHYSSE)  Why did you form

 8  Quintessa, LLC?

 9    A.   McNeil Consultants initially did consulting

10  for attorneys, so for West Seegmiller.  We stopped

11  doing any type of consulting for attorneys and helping

12  them on their intake side.  I used to travel a lot; and

13  once COVID happened, and even before then, I was able

14  to just speak with someone on the phone about the

15  process instead of having to fly out there.

16    Q.   Got it.  So you said you stopped doing

17  consulting and stopped doing all that travel.  About

18  when did you stop doing consulting work?

19    A.   Probably '16 or '17.

20    Q.   Okay.  And so at that point in around 2017,

21  late 2017, you had settled with Azar; right?

22    A.   Yes, sir.

23    Q.   And you had stopped working with Exclusive;

24  correct?

25    A.   Yes, sir.
```

1 marketing.

2     Q.   What type of marketing does Wallace handle?

3     A.   Pay-per-click and setting up new affiliate

4 relationships, as well.

5     Q.   So stepping back in that '17, '18 time period

6 as -- as you were becoming just a company that engaged

7 with these client personal injury law firms, at that

8 time was all you were doing sending them leads based on

9 pay-to-click?

10     A.   I was sending them leads not solely based on

11 pay-per-click. Other forms of marketing, as well.

12     Q.   Okay. Where else were the leads coming from?

13 ███████████████████████████

███████████████████████████████

██████████████████████████████████

█████████████████████████████████

██████████████████████████████████

███████████████

██████████████████████████████████

███████████████████████████████████

██████████████████████████████

██████████████████

23     Q.   Okay. And then, for instance, that would be

24 at Accident Injury Legal Center's website?

25     A.   No, sir. That would have been using my

```
 1        A.    My executive assistant and Mike Walker.

 2        Q.    Who is your executive assistant?

 3        A.    Rachel Roe, R-o-e.

 4        Q.    Do you know approximately how many employees

 5  you currently have?

 6        A.    I believe 42, but I do not have the exact

 7  number.

 8        Q.    Okay.  How many of those are in the intake

 9  call center?

10        A.    I believe 35.

11        Q.    I recall seeing in mid 2021 that y'all posted

12  that you had 20 positions to fill.  Do you recall that?

13        A.    Yes, sir.

14        Q.    And were most of those for the intake center?

15        A.    Yes, sir.

16        Q.    You also mentioned in the notice that the

17  intake specialist position can get monthly performance

18  bonuses.  Do you recall that?

19        A.    I didn't write it.

20
```

Confidential

1  who is just e-mailed over.  And if you send a client

2  over without a retainer, you are leaving it in someone

3  else's hands to maybe -- if they had a bad day or they

4  communicate poorly, whatever may have you.

5       Q.   Okay.  So is there -- have you looked

6  internally to judge whether leads with a retainer are

7  more likely to be retained and engaged than leads

8  without retainers?

9       A.   It's never -- sorry.  It's never been our

10  practice to send over leads without a retainer.

11            THE WITNESS:  Thank you.

12       Q.   (BY MR. MATTHYSSE)  Okay.  So in almost all

13  instances, are the leads sent with a retainer?

14       A.   That is the goal.

15       Q.   Okay.  Do you know about what percentage it

16  is?

17       A.   No, sir.

18       Q.   Okay.  But would you agree that it's the

19  majority?

20       A.   I guess on your definition of "majority."

21       Q.   More than 50 percent?

22       A.   Yes, sir.

23       Q.   Okay.  In the 2017, '18 time period, as you

24  were still McNeil Consultants and expanding the

25  business, to your knowledge at that point, to your own

Page 98

1  call center, were folks calling in looking for

2  attorneys that were not clients of yours?

3     A.   Yes, sir.

4     Q.   Okay.  And in that time period, 2017, '18 time

5  period prior to becoming Quintessa, did that concern

6  you?

7     A.   In personal injury, a vast majority of people

8  do competitive advertising.  It would concern me if

9  there was -- if anyone felt misled, but the -- that

10 advertising practice was a very and is a very accepted

11 practice in motor vehicle accidents with different

12 lawyers.

13     Q.   So it did not concern you?

14           MR. SCHWEGMANN:  Objection to form.

15           But you can answer.

16     A.   It concerned me if someone felt misled.

17     Q.   (BY MR. MATTHYSSE)  What did you do to look

18 into whether they felt misled?

19     A.   If it was brought up in an e-mail or a phone

20 call, then research was done.

21     Q.   What type of research?

22     A.   We would pull the phone call and listen to it

23 to see if an intake rep said anything, and then -- and

24 then they would also call the client to see what

25 happened or why they felt that way.

Page 111

1   you can be 99 percent at fault.  So this is the basis

2   of a very general fact-gathering pattern.

3       Q.    Okay.  And so if someone does sign, typically

4   is that done while -- signed the retainer, is that

5   typically done while that individual injured victim is

6   on the phone with the intake specialist?

7   ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████

██████████████████████████

██████████████

██████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████

██████████████████

███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████

```
 9      Q.    Okay.  If you can go to the next page,
10   Ms. Mingee, page Quintessa 6.  See at the top there,
11   ███████████████████████████"?
12      A.    Yes, sir.
13      Q.    And it has a screenshot here of what's called
14   ██████████████████."  Do you see that?
15      A.    Yes, sir.
16      Q.    Can you just tell for me generally what is the
```

██████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████.

```
25              A couple questions I have is:  What is the
```

1    "override attorney" fee?

2        A.    So let's say that we signed up a child.

3        Q.    Okay.

4        A.    And the parent is injured but the child,

5    because they have a really strong -- what's the

6    word? -- like threshold, they're like, "No I'm fine."

7               Well, we're not going to charge for

8    someone who is not injured.  So we would override that

9    intake fee for one person but still charge for the

10   plaintiff --

11       Q.    Okay.

12       A.    -- the mother or the father.

13       Q.    And is that up to the intake specialist?  Who

14   decides that?

15       A.    No.  That is after the lead's been sent.

16       Q.    Okay.

17       A.    And then it's just for an admin feature.

18       Q.    Gotcha.  And the intake user there is the

19   intake specialist that's on the call?

20       A.    Yes, sir.

21       Q.    And there's a drop-down category for

22   "campaign."  What is "campaign"?

23       A.    It's -- we have hundreds of campaigns that

24   come in, so e-mail leads or Google or whatever may have

25   you; and so they do a drop-down of that campaign to

Confidential

1     Q.   Will they recommend?

2     A.   Yes, sir.

3     Q.   For -- for -- not for broad match, but for

4  actual purchasing of keywords?

5     ████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████

████████████████████████████

███████████████████████████████████████████

████████████████████

███████████████████████████████████████████████████

█████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

19    Q.   Okay.  Does Google tell you why -- why that --

20  or the value of that term?

21    A.   No, sir.

22    Q.   Does it show you information about how much

23  people are searching for that term?

24    A.   In Google, there is a tool that you can use

25  that you can look up any term and it would tell you how

Confidential

```
 1   one client -- one law firm would not be able to help
 2   but another law firm may.  If they need immediate
 3   treatment and need to go into an emergency room and we
 4   know that a law firm has LOPs or letter of protections
 5   with emergency rooms, well, that's going to go to that
 6   person.
 7        Q.   Okay.
 8        A.   So whatever the potential client is calling in
 9   for.  It's not a "By the way, the sky is blue; I'm
10   sending you here."  It really is, "You need ABC.  Let
11   me get you help for that."
12        Q.   And the folks that you are talking about who
13   stand up in the call center and go to the intake
14   specialist, that hold their hand up, do they have
15   that -- all that knowledge in their head; or is there
16   something they are consulting?
17        A.   No.  Most of them have been there for a while;
18   and because I initially ran it, they know how I think;
19   and so they have more insight.
20        Q.   Okay.  So you -- did you train them?
21        A.   No, not all of them.
22        Q.   Okay.
23        A.   But some of our employees have been with us
24   for a while.
25        Q.   Got it.  And was it your job at one point to
```

Page 137

1    accurate to say that Quin- -- sorry -- that McNeil

2    Consultants began bidding on the Adler marks in June

3    '16?

4        A.   I do not have the spreadsheet in front of me;

5    but if I signed this, then, yes, that is true.

6        Q.   Okay.  And do you recall, sitting here today,

7    what led you to purchase the Adler marks as keywords in

8    June 2016?

9        A.   Exclusive Legal, one of -- we were still doing

10   the AdWords or helping with the management; and

11   Exclusive was bidding on Adler.

12       Q.   Got you.  So you just continued doing so on

13   their behalf?

14       A.   I believe at that time it was on their behalf

15   and not for any of my own clients.

16       Q.   Okay.  Do you recall when you first got your

17   own Texas client law firm?

18       A.   No, I don't remember.  It was -- it was for a

19   while after that.

20       Q.   Okay.

21       A.   I don't remember the exact year.

22       Q.   But you weren't in -- to the best of your

23   knowledge, you weren't in the Texas marketplace for

24   personal injury law firms in -- in that beginning phase

25   of your -- of McNeil Consultants in 2016; is that

Confidential

Page 138

1   right?

2        A.   Yes, sir.

3        Q.   Sorry.  Okay.

4             And then I believe you had testified that

5   you had no -- began at some point in 2017 moving away

6   from working with Exclusive and you were no longer

7   working with the California firm and you were doing

8   your own pay-per-click advertising; is that right?

9        A.   Yes, sir.

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████

██████████████████████████████████████████████

█████████████████

15       Q.   And is it true there -- and so I assume that

16  until May of '19, that's because McNeil Consultants

17  stopped and Quintessa took over; is that right?

18       A.   I'm --

19       Q.   Because it has a dividing line here in the

20  answer that McNeil Consultants bid until May of '19,

21  and Quintessa started that same month.  So my question

22  is just:  Is that because McNeil Consultants stopped

23  existing and Quintessa took over?

24       A.   Quintessa didn't take over; but Quintessa was

25  a brand-new corporation; but, yes, Quintessa started

Page 139

```
 1   its own campaign.

 2        Q.   Got it.  And at that point, did you reconsider

 3   whether or not to use the Adler marks as keywords?

 4        A.   I don't think it was a question that was

 5   brought up.  We just looked at all of our advertising

 6   and campaigns and continued to create new ones.

 7        Q.   Okay.  And that remains ongoing to today?

 8        A.   What does?

 9        Q.   The Quintessa's bidding on the Adler marks as

10   keywords?

11        A.   Yes.

12        Q.   Do you bid on the Adler marks as keywords on

13   any platforms other than Google AdWords -- or Ads?

14        A.   To my knowledge, no.

15        Q.   To your knowledge, have you ever used "Adler,"

16   "hammer," or any of the other Adler trademarks in the

17   copy of your advertisements?

18        A.   To my knowledge, no.

19        Q.   To your knowledge, have you ever used the

20   Adler trademarks such as "Adler" or "hammer" in any

21   e-mail campaigns or social media advertisements?

22        A.   No.  And I don't believe you're able to --

23        Q.   Okay.

24        A.   -- to my knowledge.

25        Q.   I'm going to show you, Ms. Mingee, what will
```

Page 168

```
1      A.    I do not know if this was in that time

2   frame --

3      Q.    Okay.

4      A.    -- when he stopped.

5      Q.    To your knowledge, did -- did you or anyone

6   else at Quintessa discuss separating out Adler to test

7   it after the Adler lawsuit was filed against McNeil

8   Consultants and Quintessa?

9      A.    I'm unsure.

10     Q.    Okay.  To your knowledge, Ms. Mingee, who is

11  in charge of coming up with the ad company -- copy,

12  excuse me -- that will go in the Google Ads for

13  Quintessa?

14     A.    I initially came up with ad copy but now we're

15  pretty generic on what's being used and it is normally

16  just copied across.

17     Q.    And is that both for mobile and for desktop?

18     A.    Yes, sir.

19     Q.    Okay.

20     A.    It is normally what -- Wallace does that.

21     Q.    And is -- I might have asked you this before;

22  and if so, I apologize.  But do you know the general

23  breakdown of how much the company spends on desktop

24  versus mobile?

25     A.    No, I do not.
```

Page 170

1    A.    On a mobile ad with just -- you can put like

2    500 characters, so you could mention "car accident

3    lawyer" 20 times and have a fantastic quality score.

4    Q.    Got it.  And have y'all done -- has the

5    company done any studies or investigations into the

6    amount or quality of leads that you get from those

7    click-to-call ads versus from a normal link-only ad?

8    A.    They are on two different planes of field.  I

9    mean, just because normally on the site link, which is

10   what you are referencing --

11   Q.    Uh-huh.

12   A.    -- the form fills, they are going into our

13   call center and then they are being called.  So they

14   have a lower -- those have a lower conversion rate.

15   Whereas if someone is calling in the intent, it is

16   easier to speak with them and get an answer, you know,

17   to them on whatever they are needing.

18   Q.    Okay.  I am going to hand you what will be

19   marked as Exhibit 10.

20              (Exhibit No. 10 was marked.)

21              THE WITNESS:  Thank you.

22   Q.    (BY MR. MATTHYSSE)  As you can see here,

23   Ms. Mingee, this is -- appears -- well, this is a

24   document produced by Quintessa and appears to be an

25   e-mail from Google Ads policy manager to Wallace.  Do

1  the entire ad copy; so it could be a copy and paste

2  error or -- but it is not an entire ad.

3      Q.    Okay.  Have you seen language like that in

4  other ads that Quintessa has run?

5      A.    Yes, sir.

6      Q.    Okay.  And remind me who comes up with that

7  language around this time, I guess, in February

8  of 2021.  Who would have been coming up with that

9  language of the company?

10     A.    It was either a copy and paste from another ad

11 or Wallace had done some or I had done some.

12     Q.    Okay.  I'm handing you, Ms. Mingee, what will

13 be marked as Exhibit 13.

14                (Exhibit No. 13 was marked.)

15                THE WITNESS:  Thank you.

16     Q.    (BY MR. MATTHYSSE)  As you can see, this is an

17 e-mail chain that's from Wallace produced by Quintessa

18 and marked AEO.  And one -- the November 18th,

19 10:49 a.m. e-mail at the bottom, it says, "Here's the

20 California exclusion list."

21                Do you see that?

22     A.    Yes.

23     Q.    And then at the top, to Alex Bryan, cc'ing

24 Ishmael Riley and Mike Walker.  It says, "Here's the

25 Texas attorney exclusion list."

```
 1      A.   He was referencing the ad group of Jim Adler.

 2   So Texas call-only is an entire campaign of Texas.

 3      Q.   Got it.

 4      A.   And he was referencing that.  In this, he was

 5   speaking about getting spammed.

 6      Q.   Okay.  Is that what you were referencing

 7   before is potentially being caused by Slocumb or

 8   someone else?

 9             MR. SCHWEGMANN:  Objection to form.

10      A.   In Google there is a side where it shows

11   invalid clicks.

12      Q.   (BY MR. MATTHYSSE)  Okay.

13      A.   So whether it be someone at your client's

14   office or whether it be another competitor, they can go

15   in and quadruple click just to try and run out

16   someone's budget.

17      Q.   Okay.

18      A.   And then -- at Quintessa, we just call them

19   "spam clicks."

20      Q.   Gotcha.  And Wallace uses the phrase

21   (Reading:)  ABS Top started -- or ABS Top started

22   dropping.  Do you know what "ABS Top" means?

23      A.   Absolute top.

24      Q.   What does that mean, "Absolute Top"?

25      A.   Your top of the page, where you rank.
```

Page 186

```
 1   of 2017, there was zero clicks; and then 31 in July but

 2   still in the single digits into '18.

 6        A.   Yes, sir.

 7        Q.   And then at some point in late '19 -- sorry --

 8   late '18, early 2019, your clicks and costs jump up.

 9   Do you see that?

10        A.   Yes, sir.

11        Q.   Do you know why that is?

12        A.   If we increased our budget, because we were

13   now doing more marketing in Texas.

14        Q.   Got it.  Okay.

15             So were you -- obviously in June of '17 or

16   mid '17, you were to some small extent purchasing the

17   Adler marks as keywords; correct?

18        A.   Yes, sir.

19        Q.   But is it fair to say you were not heavily

20   engaged in marketing in Texas at that point?

21        A.   I would say I was not; but also the clicks,

22   the cost-per-click was -- used to be a lot less.

23        Q.   Okay.  So the amount has gone up?

24        A.   Yes, sir.

25        Q.   Is it -- do you know why that is?
```

 1  accidentinjurylegalcenter.com; correct?

 2      A.    Yes, sir.

 3      Q.    And is there a call center associated with

 4  that site?

 5      A.    I mean, there is a call center associated with

 6  Quintessa.

 7      Q.    Okay.  And then the number displayed on that

 8  site?

 9      A.    Yes, sir.

10      Q.    Okay.  And do you direct and control

11  Quintessa's activities and use of the Adler marks?

12      A.    Not solely, no.

13      Q.    Okay.  Who else directs and controls that?

14      A.    I guess I'd need to understand what "direct

15  and control" means.

16      Q.    Do you have -- let's go to the next sentence.

17  Do you have the authority to bind Quintessa in

18  transactions?

19      A.    In -- in what type of --

20      Q.    Any business transactions, contracts,

21  et cetera.

22      A.    I do, yes.

23      Q.    And do you have final say over Quintessa's

24  business strategy and Google Ad strategy?

25      A.    Not always, no.

Page 221

1    A.    Wallace is a manager, and I would -- Mike is

2  an officer.

3    Q.    Okay.  Got it.

4    A.    But I also think it's a definition of what an

5  officer is.  He can't sign anything, checks, or

6  anything like that.

7    Q.    So you are the only one that can sign checks?

8    A.    Correct.

9    Q.    And you're the only owner?

10   A.    Yes, sir.

11   Q.    Okay.  And the bottom of page 2, it states

12  that "Quintessa Marketing, LLC" -- which, again, I

13  thought -- is that an LLC?

14   A.    It is just Quintessa, LLC.

15   Q.    Okay.  -- "provides leads to personal injury

16  attorneys by way of retainer services."

17           Do you see that, the last paragraph of

18  page 2?

19   A.    Yes.

20   Q.    (Reading:)  Attorneys pay Quintessa via

21  monthly budget; and -- and you, Ms. Mingee, are paid

22  via salary and ownership draws.

23           Do you see that?

24   A.    Yes, sir.

25   Q.    And do you recall us discussing that earlier?

Page 257

1    Q.    (BY MR. MATTHYSSE)  What did you do to change

2  up your processes and advertisements between this and

3  the Fifth Circuit decision?

4    A.    Our process and procedure was to pull every

5  call and to see what happened and to diagnose it and

6  then address it and move on from there.

7    Q.    But you didn't change how your ads looked for

8  the Texas click-to-call campaign?

9    A.    I can't speak to what our ad copy would have

10  changed every time it changed.

11    Q.    And you kept bidding on Jim's name?

12    A.    Yes, sir.

13    Q.    I'm handing you, Ms. Mingee, what will be

14  marked as Exhibit 24.

15            (Exhibit No. 24 was marked.)

16            THE WITNESS:  Thank you.

17    Q.    (BY MR. MATTHYSSE)  Another e-mail chain with

18  ████████████████████        Did you see that?

19    A.    Yes.

20    Q.    And Lauren at Quintessa Marketing, that's you;

21  right?

22    A.    Yes.

23    Q.    If I can take you to Quintessa 1103.  See the

24  bottom, from again, the accidentintakeforms@gmail, the

25  "Case status has been changed to 'attorney retained.'

Page 288

```
 1        A.    Of the leads that we sent, that was their keep
 2   rate after disengagements.  So meaning after the seven
 3   days, they would still end up keeping.
 4        Q.    Got it.
 5        A.    Because they would still be fallout for -- if
 6   a police report came out 21 days later or whatever, we
 7   have you.
 8        Q.    Got you.  And then you say, "With the
 9   competitive nature, we sell them while they are on the
10   phone and stop them from shopping."
11        A.    Yes.
12        Q.    What do you mean by "the competitive nature"?
13        A.    Of personal injury.
14        Q.    Okay.  Of the personal injury field or --
15        A.    So with car accident -- when people have been
16   injured in an accident, they are not only shopping
17   contingency fee rates, they are shopping if they can
18   get a rental car, if they can get a loan.  So when we
19   get a lead, our goal is to get them signed and so that
20   they stop shopping or call another law firm and send
21   them to the one that we work with.
22        Q.    Okay.  And so what -- what's the importance of
23   selling them on the phone just to stop them from
24   shopping?
25        A.    If you -- if they are on the phone -- I mean,
```

Confidential

Page 300

```
 1      A.    Yes.

 2      Q.    My question is:  These protocols that you are

 3  doing, do you believe that they led in late '20 and '21

 4  to a decrease in the amount of folks calling and

 5  looking for Adler?

 6      A.    When you showed the report earlier, our spend

 7  went up in '20 and '21.  So I don't know if it is a

 8  decrease in that because we had an increase in calls.

 9  So it may have been a lower percentage, but I don't

10  know that number.

11      Q.    Do you -- sitting here today, though, are you

12  aware or have you done any investigation into whether

13  your protocols have resulted in less confusion?

14      A.    We're not seeing as many e-mails, no.

15      Q.    What do you mean by "not seeing as many

16  e-mails"?

17      A.    Of -- of people being confused.

18      Q.    Do you mean from the current law firms, the

19  client law firms?

20      A.    In just general.

21      Q.    Okay.  Are you still seeing folks into this

22  year calling, looking for Adler?

23      A.    I can't speak to -- I mean, in our export it

24  showed in January that there were some, yes.

25      Q.    Okay.  And so back to -- sorry -- to
```

```
1                        ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads      Should Read  Reason

6   ___  ___ _____     _____   _____

7   ___  ___ _____     _____   _____

8   ___  ___ _____     _____   _____

9   ___  ___ _____     _____   _____

10  ___  ___ _____     _____   _____

11  ___  ___ _____     _____   _____

12  ___  ___ _____     _____   _____

13  ___  ___ _____     _____   _____

14  ___  ___ _____     _____   _____

15  ___  ___ _____     _____   _____

16  ___  ___ _____     _____   _____

17  ___  ___ _____     _____   _____

18  ___  ___ _____     _____   _____

19  ___  ___ _____     _____   _____

20                          _____

21                          Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2022.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

1               J U R A T

2

3    I,               , do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on            ;

6    that I have made such corrections as appear noted

7    herein in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10   DATED this _____ day of _____,2022,

11   at _____,          .

12

13

14

15

16

17   _____

18          SIGNATURE OF WITNESS

19

20

21

22

23

24

25

Page 354

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3    JIM S. ADLER, P.C. and      )
      JIM ADLER,                  )
 4       Plaintiffs,              )
                                  )
 5                                )
      VS.                         ) CA NO. 3:19-cv-02025-K-BN
 6                                )
                                  )
 7    MCNEIL CONSULTANTS, LLC     )
      D/B/A ACCIDENT INJURY       )
 8    LEGAL CENTER, QUINTESSA     )
      MARKETING, LLC D/B/A        )
 9    ACCIDENT INJURY LEGAL       )
      CENTER, and LAUREN VON      )
10    MCNEIL,                     )
         Defendants.             )
11

12                   REPORTER'S CERTIFICATION

13           DEPOSITION OF LAUREN VON MCNEIL MINGEE

14                      April 13, 2022

15                   (REPORTED REMOTELY)

16

17                I, DIANA M. BENGS, Certified Shorthand

18    Reporter in and for the State of Texas, hereby certify

19    to the following:

20                That the witness, LAUREN VON MCNEIL

21    MINGEE, was duly sworn by the officer and that the

22    transcript of the oral deposition is a true record of

23    the testimony given by the witness;

24                I further certify that pursuant to

25    FRCP Rule 30(f)(1) that the signature of the deponent:
```

Confidential

Page 355

```
1                    XXX was requested by the deponent or a

2    party before the completion of the deposition and that

3    the signature is to be before any notary public and

4    returned within 30 days from the date of receipt of the

5    transcript.  If returned, the attached Changes and

6    Signature Pages contains any changes and the reasons

7    therefore;

8                    ___ was not requested by the deponent or

9    a party before the completion of the deposition.

10                    I further certify that I am neither

11   counsel for, related to nor employed by any of the

12   parties or attorneys in the action in which this

13   proceeding was taken, and further that I am not

14   financially or otherwise interested in the outcome of

15   the action.

16                    SWORN TO AND SUBSCRIBED by me in Tarrant

17   County, Texas, on this 25th day of April, 2022.

18

19                    Diana Bengs

20   _____

21   DIANA M. BENGS, CSR, RPR
     Texas CSR No. 4907
     Certification Expires:  January 31, 2024
22   TSG REPORTING, INC.
     747 Third Avenue, 10th Floor
23   New York, New York 10017
     877.702.9580 (Office)

24

25
```

# EXHIBIT 11
(To the Declaration of Diana Rausa)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C., AND JIM ADLER, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CA NO. 3:19-CV-02025-K-BN |
| | § | |
| MCNEIL CONSULTANTS, LLC, d/b/a | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | JURY DEMAND |
| QUINTESSA MARKETING, LLC, d/b/a | § | |
| ACCIDENT INJURY LEGAL CENTER, | § | |
| AND LAUREN VON MCNEIL, | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:  Plaintiffs Jim S. Adler, P.C., and Jim Adler, by and through their counsels of record:

Jered E. Matthysee and Giulio Yaquinto, PIRKEY BARBER PLLC, 1801 East 6th Street, Suite 300, Austin, Texas 78702;

Kurt Kuhn, KUHN HOBBS PLLC, 2310 Rutland Street, Houston, Texas 77008; and

Garrett W. Mize, JIM S. ADLER AND ASSOCIATES, The Tower at City Place, 2711 North Haskell Avenue, Suite 2500, Dallas, Texas 75204.

Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 33, Defendants McNeil Consultants, LLC,

d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC, d/b/a Accident Injury Legal Center,

and Lauren Von McNeil ("Defendants") make the following objections and answers to Plaintiffs

Jim S. Adler, P.C., and Jim Adler's ("Plaintiffs") First Set of Interrogatories:

## AMENDED OBJECTIONS AND ANSWERS TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any and all current or former owners, directors, and/or officers of McNeil Consultants, LLC, Quintessa Marketing, LLC, and/or any other business operated

---

DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES                                                              PAGE 1

McNeil Consultants LLC is no longer an operating business, it was formerly dissolved in May 2019. McNeil Consultants performed consulting services for personal injury law firms such as intake training, advertising, and case management.

**INTERROGATORY NO. 3:** Identify any and all companies or other legal entities or assumed names under which you currently do, or have in the past done, business during the last ten (10) years.

**ANSWER:**

Defendants object to this Interrogatory as overbroad in time and scope, irrelevant, not calculated to lead to the discovery of admissible evidence, and disproportionate to the needs of the case to the extent that the request is not limited to legal entities that bid on or purchased the alleged Adler Marks as advertising keywords or time periods in which such bidding or keyword purchasing occurred. To the extent this Interrogatory seeks information about Ms. Mingee personally, Defendants object that the foundation of the Interrogatory is misleading; Ms. Mingee is not a company or a legal entity, and she has not personally done business under an assumed name. Defendants limit their response to the aforementioned limitations.

Subject to and without waiver of the foregoing objections and limitations, Defendants respond that McNeil Consulting, LLC and Quintessa Marketing, LLC both do or have done business as "Accident Injury Legal Center" and "Car Accident Helpline."

**INTERROGATORY NO. 4:** Identify all clients for whom you have referred leads related to or arising from any accident or injuries occurring in the State of Texas.

**ANSWER:**

Defendants object to this Interrogatory as overbroad in time and scope as it seeks "all clients" without reference to any specific subject matter in dispute or any particular date range. Defendants also object that this Interrogatory is harassing, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, and disproportionate to the needs of the case. It is an impermissible fishing expedition as the identity of Defendants' clients have no bearing on the causes of action in this case. Defendants further object to this Request to the extent it requires Defendants to disclose internal trade secret and other confidential information of the company.

**AMENDED ANSWER:**

Subject to and without waiver of the foregoing objections, Defendants will provide a list of attorney customers in Texas to be produced in a separate interrogatory response labeled Attorneys' Eyes Only.

**INTERROGATORY NO. 5:** Identify all persons who participated in the decision to purchase, cause to be purchased, and/or use the Adler Marks as keywords, and which lawyer or law firm you refer or have referred cases based on Keyword Advertisements triggered by any of the Adler Marks.

---

**DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'**
**FIRST SET OF INTERROGATORIES**                                    PAGE 3

**INTERROGATORY NO. 13:** Identify any disputes (demand letters, lawsuits, etc.) between you and any third-party involving (a) allegations of trademark infringement and/or (b) Keyword Advertisements.

**ANSWER:**

Defendants object to this Interrogatory as overbroad in scope, harassing, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence as it is an impermissible fishing expedition, and disproportionate to the needs of the case as any disputes between Defendants and any third party has no bearing on the causes of action in this case.

**AMENDED ANSWER:**

Subject to and without waiver of the foregoing objections, Defendants will identify lawsuits and produce non-privileged demand letters responsive to this request. Investigation is ongoing and Defendants will supplement this response once the responsive disputes have been identified.

**INTERROGATORY NO. 14:** Identify all persons who participated in any way in the preparation of the answers or responses to these interrogatories and state specifically the area of participation of each such person.

**ANSWER:**

Defendants object to this Interrogatory because it seeks information protected from disclosure by the attorney client, work product, and other applicable privileges.

Defendant responds by identifying Lauren Mingee who made and verified these answers. Withholding statement: Information responsive to this request is withheld under the attorney-client and work product privileges.

**AMENDED ANSWER:**

Defendants respond by identifying Lauren Mingee who made and verified these answers with the assistance of her counsel, Christopher Schwegmann, Rebecca Adams, and Barira Munshi.

DATE: March 11, 2022                    Respectfully submitted,

                                        /s/ Rebecca L. Adams
                                        Christopher J. Schwegmann
                                        Texas Bar No. 24051315
                                        cschwegmann@lynnllp.com
                                        Rebecca L. Adams
                                        Texas Bar No. 24098255
                                        radams@lynnllp.com
                                        Barira Munshi

**DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**                    **PAGE 8**

Texas Bar No. 24095924
bmunshi@lynnllp.com
LYNN PINKER HURST & SCHWEGMANN, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:   214-981-3800
Facsimile:   214-981-3839

**ATTORNEYS FOR DEFENDANTS
MCNEIL   CONSULTANTS,   LLC,
D/B/A  ACCIDENT  INJURY  LEGAL
CENTER, QUINTESSA MARKETING,
LLC,  D/B/A  ACCIDENT  INJURY
LEGAL CENTER, AND LAUREN VON
MCNEIL**

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2022, a true and correct of the foregoing document was served *via email* upon all counsel of record:

*/s/ Rebecca L. Adams*
Rebecca L. Adams

---

DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES                                    PAGE 9

## VERIFICATION

STATE OF Oklahoma 
COUNTY OF Oklahoma

I, Lauren Mingee, make this Declaration under oath pursuant to 28 U.S.C. Section 1746. I was the sole owner of McNeil Consultants, LLC d/b/a Accident Injury Legal Center, and I am currently the sole owner of Quintessa Marketing, LLC d/b/a Accident Injury Legal Center. I have read the foregoing document, Defendants' First Amended Objections and Answers to Plaintiffs' First Set of Interrogatories. I declare under penalty of perjury that the contents of the foregoing are true and correct.

Executed on this 28 day of March, 2022.

Lauren Mingee

---

**DEFENDANTS' FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFFS'**
**FIRST SET OF INTERROGATORIES**                                      PAGE 10

# EXHIBIT 12
(To the Declaration of Diana Rausa)
FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GORAYEB & ASSOCIATES, P.C.,

                            Plaintiff,                    Case No. 17-cv-3805

v.

GOOGLE, INC., MCNEIL CONSULTANTS LLC,
QUINTESSA MARKETING, LLC, ACCIDENT
INJURY LAW CENTER, and LAUREN MCNEIL,

                           Defendants.

## SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement and Mutual Release Agreement ("Agreement") is made between Gorayeb & Associates, P.C. ("Plaintiff"), a New York professional corporation with its principal place of business at 100 William Street, 19th Floor, New York, New York 10038, and McNeil Consultants LLC, an Oklahoma limited liability company with its principal place of business at 2576 Forest Glen Drive, Choctow, OK 73020 ("McNeil"); Quintessa Marketing, LLC, an Oklahoma limited liability company with its principal place of business at 2576 Forest Glen Drive, Choctow, OK 73020 ("Quintessa"); Accident Injury Law Center, an unincorporated association with its principal place of business at 7110 W. Sunset Blvd., Los Angeles, CA 90046 ("Law Center"); Lauren McNeil, an individual who is the sole owner of McNeil, Quintessa, and Law Center and who resides at 2576 Forest Glen Drive, Choctow, OK 73020 (Ms. McNeil"). McNeil, Quintessa, Law Center, and Ms. McNeil are collectively referred to as the Defendants. Plaintiff and the Defendants may be referred to herein singularly as a "Party" or collectively as the "Parties." The effective date of this Agreement shall be the date of last signature ("Effective Date").

### Recitals

**WHEREAS,** Plaintiff filed a Complaint on May 19, 2017, which was subsequently served, alleging, among other things, violations of Sections 32(1), 43(a), and 43(c) of the Lanham Act, contributory trademark infringement, contributory unfair competition, common law trademark infringement, common law unfair competition, and violations of New York General Business Law Sections 133, 349, 350, and 360-L, vicarious liability, and injunctive relief for violation of, *inter alia*, sections 479 and 495 of the New York Judiciary Law (the "Claims") in the United States District Court for the Southern District of New York, in the action entitled *Gorayeb & Associates, P.C. v. Google, Inc., et al* ("the Action").

**WHEREAS,** Plaintiff agreed to extend the response date to the Complaint until July 31, 2017 and Defendants interposed an Answer on that date;

**WHEREAS,** the Parties desire to settle and resolve all differences, disputes and claims arising out of or relating to the Action or the subject matter of the Action without any admission of liability or wrongdoing and, in consideration of the following terms, covenants and conditions;

Confidential - Attorneys' Eyes Only

**IT IS HEREBY AGREED** as follows:

### I.  Definitions

For purposes of this Agreement, the following terms shall have the meanings given:

1. "Affiliates," with respect to a Party, shall mean (i) all entities now or in the future controlling, controlled by or under common control with that Party; (ii) all entities in the past controlling, controlled by or under common control with that Party, for the period of time that such control exists or existed; (iii) all employees, employers, and agents of that Party; (iv) all partners, joint venturers, or business associates of that Party; and (v) predecessors, successors or successors in interest thereof, including all entities formed or acquired by that Party in the future that come to be controlled by that Party or control that Party. For purposes of this definition, "control" means possession directly or indirectly of the power to direct or cause the direction of management or policies of a company or entity through the ownership of voting securities, contract, or otherwise, and "entities" includes all persons, companies, partnerships, corporations, associations, organizations, and other entities.

2. "Plaintiff Affiliates" shall mean all Affiliates of the Plaintiff.

3. "Defendant Affiliates" shall mean all Affiliates of each of the Defendants.

### II.  No Use of "GORAYEB"

Commencing upon the execution of this Agreement and continuously for all time thereafter until the end of time, Defendants and any of the Defendant Affiliates shall not, any place in the world, directly, indirectly, alone or with others in any combination or capacity whatsoever, use, cause to be used, or suggest to be used "Gorayeb," or any variation or form of any kind whatsoever of "Gorayeb," for any purpose whatsoever, including, but not limited to, for any commercial purpose, including, but not limited to, in advertising or Internet advertising of any kind or form whatsoever

### III.  Dismissal of the Action

Within three (3) days of the Effective Date, the Parties will execute and electronically file a Stipulation and Order of Dismissal, in the form of Exhibit 1 attached hereto, with each Party bearing its own attorneys' fees and costs incurred in connection with the Action, including, but not limited to, this Agreement.

### IV.  Mutual Releases

In consideration of the promises above, the Parties hereby release their claims as follows:

1. Plaintiff hereby releases and discharges Defendants and the Defendant Affiliates, and their respective officers, directors, employees, members, agents, attorneys, administrators, representatives, insurers, beneficiaries, trustees, partners, shareholders, investors, contractors, joint venturers, predecessors, successors, assigns, transferees, and all other individuals and entities acting on Defendant's behalf from any and all claims, complaints, demands, damages, debts, liabilities, actions, proceedings, remedies, causes of actions or suits, known or unknown, of whatever kind or nature, including but not limited to whether in law or in equity, under contract,

2

**Confidential - Attorneys' Eyes Only**

tort or any other subject area, or under any statute, rule, regulation, order, or law, asserted or not asserted, arising out of or related to the Action or the subject matter of the Action.

2. Defendant and the Defendant Affiliates hereby release and discharge Plaintiff and the Plaintiff Affiliates, and their respective officers, directors, employees, members, agents, attorneys, administrators, representatives, insurers, beneficiaries, trustees, partners, shareholders, investors, contractors, joint venturers, predecessors, successors, assigns, transferees, and all other individuals and entities acting on Plaintiff's behalf and/or on behalf of the Plaintiff Affiliates from any and all claims, complaints, demands, damages, debts, liabilities, actions, proceedings, remedies, causes of actions or suits, known or unknown, of whatever kind or nature, including, but not limited to, whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, asserted or not asserted, arising out of or related to the Action or to the subject matter of the Action.

### V.  Warranties

1. Plaintiff represents and warrants that it has not assigned or otherwise transferred to any third party any interest in any claim, demand, complaint, action, proceeding, remedy, lien or any other matter subject to the release in Section IV it may have against Defendants or the Defendants' Affiliates. Plaintiff represents and warrants that it has the legal authority to release all such matters and agrees.

2. Defendants represent and warrant that they have not assigned or otherwise transferred to any third party any interest in any claim, demand, complaint, action, proceeding, remedy, lien or any other matter subject to the release in Section IV it may have against Plaintiff or the Plaintiff Affiliates. Defendants represent and warrant that they have the legal authority to release all such matters.

3. Each person who executes this Agreement on behalf of a Party represents and warrants to the other Party that he or she has the authority of the Party, including directors and officers of said entity to do so, and each Party agrees to indemnify and hold harmless the other Party from any and all claims, liability, costs and damages, including but not limited to attorneys' fees, costs and expenses, involving any assertion that such authority did not exist or was limited.

### VI. Governing Law and Venue

Prior to commencing any court action or proceeding, the Parties shall try to reach a resolution through negotiation. In the event the dispute is not resolved by the aforementioned negotiation, the Parties may commence a court action before the Court, which the Parties agree will retain jurisdiction over such disputes.

All claims arising out of or relating to this Agreement will be governed, interpreted, enforced, construed and controlled by the laws of the State of New York, without regard to principle of conflicts or choice of law provisions. The prevailing Party in any court action or proceeding alleging breach of this Agreement shall be entitled to recover from the Party who breaches the Agreement, not only the amount of any judgment or order, but also such other costs and expenses as may be reasonably incurred by said Party, including court costs and reasonable attorneys' fees and all other reasonable costs and expenses, whether taxed or otherwise, incurred in connection with said action or proceeding.

### VII.        Successors and Assigns

3

Confidential - Attorneys' Eyes Only

This Agreement and the obligations and benefits of this Agreement will be binding upon and inure to the benefit of, and be enforceable by and against each of the Parties and their respective successors and assigns. The Parties have an affirmative duty to ensure that this Agreement and the obligations and benefits of this Agreement will be binding upon and inure to the benefit of, and be enforceable by, each of the Parties and their respective successors and assigns.

### VIII.   General Provisions

1. **Entire Understanding**: This Agreement constitutes the complete, final and exclusive embodiment of the entire agreement between the Parties with regard to the subject matter hereof. It is entered into without reliance on any statements, promises, warranties or representations, written or oral, other than those expressly contained herein, and it supersedes any other statements, promises, warranties or representations.

2. **Amendments:** This Agreement cannot be modified or amended except by a written agreement, signed by the Parties to be bound by the modification or amendment, and which specifically states it is amending this Agreement.

3. **No Construction Against Any Party**: The Parties to this Agreement and their counsel have participated jointly and at arms-length in the negotiation and drafting of this Agreement, and for all purposes this Agreement shall be deemed to have been drafted jointly by the Parties and their counsel. The Parties agree that the normal rules of construction that any ambiguity in a document is construed against the drafting party shall not apply to the interpretation or enforcement of this Agreement, as the Parties each participated in the drafting of this Agreement.

4. **Parties' Knowledge and Advice of Counsel**: The Parties execute this Agreement freely and voluntarily and without acting under any duress or in reliance upon any threat made by or on behalf of the other Party. Each Party has consulted with or has had an opportunity to consult with counsel of its own choice about the legal effect of entering into this Agreement, and executes this Agreement being fully informed as to its terms, content and legal effect.

5. **Severability**: The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision. If any provision (or part of a provision) of this Agreement is found to be invalid, illegal or unenforceable, the rest of the Agreement shall remain in effect.

6. **Counterparts**: This Agreement may be executed by the Parties in counterparts and exchanged by electronic means, including facsimile, PDF, and other electronic means, with the same effect as if all Parties had signed the same instrument.

7. **No Waiver**: Neither Party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement. Moreover, a waiver of any breach of this Agreement by any Party shall not be deemed to be a waiver by any Party of any other breach of this Agreement

### IX. Notices

All notices that are required or permitted to be given hereunder shall be in writing and shall be sent by overnight courier service to the Party to be notified, addressed to such Party at the physical address set

4

Confidential - Attorneys' Eyes Only

forth below, or such other physical address(es) as such Party may have substituted by written notice to the Party providing notice

**To Defendants:**

[PLEASE FILL IN]

Lauren McNeil
2576 Forest Glen Drive
Choctow, Oklahoma 73020

With a copy to:

Robert M. Ward
BMWipLAW, LLC
621 Brixton Circle
Simpsonville, SC 29681

**To Plaintiff:**

Christopher J. Gorayeb
Gorayeb & Associates, P.C.
100 William Street, 19th Floor
New York, NY 10038

With a copy to:

Arthur J. Ciampi
Ciampi LLC
39 Broadway, Suite 520
New York, NY 10006

\*   \*   \*   \*   \*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

Gorayeb & Associates, P.C.

By: _____

Christopher J. Gorayeb
Sole Shareholder

Dated: _____8/10/17_____

**McNeil Consultants LLC**

By: _____

Lauren McNeil
Managing Member

Dated: __8/8/17__

5

Quintessa Marketing, LLC

By:

Lauren McNeil
Managing Member

Dated: 8/8/17

Accident Injury Law Center

By:

Lauren McNeil
Sole Owner

Dated: 8/8/7

Lauren McNeil, individually

Dated: 8/8/17

6

Confidential - Attorneys' Eyes Only

ADLER_001686

# EXHIBIT 13

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-2026-E |
| | § | |
| LAW STREET MARKETING, LLC d/b/a | § | |
| PREMIUM INJURY HELP, EXCLUSIVE | § | |
| LEGAL MARKETING, INC. d/b/a | § | |
| PREMIUM INJURY HELP, DEANA | § | |
| BRYANT, COETY BRYANT a/k/a CODY | § | |
| BRYANT, and RAMJI LAW GROUP, P.C., | § | |
| | § | |
| Defendants. | § | |

**AFFIDAVIT OF COETY BRYANT**

**STATE OF TEXAS**

**COUNTY OF DENTON**



1

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000091

Appx. 255



2

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000092

Appx. 256



3

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000093

Appx. 257

Affiant further sayeth not."

_____
Coety Bryant

**SWORN AND SUBSCRIBED TO BEFORE ME** on this the _____day of _____, 2019, by Coety Bryant.

_____
Notary Public State of Texas

4

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER                    ADLER_000094

**Appx. 258**

Attachment A

## SETTLEMENT AGREEMENT



Page 1 of 5

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000095

Appx. 259



. 260



Page 3 of 5

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000097

**5.** **General Provisions**

    5.1    This Agreement is binding on and inures to the benefit of each party hereto, including its respective administrators, officers, directors, shareholders, agents, servants, affiliates, employees, legal representatives, related entities, assigns, successors, and all those acting in concert with them or any of them.

    5.2    This Agreement constitutes the final and complete expression of all the terms of the agreement between the parties with respect to the subject matter hereof. It supersedes all understandings and negotiations concerning the matters specified herein. Any representations, oral statements, promises, or warranties made by any party that differ in any way from the terms of this Agreement are not binding unless made in writing and signed by a duly authorized representative of all parties.

    5.3    Any invalidity, in whole or in part, of any provision of this Agreement will not affect the validity of any other of its provisions and any invalid provision shall be modified to the extent necessary to make it valid and/or enforceable or shall be severed if a saving modification is not possible.

    5.4    The parties agree to execute all such documents and take all such actions as may be necessary to effectuate and to fully carry out the terms and purposes of this Agreement.

    **5.5**    **Each party acknowledges that it negotiated this Agreement with full opportunity to consult with legal counsel and negotiate revisions to the terms agreed upon. In entering this Agreement, the parties have relied only on their own judgment and advice of their own counsel. In making this Agreement, the parties have not relied on any representations or advice of any other party or any other party's attorneys. The parties specifically waive and release any claim resulting from their decision to enter into this Agreement, including but not limited to any claim of fraud, misrepresentation, or fraudulent inducement. No part of this Agreement is to be construed against either party because of the identity of the drafter.**

    5.6    Each party represents that the person executing this Agreement on its behalf has been authorized to sign on behalf of the party and to bind it to the terms of this Agreement.

    5.7    The exclusive venue for any litigation commenced between the parties regarding this Agreement will be the United States District Court for the Northern District of Texas, Dallas Division, and the parties expressly consent to personal jurisdiction in that court. This Agreement will be interpreted under the laws of the State of Texas.

    5.8    This Agreement may be executed in counterparts or duplicate originals, each of which is deemed an original for all purposes. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

Page **4** of **5**

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000098

JIM S. ADLER P.C.

By: _____

Name: Jim S. Adler

Title: President

Date: 12/4/2019

JIM ADLER

By: _____

Date: 12/4/2019

**LAW STREET MARKETING, LLC
D/B/A PREMIUM INJURY HELP**

By: Deana Bryant

Name: Deana Bryant

Title: owner

Date: 11/27/19

**EXCLUSIVE LEGAL MARKETING,
INC. D/B/A PREMIUM INJURY HELP**

By: _____

Name: Coety Bryant

Title: CEO

Date: 11/27/19

**DEANA BRYANT**

By: Deana Bryant

Date: 11/27/19

**COETY BRYANT A/K/A CODY
BRYANT**

By: _____

Date: 11/27/19

Page 5 of 5

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

ADLER_000099

Appx. 263

# EXHIBIT 14

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3               FOR THE NORTHERN DISTRICT OF TEXAS

 4                         DALLAS DIVISION

 5     JIM S. ADLER, P.C., and
       JIM ADLER,
 6
              Plaintiffs,
 7
       VS.                              Case Number
 8                                      3:19-cv-02025-K-BN
       MCNEIL CONSULTING, LLC, d/b/a
 9     ACCIDENT INJURY LEGAL CENTER;
       QUINTESSA MARKETING, LLC,
10     d/b/a ACCIDENT INJURY LEGAL
       CENTER; and LAUREN MINGEE,
11
              Defendants.
12

13

14

15                        *  *  *  *  *

16         VIDEOTAPED DEPOSITION OF WALLACE KITTREDGE

17                   ON SEPTEMBER 30, 2022

18                IN OKLAHOMA CITY, OKLAHOMA

19                        *  *  *  *  *

20

21

22

23

24     REPORTED BY:  Cheryl D. Rylant, CSR, RPR

25     TSG Job No. 217460
```

1

2

3

4
                    SEPTEMBER 30, 2022
5
                        9:31 A.M.
6

7

8

9          Videotaped Deposition of WALLACE KITTREDGE,

10   held at Regus, 101 Park Avenue, Suite 1300,

11   Oklahoma City, Oklahoma, before Cheryl D. Rylant, a

12   Certified Shorthand Reporter of the State of

13   Oklahoma.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4          PIRKEY BARBER PLLC

 5          Attorneys for Plaintiffs

 6    BY:   GIULIO YAQUINTO, ESQ.
            JERED MATTHYSSE, ESQ.
 7          1801 East 6th Street
            Austin, Texas 78702
 8

 9

10

11          LYNN PINKER HURST & SCHWEGMANN, LLP

12          Attorney for Defendants

13    BY:   REBECCA ADAMS, ESQ.
            BARIRA MUNSHI, ESQ. (via Zoom)
14          2100 Ross Avenue
            Dallas, Texas 75201
15

16

17

18

19

20

21

22

23

24

25    VIDEOGRAPHER:  Mark Von Lanken - TSG Reporting
```

1

2          IT IS HEREBY STIPULATED AND AGREED by and

3     between the attorneys for the respective parties

4     herein, that filing and sealing be and the same are

5     hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED that all

7     objections, except as to the form of the question,

8     shall be reserved to the time of the trial.

9          IT IS FURTHER STIPULATED AND AGREED that the

10    within deposition may be sworn to and signed before

11    any officer authorized to administer an oath, with

12    the same force and effect as if signed and sworn to

13    before the Court.

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                     W. KITTREDGE

 2           VIDEO TECHNICIAN:  This is the start of

 3    media labeled number 1 of the video recorded

 4    deposition of Wallace Kittredge, in the matter

 5    Jim S. Adler, P.C., et al., versus McNeil

 6    Consultants, LLC, et al., in the United States

 7    District Court for the Northern District of Texas,

 8    Dallas Division, Civil Action Number

 9    3:19-cv-02025-K-BN.

10           This deposition is being held at Regus,

11    101 Park Avenue, Suite 1300, Oklahoma City, Oklahoma,

12    on Friday, September 30th, 2022, at approximately

13    9:31 a.m. Central Time Zone.

14           My name is Mark Von Lanken.  I am a Certified

15    Legal Videographer, in association with

16    TSG Reporting, Inc., headquartered at 228 East

17    45th Street, Suite 810, New York, New York.

18           The court reporter is Cheryl Rylant, in

19    association with TSG Reporting.

20           Counsel, will you please introduce

21    yourselves.

22           MR. YAQUINTO:  Giulio Yaquinto,

23    Pirkey Barber, for the Plaintiff.

24           MR. MATTHYSSE:  Jered Matthysse, also with

25    Pirkey Barber, for Plaintiffs.
```

```
 1                    W. KITTREDGE
 2           MS. ADAMS:  Rebecca Adams with Lynn,
 3   Pinker, Hurst, & Schwegmann, for Defendants.
 4           And also attending remotely is Barira Munshi,
 5   also with Lynn, Pinker, Hurst, & Schwegmann, for the
 6   Defendants.
 7           VIDEO TECHNICIAN:  Will the court reporter
 8   please swear in the witness.
 9           (Oath administered.)
10                  WALLACE KITTREDGE,
11   having been first duly sworn, deposes and says in
12   reply to the questions propounded as follows:
13                  * * * * * *
14                  EXAMINATION
15   BY MR. YAQUINTO:
16      Q. Will you please state your full name for the
17   record?
18      A. Wallace Randall Kittredge.
19      Q. And so, the last name is pronounced
20   "Kittredge" or "Kittredge"?
21      A. "Kittredge."
22      Q. "Kittredge."  All right.  That'll make it
23   easier for me.  That's how I've been saying it in my
24   head.
25           Have you ever been deposed before,
```

```
 1                    W. KITTREDGE
 2   Mr. Kittredge?
 3         A. No.
 4         Q. Are you at all familiar with the process in
 5   terms of -- I'm going to ask you some questions,
 6   you'll answer them to the best you can based on your
 7   personal knowledge.  Whenever I ask you a question,
 8   we'll pause in between, give Ms. Adams an opportunity
 9   to object if there are going to be any objections.
10   We'll do our best not to talk over each other, but it
11   should be pretty straightforward.
12         A. Sounds good.
13         Q. Okay.  And you realize that you are under
14   oath and you have to fully answer all of my questions
15   to the best of your ability?
16         A. Yes.
17         Q. Is there any condition or other reason why
18   you can't give full and complete testimony today?
19         A. No.
20         Q. You're not on any medications or anything
21   like that?
22         A. No.
23         Q. Where do you currently live?
24         A. Oklahoma City.
25         Q. Is it in a house, an apartment, or...
```

```
 1                    W. KITTREDGE

 2        A. It's a house.

 3        Q. Are you originally from Oklahoma City?

 4        A. No.

 5        Q. Where were you born and raised?

 6        A. I was born in Columbus, Ohio, raised in

 7   Boston, Massachusetts.

 8        Q. So, when did you move to Oklahoma City?

 9        A. That was July of 2015.

10        Q. And what brought you here?

11        A. My wife wanted to get her master's in piano

12   pedagogy and performance and the best program that

13   she found was at OU.

14        Q. Okay.  And so, she finished the program,

15   I take it?

16        A. Yeah.

17        Q. And you guys decided to stick around?

18        A. So far, so good.

19        Q. And what is your current occupation or job

20   title?

21        A. Well, I recently resigned from Quintessa and

22   my job title was director of digital marketing.

23        Q. And when did you resign?

24        A. Tuesday was my last day.

25        Q. That was the 27th?  Or the 26th -- the 27th.
```

```
 1                      W. KITTREDGE

 2    like that.

 3          So, based on all this data, Google then chooses

 4    where and how and who to deliver these ads to.  And

 5    when using things like a broad match or whatever, it

 6    finds the best keyword search terms to deliver.  So,

 7    it's really putting, you know, the control into

 8    Google's hands.

 9          Q. When you say "putting control into Google's

10    hands," do you mean specifically but not exclusively

11    necessarily the keywords?

12          A. No.  No.  You -- you put in the keywords, but

13    it determines when and where and how to deliver those

14    ads based on those keywords.

15          Q. Who determines how Quintessa's Google SEM ads

16    look?

17          And when I say "how they look," what I mean is

18    the advertising copy, the, you know, placement of

19    either a phone number or other text.  Who decides

20    what the advertising copy is?

21          A. The advertising copy needed to be approved by

22    Lauren.  But, I mean, there are certain advertising

23    copy that has been the same pretty much for years.

24          Q. So, did you ever create new advertising copy?

25          A. I did.
```

```
 1                    W. KITTREDGE

 2       Q. And did Lauren have to approve that before it

 3  ran?

 4       A. As I recall, usually, yes.

 5       Q. Why does Quintessa use

 6  AccidentInjuryLegalCenter.com?

 7       A. What do you mean?

 8       Q. What do they use it for?

 9       A. For -- as a resource website for people who

10  have been injured in an accident to be able to

11  contact us.

12       Q. And is that domain linked to Google Ads ever?

13       A. Yes.

14       Q. What other domains does Quintessa use, to

15  your knowledge?

16       A. I'll go by memory.  ████████████████████

    ████████████████████████████████████

18       That's pretty much it.

19       Q. How about ██████████████████████   Have you

20  ever heard of that one?

21       A. ██████████████████████   It's not a --

22  that's not a domain or a landing page, to my

23  knowledge.  Is it?

24       Q. I'm asking you.

25       A. It's -- I mean, to my knowledge, it's not a
```

```
 1                      W. KITTREDGE
 2        A. I mean, it's -- I mean that's not my call.
    I mean, why aren't they using it?  I mean, I --
 3
 4    I mean Quintessa Marketing does -- you know, isn't
 5    exactly a -- I mean, that's a B2B brand, not a brand
 6    that someone would think, "Oh, this is someone who
 7    could help me with a car accident."
 8        Q. Well, whenever a consumer is on Google or
 9    potential clients who are using Google click on a
10    Quintessa ad, do those users search Accident Injury
11    Legal Center?
12             MS. ADAMS:  Objection, form.
13             THE WITNESS:  I would have to see the data
14    of search terms.
15        Q. (By Mr. Yaquinto)  Do you recall ever running
16    campaigns that included Accident Injury Legal Center
17    or -- as a search -- as a keyword term?
18        A. (Indicating.)
19        Q. What about ████████████████   as a keyword
20    term?
21        A. (Indicating.)
22        Q. ████████████████████
23             MS. ADAMS:  I'm sorry, you have to give
24    verbal answers.
25             THE WITNESS:  Oh, sorry.  Yeah.  I -- I
```

```
 1                    W. KITTREDGE

 2    don't recall.

 3         Q. (By Mr. Yaquinto)  So, you don't recall ever

 4    seeing ████████████████████ as a keyword?

 5         A. I don't.

 6         Q. And you don't recall ever seeing ████████

      ████████████████████ as a keyword?

 8         A. That is correct.

 9         Q. And the same with ███████████████████

10         A. That is correct.

11         Q. Have you ever heard the name Case Connect

12    before?

13         A. It sounds familiar.

14         Q. But not anything specific comes to mind?

15         A. No.

16         Q. And I think we touched on this earlier, but

17    just to cover it and be certain, did you play any

18    role in supervising or working in the call center

19    intake side of things?

20         A. No.  My job was -- my job was the marketing

21    side.

22         Q. So, you don't know whether the intake agents

23    in the call center used scripts whenever they

24    received phone calls?

25         A. I believe they had scripts.
```

```
 1                      W. KITTREDGE

 2    Emily Kalish.

 3                 THE REPORTER:  What's the last name of

 4    Emily?

 5                 THE WITNESS:  Kalish, K-A-L-I-S-H.

 6                 MR. YAQUINTO:  Let's go ahead and do

 7    another document, Mr. Kittredge.

 8                 (Exhibit 14, previously marked.)

 9        Q. (By Mr. Yaquinto)  I'm going to hand you what

10    was previously marked as Exhibit 14.  I'll give you a

11    second to take a look.  Once you're done having a

12    look, can you tell me what the subject line of this

13    email is?

14        A. Okay.  Subject line?

15        Q. Yes.

16        A. "Absolute top Jim Adler - Can you take a

17    look?"

18        Q. So, the "Abs" is absolutely --

19        A. Uh-huh.

20        Q. -- is how you understand that?

21        A. Yeah.

22        Q. What does "absolute top" mean?

23        A. Absolute top is first listing of, like, the

24    top three positions on Google Ads that appear on the

25    first page of search.
```

```
1                    W. KITTREDGE

2         Q. So, the absolutely top is -- it's literally

3    what it is --

4         A. Uh-huh.

5         Q. -- it's the very top?

6         A. Yes.

7         Q. So, there's no organic result above it?

8    There's no other advertising or sponsored --

9         A. No.

10        Q. -- link above it?

11        A. It's -- it's entirely the area that Google

12   owns at the very top of that, of any search screen.

13        Q. And so, going to your initial email, you

14   emailed Lauren Bernaky:

15             "Hey, Lauren, can you take a look at."

16        Do you see where I'm reading from?

17        A. Uh-huh.

18        Q. And then it has a phone number.  It says:

19   ███████████████████████████████████████████

     ██████████████████████████████████████████████

     ██████████████

22        A. Uh-huh.

23        Q. Can you tell me what each of those refers to?

24        A. That would be broad match, exact match, and

25   phrase match.
```

1                          W. KITTREDGE

2



1                          W. KITTREDGE

2        Q. And why did that matter to Quintessa?

3        A. For the same reason -- you know, for the same

4    reason that I brought up earlier.  Like working at

5    Bob Mills Furniture, if someone is searching for

6    Mathis Brothers Furniture, we want to be on top.

7    We are going for the same clients.  And, you know,

8    they did the same -- they did the same.  And it's

9    just -- it's standard competitive practice.

10       Q. And so, earlier you were talking about it --

11   I believe you conditioned it in terms of organic

12   results.  But this, obviously, wouldn't be organic

13   result; is that correct?

14       A. Correct.

15       Q. So, the importance that you said earlier

16   about being at the top of the organic results is also

17   the same as with being at the top of sponsored or

18   advertising; is that correct?

19       A. They are two different -- they are two

20   different entities.  I mean, I don't know what the

21   importance -- they're different situations where

22   you'd want to be on top or second or third.  I mean,

23   there are times when being at the top isn't

24   necessarily as beneficial as being two or three, but

25   that's my job, to figure out what the best positions

1                    W. KITTREDGE

2    are.

3         

```
 1                      W. KITTREDGE

 2    the positions are in Houston.  And I'm having

 3    difficulty reading this, but I don't even see an ad

 4    of ours.

 5         Q. And I -- I don't think there is an ad of

 6    yours on here.

 7         A. Okay.

 8            MR. YAQUINTO:  Let's do another one.  This

 9    is again a document that hasn't been marked yet.

10            And, for the record, this is Quintessa 933.

11            (Exhibit 122 marked.)

12            THE WITNESS:  Oh, man.

13            THE REPORTER:  What do you need?

14            THE WITNESS:  I can't read it.

15         Q. (By Mr. Yaquinto)  Okay.  And so,

16    Mr. Kittredge, have you -- do you recall ever seeing

17    this?

18         A. I don't recall it.

19         Q. And so, this document appears to show an

20    email sent from you to Lauren Mingee; is that

21    correct?

22         A. Correct.

23         Q. And the subject line is "Adler ranking";

24    is that correct?

25         A. Correct.
```

```
 1                       W. KITTREDGE

 2        Q. And so, again, understanding that the image

 3   is somewhat difficult to look at, it looks like

 4   there's a Jim Adler ad that is second; is that right?

 5        A. I'm -- yeah.  It looks that way.

 6        Q. And can you think of any reason why you would

 7   have been sending this to Ms. Mingee?

 8             MS. ADAMS:  Objection, form.

 9             THE WITNESS:  I don't recall the reason.

10        Q. (By Mr. Yaquinto)  Do you think that it was

11   potentially because you were trying to see what the

12   rankings were?

13             MS. ADAMS:  Objection, form.

14             THE WITNESS:  I mean, that's the subject of

15   the email; so, I -- I assume so.

16        Q. (By Mr. Yaquinto)  Was that a common practice

17   or a practice that occurred more than once, where you

18   would send a screenshot of keyword advertisements

19   like this to look at the rankings?

20        A. Absolutely, for any campaign.

21        Q. And so, when you were trying to do that, what

22   would you be looking for specifically?  What kind of

23   information would you be trying to glean from,

24   you know, the screenshot that you saw?

25        A. What the ranking was for the ads.
```

1                          W. KITTREDGE

2          Q. And specifically where Quintessa's ads were

3     ranking next to other ads?

4          A. Yes.

5          Q. In terms of the order from first, second,

6     third, fourth?

7          A. Right.  But, again, with the -- with the --

8     there would be also a determination and goal of which

9     position we would want.  And I don't know what

10    keyword this is for because I can't -- I can't read

11    it.

12         Q. I think it's Jim Adler.

13         A. Okay.

14         Q. But I appreciate the inscrutability of this

15    image.

16         A. So...

17         Q. Let me ask you this, Mr. Kittredge:  Could

18    you have two keyword advertisements in the same

19    search, meaning could you have two different -- if

20    somebody put in a search for Jim Adler, would it be

21    possible for Quintessa to have two separate ads

22    respond in the mix?

23         A. Is it possible?  It's technically possible,

24    yes.

25         Q. And when you say "technically possible,"

```
 1                      W. KITTREDGE

 2                   C E R T I F I C A T E

 3    STATE OF OKLAHOMA

 4    SS

 5    OKLAHOMA COUNTY

 6           I, Cheryl D. Rylant, Certified Shorthand

 7    Reporter within and for the State of Oklahoma,

 8    certify that WALLACE KITTREDGE was by me sworn to

 9    testify the truth; that the videotaped deposition was

10    taken by me in stenotype and thereafter transcribed

11    by computer and is a true and correct transcript of

12    the testimony of the witness; totaling 151 pages;

13    that the deposition was taken by me on

14    September 30, 2022, at 9:31 a.m., at 101 Park Avenue,

15    Suite 1300, Oklahoma City, Oklahoma; that I am not a

16    relative, employee, attorney or counsel to any party

17    in this case or otherwise financially interested in

18    this action; and that the witness elected to exercise

19    his right to review the deposition transcript prior

20    to its filing.

21           Witness my hand and seal of office on this

22    the 12th day of October, 2022.

23
                                  *Cheryl Rylant*
24                          _____
                            Cheryl D. Rylant, CSR
25                          Oklahoma CSR No. 1448
```

```
 1                    ERRATA SHEET

 2   Case Name:

 3   Deposition Date:

 4   Deponent:

 5   Pg.  No. Now Reads     Should Read  Reason

 6   ___  ___ _____    _____   _____

 7   ___  ___ _____    _____   _____

 8   ___  ___ _____    _____   _____

 9   ___  ___ _____    _____   _____

10   ___  ___ _____    _____   _____

11   ___  ___ _____    _____   _____

12   ___  ___ _____    _____   _____

13   ___  ___ _____    _____   _____

14   ___  ___ _____    _____   _____

15   ___  ___ _____    _____   _____

16   ___  ___ _____    _____   _____

17   ___  ___ _____    _____   _____

18   ___  ___ _____    _____   _____

19   ___  ___ _____    _____   _____

20                         _____

                                  Signature of Deponent

21

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2022.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

# EXHIBIT 15

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

| From: | Wallace Kittredge |
|---|---|
| Sent: | Friday, January 29, 2021 5:09 PM CST |
| To: | Lauren Mingee |
| Subject: | aDLER rANKING |



--
Wallace Kittredge
Director of Digital Marketing
614-530-7926



QUINTESSA_000933

Appx. 288

| | |
|---|---|
| **From:** | Wallace Kittredge |
| **Sent:** | Friday, January 29, 2021 5:11 PM CST |
| **To:** | Lauren Mingee |
| **Subject:** | Houston Adler Screen shot |



--
Wallace Kittredge
Director of Digital Marketing
614-530-7926



QUINTESSA_000934

Appx. 289

| From: | Wallace Kittredge |
|---|---|
| Sent: | Tuesday, February 23, 2021 4:42 PM CST |
| To: | Lauren Mingee |
| Subject: | Isearchfrom and Google Adler Gone |





Wallace Kittredge
Director of Digital Marketing
614-530-7926



# EXHIBIT 16
(To the Declaration of Diana Rausa)

FILED UNDER SEAL

jim adler

| Location | Language | Device | Audience |
|---|---|---|---|
| San Antonio TX, Texas, United... | English | Mobile | Users not in any audience |

✓ **Your ad is showing**

For the keyword [jim adler] 

⚠ 2 of your extensions are not being shown.
View details

Preview of mobile search results



ALL    NEWS    IMAGES    VIDEOS    MAPS

Ad · www.accidentinjurylegalcenter.com/

📞 Call (855) 686-8852 | Texas Accident
Lawyers | Let Us Help You Now

Car Accident Helpline - If You Were Hurt In An
Accident, Call Today For a Free Consultation!
Nothing Out Of Pocket. Enough is Enough, Let...

Ad · attorney.jimadler.com/TheTexasHammer/Per...

Jim Adler - The Texas Hammer | Dallas,
Houston, San Antonio | JimAdler.com

When The Time Comes To Pay, Insurance
Companies Play Dirty. The Texas Hammer Beats
Insurance Companies At Their Own Game.

Office Locations & Hours    Contact Us    Car A

📞 Call (877) 797-1245

Ad · www.allianceinjurygroup.net/

Confidential - Attorneys' Eyes Only



Confidential - Attorneys' Eyes Only

jim adler 🔍

| Location | Language | Device | Audience |
|---|---|---|---|
| Dallas-Ft. Worth TX, Texas, Un... | English | Mobile | Users not in any audience |

✅ **Your ad is showing**

For the keyword [jim adler] 

⚠️ 3 of your extensions are not being shown.
View details



Preview of mobile search results

ALL    NEWS    IMAGES    VIDEOS    MAPS

Ad · www.accidentinjurylegalcenter.com/    ⓘ

📞 Call (888) 599-7715 | Texas Car Accident Lawyers

Car Accident Helpline - Hurt In an Accident? Call Now. Get The Money You Deserve! Let Us Fight On Your Behalf. Need A Rental Car? We Can Help. Free Consultation 24/7. Free Consultation.

Ad · www.zehllaw.com/    ⓘ

Houston Accident Lawyers | We're Undefeated

Undefeated and Billions Won for TX Accident Victims and their Families. Free Consults.

🏷️ 100% off Case Consultation

Ad · attorney.jimadler.com/TheTexasHammer/Per...    ⓘ

Jim Adler - The Texas Hammer | Dallas, Houston, San Antonio | JimAdler.com

Confidential - Attorneys' Eyes Only

ADLER_001772
Appx. 294

# EXHIBIT 17

(To the Declaration of Diana Rausa)

FILED UNDER SEAL