| | |
|---|---|
| **From:** | accidentintakeforms1@gmail.com |
| **Sent:** | Wednesday, May 12, 2021 11:23 AM CDT |
| **To:** | disengagementreports@quintessamarketing.com; system@quintessamarketing.com |
| **CC:** | |
| **Subject:** | Case Submitted For Disengagement For PC, ▇▇▇▇ |

The PC, Luz Cramer, was submitted for disengagement by ▇▇▇▇▇▇▇ on 5/12/2021 11:23:28 AM

Reason: Was represented at time lead was sent: Requested Jim Adler

Click here for the case link

| | |
|---|---|
| **From:** | accidentintakeforms1@gmail.com |
| **Sent:** | Wednesday, June 16, 2021 8:06 PM CDT |
| **To:** | disengagementreports@quintessamarketing.com; system@quintessamarketing.com |
| **CC:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | intake@quintessamarketing.com; D▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Subject:** | Case Submitted For Disengagement For PC, Billy Crawford |

The PC, Billy Crawford, was submitted for disengagement by ▮▮▮▮▮▮▮▮▮ n 6/16/2021 8:06:00 PM

Reason: Outside Attorney's geographic area: Quintessa misrepresented this case and had confirmed that the PCs are signing up with Jim Adler. That is the only law firm Ms. Hubbard wanted to sign up with and according to her, she had repeatedly asked if that is the law firm they are signing up and was told yes by Quintessa. I explained what our law firm can do for them and how they will have access to me directly and how our law firm is different. Her response was that she has always wanted to have a case with Jim Adler and that was the firm being represented to her. Please disengage and provide refund.

[Click here for the case link](#)

QUINTESSA_001144



| From: | accidentintakeforms1@gmail.com |
| Sent: | Friday, July 2, 2021 2:15 PM CDT |
| To: | disengagementreports@quintessamarketing.com; system@quintessamarketing.com |
| CC: | |
| Subject: | Case Submitted For Disengagement For PC, Louis Henry |

The PC, Louis Henry, was submitted for disengagement by ████████ on 7/2/2021 2:15:28 PM

Reason: Was represented at time lead was sent: Client already has an attorney with "Jim Adler"

Click here for the case link

| | |
|---|---|
| **From:** | |
| **Sent:** | Friday, July 2, 2021 2:49 PM CDT |
| **To:** | accidentintakeforms1@gmail.com; disengagementreports@quintessamarketing.com; system@quintessamarketing.com |
| **CC:** | |
| **Subject:** | Re: Case Submitted For Disengagement For PC, Louis Henry |

### Great, thanks you!



*If you have received this communication in error, please delete it from your computer immediately and permanently, destroy all copies, and notify us by telephone at (713) 850-8600. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information contained in this email is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee of agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.*

**From:** accidentintakeforms1@gmail.com <accidentintakeforms1@gmail.com>
**Sent:** Friday, July 2, 2021 2:15 PM
**To:** disengagementreports@quintessamarketing.com
<disengagementreports@quintessamarketing.com>; system@quintessamarketing.com
<system@quintessamarketing.com>



**Subject:** Case Submitted For Disengagement For PC, Louis Henry

The PC, Louis Henry, was submitted for disengagement by J⬛⬛⬛⬛ on 7/2/2021
2:15:28 PM

**ATTORNEYS' EYES ONLY**

Reason: Was represented at time lead was sent: Client already has an attorney with "Jim Adler"
[Click here for the case link](#)

**ATTORNEYS' EYES ONLY**

**QUINTESSA_001155**

| From: | accidentintakeforms2@gmail.com |
|---|---|
| Sent: | Tuesday, July 6, 2021 3:10 PM CDT |
| To: | disengagementreports@quintessamarketing.com; system@quintessamarketing.com |
| CC: | |
| Subject: | Case Submitted For Disengagement For PC, Alejandro Padilla |

The PC, Alejandro Padilla, was submitted for disengagement b███████ on 7/6/2021 3:10:52 PM

Reason: Was represented at time lead was sent: Alejandro spoke with two of our associates today and told us that he is represented by Jim Adler. We advised that he did sign our contract on Saturday but he says he thought we were Jim Adler and is not interested in Stanley & Associates representing him. Please do not bill for this one.

Click here for the case link

QUINTESSA_001168

| | |
|---|---|
| **From:** | accidentintakeforms2@gmail.com |
| **Sent:** | Tuesday, July 6, 2021 3:11 PM CDT |
| **To:** | disengagementreports@quintessamarketing.com; system@quintessamarketing.com |
| **CC:** | |
| **Subject:** | |



The PC, Albert Williams, was submitted for disengagement b             n 7/6/2021 3:11:41 PM

Reason: Was represented at time lead was sent: This PNC stated that he was mislead into signing with our office. He stated that whoever he spoke with said he would be signing with Jim Adler. He did not want to sign with our law firm. The PNC made it very clear and sent a text message in writing releasing us of our services. We will be terminating this case due to the PNC stating he was mislead into signing with us and because of the text message we received releasing us as his attorney

Click here for the case link

ATTORNEYS' EYES ONLY

| | |
|---|---|
| **From:** | |
| **Sent:** | Wednesday, July 21, 2021 1:04 PM CDT |
| **To:** | Lauren McNeil; Mike Walker; wreust@quintessamarketing.com |
| **CC:** | |
| **Subject:** | Final Pending Issues |

All,

I am going to put our pending issue in an e-mail for tracking purposes.

Besides the 7 cases within the disengagement window that were sent after 7/16, the only pending disengagements (7) on my end are:

    (4) Demadreic Phillips = non-responsive, incorrect number;
    (1) Brian Love = never signed the contract and is not going to treat;
    (1) Sara Perkins = never signed the contract, already had an attorney; and
    (1) Franklin Hubbard = thought he signed a contract with Jim Adler.

Thank you,



QUINTESSA_001185

# EXHIBIT 25
(To the Declaration of Diana Rausa)

FILED UNDER SEAL



CONFIDENTIAL
ATTORNEY EYES ONLY



**CONFIDENTIAL**
**ATTORNEY EYES ONLY**

**QUINTESSA_002507**

**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001376

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001473

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001491

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001497

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001499

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001506

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001525

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001548

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001593

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001597

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001598

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001606

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001613

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001614

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001625

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001632

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001633

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001654

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001673

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001683

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001688

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001701

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001702

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001710

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001711

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001712

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001716

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





## EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001722

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001729

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001730

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001740

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001741

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001753

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001775

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001777

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001779

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001781

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001790

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001793

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001795

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 26

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001805

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001806

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001807

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_001823

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





**EXHIBIT 26**

(To the Declaration of Diana Rausa)

FILED UNDER SEAL

See mp3 file marked QUINTESSA_002608

CONFIDENTIAL

FILED MANUALLY WITH THE COURT





# EXHIBIT 27

(To the Declaration of Diana Rausa)

**ACCIDENT INJURY LEGAL CENTER AND KEYWORD ADVERTISEMENTS:**

**A LIKELIHOOD OF CONFUSION SURVEY REPORT**

**Prepared by:**

**Dr. David W. Stewart, Ph.D.**

**July 11, 2022**

## Qualifications

I am Emeritus President's Professor of Marketing and Business Law at Loyola Marymount University and an independent management consultant. I have previously served as a tenured member of the faculty and in various administrative roles at Vanderbilt University, the University of Southern California, the University of California, Riverside, and Loyola Marymount University. I serve or have served on the editorial boards of more than twenty journals and regularly review manuscripts that have been submitted for publication in these journals, including the *Journal of Marketing*, the *Journal of Public Policy and Marketing*, the *Journal of the Academy of Marketing Science*, the *Journal of Marketing Research*, the *Journal of Advertising*, the *Journal of Advertising Research*, the *International Journal of Advertising*, the *Journal of Promotion Management*, the *Journal of Interactive Marketing*, and *Media Psychology*, among others. I am a past editor of the *Journal of Marketing*, the *Journal of the Academy of Marketing Science,* and the *Journal of Public Policy and Marketing.*

I hold three academic degrees in psychology: a B.A. from the University of Louisiana at Monroe, an M.A. in general experimental psychology from Baylor University, and a Ph.D. in personality psychology from Baylor University. I have written extensively about market analysis, consumer behavior, market definition and structure, branding, marketing communication, marketing research, marketing management, and public policy issues related to marketing. My research has examined how consumers and managers search for and use information in decision making, effective communication with consumers, methods for the study of consumers and their behavior, and the effective and efficient design of marketing programs. In addition to my work on consumer behavior related to commercial products and services, I have also examined the influences of warnings and disclosures on consumers.

My scholarship has been widely cited and has been recognized and honored in a number of venues including the receipt of the Ivan Preston Award for Outstanding Lifetime Contributions to Advertising Research by the American Academy of Advertising, the Elsevier Distinguished Marketing Scholar Award by the Society for Marketing Advances, the Cutco/Vector Distinguished Marketing Educator Award by the Academy of Marketing Science, the American Marketing Association's Award for Lifetime Contributions to Marketing and Public Policy, the Margaret H. Blair Award for Marketing Accountability conferred by the Marketing Accountability Standards Board, the Chinese Scholar Marketing Association Fellow Award for Outstanding Contribution to Marketing Scholarship in China and Beyond, and the Ingolstadt Legacy Award for Business and Economics in Service of Humanity, Awarded by the City of Ingolstadt and the Catholic University of Eichstätt-Ingolstadt.

I am a member of the American Marketing Association, the Marketing Research Association, the American Statistical Association, the Association for Consumer Research, the Society for Consumer Psychology, the American Academy of Advertising, the American Psychological Association, the Association for Psychological Science, the American Association for Public Opinion Research, the Psychometric Society, the Academy of Management, and the Institute for Operations Research and Management Sciences, among others. I have also served two terms as a member of the United States Census Bureau's Advisory Committee of Joint Professional Associations, and I am a past-chairman of this committee.

I have served as Vice President for Finance, Vice President for Publications, and as a member of the Board of Directors of the American Marketing Association. I am a past-president of the Society for Consumer Psychology, a past-chair of the Section on Statistics in Marketing of the American Statistical Association, and a past-president of the Academic Council of the

**Appx. 555**

American Marketing Association. I am a Fellow of the American Marketing Association, the American Psychological Association, and the American Psychological Society.

I have taught marketing courses to undergraduates, MBA students, Ph.D. students, and practicing managers for more than forty years. I have taught courses on principles of marketing, consumer behavior, advertising and promotion management, product development and management, marketing research, marketing management, and marketing strategy, among others. I have taught both qualitative and quantitative approaches to marketing research, including the design and use of in-depth personal interviews, customer visits, focus groups, survey research, choice modeling, and marketing experiments to both university students and practicing professionals. I have offered executive education courses on marketing topics, including marketing research, in more than twenty countries on five continents.

I have served as a consultant for a wide array of business firms, not-for-profit organizations and government agencies. In this work I have studied marketing activities and consumer behavior and have advised companies, not-for-profit organizations, and government agencies regarding marketing activities. Among the organizations with which I have consulted are Coca-Cola, General Motors, Visa Services, Hewlett Packard, Agilent Technologies, Hughes, Texas Instruments, Samsung, NCR, IBM, and Cadence Design Systems, among other companies. I have also served as a consultant to and expert witness for the Federal Trade Commission and the Office of Consumer Protection of the California Attorney General.

As a part of my business experience, academic research, and consulting practice, I have personally designed and conducted hundreds of consumer surveys. My experience with survey research includes the design of questionnaires, specification of the relevant universe and sampling frame, identification and implementation of approaches for sample selection,

Appx. 556

supervision of fieldwork, and data analysis and interpretation. I have published numerous papers using survey methodology and have also published papers on the methodology of survey research. I have also presented the results of my surveys to academic conferences and to senior managers. I have offered testimony regarding surveys, including surveys of my own design, before the Federal Trade Commission and in various Federal and State Courts. I have also offered other testimony regarding marketing issues, including issues related to consumer behavior, branding, marketing communications, marketing strategy, deceptive advertising, and intellectual property before the Federal Trade Commission and in Federal and State Courts. I have served as an expert witness for a mixture of plaintiffs and defendants over time.

In the conduct of my work as scholar, teacher, consultant, and expert witness I rely on well-accepted principles and theories in marketing and the behavioral sciences. I also place great reliance on properly designed and well-executed empirical research, such as survey research, to inform my opinions. Such research may be of my own design but may also be research published in peer reviewed journals or conducted to inform business decisions with important economic and/or social consequences.

A copy of my *Curriculum Vitae*, including a list of my testimony over the prior 4 years, is attached as **Exhibit A**.

**Scope of Assignment**

Jim Adler is a personal injury attorney who advertises his services using the federally registered trademark "The Texas Hammer." I have been retained by Pirkey Barber PPLC on behalf of Adler to design and implement a survey to determine the degree to which consumers are confused by online keyword advertisements that are found through searches for "The Texas Hammer." I am being compensated at a rate of $750 per hour for my work on this project. My

compensation is not dependent on the results of the survey or the outcome of this particular matter.

**Description of the Survey**

**Approach**

The design of the survey involved a modification of the well-accepted *Squirt* protocol,[1] with a test/control approach.[2] In a traditional *Squirt* survey design respondents are first shown the senior mark, which in the present matter is "The Texas Hammer." Respondents are then shown several other marks side-by-side or sequentially, including the alleged infringing mark at issue (the test mark). Respondents are also shown other marks (the control mark). After viewing the test and control marks, respondents are asked a series of questions regarding their perceptions of any association between the senior mark and the test and control marks. A likelihood of confusion is determined by examining the difference in the percentage of consumers who perceive an association between the senior mark and the test mark relative to the percentage of consumers who perceive an association between the senior mark and the control mark.

In the present survey the traditional *Squirt* survey design was modified to reflect the characteristics of the online search environment. In the online search environment, a consumer enters a search term into a search engine, most often Google, using a computer or mobile device.[3] The search engine produces several results responsive to the search term. Some of these

---

[1] Jerre B. Swann (2008), "Likelihood of Confusion Studies and the Straitened Scope of Squirt," *The Trademark Report*, 98 (3), 739- 756; Jerre Swann (2012) "Likelihood of Confusion," Ch. 4 Shari Seidman Diamond and Jerre Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (ABA Book Publishing).
[2] Shari Seidman Diamond (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition (Washington, D.C.: National Academies Press), pp. 359 – 423; see also Shari Seidman Diamond and Jerre Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (ABA Book Publishing).
[3] Google's share of desktop information search is 86% and exceeds 94% for mobile search Statista (2020), Worldwide desktop market share of leading search engines from January 2010 to April 2020, https://www.statista.com/statistics/216573/worldwide-market-share-of-search-engines/; Statista (2020), Market

responses may reflect paid advertising, that is, payment by an advertiser for a listing and/or specific placement within a listing produced in response to a specific search term. The present survey was designed to simulate such online searching by first informing the respondent to assume that they conducted a Google search using the search term "The Texas Hammer" on their mobile phone. Respondents were then presented with three advertising links that they were told were produced by their search using the term "The Texas Hammer." These links were typical of what a consumer would find on a mobile phone screen following a Google search using the term "The Texas Hammer." Respondents were asked to click on the link they would select to obtain legal services from "The Texas Hammer" had they actually engaged in a search.[4] Respondents who selected a link were subsequently asked a series of questions about the relationship(s) between the link selected and senior mark ("The Texas Hammer"). The specific search results and questions used in the present survey will be described below.

**Objectives of the Survey**

The survey was designed to determine whether and the extent to which consumers are confused about the source or sponsorship of a search engine result obtained using the search term "The Texas Hammer."  More specifically, the present survey was designed to determine the degree to which survey respondents perceived the link they selected to be put out by or associated with Adler, who uses the federally registered trademark "The Texas Hammer." The survey also sought to identify the reasons consumers gave for such perceptions.

---

share of selected leading mobile search providers in the United States from October 2012 to April 2020, https://www.statista.com/statistics/511358/market-share-mobile-search-usa/.
[4] Respondents had the option to select no link. If a respondent selected no link the survey was complete, respondents were thanked for their time, and the survey was terminated.

Appx. 559

**Summary of Findings**

A representative sample of 400 consumers 18 years of age or older who reside in Texas and who indicated that they had previously used the services of a personal injury attorney or would consider using such services in the future were sampled. Respondents had the option to complete the survey in English or Spanish. The survey was conducted on the Internet by California Survey Research Services using the Dynata online consumer panel. In this survey respondents were first told to assume that they had used the Google search engine on their mobile phone to search for "The Texas Hammer." They were then shown an image that was the result of their search. Three links were presented in this image. One was for Accident Injury Legal Center (the alleged infringer), one was for Semi Truck Settlement (the control), and one was for Adler. In response to the question about which one of the links they would select if they were seeking "The Texas Hammer" law firm, 47% of the respondents selected Accident Injury Legal Center, 3% selected Semi Truck Settlement, 32% selected the link for Adler, and 19% did not select a link.

Applying the traditional correction for guessing by subtracting the percent of respondents who selected the control (Semi Truck Settlement) from the percent of respondents who selected the alleged infringing link (Accident Injury Legal Center) yields a level of net confusion of 44% (47% - 3%). Even with the correct response among the alternatives (the senior mark, "The Texas Hammer") more respondents selected the alleged infringing link than selected the correct link associated with Adler. When respondents who selected the Accident Injury Legal Center link were asked why they selected this link, 30% indicated that the reason was because the link was in some way associated with "The Texas Hammer" law firm. Indeed, in response to a direct

question about association, 48% of all respondents who selected the Accident Injury Legal Center link indicated that the link was for the same firm as the one that uses this moniker.

These results provide strong evidence that a substantial number of consumers are likely confused as to the relationship between Accident Injury Legal Center and the law firm doing business as "The Texas Hammer" due to Accident Injury Legal Center's Google advertisement.

**Method**

The present survey was designed and conducted in accordance with established principles of survey research and is consistent with guidelines for survey research offered in litigation as articulated in the <u>Manual for Complex Litigation</u>[5]:

A.        The population was properly chosen and defined;

B.        The sample chosen was representative of that population;

C.        The data gathered were accurately reported;

D.        The data were analyzed in accordance with accepted statistical principles;

E.        The questions asked were clear and not leading;

F.        The survey was conducted by qualified persons following proper interview procedures; and

G.        The process was conducted so as to ensure objectivity (e.g., the study was "double blind").

<u>The Relevant Population</u>

The relevant population for the survey was defined as consumers 18 years of age or older

---

[5] *Manual for Complex Litigation*, Fourth Edition, §11.493, (Federal Judicial Center, 2004).

Appx. 561

who reside in the state of Texas and who indicated that they had previously used the services of a personal injury attorney or would consider using such services in the future if they sustained an injury. Thus, the population was defined in terms of consumers in the market.

The Sample

      Sampling is a process by which individuals are selected for participation in a survey. The procedures that guide the selection of a sample are referred to as the "sampling plan." A critical element of sound survey research is the use of a sampling plan that assures that the individuals included in the survey are representative of the relevant population. In the present survey, invitations to participate in the survey were sent to a randomly selected sample of members of the Dynata consumer Internet panel (a description of this panel is provided in **Exhibit B**).[6]

      Because respondents may choose to participate or not, the sample is a non-probability sample. In marketing and consumer research, non-probability sampling designs, such as those used in the present survey, are the most common type of sampling. Academic and commercial researchers widely and appropriately rely upon well-designed and properly executed non-probability samples. Business decisions of considerable import are routinely based on the results obtained from the use of such well-constructed sampling plans. Although statistical estimation requires a true probability sample in order to meet underlying statistical assumptions, in my experience it is common to compute measures of statistical precision and error when using non-probability samples since these measures provide some sense of the relative accuracy of specific outcomes obtained in a survey. This practice was followed in the present study.

---

[6] Consumer panels have been in use for more than 100 years. Well-constructed and well-maintained consumer panels are frequently and appropriately used in research by business, government and other organizations to inform decisions of significant import. (See Seymour Sudman and Brian Wansink (2002), *Consumer Panels*, Second Edition, Mason, OH: Cengage).

<u>Sample Size</u>

The total sample reported on here includes 400 respondents. Under appropriate statistical assumptions, a sample size of 400 provides estimates of population statistics, such as the percentages used in the present report, that are, in the worst case, within approximately plus or minus five (5) percent of the true population statistics ninety-five percent (95%) of the time.[7]

<u>Selection of Respondents</u>

Respondents who participated in the survey are members of the Dynata consumer Internet panel.[8] An e-mail invitation to participate in the survey was sent to a random sample of members of the panel. In order to ensure that the sample was broadly representative of the relevant population, quotas were established for age and gender.

The questions were presented to respondents via the Internet on the respondents' mobile phone. This mode of presentation was employed to simulate an online search that would occur on a mobile phone. Respondents were given the option to complete the survey in English or in Spanish.

Two questionnaires were used in the survey: (1) a "screener" that included questions used for identifying members of the previously defined population; and (2) a main questionnaire that included questions asked only of respondents who met the qualifications for inclusion in the sample. A copy of screen shots of the questionnaires is included in **Exhibit C**. The screener questionnaire of the survey included questions that determined whether an individual was a

---

[7] Formulas for the determination of sample size and sampling error are described in various textbooks on survey and marketing research. See for example: David A. Aaker, V. Kumar, and George S. Day (2004), *Marketing Research*, Eighth Edition, (New York: Wiley), pp. 402 – 431.

[8] Dynata was recently created through a merger of SSI and Research Now, two of the oldest and largest consumer panel organizations.

**Appx. 563**

member of the relevant population. Respondents who met all of the qualifications of membership in the relevant population based on their responses to the screener questions were transitioned to the main questionnaire. Respondents who were disqualified from participation by virtue of their responses to the screener questions were thanked and the survey was terminated.

As is customary in survey research, respondents who might be atypically knowledgeable about the subject on which the survey focuses were eliminated from the sample.[9] Thus, respondents who lived in household in which anyone worked in an advertising agency, a public relations firm, a market research company, or a legal services firm were excluded from the sample.

Internet surveys are well-accepted in the field of survey research as a standard, reliable methodology and are now the most common method of conducting survey research.[10] Businesses and other organizations routinely make decisions of considerable import based on the results of Internet survey research among consumers and such surveys have been accepted in evidence in numerous federal court cases. The sample used in the present survey was provided by Dynata, a leading supplier of Internet samples for surveys. I have worked with Dynata, and its predecessors, SSI and Research Now, on many surveys and have found their procedures and panels to be highly reliable. Dynata has a large and diverse panel consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research. Dynata utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Dynata employs a "by-invitation-only" panel recruitment

---

[9] Joseph F. Hair, Jr., Robert P. Bush, and David J. Ortinau (2003), *Marketing Research*, Second Edition, (New York: McGraw-Hill), p. 476.

[10] Don A. Dillman, Jolene D. Smyth, and Leah Melani Christian (2014), *Internet, Phone, Mail, and Mixed-mode Surveys: The Tailored Design Method*, (New York: Wiley); Roger Tourangeau and Shari Seidman Diamond (2012), "Internet Surveys for Evaluating Trademark Infringement and Deceptive Advertising," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, (Chicago: ABA Publishing).

Appx. 564

model to enroll pre-validated individuals and, therefore, maintains a panel comprised of the most credible survey takers who are less prone to self-selection bias.

Dynata uses a double opt-in approach to panel construction. Potential panelists opt-in during an enrollment process, and then they are sent a follow-up email confirmation that requests the potential panelist to click a link to validate the opt-in. Then, he or she is sent a follow-up email providing access to their member account and they can begin receiving surveys. A unique email address is required to opt-in to the panel and physical addresses provided by panelists in the U.S. are verified against government postal information.

Accurately Reported Data

All survey respondents inputted their responses from their own mobile phones, and these responses were recorded electronically. Dynata employs an identity verification procedure when recruiting members for its Internet panels. Dynata uses a variety of invitations, including emails, telephone alerts, and banners and messages on websites to recruit members of its panels. Respondents may only participate in a survey if they input an individual password recognized by Dynata. Such identity verification is regarded as a best practice in the management of Internet surveys and serves to assure that the respondent to a specific survey is the actual panel member.[11]

California Survey Research Services programmed and hosted the survey. I have personally reviewed the data on which the present report is based. All completed questionnaires were evaluated by California Survey Research Services for consistency and for evidence that

---

[11] Council of American Survey Research Organizations, Code of Standards and Ethics for Survey Research, http://www.casro.org/codeofstandards.cfm.  See also: Gabriel M. Gelb and Betsy D. Gelb (2007), "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, 97 (5), 1073 – 1088.

Appx. 565

respondents followed the directions, a process known in survey research as editing.[12] Coding classifications for responses to open-ended questions in the survey were developed by professional coders employed by California Survey Research Services. These coders have no knowledge of the sponsor or purpose of the survey. I personally reviewed and approved these coding classifications, which were subsequently used by the coders to classify open-ended responses and for data tabulation and reporting.[13] **Exhibit D** provides the codebook used for coding the verbatim responses to the open-ended questions.

Main Questionnaire

      **Exhibit C** provides a copy of the main questionnaire including the image to which respondents were exposed and the questions they were asked. The main questionnaire for the survey began by asking respondents to assume that they had carried out a Google search using the search term "The Texas Hammer." They were then shown a screen image of the results of this search. The image included three sponsored advertisements: Accident Injury Legal Center, Semi Truck Settlement, and Adler. Each respondent was asked to review this image and then answer which advertisement they would select if they were seeking to reach "The Texas Hammer." Respondents were not required to make a selection and were given an explicit "I would not click on any" option. Respondents who did not select an option were thanked and their survey was concluded. Respondents who selected a link advanced to a series of questions. Respondents were asked:

---

[12] William G. Zikmund, Barry J. Babin, Jon C. Carr, and Mitch Griffin (2012), *Business Research Methods*, 9th Edition, (Mason, OH: Cengage Learning), Chapter 19. Editing is also common in surveys sponsored by the Federal government, see Linda L. Stinson and Sylvia Kay Fisher (1996), "Overview of Data Editing Procedures in Surveys Administered by the Bureau of Labor Statistics: Procedures and Implications," paper to be presented at the first International Computer-Assisted System Information Computing (CASIC) Conference to be held in San Antonio, Texas on December 12, 1996.

[13] The codebook used for coding of verbatim responses to the open-ended questions and tabulations of the coded responses is provided in Appendix D.

Q.1.  Thinking about the ad you selected, do you think this advertisement is <u>put out by the same personal injury attorney for which you were searching</u>?

1 = Yes (is likely) (CONTINUE)

2 = No (is NOT likely) (GO TO Q.2.)

3 = Don't know (GO TO Q.2.)

[PROGRAMMING NOTE: FOR THOSE THAT SELECTED "1-YES (IS LIKELY)," GO TO Q1a, otherwise go to Q2]

Q.1a.  You indicated that the ad is likely to be put out by the same personal injury attorney for which you were searching. Why do you think this?  Please be as complete as possible, as it will help us understand your answer. [END SURVEY]

Q.2.  Now thinking about the ad you selected, do you think the services being advertised <u>are likely affiliated, associated or connected with the personal injury attorney for which you were searching</u>? If you don't know, feel free to say so.

1 = Yes (is likely) (CONTINUE)

2 = No (is NOT likely) (GO TO Q.3.)

3 = Don't know (GO TO Q.3.)

PROGRAMMING NOTE: FOR THOSE THAT SELECTED "1-YES (IS LIKELY)," GO TO Q2a, otherwise go to Q3]

Q.2a.  You indicated that the services being advertised in the ad you selected <u>are likely to be affiliated, associated or connected with the personal injury attorney for which you were searching.</u>  Why do you think this?  Please be as complete as possible, as it will help us understand your answer. [END SURVEY]

Q.3.  Now thinking about the ad you selected, do you think the services being advertised <u>are likely to have the authorization, approval or endorsement of the personal injury attorney for which you were searching</u>? If you don't know please feel free to say so.

1 = Yes (is likely) (CONTINUE)

2 = No (is NOT likely) (END SURVEY)

3 = Don't know (END SURVEY)

PROGRAMMING NOTE: FOR THOSE THAT SELECTED "1-YES (IS LIKELY)," GO TO Q3a, otherwise END SURVEY]

Q.3a.  You indicated that the services being advertised in the ad you selected <u>are likely to have the authorization or approval of the personal injury attorney for which you were searching.</u>  Why do you think this?  Please be as complete as possible, as it will help us understand your answer.

<u>Survey Was Conducted by Qualified Persons Following Proper Procedures</u>

I personally designed the survey. Under my supervision, California Survey Research Services, a well-known Internet, mail, and telephone survey research agency that has implemented survey research for leading companies, government agencies, and not-for-profit organizations throughout the United States, coordinated computer programming, data collection,

coding and data tabulation. I have worked with California Survey Research Services for more than two decades and have found their work to be of high quality and reliability. The list of potential respondents was provided by Dynata, one of the largest and most widely used providers of Internet based panels (See **Exhibit B**). I have conducted numerous surveys using Dynata consumer panels and have found the samples obtained from these panels to be of high quality and representative of larger populations of consumers.

Process Was Conducted to Ensure Objectivity

The present survey was "double-blind." Respondents and line personnel in the survey research agency were not informed of the purpose and sponsorship of the study. Without such knowledge, the possibility that some respondents might correctly guess the purpose and/or the sponsor of the investigation is decreased. Similarly, without knowledge of the purpose and sponsorship of the survey, research agency personnel involved in such tasks as coding are unlikely to bias results in any particular direction.[14] Per California Survey Research Services, data collection began on June 19, 2020 and was completed on July 2, 2020. The cost of field work for the project was $8,700.

**Findings**

Summary tabulations of the results of the survey are provided in **Exhibit E**.

A representative sample was obtained of 400 consumers 18 years of age or older who reside in the state of Texas and who indicated that they had previously used the services of a personal injury attorney or would consider using such services in the future if they sustained an

---

[14] An advantage of an Internet survey is that it eliminates any potential for interviewer bias because there are no interviewers. See Gabriel M. Gelb and Betsy D. Gelb (2007), "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, 97 (5), 1073 – 1088.

injury. In this survey respondents were first told to assume that they had used Google on their mobile phone to search for "The Texas Hammer." They were then shown an image showing the result of their search. Three sponsored advertisements were presented in this image: Accident Injury Legal Center (the alleged infringer); Semi Truck Settlement (the control); and Adler. In response to the question about which one of the advertisements they would select if they were seeking "The Texas Hammer," 47% of the respondents selected Accident Injury Legal Center, 3% selected Semi Truck Settlement, 32% selected Adler, and 19% did not select an advertisement. Applying the traditional correction for guessing by subtracting the percent of respondents who selected the control (Semi Truck Settlement) from the percent of respondents who selected the alleged infringing advertisement (Accident Injury Legal Center) yields a level of net confusion of 44% (47% - 3%).

Even with the correct response among the alternatives (the senior mark, "The Texas Hammer") more respondents selected the alleged infringing advertisement than the correct advertisement associated with Adler. In response to a direct question (Q1), 48% of all respondents who selected the Accident Injury Legal Center advertisement indicated that it was for the same firm as the one that uses the mark "The Texas Hammer."[15] When respondents who selected the Accident Injury Legal Center advertisement were asked an open-ended question about why they selected the ad, 30% indicated that the reason was because the advertisement was in some way associated with the firm that uses "The Texas Hammer" mark (Q1a).

Even with the correct response (Adler) among the alternatives, more respondents selected the alleged infringing advertisement than the ad for Adler. Including the correct advertisement

---

[15] In response to additional questions, Q2 and Q3, another 23% of the respondents who selected the Texas Accident Lawyers link indicated that they thought there was some association between Texas Accident Lawyers and the firm that uses the "Texas Hammer" moniker or believed that Texas Accident Lawyers would need to obtain the permission or approval of the firm that uses the "Texas Hammer" moniker.

Appx. 570

among the alternatives provides a highly conservative estimate of confusion. While Adler may appear in actual search results in the market, this will not always be the case because search results are dynamically generated. It is likely that even more consumers would select the Accident Injury Legal Center advertisement in the absence of the Adler alternative.

## Conclusions

These results provide strong evidence that a substantial number of consumers are likely confused when confronting Accident Injury Legal Center's advertisement as to the relationship between Accident Injury Legal Center and the law firm doing business as "The Texas Hammer."

Executed this <u>11</u><sup>th</sup> day of <u>July, 2022</u> at <u>Spring Hill, Tennessee</u>.

_____

David W. Stewart, Ph.D.

**Appx. 571**

# EXHIBIT 28

(To the Declaration of Diana Rausa)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **JIM S. ADLER, P.C. and JIM ADLER,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MCNEIL CONSULTANTS, LLC,** | § | **Civil Action No. 3:19-CV-02025-K-BN** |
| **d/b/a ACCIDENT INJURY LEGAL** | § | |
| **CENTER, QUINTESSA MARKETING,** | § | |
| **LLC d/b/a ACCIDENT INJURY LEGAL** | § | |
| **CENTER, AND LAUREN VON** | § | |
| **MCNEIL,** | § | |
| | § | |
| *Defendants.* | § | |

---

## DEFENDANTS' OBJECTIONS AND RESPONSES TO
## PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

---

TO:   Plaintiffs Jim S. Adler, P.C. and Jim. Adler, by and through their counsel of record, Jered E. Matthysee and Giuliio Yaquinto, PIRKEY BARBER PLLC, 1801 East 6th Street, Suite 300, Austin, Texas 78702; Kurt Kuhn, KUHN HOBBS PLLC, 2310 Rutland Street, Houston, Texas 77008; and Garrett W. Mize, JIM S. ADLER AND ASSOCIATES, The Tower at City Place, 2711 North Haskell Avenue, Suite 2500, Dallas, Texas 75204.

Pursuant to Federal Rule of Civil Procedure 198, Defendants McNeil Consultants, LLC

d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center,

and Lauren Mingee ("Defendants") serve their *Objections and Responses to Plaintiff's First*

*Requests for Admission* as follows:

## OBJECTIONS AND RESPONSES

**REQUEST NO. 1:** Admit that you do not have Adler's authorization to use the Adler Marks in connection with Keyword Advertisements.

**RESPONSE:** Defendants object to this Request as misleading because Defendants do not need to obtain Adler's authorization to bid on the Adler Marks as keyword search terms. Defendants also object that this Request is vague and ambiguous with respect the phrase "use the Adler Marks in

---

connection with Keyword Advertisements." Defendants do not use the Adler Marks in the text of their advertisements.

Subject to and without waiving these objections, admit.

**REQUEST NO. 2**:  Admit that you compete directly with Adler in online search engine marketing to develop leads for personal injury cases.

**RESPONSE:**  Defendants admit that Quintessa competes directly with Adler in some, but not all, auctions for certain search engine keywords in online search engine marketing to develop leads for personal injury cases.

**REQUEST NO. 3:**  Admit that you compete with Adler in bidding on and purchasing the Adler Marks as keywords.

**RESPONSE:**  Defendants admits that Quintessa competes directly with Adler in some, but not all, auctions for the Adler Marks as search engine keywords in online search engine marketing to develop leads for personal injury cases.

**REQUEST NO. 4:**  Admit that you have received phone calls from potential clients that were trying to contact a specific lawyer or law firm and contacted you by mistake.

**RESPONSE:**  Defendants object to this Request as vague, ambiguous, and requiring speculation as to what potential clients were "trying to do."

Subject to and without waiving these objections, Defendants lack sufficient information to admit or deny this request.

**REQUEST NO. 5:**  Admit that, prior to August 2019, you had received phone calls from potential clients that were trying to contact Adler and contacted you by mistake.

**RESPONSE:**  Defendants object to this Request as vague, ambiguous, and requiring speculation as to what potential clients were "trying to do."

Subject to and without waiving these objections, Defendants lack sufficient information to admit or deny this request.

**REQUEST NO. 6:**  Admit that, since August 2019, you have received phone calls from potential clients that were trying to contact Adler and contacted you by mistake.

---

**RESPONSE:** Defendants object to this Request as unduly burdensome as it would require Defendants to conduct a lengthy, expensive and burdensome analysis to confirm or disprove the predicate of the Request. The information sought by this Request may be derived from the information provided in documents produced in this case, including ADLER_000631-640 and ADLER_000649-661.


DATE: August 31, 2022                           Respectfully submitted,

                                                */s/ Christopher J. Schwegmann*
                                                Christopher J. Schwegmann
                                                Texas Bar No. 24051315
                                                cschwegmann@lynnllp.com
                                                Rebecca L. Adams
                                                Texas Bar No. 24098255
                                                radams@lynnllp.com
                                                Barira Munshi
                                                Texas Bar No. 24095924
                                                **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                                2100 Ross Avenue, Suite 2700
                                                Dallas, Texas 75201
                                                214-981-3800 – Telephone
                                                214-981-3839 – Facsimile

                                                **ATTORNEYS FOR DEFENDANTS
                                                MCNEIL CONSULTANTS, LLC D/B/A
                                                ACCIDENT INJURY LEGAL CENTER,
                                                QUINTESSA MARKETING, LLC D/B/A
                                                ACCIDENT INJURY LEGAL CENTER,
                                                AND LAUREN VON MCNEIL**


## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2022, a true and correct copy of the foregoing was served via email upon all counsel of record.


                                                */s/ Rebecca L. Adams*
                                                Rebecca L. Adams