**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JIM S. ADLER, P.C., AND JIM ADLER,** | § | |
| | § | |
| *Plaintiffs,* | § | <span style="color:red">**FILED UNDER SEAL**</span> |
| | § | |
| v. | § | **CA NO. 3:19-CV-02025-K-BN** |
| | § | |
| **MCNEIL CONSULTANTS, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | **JURY DEMAND** |
| **QUINTESSA MARKETING, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | |
| **AND LAUREN VON MCNEIL,** | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................6

II.     FACTUAL BACKGROUND ..............................................................................7

        A.      Lauren Mingee, a Young Entrepreneur and Trailblazer ...................7

        B.      Google Keyword Bidding.........................................................................8

        C.      Consumers Are Proficient with Search Engines. ...............................10

        D.      The Adler Law Firm Can't Beat Its Competitors. .............................11

        E.      If You Can't Beat 'em, Sue 'em. ...........................................................14

III.    ARGUMENT AND AUTHORITIES ................................................................14

        A.      Summary Judgment Standard on Likelihood of Confusion. ............14

        B.      Adler's Proffered Evidence Does Not Prove Likelihood of Confusion. ....................16

                1.      Digits 1 and 2 are Not Informative in Keyword Bidding Cases. ....................16

                2.      Digits 3 through 5 Are Not Informative in Cases Involving Close Competitors. ........................19

                3.      Digit 6: Adler Has Not Proven Intent to Mislead or Confuse........................20

                4.      Digit 7: Adler Has Not Proven Actual Confusion as a Matter of Law........................23

                5.      Digit 8: Adler Has Not Proven That Consumers are Unsophisticated as a Matter of Law........................29

        C.      Adler is Not Entitled to Injunctive Relief...........................................32

        D.      Adler is Not Entitled to Disgorgement of Quintessa's Profits.....................33

IV.     CONCLUSION ................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. JAND, Inc.*, No. 21 Civ. 6966, 2022 WL 2316181 (S.D.N.Y. June 27, 2022) ...............................................................................................................17

*1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229 (10th Cir. 2013)..................................... 16, 17, 30, 31

*Abraham v. Alpha Chi Omega*, 781 F. Supp. 2d 396 (N.D. Tex. 2011) ......................................19

*All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498 (5th Cir. 2018)............................................. 18, 19

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp.3d 260 (S.D.N.Y. 2018) ...............................................................................................passim

*Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016) ...........................................................................16

*BMC Software, Inc. v. Hughes,* Civil Action H-19-4810, 2022 WL 5406943 (S.D. Tex. 2022) ................16

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997)........................................................................................................26

*Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169 (7th Cir. 1996) ........................................26

*Elvis Presley Enters. v. Capece*, 141 F.3d 188 (5th Cir. 1998) .........................................................15

*Eppendorf v. Ritter GmbH*, 289 F.3d 351 (5th Cir. 2002) ............................................................15

*Firebirds Int'l, LLC v. Firebird Rest. Group, LLC,* 397 F. Supp. 3d 847 (N.D. Tex. 2019) .......................19

*Flushing Bank v. Green Dot Corp.*, No. 13-Civ-9120, 2015 WL 5802385 (S.D.N.Y. Oct. 5, 2015)....................................................................................................................................25

*Ford Motor Co. v. O.E. Wheel Distribs., LLC,* 868 F. Supp. 2d 1350 (M.D. Fla. 2012) ...........................15

*Future Proof Brands, L.L.C.*, 982 F.3d at 297...............................................................................29

*General Steel Domestic Sales, LLC v. Chumley*, 2013 WL 1900562 (D. Colo. 2013) ..................................18

*George and Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383 (4th Cir. 2009)......................... 24, 25

*Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207 (S.D.N.Y. 2012) .........................................14

*Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996) ......................................................22

*Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274 (D. Mass. 2009) ............................... 18, 24

*Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100 (6th Cir. 1991) ................................26

*Instant Media, Inc. v. Microsoft Corp.*, C 07-02639 SBA, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) ..................................................................................................................26

*Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422 (5th Cir. 2021) ...........................24

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 125 S.Ct. 542 L. Ed. 2d 440 (2004) ................14

*Lang v. Ret. Living Pub. Co.*, 949 F.2d 576 (2d Cir. 1991) ......................................................................................................26

*Mary Kay, Inc. v. Weber*, 661 F.Supp.2d 632 (N.D. Tex. 2009).............................................. 21, 32

*Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330 (Fed. Cir. 2004) ...............................26

*Neles-Jamesbury, Inc. v. Valve Dynamics, Inc.*, 974 F.Supp. 964 (S.D. Tex. 1997) .........................................22

*Network Automation v. Advance Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011) ............... 16, 17, 19, 20

*New England Mercantile Grp., LLC v. Barnell*, No. X03HHDCV146069683S, 2019 WL 2307446 (Conn. Super. Ct. Apr. 2, 2019)..................................................................................17

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114 (2d Cir. 2001)...............................................26

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) .......................................................................30

*Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166 (5th Cir. 1986) ..................................................29

*Overstock.com, Inc. v. Nomorerack.com, Inc.* ....................................................................................24

*Pebble Beach Co. v. Tour*, 18 I Ltd., 155 F.3d 526 (5th Cir. 1998) ................................................33

*Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88 (4th Cir. 1997)......................... 24, 26

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir.2004) ...........................................20

*RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679 (S.D. Tex. 2009) ...........................16

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012)...................................................................16

*S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754 (N.D. Tex. 2013) .........................................................7

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir.2004)...............................................passim

*Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988) ........................................................................30

*Smack Apparel Co.*, 550 F.3d at 483.......................................................................................................29

*Society of Financial Examiners v. National Association of Certified Fraud Examiners, Inc.*, 41 F.3d 223 (5th Cir.1995)................................................................................................ 22, 28

*Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805 (5th Cir. 2019)......................... 15, 29

*Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994) .........................................................28

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440 (5th Cir. 2017) ..................................................... 15, 26, 28, 29

*Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112 (2d Cir.1984)................................29

*US Risk Ins. Grp., Inc.*, 2013 WL 4504754 ...............................................................................29

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221 (5th Cir. 2009)..................................15

**Other Authorities**

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:14 (4th ed.2014)..........................................................................................................24

627 Fed. Appx. 682, 2015-2 Trade Cas. (CCH) ¶ 79255 (10th Cir. 2015).................................18

Franklyn and Hyman, Trademarks as Keywords: Much Ado About Something?, 26 Harv. J.L. & Tech. 481, .......................................................................................10

Goldman, Brand Spillovers, 22 Harv. J.L. & Tech. 381 (Spring 2009)............................................ 10, 18

Goldman, Deregulating Relevancy in Internet Trademark Law, 54 Emory L. J. 507, 566 (Winter 2005) .......................................................................................................18

McCarthy on Trademarks and Unfair Competition § 25A:7 (5th ed.)...........................................passim

Professional Ethics Committee for the State Bar of Texas  Opinion No. 661 at 2-3 (July 2016)..................................................................................................................10

Professional Ethics Committee for the State Bar of Texas  Opinion No. 661 at 2-3 (July 2016)..................................................................................................................21

Restatement (Third) of Unfair Competition § 20 .....................................................................26

# I.    INTRODUCTION

If you can't beat 'em, sue 'em. That is the tactic Adler employs in bringing the lawsuit against his largest search engine marketing competitor, Quintessa. Adler's internal communications show that before filing this lawsuit, Adler fell prey to an all-encompassing obsession with beating Quintessa in search engine marketing ("SEM") by bidding on keywords that included his marks. Adler was adamant about beating that "internet leech" (as he referred to Quintessa and any other competitor who bid on his marks) regardless of whether it made good business sense to do so and no matter what it cost him.

However, as Adler soon found out, Quintessa was (and still is) lightyears ahead of Adler in terms of search engine marketing strategy and sophistication. No matter how hard Adler tried, he could not crack the code on Quintessa's successful SEM and keyword bidding strategies, and he was not able to beat Quintessa fair and square in the SEM arena.

On August 20, 2019, Adler's SEM consultant informed Adler that, due to increased keyword bidding competition on his name, his SEM budget would not last till the end of the month. *"[W]e need to file that suit and injunction asap*," Bill Adler told his dad. Just two days later, this lawsuit was born. Not because of consumer confusion. But because Adler wanted to be listed first among the advertisements on Google's search engine results page.

But no law prohibits Quintessa—or other law firms or lead generation agencies—from bidding on branded keywords or the trademarks of another in search engine advertising. So Adler has invented an alleged "scheme" whereby Quintessa purportedly confuses searchers with its advertisements into thinking they are advertisements for Adler—even though Quintessa's advertisements don't reference the Adler Marks *anywhere* in its advertisements and Quintessa now takes additional steps to identify itself as a third-party intake department. The truth is, there is not a single internal Adler email concerning consumer confusion related to Quintessa's marketing. In fact, Adler did not have any evidence of consumer confusion *at all* until he sought document discovery after this

lawsuit was filed. Even then, Quintessa's data shows that, at most, only 4.7% of its callers from its competitive bidding campaign ever mention Adler. That's because most people using search engines are proficient with searching and are aware of search result advertisements. Any confusion that may exist is *de minimis*, and Adler's feigned concern over confusion is a thin guise for his true agenda of ridding himself of an SEM competitor.

Now, Adler moves for summary judgment on trademark infringement and unfair competition,[1] and seeks a permanent injunction and award of equitable disgorgement of Quintessa's profits. Adler's motion must be denied. Adler cannot meet his burden to establish likelihood of confusion as a matter of law, and in the face of overwhelming contrary evidence, at best, a fact issue exists for a jury to decide. Adler further has failed to meet his burden to show he is entitled to a permanent injunction and disgorgement of Quintessa's profits as a matter of law.[2]

## II.     FACTUAL BACKGROUND

### A.  Lauren Mingee, a Young Entrepreneur and Trailblazer.

Lauren Mingee is a successful entrepreneur, volunteer, mentor, and longtime advocate for women.[3] Though Mingee is now the CEO of Quintessa Marketing, LLC, a lead-generating company she founded in 2019,[4] Mingee began her career in management and sales at AT&T in 2008.[5] By 2010, Mingee was working for an advertising agency where she developed commercials for personal injury lawyers.[6] During this time, Mingee began to learn about search engine optimization (SEO) and how to assist her clients to develop their website and content to rank in the No. 1 position on Google.[7]

---

[1] "Unfair competition claims under the Lanham Act are governed by the same standard as those for trademark infringement, *e.g.*, the likelihood of confusion." *S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 762 (N.D. Tex. 2013) (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir.2004)).

[2] The live pleadings in this case are Adler's Third Amended Complaint (Dkt. 60) and Defendants' Answer (Dkt. 47).

[3] https://www.prweb.com/releases/2022/7/prweb18801067.htm; App. 1-3 (Mingee Decl. ¶¶ 2, 13-14).

[4] App. 1 (Mingee Decl. ¶ 2).

[5] App. 12 (Mingee Dep. 15:1-12).

[6] App. 13 (Mingee Dep. 18:12-17).

[7] App. 14 (Mingee Dep. 21:10-16).

Mingee began to work exclusively on SEO for attorneys, and after several years of managing attorney clients and helping law firms manage after-hour telephone calls, in 2015, Mingee started to learn about pay-per-click (PPC) Google Ads.[8]

After working for others for several years, Mingee took her years of experience and knowledge in internet advertising for law firms and attorney call-center management and created McNeil Consultants, LLC in 2016.[9] Through McNeil Consultants, LLC, Mingee focused on PPC advertising, began operating her own call center, and generating leads by running call-only[10] advertisements on Google Ads under the name "Accident Injury Legal Center" (AILC).[11]

In 2019, Mingee re-branded under the name Quintessa Marketing, LLC. Located in Oklahoma City, with 55 employees, Quintessa is, at its essence, a marketing firm.[12] Mingee created Quintessa to bridge the gap between lawyers and accident injury victims through meaningful internet advertising.[13] With over 37 law firm clients across 40 states, Quintessa specializes in giving personal injury law firms a competitive edge in marketing by delivering high-quality client leads.[14] It gathers necessary information from potential new clients, vets them, and then signs them up on a law firm's retainer agreement.[15]



[18]

### B.  Google Keyword Bidding.

---

[8] *Id.* at App. 15, 16-17 (Mingee Dep. 26:5-10; 30:23-31:5).
[9] App. 37 (Mingee Corp. Rep. Dep. 103:4-6).
[10] *Id.*
[11] App. 18-19, 20 (Mingee Dep. 51:22-52:7; 54:12-14).
[12] App. 1 (Mingee Decl. ¶ 3).
[13] *Id.*; https://www.prweb.com/releases/2022/7/prweb18801067.htm
[14] App. 2 (Mingee Decl. ¶4).
[15] App. 1 (Mingee Decl. ¶ 3).
[16] App. 1 (Mingee Decl. ¶ 3).
[17] *Id.*
[18] *Id.*

Google is the most used online search engine and holds approximately 92 percent of the global search engine market.[19] When someone enters a search term or a query into a search engine, among other types of results, the searcher is presented with organic results (unpaid websites) and paid advertisements.[20] Advertisements on a Search Engine Result Page (SERP) are displayed as a result of the words in the search query and keyword bidding by advertisers.[21] Advertisers can bid on certain keywords so that their ads have the opportunity to appear when searches contain these words.[22] Advertisers generally pay the search engine only when people click on the ads shown in the search results, known as (PPC) advertising or paid search.[23] Advertisers are not charged for the ads appearing; advertisers only pay when a searcher clicks on a displayed ad.[24]

An advertiser can bid on different kinds of search words (*i.e.* keywords), including branded keywords which may be a competitor's brand names (like "Jim Adler") or generic words (like "car accident attorney").[25] Competitor bidding is a practice that occurs across several industries, including the legal industry. Competitive bidding is a well-known practice among advertisers, and many searchers encounter this situation frequently when online searching.[26] Even Adler's external SEM consultant engages in competitive keyword bidding for its other clients.[27]

Advertisements can appear in several forms. One example is click-to-call. In response to a search query on a mobile device, advertisements may appear as click-to-call ads, which allow the

---

[19] App. 45 (Leathers ¶ 12).
[20] App. 139-140 (Jansen ¶¶ 35-36).
[21] App. 146 (Jansen ¶ 49).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *See id.* App. 146 (Jansen ¶ 50).
[26] *Id.* App. 148 (Jansen ¶ 55).
[27] App. 239-240 (Madrigal Dep. 181:2-5; 181:22-182:4 ("Q: ███████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████

searchers to call a phone number directly by clicking on the ad's link.[28] In all other respects, a click-to-call ads is the same as a typical search engine ad in appearance and function.[29] Click-to-call advertising has been around for over a decade, and is a format familiar to searchers using mobile devices.[30]

Advertising on Google is as much of an art as it is a science. Adler's SEM specialists recognize that there are numerous types of bidding strategies along with several factors that Google's algorithm considers when auctioning ads and determining their placement.[31]

### C. Consumers Are Proficient with Search Engines.

Most consumers using search engines are proficient with searching and are aware of search result advertisements, such as sponsored links and google advertisements.[32] Eric Goldman, one of the leading experts in the fields of internet law and intellectual property, notes that "many consumers entering a trademarked search term may not be looking for the trademark owner's goods or services."[33] Recent surveys and studies show that consumer search expectations are decidedly mixed.[34] One survey found that 47% of respondents said they wanted information about the specific brand they searched for, 31% wanted information about similar products from other brands and 22% had no preference.[35] The Professional Ethics Committee for the State Bar of Texas also recognizes that "a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are

---

[28] *Id.* App. 142 (Jansen ¶42).

[29] *Id.*

[30] *Id.* App. 143 (Jansen ¶ 44).

[31] App. 237-238 (Madrigal Dep. 44:16-45:2 (identifying Target CPA, Target ROAS, maximized clicks, max conversions, Target Impression Share as smart bidding strategies)).

[32] App. 135 (Jansen ¶ 22).

[33] Goldman, Brand Spillovers, 22 Harv. J.L. & Tech. 381, 412 (Spring 2009).

[34] Franklyn and Hyman, Trademarks as Keywords: Much Ado About Something?, 26 Harv. J.L. & Tech. 481, 517 (2013); *see also* App. 150-151 (Jansen ¶¶ 63-64).

[35] 5 McCarthy on Trademarks and Unfair Competition § 25A:7 (5th ed.) (citing Franklyn and Hyman, Trademarks as Keywords: Much Ado About Something?, 26 Harv. J.L. & Tech. 481, 517 (2013); *see also* App. 1~~50~~49-151 (Jansen ¶¶62-64 (explaining the three different kinds of use intent as informational, navigational, or transactional)).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**                                                                                                    **PAGE 10**

advertisements presented on web pages showing search results.”[36] McCarthy has also opined on consumer search behavior, stating that “[i]n the author's view, a computer user who sees a search engine results page and clicks on a non-deceptive advertising link resulting from a trademark keyword purchased by a competitor is not confused as to the source or affiliation of any ultimate purchase that is made from that website.”[37] The appearance of an ad on a SERP does not mean that a person will click on the ad.[38] Click-through rates for ads are usually low; most clicks occur on the organic results.[39] Low click-through-rates is typical and not surprising among consumer search behavior because today searchers are adept at circumventing ads or employing ad blockers.[40] According to Jansen, even if an ad is clicked on, it does not mean that a user will convert, *i.e.,* make a transaction; conversions for ads are low and more clicks do not lead to more conversions.[41]

### D. The Adler Law Firm Can't Beat Its Competitors.

Jim Adler is perhaps best known for his flashy, over-the-top, television and radio advertisements. And while competitive bidding and PPC has been around since the early 2000's, Google advertising is not, and never has been, the focus of Adler's advertisement efforts.



In 2019, once Adler learned that his competitors, including law firm clients and lead generators, were bidding on Adler's branded terms,

---

[36] App. 294-295 (Professional Ethics Committee for the State Bar of Texas  Opinion No. 661 at 2-3 (July 2016)).
[37] 5 McCarthy on Trademarks and Unfair Competition § 25A:8 (5th ed.)
[38] App. 148 (Jansen ¶ 56).
[39] *Id* at App. 148-149 (Jansen ¶ 57).
[40] *Id.*
[41] *Id.* at app. 149 (Jansen ¶ 58).
[42] App. 242-244, 245-251 (ADLER_000646, ADLER_000644).
[43] *Id.*
[44] *Id.*



In April of 2019, Adler sought to advertise in a segment he knows nothing about—call-only advertising.[47] After a month, Adler was not pleased with the results; Adler's ad appeared in the 2nd position in San Antonio (meaning the second of three sponsored ads that are shown on the SERP).[48] Accident Injury Legal Center (operated by Quintessa) took the top or number 1 position in all three of Adler's Texas markets.[49] In one of Adler's many attempts to stifle the competition, Adler's SEM Specialist, Wendy Echeverri, submitted a complaint to Google alleging that AILC's ads were misleading.[50] In a May 9, 2019 email to Adler's external SEM consultant, Echeverri wrote:

> *I'll keep you posted on what the result of this Google Ads complaint is. The language on Accident Injury Help Center's website and old landing page at the top says "Speak to an attorney today"* **so maybe Google will consider the text to be misleading and push their ads down? I can only try.**[51]

But Adler admits that complaints to Google did not work either.[52] In fact, after complaining to Google and asking Google to prohibit Quintessa from bidding on Adler's branded terms, Google didn't even respond to Adler's complaint.[53] And why would Google do that? Google's own Trademarks and Advertising Policies states that "We don't investigate or restrict trademarks as keywords."[54]

---

[45] *Id.,*
[46] *Id.*
[47] App. 251-252 (ADLER_000844).
[48] App. 253-255 (ADLER_000852).
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] App. 298 (J. Adler Depo. at 97:7-11).
[53] *Id.* at App. 298 (97:15-18).
[54] https://support.google.com/adspolicy/answer/6118?hl=en

Frustrated by the fact that Quintessa is simply better at SEM than Adler, Jim Adler became fixated on being in the number one spot, also known as "absolute top" for sponsored advertisements 24 hours of the day, 7 days a week, 365 days a year, whether or not the top position resulted in more client referrals.[55] In order to maintain the absolute top 24/7, Adler's external marketing consultant, Monica Madrigal, ████████████████████████████████████████████████ ████████ By doing so, Madrigal hoped that "some or most of our competition wouldn't be able to compete with the increased CPCs and would back down."[57] Echeverri, however, admitted that it is nearly impossible to maintain the absolute top position in sponsored advertisements 24/7.[58]

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████  ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████  ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████  ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

---

[55] App. 260 (Echeverri Dep. at 72:13-20).

[56] *Id.* at App. 261 (Echeverri Dep. 73:1-9).

[57] *Id.* at App. 262 (Echeverri Dep. 74:4-9).

[58] *Id.* at App. 259 (Echeverri Dep. 67:5-15).

[59] *Id.* at App. 263-264, 262, 265, 265-266 (Echeverri Dep. 103:23-104:9; 104:18-21; 105:2-13; 105:22-106:1).

[60] *Id.* at App. 268 (Echeverri Dep. 178:20-23).

[61] *Id.* at app. 269-270 (Echeverri Dep. 181:18-182:18).

[62] App. 275-277 (ADLER_001837).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**                                                    **PAGE 13**

███████████████████████████████████████

███████████████████████████████████████

### E.  If You Can't Beat 'em, Sue 'em.

Fed up that Adler couldn't beat Quintessa fair and square by using Google's advertising platform as designed, and despite throwing more money into his branded keyword advertising budget, Adler decided to sue his competitors.[64] In the months leading up to filing this lawsuit, **not once** did Jim Adler, Bill Adler, any employee on Adler's internet marketing team, or any Adler consultant express concern about searchers being confused by Quintessa's advertisements. Nor does Adler have evidence that any client or prospective client of his ever reached out to Adler's office to complain about Quintessa's advertising. Rather, Jim Adler focused on chilling **all** competition—and especially Quintessa—who he referred to as "internet leeches" to reduce his own costs of advertising.[65]

### III.    ARGUMENT AND AUTHORITIES

### A.  Summary Judgment Standard on Likelihood of Confusion.

The moving party's burden on summary judgment is to demonstrate conclusively the non-existence of any material question of law or fact. Any party seeking affirmative summary judgment, or more accurately here, affirmative partial summary judgment on a discrete issue—the likelihood of confusion—bears an extraordinarily heavy burden. The likelihood of confusion analysis entails not only the eight digits of confusion, but proof sufficient to affirmatively negate all of the affirmative defenses which independently would defeat a likelihood of confusion finding. *See generally KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 125 S.Ct. 542, 160 L. Ed. 2d 440 (2004).

---

[63] *See* App. 278-280 *(*ADLER_001817-1819).

[64] *See* App. 278-280 *(*ADLER_001817-1819 ("This is ridiculous. All the money we're spending and we're not even showing up in the top three in Google ad words")).

[65] App. 267, 268, 281-284 (Echeverri Dep. at. 125:10-23; 178:10-19; ADLER_001021-24).

Because Plaintiffs are seeking partial summary judgment on the issue of "likelihood of confusion" under federal trademark or unfair competition theories, their burden is exceptionally onerous. Plaintiffs must demonstrate that it is entitled to judgment as a matter of law on the likelihood of confusion with respect to *each* of the Adler Marks. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 222 (S.D.N.Y. 2012) (stating that each mark must be examined separately where infringement is asserted against multiple marks); *Ford Motor Co. v. O.E. Wheel Distribs., LLC,* 868 F. Supp. 2d 1350, 1364 (M.D. Fla. 2012) ("In determining whether Ford has met its burden on its trademark infringement… it is necessary to now analyze each of OEW's alleged infringing uses of Ford marks in order to determine whether any such use resulted in a likelihood of confusion.").

The movant seeking summary judgment, consistent with the foregoing authorities, must show that a probable—not just possible—likelihood of confusion exists to a degree that is particularly compelling as a matter of law. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009). Because likelihood of confusion is typically a question of fact, judgment as a matter of law will only be granted where the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion. *Eppendorf v. Ritter GmbH*, 289 F.3d 351, 357 (5th Cir. 2002). No case in this Circuit has, to our knowledge, affirmed or granted partial summary judgment on "likelihood of confusion," in favor of a trademark infringement plaintiff in a case with analogous facts involving keyword bidding. And "[v]irtually no court has held that, on its own, a defendant's purchase of a plaintiff's mark as a keyword is sufficient for liability." *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp.3d 260, 284 (S.D.N.Y. 2018).

In considering the likelihood of confusion, the Fifth Circuit directs courts to consider the following nonexclusive list of factors known as the digits of confusion to decide whether the alleged use of a mark was confusing:

(1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.

*Springboards to Educ., Inc. v. Houston Indep. Sch. Dist*., 912 F.3d 805, 811–12 (5th Cir. 2019) (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc*., 851 F.3d 440, 453 (5th Cir. 2017)). No one factor is dispositive. *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998). "Rather, the court must assess each digit individually and then weigh them as a whole to determine whether there is a likelihood of confusion."[66]

### B. Adler's Proffered Evidence Does Not Prove Likelihood of Confusion.

#### 1. *Digits 1 and 2 are Not Informative in Keyword Bidding Cases.*

The first two digits of confusion— (1) the strength of the mark and (2) mark similarity—have little import, if any, in keyword bidding cases because the only marks at issue are the marks and products of the mark holder. Courts increasingly recognize that it is difficult to apply the traditional trademark infringement factor or digit test to infringement claims arising out of the purchase of trademarks as keywords in the internet advertising arena. *See, e.g., 1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1243 (10th Cir. 2013) (quoting *Rosetta Stone Ltd. v. Google, Inc.,* 676 F.3d 144, 153–154 (4th Cir. 2012) ("in some contexts the application of the traditional multi-factor test is difficult because often many of the factors are either unworkable or not suited or helpful as indicators of confusion" (internal quotation marks omitted), *aff'g in part and rev'd in part*, 755 F. Supp. 2d 1151 (D.C. Utah 2010)).[67]

---

[66] *BMC Software, Inc. v. Hughes,* Civil Action H-19-4810, 2022 WL 5406943, at *3 (S.D. Tex. 2022) (citing *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*., 655 F. Supp. 2d 679, 697 (S.D. Tex. 2009)); *see also Scott Fetzer Co. v. House of Vacuums Inc.,* 381 F.3d 477, 483–84 (5th Cir. 2004), a*brogated in part on other grounds by Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016) ("The digits are a flexible and nonexhaustive list. They do not apply mechanically to every case and can serve only as guides, not as an exact calculus.").

[67] *See also Network Automation v. Advance Sys. Concepts, Inc.,* 638 F.3d 1137, 1154 (9th Cir. 2011) (finding the district court erred in relying on similarity between the marks, similarity between the goods and similarity in marketing channels, which fails to discern whether there is a likelihood of confusion in a keywords case).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Digits 1 (strength of the mark) and 2 (the similarity of the marks) particularly carry little to no weight in the keyword advertising context, where these factors will always weigh against the defendant when a competitor bids on a trademarked keyword, even if they do not indicate probable likelihood of confusion. Courts across the country have recognized that the similarity of the marks being used by the parties "is not the relevant analysis for determining the likelihood of confusion in the context of search term advertising." *1-800 Contacts, Inc. v. JAND, Inc.*, No. 21 Civ. 6966, 2022 WL 2316181, at *5 (S.D.N.Y. June 27, 2022).[68]



Rather, the proper comparison should be between the resulting **ads** for Adler and Quintessa, as this is how consumer confusion in the search-engine context would manifest itself. *See Alzheimer's Disease*, 307 F.Supp.3d at 291[69] Quintessa's advertisements which appear on a search-engine results page (above) shows that Quintessa does not use Adler's marks in its ad header, in the text of its ad, or in the URL for its link.[70]

Adler concedes that Quintessa does not use Adler's Marks in the text of its ads. Mot. at 25. Nevertheless, Adler argues that this critical fact is irrelevant because searchers had to have had Adler's

---

[68] *See also Alzheimer's Disease,* 307 F. Supp. 3d at 287 (use of a plaintiff's mark as an AdWord is diversion not confusion); *Network Automation,* 638 F.3d at 1154 (finding the district court erred in relying on similarity of marks, goods and trade channels because those factors "fail[] to discern whether there is a likelihood of confusion in a keywords case"); *1–800 Contacts,* 722 F.3d at 1245 ("the similarity of the search term and 1–800's mark is of minor relevance…. [An] inference [that a trademark owner is the source of another webpage] is an unnatural one when the entry is clearly labeled as an advertisement and clearly identifies the source, which has a name quite different from the business being searched for"); *New England Mercantile Grp., LLC v. Barnell,* No. X03HHDCV146069683S, 2019 WL 2307446, at *8 (Conn. Super. Ct. Apr. 2, 2019) (rejects argument that the marks are identical when the plaintiff does not claim that the defendant is using its mark or a similar mark in a consumer-facing manner).

[69] "The mere fact of AFA's purchase of the Association Marks either verbatim . . .or nearly verbatim. . .cannot in and of itself cause confusion. . . .When examining the similarity of the marks in the AdWords context, the court must consider the degree of similarity between plaintiff's service mark and the defendant's advertisements appearing on the search-results page." (internal citations and quotations omitted).

[70] App. 2 (Mingee Decl. ¶ 12).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**        **PAGE 17**

Marks in mind to conduct a search leading them to Quintessa's ads. *Id.* But the fallacy of this assumption has been noted by Goldman, who opines that "[I]t is improper to assume that using a trademarked keyword means that the searcher wanted to find the trademark owner … Finding search 'diversion' is not possible until one knows where searchers were heading in the first place.")[71] Goldman continues that "[T]his assumption is unquestionably incorrect; many consumers entering a trademarked search term may not be looking for the trademark owner's goods or services.").[72] A consumer searching a particular trademark is irrelevant to the likelihood of confusion inquiry, which "ultimately turn[s] on what the consumer saw on the screen and reasonably believed, given the context" and not merely what a user searched. *Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 288 (D. Mass. 2009); *see also Alzheimer's Disease*, 307 F.Supp.3d at 292 (weighing the similarity of the marks factor "with consideration of the visual context of the ads but without consideration of the consumer's sophistication or purpose in entering the keyword also without consideration of the differences in websites that the ads link to").

Even if Digit 1 (the strength of the mark) were relevant in this context, Defendants have offered no evidence to carry their burden of proving that each of the four asserted Adler Marks is commercially strong. The strength of a trademark involves two components: its inherent or intrinsic distinctiveness and the distinctiveness it has acquired in the marketplace, *i.e.*, its commercial strength

---

[71] 5 McCarthy on Trademarks and Unfair Competition § 25A:7 fn.5 (5th ed.) (quoting Goldman, Deregulating Relevancy in Internet Trademark Law, 54 Emory L. J. 507, 566 (Winter 2005).

[72] *Id.* (quoting *Goldman, Brand Spillovers*, 22 Harv. J.L. & Tech. 381, 412 (Spring 2009)); accord: *General Steel Domestic Sales, LLC v. Chumley*, 2013 WL 1900562 (D. Colo. 2013), judgment aff'd, 627 Fed. Appx. 682, 2015-2 Trade Cas. (CCH) ¶ 79255 (10th Cir. 2015) (After trial, held that no likelihood of confusion was caused by defendant's use of a competitor's trademark in Google keywords. Court rejected plaintiff's argument that web shoppers inputting plaintiff's trademark "General Steel" were "searching exclusively for that company, as opposed to executing a broader search for all companies selling similar products."); *Alzheimer's Disease and Related Disorders Association, Inc. v. Alzheimer's Foundation of America, Inc.*, 307 F. Supp. 3d 260, 296 (S.D. N.Y. 2018) ("[W]hen consumers enter 'Alzheimer's association' as a search term in the real world, they may be using the term generically and not have a particular organization in mind when searching. In these situations, the consumers cannot be confused by [the accused] ad or webpage….."); *see also* App. 151 (Jansen ¶ 64 ("So, people searching for the query presented in the Stewart Report does not mean these people would have a commercial or a transaction intent. As shown by prior research and the distribution of organic results, the searching intention can be quite varied, even when searching for a business name.)).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

or secondary meaning. *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 509 (5th Cir. 2018). When evaluating the commercial strength of a mark, some factors applied by courts Fifth Circuit include the duration of use and advertising, as well as public recognition. *Firebirds Int'l, LLC v. Firebird Rest. Group, LLC*, 397 F. Supp. 3d 847, 861 (N.D. Tex. 2019). And while Defendants have offered evidence of federal registration of each of the Adler Marks, which supports a finding of inherent distinctiveness,[73] validity, and ownership,[74] federal registration does not prove commercial strength. Adler lumps all four of the asserted Adler Marks as part of Adler's "brand," and suggests that Adler's advertising spend, media recognition, and duration of use of the Adler Marks is sufficient to establish the first factor. But Adler fails to meet his burden to offer evidence of commercial strength of *each* Adler Mark. Thus, even if Digit 1 were relevant in the context of this case, it weighs against Adler on summary judgment for lack of competent evidence.

### 2. Digits 3 through 5 Are Not Informative in Cases Involving Close Competitors.

Digits 3 (the similarity of the products or services), 4 (identity of retail outlets and purchasers) and 5 (identity of the advertising media used) are not informative of likelihood of confusion in the context of close competitors in search engine marketing. *See, Network Automation,* 638 F.3d at 1154 (finding the district court erred in relying on proximity of goods and marketing channels because those factors "fail[] to discern whether there is a likelihood of confusion in a keywords case").

Adler argues, in a conclusory fashion, that because Quintessa directly and closely competes with Adler to develop leads for personal injury cases through internet advertising, that these three factors "strongly" weigh in favor of Adler. Mot. at 26-27. Adler fails to appreciate that these digits, while applicable to traditional trademark infringement cases, in keyword advertising among close competitors "will appear to indicate confusion even if no confusion is likely." *See Scott Fetzer*, 381 F.3d

---

[73] *All. for Good Gov't*, 901 F.3d at 510.
[74] *Abraham v. Alpha Chi Omega*, 781 F. Supp. 2d 396, 407 (N.D. Tex. 2011) ("federal registration of a trademark consists of prima facie evidence of the validity and ownership of the mark").

at 485. By definition, close competitors will target identical or nearly identical purchasers and use identical or nearly identical advertising media for identical or nearly identical products or services.

Digit 3, the similarity of the products or services, weighs, at best, neutral, where Quintessa's advertisements make no mention of Adler and where consumers exercise a high degree of care when exercising choice among similar products. *Network Automation*, 638 F.3d at 1151. Likewise, Digits 4 and 5 weigh, at best, neutral, because the shared use of a ubiquitous marketing channel, *i.e.*, the internet, "does not shed much light on the likelihood of consumer confusion." *Id.*[75] Thus, in this case, Digits 3 through 5 fail to illuminate the likelihood of customer confusion and instead merely reveal what is already clear: Quintessa and Adler are close competitors for personal injury leads.

### 3. Digit 6: Adler Has Not Proven Intent to Mislead or Confuse.

The sixth digit—Defendants' intent—also weighs against Adler's request for summary judgment because, to the extent that Adler has any competent evidence of intent, there is abundant contrary evidence showing a lack of intent creating, at best, a fact issue for the jury. The "intent" digit asks whether the defendant had an intent to confuse consumers. Though Adler takes issue with its competitors bidding on the Adler Marks, McCarthy acknowledges that "liability for trademark infringement has never turned on 'free riding' per se: the test has always been whether there is a likelihood of confusion. Sometimes, 'free riding' is no more than a form of ***fair competition.***"[76] Indeed, competitor bidding is a practice that occurs in many competitive industries.[77]

Here, there is ample evidence that Quintessa had a good faith legal basis for believing that it was permitted to bid on Adler's Marks in keyword advertising. First, it is well-established—in almost every jurisdiction—that bidding on a competitor's trademark as a search engine keyword alone does

---

[75] *See also Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir.2004) ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight.").

[76] 5 McCarthy on Trademarks and Unfair Competition § 25A:8 (5th ed.) (emphasis added).

[77] App. 144 (Jansen ¶ 46).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**                                                                                      **PAGE 20**

not violate the Lanham Act as a matter of law, especially where, as here, Adler's Marks are not displayed in the text of Quintessa's advertisements. *See, e.g., Alzheimer's Disease*, 307 F.Supp.3d at 284 ("[v]irtually no court has held that, on its own, a defendant's purchase of a plaintiff's mark as a keyword is sufficient for liability.").

Indeed, then Chief Judge Fish held that the purchase of another company's trademarks is permissible, *even after a jury finding of willful infringement. See Mary Kay, Inc. v. Weber,* 661 F.Supp.2d 632, 646 (N.D. Tex. 2009) (granting an injunction on other grounds but expressly stating "[t]his holding does not mean . . . that the defendants may not purchase the words 'Mary Kay' as a search term from search engines such as Google or Yahoo.").

Second, the Professional Ethics Committee for the State Bar of Texas issued an opinion squarely on point, stating that "[a] lawyer does not violate the Texas Disciplinary Rules of Professional Conduct by simply using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company."[78] In that opinion, the Committee considered a scenario when a lawyer (Lawyer A) competing in the area of practice similar to his competitor (Lawyer B) bids on Lawyer B's name, resulting in Lawyer A's name appearing on the SERP when a user searches Lawyer B's name.[79] Lawyer A's advertisement appears in the "ads" or "sponsored links" section, displays Lawyer A's name and a link to his website.[80] The Committee found that "since a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results, it appears highly unlikely that a reasonable person using an internet search engine would be misled into thinking that every search result indicates that a lawyer shown in the list of search results has

---

[78] App. 294-295 (Professional Ethics Committee for the State Bar of Texas  Opinion No. 661 at 2-3 (July 2016)).
[79] *Id.* at App. 293 (Professional Ethics Committee for the State Bar of Texas Opinion No. 661 at 1 (July 2016)).
[80] *Id.*

some type of relationship with the lawyer whose name was used in the search."[81] The Committee concluded that a lawyer does not violate the Texas Disciplinary Rules of Professional Conduct simply by using the name of a competing lawyer or law firm as a keyword in the implementation of an advertisement, so long as the lawyer's statements in the ad do not contain false or misleading communications and comply in all other respects with applicable rules on lawyer advertising.[82]

Finally, Google does not restrict the use of trademarks as keywords in its Google Ads program.[83] And Adler's own digital advertising marketing consultant, 3Q Digital/DEPT, competitively bids for its other clients, which by Adler's own consultant's admission is not unethical.[84]

Given that the weight of all authority—legal, ethical, and commercial authorities—indicated (and still do indicate) that it is permissible for Quintessa to bid on Adler's Marks, evidence of Quintessa's bidding activity on the Adler Marks—even heavy or expensive bidding —does not establish bad faith, as Adler contends. Because "summary judgment is rarely proper when an issue of intent is involved," and a reasonable jury may find that the evidence Adler relies upon shows that Quintessa had a good-faith belief it was permitted to bid on Adler's Marks, it would be inappropriate for the Court to make a factual finding as to this digit. *Neles-Jamesbury, Inc. v. Valve Dynamics, Inc.*, 974 F.Supp. 964, 973 (S.D. Tex. 1997) (quoting *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996).[85]

Adler's allegations of bad faith are further undercut by the fact that after the Fifth Circuit reversed dismissal of Adler's complaint on appeal, Quintessa modified its intake script when responding to a caller who mentions a specific third party law firm.[86] Employees in the intake center

---

[81] *Id.* at App. 294-295 Professional Ethics Committee for the State Bar of Texas Opinion No. 661 at 2-3 (July 2016)).

[82] *Id.* at App. 295 Professional Ethics Committee for the State Bar of Texas Opinion No. 661 at 3 (July 2016)).

[83] https://support.google.com/adspolicy/answer/6118?hl=en

[84] App. 239, 239-240 (Madrigal Dep. 181:2-5; 181:22-182:4).

[85] *See also Society of Financial Examiners v. National Association of Certified Fraud Examiners, Inc.*, 41 F.3d 223, 224–25 (5th Cir.1995) ("these fact-intensive inquiries cannot be conducted properly without a trial.").

[86] App. 33, 35-36, 25, (Mingee Corp. Rep. Dep. 86:7-17; 89:22-90:3.; Mingee Dep. 101:1-10 (Q: So just to be clear, it's your position sitting here today that you've instructed them to use the words "third-party" before the words "intake



[90]

Adler contends that Quintessa acted in bad faith because it has allegedly known about actual confusion among callers since 2016 and has received a handful of complaints from attorneys who received referrals from Quintessa. But, for the reasons explained below, the "actual confusion" Adler claims is *de minimis*, and insufficient to warrant a finding of intent to mislead or confuse or establish bad faith.[91] At a minimum, this is a fact issue for the jury.

In the face of abundance evidence showing a lack of intent to confuse by Quintessa and lack of actual confusion evidence (discussed below), this factor should weigh against a likelihood of confusion, and weigh neutral.

### 4. *Digit 7: Adler Has Not Proven Actual Confusion as a Matter of Law*

---

department," not just "intake department"? A: Yes, sir. Q: Okay. A: But, again, that is the instruction. They are told to do that. Q: Is that in writing? A: Yes, sir.)).

[87] *Id.* at App. 34 (Mingee Corp. Rep. Dep. 87:7-12).

[88] App. 25 (Mingee Dep. 101:16-20).

[89] *Id.* at App. 25 (Mingee Dep. 101:20-23).

[90] App. 23-24 (Mingee Dep. 99:20-100:7 ("Q: What change did you make to resolve those issues? We changed the way that -- our advertisements, so we would put that they are a third-party intake and not a law firm to make sure that was very clear. Q: So that currently appears in your advertisements? A: Yes, sir. Q: In your Google advertisements? A: Yes, sir. Q: Where does it appear in the Google advertisement? A: In the ad copy.)); *see supra* at 16; *see also* App. 6.

[91] Adler also relies on two lawsuits where McNeil Consultants or Quintessa was sued for trademark infringement. In one of those lawsuits, a third-party company had turned on keyword insertion into ad copy whereby, due to a technical error, the competing law firm's name appeared in McNeil's ad copy for 36 hours. *See* App. 31-32 (Mingee Corp. Rep. Dep. at 46:3-47:13). McNeil turned the ad off as soon as it learned of the error and agreed to stop bidding on the law firm's name. In the Abbott lawsuit, Quintessa agreed to stop bidding on Abbotts' name, without any admission of guilt or exchange of money. *See* App. 21-22 (Mingee Dep. at 66:25-67:15). Regardless, these lawsuits do not show intent to confuse where Quintessa was merely competing with these law firms. *See Scott Fetzer*, 381 F.3d at 486 ("[i]ntent to compete, however, is not tantamount to intent to confuse."

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

"The sine qua non of trademark infringement is consumer confusion caused by the infringing behavior, and behavior meant to harm a competitor does not necessarily entail infringement if a consumer is unlikely to be confused." *Alzheimer's Disease*, 307 F. Supp. 3d at 287. "Mere diversion, without any hint of confusion, is not enough." *Hearts on Fire*, 603 F. Supp.2d at 286. The Fifth Circuit agrees that "in the context of internet searches and search-engine advertising in particular, the critical issue is whether there is consumer confusion. **Distraction is insufficient**." *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428 (5th Cir. 2021) (emphasis added). The "evidence" of actual confusion Adler relies on shows just that: mere diversion and distraction. *See* 5 McCarthy on Trademarks and Unfair Competition § 25A:8 (5th ed.) ("But distraction or diversion is not the same as 'confusion' by the web shopper."). Adler's proffered evidence of actual confusion fails as a matter of law for two reasons: (1) the evidence of purported actual confusion represents nothing more than *de minimis* confusion and (2) the evidence is replete with factual issues revealing that many of the complaints do not show confusion at all, much less confusion caused by Quintessa.

First, to prove actual confusion, Adler relies on a spreadsheet of intake descriptions from callers and potential clients where "Jim Adler" or "The Texas Hammer" were mentioned on a call to argue that "hundreds—if not thousands—of instances of actual confusion have occurred." Mot. at 20. But a holistic view of the data shows that any alleged confusion that may have occurred was *de minimis*. It is well established that incidents of confusion must be considered in light of the total course of the parties' competition. As the Fourth Circuit has adopted:

> [e]vidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

*George and Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009) (citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:14 (4th ed.2014)).[92]

The District Court of Utah's analysis of similar consumer complaint evidence in *Overstock.com, Inc. v. Nomorerack.com, Inc.* is instructive here. In that case, the court considered whether evidence of over 200 customer complaints establish actual confusion to support a trademark infringement claim. 2:13-CV-1095 TS, 2014 WL 2946646, at *4-5 (D. Utah June 30, 2014). The court noted that, even if the proffered complaints did evidence some actual confusion, it was imperative to put the complaints in the proper context. *Id.* at *5. Because both parties serviced millions of customers each year and made millions in sales each year, the court found that "the limited evidence of actual confusion provides little weight." *Id.* Because the Plaintiff "ha[d] not engaged in any meaningful analysis concerning the evidence of actual confusion" and instead "only provided a limited number of instances of actual confusion" the court found that the factor of actual confusion weighed against Plaintiff. *Id.* The analysis in *Ovestock* applies with equal force to this case, where Quintessa has received tens of thousands of calls from internet searchers between 2018-2022. Adler has done no analysis— and offered no evidence—to show that the actual confusion it alleges amounts to anything more than *de minimis* confusion.  Rather, the evidence shows the opposite.

Quintessa's intake records show that from 2018-2021, there were 1,595 instances of callers mentioning "Jim Adler" or "The Texas Hammer."[93] However, when compared to the 33,463 phone calls that Quintessa received from 2018-2021,[94] *i.e.* the number of actual leads processed by Quintessa from its competitive bidding campaign (the campaign that bids on the Adler Marks), the percentage of callers who mentioned "Jim Adler" or "The Texas Hammer" is **4.7%** of the total number of calls

---

[92] *See also Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 95 (4th Cir. 1997) ("In light of [Plaintiffs] huge volume of commerce, [Plaintiffs] meager evidence of actual confusion is at best de minimis.").
[93] App. 4 (Quintessa_000001).
[94] App. 2 (Mingee Decl. ¶ 8).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**                                                    **PAGE 25**

only for Quintessa's competitive bidding campaign. At best, Adler's evidence of purported confusion only rises to a level of *de minmis* confusion that is far below the level of actionable confusion.[95] *See* McCarthy § 32:189 (percentages below 10% indicate confusion is not likely).[96]

Second, even if the Court considers the intake notes to be sufficient evidence of actual confusion, the alleged "hundreds" of instances of potential confusion Adler seeks to capitalize are replete with factual discrepancies and are not actionable. As an initial matter, a simple misdial and hang up—which many of these instances were—is not legally relevant confusion. To the extent these entries show any confusion at all, it is not the type of relevant confusion that courts look to when evaluating actual confusion for trademark infringement. *See Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017) ("***[N]ot all confusion counts***: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that [t]he confusion ***was caused by the trademarks employed and it swayed consumer purchases***.")(emphasis added); *see also Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) ("trademark infringement protects only against mistaken purchasing decisions and not against confusion generally") (quoting Restatement (Third) of Unfair Competition § 20 reporter's note at 179); *Instant Media, Inc. v. Microsoft Corp.*, C 07-02639 SBA,

---

[95] To the extent Adler contends that the nine complaints from attorney-clients amount to evidence of actual confusion, this evidence is also *de minimis* when viewed against the ▮▮▮▮ ▮▮ it sent to its clients. See Mingee Decl. ¶ 9.

[96] *See also Flushing Bank v. Green Dot Corp.*, No. 13-Civ-9120, 2015 WL 5802385, at *19 (S.D.N.Y. Oct. 5, 2015) (stating a "dozen or so inquiries spread over a period of time—and during the pendency of a litigation in which it can be assumed the company was actively on the look-out for any instances of actual confusion—are minimal). These principles are well-established. *See, e.g., George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009) (four instances of actual confusion was *de minimis* when measured against significant sales volume); *Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1338 (Fed. Cir. 2004) (four misdirected phone calls out of thousands is a "relatively small number" and is "too unreliable to establish actual confusion"); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir. 2001) ("[W]e do not believe the district court erred in finding that two anecdotes of confusion over the entire course of competition constituted de minimis evidence insufficient to raise triable issues."); *Petro Stopping Centers L.P. v. James River Petroleum*, 130 F.3d 88, 95 (4th Cir. 1997) (when measured against a substantial volume of commerce, isolated instances of actual confusion are de minimis ); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) (isolated instances of actual confusion when there has been extensive advertising do not always indicate an increased likelihood of confusion and in fact may indicate the opposite); *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) ("[T]he plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion even if the evidence, which is hearsay, is admissible and credible, which we doubt."); *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991) (where parties have advertised extensively and are doing business in the same area, isolated instances of actual confusion are not conclusive or entitled to great weight in the determination).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

2007 WL 2318948, at *14 (N.D. Cal. Aug. 13, 2007) ("Relevant confusion is that which affects purchasing decisions, not confusion generally."). Rather than conduct a meaningful analysis of the intake notes to determine whether callers were allegedly confused as a result of their search **and** that it swayed their decision, Adler erroneously simply counts every entry on the spreadsheet as legally relevant confusion.

But more importantly, the intake spreadsheet shows that several instances where a caller mentioned "Jim Adler" or "The Texas Hammer," the caller expressed *complaints* about Jim Adler, wanted to disengage his representation from Jim Adler, or was seeking new representation (the exact service Quintessa provides) because *Adler* had disengaged with the *caller*. For example:[97]

| Intake Date and Time | Description |
|---|---|
| 1/6/22 13:16 | **PC wants to disengage from Jim Adler**. . . |
| 1/20/22 14:07 | The client was previously represented by Jim Adler. He **requested them to disengage from his case** as of today, January 20th. |
| 1/19/21 15:51 | PC is happy with her current attorney/ **PC is needing a disengagement letter from Jim Adler**/ PC does not want a 3rd opinion |
| 2/10/21 12:25 | Recently **disengaged Jim Adler because of an unwillingness to coordinate** treatment. |
| 3/14/21 13:15 | **Jim Adler is dropping because he is going off the police report.** |
| 6/7/21 17:47 | Criminal case that **wanted to disengage from Adler**, but no one would answer and he has another attorney that wants to assist |
| 7/23/21 13:33 | Denied-PC **wanting to wait on disengagement letter from Adler**/Already has a new atty and is happy with their services;" |
| 2/21/20 15:46 | PC is a cc of Jim Adler, **wants to disengage due to poor communication**;" |
| 9/21/20 9:33 | **Previous attorney working PCs was Jim Adler. **PC disengaged** as of today do to lack of contact and response |
| 7/15/20 13:27 | The PC is retained by Jim Adler and they told him that due to the DEF's policy limits he will only be receiving 30,000. The PC's hospital bills are over 100,000. They have several attorneys looking into where the DEF was drinking at and recalls on the vehicle. **The PC is not happy with the attorneys' services**;" |
| 5/24/19 10:46 | **PC had Jim Adler who disengaged** |
| 4/10/19 9:46 | Denied **PC calling Adler to complain and disengage** but has another atty already she is happy with. |

---

[97] *See, e.g.,* App. 4 (Quintessa_000001) (emphasis added).

Adler has done **no analysis** of the call logs in which callers referenced Adler's marks to determine how many of these callers were actually confused as opposed to referencing his name for another reasons, or a "fleeting mix up" or dissatisfied clients or potential clients of Adler's. Without this analysis, the call logs are not competent evidence for summary judgment regarding actual confusion. At most, Adler's proffered evidence of actual confusion creates a fact issue for the jury to decide at trial.[98]

Moreover, as explained above, after the Fifth Circuit's reversed dismissal, Quintessa revised the intake department script to ensure that no callers are confused. ██████████████████████ ████████████████████████████████████████████████████████████ ███████████████[99]

The complaints Adler relies upon are not competent evidence of actionable confusion. *Streamline Prod. Sys., Inc.*, 851 F.3d at 457 ("We have rejected anecdotal evidence of actual confusion when the proponent did not show that "a misleading representation by [the defendant], as opposed to some other source, caused a likelihood of confusion."). Adler cites to the intake notes, emails from Quintessa's referral attorneys, and disengagement emails to show purported confusion, but Adler adduces zero evidence that the confusion was **caused** by Quintessa's use of Adler Marks as keywords. Adler has not—and cannot—show that the consumer complaints represent anything more than *de minimis* confusion caused by a fleeting mix-up when compared to the volume of calls received and processed by Quintessa.

Adler additionally relies on a flawed survey conducted by Dr. Stewart, which, at best, creates a fact issue for the jury to consider. "Survey evidence is not evidence of actual confusion, because surveys 'do not measure the degree of actual confusion by real consumers.'" *Alzheimer's Disease*, 307

---

[98] *Society of Financial Examiners*, 41 F.3d at 224-25.
[99] App. 34 (Mingee Corp. Rep. Dep. at 87:7-12).

F.Supp.3d at 294 (quoting 2 McCarthy on Trademarks § 32:184 (5th ed.)). "In order to be probative of the issue of actual confusion, however, the consumer surveys must 'have been fairly prepared and [their] results directed to the relevant issues." *Id.* at 295 (quoting *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994)). Adler cites to no case, and Defendants are aware of none, where a trademark infringement plaintiff won a summary judgment on the likelihood of confusion based on a survey.

In any case, Stewart's survey is not reliable evidence of confusion. The Fifth Circuit has recognized that "serious flaws in a survey will make any reliance on that survey unreasonable." *Scott Fetzer*, at 381 F.3d 488; *see also Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984) (a survey can be "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion."). As explained in Quintessa's Motion to Exclude Plaintiffs' Expert David Stewart (Dkt. No. 87), which Quintessa incorporates by reference herein, Stewart's survey suffers from such serious flaws as reliance on it would be unreasonable and cannot be used to demonstrate likelihood of confusion.

### 5. *Digit 8: Adler Has Not Proven That Consumers are Unsophisticated as a Matter of Law.*

Digit 8 relates to the degree of care that potential purchasers of a plaintiff's products and services are likely to exercise. *Springboards to Educ., Inc.*, 912 F.3d at 817 (citing *Streamline Prod., Inc.*, 851 F.3d at 458) ("[T]he greater the care potential purchasers exercise, the less likely it is they will confuse a junior mark user's products or services with the senior mark user's products or services."). A key factor upon which the likely degree of care depends is the cost of the products and services. *See Streamline Prod., Inc.*, 851 F.3d at 458 (quoting *Smack Apparel Co.*, 550 F.3d at 483). Repeatedly, courts have found that potential purchasers who buy "for professional or institutional purposes at a high cost ... are virtually certain to be informed, deliberative buyers."[100]

---

[100] *US Risk Ins. Grp., Inc.*, 2013 WL 4504754 at *17 (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986)); *see also Future Proof Brands, L.L.C.*, 982 F.3d at 297 (quoting *Smack Apparel Co.*, 550 F.3d at 483) (acknowledging that purchasers of "relatively inexpensive" items "may take less care in selecting the item[.]"); *Springboards*, 912 F.3d at 817.

Adler relies on one case from 1978—pre-dating the availability of internet to the general public—to argue that certain forms of attorney advertising may invade accident victims' privacy. Mot. at 27. But *Ohralik*, which concerned a lawyer soliciting through direct, in-person communication with prospective injured clients—*one of whom the lawyer approached in the hospital*—is a free speech case which is inapplicable here. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 465 (1978). Ten years later, the Supreme Court distinguished its holding in *Ohralik*, nothing that "[l]ike print advertising, petitioner's letter—and targeted, direct-mail solicitation generally—poses much less risk of overreaching or undue influence than does in-person solicitation." *Shapero v. Kentucky Bar* Ass'n, 486 U.S. 466, 475 (1988) (internal citations and quotations omitted). The Court reasoned that "[u]nlike the potential client with a badgering advocate breathing down his neck, the recipient of a latter and the 'reader of an advertisement. . . can effectively avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" *Id.* (internal quotations omitted).[101]

More recent and applicable case law has applied this logic to internet advertisements. *See 1-800 Contacts, Inc.*, 2022 WL 2316181, at *6 ("Relatedly, the Court also concludes that the relevant consumer base here would be sophisticated enough to (1) review the results of their online search—including linked website addresses that will navigate them to a different website when clicked—before clicking on such links, and (2) review the contents of any website that they have navigated to before taking further action, such as making an online purchase and providing sensitive payment information."). In other words, reasonable internet consumers can take time to review online search results and any websites—or click to call links—they may navigate to. Consumers "diverted on the

---

[101] "A letter, like a printed advertisement (but unlike a lawyer), can readily be put in a drawer to be considered later, ignored, or discarded. In short, both types of written solicitation "conve[y] information about legal services [by means] that [are] more conducive to reflection and the exercise of choice on the part of the consumer than is personal solicitation by an attorney." *Id.* at 475-76.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site." *Id.* at *7.

The leading treatise on trademark infringement also explains that "a consumer use who sees a search engine results page and clicks on a non-deceptive advertising link resulting from a trademark keyword purchased by a competitor is not confused as to the source or affiliation of any ultimate purchase that is made from that website.[102] *See supra* Section II.C (identifying various studies, surveys, and experts all finding that consumers are unlikely to be confused by sponsored advertisements, even if they searched a specific trademark). And indeed, the evidence shows just that—that consumers diverted on the internet can get back on track easily. Quintessa's consumer-behavior expert, Dr. Jansen, investigated Adler's bounce rate for the website jimadler.com, and found according to publicly available data that more than 73% of consumer visits to jimadler.com were bounces, and that the average session duration on this website was 15 seconds.[103] According to Adler's SEM specialist, Sara Drevecky, a bounce rate "is the percentage of times that people go to a website and click out of it quickly."[104] The data thus shows that 73% of consumers who visit jimadler.com spend an average of 15 seconds on the website, and then exit out to return to their search results.

Adler's fails to adduce *any* evidence to establish that the types of consumers who are seeking personal injury representation are vulnerable, unsophisticated, and unfamiliar with the concept of paid search results compared to organic results. *See* Mot. at 27. Adler instead leaps to the assumption that the consumers searching for personal injury representation and calling Quintessa's intake department are accident victims who are imminently injured or seeking immediate representation. Adler has failed to carry his burden to establish this fact. The relevant recent case law, along with the evidence, show the opposite: that potential clients seeking personal injury representation are sophisticated, exercise a

---

[102] 5 McCarthy on Trademarks and Unfair Competition § 25A:8 (5th ed.) (emphasis added).
[103] App. 151 (Jansen ¶ 66).
[104] App. 288 (Drevecky Dep. 52:20-22).

high degree of care, aware of the high cost of representation, and can easily navigate paid advertisements and organic results. *See 1-800 Contacts*, 2022 WL 2316181, at *6 ("Consequently, the relevant consumer base, conducting internet searches in the year 2022, would likely be familiar with both the concept of paid search results and the significance of website address links—to infer otherwise would not be reasonable inference in light of the pleadings."). This factor thus weighs against a finding of likelihood of confusion.

## C. Adler is Not Entitled to Injunctive Relief.

Adler seeks permanent injunctive relief but acknowledges that this remedy rises and falls with the Court's finding on likelihood of confusion. Mot. at 28. For the reasons explained above, Adler cannot establish a likelihood of confusion as a matter of law, and thus a permanent injunction at the summary judgment stage is premature. At best, the evidence presented herein raises a fact issue for the jury. Notwithstanding that is not entitled to a permanent injunction because no likelihood of confusion exists as a matter of law, Adler is also not entitled to an injunction prohibiting Quintessa from bidding on the Adler Marks under the prevailing case law, guidance from the State Bar of Texas, and the accepted industry practice.

The Northern District of Texas has held that the purchase of another company's trademarks is permissible, even after a jury finding of willful infringement. *See Mary Kay, Inc.,* 661 F.Supp.2d at 646 (granting an injunction on other grounds but expressly stating "[t]his holding does not mean . . . that the defendants may not purchase the words 'Mary Kay' as a search term from search engines such as Google or Yahoo."). And as discussed above, the Professional Ethics Committee has found that "[a] lawyer does not violate the Texas Disciplinary Rules of Professional Conduct by simply using the name of a competing lawyer or law firm as a keyword. . ." Google itself does not restrict the use of trademarks as keywords. And Adler's own external SEM consultant engages in competitive bidding for its other clients. Accordingly, Adler is not entitled to injunctive relief.

**D. Adler is Not Entitled to Disgorgement of Quintessa's Profits.**

As detailed in Quintessa's Motion for Partial Summary Judgment (Dkt. No. 101), Adler is not entitled to disgorgement of Quintessa's profits because Adler has no evidence that it has suffered any compensable harm. Additionally, Adler has failed to adduce evidence of the six non-exclusive factors courts consider when determining whether disgorgement is equitable and failed to show that Quintessa's profits are attributable to it bidding on Adler's Marks. *See Retractable Tech., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 875-76 (5th Cir. 2019) ("Our caselaw establishes two distinct considerations in assessing whether disgorgement is appropriate. The first is whether disgorgement is equitable under the six factors. . .The second consideration is whether the defendant's profits are attributable to the Lanham Act violation."). These six factors include:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*See Pebble Beach Co. v. Tour*, 18 I Ltd., 155 F.3d 526, 554 (5th Cir. 1998).

As to the first factor, Adler has not proven that Quintessa bid on Adler's Marks with the intent to confuse or deceive. *See supra* at 18-21. Rather, Quintessa has presented ample evidence supporting a good-faith basis for believing that it was permitted to use Adler's Marks in keyword advertising. *Id.* Quintessa has further presented evidence that once the Fifth Circuit reversed the dismissal of Adler's complaint on appeal, Quintessa took affirmative steps to increase training for its intake employees and modify the intake script to eliminate any conceivable affiliation between Quintessa and Adler. *Id.*

Adler further proffers no evidence of the second factor, that any sales or consumers of Adler's have been diverted as a result of Quintessa's bidding practices. Adler merely recites, in a conclusory fashion, that "the undisputed evidence of actual confusion, which is overwhelming, establishes that Adler has been damaged." Mot. at 29. But Adler offers no evidence of how many callers were allegedly

diverted from Adler, nor does Adler present any data or evidence that it would have engaged every caller who Quintessa allegedly diverted. And the reason why Adler has no evidence of this is clear: Adler and Quintessa do not compete in a vacuum; *numerous* other law firms and lead generators bid on Adler's name.[105] Adler cannot show that a searcher or diverted caller would have clicked on Adler's advertisements *but for* Quintessa's advertisement in the face of numerous competitors. Just the opposite: Echeverri recognized that when Quintessa had turned off its advertisements for a two-day period, advertisements placed by other competitors would immediately get pushed to the top where AILC's ad would have been, and in some cases, those competitors outperformed Adler.[106]

Further, the public data reveals Adler was struggling to retain and engage the traffic that *did* visit Adler's website. *See supra* at 27-28. "In many cases, disgorgement will not be equitable where few or no sales were ever diverted from the plaintiff to the defendant, because disgorgement in such contexts would grant the plaintiff an unjustified windfall." *Retractable Tech., Inc.*, 919 F.3d at 878. This is such a case, and Adler should not benefit from a windfall when Adler has presented no evidence of diversion.

The sixth factor is also inapplicable here. This is not a case of palming off. "The 'palming off' factor applies when a Lanham Act defendant attempts to pass off its goods as the plaintiff's." *Id.* at 881. Adler relies on one email from an unhappy law-firm client of Quintessa's who stated that unsophisticated clients were deceived into signing with them to argue that Quintessa is trying to palm off its services as if it is Adler. Mot. at 30. But the uncontroverted evidence shows the opposite: Quintessa does not use the Adler Marks anywhere in its ad copy, it does not identify itself as the Adler law firm when a potential lead calls the intake department (rather, Quintessa affirmatively states it is a

---

[105] App. 290-293 (ADLER_001003 (identifying Adler's top competitors bidding on "Jim Adler" and "Texas Hammer," including ██████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

[106] App. 271, 272-273 (Echeverri Dep. at 195:14-18; 199:8-200:7).

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

"third-party intake department), and the number of callers who have expressed some confusion is *de minimis*. *See supra* at 21-25.

Finally, Adler does not even argue, much less proffer evidence of, the third and fifth factors, *i.e.,* adequacy of other remedies or the public interest in making the misconduct profitable. Though Adler may not have unreasonably delayed in asserting his rights (the fourth factor), this one factor alone is not sufficient to support a finding of equitable disgorgement. As to the second consideration, *i.e.*, whether Quintessa's profits are attributable to its use of the Adler Marks, Adler has presented *no evidence* on this matter. *See* Mot. at 28-30. Quintessa, on the other hand, has presented ample evidence and argument in its Motion to Partially Exclude the Option of Plaintiffs' Damages Expert Christopher Anderson (Dkt. 93) that Anderson's attribution analysis is based upon unsupported assumptions.

Adler has done no work and presented little to no evidence to support its request for equitable disgorgement of Quintessa's profits. The Court, therefore, should deny Adler's Motion on this basis.

## IV.    CONCLUSION

Adler has never been concerned about consumer confusion. Unable to compete with Quintessa in competitive keyword bidding and CPCs, Adler has now concocted a "scheme" accusing Quintessa of intentionally trying to mislead or confuse search users. But under the likelihood of confusion analysis, Adler has not adduced sufficient evidence to succeed on his. Rather, the evidence and relevant law all suggest the same: competitive keyword bidding is lawful, and in the face of Quintessa's advertisements *which do not bear the Adler Marks anywhere in the ad copy* and in which Quintessa now clearly identifies as being a "Third Party Intake Not a Firm," no confusion can exist. Moreover, Adler has *no* sufficient evidence of source confusion by Quintessa's intake department. Consequently, Adler is not entitled to permanent injunctive relief, nor is he entitled to equitable disgorgement of Quintessa's profits. Accordingly, Adler's Motion should be denied.

DATE: February 13, 2023                    Respectfully submitted,

                                           /s/ Christopher J. Schwegmann
                                           Christopher J. Schwegmann
                                           State Bar No. 24051315
                                           cschwegmann@lynnllp.com
                                           Rebecca L. Adams
                                           State Bar No. 240298255
                                           radams@lynnllp.com
                                           Barira Munshi
                                           State Bar No. 24095924
                                           bmunshi@lynnllp.com
                                           **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                           2100 Ross Avenue, Suite 2700
                                           Dallas, Texas 75201
                                           Telephone: (214) 981-3800
                                           Facsimile: (214) 981-3839

                                           **ATTORNEYS FOR DEFENDANTS**
                                           **MCNEIL CONSULTANTS, LLC D/B/A**
                                           **ACCIDENT INJURY LEGAL CENTER,**
                                           **QUINTESSA MARKETING, LLC D/B/A**
                                           **ACCIDENT INJURY LEGAL CENTER and**
                                           **LAUREN VON MCNEIL**

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, a true and correct copy of the foregoing was served via e-file upon all counsel of record.

                                           /s/ Rebecca L. Adams
                                           Rebecca L. Adams

JIM S. ADLER, P.C., and JIM ADLER,　§
　§
PLAINTIFFS,　§
　§
v.　§
　§
MCNEIL CONSULTANTS, LLC D/B/A　§
ACCIDENT INJURY LEGAL CENTER,　§
QUINTESSA MARKETING, LLC D/B/A　§
ACCIDENT INJURY LEGAL CENTER　§
and LAUREN VON MCNEIL,　§
　§
DEFENDANTS.　§

**FILE UNDER SEAL**

CIVIL NO. 3:19-CV-2025-K

## APPENDIX TO DEFENDANTS' RESPONSE IN TO PLAINTIFF'S MOTION OFR PARTIAL SUMMARY JUDGMENT[1]

1.  Ex. A - Declaration of Lauren Mingee ..................................................................App. 1-3

2.  Ex. A-1 - QUINTESSA_000001 (CONFIDENTIAL-ATTORNEY EYES ONLY ........................................................................................................ App. 4

3.  Ex. A-2 – QUINTESSA_002622 ............................................................ App. 5

4.  Ex. A-3 –Quintessa add copy.............................................................. App. 6

5.  Ex. B - Declaration of Barira Munshi ................................................App. 7-9

6.  Ex. B-1 - Lauren Mingee deposition excerpts ....................................... App.10-27

7.  Ex. B-2 – Lauren Mingee as corporate representative deposition excerpts .............. App. 28-40

8.  Ex. B-3 David Leathers' expert report.................................................. App. 41-127

9.  Ex. B-4 Jim Jansen expert report......................................................... App. 128-233

10. Ex. B-5 - Monica Madrigal deposition excerpts ....................................... App. 234-241

11. Ex. B-6 - ADLER_000646 (CONFIDENTIAL-ATTORNEYS' EYES ONLY)............................................................................................. App. 242-244

---

[1] The Court's order requires that the Parties "bracket in the margin of each document of the appendix the portions of the document on which the respondents rely". The program used does not permit "bracketing" so counsel have highlighted the relevant portions of the documents.

---

12.    Ex. B-7 - ADLER_000644 (CONFIDENTIAL-ATTORNEY EYES ONLY)
........................................................................................................................ App. 245-250

13.    Ex. B-8 - ADLER_000844 ........................................................................ App.251-252

14.    Ex. B-9 - ADLER_852 ............................................................................... App. 253-255

15.    Ex. B-10 - Wendy Echeverri deposition excerpts .................................... App. 256-274

16.    Ex. B-11 - ADLER_001837 ..................................................................... App. 275-277

17.    Ex. B-12 - ADLER_001817 ..................................................................... App. 278-280

18.    Ex. B-13 - ADLER_001021 ..................................................................... App.281-284

19.    Ex. B-14 - Sara Drevecki deposition excerpts .......................................... App. 285-289

20.    Ex. B-15 - ADLER_001003 ..................................................................... App. 290-292

21.    Ex. B-16 - Opinion No. 661 ..................................................................... App. 293-295

22.    Ex. B-17 Jim Adler deposition excerpts ................................................... App. 296-299

DATE: February 13, 2023    Respectfully submitted,

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com
Rebecca L. Adams
Texas Bar No. 24098255
radams@lynnllp.com
Barira Munshi
Texas State Bar No. 24095924
bmunshi@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3829 – Facsimile

**ATTORNEYS FOR DEFENDANTS
MCNEIL CONSULTANTS, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER,
QUINTESSA MARKETING, LLC D/B/A
ACCIDENT INJURY LEGAL CENTER and
LAUREN VON MCNEIL**

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via ECF on counsel of record on February 13, 2023.

                                    */s/ Rebecca L. Adams*
                                      Rebecca L. Adams

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **JIM S. ADLER, P.C., AND JIM ADLER,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CA NO. 3:19-CV-02025-K-BN** |
| | § | |
| **MCNEIL CONSULTANTS, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | **JURY DEMAND** |
| **QUINTESSA MARKETING, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | |
| **AND LAUREN VON MCNEIL,** | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF LAUREN VON MINGEE

My name is Lauren Von Mingee, my date of birth is January 22, 1986 and my address is business address is 1900 NW Expressway, Suite 1600, Oklahoma City, Oklahoma, 73118, United States of America.

I declare under penalty of perjury that the foregoing and the following facts stated in this Declaration are true and correct and are within my personal knowledge:

1.     I am over the age of eighteen (18) years, of sound mind, have never been convicted of a felony, and am fully competent to testify to the facts contained herein. Every statement made in this declaration is made on my personal knowledge and is true and correct. I make this declaration in support of Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment.

2.     I am the founder and sole owner of Quintessa Marketing, LLC d/b/a Accident Injury Legal Center. Quintessa Marketing, LLC, was founded in 2019. Its business address is 1900 NW Expressway, Suite 1600, Oklahoma City, Oklahoma, 73118.

**Declaration of Lauren Von Mingee**

Page 1

**App. 001**



4. _____ .

5. _____

6.  Attached as Exhibit 1 is Quintessa_000001, which is a true and correct spreadsheet describing the calls received by intake where "Jim Adler" or "The Texas Hammer" was mentioned by a caller from May 2018 to January 2022.

7.  Attached as Exhibit 2 is Quintessa_002622, which is a true and correct copy of the number of calls Quintessa receives, the number of leads it sent to attorneys, and the number of leads retained by attorneys, from January 1, 2018 through June 29, 2022 for all phone calls received through Quintessa's competitive bidding campaign (QM Injury).



11. _____

12.  Exhibit 3 is a true and correct copy of what Quintessa's ad copies appear as following the Fifth Circuit's opinion reversing the earlier dismissal of this lawsuit.

13.  In July of 2022, I was nominated for Journal Record's 2022 Woman of the Year as one of the 50 Making a Difference from my successful career and giving back to my community. The award recognizes Oklahoma's prominent women who epitomize leadership in their professional endeavors and in the communities they are a part of. I, along with Quintessa, have donated millions of dollars to nonprofits across Oklahoma City, the Regional Food Bank of Oklahoma, and Oklahoma Dream Centers, and YouVersion Bible App. Quintessa donates half of all profits. I have also partnered with ReMerge, a program that serves the needs of Oklahoma mothers facing non-violent offenses.

14.  In addition, I have participated in numerous media interviews concerning my business success, including DotCom Magazine, PRweb.com, Chris Voss. In October of 2022, I

spoke in front of the State Senators at the Oklahoma Capitol to discuss with other leaders on ways to create meaningful legislation to improve outcomes for women in the Oklahoma workplace.

Executed in Oklahoma City, Oklahoma, on February 13, 2023.

Lauren Von Mingee

**EXHIBIT A-1**

**SEE NATIVE FILE A-1 QUINTESSA_000001**

**CONFIDENTIAL**

**MANUALLY FILED WITH COURT**

**EXHIBIT A-2**

**SEE NATIVE FILE A-1 QUINTESSA_002622**

**CONFIDENTIAL**

**MANUALLY FILED WITH COURT**



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **JIM S. ADLER, P.C., AND JIM ADLER,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CA NO. 3:19-CV-02025-K-BN** |
| | § | |
| **MCNEIL CONSULTANTS, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | **JURY DEMAND** |
| **QUINTESSA MARKETING, LLC, d/b/a** | § | |
| **ACCIDENT INJURY LEGAL CENTER,** | § | |
| **AND LAUREN VON MCNEIL,** | § | |
| | § | |
| *Defendants.* | § | |

---

## DECLARATION OF BARIRA MUNSHI

---

My name is Barira Munshi, my date of birth is March 30, 1989, and my business address is 2100 Ross Avenue, Suite 2700, Dallas, Texas 75201.

I declare under penalty of perjury that the foregoing and the following facts stated in this Declaration are true and correct and are within my personal knowledge:

1. I am over the age of eighteen (18) years, of sound mind, have never been convicted of a felony, and am fully competent to testify to the facts contained herein. Every statement made in this declaration is made on my personal knowledge and is true and correct. I make this declaration in support of Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment (the "Motion").

2. I am an attorney licensed to practice in Texas and a member in good standing with the State Bar of Texas. I am an Associate at the law firm Lynn Pinker Hurst and Schwegmann ("LPHS"). LPHS represents Defendants McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren Von McNeil in the above-captioned lawsuit.

3. I am familiar with the depositions taken and the documents produced in this matter.

4. Ex. B-1 is a true and correct copy of excerpts from Lauren Mingee's deposition.

5.     Ex. B-2 is a true and correct copy of excerpts from Lauren Mingee's, as corporate representative, deposition.

6.     Ex. B-3 is a true and correct copy of David Leathers' expert report.

7.     Ex. B-4 is a true and correct copy of Jim Jansen's expert report.

8.     Ex. B-5 is a true and correct copy of Monica Madrigal's deposition excerpts

9.     Ex. B-6 is a true and correct copy of the document Bates stamped ADLER_000646.

10.    Ex. B-7 is a true and correct copy of the document Bates stamped ADLER_000644.

11.    Ex. B-8 is a true and correct copy of the document Bates stamped ADLER_000844.

12.    Ex. B-9 is a true and correct copy of the document Bates stamped ADLER_000852.

13.    Ex. B-10 is a true and correct copy of Wendy Echeverri's deposition excerpts.

14.    Ex. B-11 is a true and correct copy of document Bates stamped ADLER_001837.

15.    Ex. B-12 is a true and correct copy of document Bates stamped ADLER_001817.

16.    Ex. B-13 is a true and correct copy of document Bates stamped ADLER_001021.

17.    Ex. B-14 is a true and correct copy of Sara Drevecky's deposition excerpts.

18.    Ex. B-15 is a true and correct copy of document Bates stamped ADLER_001003

19.    Ex. B-16 is a true and correct copy of Opinion 661 from the State Bar of Texas.

20.    Ex. B-17 is a true and correct copy of Jim Adler's deposition excerpts.

Executed in Dallas, Texas, on February 13, 2023.

_____
Barira Munshi

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION

3    JIM S. ADLER, P.C. and      )
     JIM ADLER,                  )
4        Plaintiffs,             )
                                 )
5    VS.                         ) CA NO. 3:19-cv-02025-K-BN
                                 )
6    MCNEIL CONSULTANTS, LLC     )
     D/B/A ACCIDENT INJURY       )
7    LEGAL CENTER, QUINTESSA     )
     MARKETING, LLC D/B/A        )
8    ACCIDENT INJURY LEGAL       )
     CENTER, and LAUREN VON      )
9    MCNEIL,                     )
         Defendants.             )
10           *****************************************
                   ORAL AND VIDEOTAPED DEPOSITION OF
11
                   LAUREN VON MCNEIL MINGEE
12
                          CONFIDENTIAL
13
                          April 13, 2022
14           *****************************************
         ORAL AND VIDEOTAPED DEPOSITION OF LAUREN VON MCNEIL
15
     MINGEE, produced as a witness at the instance of the
16
     Plaintiffs, and duly sworn by me, taken in the above-
17
     styled and numbered cause on April 13, 2022, from
18
     10:08 a.m. to 7:29 p.m., before DIANA BENGS, CSR, RPR,
19
     Texas CSR No. 4907, in and for the State of Texas,
20
     reported by machine shorthand, at the offices of Lynn,
21
     Pinker, Hurst & Schwegmann, 2100 Ross Avenue, Suite 2700,
22
     Dallas, Texas, pursuant to the Federal Rules of Civil
23
     Procedure and provisions stated on the record.
24
     Reported By: DIANA M. BENGS, CSR, RPR
25   Job No. 207160
```

**Exhibit B-1**

```
 1               A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
          Jered Matthysse, Esq.
 4        Giulio Yaquinto, Esq.
          Pirkey Barber
 5        1801 East 6th Street
          Austin, TX 78702
 6

 7

 8

 9
     FOR THE DEFENDANTS:
10        Christopher Schwegmann, Esq.
          Rebecca Adams, Esq.
11        Lynn Pinker Hurst & Schwegmann
          2100 Ross Avenue
12        Dallas, TX 75201

13

14

15

16   VIDEOGRAPHER:
          MR. MICHAEL MOORE
17

18

19

20

21

22

23

24

25
```

1    Q.   Okay.  Well, what was your responsibilities

2  there?

3    A.   I helped manage the store and do phone sales.

4    Q.   So you worked at an AT&T store?

5    A.   I did.

6    Q.   Gotcha.  Did your job title or

7  responsibilities change during the duration of your

8  employment with AT&T?

9    A.   No.  It encompassed those two things.

10    Q.   Gotcha.  So you were at AT&T in about '08 or

11  '09; is that right?

12    A.   I believe so.  Again, it's been a long time

13  since I've been there.

14    Q.   Okay.  When did you leave AT&T?

15    A.   I'd say in early 2009.  I believe so.  It was

16  around that time.

17    Q.   What caused you to leave?

18    A.   I ended up getting a job with another company.

19    Q.   What company was that?

20    A.   It was PI Collision.

21    Q.   How did you get the job with PI Collision?

22    A.   I met someone, Coety Bryant, at an AT&T store;

23  and he -- he was impressed with how I was able to sell

24  as many phones as I was.  And so he asked if I had ever

25  looked at doing sales or being an assistant for

                        LAUREN MINGEE

1

2        A.   Yes.

3        Q.   And do you know why they paused their purchases

4   from Quintessa?

5        A.   From a financial standpoint.

6        Q.   And so just stepping back, again, Ms. Mingee,

7   these documents, Exhibits 116 (sic) and 117, represent the

8   revenue that the company has received from law firms in

9   Texas for sending them leads, including leads from Google

10  Ad bidding, correct?

11       A.   Correct.

12       Q.   Ms. Mingee, are you the sole owner of Quintessa

13  Marketing, LLC?

14       A.   I am.

15       Q.   During your time -- and so that has been since

16  the company was formed in 2019, correct?

17       A.   Correct.

18       Q.   And had that been the case throughout that time,

19  from 2019 to today, you've been the sole, 100 percent

20  owner of the company?

21       A.   Yes, sir.

22       Q.   And is it on you to make the final decision, in

23  terms of the company's advertising spend?

24       A.   No, it's not on me.  So we have a process -- we

25  have different vice presidents of each division.  So it's

1    A.    It's been so long ago.

2    Q.    That's fair.

3          Stepping back, I think we've taken for

4  granted that we're talking about the same thing.

5  What -- can you first state what SEO means and then

6  what you understand SEO to be?

7    A.    Yes, sir.  Search engine optimization is the

8  definition of SEO.  It means ranking people No. 1 on --

9  on Google.

10   Q.    Okay.  So at that time in the 2011 time

11 period, what was PI Advertising doing with SEO to help

12 the personal injury attorneys?

13   A.    We would help develop their websites and

14 develop content to be able to rank them in Google, and

15 through a variety of methods with video production and

16 content.

17   Q.    Okay.  Were meta tags involved at all at the

18 time?

19   A.    Yes, but meta tags were pretty irrelevant.

20   Q.    Okay.  They had become kind of stale at that

21 point?

22   A.    Yes, sir.

23   Q.    So is it fair to say at that time the primary

24 method of SEO that you were engaged in for PI

25 Advertising was trying to get client law firms ranked

1    A.    Yes, I believe so.  I didn't have an

2   official -- again, we were a very small company; so we

3   didn't really have titles.  But I was a manager.  I

4   helped manage the day-to-day.

5    Q.    And what did you do day to day at Exclusive

6   Legal?

7    A.    I helped with the intake side of handling

8   after-hours calls; and I helped with the billing and

9   with the -- just the client side, speaking and

10  communicating with clients.

11   Q.    Did you do any SEO strategy?

12   A.    Yes.

13   Q.    Did Coety tell you why they were moving the

14  SEO from PI Advertising to Exclusive Legal?

15   A.    Jerry had gotten himself in just trouble with

16  Frank Azar and with Brian Loncar and they ended up

17  having a judgment against him and Coety didn't want to

18  live with that over the company because the SEO was so

19  much bigger than the TV commercial side.  It

20  overpowered it.  And he was the one running that, and

21  so he just told him he was going to start that on his

22  own.

23   Q.    Do you know when -- so stepping back.  You

24  said it was around 2011 when PI Advertising started

25  getting into SEO; is that right?

1  links; is that right?

2      A.   Yes, sir.

3      Q.   And so why did that make it less of a waste of

4  time?

5      A.   Because it became the -- it became the way --

6  now, if someone was typing in "car accident lawyer,"

7  they weren't going to see the No. 1 spot.  You would

8  see three competitors who could pay for that --

9      Q.   Got it.

10     A.   -- above that one.

11     Q.   Do you know if Exclusive started dabbling in

12 pay-per-click in 2015?

13     A.   I believe --

14     Q.   Okay.  Were you --

15     A.   -- it was.

16     Q.   Sorry.

17          Were you involved in that?

18     A.   Yes.

19     Q.   Okay.  What was your involvement in that?

20     A.   Just research, keyword research.

21     Q.   What sort of research did you do?  Where did

22 you look?

23     A.   Coety found -- or I can't say Coety found.

24 Someone found a company named -- I believe it was

25 Tessera Marketing, and they spoke with -- they looked

1  for someone who had experience in pay-per-click,

2  because at that time, not a lot of people did.  It was

3  like starting all over.  So my research was looking at

4  keywords and things of that nature and what the volume

5  was in different states.

6      Q.   Okay.  So did you -- were you looking at what

7  consumers that were involved in the personal --

8  personal injury accident were searching for?

9      A.   Like -- for instance, like, "car accident

10 attorney"?

11     Q.   "Car accident attorney" or the name of an

12 attorney?

13     A.   At that time, we were taking our list that we

14 would try to rank SEO for.  So, for instance, "car

15 accident lawyer," "car accident attorney," things of

16 that nature.

17     Q.   Got it.

18          And do you recall who you worked with or

19 talked to at Tessera Marketing?

20     A.   It is a small company, so it was Nick.

21     Q.   Do you recall his last name?

22     A.   No.

23     Q.   Okay.

24     A.   I'm really good with first names, just not the

25 last ones.

```
 1      A.    I don't remember every state, but there -- a

 2   big one was Florida and Georgia.

 3      Q.    Do you recall which of you at that point had

 4   Texas?

 5      A.    No.  I want to say Coety, but I don't remember

 6   exactly.

 7      Q.    Okay.  Do you recall in that -- for your

 8   initial personal injury clients in 2016 if you had any

 9   other than Slater, outside of Exclusive's clients?

10      A.    I had others, yes, sir.

11      Q.    Do you recall about how many?

12      A.    No, sir.

13      Q.    Were those all referrals from Exclusive, or

14   did you get them in other ways?

15      A.    Through other ways, as well.

16      Q.    Okay.  How did you get additional clients

17   other than referrals through Exclusive in 2016?

18      A.    Referrals from current clients or at -- I

19   don't want to say a trade show, but something -- like

20   a -- something like a trade show where a lot of

21   personal injury lawyers would be.

22   ████████████████████████████████████████
```

8    Q.   And how many folks were in the call center at

9  that time?

10    A.   It would range -- with call centers, they --

11  they are not the best individuals sometimes; so we

12  would range from 3 to 10.

13    Q.   Where was -- at that point, 2016, where was

14  Quintessa based out of?

15    A.   Midwest City.

16    Q.   And is that where the call center was?

17    A.   Yes, sir.

18    Q.   Did you answer calls?

19    A.   On rare occasions.  If someone called in, then

20  yes.

21    Q.   And at that point in 2016, was yourself and

22  Quintessa engaged in competitive keyword bidding?

23    A.   Yes, sir.

24    Q.   When your advertisements showed up on behalf

25  of your clients in 2016, what -- how did they typically

1    A.    Yes, sir.

2    Q.    Did you use any ones that used more

3  distinctive language like Quintessa or McNeil

4  Consultants?

5    A.    No, sir.

6    Q.    Why not?

7    A.    Every incorporation has D/B/As for different

8  reasons; and just because Quintessa or McNeil

9  Consultants was a parent company, the D/B/As would be

10  used for the certain type of ad that we were going

11  after to be relevant.

12    Q.    And at that point, do you recall if you were

13  using Accident Injury Legal Center?

14    A.    Yes, sir, I believe so.

15    Q.    Okay.  Was that the main domain that you used

16  at the time for -- for personal injury accidents?

17    A.    Yes, sir, I believe so.

18    Q.    Do you recall when you started the business

19  around 2016 if you owned any domains other than

20  accidentinjurylegalcenter.com?

21    A.    We owned hundreds.

22    Q.    Okay.  So -- and you still own hundreds of

23  domain names?

24    A.    Yes, sir.

25    Q.    And what's the purpose of owning hundreds of

1    shouldn't have been done.

2        Q.    Okay.  And to settle this lawsuit, you went

3    above and beyond that and agreed not to purchase his

4    name moving forward; is that right?

5        A.    Yes, sir.

6        Q.    Have -- since -- so we've talked about the

7    Exclusive Legal lawsuit filed against McNeil

8    Consultants and yourself, this Gorayeb lawsuit filed

9    against your company and yourself, and the Azar

10   lawsuit.  Since -- since those three, have there been

11   any other lawsuits filed against you or your company

12   alleging trademark infringement?

13       A.    I am unsure.  We have other lawsuits right

14   now, but I don't know every allegation in there.

15       Q.    Okay.  Do you recall being sued by Ben Abbott?

16       A.    Yes, sir.

17       Q.    What were the -- what was that lawsuit about?

18       A.    I'm not sure what he alleged.  I don't have an

19   exact copy of the lawsuit.

20       Q.    But you don't recall what the claims were in

21   that lawsuit?

22       A.    I don't know every claim.  I know that there

23   was something about keywords, about us bidding on him

24   or broad matching to him.

25       Q.    So as part of -- to your -- to the best of

```
 1   your recollection, was part of the complaint in the

 2   Abbott lawsuit your purchase of his name as a keyword?

 3        A.   I believe so, yes.

 4        Q.   Do you recall if you denied those claims?

 5        A.   I'm unsure.  I never spoke with Ben Abbott.

 6        Q.   Did you settle that case?

 7        A.   I did.

 8        Q.   What were the terms of that settlement?

 9        A.   I'm -- I don't have all the terms.  I'd have

10   to refer to counsel on that.

11   ████████████████████████████████████████████

     ██████████████████

     ████████████████████████████

     ██████████████████████████████████████████

     ████████████████████████

16        Q.   Do you recall a lawsuit filed, and I believe

17   still ongoing, by ERB against your company?

18        A.   Yes, sir.

19        Q.   Do you know what that lawsuit is about?

20        A.   Yes.  We sued him first in Oklahoma; and he

21   sued us, as well; and it was moved to Missouri.

22        Q.   And what are ERB's claims in that lawsuit?

23        A.   Every claim has been dismissed except for one,

24   and that is on an unlimited time of disengaging leads.

25        Q.   And what did -- to the best of your
```

1    Q.   And were there times in which the client

2  reported that they felt that they were calling a

3  different law firm and were confused?

4    A.   Yes, sir.

5    Q.   What did you do to change your advertising

6  practices after hearing that so that that didn't happen

7  again?

8    A.   The majority of our calls and intakes and

9  e-mails did not have confusion.

10   Q.   So you didn't change anything?

11   A.   I didn't say that.

12   Q.   Okay.

13   A.   I'm just saying the majority, the vast

14  majority; so you are looking at a very minute number.

15  So that minute number was investigated; and then if it

16  felt like a change needed to be made, then we would

17  make that change.

18   Q.   Did you make any changes?

19   A.   Yes, sir.

20   Q.   What change did you make to resolve those

21  issues?

22   A.   We changed the way that -- our advertisements,

23  so we would put that they are a third-party intake and

24  not a law firm to make sure that was very clear.

25   Q.   So that currently appears in your

1  advertisements?

2     A.   Yes, sir.

3     Q.   In your Google advertisements?

4     A.   Yes, sir.

5     Q.   Where does it appear in the Google

6  advertisement?

7     A.   In the ad copy.

8     Q.   Okay.  Did you do anything else to try to

9  resolve that issue?

10    A.   We also let people know that we're a

11  third-party intake if they ask any questions --

12    Q.   Do you --

13    A.   -- about that.

14    Q.   Sorry.

11     Q.    Where is that?

12     A.    In -- it was in an e-mail sent out, as well as

13  in their training.

14     Q.    Okay.  When was that e-mail sent?

15     A.    I'm not sure.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   JIM S. ADLER, P.C. and       )
     JIM ADLER,                   )
 4       Plaintiffs,              )
                                  )
 5                                )
     VS.                          ) CA NO. 3:19-cv-02025-K-BN
 6                                )
                                  )
 7   MCNEIL CONSULTANTS, LLC      )
     D/B/A ACCIDENT INJURY        )
 8   LEGAL CENTER, QUINTESSA      )
     MARKETING, LLC D/B/A         )
 9   ACCIDENT INJURY LEGAL        )
     CENTER, and LAUREN VON       )
10   MCNEIL,                      )
         Defendants.             )
11
```

12                REPORTER'S CERTIFICATION

13          DEPOSITION OF LAUREN VON MCNEIL MINGEE

14                     April 13, 2022

15                   (REPORTED REMOTELY)

16

17          I, DIANA M. BENGS, Certified Shorthand

18  Reporter in and for the State of Texas, hereby certify

19  to the following:

20          That the witness, LAUREN VON MCNEIL

21  MINGEE, was duly sworn by the officer and that the

22  transcript of the oral deposition is a true record of

23  the testimony given by the witness;

24          I further certify that pursuant to

25  FRCP Rule 30(f)(1) that the signature of the deponent:

1          XXX was requested by the deponent or a

2   party before the completion of the deposition and that

3   the signature is to be before any notary public and

4   returned within 30 days from the date of receipt of the

5   transcript.  If returned, the attached Changes and

6   Signature Pages contains any changes and the reasons

7   therefore;

8          ____ was not requested by the deponent or

9   a party before the completion of the deposition.

10         I further certify that I am neither

11  counsel for, related to nor employed by any of the

12  parties or attorneys in the action in which this

13  proceeding was taken, and further that I am not

14  financially or otherwise interested in the outcome of

15  the action.

16         SWORN TO AND SUBSCRIBED by me in Tarrant

17  County, Texas, on this 25th day of April, 2022.

18

19  *Diana Bengs*

20  _____

    DIANA M. BENGS, CSR, RPR
21  Texas CSR No. 4907
    Certification Expires:  January 31, 2024
22  TSG REPORTING, INC.
    747 Third Avenue, 10th Floor
23  New York, New York 10017
    877.702.9580 (Office)
24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF TEXAS

 3                      DALLAS DIVISION

 4   JIM ADLER, P.C. AND           )

 5   JIM ADLER,                    )

 6            Plaintiffs           )

 7                                 )

 8   VS.                           )CIVIL ACTION

 9                                 )NO. 3:19-cv-02025-K-BN

10   MCNEIL CONSULTANTS, LLC,      )

11   D/B/A ACCIDENT INJURY LEGAL   )

12   CENTER, QUINTESSA MARKETING,  )

13   LLC, D/B/A ACCIDENT INJURY    )

14   LEGAL CENTER, AND LAURA       )

15   MINGEE,                       )

16            Defendants           )

17       -----------------------------------------

18            VIDEOTAPED ORAL DEPOSITION OF

19                    LAUREN MINGEE

20                  NOVEMBER 16, 2022

21             ***ATTORNEYS' EYES ONLY***

22       -----------------------------------------

23

24   REPORTED BY KATHRYN R. BAKER, RPR, CSR

25   JOB #219107
```

Exhibit B-2

1          VIDEOTAPED ORAL DEPOSITION OF LAUREN MINGEE,

2  produced as a witness at the instance of the PLAINTIFFS,

3  and duly sworn, was taken in the above-styled and numbered

4  cause on the 16th day of November, 2022, from 9:58 a.m. to

5  3:19 p.m., before Kathryn R. Baker, CSR, RPR, in and for

6  the State of Texas, reported by a Texas certified machine

7  shorthand reporter, at the offices of Lynn, Pinker, Cox,

8  Hurst & Schwegmann, LLP, 2100 Ross Avenue, Suite 2700, in

9  the City of Dallas, State of Texas, pursuant to the

10  Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:
      Jered Matthysse, Esq.
 3    Giulio Yaquinto, Esq.
      PIRKEY BARBER PLLC
 4    1801 East 6th Street
      Austin, Texas 78702
 5


 6
      FOR THE DEFENDANTS:
 7    Rebecca Adams, Esq.
      Christopher Schwegmann, Esq.
 8    LYNN PINKER HURST & SCHWEGMANN, LLP
      2100 Ross Avenue
 9    Dallas, Texas 75201

10

11    ALSO PRESENT:
      Mr. Chase Huddleston, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      LAUREN MINGEE

2    in boy.

3        Q.   And do you recall what Gorayab alleged in that

4    lawsuit?

5        A.   No.  I -- I know what had happened in the

6    lawsuit, though.  We had a third-party company that turned

7    on keyword insertion into ad copy, and it was supposed to

8    be for raising quality score for instances like car

9    accident lawyer.

10              So, for instance, if someone typed in this

11   client was in New York, someone typed in Brooklyn car

12   accident lawyer, the ad copy was supposed to read call

13   Brooklyn's car accident lawyer today.  Things of that

14   nature.

15              So whatever the person was typing in, the

16   potential client, it was supposed to insert it into ad

17   copy.  So they were AB testing in Google Ads, and they

18   turned that on in competitive.  And that was not supposed

19   to happen.

20              So whenever you would see our ad, it would

21   show Gorayab's name in the ad copy.  And it was for 36

22   hours that this happened and we did not know.  And once we

23   found out, we turned it off.

24       Q.   Okay.  And how did you resolve the lawsuit with

25   Google Ads?

1                            LAUREN MINGEE

2          A.    We just stopped bidding on his name.

3          Q.    Okay.  Did you agree to stop bidding on his name

4    in the settlement agreement?

5          A.    Yes.

6          Q.    Why did you agree to stop bidding on Gorayab's

7    name?

8          A.    We had -- we had done something wrong.  We had

9    entered his name into -- unknowingly, but we had put his

10   name in the ad copy.

11               And that is not at all what our best

12   practices were or what we were supposed to do.  So we said

13   that we would stop --

14         Q.    Okay.

15         A.    -- bidding on his name.

16         Q.    And you used the phrase "best practices."

17               What do you consider to be the best

18   practices for how you advertise your services?

19         A.    Best practices in regards to competitive

20   bidding?

21         Q.    Yes.

22         A.    In regards to competitive bidding, we do not use

23   the competitor's name in ad copy.  We are very generic in

24   our ad copy, as far as saying if they're injured in an

25   accident, call in for help.  And once they call in, then

```
1                        LAUREN MINGEE

2          A.    Yes, sir.

3          Q.    And is that because people were both calling in

4     in regards to potential cases and then also existing

5     cases?

6          A.    Yes, sir.
```

MS. ADAMS:  Objection, form.

1                    LAUREN MINGEE

2

App. 034

1                                LAUREN MINGEE

2     you?

3          A.    No, not to my knowledge.

4

1          LAUREN MINGEE

2   I would assume within 90 days, but I can't -- I can't

3   expressly give you the exact date.

4        Q.   I am going to hand you, Ms. Mingee, what will be

5   marked as Exhibit 140 -- no, 139.

6               (Exhibit 139 marked.)

7        A.   Thank you.

8        Q.   (BY MR. MATTHYSSE)   One -- I will give you a

9   second, Ms. Mingee, to take a look at this.  But as you

10  can see, this is another Excel.  It was a little smaller

11  so we were able to print it.  But it's an Excel produced

12  by Quintessa in this case in the same format.

13              Do you recognize this format as similar to

14  Quintessa 1 that we reviewed on the computer?

15       A.   Yes, sir.

16       Q.   And so this appears to be additional examples of

17  folks calling in, correct, and mentioning or asking for

18  Jim Adler or Texas Hammer; is that right?

19       A.   Yes.

20       Q.   And so that has continued to occur this year,

21  correct?

22       A.   Yes.

23       Q.   And these are summaries written by the call

24  center employees describing the conversation as it's

25  happening, correct?

```
1                      LAUREN MINGEE

2        A.   That the ad only allows you to click a call

3   button, not go to a Web site.
```

1                        LAUREN MINGEE

2              IN THE UNITED STATES DISTRICT COURT

3             FOR THE NORTHERN DISTRICT OF TEXAS

4                        DALLAS DIVISION

5    JIM ADLER, P.C. AND            )

6    JIM ADLER,                     )

7              Plaintiffs           )

8                                   )

9    VS.                            )CIVIL ACTION

10                                  )NO. 3:19-cv-02025-K-BN

11   MCNEIL CONSULTANTS, LLC,       )

12   D/B/A ACCIDENT INJURY LEGAL    )

13   CENTER, QUINTESSA MARKETING,   )

14   LLC, D/B/A ACCIDENT INJURY     )

15   LEGAL CENTER, AND LAURA        )

16   MINGEE,                        )

17            Defendants            )

18          ***********************************

19              REPORTER'S CERTIFICATION

20          ORAL DEPOSITION OF LAUREN MINGEE

21                 NOVEMBER 16, 2022

22          ***********************************

23        I, Kathryn R. Baker, RPR, a Certified Shorthand

24   Reporter in and for the State of Texas, hereby certify to

25   the following:

1                           LAUREN MINGEE

2              That the witness, LAUREN MINGEE, was duly sworn

3      by the officer and that the transcript of the oral

4      deposition is a true record of the testimony given by the

5      witness;

6              I further certify that pursuant to FRCP Rule

7      30(f)(1) that the signature of the deponent:

8              _X_ was requested by the deponent or a party

9      before the completion of the deposition and is to be

10     returned within 30 days from the date of receipt of the

11     transcript.  If returned, the attached Errata contain any

12     changes and the reasons therefor;

13             ___ was not requested by the deponent or a party

14     before the completion of the deposition.

15             I further certify that I am neither counsel for,

16     related to, nor employed by any of the parties or

17     attorneys in the action in which this proceeding was

18     taken, and further that I am not financially or otherwise

19     interested in the outcome of the action;

20

21

22

23

24

25

1                           LAUREN MINGEE

2           Subscribed and sworn to on this 30th day of

3     November, 2022.

4

5     _____
      KATHRYN R. BAKER, RPR, CSR #6955
6     Expiration Date:  04/30/2023
      Firm Registration No. 615
7     TSG Reporting
      228 E. 45th Street
8     Suite 810
      New York, New York 10017
9     877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JIM S. ADLER, P.C., AND JIM ADLER,** | § § § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § § | CAUSE NO. 3:19-cv-02025-K-BN |
| | § § | |
| | § | |
| **MCNEIL CONSULTANTS, LLC, d/b/a ACCIDENT INJURY LEGAL CENTER QUINTESSA MARKETING, LLC, d/b/a ACCIDENT INJURY LEGAL CENTER, AND LAUREN MINGEE,** | § § § § § § | |
| *Defendants.* | § | |

**EXPERT REBUTTAL REPORT OF DAVID M. LEATHERS**

_____
David M. Leathers

August 15, 2022

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I. ASSIGNMENT

1. I have been asked to evaluate the damages, if any, suffered by Jim S. Adler, P.C. and Jim Adler ("Adler") resulting from the alleged actions of McNeil Consultants, LLC, d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC, d/b/a Accident Injury Legal Center, and Lauren Mingee (collectively referred to as "AILC"). Specifically, I have been asked to respond to the July 14, 2022 Expert Report of R. Christopher Anderson (the "Anderson Report") issued on behalf of Adler. My report and the attached exhibits summarize my opinions based on the information reviewed and analysis performed to date. I may update my opinions, analyses and conclusions as additional information is made available to me.

2. In developing my opinions in this matter, I, and professionals working under my supervision and direction, have reviewed and analyzed documents produced in this matter, additional data provided by AILC, as well as publicly available information as listed on Exhibit 1. The review and analysis of this information and my experience in business and intellectual property valuation and the evaluation of economic damages, including damages resulting from trademark infringement, false advertising, and diminution, form the basis of my opinions.

3. Alvarez and Marsal ("A&M") is being compensated at a rate of $695 per hour for the work I have performed in connection with this matter. Neither A&M's fees nor my compensation is contingent on the conclusions reached or the ultimate resolution of this case.

4. I understand that I may be asked to testify regarding my opinions contained in this report as well as other related matters that may arise during trial. I anticipate that I will rely on materials referenced in my report as well as demonstrative exhibits to facilitate explanation of my testimony at trial in this matter.

## II. QUALIFICATIONS AND EXPERIENCE

5. I am a Managing Director in the Disputes and Investigations practice at A&M. A&M is a global professional services firm specializing in turnaround and interim management,

**App. 042**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

performance improvement, and business advisory services.  I am an Accredited Senior Member of the American Society of Appraisers and a Certified Fraud Examiner. Prior to joining A&M, I led the Legal & Economic Consulting practice for a global boutique management consulting firm.  Previously, I was a Managing Director at Huron Consulting Group, a Vice President of Charles River Associates, and a Principal and Senior Consultant at PricewaterhouseCoopers LLP.

6.    I have served as a financial expert witness or consultant in a variety of complex commercial litigation, business valuation and intellectual property matters.  My experience includes the analysis of accounting, financial, marketing and other business information to assess the economic impact of business events and negotiation decisions.  This experience includes the valuation of intellectual property as well as the determination of economic damages.  I often advise these clients on financial and valuation issues that arise during commercial disputes, capital raising activities, merger and acquisitions, and inter-company and other transactions.

7.    A copy of my curriculum vitae, including my current and past employment, professional affiliations and previous expert testimony is included as Exhibit 2 to this report.

### III.    SUMMARY OF OPINIONS

8.    Based on the information reviewed and analysis performed as of the date of this report, I have concluded the following:

- Mr. Anderson's analysis of the harm suffered as a result of the alleged actions in this matter ignores numerous factors and considerations which should be analyzed in connection with a claim of trademark infringement and unfair competition.   To ignore such considerations deviates from methodology accepted in the industry for such analysis.

- Mr. Anderson's analysis of the actual damages suffered by Adler are overstated, unsubstantiated, and unreliable.

- AILC earned no profits on its sale of leads derived from the Adler Marks.

2

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV.      BACKGROUND

### A.  *Personal Injury Law*

9.      The personal injury law industry consists of law firms that litigate tort lawsuits for their clients.[1]  These personal injury lawsuits include claims filed for motor vehicle, workplace, at-home, defective products, and other accidents.[2]  The industry is highly fragmented and varies geographically based on the laws of each specific state.[3]  The majority of personal injury lawyers work on a contingency fee basis in which the lawyers receive a portion of the final settlement if they win the case.[4]

10.      Personal injury lawyers compete for clients primarily on the basis of contingency fee percentage, services offered, and reputation.[5]  Personal injury lawyers advertise for clients on billboards, buses, benches, TV commercials, radio commercials, and online using search engines.[6]  With respect to mobile device marketing, Search Engine Marketing ("SEM") is an effective tool used by many personal injury lawyers and marketers.

### B.  *SEM*

11.      SEM is the online advertising of products and services through Google, Bing, and other search engines.   Based on the keywords typed into a search engine (e.g., Google), advertisements appear on the search engine results page ("SERP").   In the case of legal representation searches, the SERPs contain links that an individual can click on that will allow them to research and secure legal representation.

---

[1] "Personal Injury Lawyers & Attorneys Industry in the US – Market Research Report" (https://www.ibisworld.com/united-states/market-research-reports/personal-injury-lawyers-attorneys-industry/).
[2] Ibid.
[3] Ibid.
[4] Ibid.
[5] Ibid.
[6] "6 Tips for Marketing Your Personal Injury Practice" (https://onward.justia.com/6-tips-for-marketing-your-personal-injury-practice/).

**App. 044**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

12.    Google is the most used search engine and holds approximately 92 percent of the global search engine market.[7] As of April 2021, roughly 63 percent of Google search traffic in the United States originated from mobile devices.[8]

13.    For each search performed, regardless of device type, Google performs a process it calls the "Ad Auction". The Ad Auction determines the ads that will display on a SERP and the order in which those ads will appear on the SERP.[9] Each Ad Auction begins with the user entering a search term or keyword into the Google platform.[10] Google then finds all the ads in its system that are similar to the keyword.[11] From there, Google removes any ineligible ads (e.g., an ad for legal representation in California, but the keywords specified legal representation in Dallas, Texas) and ranks the remaining ads according to its "Ad Rank" scoring system.[12] Ad Rank assigns a number to each ad based on six factors:[13]

1. Bid amount, which is the maximum amount an advertiser is willing to pay for a click on their ad;

2. Quality of the ad and landing page;

3. Ad rank thresholds, or the minimum scores that an ad must have to appear in a certain position on a SERP;

4. Competitiveness of an ad auction;

5. Context of the keyword search, which includes factors such as the time the search was made and the person's location when the search was made; and

6. Expected impact related to ad extensions (i.e., a phone number to call) and other ad formats.

---

[7] Ibid.
[8] Ibid.
[9] "The Ad Auction", Google Ads Help (https://support.google.com/google-ads/answer/1704431).
[10] Ibid.
[11] Ibid.
[12] Ibid.
[13] "About Ad Position and Ad Rank", Google Ads Help (https://support.google.com/google-ads/answer/1722122?hl=en&ref_topic=3121771).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

The ads with the highest Ad Rank score appear on the SERP, with ads meeting the highest Ad Rank thresholds appearing above the organic search results.[14] Depending on the Ad Ranks for a particular Ad Auction, different numbers of ads may appear above the organic search results and below the organic search results.

14. Google tracks the results of an advertiser's Ad Auctions using its Quality Score, which is a score from one to ten that estimates the quality of an advertiser's ads, keywords, and landing pages.[15] Google calculates this score based on three performance factors: (1) expected clickthrough rate, (2) ad relevance, and (3) landing page experience. Expected clickthrough rate is the probability that an ad will be clicked on. Ad relevance is the measure of how an ad matches the reason for the user's search. Landing Page Experience measures the relevance and usefulness of an ad's landing page.[16] A business with a high Quality Score has demonstrated an ability to place quality ads resulting in more traffic to its business.[17] Because of this, Google places preferential treatment to advertisements with high Quality Scores.[18]

15. Based on the Google AdWords algorithm, improving the relevancy of the keywords being bid on and improving the Quality Score of the advertisements can directly impact the advertiser's CPC.[19] For example, if a competitors' Quality Score increases, and yours stays constant, your CPC will increase to stay in competition.[20]

### i. Keywords and Campaigns

16. Specific keywords and campaigns are important in reaching the desired ad audience. Keywords are a set of words or phrases that align with terms currently being searched by

---

[14] Ibid.

[15] "Quality Score: Definition", Google Ads Help (https://support.google.com/google-ads/answer/140351?hl=en).

[16] "About Quality Score", Google Ads Help (https://support.google.com/google-ads/answer/6167118?hl=en).

[17] "Quality Score: Definition", Google Ads Help (https://support.google.com/google-ads/answer/140351?hl=en).

[18] "Why Are Clicks Becoming More Expensive? Understanding CPC Inflation in Google Ads" (https://www.evoluted.net/thinktank/marketing/cpc-inflation).

[19] "How Much Do Google Ads Cost: 2021 vs. 2022" (https://videnglobe.com/blog/how-much-do-google-ads-cost-2021-vs-2022).

[20] "3 Trends That Explain Why Your CPC is Rising" (https://postclick.com/blog/why-cpc-rises/).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Google users.  The utilization of higher quality or more targeted key words (e.g., "Jim Adler"), will yield a better match between ad results and consumer search.[21]

17.   Google offers three different keyword matching processes that an advertiser can utilize: Exact Match, Phrase Match, and Broad Match.  Google defines these match types as follows:

- Exact Match is a "keyword match type that allows you to show your ads on searches that have the same meaning or same intent as your keyword. Exact match gives you the most control over who sees your ad, but reaches fewer searches than both phrase and broad match. This allows you to reach only users who make searches with the same meaning as your keywords."[22]

- Phrase Match is a "keyword match type that allows you to show your ads on searches that include the meaning of your keyword. The meaning of the keyword can be implied, and user searches can be a more specific form of the meaning. This allows you to reach more searches than with exact match and fewer searches than with broad match."[23]

- Broad Match is a "keyword match type allows your ad to show on searches that are related to the meaning of your keyword, which can include searches that don't contain the keyword terms. This allows you to reach more searches than with exact and phrase matches."[24]

18.   The table below provides examples of the three types of keyword matches based on the keyword "jim adler".

**Table 1**

| Keyword Purchased | Exact Match User Search Term | Phrase Match User Search Term | Broad Match User Search Term |
|---|---|---|---|
| **jim adler** | jim adler<br>jim addler<br>jom adler | jim adler houston tx<br>lawyer jim adler<br>jim adler son | injury lawyer houston<br>24 hour lawyer near me<br>labor lawyer |

---

[21] "About Keywords in Search Network Campaigns", Google Ads Help (https://support.google.com/google-ads/answer/1704371?hl=en).

[22] "Exact Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407781?hl=en#:~:text=A%20keyword%20match%20type%20that,both%20phrase%20and%20broad%20match.).

[23] "Phrase Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/11586965?hl=en).

[24] "Broad Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407779?hl=en&ref_topic=24936).

**App. 047**

19.     An Ad Campaign is a group of keywords that allows an advertiser to place ads over a variety of search inquiries. In order to create an Ad Campaign, the user selects a set of keywords to group together. After this selection, they set a budget for bidding. This tells the search engine how much they are willing to bid per keyword.[25]

### ii.   Click-to-call Advertisements

20.     Click-to-call advertisements are strictly for mobile searches and enable a mobile phone user to click on an ad shown on the SERP and initiate a phone call directly to that business.[26] These advertisements are usually short in nature and include the following: a heading, business name, phone number, description, and a URL display path.[27]

21.     Introduced by Google in 2010, click-to-call was designed with the belief that consumers preferred to directly call a business rather than visit a business's website.[28] Click-to-call ads evolved over the years following their introduction as the features and technology of mobile phones continued to evolve. For example, setting up a click-to-call ad became simpler, the user ad experience improved, and Google began tracking detailed reporting on calls and clicks.[29]

### iii.   Competition Among Advertisers

22.     Since the creation of Google AdWords in October 2000, the platform has seen a continuous and steep increase in advertising traffic.[30] However, as more businesses utilized keyword bidding, competition for space on the SERP increased, and keyword bidding has become

---

[25] "Create a Search Campaign", Google Ads Help (https://support.google.com/google-ads/answer/9510373#zippy=).
[26] "Click-to-Call Ads" (https://www.marchex.com/feature/click-to-call-ads/#:~:text=Digital%20ads%20that%20drive%20phone,click%20on%20a%20mobile%20device).
[27] "About Call Ads", Google Ads Help (https://support.google.com/google-ads/answer/6341403?hl=en).
[28] "Go Mobile! Series: Introducing Click-to-Call Phone Numbers in Local Ads on Mobile Devices" (https://adwords.googleblog.com/2010/01/introducing-click-to-call-phone-numbers html).
[29] "A Fast Start to 2017 for Click-to-Call Ads" (https://www.blog.google/products/ads/fast-start-2017-click-call-ads/).
[30] "The Evolution of Google AdWords – A $38 Billion Advertising Platform" (https://www.wordstream.com/blog/ws/2012/06/05/evolution-of-adwords#:~:text=October%2023%2C%202000%2C%20will%20be,online%20advertising%20platform%20%E2%80%80%93%20Google%20AdWords.).

App. 048

CONFIDENTIAL – ATTORNEYS' EYES ONLY

more expensive. The following points summarize key changes in the last decade in on-line advertising and the resulting impact on CPC.

- Average CPC increased by approximately 13 percent from January 2012 and January 2013.[31]

- In May 2017, Google removed the cap on Enhanced CPC bidding. Prior to this change, if Google believed that the purchased keyword would perform better at a higher bid, it would initiate an increase in bid price up to 30 percent of the originally selected bid price. After to this change, Google removed the cap resulting in an increase in keyword bidding of up to approximately 75 percent.[32]

- During 2019, Google updated its SERP to limit the amount of advertising space available to AdWords customers. This change resulted in increased competition and increased CPC.[33]

- In 2020, the global COVID-19 pandemic and resulting widespread lockdowns caused a sudden increase in digital advertising driven by changes in the way consumers led their personal and professional lives. In response to this change, businesses shifted their advertising dollars to focus on online (mobile and desktop) digital advertising resulting in additional increases in CPC.[34]

- Google's ad costs increased by an average of 15 to 25 percent in 2021 depending on the industry and are predicted to increase an additional 20 to 40 percent in 2022.[35]

23.    Google AdWords measures ad performance based on a variety of insights, including Search Overlap Rate, Position Above Rate, Search Outranking Share, and Absolute Top of the

---

[31] "Analyzing Cost-per-Click Inflation in the Marketplace" (https://searchengineland.com/analyzing-cost-per-click-inflation-in-the-marketplace-166634).
[32] "Why Are Clicks Becoming More Expensive? Understanding CPC Inflation in Google Ads" (https://www.evoluted.net/thinktank/marketing/cpc-inflation).
[33] Ibid.
[34] "3 Trends that Explain Why Your CPC is Rising" (https://postclick.com/blog/why-cpc-rises/).
[35] "How Much Do Google Ads Cost: 2021 vs 2022" (https://videnglobe.com/blog/how-much-do-google-ads-cost-2021-vs-2022).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page Rate. Search Overlap Rate is the metric that shows how often your advertisement and a competitor's advertisement acquired an impression at the same time.[36] Position above rate describes how often a competitor's advertisement was shown above yours when both advertisements were shown during a search.[37] Search Outranking Share is a metric that shows how often your advertisement ranked higher in an auction than your competitor's advertisement.[38] Absolute Top of Page Rate details how often your advertisement was shown as the first result in a search.[39]

### C. Parties

#### i. Adler

24. Jim Adler & Associates is a firm of thirty lawyers based in Houston, TX that has served its clients for over forty years.[40]  According to its website, Adler's practice areas include the following types of cases, among others:[41]

- Personal Injury;

- Motorcycle Accidents;

- Pedestrian Accidents; and

- Commercial Vehicle Accidents.

25. Adler's website indicates that they are "paid only at the end by winning for you, and then only from a part of the settlement, and not from your pocket."[42]

---

[36] "Use Auction Insights to Compare Performance" (https://support.google.com/google-ads/answer/2579754?hl=en#zippy=%2Cposition-above-rate-search-campaigns-only%2Coutranking-share%2Cabsolute-top-of-the-page-rate-search-campaigns-only).
[37] Ibid.
[38] Ibid.
[39] Ibid.
[40]  "About Us" (https://www.jimadler.com/about-us/).
[41] "Our Practice Areas" (https://www.jimadler.com/practices/).
[42] "About Us" (https://www.jimadler.com/about-us/).

### ii. AILC

26.     Lauren Mingee founded McNeil Consultants ("McNeil") in 2015 to provide marketing development consulting services to West Seegmiller, a California lawyer from The Seegmiller Law Firm, a firm specializing in personal injury law.[43] In 2017, McNeil stopped providing consulting services to ▓▓▓▓▓▓ and shifted its focus to Google keyword marketing of personal injury legal services in order to acquire and sell leads to law firms.[44] In 2019, Ms. Mingee wound down McNeil Consulting, LLC and formed a new business, Quintessa Marketing, LLC. ("Quintessa").[45] Currently, Quintessa has approximately 50 employees and is based in Oklahoma City, Oklahoma.[46] According to its website, "Quintessa Marketing delivers comprehensive marketing services for client acquisition to attorneys and law firms."[47]

27.     

## V.     ASSERTED CLAIMS OF ADLER

27.     Adler alleges that AILC uses Adler's trademarks, which include "JIM ADLER", ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" (collectively, the "Adler Marks"), to place confusing and misleading advertisements via mobile search

---

[43] Mingee Deposition at 36, 41, 44; ▓▓▓▓▓▓▓▓▓" (https://www.yelp.com/biz/the-seegmiller-law-firm-newport-beach).
[44] Mingee Deposition at 80-81.
[45] Mingee Deposition at 138.
[46] "Quintessa Marketing LinkedIn" (https://www.linkedin.com/company/quintessamarketing/about/).
[47] "Quintessa Marketing Home Page" (http://quintessamarketing.com/).
[48] Mingee Deposition at 74-75.
[49] Mingee Deposition at 73 and 199.

engines, which it alleges divert potential clients from Adler to AILC.[50] Adler alleges that AILC does this through its "Click-to-Call Scheme".[51]

28. Adler alleges that as part of AILC's Click-to-Call scheme it purchases the Adler Marks as keywords for ads on mobile devices because of the likelihood that the consumer will confusingly click on the AILC ad and call their operators.[52] Adler further alleges that these Google advertisements placed by AILC are designed to trick Adler's potential clients into believing that the AILC's website is associated with Adler. Additionally, Adler alleges that AILC is increasingly bidding higher amounts for keywords based on or associated with the Adler Marks, resulting in AILC's ads appearing next to Adler's on the SERP, causing additional confusion to consumers.[53]

29. As a result of the above allegations, Adler has asserted claims for the following:[54]

- Federal Trademark Infringement;

- Violation of Lanham Act Section 43(a);

- Common Law Trademark Infringement;

- Common Law Unfair Competition;

- Dilution Under Texas Law;

- Unjust Enrichment;

- Misappropriation of Name of Likeness;

- Misappropriation of Business Opportunity;

- Tortious Interference with Prospective Business Opportunity; and

- Tortious Interference with Existing Contract.

---

[50] Plaintiff's Third Amended Petition, p. 10-11.
[51] Plaintiff's Third Amended Petition, p. 10.
[52] Plaintiff's Third Amended Petition, p. 11.
[53] Plaintiff's Third Amended Petition, p. 10-12.
[54] Plaintiff's Third Amended Petition, pp. 16-18.

11

**App. 052**

30. Adler seeks lost profits and disgorgement of AILC's profits obtained through the so-called Click-to-Call Scheme, among other actions.[55]

## VI. SUMMARY OF DR. STEWART'S OPINIONS

31. Dr. David W. Stewart, Ph.D. issued an expert report on July 11, 2022 (the "Stewart Report") on behalf of Adler. I understand that the Stewart Report includes the results of a survey that focused solely on a Google search for the term "the texas hammer". Dr. Stewart surveyed roughly 400 individuals that were above the age of 18 and that live in Texas.

32. I understand that the survey instructed respondents to imagine they wanted to seek information about or shop for the services of a personal injury attorney. The survey then instructed respondents to imagine that they had heard of a lawyer referred to as "the texas hammer" and to imagine they entered a search for that term. The survey then presented each respondent with a screenshot of three different Google ads for the various groups (an AILC ad, a semi-truck settlement ad, and an Alder ad) and asked respondents to select which advertisement they would click to "obtain those services." Dr. Stewart analyzed the individuals' responses and concluded that 44 percent of the respondents who selected the AILC advertisement were confused by the advertisement.[56]

## VII. SUMMARY OF MR. ANDERSON'S OPINIONS

33. Mr. Anderson asserts that AILC's "unauthorized use of the Adler Marks caused Adler to lose clients and incur higher advertising expenses."[57] ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████ █████████████
████████████████████████████████████████████████
████████████████████████████████████████████[59]

---

[55] Plaintiff's Third Amended Complaint, p. 19.
[56] Dr. David W. Steward, Ph. D Expert Report dated July 11, 2022 p. 17.
[57] Anderson Report, p. 20.
[58] Anderson Report, p. 23.
[59] Anderson Report, p. 35.

### A. Increased Advertising Expenses

34.   Mr. Anderson asserts that Adler is entitled to damages based on Adler's increased CPC allegedly caused by the actions of AILC from the second quarter of 2019 ("Q2 2019") through the second quarter of 2022 ("Q2 2022").[60]   Mr. Anderson begins his damages period in Q2 2019 because Q2 2019 is when he understood that "AILC markedly increased its bids and total spending on Keywords that use the Adler Marks."[61] ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

35.   Mr. Anderson's first method estimates Adler's increased CPC from Q2 2019 through Q2 2022 based on a multiple regression analysis which relies solely on Adler's Google AdWords data (the "Anderson Regression").[63]   According to Mr. Anderson, the Anderson Regression measures the increase in Adler's CPC beginning in Q2 2019 "that cannot be explained by general price increases over time, market anomalies such as the COVID19 pandemic, or general differences in individual Keyword prices."[64]   Additionally, Mr. Anderson claims that the Anderson Regression "controls for monthly cost trends, observed annual price changes of all Adler's Branded Keywords, generally, and the observed daily price changes of Adler's top seventeen (17) Keywords (by spending)."[65]

36.   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

---

[60] Anderson Report, pp. 21-22.
[61] Anderson Report, p. 22.
[62] Anderson Report, pp. 21-23.
[63] Anderson Report, pp. 21-22, Schedule 4.1, Schedule 4.1a, and Schedule 9.0.
[64] Anderson Report, p. 22.
[65] Ibid.
[66] Anderson Report, pp. 21-23.
[67] Anderson Report, Schedule 4.1.

**App. 054**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

37. 

38.

### B. Diverted Clients

39.    Mr. Anderson asserts that AILC confused Google mobile users and diverted "potential and/or existing clients" from Adler to Adler's competitors through the use of the Adler Marks.[74] Mr. Anderson claims that AILC was able to exploit the Adler Marks by placing higher bids on Adler keywords, using smart bidding strategies, and implementing click-to-call campaigns on mobile phones.[75] Mr. Anderson concludes the following based on his analysis of AILC's use of the "jim adler" keyword from Q1 2019 through Q2 2022:[76]

---

[68] Anderson Report, pp. 22-23.
[69] Anderson Report, p. 23 and Schedule 4.2.
[70] Ibid.
[71] Ibid.
[72] Ibid.
[73] Anderson Report, p. 32.
[74] Ibid.
[75] Ibid.
[76] Anderson Report, pp. 30-32 and Schedules 14.1-14.4.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ██████████████████████

### C. AILC's Revenues

40.  Mr. Anderson asserts that Adler is entitled to the disgorgement of AILC's revenues and profits resulting from its allegedly unlawful activities. ██████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████

41.  ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

---

[77] Anderson Report, p. 35.
[78] Ibid.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

spending on the Adler Marks.[79]  The table below summarizes Mr. Anderson's estimation of AILC's revenues derived from the Adler Marks from 2019 through 2021.



*Source  Anderson Report, p. 35*

# VIII.        DAMAGE ANALYSIS

### A.  Forms of Relief

42.    Damages in trademark infringement, unfair competition, and false advertising matters can be measured using a number of different methodologies, including the infringer's actual profits and the plaintiff's actual damages sustained, including the plaintiff's lost profits, or alternatively, a reasonable royalty for the use of the trademark owner's marks.[80]

### B.  Diverted Clients

43.    Mr. Anderson asserts that AILC confused Google users and diverted Adler's potential and/or actual clients to Adler's competitors.

#### i.  Alleged Confusion

44.    I understand that Dr. Jeffery Stec has been retained to analyze Dr. Stewart's survey and conclusions on the alleged customer confusion and Dr. Stec has opined that Dr. Stewart's survey is unreliable and materially flawed.  I understand that Dr. Stec's opinion is that the

---

[79] Anderson Report, pp. 34-35.
[80] *15 U.S. Code § 1117, Recovery for Violation of Rights*; The use of a reasonable royalty as a measure of the trademark owner's damages is supported by *Sands, Taylor & Wood v. Quaker Oaks Co*., 34 F.3d (7th Cir. 1994), *corrected, substituted op.*, 44 F.3d 579 (7th Cir. 1995) and *adidas America, Inc. v. Payless Shoesource, Inc*., No. CV 01-1655-KI, 2008 wl 4279812 (D. Or. Sept. 12, 2008).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

actual percentage of customers who may have been confused by AILC's click-to-call ads is significantly less than the confusion rate concluded by Dr. Stewart.

45.     

46.     Mr. Anderson failed to isolate the portion of AILC's clicks and resulting leads, if any, that directly resulted from the alleged customer confusion. Instead, he incorrectly assumed that 100 percent of AILC's clicks and resulting leads were due to the alleged confusion and that no other factors influenced a consumer's purchasing decision.

### ii.   Diverted Clients

47.     Mr. Anderson evaluates a variety of Google performance metrics to show that Adler and AILC directly competed for impressions and clicks from Q1 2019 through Q2 2022. However, the same Google performance metrics that Mr. Anderson evaluates also show that 42 attorneys, law firms, and other marketers (collectively, "Other Competitors") also competed directly with Adler for impressions and clicks. For any given quarter during the alleged damage period, an average of 10 Other Competitors competed with Adler for impressions and clicks.

48.     Adler's Google performance metrics illustrate the significant presence of Other Competitors in Adler's ad auctions from Q1 2019 through Q2 2022:[82]

●     ███████████████████████████████████████████
      ██████████████████████████

---

[81] Anderson Report, p. 24.
[82] Anderson Report, Schedules 14.1-14.4; ADLER_000625.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



49.     Mr. Anderson did not consider how the competitive landscape may or may not have changed from his pre-damages period (prior to Q2 2019) to his damages period (Q2 2019 through Q2 2022).  For example, Mr. Anderson did not consider the Google performance metrics from any years prior to 2019.

50.     In summary, Mr. Anderson's analysis ignores the bidding activities of the Other Competitors and the resulting impact on Adler's impressions, clicks, and CPC.

### C. Increased Advertising Expenses

51.     The value of the plaintiff's lost profits should measure the direct impact of the alleged harmful acts on the plaintiff.  Lost profits represent the difference between the profits the Plaintiff would have earned if not for the Defendant's alleged harmful acts and the Plaintiff's actual profits.  While Mr. Anderson has asserted that AILC diverted potential and/or actual clients to Adler's competitors, Mr. Anderson has not calculated Adler's lost revenues or resulting lost profits from the allegedly diverted clients.

52.     Mr. Anderson has instead estimated the increased advertising costs that Adler has allegedly incurred.  The following sections evaluate Mr. Anderson's calculations of the increase in Adler's advertising expenses purportedly resulting from the alleged harmful acts of AILC.

### i. Adler's Advertising Expenses

53.     Google CPC for keywords across all industries has increased steadily over the past decade.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



54. Other than a ▓▓▓ CPC during the first half of 2020, likely the result of the COVID-19 pandemic, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as it did prior to AILC's alleged harmful actions.

55. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

56. Table 3 below summarizes ▓▓▓▓▓▓▓▓▓▓▓▓▓ for the pre-damages period of Q1 2017 through Q1 2019 compared to Mr. Anderson's damages period of Q2 2019 through Q2 2022. As the table demonstrates, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19

**App. 060**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

during the alleged damages period, illustrating that the alleged unlawful actions did not unfavorably impact Adler's Branded CPC or that there are other factors impacting Adler's Branded CPC.

**Table 3**



*Source: Anderson Report Schedule 9.0*

57.

**Table 4**

*Source: ADLER_000619-000623; ADLER_000689*

58.     During the damage period, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These statistics further illustrate that other factors contributed to changes in Adler's branded CPC.

### ii. Anderson Regression

59.     The Anderson Regression suffers from a number of deficiencies that result in a speculative and unreliable conclusion.  First, because the regression only utilizes Adler's data, it does not control for exogenous factors, such as changes in CPC across the market, the actions

20

of AILC, or the actions of the Other Competitors. Mr. Anderson does not consider or utilize any market data as a benchmark or baseline to measure CPC price changes that are not affected by AILC's actions. By failing to incorporate this outside data and CPC market price changes, the Anderson Regression deviates from methodology accepted in the industry for such analysis.

60. The Anderson Regression assumes, without explanation, that the full increase in Adler's Branded CPC between Q2 2019 and Q2 2022, after controlling for monthly, yearly, and keyword-specific effects on CPC, is due entirely to AILC's alleged harmful actions. Since AILC's data is not utilized in the Anderson Regression, this assumption doesn't measure the impact on Adler's Branded CPC that may have been caused by AILC's branded keyword bidding, impressions, clicks, and spending by others on Adler's keywords in a given month or period of time.

61. In addition to the failure to control for exogenous factors or consider AILC's actual bidding activity, Mr. Anderson does not account for the number of clicks for a given CPC. For example, certain keywords resulted in far more clicks than others. The Anderson Regression does not account for this volume difference and weight certain keywords more than others in calculating the overall effect on Adler's CPC. Mr. Anderson simply and unilaterally applies an unweighted average CPC to all branded clicks. In addition, the daily CPC data and monthly summaries of the daily CPC data that Mr. Anderson relies on, contain observations that are not equally weighted. For example, some daily observations had only one click, while others had as many as 81 clicks. The number of clicks necessarily affects the ultimate cost to Adler and should be accounted for in the Anderson Regression.

62. ███████████████████████████████████████████████████
███████████████████    ███████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████.

63. In addition to the issues described above, Mr. Anderson's explanation of the Anderson Regression is inconsistent with the actual functionality and results of the regression for the following reasons:

21

- Anderson states that his model is based on the "daily CPC data from January 2017 to March 2019,"[83] which would suggest that the model's coefficients control for cost trends over months and years and adjust for individual keywords that are based on Q1 2017 through Q1 2019 data. However, the regression model's coefficients are estimated using CPC data from Q1 2017 through Q2 2022 (not ending in Q1 2019), meaning that all of the Anderson Regression's coefficients are based on data in both the pre-damages period and the damages period.

- Anderson states that the Anderson Regression controls for "market anomalies such as the COVID19 pandemic."[84] However, the Anderson Regression simply accounts for the monthly increase in prices over time and if a certain year had abnormal pricing relative to other years. Mr. Anderson did not evaluate or control for decreases in other AdWords costs due to COVID19 or specifically adjust for a period of time in which costs were affected by COVID19.

- Anderson states that his model controls for "the observed _daily_ price changes of Adler's top seventeen (17) Keywords (by spending)."[85] (emphasis added) However, there is no indication that daily price changes were controlled for in his model as the model relies on a monthly summary of Adler's CPC data.

64. In order to further evaluate the Anderson Regression, I ran a regression model based on AILC's impressions and Adler's Branded CPC, controlling for the month.[86] Presumably, if AILC's impressions were causing Adler's Branded CPC to increase, as Mr. Anderson seems to assert, there should be a positive, statistically significant relationship between the two variables, as demonstrated by the regression results. However, the regression shows no relationship between AILC's impressions and Adler's Branded CPC. The AILC impressions coefficient was 0.002 with an insignificant p-value (0.22), meaning that there was no statistically significant relationship identified between AILC's impressions and

---

[83] Anderson Report, p. 22.
[84] Ibid.
[85] Ibid.
[86] Because only exact matches were available in the AILC data (QUINTESSA_000002), I utilized Adler's Branded CPC for exact matches only for purposes of this regression.

App. 063

Adler's Branded CPC when controlling for the month. See Exhibit 4 to this report for a summary of this regression, which further serves to show the speculative and unreliable nature of the Anderson Regression.

### iii. Anderson Average

65. The Anderson Average is a simplistic calculation that also fails to control for exogenous factors, such as changes in CPC across the market, the actions of AILC, or the actions of the Other Competitors. For the Anderson Average to produce a supportable and reliable result, it should consider a market benchmark or yardstick, which when compared to Adler's CPC could indicate the amount by which Adler's CPC was impacted by non-market forces. If Mr. Anderson had evidence that such non-market forces stemmed from AILC's alleged harmful actions, then Mr. Anderson may be able to show that Adler's above market CPC was caused by the alleged actions of AILC. However, Mr. Anderson's simplistic approach fails to consider anything beyond Adler's historical average from only a portion of the pre-damages period.

66. If adjusted to utilize the average quarterly change of ▆▆▆▆▆▆ from the entire pre-damages period (Q1 2017 through Q1 2019), the Anderson Average model would have resulted in But-For CPC that was higher than Adler's actual CPC. In other words, there would be no damages according to Mr. Anderson's model. Exhibit 5 demonstrates the impact (no damages) from changing the historical average growth rate to the period from Q1 2017 through Q1 2019.

### iv. Conclusion

67. Mr. Anderson takes a myopic view of Adler's advertising costs from 2017 through Q2 2022. He does not consider and utilize the entire pre-damages time period in the Anderson Average. The Anderson Regression serves as an echo chamber as it does not incorporate market data, or any data outside of Adler's own data, to quantify the impact on Adler's branded CPC, if any, resulting from AILC's actions.

68. As described above, the Anderson Regression and the Anderson Average both suffer from numerous flaws and deviate from accepted methodology for such analysis. The similar

CONFIDENTIAL – ATTORNEYS' EYES ONLY

results from both analysis proport to add validity to the calculated damages and that Adler suffered some harm as a result of AILC's alleged harmful actions. However, the similar results from each methodology only result from the utilization of flawed assumptions. While the mechanics of each approach differ, both models:

- Attempt to control for "normal" changes in Adler's CPC;

- Apply an estimated increase in CPC, allegedly attributable to AILC, unilaterally across all keywords;

- Fail to properly account for changes in CPCs not caused by AILC's activity, such as the impact of Other Competitors and overall market forces; and

- Attribute the full increase in cost above Mr. Anderson's price increase-adjusted expected CPC to AILC.

69.    In summary, Mr. Anderson has failed to show that Adler was harmed as a result of AILC's actions in this matter.

### D.  Accounting of AILC's Profits

70.    In computing the infringer's actual profits, the Lanham Act states that the plaintiff (Adler) must only prove the defendants' (AILC) sales.[87]   It is then the responsibility of the defendant to "prove all elements of cost or deduction claimed".[88]

71.    When calculating the disgorgement of profits, the applicable profit is the incremental profit resulting from the alleged harmful acts.  Incremental profits are best represented by gross profits, or revenues less cost of goods sold (or direct costs) and other incremental costs, that vary when certain volume levels or thresholds are reached or are removed.

---

[87] Lanham Act § 35(a).
[88] Lanham Act § 35(a).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

> ### *i.* *Mr. Anderson's Estimation of Revenues Attributable to the Alleged Infringement of the Adler Marks*

72. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████

> ### *ii.* *Calculation of AILC's Revenues*

73. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

74. AILC tracks its revenue on a campaign basis and does not track revenue at a keyword level. Therefore, the revenue attributable to the Adler keywords must be apportioned from the campaign level revenues. AILC provided revenues for each campaign containing an Adler keyword from January 1, 2019 through August 10, 2022. I have estimated the revenue attributed to the Adler keywords based on the following two methodologies:[92]

  - Adler Revenues = Percentage of total clicks resulting from Adler keywords multiplied by total campaign revenues; and

  - Adler Revenues = Percentage of total calls resulting from Adler keywords multiplied by total campaign revenues.

---

[89] Anderson Report, p. 35.
[90] Ibid.
[91] Interview with Lauren Mingee.
[92] See Exhibit 6 for the annual calculations of AILC's Adler related revenues from January 1, 2019 through August 10, 2022.

**App. 066**

75.     In estimating AILC's incremental profits below, I have utilized the apportionment methodology based on the percentage of calls as it is more indicative of the number of leads provided.

### iii. Incremental Expenses

76.     

Therefore, my analysis of AILC's incremental costs and profits was limited to a deduction of Google advertising expenses. Exhibit 7 to this report summarizes AILC's Google advertising expenses from January 1, 2019 through August 10, 2022.

### iv. Summary

77.     



---

[93] Interview with AILC accounting personnel.
[94] Ibid.
[95]

These gross profits would only be relevant if it was determined that leads from the use of Adler keywords contributed to growth in AILC's attorney and law firm clients. I understand and have seen no evidence support such results. Additionally, I understand that AILC was willing to stop bidding on the Adler Marks because they are not profitable (Mingee Deposition at 188-189).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

78.   These revenues have not been adjusted to account for the fact that Google's broad match process often matches AILC's keywords that include the Adler Marks with user search terms that are not related to the Adler Marks, and therefore could not have resulted from some confusion.  For example, Table 6 compares the consumer search terms to broad match keywords that resulted in a click on AILC's advertisement.

**Table 6**



*Source: 2019-2022 Adler Keywords and Search terms.xlsm*

79.

App. 068

Adler v. Quintessa, et al.
Altern & Marsal - Privileged & Confidential

**Exhibit 1**
**Documents Considered**

| Documents |
| --- |

**Adler Produced Documents**

| | | |
| --- | --- | --- |
| ADLER_000001 | ADLER_000422 | ADLER_000626 (Slipsheet) |
| ADLER_000003 | ADLER_000425 | ADLER_000626 |
| ADLER_000004 | ADLER_000428 | ADLER_000627 (Slipsheet) |
| ADLER_000009 | ADLER_000431 | ADLER_000627 |
| ADLER_000018 | ADLER_000434 | ADLER_000628 (Slipsheet) |
| ADLER_000024 | ADLER_000437 | ADLER_000628 |
| ADLER_000077 | ADLER_000440 | ADLER_000629 (Slipsheet) |
| ADLER_000082 | ADLER_000443 | ADLER_000629 |
| ADLER_000087 | ADLER_000446 | ADLER_000630 (Slipsheet) |
| ADLER_000091 | ADLER_000448 | ADLER_000630 |
| ADLER_000100 | ADLER_000450 | ADLER_000631 (Slipsheet) |
| ADLER_000104 | ADLER_000456 | ADLER_000631 |
| ADLER_000116 | ADLER_000462 | ADLER_000632 (Slipsheet) |
| ADLER_000131 | ADLER_000463 | ADLER_000632 |
| ADLER_000134 | ADLER_000468 | ADLER_000633 (Slipsheet) |
| ADLER_000139 | ADLER_000469 | ADLER_000633 |
| ADLER_000142 | ADLER_000472 | ADLER_000634 (Slipsheet) |
| ADLER_000146 | ADLER_000477 | ADLER_000634 |
| ADLER_000151 | ADLER_000481 | ADLER_000635 (Slipsheet) |
| ADLER_000155 | ADLER_000482 | ADLER_000635 |
| ADLER_000159 | ADLER_000486 | ADLER_000636 (Slipsheet) |
| ADLER_000166 | ADLER_000487 | ADLER_000636 |
| ADLER_000167 | ADLER_000491 | ADLER_000637 (Slipsheet) |
| ADLER_000168 | ADLER_000492 | ADLER_000637 |
| ADLER_000169 | ADLER_000493 | ADLER_000638 (Slipsheet) |
| ADLER_000170 | ADLER_000498 | ADLER_000638 |
| ADLER_000175 | ADLER_000501 | ADLER_000639 (Slipsheet) |
| ADLER_000179 | ADLER_000506 | ADLER_000639 |
| ADLER_000183 | ADLER_000507 | ADLER_000640 |
| ADLER_000188 | ADLER_000511 | ADLER_000644 (Slipsheet) |
| ADLER_000189 | ADLER_000516 | ADLER_000644 |
| ADLER_000190 | ADLER_000519 | ADLER_000645 (Slipsheet) |
| ADLER_000191 | ADLER_000520 | ADLER_000645 |
| ADLER_000199 (Slipsheet) | ADLER_000521 | ADLER_000646 |
| ADLER_000200 | ADLER_000522 | ADLER_000649 |
| ADLER_000207 | ADLER_000527 | ADLER_000650 |
| ADLER_000214 | ADLER_000528 | ADLER_000653 (Slipsheet) |
| ADLER_000219 | ADLER_000534 | ADLER_000653 |
| ADLER_000220 | ADLER_000539 | ADLER_000654 (Slipsheet) |
| ADLER_000221 | ADLER_000543 | ADLER_000654 |
| ADLER_000222 | ADLER_000547 | ADLER_000655 (Slipsheet) |
| ADLER_000236 | ADLER_000548 | ADLER_000655 |
| ADLER_000240 | ADLER_000551 | ADLER_000656 (Slipsheet) |
| ADLER_000254 | ADLER_000556 | ADLER_000656 |
| ADLER_000261 | ADLER_000561 | ADLER_000657 (Slipsheet) |
| ADLER_000268 | ADLER_000564 | ADLER_000657 |
| ADLER_000269 | ADLER_000565 | ADLER_000658 (Slipsheet) |
| ADLER_000270 | ADLER_000569 | ADLER_000658 |
| ADLER_000271 | ADLER_000572 | ADLER_000659 (Slipsheet) |
| ADLER_000272 | ADLER_000575 | ADLER_000659 |
| ADLER_000280 | ADLER_000576 | ADLER_000660 (Slipsheet) |
| ADLER_000283 | ADLER_000581 | ADLER_000660 |
| ADLER_000287 | ADLER_000582 | ADLER_000661 (Slipsheet) |
| ADLER_000292 | ADLER_000583 | ADLER_000661 |
| ADLER_000294 | ADLER_000584 | ADLER_000662 |
| ADLER_000295 | ADLER_000585 | ADLER_000666 |
| ADLER_000296 | ADLER_000586 | ADLER_000671 |

Case 1:19-cv-02025-BAH Document 2027-1 Filed 08/22/23 Page 109 of 338 PageID 26060
Alvarez & Marsal
Adler v. Quintessa, et al
Privileged & Confidential

| Documents | | |
|---|---|---|
| ADLER_000302 | ADLER_000587 | ADLER_000688 (Slipsheet) |
| ADLER_000303 | ADLER_000588 | ADLER_000688 |
| ADLER_000308 | ADLER_000589 | ADLER_000689 (Slipsheet) |
| ADLER_000316 | ADLER_000590 | ADLER_000689 |
| ADLER_000322 | ADLER_000591 | ADLER_000690 (Slipsheet) |
| ADLER_000323 | ADLER_000592 | ADLER_000690 |
| ADLER_000324 | ADLER_000593 | ADLER_000691 (Slipsheet) |
| ADLER_000326 | ADLER_000594 | ADLER_000691 |
| ADLER_000333 | ADLER_000595 | ADLER_000692 |
| ADLER_000335 | ADLER_000596 | ADLER_000698 |
| ADLER_000341 | ADLER_000597 | ADLER_000700 |
| ADLER_000342 | ADLER_000598 | ADLER_000701 |
| ADLER_000343 | ADLER_000599 | ADLER_000702 |
| ADLER_000345 | ADLER_000600 | ADLER_000703 |
| ADLER_000350 | ADLER_000601 | ADLER_000704 |
| ADLER_000352 | ADLER_000602 | ADLER_000705 |
| ADLER_000358 | ADLER_000603 | ADLER_000706 |
| ADLER_000359 | ADLER_000604 | ADLER_000707 |
| ADLER_000360 | ADLER_000605 | ADLER_000708 |
| ADLER_000361 | ADLER_000606 | ADLER_000709 |
| ADLER_000362 | ADLER_000607 | ADLER_000710 |
| ADLER_000367 | ADLER_000608 | ADLER_000711 |
| ADLER_000375 | ADLER_000609 | ADLER_000712 |
| ADLER_000376 | ADLER_000610 | ADLER_000713 |
| ADLER_000378 | ADLER_000611 | ADLER_000714 |
| ADLER_000379 | ADLER_000614 | ADLER_000715 |
| ADLER_000381 | ADLER_000617 | ADLER_000716 |
| ADLER_000382 | ADLER_000618 (Slipsheet) | ADLER_000717 |
| ADLER_000384 | ADLER_000618 | ADLER_000718 |
| ADLER_000385 | ADLER_000619 (Slipsheet) | ADLER_000719 |
| ADLER_000386 | ADLER_000619 | ADLER_000720 |
| ADLER_000387 | ADLER_000620 (Slipsheet) | ADLER_000724 |
| ADLER_000388 | ADLER_000620 | ADLER_000618 |
| ADLER_000404 | ADLER_000621 (Slipsheet) | ADLER_000624 |
| ADLER_000407 | ADLER_000621 | ADLER_000625 |
| ADLER_000410 | ADLER_000622 (Slipsheet) | ADLER_000626 |
| ADLER_000413 | ADLER_000622 | ADLER_000627 |
| ADLER_000416 | ADLER_000623 (Slipsheet) | ADLER_000628 |
| ADLER_000419 | ADLER_000623 | ADLER_000629 |
| ADLER_000634 | ADLER_000624 (Slipsheet) | ADLER_000630 |
| ADLER_000635 | ADLER_000624 | ADLER_000631 |
| ADLER_000636 | ADLER_000625 (Slipsheet) | ADLER_000632 |
| ADLER_000637 | ADLER_000625 | ADLER_000633 |
| ADLER_000638 | ADLER_000639 | ADLER_000644 |
| ADLER_000645 | ADLER_000657 | ADLER_000688 |
| ADLER_000653 | ADLER_000658 | ADLER_000689 |
| ADLER_000654 | ADLER_000659 | ADLER_000690 |
| ADLER_000655 | ADLER_000660 | ADLER_000691 |
| ADLER_000656 | ADLER_000661 | ADLER_000619 |
| ADLER_000620 | ADLER_000622 | ADLER_000199 |
| ADLER_000621 | ADLER_000623 | |

**Quintessa Produced Documents**

| | | |
|---|---|---|
| QUINTESSA_000001 | QUINTESSA_001479 | QUINTESSA_001618 |
| QUINTESSA_000002 | QUINTESSA_001480 | QUINTESSA_001619 |
| QUINTESSA_000127 | QUINTESSA_001481 | QUINTESSA_001620 |
| QUINTESSA_000164 | QUINTESSA_001482 | QUINTESSA_001621 |
| QUINTESSA_000165 | QUINTESSA_001483 | QUINTESSA_001622 |
| QUINTESSA_000181 | QUINTESSA_001484 | QUINTESSA_001623 |
| QUINTESSA_000486 | QUINTESSA_001485 | QUINTESSA_001624 |

Alvarez & Marsal
Alvarez Quintessa, et al.

Privileged & Confidential

**Documents**

| | | |
|---|---|---|
| QUINTESSA_000837 | QUINTESSA_001486 | QUINTESSA_001625 |
| QUINTESSA_001227 | QUINTESSA_001487 | QUINTESSA_001626 |
| QUINTESSA_001229 | QUINTESSA_001488 | QUINTESSA_001627 |
| QUINTESSA_001231 | QUINTESSA_001489 | QUINTESSA_001628 |
| QUINTESSA_001233 | QUINTESSA_001490 | QUINTESSA_001629 |
| QUINTESSA_001395 | QUINTESSA_001491 | QUINTESSA_001630 |
| QUINTESSA_001396 | QUINTESSA_001492 | QUINTESSA_001631 |
| QUINTESSA_001397 | QUINTESSA_001493 | QUINTESSA_001632 |
| QUINTESSA_001398 | QUINTESSA_001494 | QUINTESSA_001633 |
| QUINTESSA_001399 | QUINTESSA_001495 | QUINTESSA_001634 |
| QUINTESSA_001400 | QUINTESSA_001496 | QUINTESSA_001635 |
| QUINTESSA_001956 | QUINTESSA_001497 | QUINTESSA_001636 |
| QUINTESSA_002421 | QUINTESSA_001498 | QUINTESSA_001637 |
| QUINTESSA_002423 | QUINTESSA_001499 | QUINTESSA_001638 |
| QUINTESSA_002425 | QUINTESSA_001500 | QUINTESSA_001639 |
| QUINTESSA_001352 | QUINTESSA_001501 | QUINTESSA_001640 |
| QUINTESSA_001353 | QUINTESSA_001502 | QUINTESSA_001641 |
| QUINTESSA_001354 | QUINTESSA_001503 | QUINTESSA_001642 |
| QUINTESSA_001355 | QUINTESSA_001504 | QUINTESSA_001643 |
| QUINTESSA_001356 | QUINTESSA_001505 | QUINTESSA_001644 |
| QUINTESSA_001357 | QUINTESSA_001506 | QUINTESSA_001645 |
| QUINTESSA_001358 | QUINTESSA_001507 | QUINTESSA_001646 |
| QUINTESSA_001359 | QUINTESSA_001508 | QUINTESSA_001647 |
| QUINTESSA_001360 | QUINTESSA_001509 | QUINTESSA_001648 |
| QUINTESSA_001361 | QUINTESSA_001510 | QUINTESSA_001649 |
| QUINTESSA_001362 | QUINTESSA_001511 | QUINTESSA_001650 |
| QUINTESSA_001363 | QUINTESSA_001512 | QUINTESSA_001651 |
| QUINTESSA_001364 | QUINTESSA_001513 | QUINTESSA_001652 |
| QUINTESSA_001365 | QUINTESSA_001514 | QUINTESSA_001653 |
| QUINTESSA_001366 | QUINTESSA_001515 | QUINTESSA_001654 |
| QUINTESSA_001367 | QUINTESSA_001516 | QUINTESSA_001655 |
| QUINTESSA_001368 | QUINTESSA_001517 | QUINTESSA_001656 |
| QUINTESSA_001369 | QUINTESSA_001518 | QUINTESSA_001657 |
| QUINTESSA_001370 | QUINTESSA_001519 | QUINTESSA_001658 |
| QUINTESSA_001371 | QUINTESSA_001520 | QUINTESSA_001659 |
| QUINTESSA_001372 | QUINTESSA_001521 | QUINTESSA_001660 |
| QUINTESSA_001373 | QUINTESSA_001522 | QUINTESSA_001661 |
| QUINTESSA_001374 | QUINTESSA_001523 | QUINTESSA_001662 |
| QUINTESSA_001375 | QUINTESSA_001524 | QUINTESSA_001663 |
| QUINTESSA_001376 | QUINTESSA_001525 | QUINTESSA_001664 |
| QUINTESSA_001377 | QUINTESSA_001526 | QUINTESSA_001665 |
| QUINTESSA_001378 | QUINTESSA_001527 | QUINTESSA_001666 |
| QUINTESSA_001379 | QUINTESSA_001528 | QUINTESSA_001667 |
| QUINTESSA_001380 | QUINTESSA_001529 | QUINTESSA_001668 |
| QUINTESSA_001381 | QUINTESSA_001530 | QUINTESSA_001669 |
| QUINTESSA_001382 | QUINTESSA_001531 | QUINTESSA_001670 |
| QUINTESSA_001383 | QUINTESSA_001532 | QUINTESSA_001671 |
| QUINTESSA_001384 | QUINTESSA_001533 | QUINTESSA_001672 |
| QUINTESSA_001385 | QUINTESSA_001534 | QUINTESSA_001673 |
| QUINTESSA_001386 | QUINTESSA_001535 | QUINTESSA_001674 |
| QUINTESSA_001387 | QUINTESSA_001536 | QUINTESSA_001675 |
| QUINTESSA_001388 | QUINTESSA_001537 | QUINTESSA_001676 |
| QUINTESSA_001389 | QUINTESSA_001538 | QUINTESSA_001677 |
| QUINTESSA_001390 | QUINTESSA_001539 | QUINTESSA_001678 |
| QUINTESSA_001401 | QUINTESSA_001540 | QUINTESSA_001679 |
| QUINTESSA_001402 | QUINTESSA_001541 | QUINTESSA_001680 |
| QUINTESSA_001403 | QUINTESSA_001542 | QUINTESSA_001681 |
| QUINTESSA_001404 | QUINTESSA_001543 | QUINTESSA_001682 |
| QUINTESSA_001405 | QUINTESSA_001544 | QUINTESSA_001683 |
| QUINTESSA_001406 | QUINTESSA_001545 | QUINTESSA_001684 |
| QUINTESSA_001407 | QUINTESSA_001546 | QUINTESSA_001685 |
| QUINTESSA_001408 | QUINTESSA_001547 | QUINTESSA_001686 |

Alvarez & Marsal
Alvarez, Quintessa, et al.

Privileged & Confidential

**Documents**

| | | |
|---|---|---|
| QUINTESSA_001409 | QUINTESSA_001548 | QUINTESSA_001687 |
| QUINTESSA_001410 | QUINTESSA_001549 | QUINTESSA_001688 |
| QUINTESSA_001411 | QUINTESSA_001550 | QUINTESSA_001689 |
| QUINTESSA_001412 | QUINTESSA_001551 | QUINTESSA_001690 |
| QUINTESSA_001413 | QUINTESSA_001552 | QUINTESSA_001691 |
| QUINTESSA_001414 | QUINTESSA_001553 | QUINTESSA_001692 |
| QUINTESSA_001415 | QUINTESSA_001554 | QUINTESSA_001693 |
| QUINTESSA_001416 | QUINTESSA_001555 | QUINTESSA_001694 |
| QUINTESSA_001417 | QUINTESSA_001556 | QUINTESSA_001695 |
| QUINTESSA_001418 | QUINTESSA_001557 | QUINTESSA_001696 |
| QUINTESSA_001419 | QUINTESSA_001558 | QUINTESSA_001697 |
| QUINTESSA_001420 | QUINTESSA_001559 | QUINTESSA_001698 |
| QUINTESSA_001421 | QUINTESSA_001560 | QUINTESSA_001699 |
| QUINTESSA_001422 | QUINTESSA_001561 | QUINTESSA_001700 |
| QUINTESSA_001423 | QUINTESSA_001562 | QUINTESSA_001701 |
| QUINTESSA_001424 | QUINTESSA_001563 | QUINTESSA_001702 |
| QUINTESSA_001425 | QUINTESSA_001564 | QUINTESSA_001703 |
| QUINTESSA_001426 | QUINTESSA_001565 | QUINTESSA_001704 |
| QUINTESSA_001427 | QUINTESSA_001566 | QUINTESSA_001705 |
| QUINTESSA_001428 | QUINTESSA_001567 | QUINTESSA_001706 |
| QUINTESSA_001429 | QUINTESSA_001568 | QUINTESSA_001707 |
| QUINTESSA_001430 | QUINTESSA_001569 | QUINTESSA_001708 |
| QUINTESSA_001431 | QUINTESSA_001570 | QUINTESSA_001709 |
| QUINTESSA_001432 | QUINTESSA_001571 | QUINTESSA_001710 |
| QUINTESSA_001433 | QUINTESSA_001572 | QUINTESSA_001711 |
| QUINTESSA_001434 | QUINTESSA_001573 | QUINTESSA_001712 |
| QUINTESSA_001435 | QUINTESSA_001574 | QUINTESSA_001713 |
| QUINTESSA_001436 | QUINTESSA_001575 | QUINTESSA_001714 |
| QUINTESSA_001437 | QUINTESSA_001576 | QUINTESSA_001715 |
| QUINTESSA_001438 | QUINTESSA_001577 | QUINTESSA_001716 |
| QUINTESSA_001439 | QUINTESSA_001578 | QUINTESSA_001717 |
| QUINTESSA_001440 | QUINTESSA_001579 | QUINTESSA_001718 |
| QUINTESSA_001441 | QUINTESSA_001580 | QUINTESSA_001719 |
| QUINTESSA_001442 | QUINTESSA_001581 | QUINTESSA_001720 |
| QUINTESSA_001443 | QUINTESSA_001582 | QUINTESSA_001721 |
| QUINTESSA_001444 | QUINTESSA_001583 | QUINTESSA_001722 |
| QUINTESSA_001445 | QUINTESSA_001584 | QUINTESSA_001723 |
| QUINTESSA_001446 | QUINTESSA_001585 | QUINTESSA_001724 |
| QUINTESSA_001447 | QUINTESSA_001586 | QUINTESSA_001725 |
| QUINTESSA_001448 | QUINTESSA_001587 | QUINTESSA_001726 |
| QUINTESSA_001449 | QUINTESSA_001588 | QUINTESSA_001727 |
| QUINTESSA_001450 | QUINTESSA_001589 | QUINTESSA_001728 |
| QUINTESSA_001451 | QUINTESSA_001590 | QUINTESSA_001729 |
| QUINTESSA_001452 | QUINTESSA_001591 | QUINTESSA_001730 |
| QUINTESSA_001453 | QUINTESSA_001592 | QUINTESSA_001731 |
| QUINTESSA_001454 | QUINTESSA_001593 | QUINTESSA_001732 |
| QUINTESSA_001455 | QUINTESSA_001594 | QUINTESSA_001733 |
| QUINTESSA_001456 | QUINTESSA_001595 | QUINTESSA_001734 |
| QUINTESSA_001457 | QUINTESSA_001596 | QUINTESSA_001735 |
| QUINTESSA_001458 | QUINTESSA_001597 | QUINTESSA_001736 |
| QUINTESSA_001459 | QUINTESSA_001598 | QUINTESSA_001737 |
| QUINTESSA_001460 | QUINTESSA_001599 | QUINTESSA_001738 |
| QUINTESSA_001461 | QUINTESSA_001600 | QUINTESSA_001739 |
| QUINTESSA_001462 | QUINTESSA_001601 | QUINTESSA_001740 |
| QUINTESSA_001463 | QUINTESSA_001602 | QUINTESSA_001741 |
| QUINTESSA_001464 | QUINTESSA_001603 | QUINTESSA_001742 |
| QUINTESSA_001465 | QUINTESSA_001604 | QUINTESSA_001743 |
| QUINTESSA_001466 | QUINTESSA_001605 | QUINTESSA_001744 |
| QUINTESSA_001467 | QUINTESSA_001606 | QUINTESSA_001745 |
| QUINTESSA_001468 | QUINTESSA_001607 | QUINTESSA_001746 |
| QUINTESSA_001469 | QUINTESSA_001608 | QUINTESSA_001747 |
| QUINTESSA_001470 | QUINTESSA_001609 | QUINTESSA_001748 |

**App. 072**

Alvarez & Marsal, et al.
Alvarez Quintessa, et al.
Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001471 | QUINTESSA_001610 | QUINTESSA_001749 |
| QUINTESSA_001472 | QUINTESSA_001611 | QUINTESSA_001750 |
| QUINTESSA_001473 | QUINTESSA_001612 | QUINTESSA_001751 |
| QUINTESSA_001474 | QUINTESSA_001613 | QUINTESSA_001752 |
| QUINTESSA_001475 | QUINTESSA_001614 | QUINTESSA_001753 |
| QUINTESSA_001476 | QUINTESSA_001615 | QUINTESSA_001754 |
| QUINTESSA_001477 | QUINTESSA_001616 | QUINTESSA_001755 |
| QUINTESSA_001478 | QUINTESSA_001617 | QUINTESSA_001756 |
| QUINTESSA_001757 | QUINTESSA_000467 | QUINTESSA_001211 |
| QUINTESSA_001758 | QUINTESSA_000468 | QUINTESSA_001213 |
| QUINTESSA_001759 | QUINTESSA_000473 | QUINTESSA_001215 |
| QUINTESSA_001760 | QUINTESSA_000476 | QUINTESSA_001217 |
| QUINTESSA_001761 | QUINTESSA_000479 | QUINTESSA_001226 |
| QUINTESSA_001762 | QUINTESSA_000482 | QUINTESSA_001227 (Slipsheet) |
| QUINTESSA_001763 | QUINTESSA_000483 | QUINTESSA_001228 |
| QUINTESSA_001764 | QUINTESSA_000484 | QUINTESSA_001229 (Slipsheet) |
| QUINTESSA_001765 | QUINTESSA_000485 | QUINTESSA_001230 |
| QUINTESSA_001766 | QUINTESSA_000486 (Slipsheet) | QUINTESSA_001231 (Slipsheet) |
| QUINTESSA_001767 | QUINTESSA_000487 | QUINTESSA_001232 |
| QUINTESSA_001768 | QUINTESSA_000490 | QUINTESSA_001233 (Slipsheet) |
| QUINTESSA_001769 | QUINTESSA_000494 | QUINTESSA_001234 |
| QUINTESSA_001770 | QUINTESSA_000497 | QUINTESSA_001240 |
| QUINTESSA_001771 | QUINTESSA_000500 | QUINTESSA_001246 |
| QUINTESSA_001772 | QUINTESSA_000503 | QUINTESSA_001248 |
| QUINTESSA_001773 | QUINTESSA_000504 | QUINTESSA_001252 |
| QUINTESSA_001774 | QUINTESSA_000505 | QUINTESSA_001255 |
| QUINTESSA_001775 | QUINTESSA_000682 | QUINTESSA_001261 |
| QUINTESSA_001776 | QUINTESSA_000684 | QUINTESSA_001268 |
| QUINTESSA_001777 | QUINTESSA_000685 | QUINTESSA_001276 |
| QUINTESSA_001778 | QUINTESSA_000687 | QUINTESSA_001282 |
| QUINTESSA_001779 | QUINTESSA_000690 | QUINTESSA_001289 |
| QUINTESSA_001780 | QUINTESSA_000697 | QUINTESSA_001297 |
| QUINTESSA_001781 | QUINTESSA_000701 | QUINTESSA_001299 |
| QUINTESSA_001782 | QUINTESSA_000702 | QUINTESSA_001302 |
| QUINTESSA_001783 | QUINTESSA_000704 | QUINTESSA_001306 |
| QUINTESSA_001784 | QUINTESSA_000706 | QUINTESSA_001311 |
| QUINTESSA_001785 | QUINTESSA_000709 | QUINTESSA_001316 |
| QUINTESSA_001786 | QUINTESSA_000713 | QUINTESSA_001321 |
| QUINTESSA_001787 | QUINTESSA_000717 | QUINTESSA_001326 |
| QUINTESSA_001788 | QUINTESSA_000721 | QUINTESSA_001331 |
| QUINTESSA_001789 | QUINTESSA_000725 | QUINTESSA_001337 |
| QUINTESSA_001790 | QUINTESSA_000728 | QUINTESSA_001342 |
| QUINTESSA_001791 | QUINTESSA_000731 | QUINTESSA_001348 |
| QUINTESSA_001792 | QUINTESSA_000734 | QUINTESSA_001352 (Slipsheet) |
| QUINTESSA_001793 | QUINTESSA_000739 | QUINTESSA_001353 (Slipsheet) |
| QUINTESSA_001794 | QUINTESSA_000744 | QUINTESSA_001354 (Slipsheet) |
| QUINTESSA_001795 | QUINTESSA_000747 | QUINTESSA_001355 (Slipsheet) |
| QUINTESSA_001796 | QUINTESSA_000748 | QUINTESSA_001356 (Slipsheet) |
| QUINTESSA_001797 | QUINTESSA_000749 | QUINTESSA_001357 (Slipsheet) |
| QUINTESSA_001798 | QUINTESSA_000753 | QUINTESSA_001358 (Slipsheet) |
| QUINTESSA_001799 | QUINTESSA_000758 | QUINTESSA_001359 (Slipsheet) |
| QUINTESSA_001800 | QUINTESSA_000761 | QUINTESSA_001360 (Slipsheet) |
| QUINTESSA_001801 | QUINTESSA_000762 | QUINTESSA_001361 (Slipsheet) |
| QUINTESSA_001802 | QUINTESSA_000764 | QUINTESSA_001362 (Slipsheet) |
| QUINTESSA_001803 | QUINTESSA_000767 | QUINTESSA_001363 (Slipsheet) |
| QUINTESSA_001804 | QUINTESSA_000770 | QUINTESSA_001364 (Slipsheet) |
| QUINTESSA_001805 | QUINTESSA_000776 | QUINTESSA_001365 (Slipsheet) |
| QUINTESSA_001806 | QUINTESSA_000777 | QUINTESSA_001366 (Slipsheet) |
| QUINTESSA_001807 | QUINTESSA_000781 | QUINTESSA_001367 (Slipsheet) |
| QUINTESSA_001808 | QUINTESSA_000782 | QUINTESSA_001368 (Slipsheet) |
| QUINTESSA_001809 | QUINTESSA_000787 | QUINTESSA_001369 (Slipsheet) |
| QUINTESSA_001810 | QUINTESSA_000790 | QUINTESSA_001370 (Slipsheet) |

Case 3:19-cv-02526-BAS-BN Document 27-1 Filed 08/22/23 PageID.271 of 338 PageID 27164
Alvarez & Masur, et al.
Alvarez Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001811 | QUINTESSA_000791 | QUINTESSA_001371 (Slipsheet) |
| QUINTESSA_001812 | QUINTESSA_000792 | QUINTESSA_001372 (Slipsheet) |
| QUINTESSA_001813 | QUINTESSA_000795 | QUINTESSA_001373 (Slipsheet) |
| QUINTESSA_001814 | QUINTESSA_000798 | QUINTESSA_001374 (Slipsheet) |
| QUINTESSA_001815 | QUINTESSA_000802 | QUINTESSA_001375 (Slipsheet) |
| QUINTESSA_001816 | QUINTESSA_000803 | QUINTESSA_001376 (Slipsheet) |
| QUINTESSA_001817 | QUINTESSA_000807 | QUINTESSA_001377 (Slipsheet) |
| QUINTESSA_001818 | QUINTESSA_000810 | QUINTESSA_001378 (Slipsheet) |
| QUINTESSA_001819 | QUINTESSA_000811 | QUINTESSA_001379 (Slipsheet) |
| QUINTESSA_001820 | QUINTESSA_000815 | QUINTESSA_001380 (Slipsheet) |
| QUINTESSA_001821 | QUINTESSA_000820 | QUINTESSA_001381 (Slipsheet) |
| QUINTESSA_001822 | QUINTESSA_000823 | QUINTESSA_001382 (Slipsheet) |
| QUINTESSA_001823 | QUINTESSA_000824 | QUINTESSA_001383 (Slipsheet) |
| QUINTESSA_001824 | QUINTESSA_000829 | QUINTESSA_001384 (Slipsheet) |
| QUINTESSA_001825 | QUINTESSA_000830 | QUINTESSA_001385 (Slipsheet) |
| QUINTESSA_001826 | QUINTESSA_000831 | QUINTESSA_001386 (Slipsheet) |
| QUINTESSA_001827 | QUINTESSA_000832 | QUINTESSA_001387 (Slipsheet) |
| QUINTESSA_001828 | QUINTESSA_000833 | QUINTESSA_001388 (Slipsheet) |
| QUINTESSA_001829 | QUINTESSA_000837 (Slipsheet) | QUINTESSA_001389 (Slipsheet) |
| QUINTESSA_000001 (Slipsheet) | QUINTESSA_000838 | QUINTESSA_001390 (Slipsheet) |
| QUINTESSA_000002 (Slipsheet) | QUINTESSA_000841 | QUINTESSA_001391 |
| QUINTESSA_000003 | QUINTESSA_000844 | QUINTESSA_001392 |
| QUINTESSA_000024 | QUINTESSA_000845 | QUINTESSA_001393 |
| QUINTESSA_000025 | QUINTESSA_000846 | QUINTESSA_001394 |
| QUINTESSA_000059 | QUINTESSA_000849 | QUINTESSA_001395 (Slipsheet) |
| QUINTESSA_000060 | QUINTESSA_000851 | QUINTESSA_001396 (Slipsheet) |
| QUINTESSA_000075 | QUINTESSA_000852 | QUINTESSA_001397 (Slipsheet) |
| QUINTESSA_000076 | QUINTESSA_000854 | QUINTESSA_001398 (Slipsheet) |
| QUINTESSA_000090 | QUINTESSA_000857 | QUINTESSA_001399 (Slipsheet) |
| QUINTESSA_000091 | QUINTESSA_000860 | QUINTESSA_001400 (Slipsheet) |
| QUINTESSA_000105 | QUINTESSA_000870 | QUINTESSA_001401 (Slipsheet) |
| QUINTESSA_000106 | QUINTESSA_000873 | QUINTESSA_001402 (Slipsheet) |
| QUINTESSA_000121 | QUINTESSA_000876 | QUINTESSA_001403 (Slipsheet) |
| QUINTESSA_000122 | QUINTESSA_000877 | QUINTESSA_001404 (Slipsheet) |
| QUINTESSA_000123 | QUINTESSA_000880 | QUINTESSA_001405 (Slipsheet) |
| QUINTESSA_000126 | QUINTESSA_000883 | QUINTESSA_001406 (Slipsheet) |
| QUINTESSA_000127 (Slipsheet) | QUINTESSA_000887 | QUINTESSA_001407 (Slipsheet) |
| QUINTESSA_000128 | QUINTESSA_000888 | QUINTESSA_001408 (Slipsheet) |
| QUINTESSA_000129 | QUINTESSA_000933 | QUINTESSA_001409 (Slipsheet) |
| QUINTESSA_000134 | QUINTESSA_000934 | QUINTESSA_001410 (Slipsheet) |
| QUINTESSA_000137 | QUINTESSA_000935 | QUINTESSA_001411 (Slipsheet) |
| QUINTESSA_000141 | QUINTESSA_000936 | QUINTESSA_001412 (Slipsheet) |
| QUINTESSA_000146 | QUINTESSA_000940 | QUINTESSA_001413 (Slipsheet) |
| QUINTESSA_000153 | QUINTESSA_000945 | QUINTESSA_001414 (Slipsheet) |
| QUINTESSA_000157 | QUINTESSA_000950 | QUINTESSA_001415 (Slipsheet) |
| QUINTESSA_000161 | QUINTESSA_000954 | QUINTESSA_001416 (Slipsheet) |
| QUINTESSA_000163 | QUINTESSA_000959 | QUINTESSA_001417 (Slipsheet) |
| QUINTESSA_000164 (Slipsheet) | QUINTESSA_000961 | QUINTESSA_001418 (Slipsheet) |
| QUINTESSA_000165 (Slipsheet) | QUINTESSA_000963 | QUINTESSA_001419 (Slipsheet) |
| QUINTESSA_000166 | QUINTESSA_000965 | QUINTESSA_001420 (Slipsheet) |
| QUINTESSA_000167 | QUINTESSA_000967 | QUINTESSA_001421 (Slipsheet) |
| QUINTESSA_000173 | QUINTESSA_000969 | QUINTESSA_001422 (Slipsheet) |
| QUINTESSA_000175 | QUINTESSA_000971 | QUINTESSA_001423 (Slipsheet) |
| QUINTESSA_000176 | QUINTESSA_000972 | QUINTESSA_001424 (Slipsheet) |
| QUINTESSA_000177 | QUINTESSA_000973 | QUINTESSA_001425 (Slipsheet) |
| QUINTESSA_000181 (Slipsheet) | QUINTESSA_000975 | QUINTESSA_001426 (Slipsheet) |
| QUINTESSA_000182 | QUINTESSA_000979 | QUINTESSA_001427 (Slipsheet) |
| QUINTESSA_000186 | QUINTESSA_000983 | QUINTESSA_001428 (Slipsheet) |
| QUINTESSA_000190 | QUINTESSA_000988 | QUINTESSA_001429 (Slipsheet) |
| QUINTESSA_000195 | QUINTESSA_000989 | QUINTESSA_001430 (Slipsheet) |
| QUINTESSA_000199 | QUINTESSA_000992 | QUINTESSA_001431 (Slipsheet) |
| QUINTESSA_000202 | QUINTESSA_000998 | QUINTESSA_001432 (Slipsheet) |

Alvarez & Marsal v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_000205 | QUINTESSA_001000 | QUINTESSA_001433 (Slipsheet) |
| QUINTESSA_000211 | QUINTESSA_001001 | QUINTESSA_001434 (Slipsheet) |
| QUINTESSA_000214 | QUINTESSA_001003 | QUINTESSA_001435 (Slipsheet) |
| QUINTESSA_000218 | QUINTESSA_001004 | QUINTESSA_001436 (Slipsheet) |
| QUINTESSA_000220 | QUINTESSA_001006 | QUINTESSA_001437 (Slipsheet) |
| QUINTESSA_000225 | QUINTESSA_001007 | QUINTESSA_001438 (Slipsheet) |
| QUINTESSA_000229 | QUINTESSA_001010 | QUINTESSA_001439 (Slipsheet) |
| QUINTESSA_000234 | QUINTESSA_001012 | QUINTESSA_001440 (Slipsheet) |
| QUINTESSA_000241 | QUINTESSA_001015 | QUINTESSA_001441 (Slipsheet) |
| QUINTESSA_000243 | QUINTESSA_001017 | QUINTESSA_001442 (Slipsheet) |
| QUINTESSA_000257 | QUINTESSA_001019 | QUINTESSA_001443 (Slipsheet) |
| QUINTESSA_000258 | QUINTESSA_001021 | QUINTESSA_001444 (Slipsheet) |
| QUINTESSA_000259 | QUINTESSA_001023 | QUINTESSA_001445 (Slipsheet) |
| QUINTESSA_000262 | QUINTESSA_001025 | QUINTESSA_001446 (Slipsheet) |
| QUINTESSA_000263 | QUINTESSA_001026 | QUINTESSA_001447 (Slipsheet) |
| QUINTESSA_000274 | QUINTESSA_001029 | QUINTESSA_001448 (Slipsheet) |
| QUINTESSA_000275 | QUINTESSA_001034 | QUINTESSA_001449 (Slipsheet) |
| QUINTESSA_000276 | QUINTESSA_001036 | QUINTESSA_001450 (Slipsheet) |
| QUINTESSA_000282 | QUINTESSA_001039 | QUINTESSA_001451 (Slipsheet) |
| QUINTESSA_000283 | QUINTESSA_001046 | QUINTESSA_001452 (Slipsheet) |
| QUINTESSA_000284 | QUINTESSA_001047 | QUINTESSA_001453 (Slipsheet) |
| QUINTESSA_000285 | QUINTESSA_001049 | QUINTESSA_001454 (Slipsheet) |
| QUINTESSA_000289 | QUINTESSA_001052 | QUINTESSA_001455 (Slipsheet) |
| QUINTESSA_000295 | QUINTESSA_001053 | QUINTESSA_001456 (Slipsheet) |
| QUINTESSA_000299 | QUINTESSA_001055 | QUINTESSA_001457 (Slipsheet) |
| QUINTESSA_000303 | QUINTESSA_001056 | QUINTESSA_001458 (Slipsheet) |
| QUINTESSA_000306 | QUINTESSA_001057 | QUINTESSA_001459 (Slipsheet) |
| QUINTESSA_000309 | QUINTESSA_001059 | QUINTESSA_001460 (Slipsheet) |
| QUINTESSA_000314 | QUINTESSA_001060 | QUINTESSA_001461 (Slipsheet) |
| QUINTESSA_000316 | QUINTESSA_001065 | QUINTESSA_001462 (Slipsheet) |
| QUINTESSA_000321 | QUINTESSA_001070 | QUINTESSA_001463 (Slipsheet) |
| QUINTESSA_000322 | QUINTESSA_001071 | QUINTESSA_001464 (Slipsheet) |
| QUINTESSA_000324 | QUINTESSA_001072 | QUINTESSA_001465 (Slipsheet) |
| QUINTESSA_000327 | QUINTESSA_001073 | QUINTESSA_001466 (Slipsheet) |
| QUINTESSA_000332 | QUINTESSA_001077 | QUINTESSA_001467 (Slipsheet) |
| QUINTESSA_000336 | QUINTESSA_001078 | QUINTESSA_001468 (Slipsheet) |
| QUINTESSA_000339 | QUINTESSA_001080 | QUINTESSA_001469 (Slipsheet) |
| QUINTESSA_000340 | QUINTESSA_001082 | QUINTESSA_001470 (Slipsheet) |
| QUINTESSA_000343 | QUINTESSA_001087 | QUINTESSA_001471 (Slipsheet) |
| QUINTESSA_000344 | QUINTESSA_001088 | QUINTESSA_001472 (Slipsheet) |
| QUINTESSA_000346 | QUINTESSA_001089 | QUINTESSA_001473 (Slipsheet) |
| QUINTESSA_000350 | QUINTESSA_001092 | QUINTESSA_001474 (Slipsheet) |
| QUINTESSA_000354 | QUINTESSA_001095 | QUINTESSA_001475 (Slipsheet) |
| QUINTESSA_000355 | QUINTESSA_001100 | QUINTESSA_001476 (Slipsheet) |
| QUINTESSA_000356 | QUINTESSA_001105 | QUINTESSA_001477 (Slipsheet) |
| QUINTESSA_000357 | QUINTESSA_001111 | QUINTESSA_001478 (Slipsheet) |
| QUINTESSA_000358 | QUINTESSA_001114 | QUINTESSA_001479 (Slipsheet) |
| QUINTESSA_000361 | QUINTESSA_001118 | QUINTESSA_001480 (Slipsheet) |
| QUINTESSA_000363 | QUINTESSA_001119 | QUINTESSA_001481 (Slipsheet) |
| QUINTESSA_000365 | QUINTESSA_001122 | QUINTESSA_001482 (Slipsheet) |
| QUINTESSA_000367 | QUINTESSA_001126 | QUINTESSA_001483 (Slipsheet) |
| QUINTESSA_000371 | QUINTESSA_001127 | QUINTESSA_001484 (Slipsheet) |
| QUINTESSA_000376 | QUINTESSA_001128 | QUINTESSA_001485 (Slipsheet) |
| QUINTESSA_000381 | QUINTESSA_001132 | QUINTESSA_001486 (Slipsheet) |
| QUINTESSA_000385 | QUINTESSA_001135 | QUINTESSA_001487 (Slipsheet) |
| QUINTESSA_000390 | QUINTESSA_001136 | QUINTESSA_001488 (Slipsheet) |
| QUINTESSA_000394 | QUINTESSA_001139 | QUINTESSA_001489 (Slipsheet) |
| QUINTESSA_000399 | QUINTESSA_001143 | QUINTESSA_001490 (Slipsheet) |
| QUINTESSA_000402 | QUINTESSA_001144 | QUINTESSA_001491 (Slipsheet) |
| QUINTESSA_000403 | QUINTESSA_001145 | QUINTESSA_001492 (Slipsheet) |
| QUINTESSA_000404 | QUINTESSA_001147 | QUINTESSA_001493 (Slipsheet) |
| QUINTESSA_000409 | QUINTESSA_001150 | QUINTESSA_001494 (Slipsheet) |

Allergy & Manuf.
Allen v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_000412 | QUINTESSA_001153 | QUINTESSA_001495 (Slipsheet) |
| QUINTESSA_000416 | QUINTESSA_001154 | QUINTESSA_001496 (Slipsheet) |
| QUINTESSA_000417 | QUINTESSA_001156 | QUINTESSA_001497 (Slipsheet) |
| QUINTESSA_000419 | QUINTESSA_001159 | QUINTESSA_001498 (Slipsheet) |
| QUINTESSA_000420 | QUINTESSA_001162 | QUINTESSA_001499 (Slipsheet) |
| QUINTESSA_000424 | QUINTESSA_001168 | QUINTESSA_001500 (Slipsheet) |
| QUINTESSA_000429 | QUINTESSA_001169 | QUINTESSA_001501 (Slipsheet) |
| QUINTESSA_000430 | QUINTESSA_001170 | QUINTESSA_001502 (Slipsheet) |
| QUINTESSA_000432 | QUINTESSA_001171 | QUINTESSA_001503 (Slipsheet) |
| QUINTESSA_000434 | QUINTESSA_001177 | QUINTESSA_001504 (Slipsheet) |
| QUINTESSA_000436 | QUINTESSA_001181 | QUINTESSA_001505 (Slipsheet) |
| QUINTESSA_000439 | QUINTESSA_001184 | QUINTESSA_001506 (Slipsheet) |
| QUINTESSA_000442 | QUINTESSA_001185 | QUINTESSA_001507 (Slipsheet) |
| QUINTESSA_000445 | QUINTESSA_001186 | QUINTESSA_001508 (Slipsheet) |
| QUINTESSA_000446 | QUINTESSA_001187 | QUINTESSA_001509 (Slipsheet) |
| QUINTESSA_000448 | QUINTESSA_001189 | QUINTESSA_001510 (Slipsheet) |
| QUINTESSA_000451 | QUINTESSA_001192 | QUINTESSA_001511 (Slipsheet) |
| QUINTESSA_000452 | QUINTESSA_001194 | QUINTESSA_001512 (Slipsheet) |
| QUINTESSA_000456 | QUINTESSA_001198 | QUINTESSA_001513 (Slipsheet) |
| QUINTESSA_000457 | QUINTESSA_001202 | QUINTESSA_001514 (Slipsheet) |
| QUINTESSA_000460 | QUINTESSA_001206 | QUINTESSA_001515 (Slipsheet) |
| QUINTESSA_000461 | QUINTESSA_001210 | QUINTESSA_001516 (Slipsheet) |
| QUINTESSA_001517 (Slipsheet) | QUINTESSA_001717 (Slipsheet) | QUINTESSA_002184 |
| QUINTESSA_001518 (Slipsheet) | QUINTESSA_001718 (Slipsheet) | QUINTESSA_002194 |
| QUINTESSA_001519 (Slipsheet) | QUINTESSA_001719 (Slipsheet) | QUINTESSA_002195 |
| QUINTESSA_001520 (Slipsheet) | QUINTESSA_001720 (Slipsheet) | QUINTESSA_002198 |
| QUINTESSA_001521 (Slipsheet) | QUINTESSA_001721 (Slipsheet) | QUINTESSA_002205 |
| QUINTESSA_001522 (Slipsheet) | QUINTESSA_001722 (Slipsheet) | QUINTESSA_002206 |
| QUINTESSA_001523 (Slipsheet) | QUINTESSA_001723 (Slipsheet) | QUINTESSA_002209 |
| QUINTESSA_001524 (Slipsheet) | QUINTESSA_001724 (Slipsheet) | QUINTESSA_002214 |
| QUINTESSA_001525 (Slipsheet) | QUINTESSA_001725 (Slipsheet) | QUINTESSA_002217 |
| QUINTESSA_001526 (Slipsheet) | QUINTESSA_001726 (Slipsheet) | QUINTESSA_002224 |
| QUINTESSA_001527 (Slipsheet) | QUINTESSA_001727 (Slipsheet) | QUINTESSA_002229 |
| QUINTESSA_001528 (Slipsheet) | QUINTESSA_001728 (Slipsheet) | QUINTESSA_002230 |
| QUINTESSA_001529 (Slipsheet) | QUINTESSA_001729 (Slipsheet) | QUINTESSA_002235 |
| QUINTESSA_001530 (Slipsheet) | QUINTESSA_001730 (Slipsheet) | QUINTESSA_002239 |
| QUINTESSA_001531 (Slipsheet) | QUINTESSA_001731 (Slipsheet) | QUINTESSA_002244 |
| QUINTESSA_001532 (Slipsheet) | QUINTESSA_001732 (Slipsheet) | QUINTESSA_002247 |
| QUINTESSA_001533 (Slipsheet) | QUINTESSA_001733 (Slipsheet) | QUINTESSA_002249 |
| QUINTESSA_001534 (Slipsheet) | QUINTESSA_001734 (Slipsheet) | QUINTESSA_002254 |
| QUINTESSA_001535 (Slipsheet) | QUINTESSA_001735 (Slipsheet) | QUINTESSA_002260 |
| QUINTESSA_001536 (Slipsheet) | QUINTESSA_001736 (Slipsheet) | QUINTESSA_002261 |
| QUINTESSA_001537 (Slipsheet) | QUINTESSA_001737 (Slipsheet) | QUINTESSA_002266 |
| QUINTESSA_001538 (Slipsheet) | QUINTESSA_001738 (Slipsheet) | QUINTESSA_002267 |
| QUINTESSA_001539 (Slipsheet) | QUINTESSA_001739 (Slipsheet) | QUINTESSA_002271 |
| QUINTESSA_001540 (Slipsheet) | QUINTESSA_001740 (Slipsheet) | QUINTESSA_002276 |
| QUINTESSA_001541 (Slipsheet) | QUINTESSA_001741 (Slipsheet) | QUINTESSA_002277 |
| QUINTESSA_001542 (Slipsheet) | QUINTESSA_001742 (Slipsheet) | QUINTESSA_002282 |
| QUINTESSA_001543 (Slipsheet) | QUINTESSA_001743 (Slipsheet) | QUINTESSA_002284 |
| QUINTESSA_001544 (Slipsheet) | QUINTESSA_001744 (Slipsheet) | QUINTESSA_002285 |
| QUINTESSA_001545 (Slipsheet) | QUINTESSA_001745 (Slipsheet) | QUINTESSA_002286 |
| QUINTESSA_001546 (Slipsheet) | QUINTESSA_001746 (Slipsheet) | QUINTESSA_002287 |
| QUINTESSA_001547 (Slipsheet) | QUINTESSA_001747 (Slipsheet) | QUINTESSA_002288 |
| QUINTESSA_001548 (Slipsheet) | QUINTESSA_001748 (Slipsheet) | QUINTESSA_002291 |
| QUINTESSA_001549 (Slipsheet) | QUINTESSA_001749 (Slipsheet) | QUINTESSA_002294 |
| QUINTESSA_001550 (Slipsheet) | QUINTESSA_001750 (Slipsheet) | QUINTESSA_002297 |
| QUINTESSA_001551 (Slipsheet) | QUINTESSA_001751 (Slipsheet) | QUINTESSA_002300 |
| QUINTESSA_001552 (Slipsheet) | QUINTESSA_001752 (Slipsheet) | QUINTESSA_002306 |
| QUINTESSA_001553 (Slipsheet) | QUINTESSA_001753 (Slipsheet) | QUINTESSA_002312 |
| QUINTESSA_001554 (Slipsheet) | QUINTESSA_001754 (Slipsheet) | QUINTESSA_002313 |
| QUINTESSA_001555 (Slipsheet) | QUINTESSA_001755 (Slipsheet) | QUINTESSA_002317 |
| QUINTESSA_001556 (Slipsheet) | QUINTESSA_001756 (Slipsheet) | QUINTESSA_002320 |

Alvarez & Marsal v. Quintessa, et al.

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001557 (Slipsheet) | QUINTESSA_001757 (Slipsheet) | QUINTESSA_002321 |
| QUINTESSA_001558 (Slipsheet) | QUINTESSA_001758 (Slipsheet) | QUINTESSA_002324 |
| QUINTESSA_001559 (Slipsheet) | QUINTESSA_001759 (Slipsheet) | QUINTESSA_002326 |
| QUINTESSA_001560 (Slipsheet) | QUINTESSA_001760 (Slipsheet) | QUINTESSA_002329 |
| QUINTESSA_001561 (Slipsheet) | QUINTESSA_001761 (Slipsheet) | QUINTESSA_002331 |
| QUINTESSA_001562 (Slipsheet) | QUINTESSA_001762 (Slipsheet) | QUINTESSA_002338 |
| QUINTESSA_001563 (Slipsheet) | QUINTESSA_001763 (Slipsheet) | QUINTESSA_002345 |
| QUINTESSA_001564 (Slipsheet) | QUINTESSA_001764 (Slipsheet) | QUINTESSA_002351 |
| QUINTESSA_001565 (Slipsheet) | QUINTESSA_001765 (Slipsheet) | QUINTESSA_002352 |
| QUINTESSA_001566 (Slipsheet) | QUINTESSA_001766 (Slipsheet) | QUINTESSA_002353 |
| QUINTESSA_001567 (Slipsheet) | QUINTESSA_001767 (Slipsheet) | QUINTESSA_002354 |
| QUINTESSA_001568 (Slipsheet) | QUINTESSA_001768 (Slipsheet) | QUINTESSA_002355 |
| QUINTESSA_001569 (Slipsheet) | QUINTESSA_001769 (Slipsheet) | QUINTESSA_002356 |
| QUINTESSA_001570 (Slipsheet) | QUINTESSA_001770 (Slipsheet) | QUINTESSA_002357 |
| QUINTESSA_001571 (Slipsheet) | QUINTESSA_001771 (Slipsheet) | QUINTESSA_002363 |
| QUINTESSA_001572 (Slipsheet) | QUINTESSA_001772 (Slipsheet) | QUINTESSA_002364 |
| QUINTESSA_001573 (Slipsheet) | QUINTESSA_001773 (Slipsheet) | QUINTESSA_002365 |
| QUINTESSA_001574 (Slipsheet) | QUINTESSA_001774 (Slipsheet) | QUINTESSA_002366 |
| QUINTESSA_001575 (Slipsheet) | QUINTESSA_001775 (Slipsheet) | QUINTESSA_002367 |
| QUINTESSA_001576 (Slipsheet) | QUINTESSA_001776 (Slipsheet) | QUINTESSA_002368 |
| QUINTESSA_001577 (Slipsheet) | QUINTESSA_001777 (Slipsheet) | QUINTESSA_002369 |
| QUINTESSA_001578 (Slipsheet) | QUINTESSA_001778 (Slipsheet) | QUINTESSA_002374 |
| QUINTESSA_001579 (Slipsheet) | QUINTESSA_001779 (Slipsheet) | QUINTESSA_002379 |
| QUINTESSA_001580 (Slipsheet) | QUINTESSA_001780 (Slipsheet) | QUINTESSA_002380 |
| QUINTESSA_001581 (Slipsheet) | QUINTESSA_001781 (Slipsheet) | QUINTESSA_002381 |
| QUINTESSA_001582 (Slipsheet) | QUINTESSA_001782 (Slipsheet) | QUINTESSA_002382 |
| QUINTESSA_001583 (Slipsheet) | QUINTESSA_001783 (Slipsheet) | QUINTESSA_002383 |
| QUINTESSA_001584 (Slipsheet) | QUINTESSA_001784 (Slipsheet) | QUINTESSA_002384 |
| QUINTESSA_001585 (Slipsheet) | QUINTESSA_001785 (Slipsheet) | QUINTESSA_002385 |
| QUINTESSA_001586 (Slipsheet) | QUINTESSA_001786 (Slipsheet) | QUINTESSA_002389 |
| QUINTESSA_001587 (Slipsheet) | QUINTESSA_001787 (Slipsheet) | QUINTESSA_002391 |
| QUINTESSA_001588 (Slipsheet) | QUINTESSA_001788 (Slipsheet) | QUINTESSA_002392 |
| QUINTESSA_001589 (Slipsheet) | QUINTESSA_001789 (Slipsheet) | QUINTESSA_002393 |
| QUINTESSA_001590 (Slipsheet) | QUINTESSA_001790 (Slipsheet) | QUINTESSA_002394 |
| QUINTESSA_001591 (Slipsheet) | QUINTESSA_001791 (Slipsheet) | QUINTESSA_002395 |
| QUINTESSA_001592 (Slipsheet) | QUINTESSA_001792 (Slipsheet) | QUINTESSA_002396 |
| QUINTESSA_001593 (Slipsheet) | QUINTESSA_001793 (Slipsheet) | QUINTESSA_002397 |
| QUINTESSA_001594 (Slipsheet) | QUINTESSA_001794 (Slipsheet) | QUINTESSA_002401 |
| QUINTESSA_001595 (Slipsheet) | QUINTESSA_001795 (Slipsheet) | QUINTESSA_002405 |
| QUINTESSA_001596 (Slipsheet) | QUINTESSA_001796 (Slipsheet) | QUINTESSA_002409 |
| QUINTESSA_001597 (Slipsheet) | QUINTESSA_001797 (Slipsheet) | QUINTESSA_002413 |
| QUINTESSA_001598 (Slipsheet) | QUINTESSA_001798 (Slipsheet) | QUINTESSA_002414 |
| QUINTESSA_001599 (Slipsheet) | QUINTESSA_001799 (Slipsheet) | QUINTESSA_002416 |
| QUINTESSA_001600 (Slipsheet) | QUINTESSA_001800 (Slipsheet) | QUINTESSA_002418 |
| QUINTESSA_001601 (Slipsheet) | QUINTESSA_001801 (Slipsheet) | QUINTESSA_002420 |
| QUINTESSA_001602 (Slipsheet) | QUINTESSA_001802 (Slipsheet) | QUINTESSA_002421 (Slipsheet) |
| QUINTESSA_001603 (Slipsheet) | QUINTESSA_001803 (Slipsheet) | QUINTESSA_002422 |
| QUINTESSA_001604 (Slipsheet) | QUINTESSA_001804 (Slipsheet) | QUINTESSA_002423 (Slipsheet) |
| QUINTESSA_001605 (Slipsheet) | QUINTESSA_001805 (Slipsheet) | QUINTESSA_002424 |
| QUINTESSA_001606 (Slipsheet) | QUINTESSA_001806 (Slipsheet) | QUINTESSA_002425 (Slipsheet) |
| QUINTESSA_001607 (Slipsheet) | QUINTESSA_001807 (Slipsheet) | QUINTESSA_002426 |
| QUINTESSA_001608 (Slipsheet) | QUINTESSA_001808 (Slipsheet) | QUINTESSA_002428 |
| QUINTESSA_001609 (Slipsheet) | QUINTESSA_001809 (Slipsheet) | QUINTESSA_002432 |
| QUINTESSA_001610 (Slipsheet) | QUINTESSA_001810 (Slipsheet) | QUINTESSA_002434 |
| QUINTESSA_001611 (Slipsheet) | QUINTESSA_001811 (Slipsheet) | QUINTESSA_002440 |
| QUINTESSA_001612 (Slipsheet) | QUINTESSA_001812 (Slipsheet) | QUINTESSA_002445 |
| QUINTESSA_001613 (Slipsheet) | QUINTESSA_001813 (Slipsheet) | QUINTESSA_002450 |
| QUINTESSA_001614 (Slipsheet) | QUINTESSA_001814 (Slipsheet) | QUINTESSA_002455 |
| QUINTESSA_001615 (Slipsheet) | QUINTESSA_001815 (Slipsheet) | QUINTESSA_002460 |
| QUINTESSA_001616 (Slipsheet) | QUINTESSA_001816 (Slipsheet) | QUINTESSA_002465 |
| QUINTESSA_001617 (Slipsheet) | QUINTESSA_001817 (Slipsheet) | QUINTESSA_002469 |
| QUINTESSA_001618 (Slipsheet) | QUINTESSA_001818 (Slipsheet) | QUINTESSA_002475 |

Alvarez & Marsal v.
Alter's Quintessa, et al

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001619 (Slipsheet) | QUINTESSA_001819 (Slipsheet) | QUINTESSA_002480 |
| QUINTESSA_001620 (Slipsheet) | QUINTESSA_001820 (Slipsheet) | QUINTESSA_002486 |
| QUINTESSA_001621 (Slipsheet) | QUINTESSA_001821 (Slipsheet) | QUINTESSA_001923 |
| QUINTESSA_001622 (Slipsheet) | QUINTESSA_001822 (Slipsheet) | QUINTESSA_001925 |
| QUINTESSA_001623 (Slipsheet) | QUINTESSA_001823 (Slipsheet) | QUINTESSA_001930 |
| QUINTESSA_001624 (Slipsheet) | QUINTESSA_001824 (Slipsheet) | QUINTESSA_001931 |
| QUINTESSA_001625 (Slipsheet) | QUINTESSA_001825 (Slipsheet) | QUINTESSA_001933 |
| QUINTESSA_001626 (Slipsheet) | QUINTESSA_001826 (Slipsheet) | QUINTESSA_001934 |
| QUINTESSA_001627 (Slipsheet) | QUINTESSA_001827 (Slipsheet) | QUINTESSA_001937 |
| QUINTESSA_001628 (Slipsheet) | QUINTESSA_001828 (Slipsheet) | QUINTESSA_001943 |
| QUINTESSA_001629 (Slipsheet) | QUINTESSA_001829 (Slipsheet) | QUINTESSA_001944 |
| QUINTESSA_001630 (Slipsheet) | QUINTESSA_001830 | QUINTESSA_001945 |
| QUINTESSA_001631 (Slipsheet) | QUINTESSA_001833 | QUINTESSA_001948 |
| QUINTESSA_001632 (Slipsheet) | QUINTESSA_001838 | QUINTESSA_001949 |
| QUINTESSA_001633 (Slipsheet) | QUINTESSA_001842 | QUINTESSA_001952 |
| QUINTESSA_001634 (Slipsheet) | QUINTESSA_001843 | QUINTESSA_001955 |
| QUINTESSA_001635 (Slipsheet) | QUINTESSA_001846 | QUINTESSA_001956 (Slipsheet) |
| QUINTESSA_001636 (Slipsheet) | QUINTESSA_001850 | QUINTESSA_001957 |
| QUINTESSA_001637 (Slipsheet) | QUINTESSA_001855 | QUINTESSA_001961 |
| QUINTESSA_001638 (Slipsheet) | QUINTESSA_001860 | QUINTESSA_001964 |
| QUINTESSA_001639 (Slipsheet) | QUINTESSA_001864 | QUINTESSA_001966 |
| QUINTESSA_001640 (Slipsheet) | QUINTESSA_001866 | QUINTESSA_001968 |
| QUINTESSA_001641 (Slipsheet) | QUINTESSA_001867 | QUINTESSA_001970 |
| QUINTESSA_001642 (Slipsheet) | QUINTESSA_001871 | QUINTESSA_001972 |
| QUINTESSA_001643 (Slipsheet) | QUINTESSA_001876 | QUINTESSA_001974 |
| QUINTESSA_001644 (Slipsheet) | QUINTESSA_001877 | QUINTESSA_001979 |
| QUINTESSA_001645 (Slipsheet) | QUINTESSA_001878 | QUINTESSA_001982 |
| QUINTESSA_001646 (Slipsheet) | QUINTESSA_001882 | QUINTESSA_001985 |
| QUINTESSA_001647 (Slipsheet) | QUINTESSA_001887 | QUINTESSA_001992 |
| QUINTESSA_001648 (Slipsheet) | QUINTESSA_001892 | QUINTESSA_001998 |
| QUINTESSA_001649 (Slipsheet) | QUINTESSA_001896 | QUINTESSA_002000 |
| QUINTESSA_001650 (Slipsheet) | QUINTESSA_001899 | QUINTESSA_002003 |
| QUINTESSA_001651 (Slipsheet) | QUINTESSA_001904 | QUINTESSA_002008 |
| QUINTESSA_001652 (Slipsheet) | QUINTESSA_001905 | QUINTESSA_002012 |
| QUINTESSA_001653 (Slipsheet) | QUINTESSA_001906 | QUINTESSA_002015 |
| QUINTESSA_001654 (Slipsheet) | QUINTESSA_001907 | QUINTESSA_002018 |
| QUINTESSA_001655 (Slipsheet) | QUINTESSA_001911 | QUINTESSA_002022 |
| QUINTESSA_001656 (Slipsheet) | QUINTESSA_001916 | QUINTESSA_002028 |
| QUINTESSA_001657 (Slipsheet) | QUINTESSA_001920 | QUINTESSA_002031 |
| QUINTESSA_001658 (Slipsheet) | QUINTESSA_001693 (Slipsheet) | QUINTESSA_002036 |
| QUINTESSA_001659 (Slipsheet) | QUINTESSA_001694 (Slipsheet) | QUINTESSA_002039 |
| QUINTESSA_001660 (Slipsheet) | QUINTESSA_001695 (Slipsheet) | QUINTESSA_002043 |
| QUINTESSA_001661 (Slipsheet) | QUINTESSA_001696 (Slipsheet) | QUINTESSA_002046 |
| QUINTESSA_001662 (Slipsheet) | QUINTESSA_001697 (Slipsheet) | QUINTESSA_002050 |
| QUINTESSA_001663 (Slipsheet) | QUINTESSA_001698 (Slipsheet) | QUINTESSA_002055 |
| QUINTESSA_001664 (Slipsheet) | QUINTESSA_001699 (Slipsheet) | QUINTESSA_002059 |
| QUINTESSA_001665 (Slipsheet) | QUINTESSA_001700 (Slipsheet) | QUINTESSA_002065 |
| QUINTESSA_001666 (Slipsheet) | QUINTESSA_001701 (Slipsheet) | QUINTESSA_002070 |
| QUINTESSA_001667 (Slipsheet) | QUINTESSA_001702 (Slipsheet) | QUINTESSA_002075 |
| QUINTESSA_001668 (Slipsheet) | QUINTESSA_001703 (Slipsheet) | QUINTESSA_002080 |
| QUINTESSA_001669 (Slipsheet) | QUINTESSA_001704 (Slipsheet) | QUINTESSA_002094 |
| QUINTESSA_001670 (Slipsheet) | QUINTESSA_001705 (Slipsheet) | QUINTESSA_002103 |
| QUINTESSA_001671 (Slipsheet) | QUINTESSA_001706 (Slipsheet) | QUINTESSA_002112 |
| QUINTESSA_001672 (Slipsheet) | QUINTESSA_001707 (Slipsheet) | QUINTESSA_002125 |
| QUINTESSA_001673 (Slipsheet) | QUINTESSA_001708 (Slipsheet) | QUINTESSA_002133 |
| QUINTESSA_001674 (Slipsheet) | QUINTESSA_001709 (Slipsheet) | QUINTESSA_002144 |
| QUINTESSA_001675 (Slipsheet) | QUINTESSA_001710 (Slipsheet) | QUINTESSA_002151 |
| QUINTESSA_001676 (Slipsheet) | QUINTESSA_001711 (Slipsheet) | QUINTESSA_002158 |
| QUINTESSA_001677 (Slipsheet) | QUINTESSA_001712 (Slipsheet) | QUINTESSA_002168 |
| QUINTESSA_001678 (Slipsheet) | QUINTESSA_001713 (Slipsheet) | QUINTESSA_002175 |
| QUINTESSA_001679 (Slipsheet) | QUINTESSA_001714 (Slipsheet) | QUINTESSA_002181 |
| QUINTESSA_001680 (Slipsheet) | QUINTESSA_001715 (Slipsheet) | QUINTESSA_001685 (Slipsheet) |

Allergy & Manual
Aller v Quintessa, et al

Privileged & Confidential

| Documents | | |
|---|---|---|
| QUINTESSA_001681 (Slipsheet) | QUINTESSA_001716 (Slipsheet) | QUINTESSA_001686 (Slipsheet) |
| QUINTESSA_001682 (Slipsheet) | QUINTESSA_001688 (Slipsheet) | QUINTESSA_001687 (Slipsheet) |
| QUINTESSA_001683 (Slipsheet) | QUINTESSA_001689 (Slipsheet) | QUINTESSA_001692 (Slipsheet) |
| QUINTESSA_001684 (Slipsheet) | QUINTESSA_001690 (Slipsheet) | QUINTESSA_001691 (Slipsheet) |

Case 1:19-cv-02615-BNB Document 2027-1 Filed 08/22/23 Page 119 of 338 PageID 27670
Alexon & Marsah
Adler v. Quintessa, et al.
Privileged & Confidential

## Exhibit 1
### Documents Considered

| Documents |
|---|

**Court Filings**
- Plaintiff's Third Amended Complaint, dated as of May 27, 2022
- Plaintiffs' Designation of Expert Witnesses, dated as of July 14, 2022

**Depositions**
- Deposition of Lauren Von McNeil Mingee, dated April 13, 2022

**Data Provided by Quintessa**
- 2019-2022 Adler Keywords and Search terms.xlsx
- Campaign Export From Google.xlsx
- CRM Billing Exports.xlsx

**Research**
- "Personal Injury Lawyers & Attorneys Industry in the US- Market Research Report" (https://www.ibisworld.com/united-states/market-research-reports/personal-injury-lawyers-attorneys-industry/)

- "6 Tips for Marketing Your Personal Injury Practice" (https://onward.justia.com/6-tips-for-marketing-your-personal-injury-practice/)

- "About Quality Score", Google Ads Help (https://support.google.com/google-ads/answer/6167118?hl=en)

- "Why Are Clicks Becoming More Expensive? Understanding CPC Inflation in Google Ads" (https://www.evoluted.net/thinktank/marketing/cpc-inflation)

- "How Much Do Google Ads Cost: 2021 vs. 2022" (https://videnglobe.com/blog/how-much-do-google-ads-cost-2021-vs-2022)

- "3 Trends that Explain Why your CPC is Rising" (https://postclick.com/blog/why-cpc-rises/)

- "About keywords in Seach Network Campaigns", Google Ads Help (https://support.google.com/google-ads/answer/1704371?hl=en)

- "Exact Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407781?hl=en#:~:text=A%20keyword%20match%20type%20that,both%20phrase%20and%20broad%20match.)

- "Phrase Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/11586965?hl=en)

- "Broad Match: Definition", Google Ads Help (https://support.google.com/google-ads/answer/2407779?hl=en&ref_topic=24936)

- "Create a Search Campaign", Google Ads Help (https://support.google.com/google-ads/answer/9510373#zippy=)

- "Click-to-Call Ads" (https://www.marchex.com/feature/click-to-call-ads/#:~:text=Digital%20ads%20that%20drive%20phone,click%20on%20a%20mobile%20device)

- "About call ads", Google Ads Help (https://support.google.com/google-ads/answer/6341403?hl=en)

Case 1:19-cv-02525-BNB Document 202-1 Filed 08/22/23 Page 120 of 338 PageID 27171
Adler v. Quintessa, et al.
Alvarez & Marsal — Privileged & Confidential

| Documents |
|---|

"Go Mobile! Series: Introducing click-to-call phone numbers in local ads on mobile devices" (https://adwords.googleblog.com/2010/01/introducing-click-to-call-phone-numbers.html)

"A Fast Start to 2017 for Click-to-Call Ads" (https://www.blog.google/products/ads/fast-start-2017-click-call-ads/)

"The Evolution of Google AdWords- A $38 Billion Advertising Platform" (https://www.wordstream.com/blog/ws/2012/06/05/evolution-of-adwords#:~:text=October%2023%2C%202000%2C%20will%20be,online%20advertising%20platform%20%E2%80%93%20Google%20AdWords.)

"Analyzing Cost-per-Click Inflation in the Marketplace" (https://searchengineland.com/analyzing-cost-per-click-inflation-in-the-marketplace-166634)

"Use Auction Insights to Compare Performance" (https://support.google.com/google-ads/answer/2579754?hl=en#zippy=%2Cposition-above-rate-search-campaigns-only%2Coutranking-share%2Cabsolute-top-of-the-page-rate-search-campaigns-only)

- "About Us" (https://www.jimadler.com/about-us/)

- "Our Practice Areas" (https://www.jimadler.com/practices/)

- "Quintessa Marketing LinkedIn" (https://www.linkedin.com/company/quintessamarketing/about/)

- "Quintessa Marketing: Home Page" (http://quintessamarketing.com/)

"Quality Score: Definition", Google Ads Help (https://support.google.com/google-ads/answer/140351?hl=en).

- "The Ad Auction", Google Ads Help (https://support.google.com/google-ads/answer/1704431).

"About Ad Position and Ad Rank", Google Ads Help (https://support.google.com/google-ads/answer/1722122?hl=en&ref_topic=3121771).

- *15 U.S. Code § 1117, Recovery for Violation of Rights*

- *Lanham Act § 35(a).*



# David M. Leathers, ASA, CFE

Managing Director – Alvarez and Marsal Disputes and Investigations, LLC

dleathers@alvarezandmarsal.com

700 Louisiana Street
Suite 3300
Houston, TX 77002
Tel: (713) 300-8240
Cell: (713) 505-5022

**Certifications**

Accredited Senior Appraiser (ASA)

Certified Fraud Examiner (CFE)

**Professional Experience**

Managing Director,
Sirius Solutions

Managing Director,
Huron Consulting Group

Vice President,
Charles River Associates

Principal and Senior Consultant,
PricewaterhouseCoopers

Bank United of Texas

**Education & Credentials**

Bachelor of Business Administration, Finance, Hankamer School of Business, Baylor University

Post graduate studies Bauer College of Business, University of Houston, and Jesse H. Jones Graduate School of Management, Rice University

David Leathers brings over 20 years of experience in assisting companies, boards of directors, individuals and legal counsel with the economic, valuation and accounting issues that arise during transactions, disputes and investigations. He has testified in both federal and state courts around the United States as well as in both U.S. and international arbitration matters, and has been appointed as a special master to assist courts on financial and accounting matters.

David's practice focuses on the technology and energy sectors. His experience includes the analysis of accounting, financial, marketing and other business information to assess the economic impact of business events and negotiation decisions. He often advises clients on business valuation and the valuation of oil and gas related entities or intellectual property assets in connection with licensing and joint venture transactions, commercial disputes, fraudulent transfer claims, capital raising activities, merger and acquisitions, and inter-company and other transactions.

Specific to the oil and gas industry, he has significant experience in the valuation of working interests, midstream economics, drilling contract damages, and crude oil trading and exchange agreements.

David's experience has also covered a number of other industries, products and technologies, including real estate, hospitality, media, software, semiconductor, biotechnology and pharmaceutical, medical device, banking and financial services, wireless, satellite and telecommunications, automotive, hazardous waste disposal, healthcare, gaming and various consumer products.

## Transactions

- Prepared valuations to support the reasonableness of proposed purchase and sale agreements, the acquisition or sale of stock, and the spin-off of assets or business entities.

- Prepared valuations and financial analysis for purposes of purchase price allocation, tax reporting, and bankruptcy and solvency related matters.

- Participated in numerous due diligence projects related to an investment or acquisition of businesses, oil and gas assets, or intellectual property.

- Participated in license negotiations for technologies ranging from semiconductor manufacturing to protein therapy.

Note: Alvarez & Marsal employs CPAs but it is not a licensed CPA firm

David M. Leathers, ASA, CFE

**Professional Associations**

Society of Petroleum Engineers

American Society of Appraisers

Institute of Business Appraisers

National Association of Certified Fraud Examiners

Licensing Executives Society – Royalty Rate Survey Chair

Rice Alliance Advisory Board

- Prepared valuations of a variety of intangible assets, early stage technologies, and oil and gas related entities, including valuation analyses to support a licensing, sale or joint venture transaction.

- Advised clients in a wide-range of strategic consulting assignments related to the management of intellectual property, including the licensing and sale of intangible assets, technology transfer strategies, intellectual property portfolio evaluation, and royalty audits.

- Developed and managed the implementation of reengineering plans; analyzed corporate and business unit profitability; performed financial analysis to support general strategic planning; coordinated a general ledger conversion; and participated in the post-acquisition merger integration process.

### *Disputes*

- Advised corporate counsel and performed financial and economic analysis in numerous breach of contract, business interruption, breach of fiduciary duty, bankruptcy and fraudulent transfer matters, including matters arising from crude oil supply and production agreements, natural gas delivery and storage contracts, off-shore drilling contracts, unconventional and enhance oil recovery projects, and various merger and acquisition transaction disputes.

- Calculated numerous business impairment and lost profit damages.

- Evaluated economic damages, including the determination of reasonable royalties, involving patent, trademark, and copyright infringement matters as well as misappropriation of trade secrets, involving a wide range of industries, products and technologies.

- Performed analysis related to market supply and demand, evaluated product pricing and manufacturing capacity, assessed industry profit margins, investigated the availability of acceptable alternatives, and analyzed fixed, variable and incremental costs.

- Reviewed and analyzed hundreds of patent and technology license agreements.

- Evaluated economic damages and determined the fair value and fair market value of businesses involving various minority shareholder disputes, such as dissenting shareholder, shareholder oppression, breach of fiduciary and breach of contract related matters.

- Provided expert testimony in federal and state court and arbitration proceedings, including testimony related to lost profits, business valuation, various state and federal securities actions, energy supply and production contracts, patent and trademark infringement, reasonable royalty, misappropriation of trade secrets, minority shareholder disputes, and insurance disputes, among others.

2

David M. Leathers, ASA, CFE

### Investigations

- Performed investigations regarding allegations of breach of fiduciary responsibility and accounting irregularities.

- Led financial and forensic accounting investigations in various countries around the world resulting from allegations of inappropriate behavior and suspected violations of the Foreign Corrupt Practices Act (FCPA) by U.S. corporations, their agents or partners and foreign executives of operating divisions.

- Developed and implemented audit plans and programs for international investigations and internal control assessments, including employee related taxes and benefits, agent agreements and customs and duty payments, among others.

- Conducted internal investigations on behalf of audit and special committees of Boards of Directors in connection with instances of suspected embezzlement or other related fraudulent activity such as inventory diverting and vendor "kick-back" schemes.

### Testimony Experience

- CWC Holdings, LLC v. Michael Christian Kanady and Echo Energy, LLC; District Court of Oklahoma County, State of Oklahoma, Case No. CJ-2021-29.

- Segundo Navarro Drilling, Ltd. v. Johnny Chilton and San Ramon Ranch Mineral Partners, Ltd.; District Court for the District of Dallas County, 160th Judicial District, Cause No. DC-20-18518.

- Jacam Chemical Company 2013, LLC v. Arthur H. Shepard Jr. and GEO Chemicals, LLC; United States District Court for the District of North Dakota, Western Division; Civil Action No. 1:19-cv-00093.

- Fremont Emergency Services (Mandavia), Ltd., et al. v. UnitedHealthGroup, Inc., et al.; District Court Clark County, Nevada, Case No. A-19-792978-B.

- TravelPass Group, LLC, et al. v. Caesars Entertainment Corporation, et al.; United States District Court for the Eastern District of Texas, Texarkana Division; Civil Action No. 5:18-cv-00153.

- SportsPower Ltd., a Hong Kong Limited Company v. Crowntec Fitness Mfg. Ltd., a Taiwanese Limited Company and LI-JU HSIANG, an individual; United States District Court for the Eastern District of Texas, Sherman Division; Civil Action No. 4:19-cv-00066.

- Caprock Permian Processing LLC v. Primoris Services Corporation, and Primoris T&D Services, LLC; District Court of Dallas County, Texas, 14th Judicial District, Cause No. DC-19-16644.

- Linksmart Wireless Technology, LLC v. Panasonic Avionics Corp.; United States District Court Central District of California; Civil Action No. 8:18-cv-00662.

- Saul Horowitz as Sellers' Representative v. National Gas & Electric, LLC and Spark Energy, Inc.; United States District Court for the Southern District of New York; Civil Action No. 17-cv-7742.

3

**App. 084**

David M. Leathers, ASA, CFE

- J. Steve Pursley v. Shaun Mooney, Recruitment Partners, L.P., and International Recruitment Corporation; District Court of Harris County, Texas, 281st Judicial District, Cause No. 2017-28294.

- Wayne Harwell v. Texas Next Capital, LP., Texas Next Management, LLC, Texas Next Services, LLC, Steven A. Hassmann, John C. Kerr and Matthew W. Murphy; District Court of Bexar County, Texas, 166th Judicial District, Cause No. 2017CI03737.

- Expedia, Inc. and EAN.Com, LP v. TravelPass Group, LLC, Partner Fusion, Inc. and Reservation Counter, LLC; American Arbitration Association, No. 01-17-002-2312.

- Ace Venture Opportunities for Airbnb, S.P. v. ADIT Ventures, LLC, f/k/a PSP Ventures II, LLC, et al.; American Arbitration Association, No. 01-19-0001-0613, New York, New York.

- M-I L.L.C. d/b/a M-I Swaco v. Q'Max Solutions, Inc., Q'Max America, Inc., and Sanjit Roy; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:18-CV-01099.

- Polygon PNG L.P., et al. v. InterOil Corporation, et al.; American Arbitration Association, No. 01-18-0000-7023, Houston, Texas.

- Finalrod IP, LLC and R2R and D, LLC d/b/a Superod v. John Crane, Inc. and John Crane Production Solutions, Inc., Endurance Lift Solutions, Inc.; United States District Court for the Western District of Texas, Midland/Odessa Division; Civil Action No. 7:15-cv-00097.

- TechnipFMC PLC v. Samik Mukherjee and McDermott International, Inc.; District Court of Harris County, Texas, 164th Judicial District, Cause No. 2018-53084.

- JSC Georgian Oil and Gas Corporation (Georgia) and LEPL State Agency of Oil and Gas (Georgia) v. Frontera Resources Georgia Corporation (Cayman Islands/U.S.A.); Arbitration Under the United Nations Commission on International Trade Law 1976; PCA Case No. 2018-02.

- DynaStudy, Inc. v. Houston Independent School District; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:16-CV-01442.

- Bordelon Marine, Inc. v. Energy XXI GOM, Inc.; United States District Court Eastern District of Louisiana; Civil Action No. 2:15-CV-00815.

- Prisua Engineering Corporation v. Samsung Electronics., Ltd, et al.; United States District Court for the Southern District of Florida; Case No. 16-CV-21761.

- Charles Dresser, IV v. Varun Mishra and Collin King; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:16-CV-1285.

- Newpark Resources, Inc. and Newpark Drilling Fluids, LLC. v. Ecoserv, LLC.; District Court of Harris County, Texas, 80th Judicial District, Cause No. 2015-40104.

- LDHJ, LLC v. Gerardus Smith; District Court of Grayson County, Texas, 15th Judicial District, Cause No. CV-15-1228.

4

David M. Leathers, ASA, CFE

- William Jones, Ameritech College Operations, LLC, Ameritech College Holdings, LLC, Ameritech College, LLC, and Ameritech Manager, LLC v. Main Street Capital Corporation, HMS Income Fund, Inc., Main Street Equity Interests, Inc., HMS Equity Holdings, LLC, and Wasatch Ameritech Holdings, LLC; American Arbitration Association, No. 01-16-00004502, Houston, Texas.

- Khaled Alattar and LuxeYard, Inc. v. Kevan Casey, et al.; District Court of Harris County, Texas, 113th Judicial District, Cause No. 2012-54501.

- Eni US Operating Co. Inc. v. Transocean Offshore Deepwater Drilling, Inc.; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:13-cv-03354.

- Collins, Edmonds, Pogorzelski, Schlather & Tower, PLLC v. Internet Machines, LLC; Steven C. Sereboff; Francis P. Knuettel, II; Internet Machines MC, LLC; and Social IP Law Group, LLP; District Court of Harris County, Texas, 295th Judicial District, Cause No. 2015-25448 (Arbitration by Agreement).

- Michael Brauser, et al. v. Sanders Morris Harris, Inc., et al; District Court of Harris County, Texas, 80th Judicial District, Cause No. 2015-11227.

- Walrus Brands, L.L.C. v. Peaches Uniform, Inc; United States District Court for the Northern District of Illinois; Civil Action No. 1:12-cv-04892.

- NGS Sub Corp., Evolution Petroleum Corporation, and Tertiaire Resources Company v. Denbury Onshore, LLC; District Court of Harris County, Texas, 133rd Judicial District, Cause No. 2013-74863.

- Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:14-cv-01289.

- UltraClean Electropolish, Inc. v. Astro Pak Corporation; United States District Court for the Southern District of Texas, Houston Division; Civil Action No. 4:14-cv-03635.

- Murex, LLC v. Bridger Rail Shipping, LLC and Bridger Group, LLC. American Arbitration Association, No. 01-14-00001314, Houston, Texas.

- In the Matter of the Arbitration Between Hanwha Resources (USA) Corporation, et al. v. O'Ryan Oil and Gas, et al., Houston, Texas.

- John K. Meyer, et al. v. JP Morgan Chase Bank, N.A., Individually/Corporately and as Trustee of the South Texas Syndicate Trust, District Court of Bexar County, Texas, 225th Judicial District, Cause No. 2010-CI-10977.

- Personal Audio, LLC v. CBS Corporation; United States District Court for the Eastern District of Texas, Marshall Division; Civil Action No. 2:13-CV-00270-JPG-RSP.[1]

- North Plains Energy, LLC v. TAM International, Inc., District Court of Harris County, Texas, 234th Judicial District, Cause No. 2012-47659.

- FUNimation Entertainment v. A.D. Vision, Inc., et al., District Court of Harris County, Texas, 151st Judicial District, Cause No. 2011-67220.

- New Process Steel, L.P. v. Jimmy C. Kollaja, District Court of Harris County, Texas, 164th Judicial District, Cause No. 2012-202260.

- Orca Assets, G.P. L.L.C., v. JP Morgan Chase Bank, N.A., et al., District Court Dallas County, Texas B-44th Judicial District, Cause No. DC-12-05303

---

[1] Includes testimony in related cases: 2:13-cv-00577, 2:13-cv-00271, 2:13-cv-00015, and 2:13-cv-00014.

David M. Leathers, ASA, CFE

- Susman Godfrey, L.L.P., v. T.C. Petroleum, Inc., JAMS Arbitration No. 1310020051, Houston, Texas.

- West Fork Advisors, LLC v. Sungard Consulting Services, et al., District Court Dallas County, Texas, Cause No. 12-00681.

- Burlington Resources Oil and Gas Company LP and GeoSouthern Dewitt Properties, LLC v. Orca Assets GP, LLC, District Court of Dewitt County, Texas 267th Judicial District, Cause No. 11-08-22,038.

- British American Offshore Limited v. TCW Global Project Fund II, Ltd., TCW Asset Management Company, and Trust Company of the West, District Court Harris County, Texas 189th Judicial District, Cause No. 2005-64490.

- American Senterfitt, Bill Bankston, Donald Neumeyer and Ruben S. Martin, III v. Scott D. Martin, Agreement of Parties in Cause No. 2010-21210, 55th Judicial District Court of Harris County, Texas.

- Shell Trading (US) Company v. Lion Oil Trading & Transportation, Inc., District Court Harris County, Texas, 270th Judicial District, Cause No. 2009-11659.

- GPS Industries, Inc., United States Bankruptcy Court for the Middle District of Florida, Tampa Division, Case No. 09-16766-CPM.

- John M. Hopper et al. v. Asim Zafar et al., District Court Harris County, Texas, 152nd Judicial District, Cause No. 2010-19789.

- Ametek, Inc. et al. v. Eralytics GmbH et al., District Court Harris County, Texas, 157th Judicial District, Cause No. 2007-76056.

- Cambrex Corporation v. Celgene Corporation, Superior Court of New Jersey, Law Division: Bergen County, L-378-08.

- Industrial Recovery Capital Holdings Co., et al. v. Harold C. Simmons et al., District Court Dallas County, Texas, K-192nd Judicial District, Cause No. 07-04855.

- Expro Americas, LLC v. Boots & Coots International Well Control, Inc., Michael L. Clark, Robert T. Hendrix and Glendell S. Hendrix; District Court Harris County, Texas, 281st Judicial District, Cause No. 2007-447397.

- OPTi Inc. v. Advanced Micro Devices, Inc.; United States District Court for the Eastern District of Texas, Marshall Division; Civil Action No. 2:06-CV-00477.

- Mary Kay Inc. v. Amy L. Weber, Scott J. Weber and Touch of Pink Cosmetics; United States District Court for the Northern District of Texas; Civil Action No.3:08-CV-0776-G.

- The Manhattan Life Insurance Company, et al. v. Family Life Corporation, et al.; District Court Harris County, Texas, 215th Judicial District, Cause No. 2007-22937.

- Eugene S. Crist, et al. v. St. James Capital Corp., et al.; District Court Harris County, Texas, 129th Judicial District, Cause No. 2004-7033.

- Personalysis Corp. v. Hardwired, Inc., et al.; District Court Harris County, Texas, 215th Judicial District, Cause No. 2004-31493.

- Abraham's Oriental Rugs, Inc. v. CenterAmerica Property Trust, L.P. and Dutch Plaza Properties, Ltd.; District Court Harris County, Texas, 295th Judicial District; Cause No. 2003-31,693.

- Jeffrey A. Kozak v. Medtronic, Inc., United States District Court for the Southern District of Texas Houston Division; Civil Action No. H-03-4400.

6

**App. 087**

David M. Leathers, ASA, CFE

- Forest Hunter Smith v. Anglo-Dutch Petroleum International; District Court of Harris County, Texas; 133rd Judicial District Court Cause No. 2004-48332.

- Biomedical Design, Inc. v. Medtronic, Inc.; American Arbitration Association No: 30 Y 133 00608 04, Atlanta, Georgia.

- Willis Energy, L.L.C. v. El Paso Production Company and El Paso Corporation; District Court of Harris County, Texas, 133rd Judicial District Cause No. 2003-13275.

- DMF Leasing, Inc. v. Budget Rent-A-Car of Maryland, Inc., et al.; In the Circuit Court for Montgomery County, Maryland; Civil Action No. 252952.

- The Maryland Jockey Club, et al., v. ODS Technologies, L.P.; United States District Court for the District of Maryland; Civil Action WMN-03-2124.

- IronPort Systems, Inc. v. Ciphertrust, Inc.; United States District Court Northern District of California San Francisco Division; Case No. C 03-05037 CRB (JCS).

- PJS of San Antonio, Inc. and PJS of Texas, Inc. v. Tim Clark, SweepTx, Inc., et al; District Court of Travis County, Texas, 261st Judicial District; Cause No. GN201499.

- Hilcom Partners, Ltd. v. Moore & Associates, Inc.; American Arbitration Association, Houston Texas.

- Comerica Bank vs. Picus International, Inc., Kenneth J. Swieter and Kent Elsbree; District Court Dallas County, Texas, 95th Judicial District, No. 00-02147.

- E. Peter Healey v. Samuels Jewelers; American Arbitration Association No. 70 160 00034 01, Austin Texas.

- Franklin S. Chow, M.D. v. United States Surgical Corporation; United States District Court for the District of Colorado; Civil Action No. 00-M-1228.

- Parrot-Ice Drink Products of America, Ltd. , and Greg Johnson v. DWS, Inc., d/b/a Selection Unlimited, and Derrick Senior; United States District Court Southern District of Texas; Civil No. H-99-2285.

### *Recent Articles and Presentations*

David has taught numerous Continuing Education courses to outside and in-counsel on economic damages, business valuation, and various accounting and financial issues that arise during transactions, disputes and investigations. He has also lectured at the University of Houston School of Law and the University of Texas IC2 Institute. Recent publications and speaking engagements include the following:

- "Book of Wisdom Refresher and What Implication COVID May have on the Book of Wisdom" – 58th Annual Conference on Intellectual Property Law, Institute for Law and Technology, Plano, Texas, November 10, 2020.

- "Joint Venture Trends" – Institute of Energy Law Merger & Acquisitions in Energy Law Conference, Houston, Texas May 17, 2018.

- "Intellectual Property Valuation and Damages: Nuts and Bolts in 2018" – The Knowledge Group, May 8, 2018.

- "In-House Perspective on Internal Investigations" – 29th Annual International Law Institute, Houston, Texas, February 23-24, 2017

- "Strategic Licensing: Advanced Skills & Tools" Licensing Executives Society, Houston, Texas, February 25-28, 2014.

7

**App. 088**

David M. Leathers, ASA, CFE

- "The Law of Fraudulent Transfer Applied to Intellectual Property" – Licensing Executives Society Houston Chapter Meeting, January 16, 2014.

- "Intellectual Property Valuation" – Licensing Executives Society Austin Chapter Meeting, May 16, 2013.

- "What Rate to Use: LES Royalty Rate Survey Methods and Results" – Licensing Executive Society Webinar, April 10, 2013.

- "Intellectual Property Valuation" – Licensing Executives Society Dallas Chapter Meeting, November 1, 2012.

- "Cloud Computing Primer for the IP Professional" – David Leathers and Shayne Phillips, 28th Annual Institute on Intellectual Property Law, October 4-6, 2012.

- "Lower Costs and Achieve Compliance through Enterprise Content Management" – David Leathers, Marilyn Kibler-Colón, and Derek Hall, Sirius Solutions Legal Advisory, October 2011.

- "Hot Topics in Corporate Disputes and Investigations: Stories from the Trenches" – 2011 Spring Accounting Expo, Houston CPA Society, May 23, 2011.

- "The Importance of the Gulf of Mexico in Determining U.S. Energy Policy" – David Leathers and David Lerman, Sirius Solutions Global Energy Advisory, March 18, 2011.

- "Essential Principles & Tools of Licensing" – Licensing Executives Society Professional Development Series (PDS 200), Houston, Texas, February 28 – March 3, 2011.

- "Chemicals Energy Environmental & Materials Royalty Rate Review" – 2010 Licensing Executives Society Annual Meeting, Chicago, Illinois, September 27, 2010.

- "Growth Areas Emerging in High Tech" – Consulting Magazine, January/February 2010.

- "Accounting for Attorneys and Understanding Financial Statements" – TexasBar CLE: 6th Annual Advanced In-House Counsel Course, In-House Counsel Boot Camp, August 15, 2007.

**App. 089**

Alvarez & Marsal
Adler v. Quinessa, et al.

Privileged & Confidential

**Exhibit 3**
**Adler's Branded CPC by Quarter**



<u>*Sources:*</u>

*\* ADLER_000619-000623; ADLER_000689*

<u>*Notes:*</u>
*\*Note: The data in this schedule is based off of Jim Adler's spending on the following campaigns: G_S_Brand_Alpha; G_S_Brand_Alpha_bidtest;*
*G_S_Brand_Alpha_mod_test; G_S_Brand_Alpha_Top_Keywords; G_S_Brand_Beta; G_S_Brand_English_Beta_Dead_Query; G_S_Brand_Spanish_Alpha;*
*G_S_Brand_Spanish_Beta; G_S_Call_Only_Brand_Alpha_tCPA_05.09.2019; and G_S_Call_Only_Top_Brand_Alpha.*

Alvarez & Marsal

Privileged & Confidential

**Exhibit 4**

**AILC Impressions Regression Analysis - Summary Output**

*Regression Equation:  Adler Branded CPC ~ Month (Trend) + AILC Impressions*



<u>**Sources:**</u>

\* *ADLER_000619-000623; ADLER_000689.*

\* *Quintessa_000002*

<u>*Notes:*</u>

*This was performed on a monthly summary of Adler's CPC and AILC's Impressions for the following keywords: "jim adler", "the texas hammer", "texas hammer", and "el martillo tejano."  The monthly summary was limited to "exact matches" by both Adler and AILC.  This regression analysis was limited to the period from June 2017 to December 2021, when data for both AILC Impressions and Adler's CPC were available.*

**Exhibit 5**
Adjusted Anderson Average Calculation (Schedule 4.2)

| Avrage Growth Rate from Q1 2017 - Q1 2019 | 11.45% |
|---|---|

Alvarez & Marsal

Privileged & Confidential

**Exhibit 6**



Privileged & Confidential

## Exhibit 7



***Source:***

*\* 2019-2022 Adler Keywords and Search terms.xlsx*

Alvarez & Marsal
North America, LLC

Privileged & Confidential

**Exhibit 8**



Alergy & Mattal
Adler v. Guinness, et al

Privileged & Confidential



**Exhibit 9**

Alvarez & Marsal                                                                           Privileged & Confidential

**Exhibit 9a**
List of AILC Purchased Keywords and Corresponding Google User Search Terms from January 1, 2019 through August 10, 2022

Alvarez & Marsal
Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential



Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal                                                                    Privileged & Confidential



Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential



Alvarez & Marsal                                                                    Privileged & Confidential



Alvarez & Marsal
Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential



Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal
Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal                                                                                          Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal
Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

Alvarez & Marsal

Privileged & Confidential

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

| | |
|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, Plaintiffs | CIVIL ACTION NO. 3:19-cv-02025-K-BN |
| vs. | **DR. BERNARD J. JANSEN REBUTTAL TO EXPERT REPORT** |
| MCNEIL CONSULTANTS, LLC D/B/A ACCIDENT INJURY LEGAL CENTER, QUINTESSA MARKETING, LLC D/B/A ACCIDENT INJURY LEGAL CENTER, and LAUREN VON MCNEIL, Defendants | |

## I.    <u>INTRODUCTION</u>

1.      I have been retained to provide expert analysis and opinion on behalf of Defendants McNeil Consultants, LLC concerning the case of Jim S. Adler, P.C. and Jim Adler, Plaintiff, vs. McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren Von McNeil, Defendants, Civil Action No. 3:19-cv-02025-K-BN, which is pending in the United States District Court for the Northern District of Texas, Dallas Division.[1]

2.      I have been asked by counsel to review and respond to (a) the July 11, 2022 report submitted by Dr. David W. Stewart[2] (the "Stewart Report") and (b) the July 14, 2022 report

---

[1] Third Amended Complaint, Jim S. Adler and JIM ADLER, Plaintiffs v. McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren von McNeil, Defendants, Civil Action No. 3:19-cv-02025-K-BN, dated May 31, 2022 ("3rd Amended Complaint").

[2] Expert Report of Dr. David W. Stewart. July 11, 2022 (the "Stewart Report")

submitted by R. Christopher Anderson[3] (the "Anderson Report") associated with the case mentioned above, specifically focusing on the topic of online searching using search engines and keyword advertising. I have not been asked to review or respond to the survey analysis of the Stewart Report nor the damages analysis of the Anderson Report, and my responses are outlined in this report ("Rebuttal Report").

3.      The opinions in this report are given to a reasonable degree of certainty in the field of web data collection, web analytics, web search, search engines, websites, online advertising, search engine advertising, and related market analysis.

4.      I am being compensated for my time on this matter at my standard rate of $500 per hour. My compensation is in no way contingent on either my expert opinion or the outcome of this litigation.

## II.      **QUALIFICATIONS**

5.      My analysis is based on my experience, training, knowledge, and education, and it is formed through the application of that experience, training, knowledge, and education in the principles of search engines, web search, keyword advertising, display advertising, online advertising, web analytics, related areas, and supported with market analysis.

6.      Since 2015, I have been a principal research scientist at the Qatar Computing Research Institute and am an adjunct professor at the College of Information Sciences and Technology at The Pennsylvania State University (Penn State), University Park, Pennsylvania. I was a tenure-track professor at Penn State from 2002 through all of 2016, departing as a tenured, full-time professor in 2017 to become a principal research scientist at the Qatar Computing Research Institute. I was a Senior Fellow at the Pew Internet & American Life Project, part of the

---

[3] Expert Report of R. Christopher Anderson. July 14, 2022 (the "Anderson Report")

2

Pew Research Center, analyzing survey data and producing research reports[4] from 2010 through 2012. I was a University Expert at the National Ground Intelligence Center from 2011 through 2014. Before my professorship at Penn State, I was a Lecturer in the Computer Science Program at the University of Maryland (Asian Division) for one year. Before that, I was an Assistant Professor in the Department of Electrical Engineering and Computer Science at the United States Military Academy, also known as West Point, for three years.

7. In addition to my academic credentials, my professional experience includes twenty years of practice in the U.S. military, serving in the Infantry as an enlisted soldier and then as a communications officer, working primarily in a variety of information technology-related positions planning and establishing communication networks from portable ground radios to large satellite communication radios. I also led a large multimedia team at a major U.S. Army educational facility, responsible for designing, providing, and evaluating multimedia products, including for the organizational website and search engine optimization for that website. During this time, the team received several product awards and honors, including one for website development, four for multimedia applications development, and one for software development.

8. I am the editor-in-chief of the international academic journal *Information Processing and Management*, a premier computing science and information science journal, including computational science, analytics, and social media computing topics. I am a former

---

[4] Jansen, B. J. (2011) The civic and community engagement of religiously active Americans. Pew Internet & American Life Project, Pew Research Center. 13 December. http://pewinternet.org/Reports/2011/Social-side-of-religious.aspx;

Jansen, B. J. (2010) 65% of Internet Users Have Paid for Online Content. Pew Internet & American Life Project, Pew Research Center. 30 December. http://www.pewinternet.org/Reports/2010/Paying-for-Content.aspx;

Jansen, B. J. (2010) Use of the internet by higher income households. Pew Internet & American Life Project, Pew Research Center. 24 November. http://www.pewinternet.org/Reports/2010/Better-off-households.aspx;

Jansen, B. J. (2010) Online Product Research. Pew Internet & American Life Project, Pew Research Center. 29 September. http://pewinternet.org/Reports/2010/Online-Product-Research.aspx

**App. 130**

Editor-in-Chief of the journal *Internet Research*, a top-ranked journal in the web science and business domains that examines the Internet's social, ethical, economic, and political implications.

9.      I have authored more than 350 academic publications focusing on web searching, search engines, keyword adverting, online advertising, online branding, web analytics, social media, and related fields. Many of my publications address search engines, search analytics, online advertising, keyword advertising, or web searching. My recent research focuses on online analytics, investigating the qualitative and quantitative attributes of digital content usage, web analytics, and social computing analytics. I have authored, co-authored, or co-edited four books, including <u>Web Search: Public Searching of the Web</u> (2007), <u>Understanding User – Web Interactions via Web Analytics</u> (2009), <u>Understanding Sponsored Search</u> (2011), and <u>Data-Driven Personas</u> (2021). In a 2020 study, I was ranked in the top 2% of researchers in my field.[5]

10.      I have conducted research and teaching concerning searching, search engines, and websites, including search engine optimization, content creation, search engine keyword advertising, web searching, and web analytics. In the field of online searching, online advertising, and web analytics, I have worked directly with real-user searching data from several web search engines. I have also analyzed web traffic data and other attributes from various websites and social media accounts. I have analyzed real-user data of a multimillion dollar online search marketing campaign that spans multiple years, involving thousands of ads and keywords. I have also analyzed website user referral traffic and monetized this traffic via online advertising. A 2015 review of keyword advertising research reported that I was the predominant researcher in the field of search

---

[5] Ioannidis JPA, Boyack KW, Baas J (2020) Updated science-wide author databases of standardized citation indicators. PLoS Biology 18(10): e3000918. https://doi.org/10.1371/journal.pbio.3000918; Data for "Updated science-wide author databases of standardized citation indicators" https://data.mendeley.com/datasets/btchxktzyw/2

**App. 131**

engine advertising[6], working with my co-authors. I have developed web analytics models and processes to analyze business goals and have used web analytics data in my research and teaching. I have also researched user searching behaviors, including query reformulation and locating relevant online information.

11.     My professional expertise includes search engine optimization, web analytics, search engines, web searching, online advertising, and related computer science and data science areas. In my academic career, I have worked with various search engines and information searching applications to understand user information behavior on the Web and other environments. For example, I designed and coded a text-based search engine for my Master's program in Computer Science. For my Doctorate program in Computer Science, I developed a program interface for Web search engines and implemented it on the Gigabyte search engine. I have been invited to give research presentations at major search engine companies, including Google, Yandex and NAVER, and many search marketing agencies.

12.     As a computer scientist, I am experienced with classic computer science areas, such as programming, software development, algorithms, and networking, along with non-traditional areas, such as data analytics, keyword advertising, and online advertising. I have taught various computer courses, including micro-computing, programming (in various programming languages), and the web/Internet, at the undergraduate and graduate levels. I have taught a web technology overview course (websites, mobile, social media, web metrics, market analysis, etc.) and a graduate-level research course for professional master's students. I have taught keyword and display advertising courses where student teams engaged with small-medium-sized enterprises

---

[6] Jafarzadeh, H., Aurum, A., D'Ambra, J., & Ghapanchi Dr, A. H. (2015). A systematic review on search engine advertising. Pacific Asia Journal of the Association for Information Systems, 7(3), 2. http://journal.ecrc.nsysu.edu.tw/index.php/pajais/article/viewFile/321/151

**App. 132**

(SMEs) to implement actual online advertising campaigns. I have supervised students working with SMEs on various online advertising platforms, including Google Ads and Facebook Ads. I have personal experience with several online marketing platforms, including Google Ads, Facebook Ads, LinkedIn Ads, and Microsoft Advertising.

13.     I have advised government agencies and private companies in consulting and expert witness matters, including online search, search engines, locating relevant information, and keyword advertising, among other related areas.

14.     A copy of my complete curriculum vitae, which includes a list of publications I have authored in the past ten years, is attached as **Appendix A**.

15.     A list of cases in which I have testified as an expert in deposition or trial in the past four years is attached as **Appendix B**.

III.    **ASSIGNMENT AND MATERIALS CONSIDERED**

16.     I have been asked by counsel to review and respond to the Stewart Report and the Anderson Report associated with the case mentioned above.

17.     Specifically, I have been asked by Defendants to review and respond to the Stewart Report's conclusions that

a.      searchers would be confused by the search results they obtained when using their smartphones after searching for 'the texas hammer',

b.      searchers that clicked on the specific Accident Injury Legal Center advertisement were confused, and

c.      searchers that clicked on the Accident Injury Legal Center advertisement would assume that the ads were associated with 'the texas hammer' law firm.

18.     Specifically, I have been asked by Defendants to review and respond to the Anderson Report's conclusions that

6

**App. 133**

a. searchers were 'intercepted' due to Accident Injury Legal Center advertisements appearing in the search results,

b. searchers were 'deceived' when clicking on Accident Injury Legal Center advertisements,

c. the practice of bidding on competitor search terms is somehow a prohibited activity.

19. The materials I considered in preparing this report are listed in **Appendix C**. Printouts of the material upon the date that I reviewed them for this report are available upon request.

## IV. **SUMMARY OF OPINIONS**

20. Based on my research and analysis in connection with this assignment, which is described in more detail in the body of this report, along with my own experience, training, knowledge, and education as stated below, I have reached the following opinions to a reasonable degree of certainty in the field of online searching science concerning views expressed in the Stewart Report:

a. There is no reason to believe that most searchers would likely be confused by the search results they obtained when using their mobile after searching for 'the texas hammer'.

b. There is no reason to believe that most searchers clicking on the Accident Injury Legal Center advertisement used in the Stewart Report would likely be confused concerning the nature of the advertisement.

c. There is no reason to believe that most searchers who clicked on the Accident Injury Legal Center advertisement would likely assume that the ads were associated with the 'the texas hammer' law firm.

21. Issues of survey design and analysis aside, the Stewart Report presents little expert analysis and offers no comprehensive evidence in support of the key stated opinions in the Stewart

Report, including:

22.     Contrary to the unsupported assumptions in the Stewart Report, most people using search engines are proficient with searching and are aware of search results advertisements, as supported by the few people that click on search engine ads relative to organic results.

23.     The Stewart Report implicitly assumes people searching for 'the texas hammer' are interested in executing transactions; this is <u>not</u> true. Most searches are not commercial, and most commercial searches are not necessarily transactional (i.e., not necessarily looking to make a purchase).

24.     Even using the reported percentage of 'confused' searchers in the Stewart Report, which is inflated and, in my assessment, not suggestive of most searchers being confused, most participants were not confused. In the survey, 56% of the participants were <u>not</u> confused about the Accident Injury Legal Center ad. I understand that the Defendants have retained a survey expert to analyze the specific flaws in Dr. Stewart's survey that inflate the likelihood of the number of confused searchers. Therefore, in this Rebuttal Report, I limit my opinions to using Dr. Stewart's numbers at face value without agreeing that those numbers are accurate.

25.     It is unreasonable to assume, as the Stewart Report does, that searchers who are competent enough to decide they need a personal injury attorney, competent enough to know to search for 'the texas hammer', competent enough to execute a relevant search on a major search concerning a personal injury attorney, and competent enough to employ a mobile phone to execute these searches would suddenly <u>not</u> be competent enough to distinguish ads among attorneys. It is more reasonable that such searchers could distinguish among ads in the search results. The

Professional Ethics Committee for the State Bar of Texas agrees with my analysis.[7]

26.     Based on my research and analysis in connection with this assignment, which is described in more detail in the body of this report, along with my own experience, training, knowledge, and education as stated below, I have reached the following opinions to a reasonable degree of certainty in the field of online searching science concerning views expressed in the Anderson Report:

a.     There is no reason to believe that most searchers were likely 'intercepted' due to Accident Injury Legal Center advertisements appearing in the search results.

b.     There is no reason to believe that most searchers were likely 'deceived' when clicking on Accident Injury Legal Center advertisements.

c.     Bidding on competitor keyterms is a common and accepted practice in the keyword advertising domain.

27.     The Anderson Report implicitly assumes people searching for 'the texas hammer' are interested in executing transactions; this is <u>not</u> true. Most searches are not commercial, and most commercial searches are not necessarily transactional (i.e., not necessarily looking to make a purchase). So, these searchers could not be 'intercepted'.

28.     It is unreasonable to assume, as the Anderson Report does, that searchers who are competent enough to decide they need a personal injury attorney, competent enough to know to search for 'the texas hammer', competent enough to execute a relevant search on a major search concerning a personal injury attorney, and competent enough to employ a mobile phone to execute

---

[7] The Professional Ethics Committee for the State Bar of Texas Opinion No. 661 July 2016, pages 2-3: "*Moreover, since a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results, it appears highly unlikely that a reasonable person using an internet search engine would be misled into thinking that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search.*"

these searches would suddenly <u>not</u> be competent enough to distinguish ads among attorneys. It is more reasonable that such searchers could distinguish among ads in the search results. The Professional Ethics Committee for the State Bar of Texas agrees with my analysis.[8]

29.     The Anderson Report attempts to paint the bidding on competitor search terms as a nefarious practice. Bidding on competitor search terms is a common and accepted practice in the keyword advertising domain.

30.     I expound on these points in the discussion below and provide foundational information to correct this inaccurate presentation of searchers in the Stewart Report.

## V.     DEFINITIONS OF TERMS

31.     In forming this opinion, I discuss several web analytics and related techniques. In order to more clearly discuss these techniques, I define the following terms (Table 1).

| Term | Definition |
|---|---|
| **Average Session Duration** | The average length of time that visitors are on the website. |
| **Bounce Rate** | A measure of visits to a website with no meaningful action occurring (i.e., they do not browse the website). Typically, bounced sessions have a duration of zero seconds. |
| **Branded Search** | A query submitted to a search engine that includes the name of a company, business, brand, or name of the branded product. |
| **Click** | An action taken to select an option on an online interface. |
| **Click Through Rate (CTR)** | The ratio of clicks to impressions |
| **Competitor bidding** | The advertising tactic of actively bidding on competitors' brand name as a keyword in keyword advertising. |
| **Conversion** | The completion of the desired goal by visitors to a website, such as signing up for a service or making a purchase. In online advertising, this usually occurs after users click on an ad. |
| **Conversion Rate (CR)** | The ratio of conversions to clicks |
| **Domain Name** | An identification string that defines the name of a website. |
| **Impression** | A measure of the number of times specific online content is displayed, such as the number of times an ad is displayed or the number of times a social media post is displayed. |

---

[8] The Professional Ethics Committee for the State Bar of Texas Opinion No. 661 July 2016, pages 2-3: "*Moreover, since a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results, it appears highly unlikely that a reasonable person using an internet search engine would be misled into thinking that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search.*"

**App. 137**

| Term | Definition |
|------|------------|
| **Keyword** | A set of one or more words that Google Ads advertisers can bid on to target a specific audience for which they want their ads to appear; A keyword is associated with search terms that searchers enter in the Google search engine. |
| **Keyword Advertising** | An online advertising practice in which advertisers pay to have advertisements appear in the search results in response to searches containing particular phrases. |
| **Knowledge Graph (or Panel, Pane)** | An infobox on the search results page used by Google and others search engines to enhance the search results. The infobox is populated with information gathered from a variety of sources. |
| **Lead generation** | The process of identifying potential customers for a business's products or services. |
| **Non-Branded Search** | A query submitted to a search engine that does not include the name of a company, business, brand, or name of the branded product. Non-branded searches often drive the majority of traffic to most websites. |
| **Organic Search Results** | Results that appear in response to a search resulting from algorithms of the search engine and are not affected by payments, such as from advertisers. |
| **Organic Traffic** | Visits to a website via links from a search engine's non-paid results (note the difference below between a 'Visit' and a 'Visitor'). |
| **Paid Search Results (a.k.a., ads)** | Results that appear in response to a search resulting from algorithms of the search engine and are affected by payments, such as from advertisers. |
| **Paid Traffic** | Visits to a website via links from a search engine's paid results, such as sponsored links or ads that appear at the top or on the right side of Google® when search results are displayed. |
| **Pay-Per-Click (PPC) Ads** | A style of internet marketing involving advertisers paying a fee each time one of their displayed ads are clicked. |
| **Related Searches** | Searches related to the just entered search usually appearing in the related searches sections at the bottom of the search page. |
| **Search** | Submission of a query to a search engine, usually in the form of terms. |
| **Search Engine** | A program with associated hardware and processes that allow people to find information on the Web typically via the use of queries consisting of terms. |
| **Search Engine Results Page (SERP)** | The search results that a search engine returns in response to a search, of which the two most common search results are organic and paid. |
| **Search Traffic** | Visitors to a site that come from search engines rather than from other websites or via direct navigation. |
| **Session** | A set of user interactions on a website (or app) that take place within a given period. |

**App. 138**

| Term | Definition |
|---|---|
| **Visit** | An occurrence when an electronic device connects to a website, which is usually defined by a combination of an IP address and Browser within a given period but can also be defined by more sophisticated methods. |
| **Visitor** | The electronic device generating the page views and is usually identified by an IP address. A Visitor is not equivalent to a person because each individual person is counted by Web Analytics data collection tools as a unique 'Visitor' or a unique 'Visit' to a website whenever that person uses different devices (e.g., phones, tablets, laptops, desktop computers), or even different Browsers on the same device (e.g., using Chrome and Firefox on the same device). |
| **Web Analytics** | The measurement, collection, analysis, and reporting of web data. |
| **Website** | A set of web pages and related content identified by a common domain name and published on one or more web servers. |

32.    **Table 1: Terms and Definitions.**

33.    In forming my option, I also employed available online analytics services, including (Table 2).

| Platform | Description |
|---|---|
| **Google Ads®** | An online advertising service for advertisers to pay to display advertisements within the Google Advertising Network®, including search engines and websites. |
| **Google Keyword Tool®** | An online service that provides the number of searches for a given set of keywords in a given month on the Google® search engine. |
| **Google Trends®** | An online service that shows how often a particular term is relatively searched on the Google® search engine in a given period. |
| **SimilarWeb®** | An online service that provides web traffic data and analysis. |
| **SpyFu®** | An online service that provides search data and analytics, including for both paid (i.e., advertisements) and organic (i.e., natural or algorithmic) channels. |

34.    **Table 2: Analytic Services and Descriptions.**

## VI.    ANALYSIS OF THE STEWART REPORT AND PROVIDING MISSING FOUNDATIONAL INFORMATION CONCERNING ONLINE SEARCHING

### VI(a)    Types of Search Engine Results

35.    When a person enters a query into a search engine, the searcher is often presented with various types of search results appearing in response to the search.

**App. 139**

36.     The search results most relevant to this case are the organic results[9] and paid results (a.k.a., the ads)[10].

37.     Immediately below is an example from a search engine results page (SERP) in response to the search 'accident lawyers in dallas texas'[11]. Figure 1(a) shows the ads; Figure 1(b) shows the organic results.




**Figure 1: (a) example of ads in response to the search 'accident lawyers in dallas texas'; (b) example of organic results in response to the search 'accident lawyers in dallas texas'. Both (a) and (b) are from the same search results page; They are separated for ease of presentation.**

39.     These two types of search results have been common to most search engines for

---

[9] Organic search result https://support.google.com/google-ads/answer/6054492?hl=en
[10] Google Ads: Definition https://support.google.com/google-ads/answer/6319?hl=en
[11] Google Search https://www.google.com/search?q=accident+lawyers+in+dallas+texas, July 17, 2022

decades[12] [13]; therefore, they are familiar to searchers who have been employing search engines, given their ubiquitous presence in response to searches.

      40.     These general types of results appear regardless of the search device that the person is using, such as a desktop device (e.g., computer) or mobile (e.g., smartphone). Figure 2 immediately below shows a screenshot of four ads and one organic result in response to the 'clay jenkins attorney' search.[14]

 

[12] Jansen, B. J. (2011). Understanding Sponsored Search: Coverage of the Core Elements of Keyword Advertising. Cambridge University Press: Cambridge, UK; Jansen, B. J. and Mullen, T. (2008) Sponsored search: An overview of the concept, history, and technology, International Journal of Electronic Business. 6(2), 114 – 131

[13] Version Museum (2019) History of Google Search https://www.versionmuseum.com/history-of/google-search

[14] Google Search (Mobile) https://www.google.com/search?q=clay+jenkins+attorney (clay jenkins attorney google search image), August 8, 2022.

41.      **Figure 2: Screenshot of four search results from a search on a mobile device in response to the 'clay jenkins attorney' search. The screenshot shows three ads (i.e., labeled 'Ad;) and one organic result (i.e., for Clay Jenkins & Associates).  Note: The left image is the start of the SERP, and the right image is the continuation of the same SERP.**[15]

42.      For the ads, the advertisers can choose to have the ads responsive to the mobile devices and appear as click-to-call[16]. The click-to-call ad type allows the searcher to call a phone number directly by clicking on the ad's link. Otherwise, a click-to-call ad is the same as a typical search engine ad in appearance and function. Figure 3 immediately below shows a screenshot of two click-to-call ads in response to the search 'personal injury attorney dallas'.[17]

---

[15] Google Search (Mobile) https://www.google.com/search?q=clay+jenkins+attorney (clay jenkins attorney google search image), August 8, 2022.

[16]  About call ads  https://support.google.com/google-ads/answer/6341403?hl=en;  About call campaigns https://support.google.com/google-ads/answer/7159344?hl=en

[17]  Google Search (Mobile) https://www.google.com/search?q=personal+injury+attorney+dallas (personal injury attorney dallas google search image), August 8, 2022.

**App. 142**



43.     **Figure 3: Screenshot of three search results from a search on a mobile device in response to the search 'personal injury attorney dallas'. The screenshot shows a click-to-call ad. The second ad is also a click-to-call ad but runs off the page due to the screenshot size.**

44.     The click-to-call ad format was introduced in 2010[18] and is a format familiar to those searchers using mobile devices, with reportedly seventy percent of mobile searchers calling businesses to both "find information and make purchases"[19].

---

[18] Google Extends "Click To Call" Ads To All Advertisers https://searchengineland.com/google-extends-click-to-call-ads-to-all-advertisers-37122
[19] New research shows that 70% of mobile searchers call a business directly from search results https://adwords.googleblog.com/2013/09/new-research-shows-that-70-of-mobile.html

**App. 143**

45. I discuss these search results and the presentation style to highlight that the cropped images used for the surveys in the Stewart Report are not realistic search results listing, as participants would have seen more search results in an actual SERP.

46. I also point out that using the search phrase 'the texas hammer' does not seem like the most appropriate search phrase for the analysis presented in the Stewart Report. As noted in the Anderson Report, the keyword 'jim adler' accounts █████████████ of Plaintiff's total branded spending and ████ of Defendants' total ad spend. So, for a more accurate survey analysis, 'jim adler' would have been a better choice for a search phrase to employ.

47. Also, the advertisement employed in the survey reported is not consistent with Plaintiff's actual ads in response to the search phrase 'the texas hammer', as shown in Figure 4, immediately below.[20]

---

[20] 000014_ADLER_000714; The Stewart Report

**App. 144**




48.    **Figure 4: Comparison of a snippet from an actual SERP in response to the search 'the texas hammer' (left image, red boxes added) and the snippet from the Steward survey (right image, red boxes added). Not only is the Jim Adler ad used in the survey (survey ad shown in the image on the right; red boxes added) notably different than that in real life (real life ad shown in the image on the left; red boxes added), the clarity of the Adler ad and the control ad is notably less than the Accident Legal Injury Center ad. These presentation issues might have caused fewer clicks on the Adler ad and are factors that should have been controlled for in the survey design and pilot testing.**

18

**App. 145**

### VI(b)  Competitor Bidding in Search Advertising

49.    Ads that appear on the SERP are displayed as a result of the words in the search query and an advertiser's bids on keywords. Advertisers can bid on certain keywords so that their ads have the opportunity to appear when searches contain these words. Advertisers generally pay the search engine only when people click on the ads shown in the search results, known as pay-per-click (PPC) advertising or paid search. Advertisers are <u>not</u> charged for the ads appearing; advertisers only pay when a searcher clicks on a displayed ad.

50.    Advertisers can bid on different search words (known as keywords), including competitors' brand names[21]. Competitor bidding is a practice that occurs in many competitive industries[22], and Google does not restrict the use of trademarks as keywords[23].

51.    Figure 4 immediately below shows competitors bidding on the search phrases 'www.jimadler.com', 'jimadler.com', 'the texas hammer', 'jim adler', and 'the tough smart lawyer'.[24]

---

[21] Desai, P. S., Shin, W., & Staelin, R. (2014). The company that you keep: When to buy a competitor's keyword. *Marketing Science*, *33*(4), 485-508.
[22] Rosso, M. A. and Jansen, B. J. (2010) Brand Names as Keywords in Sponsored Search Advertising. Communications of the Association for Information Systems. 27(1), Article 6. Available at: http://aisel.aisnet.org/cais/vol27/iss1/6
[23] Trademarks https://support.google.com/adspolicy/answer/6118?hl=en
[24]           000007_ADLER_000707.pdf,           000010_ADLER_000710.pdf,           000016_ADLER_000716.pdf, 000017_ADLER_000717.pdf, 000017_ADLER_000718.pdf, 000017_ADLER_000719.pdf

19



52.    **Figure 4: Six screenshots of ads responding to the search phrases ‘www.jimadler.com’, ‘jimadler.com’, ‘‘the texas hammer’’, ‘jim adler’, and ‘the tough**

smart lawyer'.[25] [26]

53.     So, the implication in the Stewart Report concerning the appearance of competitor ads as unusual is incorrect, and the appearance of ads from competitors is common.

54.     Also, the implication in the Anderson Report concerning the employment of competitor bidding on keywords as unique to the Defendants is incorrect. Competitive bidding is a common practice in PPC advertising.

55.     Competitive bidding is a well-known practice among advertisers, and many searchers encounter this situation frequently with online searching, as shown in the examples above, and competitive bidding has been standard for some time.[27]

### VI(c)   Performance of Search Ads

56.     Even if an ad appears on the SERP, this does not mean a person will click on the ad. Click-through rates (CTRs) for ads are usually low.[28] Most clicks occur on the organic results.[29]

57.     As noted, most searchers generally do not click on ads. Reported CTRs are generally relatively low[30] [31], with single-digit CTR not unusual. From my practical experience and

---

[25]        000007_ADLER_000707.pdf,          000010_ADLER_000710.pdf,          000016_ADLER_000716.pdf, 000017_ADLER_000717.pdf, 000017_ADLER_000718.pdf, 000017_ADLER_000719.pdf
[26] Note: These were provided by Plaintiff, so I do not know if the appearance of and ordering of ads in these documents are representative of all searches.
[27] Bechtold, S., & Tucker, C. (2014). Trademarks, triggers, and online search. *Journal of Empirical Legal Studies*, *11*(4), 718-750.
[28]  Wordstream (2021) Click-Through Rate (CTR): Understanding Click-Through Rate for PPC. https://www.wordstream.com/click-through-rate
[29]  Elisa Gabbert (2021) Organic vs. Paid Clicks: These Are Not the Clicks You're Looking For. https://www.wordstream.com/blog/ws/2012/09/07/organic-versus-paid-clicks; Matt G. Southern (2021) Over 25% of People Click the First Google Search Result, Search Engine Journal. https://www.searchenginejournal.com/google-first-page-clicks/374516/
[30] Larry Kim (2012) What's a Good Conversion Rate on Google AdWords? Average Conversion Rates by Industry. https://www.business2community.com/online-marketing/whats-a-good-conversion-rate-on-google-adwords-average-conversion-rates-by-industry-0318438
[31] Chiou, L., and C. Tucker. (2012) How Does the Use of Trademarks by Third-Party Sellers Affect Online Search? Marketing Science, 31(5), p. 819–837.

**App. 148**

research[32], this low CTR is typical and not surprising for several reasons, including that searchers are now adept at circumventing ads[33] or employing ad blockers[34] where the ads are not even seen.

58.    Even if the ad is clicked on, it does not mean the person will convert (i.e., make a transaction). Most clicks on ads do not lead to conversions.[35] Conversion rates (CR) for ads are low.[36]

59.    Using a SERP snippet of only three results in the Stewart Report is an unrealistic searching situation for searchers in that it restricts them to just these three results. There might be many results on a search for 'the texas hammer', which can affect searcher selections of both paid and organic results[37].

### VI(d)   The State of Online Searching

60.    Most people employ a search engine to locate information and other resources on the Web.[38]

61.    In the U.S., the search engine of choice is primarily Google, with a market share of about ninety (90) percent for all platforms[39] and 95.85 percent market share for mobile[40].

62.    By analyzing the searches that people submit to a search engine, one can, to some extent, determine the searcher's intent for a given search or set of searches. One taxonomy for

---

[32] Jansen, B. J. and Schuster, S. (2011) Bidding on the Buying Funnel for Sponsored Search Campaigns. Journal of Electronic Commerce Research. 12(1), 1-18.
[33] Harris Interactive (2010) Are Advertisers Wasting Their Money? https://www.prnewswire.com/news-releases/are-advertisers-wasting-their-money-111254549.html
[34] Stephen Shankland (2021) Ad blocking surges as millions more seek privacy, security and less annoyance. CNET. https://www.cnet.com/news/privacy/ad-blocking-surges-as-millions-more-seek-privacy-security-and-less-annoyance/
[35] Jansen, B. J. and Schuster, S. (2011) Bidding on the Buying Funnel for Sponsored Search Campaigns. Journal of Electronic Commerce Research. 12(1), 1-18.
[36] Wordsteam (2021) Conversion Rate: What Is a Conversion Rate? https://www.wordstream.com/conversion-rate
[37] Chiou, L., and C. Tucker. (2012) How Does the Use of Trademarks by Third-Party Sellers Affect Online Search? Marketing Science, 31(5), p. 819–837.
[38] Purcell, K., Rainie, L., & Brenner, J. (2012). Search engine use 2012. Pew Internet Research.
[39] Search Engines Market Share in United States https://www.similarweb.com/engines/united-states/
[40] Search Engines Market Share in United States https://www.similarweb.com/engines/united-states/mobile-phone/

**App. 149**

determining user intent is the Informational, Navigational, or Transactional[41] classification, with each type of user intent defined as:

a. **Informational searching**: Informational searching intends to locate content concerning a particular topic to address an information need of the searcher, which is about eighty percent of searches[42].

b. **Navigational searching**: Navigational searching intends to locate a particular Website, which is about ten percent of searches[43]. The searcher may have a particular Website in mind, or the searcher may just 'think' a particular Website exists.

c. **Transactional searching**: Transactional searching intends to locate a Website to obtain some other product, which may require executing some Web service on that website. Transactional searching is about ten percent of searches[44], which might not always be commercial. This percentage tracks reasonably well but is higher than reported conversion rates for online ads, with less than ten percent conversion rates across industries [45].

63. This informational intent of searchers[46] is illustrated in the distribution of organic search results in response to a query. I searched for 'the texas hammer' on August 8, 2022; the

---

[41] Jansen, B. J., Booth, D., and Spink, A. (2008) Determining the informational, navigational, and transactional intent of Web queries, Information Processing & Management. 44(3), 1251-1266.

[42] Jansen, B. J., Booth, D., and Spink, A. (2008) Determining the informational, navigational, and transactional intent of Web queries, Information Processing & Management. 44(3), 1251-1266.

[43] Jansen, B. J., Booth, D., and Spink, A. (2008) Determining the informational, navigational, and transactional intent of Web queries, Information Processing & Management. 44(3), 1251-1266.

[44] Jansen, B. J., Booth, D., and Spink, A. (2008) Determining the informational, navigational, and transactional intent of Web queries, Information Processing & Management. 44(3), 1251-1266; Elisa Gabbert (2021) Organic vs. Paid Clicks: These Are Not the Clicks You're Looking For.
https://www.wordstream.com/blog/ws/2012/09/07/organic-versus-paid-clicks

[45] Brooke Osmundson (2022) Average Click-Through Rate In Google Ads By Industry. Search Engine Journal. https://www.searchenginejournal.com/data-whats-good-ctr-cpa-conversion-rate-adwords-2018/248947; Elan Mosbacher (2022) 10 Industry Benchmarks For Your Call Tracking Conversion Rate, Search Engine Land. https://searchengineland.com/10-industry-benchmarks-for-your-call-tracking-conversion-rate-97692

[46] Schultz, C. D. (2020). Informational, transactional, and navigational need of information: relevance of search intention in search engine advertising. *Information Retrieval Journal*, *23*(2), 117-135.

**App. 150**

organic results include a result for wwww.jimadler.com, three videos of apparently Jim Adler YouTube videos, four images of Jim Alder, two results from www.law.com, an Instagram result, a Wikipedia result, a Twitter result, and a result from www.chron.com.[47] Related searches were 'the texas hammer commercial', 'jim adler', 'the texas hammer dead', 'the texas hammer meme', 'bill adler the texas hammer', 'jim adler the texas hammer phone number', 'the hammer lawyer', and 'jim adler son'. The mobile search results were similar.[48] I would consider this query, 'the texas hammer', to be informational in nature, which is consistent with the type of organic search results shown.

64.     So, people searching for the query presented in the Stewart Report does not mean these people would have a commercial or a transaction intent. As shown by prior research and the distribution of organic results, the searching intention can be quite varied, even when searching for a business name.

65.     The implications in the Anderson Report concerning searchers being 'intercepted' due to Accident Injury Legal Center advertisements appearing in the search results is not correct. Most searchers would likely not click on the ads. Those who do click on ads are not necessarily confused and are not always looking to make a transaction. For example, searchers may click on multiple ads in a search for information from various advertisers.

66.     This analysis of the various interests of searchers is further supported by the bounce rate of the jimadler.com website, reported by SimilarWeb as exceeding 73% (i.e., more than seventy-three percent of the visits to the website were bounces), and the average session duration on jimadler.com was 15 seconds.[49]

---

[47] ███████████████████████████████████

[49] SimilarWeb Website Analysis for jimadler.com, August 2022

67.     Peer-reviewed research has shown SimilarWeb to be comparable yet conservative to measures from site analytics services, such as Google Analytics.[50]

68.     The implicit assumption of the Stewart Report is not true. It is not correct that anyone searching for 'the texas hammer' is exclusively looking to retain Jim S. Adler, P.C.

**VI(e)   Customer Journey**

69.     Even if a search has commercial intent, this does mean that every commercial search is transactional, as in wanting to make a purchase. The searcher may be engaged in collecting information about a service or conducting comparison shopping by, for example, conducting a series of searches on the names of lawyers in a given area.

70.     The customer journey (a.k.a., customer funnel) is a model used to describe a formal information gathering and decision process that consumers progress through before making a purchase – generally starting broadly in informational scope and narrowing down to the actual decision. The unidirectional customer funnel is a simplified visualization, as the search path is not linear, with customer journeys involving concurrent searches and looping back and forth among the stages before the decision is made.[51]

71.     The customer journey is well documented in many peer-reviewed academic studies[52], including my research work[53], in practice at commercial organizations[54], and has been

---

[50] Jansen, B. J., Jung, S.G., and Salminen, J. (2022) Measuring user interactions with websites: A comparison of two industry standard analytics approaches using data of 86 websites. PLoS ONE. 17(5): e0268212. https://doi.org/10.1371/journal.pone.0268212

[51] Daniel Schneider (2022) The Basics of Conversion Funnel Optimization and How to Get Started. SimilarWeb. https://www.similarweb.com/corp/blog/eCommerce/retail-insights/conversion-funnel-optimization/

[52] Tueanrat, Y., Papagiannidis, S., & Alamanos, E. (2021). Going on a journey: A review of the customer journey literature. Journal of Business Research, *125*, 336-353.

[53] Jansen, B. J. and Schuster, S. (2011) Bidding on the Buying Funnel for Sponsored Search Campaigns. Journal of Electronic Commerce Research. 12(1), 1-18.

[54] SalesForce (2016) Customer Journey Map: What is Customer Journey Mapping & Why is it Important? https://www.salesforce.com/uk/blog/2016/03/customer-journey-mapping-explained html

documented for commercial searching via search engines[55].

72.    Customer journey stages, with variations among different but related models, are shown immediately below in Figure 5.



**Awareness**: the prospective customer becomes cognizant of a need for a service or product.

**Research**: the prospective customer expresses interest and seeks more information, such as comparing the offerings of various competitors

**Decision**: the prospective customer makes the decision to move forward with purchasing the service or product or not

**Purchase**: the final stage of the sales funnel is action. This is the point at which the prospective customer completes the process by making a purchase.

73.    **Figure 5: The stages of the customer journey (Awareness, Research, Decision, and Purchase) with descriptions.**

74.    Each stage has a commercial aspect, where people might search for the name of a product or service. Only the last of these stages, Purchase, is primarily transactional. My analysis of the customer journey in retail keyword advertising showed that about 6 percent of the searches were at the Purchase phase.[56]

75.    The implications in the Anderson Report concerning searchers being 'deceived'

---

[55] Google (2016) From confusion to clarity: How brands can help people make confident purchase decisions with Search     https://www.thinkwithgoogle.com/intl/en-apac/consumer-insights/consumer-journey/reshaping-customer-journey-search/
[56] Jansen, B. J. and Schuster, S. (2011) Bidding on the Buying Funnel for Sponsored Search Campaigns. Journal of Electronic Commerce Research. 12(1), 1-18.

due to Accident Injury Legal Center advertisements appearing in the search results is not correct. Competitor ads often occur in online searching, and searchers may be in an information gathering mode rather than making a transaction.

76.     Likewise, the assumption of the Stewart Report is not true that searching for 'the texas hammer' means these searchers would have a commercial transaction intent to retain only Jim S. Adler, P.C.

77.     In fact, the main question in the survey reported in the Stewart Report conflates an informational search and a transactional search, as shown in Figure 6 immediately below.



78.     **Figure 6: Question from the survey in the Stewart Report. <span style="color:red">Red lines</span> added. The question conflates an informational search (i.e., 'information on') and a transactional search (i.e., 'shop for') in a single instruction to the survey participants. This is likely unclear to the participants as the two types of searches represent different customer journey stages. An informational search would most likely occur in the Research stage, and a transactional search would most likely occur in the Decision or Purchase stage.**

## VII.  SUMMARY

79.     In summary, I have reached the following opinions to a reasonable degree of certainty in the field of online searching science concerning the opinions expressed in the Stewart Report:

**App. 154**

80.     There is no reason to believe that searchers would likely be confused by the search results they obtained when using their smartphones after searching for 'the texas hammer'.

81.     There is no reason to believe that searchers who clicked on the Accident Injury Legal Center advertisement presented would likely be confused about what result they selected.

82.     There is no reason to believe that searchers who clicked on the Accident Injury Legal Center advertisement would likely assume that the ad was associated with 'the texas hammer'.

83.     I have reached the following opinions to a reasonable degree of certainty in the field of online searching science concerning the views expressed in the Anderson Report.

84.     There is no reason to believe that searchers were likely 'intercepted' due to Accident Injury Legal Center advertisements appearing in the search results.

85.     There is no reason to believe that most searchers were likely 'deceived' when clicking on Accident Injury Legal Center advertisements.

86.     Bidding on competitor search terms is a common and accepted practice in the keyword advertising domain.

## VII.    RIGHT TO AMEND

87.     I reserve the right to issue a supplemental or an amended report to respond to any rebuttal report by the Plaintiffs or if additional facts, including data, are brought to my attention that I deem material to my opinions.

Respectfully submitted,

DATED: August 15, 2022

Bernard J. Jansen

Digitally signed by Bernard J. Jansen
DN: cn=Bernard J. Jansen, o, ou,
email=jjansen@acm.org, c=<n
Date: 2022.08.15 18:18:18 +03'00'

By_____

Dr. Bernard J. (Jim) Jansen
Adjunct Professor
College of Information Sciences and Technology
The Pennsylvania State University
University Park, PA, 16802
Phone: 434-249-8687
Email: jjansen@acm.orq
URL: http://www.bernardjjansen.com/

29

# Appendix A

## Curriculum Vitae                    Bernard J. Jansen (Jim)



**Principal Scientist,** Qatar Computing Research Institute (QCRI), Hamad Bin Khalifa University, Doha, Qatar

**Professor,** College of Science and Engineering Hamad Bin Khalifa University, Doha, Qatar

**Adjunct Professor**, College of Information Sciences and Technology, The Pennsylvania State University, University Park, Pennsylvania, USA.

Voice: +1-434-249-8687
Web: http://www.bernardjjansen.com/
Email: jjansen@acm.org
LinkedIn: www.linkedin.com/in/jjansen/
Blog: http://jimjansen.blogspot.com/

### Table of Contents

- Research
- Education
- Certifications
- Academic Appointments
- Honors and Awards
- Books
- Parts of Books
- Refereed Journal Articles
- Book Reviews
- Non-refereed Articles
- Refereed Conference Proceedings
- Papers Presented at Technical and Professional Meetings
- Scholarly Reports
- Funded Projects, Grants, Commissions, and Contracts
- Software Developed
- Teaching
- Membership on Degree Committees
- Supervision of Other Undergraduate Research
- Professional Service: Editorial Boards
- Professional Service: Tenure Letters
- Professional Service: Ad hoc Reviewing
- Professional Service: Grant Reviewing
- Professional Service: Other
- Professional Service: Conference Activities
- Advisory Boards
- Invited Talks (Selected)
- Membership in Professional Societies
- Professional Experience

## Research

**Research Goal**: Increase the probability of successful outcomes of work and life decisions by improving the effectiveness and efficiency of people, information, and technology interactions

**Research Interests**:
I study the uses and affordances of the digital environment for information searching and ecommerce, focusing on interactions among the person, information, and technology. Current active research areas are **algorithmically generated personas**, **web analytics**, w**eb searching**, **online marketing**, **online social networking, keyword advertising**, and **information retrieval**, especially within the ecommerce domain, to better understand audiences, customers, and users.

- **Algorithmically generated personas**, **web analytics**, w**eb searching**
- **Sponsored search** and **keyword advertising**
- **Social media** as an information source
- **Information searching** and **web information retrieval**

**Short Bio:**
Jim has authored or co-authored **350 or so research publications**, with articles appearing in a multi-disciplinary and extensive range of journals and conferences. He is the author of the book, Understanding Sponsored Search: A Coverage of the Core Elements of Keyword Advertising (Cambridge University Press), author of the book Understanding User - Web Interactions Via Web Analytics, co-author of the book, Web Search: Public Searching of the Web, and co-editor of the book Handbook of Research on Weblog Analysis.

Jim is a principal scientist at the **Qatar Computing Research Institute**, a Professor in the College of Science and Engineering, **Hamad bin Khalifa University**, and an Adjunct Professor at the College of Information Sciences and Technology at **The Pennsylvania State University**. He is a graduate of **West Point** and has a Ph.D. in computer science from **Texas A&M University**, along with master's degrees from **Texas A&M** (computer science) and **Troy State** (international relations).

Jim is **editor-in-chief** of the journal, Information Processing & Management (Elsevier), a member of the editorial boards of seven international journals, former editor-in-chief of the journal, Internet Research (Emerald), and he has served on the research committee for the Search Engine Marketing Professional Organization (SEMPO). He has received **several awards and honors**, including an ACM Research Award, six application development awards, and a university-level teaching award, along with other writing, publishing, research, teaching, and leadership honors.

He has served as a Senior Fellow at the **Pew Research Center** with the Pew Internet and American Life Project and a university expert with the **National Ground Intelligence Center**.

He has done several **consulting projects** (log analysis, statistical analysis) and **expert witness** cases (patent litigation, civil litigation, and class action suits) in the areas of keyword advertising, web analytics, co-registration, domain parking, webpage access, webpage history, and online advertising click fraud.

## Education

PhD Computer Science, August 1999 - May 1996
**Texas A&M University**, College Station, Texas 77843
Dissertation: A Software Agent for Performance Improvement of an Existing Information Retrieval System
Advisor: Dr. Udo Pooch

M.CS. Computer Science, May 1996 - June 1994
**Texas A&M University**, College Station, Texas 77843
Research Area: Network Performance and Monitoring

MS International Relations, August 1994 - June 1992
**Troy State University**, European Division
Research Thesis: National Competitive Advantage

B.S. Computer Science, May 1985 - June 1981
**United States Military Academy**, West Point, New York 10996
Engineering Sequence: Electrical Engineering

## Certifications

**Foundations for Teaching Online Certificate**, January 2019
Penn State World Campus
The Pennsylvania State University, University Park, Pennsylvania
(set of four courses covering the foundational elements of online teaching)
https://wcfd.psu.edu/programs/online-teaching-certificates/

**Instructional Practice Certificate**, March 2019
Penn State World Campus
The Pennsylvania State University, University Park, Pennsylvania
(set of four courses covering the implementation elements of online teaching)
https://wcfd.psu.edu/programs/online-teaching-certificates/

## Academic Appointments

Current - 2015    **Principal Scientist**, Qatar Computing Research Institute (QCRI), Hamad Bin Khalifa University, Doha, Qatar

Current - 2017    **Adjunct Professor**, College of Information Sciences and Technology, The Pennsylvania State University, University Park, PA, 16802, USA.

Current - 2017    **Professor**, College of Science and Engineering, Hamad bin Khalifa University, Doha, Qatar

## Academic Appointments

| | |
|---|---|
| 2016 - 2014 | **Full Professor**, College of Information Sciences and Technology, The Pennsylvania State University, University Park, PA, 16802, USA. |
| 2014 - 2011 | **University Researcher,** National Ground Intelligence Center, 2055 Boulders Road, Charlottesville, VA 22911 |
| 2014 - 2009 | **Associate Professor**, College of Information Sciences and Technology, The Pennsylvania State University, University Park, PA, 16802, USA. |
| 2012 - 2010 | **Senior Fellow,** Pew Internet and American Life Project, Pew Research Center, 1615 L Street, NW Suite 700 Washington, DC 20036 |
| 2009 - 2003 | **Assistant Professor**, College of Information Sciences and Technology, The Pennsylvania State University, University Park, PA, 16802, USA. (Previously, School of Information Sciences and Technology) |
| 2003 - 2001 | **Instructor**, School of Information Sciences and Technology, The Pennsylvania State University, University Park, PA, 16802, USA |
| 2000 - 1999 | **Lecturer**, Computer Science Program, University of Maryland (Asian Division), Seoul, 104-022, Republic of Korea |
| 1999 - 1998 | **Assistant Professor**, Department of Electrical Engineering and Computer Science, United States Military Academy, West Point, New York, 10996 |
| 1998 - 1996 | **Lecturer**, Department of Electrical Engineering and Computer Science, United States Military Academy, West Point, New York, 10996, USA. |

## Honors and Awards

| | |
|---|---|
| Current – 2020 (DSP) | **ACM Distinguished Speaker**, ACM's Distinguished Speaker Program |
| 2022 | **Paper Award**: The article, Pirilä, T., Salminen, J., Osburg, V.S., Yoganathan, Y. and **Jansen, B. J.** (2022) The Role of Technical and Process Quality of Chatbots: A Case Study from the Insurance Industry. 55th Annual Hawaii International Conference on System Sciences (HICSS 2022), 4-7 June. Koloa, Hawaii, United States. |
| 2021 | **Paper Award**: The article, Salminen, J., Milenkovic, M., Şengün, S., Jung, S.G., and **Jansen, B. J.** (2021) Weaponizing Words: An Analysis of User-Generated Fake News Accusations Against an Online News Organization. The 8th International Conference on Behavioural and Social Computing 2021 (BESC2021), Doha, Qatar. 29-31 October. pp. 1-7, doi: 10.1109/BESC53957.2021.9635436. |

## Honors and Awards

2020   **Paper Award**: The article, Salminen, J., Rao, R.G., Jung, S.G., Chowdury, S.A., and **Jansen, B. J.** (2020) *Enriching Social Media Personas with Personality Traits: A Deep Learning Approach Using the Big Five Classes*. 22nd International Conference on Human-Computer Interaction (HCII2020). Copenhagen, Denmark, 19-24 July 2020. 101-120, selected as Best Paper Award of the 1st International Conference on AI in HCI.

2020   **Paper Award**: The article, Salminen, J., Jung, S.G., Chowdhury, S. Şengün, S., and **Jansen, B. J.** (2020). *Personas and Analytics: A Comparative User Study of Efficiency and Effectiveness for a User Identification Task*. ACM CHI Conference on Human Factors in Computing Systems (CHI2020), Honolulu, USA. 25–30 April selected as Honorable Mention (less than 5% of accepted papers).

2017   **Paper Award**: The article, *The Seventeen Theoretical Constructs of Information Searching and Information Retrieval*, published in the Journal of the American Society for Information Science and Technology, was selected as a high-impact article of the 2010s.

2017   **Paper Award**: The article, *Twitter Power: Tweets as Electronic Word of Mouth*, published in the Journal of the American Society for Information Science and Technology, was selected as a high-impact article of the 2000s.

2017   **Paper Award**: The article, *Real life, real users, and real needs: a study and analysis of user queries on the web*, published in Information Processing & Management, is recognized as one of the most cited articles of the 2000s.

2017   **Paper Award**: The article, *How are we searching the World Wide Web? An analysis of nine search engine transaction logs,* published in Information Processing & Management recognized by Google Classics as one of the most impactful; articles published in 2006

2016   **2016 President's Award for Engagement with Students**, The Pennsylvania State University, University Park, Pennsylvania.

2015   **Best Paper**: Liu, Z. and **Jansen, B. J.** (2015) *Subjective versus Objective Questions: Perception of Question Subjectivity in Social Q&A*. 2015 International Conference on Social Computing, Behavioral-Cultural Modeling, and Prediction (SBP15). Washington DC, p. 131-140. 31 Mar.-3 Apr.

2011   **Teaching and Learning with Technology Fellow** at Penn State (May 2011 – May 2012). Teaching research fellowship to develop subject-based learning apps that leverage cellular technology, the contextual (location-aware) attributes of mobile technology, and social media. See tlt.its.psu.edu/2011/07/24/jim-jansen/

2011   **Paper Award**: The article, *The Seventeen Theoretical Constructs of Information Searching and Information Retrieval*, published in the Journal of the American Society for Information Science and Technology, selected as **John Wiley Best JASIST Paper Award 2011** (see http://www.asis.org/awards/jasis_paper.html).

## Honors and Awards

2010   Emerald Literati Network **2010 Award for Excellence for Outstanding Reviewer** for the journal Internet Research (http://info.emeraldinsight.com/authors/literati/index.htm)

2008   **Best Paper**, Jansen, B. J., Zhang, M., and Schultz, C. (2008) *The Effect of Brand on the Evaluation of IT System Performance*.  Proceedings of the Southern Association for Information Systems Conference, Richmond, VA, USA 13-15 March 2008

2008   Presented with a **Google Faculty Research Award** ($50,000)

2007   Article selected as **Highly Commended Winner** at the Emerald Literati Network Awards for Excellence 2007. Spink, A. and Jansen, B. J. (2006) *Searching multiple federated content Web collections*, Online Information Review. 30(5), 485-495.

2004   Worldwide press coverage for book Web Search: Public Searching of the Web, co-authored with Dr. Amanda Spink. Including AP, Yahoo! News, CNN, MSN, and numerous other television, radio, Web, and print outlets.

2003   Worldwide press coverage and interviews 6/30/2003-7/3/2003 reference article: Jansen, B. J., and Spink, A. (2003) *An analysis of Web pages retrieved and viewed*, IC'03: Internet Computing: Web Mining Session, Las Vegas, 4-6 June 2003. Including BBC, Irish Radio, Washington Times, Psychology Today, and several U.S. radio stations.

2003   **ISI Most Highly Cited Articles in Field of Web Searching** for the manuscript Jansen, B. J., Spink, A., and Saracevic, T. (2000) *Real Life, Real Users, and Real Needs: A Study and Analysis of User Queries on the Web*, Information Processing & Management. 38(2), 207-227.

The article was identified in May 2003 by ISI Essential Science Indicators to be one of the most cited papers in the research area of Web Searching Behavior.

2002   **Highly Commended Article** invited for journal publication. Jansen, B. J. (2002) *Towards Implementing a Cognitive Model of Searching*, Proceedings of the E-Learning 2002 Conference (Web Track)*, Montreal, Canada. 15-19 October.

2002   **Two Crystal Awards of Excellence** for outstanding software development in the communications field.

2002   Worldwide press coverage and interviews 3/31/02- 4/5/02 reference article: Spink, A., Jansen, B. J., Wolfram, D., and Saracevic, T. (2002). *From e-sex to e-commerce: Web search changes*, IEEE Computer, 35(3), 133-135.

Including: Associated Press, BBC, CBC, MSNBC, Wall Street Journal, New York Times, PC World, CNN, Chinese People's Daily, Toronto Star, US News and World Report, San Francisco Chronicle, The Independent (UK), Business Week, Washington Post, Financial Times (UK), Information Week, Web, TV, newspaper (200+) and magazine media.

## Honors and Awards

2002  **Award of Distinction** for interactive Web site development.

2002  **Two Awards of Excellence** for exceptional multimedia application development.

2002  US Army War College **Team of the Year** for outstanding contributions as team manager.

2001  **U.S. Army Visual Information Award** for multimedia development.

2000  **Highly Commended Award** by MCB Publishers, for Spink, A., Bateman, J., and Jansen, B. J. (1999) *Searching the Web: A survey of Excite users*, Journal of Internet Research: Electronic Networking Applications and Policy, 9(2), 117-128.

1998  **Top Paper Award** for Spink, A., Bateman, J., and Jansen, B. J. (1998) *Users' searching behavior on the Excite Web search engine*, 1999 World Conference on the WWW and Internet, Orlando, Florida.

1997  **ACM Student Research Award** for Jansen, B. J. (1997) *Simulated Annealing for Query Results Ranking*, Computer Science Education Conference, San Jose, CA. 28 – 30 February.

1992  **Writing and Research Award**, U.S. Marine Corps University.

1992  **Research Award** from U.S. Army Trainer Journal

## Books

**Jansen, B. J.**, Salminen, J., Jung, S.G., and Guan, K. (2021). Data-Driven Personas. Synthesis Lectures on Human-Centered Informatics,1 Carroll, J. (Ed). Morgan-Claypool: San Rafael, CA., 4:1, i-317.

**Jansen, B. J.** (2011). Understanding Sponsored Search: Coverage of the Core Elements of Keyword Advertising. Cambridge University Press: Cambridge, UK.

**Jansen, B. J.** (2009) Understanding User – Web Interactions via Web Analytics. Morgan-Claypool Lecture Series. Marchionini, G. (Ed). Morgan-Claypool: San Rafael, CA.

**Jansen, B. J.**, Spink, A., and Taksa, I. Editors. (2009) Handbook of Research on Web Log Analysis, Hershey, PA: Idea Group Publishing.

Spink, A., and **Jansen, B. J.** (2004) Web Search: Public Searching of the Web, Dordrecht: Kluwer Academic Publishers.

## Parts of Books

Salminen, J., **Jansen, B. J.**, An, J., Kwak, H. and Jung, S. G. (2018*) Automatic Persona Generation for Online Content Creators: Conceptual Rationale and a Research Agenda*. Personas: User Focused Design. 1, 1, Article 1, 135-160.

**Jansen, B. J.** (2016) *Log Analysis*. Research Methods in Library and Information Science. Libraries Unlimited.

Mukherjee, P, Kozlek, B., Gyorke, A., Camplese, C. and **Jansen, B. J.** (2014) *Leveraging Mobile Technology to Enhance Both Competition and Cooperation in an Undergraduate STEM Course*. Innovative Practices in Teaching Information Sciences and Technology: Experience Reports and Reflections. p. 167-178. New York: Springer.

Reddy, M. C., **Jansen, B. J.**, Spence, P. R. (2010) *Collaborative Information Behavior: Exploring Collaboration and Coordination During Information Seeking and Retrieval Activities*. Foster, J. (Ed.), Collaborative Information Behavior: User Engagement and Communication Sharing. p. 73 - 88. Hershey, PA: IGI.

Booth, D., and **Jansen, B. J.** (2009) *A review of methodologies for analyzing Websites*. In B. J. Jansen, A. Spink & I. Taksa (Eds.), Handbook of Web Log Analysis. p. 143-164. Hershey, PA: IGI.

**Jansen, B. J.** (2009) *The methodology of search log analysis*. In B. J. Jansen, A. Spink & I. Taksa (Eds.), Handbook of Web log analysis. p. 100-123. Hershey, PA: IGI.

**Jansen, B. J.**, Taksa, I., and Spink, A. (2009) *Research and methodological foundations of transaction log analysis*. In B. J. Jansen, A. Spink & I. Taksa (Eds.), Handbook of Web Log Analysis. p. 1-17. Hershey, PA: IGI.

Rainie, L., and **Jansen, B. J.** (2009) *Surveys as a complementary method to Web log analysis*. In B. J. Jansen, A. Spink & I. Taksa (Eds.), Handbook of Web Log Analysis. p. 39-64. Hershey, PA: IGI.

Taksa, I., Spink, A., and **Jansen, B. J.** (2009) *A review of methods in presented in the handbook of weblog analysis*. In B. J. Jansen, A. Spink & I. Taksa (Eds.), Handbook of Web Log Analysis. p. -358. Hershey, PA: IGI.

Zhang, M. and **Jansen, B. J.** (2009) *Using action-object pairs as a conceptual framework for transaction log analysis*. In B. J. Jansen, A. Spink & Taksa, I. (Eds.), Handbook of Web Log Analysis. p. 416-435. Hershey, PA: IGI.

**Jansen, B. J.** and Spink, A. (2008) *Logfile analysis*. In International Encyclopedia of Communication. Editors: Robin Mansell. Oxford: Blackwell Press. 6. p. 2730-2734.

**Jansen, B. J.** and Spink, A. (2008) *How to Define Searching Sessions on Web Search Engines*. In Lecture Notes in Artificial Intelligence, LNAI 4198, Advances in Web Mining and Web Usage Analysis. Editors: Olfa Nasraoui, Osmar Zaiane, Myra Spiliopoulou, Bamshad Mobasher, Philip Yu, Brij Masand. p. 92 – 109. Berlin Heidelberg: Springer-Verlag.

## Parts of Books

**Jansen, B. J.**, Berkheiser, W, Spink, A., and Pedersen, J. (2007) *How people search for governmental information on the Web*. In: Encyclopedia of Digital Government. Editors: Ari-Veikko Anttiroiko and Matti Malkia. p. 933-939. Hershey, PA: Idea Group Publishing.

Wolfe, R., **Jansen, B. J.**, and Spink, A. (2006) *Semantics and the medical Web: A review of barriers and breakthroughs in effective healthcare query*. In: Advances in Electronic Business. Vol. II. Editors: E. Li and D.C. Timon. p. 267-279. Hershey, PA: Idea Group Publishing.

Jansen, K. J., Corley, K. G., and **Jansen, B. J.** (2006) *E-Survey methodology: A review, issues, and implications*. In Encyclopedia of Electronic Surveys and Measurements (EESM)U. Editors: Jason D. Baker and Robert Woods. p. 1-8. Hershey, PA: Idea Group Publishing.

**Jansen, B. J.** and Spink, A. (2004) *An analysis of documents viewing patterns of Web search engine users*, In Web Mining: Applications and Techniques. Editor: Anthony Scime. p. 339-354. Hershey, PA: Idea Group Publishing.

**Jansen, B. J.** (2004) *The use of query operators and their effect on the results of Web search engines*, In Issues of Human Computer Interaction. Editor: Dr. Anabela Sarmento. p. 50-72. Hershey, PA: Idea Group Publishing.

## Refereed Journal Articles

Yang, Y., Zhao; K., Zeng, D., and **Jansen, B. J.** (2022) Time-varying Effects of Search Engine Advertising on Sales-An Empirical Investigation in eCommerce. Decision Support Systems.

Salminen, J. O., Nielsen, L., Bahloul, M., Jørgensen, R.G., Santos, J. M., Jung, S.G., and **Jansen, B. J.** (2022). *Persona Preparedness: A Survey Instrument for Measuring the Organizational Readiness for Deploying Personas*. Information Technology and Management.

Salminen, J., Mustak, M., Corporan, J., Jung, S., & **Jansen, B. J.** (2022). *Detecting Pain Points from User-Generated Social Media Posts* Using Machine Learning. Journal of Interactive Marketing. 57(3) https://doi.org/10.1177/10949968221095556

Salminen, J. O., Jung, S.G., and **Jansen, B. J.** (2022) *Big Data, Small Personas: How Algorithms Shape the Demographic Representation of Data-Driven User Segments*. Big Data.

Mukherjee, P. and **Jansen, B. J.** (2022) *Analysis of Formality in Second Screen Postings for Television Broadcast of In-Real Life Event*s. The Journal of Communication and Media Studies.

**Jansen, B. J.**, Jung, S.G., Guan, K., Nielsen, L., and Salminen, J. (2022) *How to Create Personas: Three Persona Creation Methodologies with Implications for Practical Employment*. Pacific Asia Journal of the Association for Information Systems. 4(3), Article 1.

**Refereed Journal Articles**

Aldous, K, An, J, and **Jansen, B. J.** (2022) *What Really Matters?: Characterizing and Predicting User Engagement of News Postings Using Multiple Platforms, Sentiments, and Topics*. Behaviour & Information Technology.

**Jansen, B. J.**, Jung, S.G., and Salminen, J. (2022) *Measuring user interactions with websites: A comparison of two industry standard analytics approaches using data of 86 websites*. PLoS ONE. 17(5): e0268212. https://doi.org/10.1371/journal.pone.0268212

Aldous, K, An, J, and **Jansen, B. J.** (2022) *Measuring 9 emotions of news posts from 8 news organizations across 4 social media platforms for 8 months*. ACM Transactions on Social Computing. 4(4), Article 15.

Mekhail, M., Salminen, J. O., Corporan, J., Jung, S.G., and **Jansen, B. J.** (2022) *Detecting Pain Points from User-Generated Social Media Posts Using Machine Learning*. Journal of Interactive Marketing.

Şengün, S., Santos, J. M., Salminen, J., Jung, S. G., and **Jansen, B. J.** (2022) *Do players communicate differently depending on the champion played? Exploring the Proteus effect in League of Legends*. Technological Forecasting & Social Change. 177, Article 121556.

Salminen, J., Şengün, S., Santos, J. M., Jung, S. G., and **Jansen, B. J.** (2022) *Can Unhappy Pictures Enhance the Effect of Personas? A User Experiment*. ACM Transactions on Computer-Human Interaction. 29(2), Article 14.

Salminen, J., Kandpal, C., Kamal, A. M., Jung, S. G., and **Jansen, B. J.** (2022) *Creating and Detecting Fake Reviews of Online Products*. Journal of Retailing and Consumer Services. 64, Article 102771.

Salminen, J., Jung, S.G., Kamel, A. M., Santos, J. M., Kwak, H., An, J., and **Jansen, B. J.** (2022) *Using Artificially Generated Pictures in Customer-facing Systems: An Evaluation Study with Data-Driven Personas*. Behaviour & Information Technology. 41:5, 905-921. DOI:10.1080/0144929X.2020.1838610

Marzouk, O., Salminen, J., Zhang, P., and **Jansen, B. J.** (2022) *Which Message? Which Channel? Which Customer?: Exploring Response Rates in Multi-Channel Marketing Using Short Form Advertising*. Data and Information Management. 6(1): 100008.

Salminen, J. O., Jung, S.G., and **Jansen, B. J.** (2021) *Are Data-Driven Personas Considered Harmful?: Diversifying user understandings with more than algorithms*. Persona Studies, 7(1), 48–63. https://doi.org/10.21153/psj2021vol7no1art1236

**Jansen, B. J.**, Jung, S.G., and Salminen, J. (2021) *The Effect of Hyperparameter Selection on the Personification of Customer Population Data*. International Journal of Electrical and Computer Engineering Research, 1(2), 1-12. https://ijecer.org/ijecer/article/view/31

## Refereed Journal Articles

Salminen, J., Jung, S. G., Santos, J. M., and **Jansen, B. J.** (2021) *Toxic Text in Personas: An Experiment on User Perceptions*. AIS Transactions on Human-Computer Interaction. 13(4), Paper 4.

**Jansen, B. J.**, Jung, S.G., Ramirez Robillos, D., and Salminen, J. (2021) *Too Few, Too Many, Just Right: Creating the Necessary Number of Segments for Large Online Customer Populations*. Electronic Commerce Research and Applications, 49, Article 101083.

**Jansen, B. J.**, Jung, S.G., Chowdhury, S., and Salminen, J. (2021) *Persona Analytics: Analyzing the stability of online segments and content interests over time using non-negative matrix factorization*. Expert Systems with Applications, 185, Article 11561.

Al-Emadi, N., Thirumuruganathan, S., and **Jansen, B. J.** (2021) *Will You Buy It Now?: Predicting Passengers that Purchase Premium Promotions Using the PAX Model*. Journal of Smart Tourism. 1(1), 53-64.

Salminen, J., Guan, K., Jung, S. G., and **Jansen, B. J.** (2021) *A Survey of 15 Years of Data-Driven Persona Development*, International Journal of Human-Computer Interaction. DOI: 10.1080/10447318.2021.1908670

Salminen, J., Jung, S.G., Chowdhury, S., Ramirez Robillos, D., and **Jansen, B. J.** (2021) *The Ability of Personas: An Empirical Evaluation of Altering Incorrect Preconceptions About Users*, International Journal of Human-Computer Studies, https://doi.org/10.1016/j.ijhcs.2021.102645

Yang, Y., Feng, B., Salminen, J., and **Jansen, B. J.** (2021) *Optimal advertising for a generalized Vidale–Wolfe response model*. Electronic Commerce Research, 1-31. https://doi.org/10.1007/s10660-021-09468-x

Thirumuruganathan, S., Jung, S.G., Ramirez Robillos, D., Salminen, J., and **Jansen, B. J.** (2021) *Forecasting the nearly unforecastable: why aren't airline bookings adhering to the prediction algorithm?*. Electronic Commerce Research. 21, 73–100 https://doi.org/10.1007/s10660-021-09457-0

Salminen, J., Kaate, I., Sayed Kamel, A., Jung, S.G., and **Jansen, B. J.** (2021) *How Does Personification Impact Ad Performance and Empathy? An Experiment with Online Advertising*, International Journal of Human–Computer Interaction, 37:2, 141-155, DOI: 10.1080/10447318.2020.1809246

**Jansen, B. J.**, Salminen, J. O., and Jung, S. (2020). *Making Meaningful User Segments from Datasets Using Product Dissemination and Product Impact*. Data and Information Management. doi: https://doi.org/10.2478/dim-2020-0048

Mukherjee, P. and **Jansen, B. J.** (2020) *Influence of Social Media Attitude in Cross Screen Conversation*. Procedia Computer Science. 168, 129–138.

## Refereed Journal Articles

Salminen, J., Santos, J. M., Kwak, H., An, J., Jung, S.G., and **Jansen, B. J.** (2020) *Persona Perception Scale: Development and Exploratory Validation of an Instrument for Evaluating Individuals' Perceptions of Personas*. International Journal of Human-Computer Studies, (141), Article 102437.

**Jansen, B. J.**, Salminen, J., and Jung, S.G. (2020) *Data-Driven Personas for Enhanced User Understanding: Combining Empathy with Rationality for Better Insights to Analytics*. Data and Information Management, 4(1), 1-17.
https://content.sciendo.com/view/journals/dim/4/1/article-p1.xml

Salminen J., Sengün S., Corporan, J., Jung S.G., and **Jansen, B. J.** (2020) *Topic-driven toxicity: Exploring the relationship between online toxicity and news topics*. PLoS ONE, 15(2): e0228723. https://doi.org/10.1371/journal.pone.0228723

Rantanen, A., Salminen, J., Ginter, F., and **Jansen, B. J.** (2020) *Classifying Online Corporate Reputation with Machine Learning: A Study in the Banking Domain*. Internet Research. (30)1, 45-66. https://doi.org/10.1108/INTR-07-2018-0318

Salminen, J., Hopf, M., Chowdhury, S.A, Jung, S.G., Almerekhi, H., and **Jansen, B. J.** (2020) Developing an online hate classifier for multiple social media platforms. Human-centric Computing and Information Sciences, 10, Article 1. https://doi:10.1186/s13673-019-0205-6

Salminen, J., Santos, J., Jung, S. G., Eslami, M. and **Jansen, B. J.** (2020) *Persona Transparency: Analyzing the Impact of Explanations on Perceptions of Data-Driven Personas*. International Journal of Human-Computer Interaction, 36(8), 788-800.

Salminen, J., Santos, J., Jung, S. G., and **Jansen, B. J.** (2020) *Does a Smile Matter if the Person Is Not Real?: The Effect of a Smile and Stock Photos on Persona Perceptions*. International Journal of Human-Computer Interaction, 36(6), 568-590.

Waqas, A, Salminen J, Jung, S.G., Almerekhi H, **Jansen B. J.** (2019) Mapping online hate: A scientometric analysis on research trends and hotspots in research on online hate. PLoS ONE, 14(9): e0222194. https://doi.org/10.1371/journal.pone.0222194

Yoganathan, V., Salminen, J., **Jansen, B. J.** and Jung. S.G. (2019) Machine learning approach to auto-tagging online content for better customer value: A comparative analysis between methods and content type. Journal of Business Research. 101 (2019), 203–217.

Salminen, J., Jung, S.G., An, J., Kwak, H. Nielsen L., and **Jansen, B. J.** (2019) Confusion and Information Triggered by Photos in Persona Profiles. International Journal of Human-Computer Studies. 129(2019), 1-14.

Yang, Y., **Jansen, B. J.** Yang, Y., Guo, X., Zeng, D. (2019) Keyword Optimization in Sponsored Search Advertising: A Multi-Level Computational Framework. IEEE Intelligence Systems. 34(1), 32-42.

Mukherjee, P. and **Jansen, B. J.** (2019) Analyzing Attitude in Social Media Messages. IEEE Intelligence Systems. 33 (6), 27-35.

## Refereed Journal Articles

Salminen, J., Kwak, H., An, J., Jung, S.G., and **Jansen, B. J.** (2018) Are personas done? Evaluating their usefulness in the age of digital analytics. Persona Studies. 4 (2), 47-65.

An, J., Kwak, H., Salminen, J., Jung, S.G., and **Jansen, B. J.** (2018) Imaginary People Representing Real Numbers: Generating Personas from Online Social Media Data. ACM Transactions on the Web. 12(4), Article 27.

An, J., Kwak, H., Salminen, J., Jung, S.G., and **Jansen, B. J.** (2018) Customer segmentation using online platforms: isolating behavioral and demographic segments for persona creation via aggregated user data, Social Network Analysis and Mining. 8(1), 54.

Yang, Y., Li, X., Zeng, D., and **Jansen, B. J.** (2018) Aggregate Effects of Advertising Decisions: A Complex Systems Look at Search Engine Advertising via an Experimental Study. Internet Research. 28(4), 1079-1102.

Salminen, J., Şengün, S., Kwak, H., and **Jansen, B. J.**, An, J., Jung, S.G., Vieweg, S., and Harrell, F. (2018) From 2,772 segments to five personas: Summarizing a diverse online audience by generating culturally adapted personas. First Monday. 23(6).

Liu, Z., and **Jansen, B. J.** (2018) *Predicting the Response Rate in Social Question and Answering on Sino Weibo*. Information Processing & Management. 54(2). 159–174.

Mukherjee, P. and **Jansen, B. J.** (2017) *Conversing and Searching: The Causal Relationship between Social Media and Web Search*. Internet Research. 27(5). 1209-1226.

**Jansen, B. J.** and Clarke, T. (2017) Conversion potential: A metric for evaluating search engine advertising performance. Journal of Research in Interactive Marketing. 11(2), 142-159.

Mukherjee, P. and **Jansen, B. J.** (2017) *Information Sharing by Viewers via Second Screens for In Real Life Events*. ACM Transactions on the Web. 11(1), Article 1.

Liu, Z., and **Jansen, B. J.** (2017) *Identifying and Predicting the Desire to Help in Social Question and Answering*. Information Processing & Management. 53(2), 490-504.

Liu, Z. and **Jansen, B. J.** (2017) *ASK: A Taxonomy of Information Seeking Posts in Social Question and Answering*. Journal of the Association for Information Science and Technology. 68(2), 333–347.

Coughlin, D. and **Jansen, B. J.** (2016) *Modeling Journal* Bibliometrics *to Predict Downloads and Inform Purchase Decisions at University Research Libraries*. Journal of the Association for Information Science and Technology. 67(9), 2263–2273.

Liu, Z. and **Jansen, B. J.** (2016) *Understanding and Predicting Question Subjectivity in Social Question and Answering*. IEEE Transactions on Computational Social Systems. 3(1), 32-41.

**Refereed Journal Articles**

Ortiz-Cordova, A. and **Jansen, B. J.** (2016) *Associating Searching on Search Engines to Subsequent Searching on Sites*. International Journal of Information Systems in the Service Sector. 8(2), 30-43.

Coughlin, D., Campbell, M., and **Jansen, B. J.** (2015) *A Web Analytics Approach for Appraising Electronic Resources in Academic Libraries*. Journal of the Association for Information Science and Technology. 67(3), 518-534.

Ortiz-Cordova, A., Yang, Y., and **Jansen, B. J.** (2015) *External to Internal Search: Associating Searching on Search Engines with Searching on Sites*. Information Processing & Management. 51(5), 718–736.

Mukherjee, P, Kozlek, B., **Jansen, B. J.**, Gyorke, A., and Camplese, C. (2014) *Designing a Mobile and Socially Networked Learning Assistant for a University-level Keyword Advertising Course*. MERLOT Journal of Online Learning and Teaching. 10(3), 351-373.

Yang, Y., Qin, R., Zhang, J., Zeng, D., and **Jansen, B. J.** (2014) *Budget Planning for Coupled Campaigns in Sponsored Search*. International Journal of Electronic Commerce. 18(3), 39-66.

Mukherjee, P. and **Jansen, B. J.** (2014) *Performance Analysis of Keyword Advertising Campaign Using Gender-Brand Effect of Search Queries*. Electronic Commerce Research and Applications. 13(2), 139–149.

**Jansen, B. J.**, Liu, Z., and Simon, Z. (2013) *The Effect of Ad Rank on Performance of Keyword Advertising Campaigns*. Journal of the American Society for Information Science and Technology. 64(10), 2115-2132.

**Jansen, B. J.**, Moore, K., and Carman, S. (2013) *Evaluating The Performance of Demographic Targeting Using Gender in Keyword Advertising*. Information Processing & Management. 49(1), 286-302.

**Jansen, B. J.**, Zhang, L, and Mattila, A. S. (2012) *Investigating Brand Knowledge of Web Search Engines: User Reactions to Search Engine Logos*. Electronic Commerce Research. 12(4), 429-454.

Zhang, L, **Jansen, B. J.**, Mattila, A. S. (2012) *A Branding Model for Web Search Engines*. International Journal of Internet Marketing and Advertising. 7(3), 195 – 216.

Ortiz-Cordova, A. and **Jansen, B. J.** (2012) *Classifying Web Search Queries in Order to Identify High Revenue Generating Customers*. Journal of the American Society for Information Science and Technology. 63(7), 1426 – 1441.

Zhang, M., **Jansen, B. J.**, and Chowdhury, A. (2011) *Business Engagement on Twitter: A Path Analysis*. Electronic Markets: The International Journal on Networked Business. 21(3), 161-175.

## Refereed Journal Articles

**Jansen, B. J.**, Sobel, K., and Zhang, M. (2011) *The Brand Effect of Key Phrases and Advertisements in Sponsored Search*. International Journal of Electronic Commerce. 6(1), 77-106.

**Jansen, B. J.**, Liu, Z., Weaver, C., Campbell, G. and Gregg, M. (2011) *Real Time Search on the Web: Queries, Topics, and Economic Value*. Information Processing & Management. 47(4), 491-506.

**Jansen, B. J.**, Sobel, K. and Cook, G. (2011) *Classifying Ecommerce Information Sharing Behaviour by Youths on Social Networking Sites*. Journal of Information Science. 37(2), 120-136.

**Jansen, B. J.** and Schuster, S. (2011) *Bidding on the Buying Funnel for Sponsored Search Campaigns*. Journal of Electronic Commerce Research. 12(1), 1-18.

Kuthuria, A., **Jansen, B. J.**, Hafernik, C. (2010) *K-means Clustering to Determine User Intent of Web Queries*. Journal of Internet Research: Electronic Networking Applications and Policy. 20(5), 563-581.

Rosso, M. A. and **Jansen, B. J.** (2010) *Brand Names as Keywords in Sponsored Search Advertising*. Communications of the Association for Information Systems. 27(1), Article 6. Available at: http://aisel.aisnet.org/cais/vol27/iss1/6

**JASIST Best Paper**

**Jansen, B. J.** and Rieh, S. (2010) *The Seventeen Theoretical Constructs of Information Searching and Information Retrieval*. Journal of the American Society for Information Science and Technology. 61(8), 1517-1534.

Selected as a JASIS&T high impact article of the 2010s. See:
http://www.bernardjjansen.com/uploads/2/4/1/8/24188166/jasisthighimpactarticles.pdf

**Jansen, B. J.**, Tapia, A. H., and Spink, A. (2010) *Searching for salvation: An analysis of US religious searching on the World Wide Web,* Religion. 40(1), 39-52.

**Highly Cited**

**Jansen, B. J.**, Zhang, M, Sobel, K, and Chowdury, A. (2009) *Twitter Power: Tweets as Electronic Word of Mouth*. Journal of the American Society for Information Science and Technology. 60(11), 2169-2188.

Recognized as one of the **top 10 most highly cited papers in JASIST** published since 2001 http://www.asis.org/Bulletin/Aug-12/AugSep12_Bar-Ilan.html

Selected as a JASIS&T high impact article of the 2010s. See:
http://www.bernardjjansen.com/uploads/2/4/1/8/24188166/jasisthighimpactarticles.pdf

**Jansen, B. J.**, Booth, D. and Smith, B. (2009) *Using the taxonomy of cognitive learning to model online searching*. Information Processing & Management. 45(6), 643-663.

### Refereed Journal Articles

Tjondronegoro, D., Spink, A., and **Jansen, B. J.** (2009) *A Study and Comparison of Multimedia Web Searching: 1997-2006.* Journal of the American Society for Information Science and Technology. 60(9), 1756-1768.

**Jansen, B. J.**, Zhang, M., and Schultz, C. (2009). *Brand and its effect on user perception of search engine performance.* Journal of the American Society for Information Science and Technology. 60(8), 1572-1595.

Flaherty, T. B., **Jansen, B. J.**, Hofacker, C., and Murphy, J. (2009). *Insights on the Google Online Marketing Challenge and Its Successful Classroom Implementation.* Journal of Online Learning and Teaching, 5(2), 446-457.

**Jansen, B. J.**, Booth, D. L., and Spink, A. (2009). *Patterns of query modification during Web searching.* Journal of the American Society for Information Science and Technology. 60(7), 1358-1371.

**Jansen, B. J.**, Flaherty, T.B., Baeza-Yates, R., Hunter, L., Kitts, B., and Murphy, J. (2009). *The Components and Impact of Sponsored Search.* IEEE Computer. 42(5) 98-101.

Rosso, M., McClelland, M. K., **Jansen, B. J.**, and Fleming, S. W. (2009) *Using Google AdWords in the MBA MIS Course.* Journal of Information System Education. 20(1), 41-50.

Zhang, Y., **Jansen, B. J.**, and Spink, A. (2009) *Identification of factors predicting clickthrough in Web searching using neural network analysis.* Journal of the American Society for Information Science and Technology. 60(3), 557-570.

Zhang, Y., **Jansen, B. J.**, and Spink, A. (2009) *Time Series Analysis of a Web Search Engine Transaction Log*, Information Processing & Management. 45(2), 230-245.

**Jansen, B. J.** and Spink, A. (2009) *Investigating Customer Click through Behavior with Integrated Sponsored and Non-Sponsored Results*, International Journal of Internet Marketing and Advertisement, 5(1/2), 74-94.

**Jansen, B. J.**, Ciamacca, C., and Spink, A. (2008) *An Analysis of travel searching on the Web,* Journal of Information Technology and Tourism. 10(2), 101-118.

**Jansen, B. J.** and Mullen, T. (2008) *Sponsored search: An overview of the concept, history, and technology,* International Journal of Electronic Business. 6(2), 114 – 131.

Spink, A., and **Jansen, B. J.** (2008) *Trends in searching for business and e-commerce information on Web search engines,* International Journal of Electronic Commerce. 9(2), 154-161.

**Highly Cited**

**Jansen, B. J.**, Booth, D., and Spink, A. (2008) *Determining the informational, navigational, and transactional intent of Web queries,* Information Processing & Management. 44(3), 1251-1266.

One of the most highly cited articles in IP&M published since 2008.

## Refereed Journal Articles

**Jansen, B. J.** (2008) *Searching for digital Images on the Web,* Journal of Documentation. 64(1), 81-101.

**Jansen, B. J.** and Eastman, C. (2008) *Limitations of advanced searching techniques on Web search engines,* Journal of Electronic Resources in Law Librarianship. 1(1), 55-81.

**Highly Cited**

Reddy, M. C. and **Jansen, B. J.** (2008) *A model for understanding collaborative information behavior in context: A study of two healthcare teams,* Information Processing & Management. 44 (1), 256-273.

One of the Top 25 most cited articles in IP&M published since 2008.

**Jansen, B. J.**, Zhang, M., and Spink, A. (2007) *Patterns and transitions of query reformulation during Web searching,* International Journal of Web Information Systems. 3(4), 328-340.

**Jansen, B. J.**, Brown, A., and Resnick, M. (2007) *Factors relating to the decision to click-on a sponsored link,* Decision Support Systems. 44(1), 46-59.

**Jansen, B. J.** and Spink, A. (2007) *Sponsored search: Is money a motivator for providing relevant results*?, IEEE Computer. 40(8), 50-55.

**Jansen, B. J.** (2007) *Click fraud.* IEEE Computer. 40(7), 85-86.

**Jansen, B. J.** (2007) *The comparative effectiveness of sponsored and non-sponsored results for Web ecommerce queries*, ACM Transactions on the Web. 1(1), Article 3.

**Jansen, B. J.**, Spink, A., Blakely, C., and Koshman, S. (2007) *Defining a session on Web search engines,* Journal of the American Society for Information Science and Technology. 58(6), 862-871.

**Jansen, B. J.**, Spink, A., and Koshman, S. (2007) *Web searcher interactions with the Dogpile.com meta-search engine,* Journal of the American Society for Information Science and Technology. 58(5), 744-755.

**Jansen, B. J.**, Mullen, T., Spink, A., and Pederson, J. (2006) *Automated gathering of Web information: An in-depth examination of agents interacting with search engines,* ACM Transactions on Internet Technology. 6(4), 442-464.

**Jansen, B. J.** and Resnick, M. (2006) *An examination of searcher's perceptions of non-sponsored and sponsored links during ecommerce Web searching,* Journal of the American Society for Information Science and Technology. 57(14), 1949-1961.

Koshman, S. Spink, A., **Jansen, B. J.**, Park, M., and Fields, C. (2006) *Web Searching on the Vivisimo search engine,* Journal of the American Society for Information Science and Technology. 57(14), 1875-1887.

## Refereed Journal Articles

Spink, A., **Jansen, B. J.**, Blakely, C., and Koshman, S. (2006) *Overlap among major search engines,* Journal of Internet Research: Electronic Networking Applications and Policy. 16(4), 419-426.

**Jansen, B. J.** (2006) *Search log analysis: What is it; what's been done; how to do it,* Library and Information Science Research, 28(3), 407-432.

**ISI Paper Award**

Spink, A., and **Jansen, B. J.** (2006) *Searching multiple federate content Web collections,* Online Information Review. 30(5), 485-495.

Spink, A., Partridge, H., and **Jansen, B. J.** (2006) *Sexual/pornographic Web searching: Trends analysis,* First Monday. 11(9).
http://www.firstmonday.org/issues/issue11_9/spink/index.html.

**Jansen, B. J.** (2006) *Paid search,* IEEE Computer. 39(7), 88-90.

Spink, A., **Jansen, B. J.**, Blakely, C., and Koshman, S. (2006) *A study of results overlap and uniqueness among major Web search engines,* Information Processing & Management. 42(5), 1379-1391.

**Jansen, B. J.** (2006) *Using temporal patterns of interactions to design effective automated searching assistance systems,* Communications of the ACM. 49(4), 72-74.

**Jansen, B. J.** and Molina, P. (2006) *The effectiveness of Web search engines for retrieving relevant ecommerce links,* Information Processing & Management. 42(4), 1075-1098.

**Jansen, B. J.** and McNeese, M. D. (2005) *Evaluating the effectiveness of and patterns of interactions with automated assistance in IR systems,* Journal of the American Society for Information Science and Technology. 56(14), 1480-1503.

**Jansen, B. J.** and Spink, A. (2005) *How are we searching the World Wide Web? An analysis of nine search engine transaction logs,* Information Processing & Management. 42(1), 248-263.

**Most Accessed**

Routinely listed as one of the most downloaded articles published in IP&M (http://www.journals.elsevier.com/information-processing-and-management/most-downloaded-articles/)

**Google Classic**

Google Classic Research Article: Noted as a 'classic paper' in the Database and Information System Area; one of the most highly cited paper published that year. (https://goo.gl/zonvNG )

Spink, A., Park, M., **Jansen, B. J.**, and Pedersen, J. (2005) *Multitasking during Web search sessions,* Information Processing & Management. 42(1), 264-275.

**Jansen, B. J.**, Jansen, K. J., and Spink, A. (2005) *Using the Web to look for work: Implications for online job seeking and recruiting,* Journal of Internet Research: Electronic Networking Applications and Policy. 15(1), 49-66.

### Refereed Journal Articles

**Jansen, B. J.**, Spink, A, and Pederson, J. (2005) *A Temporal Comparison of AltaVista Web Searching*, Journal of the American Society for Information Science and Technology. 56(6), 559-570.

**Jansen, B. J.** (2005) *Seeking and implementing automated assistance during the search process,* Information Processing & Management. 41(4), 909-928.

**Jansen, B. J.**, Spink, A., and Pederson, J. (2005) *The effect of specialized multimedia collections on Web searching*, Journal of Web Engineering. 3(3/4), 182-199.

Spink, A. and **Jansen, B. J.** (2005) *A study of Web search trends*, Webology. 1(2), Article 4, Available at: http://www.webology.ir/2004/v1n2/a4.html.

**Jansen, B. J.** and Spink, A. (2004) *An analysis of Web searching by European Alltheweb.com users*, Information Processing & Management. 41(2), 361-381.

Spink, A., **Jansen, B. J.**, and Pedersen, J. (2004) *Searching for people on Web search engines,* Journal of Documentation. 60, (3), 266-278.

Spink, A., Yang, Y., **Jansen, B. J.**, Nvkanen, P., Ozmutlu, S., and Ozmutlu, C. (2004) *Medical and health Web searching: an exploratory study*, Health Information and Libraries Journal. 21(1), 44-51.

**Jansen, B. J.** and Pooch, U. (2004) *Improving IR system performance using software integration,* Journal of Internet Research: Electronic Networking Applications and Policy. 14(1), 19-33.

Spink, A., Koricich, A., and **Jansen, B. J.** (2004) *Sexual searching on Web search engines,* Cyber-psychology and Behavior. 7(1), 65-72.

Eastman, C. and **Jansen, B. J.** (2003) *Coverage, relevance, and ranking: the impact of query operators on Web search engine results*, ACM Transactions on Information Systems. 21(4), 383-411.

Spink, A., **Jansen, B. J.**, Wolfram, D., and Saracevic, T. (2002) *From e-sex to e-commerce: Web search changes,* IEEE Computer. 35(3), 107-111.

Wolfram, D., Spink, A., **Jansen, B. J.**, and Saracevic, T. (2001) *Vox populi: The public searching of the Web*, Journal of the American Society for Information Science and Technology. 52(12), 1073-1074.

**Highly Cited**

**Jansen, B. J.** and Pooch, U. (2001) *A Review of Web Searching Studies and a Framework for Future Research*, Journal of the American Society for Information Science and Technology. 52(3), 235-246.

Recognized as one of the **top 10 most highly cited papers in JASIST** published since 2001 http://www.asis.org/Bulletin/Aug-12/AugSep12_Bar-Ilan.html

## Refereed Journal Articles

**Highly Cited**

Spink, A., Wolfram, D., **Jansen, B. J.**, and Saracevic, T. (2001). *Searching of the Web: the public and their queries,* Journal of the American Society for Information Science and Technology. 52(3), 226-234.

> Recognized as the **most highly cited paper in JASIST** published since 2001
> http://www.asis.org/Bulletin/Aug-12/AugSep12_Bar-Ilan.html

Brown, G., Fisher, M., Stoll, N., Beeksma, D., Black, M., Taylor, R., Choe, S., Williams, A., Bryant, W., and **Jansen, B. J.** (2000) *Leveraging a Y2K evaluation to improve information systems architecture,* Communications of the ACM. 43(10), 90-97.

**Highly Cited**

**Jansen, B. J.**, Spink, A., and Saracevic, T. (2000) *Real life, real users, and real needs: A study and analysis of user queries on the Web*, Information Processing & Management. 36(2), 207-227.

> One of the most highly cited paper published in IP&M since 2000.
> http://www.bernardjjansen.com/uploads/2/4/1/8/24188166/topcitedpapersfrominformation processing_management.pdf

**Jansen, B. J.**, Goodrum, A., and Spink, A. (2000) *Searching for multimedia: video, audio, and image Web queries*, World Wide Web Journal. 3(4), 249-254.

Spink, A., **Jansen, B. J.**, and Ozmutlu, C. (2000) *Use of query reformulation and relevance feedback by Excite users*, Journal of Internet Research: Electronic Networking Applications and Policy. 10(4), 317-328.

Schmoyer, T. and **Jansen, B. J.** (2000) *An adaptive hypermedia system for improving an organization's customer support*, WebNet Journal. 2(4), 30-35.

**Jansen, B. J.** (2000) *An investigation into the use of simple queries on Web IR systems*, Information Research: An Electronic Journal. 6(1). http://informationr.net/ir/6-1/paper87.html

**Paper Award**

Spink, A., Bateman, J., and **Jansen, B. J.** (1999) *Searching the Web: A survey of Excite users*, Journal of Internet Research: Electronic Networking Applications and Policy. 9(2). 117-128.

Spink, A., Bateman, J., and **Jansen, B. J.** (1998) *Searching heterogeneous collections on the Web: Behavior of Excite users*, Information Research: An Electronic Journal. 5(2). http://informationr.net/ir/4-2/paper53.html

**Jansen, B. J.** (1997) *Using an intelligent agent to enhance the performance of an information retrieval engine*, First Monday. 2(3). http://www.firstmonday.dk/issues/issue2_3/jansen/index.html

## Book Reviews

**Jansen, B. J.** (2008) Book review: *Making Sense of Data: A Practical Guide to Exploratory Data Analysis and Data Mining* by Glenn J. Myatt. Wiley. 2007 pages 280. $74.95**.** Information Processing & Management. *44(2),* 978-979.

**Jansen, B. J.** (2007) Book review: *The Long Tail: Why the Future of Business is Selling Less or More.* By Chris Anderson. Hyperion: New York. 2006. $24.95 ISBN: 1-4013-0237-8. Information Processing & Management. 43(4*),* 1147-1148.

**Jansen, B. J.** (2007) Book review: *The Craft of Research*, 2nd edition (Chicago Guides to Writing, Editing, and Publishing) (Paperback) by Wayne C. Booth, Joseph M. Williams, Gregory G. Colomb. Paperback: 336 pages. University of Chicago Press; 2nd edition. ISBN: 0226065685. Information Processing & Management. 43(3), 827-828.

**Jansen, B. J.** (2007) Book review: *Effective Expert Witnessing*, Fourth Edition, by Jack V. Matson, Suha F. Daou, and Jeffrey G. Soper. 160 pages. CRC. ISBN: 0849313015. $99.95. Information Processing & Management. 43(3), 830-831.

**Jansen, B. J.** (2007) Book review: *Messages, Meanings and Symbols: The Communication of Information.* By Charles T. Meadow. Lanham, MD: Scarecrow Press, 2006. 264 pp. $40.00 (paper). ISBN 0-8108-5271-3. Library and Information Science Research. 29(2), *303-304.*

**Jansen, B. J.** (2006) Book review: *The Search: How Google and Its Rivals Rewrote the Rules of Business and Transformed our Culture.* by John Battelle. Penguin Group. 311 pages. Cost: $25.95. ISBN: 1591840880. Information Processing & Management. *42*(5), 1399-1401.

**Jansen, B. J.** (2006) Book review: *Theories of Information Science Behavior.* 2005, Edited by Karen E. Fisher, Sanda Erdelez, and Lynn (Ed.) McKechnie. ASIST Monograph Series. Information Today, Inc. Medford, New Jersey. 431 pages. Cost: $49.50. Information Processing & Management. *42*(5), 1392-1395.

**Jansen, B. J.** (2005) Book review: *Mining the Web: Discovering Knowledge from Hypertext Data*_ 2002. Soumen Chakrabarti. Morgan-Kaufmann Publishers, 352 pages. Cost: $54.95. ISBN: 1-55860-754-4. Information Processing & Management. *42*(1), 317-318.

## Non-refereed Articles

Yang, Y., Yang, Y.C., **Jansen, B. J.**, Lalmas, M. (2017) Computational Advertising: A Paradigm Shift for Advertising and Marketing? IEEE Intelligent Systems. 32(3), 3-6.

**Jansen, B. J.**, Chowdhury, A., and Cook, G. (2010) *The Ubiquitous and Increasingly Significant Status Message.* Interactions. May/June, 15-17.

**Jansen, B. J.**, Hudson, K., Hunter, L., Liu, F., and Murphy, J. (2008) *The Google Online Marketing Challenge: Real-World Learning with Real Clients, Real Money, and Real Advertising Campaigns*, Journal of Interactive Advertising. 9(1), http://jiad-org.adprofession.com/article109.html

## Non-refereed Articles

**Jansen, B. J.** (2008) *Sponsored search,* International Journal of Electronic Business. 6(2), 112-113.

Edmonds, A., Hawkey, K., **Jansen, B. J.**, Kellar, M., and Turnbull, D. (2007) *Editorial for Special Issue on Logging Traces of Web,* Journal of Web Engineering. 6(3), 193-195.

**Jansen, B. J.** (2006) *Paid search as an information seeking paradigm,* Bulletin of the American Society for Information Science and Technology. 32(2), 7-8.

Spink, A., Ozmutlu, S., Ozmutlu, H. C., and **Jansen, B. J.** (2002) *U.S. versus European Web searching trends,* SIGIR Forum. 32(1), 30-37.

**Jansen, B. J.**, Riedt, R., and Turner, J. (2002) *Hitting the moving technology target,* SIGNAL: International Journal of AFCEA. 56(80), 65.

Schmoyer, T. and **Jansen, B. J.** (2001) *Personalized computer interaction improves customer service,* SIGNAL: International Journal of AFCEA. 55(9), 63-65.

**Jansen, B. J.** and Spink, A. (2000) *Methodological approach in discovering user search patterns through Web log analysis,* Bulletin of the American Society for Information Science and Technology. 27(1), 15-17.

**Jansen, B. J.**, Spink, A., Bateman, J., and Saracevic, T. (1998) *Real life information retrieval: A study of user queries on the Web,* SIGIR Forum. 32(1), 5 -17. 128.

Crow, D. and **Jansen, B. J.** (1998) *Seminal works in computer human interaction,* SIGCHI Bulletin. 30(3), 24-28.

**Jansen, B. J.** (1998) *The graphical user interface: An introduction,* SIGCHI Bulletin. 30(2), 22-26.

## Refereed Conference Proceedings

Salminen, J., Jung, S.G., and **Jansen, B. J.** (2022) Intentionally Biasing User Representation?: Investigating the Pros and Cons of Implementing Toxicity Filtering in Algorithmically Generated Personas. NordiCHI 2022, 10-12 October 2022, Aarhus University, Denmark.

Salminen, J., Jung, S.G., and **Jansen, B. J.** (2022) More Personas Improve Demographic Diversity of Large and Heterogeneous Online User Populations: Implications Towards Interactive Persona Systems. NordiCHI 2022, 10-12 October 2022, Aarhus University, Denmark.

### Refereed Conference Proceedings

Salminen, J., Mustak, M., Rizun, N., Revina, A., Nikiforova, A., Almerekhi, H., Jung, S.G., and **Jansen, B. J.** (2022) Integrating AI into Customer Service: Improving the Actionability of Customer Feedback Analysis Using Machine Learning, AIRSI2022 Technologies 4.0 in Tourism, Services, & Marketing, 11-13 July 2022. (Virtual).

Jung, S.G., Salminen, J. and **Jansen, B. J.** (2022) Survey2Persona: Rendering Survey Responses as Personas. UMAP '22 Adjunct: Adjunct Proceedings of the 30th ACM Conference on User Modeling, Adaptation and Personalization, 4-7 July, Barcelona (Spain), p. 67–73.

Jung, S.G., Salminen, J. and **Jansen, B. J.** (2022) The Effect of Hiding the Count of Dislikes on the Use of the YouTube Like and Dislike Features. ACM Web Science Conference, 26–29 June, Barcelona, Spain. p. 202–207.

Jung, S.G., Salminen, J. and **Jansen, B. J.** (2022) Engineers, Aware! Commercial Tools Disagree on Social Media Sentiment. ACM SIGCHI Symposium on Engineering Interactive Computing Systems (EICS22), 21-24 June. Sophia Antipolis, France. Article 153.

Salminen, J., Guan, K., Jung, S.G., and **Jansen, B. J.** (2022) Use Cases for Design Personas: A Systematic Review and New Frontiers. 2022 ACM Conference on Human Factors in Computing Systems (CHI'22). 30 April – 6 May. New Orleans, USA. Article 543.

Jung, S.G., Salminen, J. and **Jansen, B. J.** (2022) Developing Persona Analytics Towards Persona Science. 27th Annual Conference on Intelligent User Interfaces. 22-25 March. Helsinki, Finland. p. 323-344.

**Paper Award** Pirilä, T., Salminen, J., Osburg, V.S., Yoganathan, Y. and **Jansen, B. J.** (2022) The Role of Technical and Process Quality of Chatbots: A Case Study from the Insurance Industry. 55th Annual Hawaii International Conference on System Sciences (HICSS 2022), 4-7 June. Koloa, Hawaii, United States.

Salminen, J., Salenius, T., and **Jansen. B. J.** (2021) SiloSolver: Algorithm for Aggregating Siloed Customer Segments in Facebook Ads Campaigns. The International Conference on Intelligent Data Science Technologies and Applications (IDSTA2021), 15-17 November. Tartu, Estonia.

**Jansen, B. J.**, Jung, S.G., Ramirez Robillos, D., and Salminen, J. (2021) Next Likely Behavior: Predicting Individual Actions from Aggregate User Behaviors. The International Conference on Intelligent Data Science Technologies and Applications (IDSTA2021), 15-17 November. Tartu, Estonia.

**Paper Award** Salminen, J., Milenkovic, M., Şengün, S., Jung, S.G., and **Jansen, B. J.** (2021) Weaponizing Words: An Analysis of User-Generated Fake News Accusations Against an Online News Organization. The 8th International Conference on Behavioural and Social Computing 2021 (BESC2021), Doha, Qatar. 29-31 October. pp. 1-7, doi: 10.1109/BESC53957.2021.9635436.

## Refereed Conference Proceedings

Salminen, J., Linarez, M. J., Jung, S.G., and **Jansen, B. J.** (2021) Online Hate Detection Systems: Challenges and Action Points for Developers, Data Scientists, and Researchers. The 8th International Conference on Behavioural and Social Computing 2021 (BESC2021), Doha, Qatar. 29-31 October. pp. 1-7, doi: 10.1109/BESC53957.2021.9635377.

**Jansen, B. J.**, Jung, S.G., and Salminen, J. (2021) The Effect of Hyperparameter Selection on the Personification of Customer Population Data. The International Conference on Electrical, Computer, Communications and Mechatronics Engineering (ICECCME2021). 7-8 October. Mauritius.

Salminen, J., Jung, S.G., and **Jansen, B. J** (2021) Manual and Automatic Methods for User Needs Detection in Requirements Engineering: Key Concepts and Challenges. The International Conference on Electrical, Computer, Communications and Mechatronics Engineering (ICECCME2021). 7-8 October. Mauritius, p. 1-7.

Nielsen, L., Salminen, J., Jung, S.G., and **Jansen, B. J.** (2021) Think-Aloud Surveys - A Method for Eliciting Enhanced Insights During User Studies, INTERACT 2021 18th IFIP TC13 International Conference on Human–Computer Interaction. 30 Aug. - 3 Sept. Bari, Italy.

Salminen, J., Chhirang, K., Jung, S.G., and **Jansen, B. J.** (2021) Helping Professionals Select Persona Interview Questions Using Natural Language Processing, INTERACT 2021 18th IFIP TC13 International Conference on Human–Computer Interaction. 30 Aug. - 3 Sept. Bari, Italy.

Salminen, J., Chhirang, K., Jung, S.G., and **Jansen, B. J.** (2021) Helping Professionals Select Persona Interview Questions Using Natural Language Processing, INTERACT 2021 18th IFIP TC13 International Conference on Human–Computer Interaction. 30 Aug. - 3 Sept. Bari, Italy.

Salminen, J., Corporan, J., Jung, S.G., and **Jansen, B. J.** (2021) Taking Back Control of Social Media Feeds with Take Back Control. International Conference on INnovations in Intelligent SysTems and Applications 2021 (INISTA2021), Kocaeli, Turkey. 25-27 August.

Salminen J., Jung S., and **Jansen B.J.** (2021) Suggestions for Online User Studies. In: Stephanidis C. et al. (eds) HCI International 2021 - Late Breaking Papers: Design and User Experience. HCII 2021. Lecture Notes in Computer Science, vol. 13094. pp 127-146. https://doi.org/10.1007/978-3-030-90238-4_11

Salminen, J., Jung, S.G., and **Jansen, B. J.** (2021) Algorithmic Detection of Online Hate: Challenges and Action Points for Developers, Data Scientists, and Researchers. The Fourteenth International Conference on Advances in Computer-Human Interactions (ACHI2021), 18-22 July 2021, Nice, France.

Salminen, J., Sercan, S., Jung, S.G., and **Jansen, B. J.** (2021) Comparing Persona Analytics and Social Media Analytics for a User-Centric Task Using Eye-Tracking and Think-Aloud. CHItaly2021, 11-13 July 2021, Bozen-Bolzano, Italy.

**Refereed Conference Proceedings**

Salminen, J., Kamel, A., Jung, S.G., and **Jansen, B. J.** (2021) The Problem of Majority Voting in Crowdsourcing with Binary Classes. The 19th European Conference on Computer-Supported Cooperative Work, 7-11 June, 2021 Remote via Internet & Zurich, Switzerland.

Salminen, J., Jung, S.G., and **Jansen, B. J.** (2021) Demo: Implementing Eye-Tracking for Persona Analytics, ACM Symposium on Eye Tracking Research & Applications (ETRA2021) 25-29 May, Virtual Event.

Salminen, J., Jung, S.G., Santos, J., Kamel, A. M., and **Jansen, B. J.** (2021) Picturing It!: The Effect of Image Styles on User Perceptions of Personas. ACM CHI Conference on Human Factors in Computing Systems (CHI2021), Yokohama, Japan. 8-13 May. Article No.: 430.

Jung, S.G., Salminen, J., and **Jansen, B. J.** (2021) Persona Analytics: Implementing Mouse-tracking for an Interactive Persona System. ACM CHI Conference on Human Factors in Computing Systems (CHI2021), Yokohama, Japan. 8-13 May. Article No.: 342.

Salminen, J., Jung, S.G., Chhirang, K., and **Jansen, B. J.** (2021) Instilling Knowledge Claims of Personas from 346 Research Articles. ACM CHI Conference on Human Factors in Computing Systems (CHI2021), Yokohama, Japan. 8-13 May. Article No.: 450.

Salminen, J., Nielsen, L., Jung, S.G., and **Jansen, B. J.** (2021) Towards a Measurement Scale of Organizational Readiness for Personas. ACM CHI Conference on Human Factors in Computing Systems (CHI2021), Yokohama, Japan. 8-13 May. Article No.: 384.

Jung, S.G., Salminen, J., and **Jansen, B. J.** (2021) All About the Name: Assigning Demographically Appropriate Names to Data-Driven Entities. 54th Annual Hawaii International Conference on System Sciences (HICSS 2021) Koloa, Hawaii, United States. 5-8 Jan. 2021. p. 4034-4042.

**Jansen, B. J.**, Jung, S.G., Salminen, J., Nielsen, L., and Guan, K.W. (2021) Strengths and Weaknesses of Persona Creation Methods: Guidelines for Novice and Experienced Users. 54th Annual Hawaii International Conference on System Sciences (HICSS 2021) Koloa, Hawaii, United States. 5-8 Jan. 2021. p. 4971-4980.

Guan, K.W., Salminen, J., Nielsen, L., Jung, S.G., and **Jansen, B. J.** (2021) Information Design for Personas in Four Professional Domains of User Experience Design, Healthcare, Market Research, and Social Media Strategy. 54th Annual Hawaii International Conference on System Sciences (HICSS 2021) Koloa, Hawaii, United States. 5-8 Jan. 2021. p. 4446-4455.

Jung, S.G., Salminen, J., and **Jansen, B. J.** (2021) Automatically Mapping Ad Targeting Criteria between Online Ad Platforms. 54th Annual Hawaii International Conference on System Sciences (HICSS 2021) Koloa, Hawaii, United States. 5-8 Jan. 2021. p. 940-948.

Mall, R., Nagpal, M., Salminen, J., Almerekhi, H., Jung, S.G., and **Jansen, B. J.** (2020) Four Types of Toxic People: Characterizing Online Users' Toxicity over Time. In Proceedings of the 11th Nordic Conference on Human-Computer Interaction (NordiCHI '20). Tallinn, Estonia. 25-29 Oct. Article 37.

## Refereed Conference Proceedings

**Jansen, B. J.**, Jung, S.G., and Salminen, J. (2020) From Flat File to Interface: Conceptual Synthesis of Personas and Analytics for Enhanced User Understanding. 83rd Annual Meeting of the Association for Information Science and Technology. Pittsburgh, PA, USA, 23-28 October 23-28. 1-11.

Salminen, J., Jung, S.G., Chowdury, S.A., and **Jansen, B. J.** (2020) Rethinking Personas for Fairness: Algorithmic Transparency and Accountability in Data-Driven Personas. 22nd International Conference on Human-Computer Interaction (HCII2020). Copenhagen, Denmark, 19-24 July 2020. 82-100.

**Paper Award**

Salminen, J., Rao, R.G., Jung, S.G., Chowdury, S.A., and **Jansen, B. J.** (2020) Enriching Social Media Personas with Personality Traits: A Deep Learning Approach Using the Big Five Classes. 22nd International Conference on Human-Computer Interaction (HCII2020). Copenhagen, Denmark, 19-24 July 2020. 101-120.

Salminen, J., Guan, K., Nielsen, L., Jung, S.G., and **Jansen, B. J.** (2020) A Template for Data-Driven Personas: Analyzing 31 Quantitatively Oriented Persona Profiles. 22nd International Conference on Human-Computer Interaction (HCII2020). Copenhagen, Denmark, 19-24 July 2020. 125-144.

Chowdhury, S., Mubarak, H., Abdelali, A., Salminen, J., Jung, S.G., and **Jansen, B. J.** (2020) A Multi-Platform Arabic News Comment Dataset for Offensive Language Detection. 12th International Conference on Language Resources and Evaluation (LREC2020). Miyazaki, Japan. 7-12 May. 6203–6212.

Salminen, J., Jung, S.G., Chowdhury. S., Ramirez-Robillos, D., and **Jansen, B. J.** (2020) Things Change: Comparing Results Using Historical Data and User Testing for Evaluating a Recommendation Task. ACM CHI Conference on Human Factors in Computing Systems (CHI2020) (Extended Abstract), Honolulu, HI, USA. 25–30 April, 1-7.

Salminen, J., Vahlo, J., Jung, S.G., Chowdhury. S., and **Jansen, B. J.** (2020) Designing Prototype Player Personas from a Game Preference Surveys. ACM CHI Conference on Human Factors in Computing Systems (CHI2020) (Extended Abstract), Honolulu, HI, USA. 25–30 April. 1-8.

Salminen, J., Jung, S.G., Santos, J., Chowdhury. S. G, and **Jansen, B. J.** (2020) The Effect of Experience on Persona Perceptions. ACM CHI Conference on Human Factors in Computing Systems (CHI2020) (Extended Abstract), Honolulu, HI, USA. 25–30 April. 1-9.

Salminen, J., Froneman, W., Jung, S.G., Chowdhury. S., and **Jansen, B. J.** (2020) The Ethics of Data-Driven Personas. ACM CHI Conference on Human Factors in Computing Systems (CHI2020) (Extended Abstract), Honolulu, HI, USA. 25–30 April. 1-7.

Salminen, J., Jung, S.G., Chowdhury. S., and **Jansen, B. J.** (2020) Analyzing Demographic Bias in Artificially Generated Facial Pictures. ACM CHI Conference on Human Factors in Computing Systems (CHI2020) (Extended Abstract), Honolulu, HI, USA. 25–30 April. 1-7.

## Refereed Conference Proceedings

**Paper Award**

Salminen, J., Jung, S.G., Chowdhury, S. Şengün, S., and **Jansen, B. J.** (2020). Personas and Analytics: A Comparative User Study of Efficiency and Effectiveness for a User Identification Task. ACM CHI Conference on Human Factors in Computing Systems (CHI2020), Honolulu, HI, USA. 25–30 April, 1-13.

Salminen, J., Guan, K., Jung, S.G., Chowdhury, S., and **Jansen, B. J.** (2020) A Literature Review of Quantitative Persona Creation. ACM CHI Conference on Human Factors in Computing Systems (CHI2020), Honolulu, HI, USA. 25–30 April. 1-14.

Almerekhi, H., Salminen, J., Kwak, K., and **Jansen, B. J.** (2020) Are These Comments Triggering? Predicting Triggers of Toxicity in Online Discussions. The Web Conference (Web2020), Taipei, China, 20-24 April, 3033–3040.

Almerekhi, H., Kwak, H., and **Jansen, B. J.** (2020) Statistical Modeling of Harassment against Reddit Moderators, The Web Conference (Web2020), Taipei, China, 20-24 April, 122–123.

Almerekhi, H., Kwak, H., Salminen, J., and **Jansen, B. J.** (2020) Are These Comments Triggering? Predicting Triggers of Toxicity in Online Discussions. In Proceedings of The Web Conference 2020 (WWW '20), Taipei, Taiwan. 20-24 April, 3033–3040.

Salminen, J., Liu, Y.H., Şengün, S., Santos, J., Jung, S.G., and **Jansen, B. J.** (2020) The Effect of Numerical and Textual Information on Visual Engagement and Perceptions of AI-Driven Persona Interfaces. ACM Conference on Intelligent User Interfaces (IUI2020), Cagliari, Italy. 17-20 March, 357–368.

Jung, S.G., Salminen, J., and **Jansen, B. J.** (2020) Giving Faces to Data: Creating Data-Driven Personas from Personified Big Data. ACM Conference on Intelligent User Interfaces (IUI2020) (Demo Paper), Cagliari, Italy. 17-20 March, 132-133.

Aldous, K, An, J, and **Jansen, B. J.** (2019) Stylistic Features Usage: Similarities and Differences Using Multiple Social Networks. 11th International Conference on Social Informatics (SocInfo2019). Doha, Qatar. 18-21 November, 309-318.

Aldous, K, An, J, and **Jansen, B. J.** (2019) Predicting Audience Engagement Across Social Media Platforms in the News Domain. 11th International Conference on Social Informatics (SocInfo2019). Doha, Qatar. 18-21 November, 173-187.

**Jansen, B. J.**, Jung, S.G., and Salminen, J. (2019) Capturing the Change in Topical Interests of Personas Over Time. Association for Information Science and Technology Annual Meeting 2019 (ASIST2019). Melbourne, Australia. 19-23 Oct.

Almerekhi, H., Kwan, H., **Jansen, B. J.,** Salminen, J. (2019) Detecting Toxicity Triggers in Online Discussions. ACM Hypertext and Social Media 2019. Hof, Germany. 17-20 September, 291-292.

## Refereed Conference Proceedings

Şengün, S., Salminen, J., Mawhorter, P., Jung, S.G., and **Jansen, B. J.** (2019) Exploring the Relationship Between Game Content and Culture-based Toxicity: A Case Study of League of Legends and MENA Players. ACM Hypertext and Social Media 2019. Hof, Germany.17-20 September, 87-95.

Aldous, K., An, J. and **Jansen, B. J.** (2019) View, Like, Comment, Post: Analyzing User Engagement by Topic at 4 Levels across 5 Social Media Platforms for 53 News Organizations. International AAAI Conference on Web and Social Media (ICWSM2019), Munich, Germany, 11-14 June, 47-57.

Salminen, J., Jung, S.G., Santos, J.M., and **Jansen, B. J.** (2019). The Effect of Smiling Pictures on Perceptions of Personas. User Modelling, Adaptation and Personalization (UMAP19). Larnaca, Cyprus. 9–12 June 2019, 75-79.

Salminen, J., Salenius, T., Hall, M., Yoganathan, V., Osburg, V.S., and **Jansen, B. J.** (2019) Analyzing the Effects of Pausing Online Advertisement on Sales Revenue. 14th Global Brand Conference. Berlin, Germany, 8-10 May.

Salminen, J., Engren, V., Salenius, T., Clarke, T., and **Jansen, B. J.** (2019) Automatically classifying search advertising terms to purchase funnel stages: A machine learning approach. 14th Global Brand Conference. Berlin, Germany, 8-10 May.

Jung, S.G., Salminen, J., and **Jansen, B. J.** (2019) Personas Changing Over Time: Analyzing Variations of Data-Driven Personas During a Two-Year Period. ACM CHI Conference on Human Factors in Computing Systems (CHI2019) (Extended Abstract), Glasgow, United Kingdom, 4-9 May. Paper No. LBW2714.

**Jansen, B. J.**, Jung, S.G., and Salminen, J., and (2019) Creating Manageable Persona Sets from Large User Populations. ACM CHI Conference on Human Factors in Computing Systems (CHI2019) (Extended Abstract), Glasgow, United Kingdom, 4-9 May. Paper No. LBW2713.

Şengün, S., Salminen, J., Jung, S.G., Mawhorter, P., and **Jansen, B. J.** (2019) Analyzing Hate Speech Toward Players from the MENA in League of Legends. ACM CHI Conference on Human Factors in Computing Systems (CHI2019) (Extended Abstract), Glasgow, United Kingdom, 4-9 May. Paper No. LBW0173.

Salminen, J., Jung, S.G., and **Jansen, B. J.** (2019) Detecting Demographic Bias in Automatically Generated Personas. ACM CHI Conference on Human Factors in Computing Systems (CHI2019) (Extended Abstract), Glasgow, United Kingdom, 4-9 May. Paper No. LBW0122.

Aldous, K, An, J, and **Jansen, B. J.** (2019) The Challenges of Creating Engaging Content: Results from a Focus Group Study of a Popular News Media Organization. ACM CHI Conference on Human Factors in Computing Systems (CHI2019) (Extended Abstract), Glasgow, United Kingdom, 4-9 May. Paper No. LBW2317.

## Refereed Conference Proceedings

Salminen, J., Jung, S.G. and **Jansen, B. J.** (2019) The Future of Automatic Persona Generation: A Marriage of Online Analytics and Human-Driven Data Representations. 21st International Conference on Enterprise Information Systems (ICEIS2019). Heraklion, Crete, Greece. 3-5 May.

Salminen, J., Marttila, R., Corporan, J., Salenius, T., and **Jansen, B. J.** (2019) Using Machine Learning to Predict Ranking of Webpages in the Gift Industry: Factors for Search-Engine Optimization. 9th International Conference on Information Systems and Technologies (ICIST 2019), Cairo, Egypt. 24–26 March. Article No. 6.

Salminen, J., Nagpal, M., Kwak, H., An, J., Jung, S.G., and **Jansen, B. J.** (2019) Confusion Prediction from Eye-Tracking Data: Experiments with Machine Learning. 9th International Conference on Information Systems and Technologies (ICIST 2019), Cairo, Egypt. 24–26 March. Article No. 5.

Salminen, J., Sengun, S., Jung, S.G., and **Jansen, B. J.** (2019) Design Issues in Automatically Generated Persona Profiles: A Qualitative Analysis from 38 Think-Aloud Transcripts. The ACM SIGIR Conference on Human Information Interaction and Retrieval (CHIIR2019). Glasgow, UK. 10-14 March. 225-229.

Salminen, J., Almerekhi, H., Kamel, A.H., Jung, S.G., and **Jansen, B. J.** (2019) Online Hate Ratings Vary by Extremes: A Statistical Analysis. The ACM SIGIR Conference on Human Information Interaction and Retrieval (CHIIR2019). Glasgow, UK. 10-14 March. 213-217.

Salminen, J., Luotolahti, J., Almerekhi, H., **Jansen, B. J.,** and Jung, S. G. (2018) Neural Network Hate Deletion: Developing a Machine Learning Model to Eliminate Hate from Online Comments. 5th International Conference 'Internet Science' (INSCI'2018) St. Petersburg, Russia, 24-26 October. 25-39.

Salminen, J., Veronesi, F., Almerekhi, H., Jung, S. G., and **Jansen, B. J.** (2018) Online Hate Interpretation Varies by Country, But More by Individual: A Statistical Analysis Using Crowdsourced Ratings. The Fifth International Conference on Social Networks Analysis, Management and Security (SNAMS-2018). Valencia, Spain. 15-18 October. 88-94.

Salminen, J., Dey, P., Almerekhi, H., and **Jansen, B. J.** (2018) Inter-rater agreement for social computing studies. The Fifth International Conference on Social Networks Analysis, Management and Security (SNAMS-2018). Valencia, Spain. 15-18 October. 80-87.

Salminen, J., Maslennikov, D., **Jansen, B. J.**, and Olkkonen, R. (2018) With or Without Online Super Platforms? Analyzing News Publishers' Strategies Through a Game of Monetization and Advertising Revenue. 10th International Conference on Social Informatics (SocInfo 2018), St. Petersburg, Russia, 25–28 September. 251-260.

Salminen, J., Almerekhi, H., Milenković, M., Jung, S.G., An, J., Kwak, H., and **Jansen, B. J.** (2018) Anatomy of Online Hate: Developing a Taxonomy and Machine Learning Models for Identifying and Classifying Hate in Online News Media, International AAAI Conference on Web and Social Media (ICWSM 2018), Stanford, CA, USA, 25-28 June. 330-339.

## Refereed Conference Proceedings

Jung, S.G., An, J., Salminen, J., Kwak, H., and **Jansen, B. J.** (2018) Assessing the Accuracy of Four Popular Face Recognition Tools for Inferring Gender, Age, and Race (Short Paper), International AAAI Conference on Web and Social Media (ICWSM 2018), Stanford, CA, USA, 25-28 June. 624-627.

Jung, S.G., Salminen, J., An, J., Kwak, H., and **Jansen, B. J.** (2018) Automatically Conceptualizing Social Media Analytics Data via Personas (Demo Paper), International AAAI Conference on Web and Social Media (ICWSM 2018), Stanford, CA, USA, 25-28 June. 715-716.

**Paper Award** Lyytikkä, J., Salminen, J., and **Jansen, B. J.** (2018) To use branded keywords or not? Rationale of professional search-engine marketers for brand bidding strategy, 13th Global Brand Conference, Northumbria University, UK, 2-4 May.

Rantanen, A., Salminen, J., Ginter, F., and **Jansen, B. J.** (2018) Determining online brand reputation with machine learning from social media mentions: A study in the banking context, 13th Global Brand Conference, Northumbria University, UK, 2-4 May.

Kwak, H., An, J., Salminen, J., Jung, S.G., and **Jansen, B. J.** (2018). What We Read, What We Search: Media Attention and Public Attention among 193 Countries. The Web Conference (WWW2018), Lyon, France. 23-27 April, 893-902.

Salminen, J., Nielsen, L., An, J., Jung, S.G., Kwak, H., and **Jansen, B. J.** (2018) Is More Better?: Impact of Multiple Photos on Perception of Persona Profiles. ACM CHI Conference on Human Factors in Computing Systems (CHI2018), Montréal, Canada, 21-26 April, Paper No. 317.

Johnson, J., **Jansen, B. J.**, Hastak, M., and Raval, D. (2018) Analyzing Advertising Labels: Testing Consumers' Recognition of Paid Content Online. ACM CHI Conference on Human Factors in Computing Systems (CHI2018) (Extended Abstract), Montréal, Canada, 21-26 April, LBW517.

Salminen, J., Kwak, H., Santos, J. M., Jung, S.G., An, J., and **Jansen, B. J.** (2018) Persona Perception Scale: Developing and Validating an Instrument for Human-Like Representations of Data. ACM CHI Conference on Human Factors in Computing Systems (CHI2018) (Extended Abstract), Montréal, Canada, 21-26 April, LBW075.

Salminen, J., Jung, S.G., An, J., Kwak, H., and **Jansen, B. J.** (2018) Findings of a User Study of Automatically Generated Personas. ACM CHI Conference on Human Factors in Computing Systems (CHI2018) (Extended Abstract), Montréal, Canada, 21-26 April, LBW097.

Jung, S.G., Salminen, J., Kwak, H., An, J., and **Jansen, B. J.** (2018) Automatic Persona Generation (APG): A Rationale and Demonstration, ACM SIGIR Conference on Human Information Interaction and Retrieval (CHIIR2018) (Demo), New Brunswick, New Jersey, USA, 11-15 March. p. 321-324.

## Refereed Conference Proceedings

Salminen, J., **Jansen, B. J.**, An, J., Jung, S.G., Nielsen, L., and Kwak, H. (2018) Fixation and Confusion – Investigating Eye-tracking Participants' Exposure to Information in Personas. ACM SIGIR Conference on Human Information Interaction and Retrieval (CHIIR2018), New Brunswick, New Jersey, USA, 11-15 March. p. 321-324.

**Jansen, B. J.**, Salminen, J., Jung, S.G., An, J., and Kwak, H. (2018) Leveraging Social Analytics Data for Identifying Customer Segments for Online News Media, *2017 IEEE/ACS 14th International Conference on Computer Systems and Applications (AICCSA)*, Hammamet, Tunisia, pp. 463-468, doi: 10.1109/AICCSA.2017.64.

Salminen, J., Seitz, S., **Jansen, B. J.**, and Salenius, T. (2017) Gender effect on e-commerce sales of experience gifts: Preliminary empirical findings, International Conference on Electronic Business (ICEB 2017), Dubai, UAE. P. 106-115. 4-8 December.

Salminen, J., **Jansen, B. J.**, and Milenkovic, M. (2017) Problems of Data Science in Organizations: An Explorative Qualitative Analysis of Business Professionals' Concerns, International Conference on Electronic Business (ICEB 2017), Dubai, UAE. p. 192-201. 4-8 December.

Jung, S., An, J., Kwak, H., Salminen, J., and **Jansen, B. J.** (2017) Inferring social media users' demographics from profile pictures: A Face++ analysis on Twitter users, International Conference on Electronic Business (ICEB 2017), Dubai, UAE. p. 140-145. 4-8 December.

Nielsen, L., Jung, S.G., An, J., Salminen, J., Kwak, H., and **Jansen, B. J.**, (2017) Who are your users?: comparing media professionals' preconception of users to data-driven personas. In Proceedings of the 29th Australian Conference on Computer-Human Interaction (OZCHI '17), 28 Nov.-1 Dec., Brisbane, Australia, p. 602-606.

**Jansen, B. J.**, An, J., Kwak, H., Salminen, J., and Jung, SG. (2017) Viewed by Too Many or Viewed Too Little: Using Information Dissemination for Audience Segmentation. Association for Information Science and Technology Annual Meeting 2017 (ASIST2017). Washington, DC. p. 189-196. 27 Oct-1 November.

Salminen, J., Şengün, S., Kwak, H., and **Jansen, B. J.**, An, J., Jung, S.G., Vieweg, S., and Harrell, F. (2017) Generating Cultural Personas from Social Data: A Perspective of Middle Eastern Users. The Fourth International Symposium on Social Networks Analysis, Management and Security (SNAMS-2017). Prague, Czech Republic, 21-23 August.

Jung, S., An, J., Kwak, H. Ahmad, M., Nielsen, L., and **Jansen, B. J.** (2017) Persona Generation from Aggregated Social Media Data. ACM Conference on Human Factors in Computing Systems 2017 (CHI2017) Extended Abstracts. Denver, CO., p. 1748-1755. 6-11 May.

An, J., Kwak, H., and **Jansen, B. J.** (2017) *Automatic Generation of Personas Using YouTube Social Media Data*. Proceedings of the 50th International Conference on System Sciences (HICSS-50). Waikoloa, Hawaii. p. 833-842. 4-7 January.

**Refereed Conference Proceedings**

Gao, Y., Reddy, M., and **Jansen, B. J.** (2017) *ShopWithMe!: Collaborative Information Searching and Shopping for Online Retail*. Proceedings of the 50th Hawaii International Conference on System Sciences (HICSS-50). p. 505-514. Waikoloa, Hawaii. p. 833-842. 4-7 January.

Rabab'ah, A., Al-Ayyoub, M., Shehab, M.A., Jararweh, Y. and **Jansen, B. J.** (2016) *Using the Panama Papers to Explore the Financial Networks of the Middle East*. The 11th International Conference for Internet Technology and Secured Transactions (ICITST-2016). Barcelona, Spain. 5-7 Dec.

Whitman, A. and **Jansen, B. J.** (2016) *Commercial Consequences of Amazon's Community Forums: The Case of the Kindle*. The Second International Workshop on Online Social Networks Technologies (OSNT-2016), 13th ACS/IEEE International Conference on Computer Systems and Applications AICCSA 2016. Agadir, Morocco. 29 November - 2 December.

An, J., Kwak, H. and **Jansen, B. J.** (2016) *Validating Social Media Data for Automatic Persona Generation*. The Second International Workshop on Online Social Networks Technologies (OSNT-2016), 13th ACS/IEEE International Conference on Computer Systems and Applications AICCSA 2016. Agadir, Morocco. 29 November - 2 December.

Das, A., Das, S.S., Ziegelmayer, J.L., **Jansen, B. J.** (2016) *Attention Allocation and Choice: An Eye-Tracking Study*. Annual Meeting of the Society for Judgment and Decision Making (SJDM2016). Boston, Massachusetts, 18-21 November.

Brown, A., Lush, B., and **Jansen, B. J.** (2016) *Pixel Efficiency Analysis:* A Quantitative Web Analytics Approach. 2016 Annual Meeting of the Association for Information Science and Technology, Copenhagen, Denmark, 14-18 Oct.

Ma, J., Gao, W., Mitra, P., Kwon, S., **Jansen, B. J.**, Wong, K.F, and Cha. M. (2016) *Detecting Rumors from Microblogs with Recurrent Neural Networks*. 25th International Joint Conference on Artificial Intelligence (IJCAI-16). New York, NY. p. 3818- 3824. 9-15 July.

Mukherjee, P. and **Jansen, B. J.** (2016) *Formality Identification in Social Media Dialogue*. 2016 International Conference on Social Computing, Behavioral-Cultural Modeling, and Prediction (SBP16). Washington DC, p. 375-380. 21 June-1 July.

Wong, J.S., Pursel, B., Divinsky, A. and **Jansen, B. J.** (2016) *An Analysis of Cognitive Learning Context in MOOC Forum Messages*. ACM Conference on Human Factors in Computing Systems (CHI2016) Extended Abstracts, San Jose, CA, USA, 7-12 May.

Gao, Y, Reddy, M., and **Jansen, B. J.** (2016) *Shopping as Searching: Collaborative Web Search in the Ecommerce Domain*. ACM Conference on Human Factors in Computing Systems (CHI2016), San Jose Extended Abstracts, CA, USA, 7-12 May.

Mukherjee, P. and **Jansen, B. J.** (2016) *Second Screen Interaction Analysis for IRL Events: Phase-Category Investigation of the Super Bowl 2015 Social Soundtrack*. The 7th International Conference on Information and Communication Systems (ICICS 2016). Irbid, Jordan. 5-7 April.

**Refereed Conference Proceedings**

Mukherjee, P. and **Jansen, B. J.** (2015) *Correlation of Brand Mentions in Social Media and Web Searching Before and After Real Life Events: Phase Analysis of Social Media and Search Data for Super Bowl 2015 Commercials.* International Workshop on Event Analytics Using Social Media Data, IEEE International Conference on Data Mining (ICDM2015) Atlantic City, New Jersey. 14-17 Nov., p. 21-26.

Wong, J.S., Pursel, B., Divinsky, A., and **Jansen, B. J.** (2015) *Analyzing MOOC Discussion Forum Messages to Identify Cognitive Learning Exchanges.* 2015 Annual Meeting of The Association for Information Science & Technology. St. Louis, Mo. 6-10 Nov.

Liu, Z., and **Jansen, B. J.** (2015) *Analysis of Question and Answering Behavior in Question Routing Services.* 21st International Conference on Collaboration and Technology (CRIWG 2015). Yerevan, Armenia. 22 – 25 Sept., p. 72-85.

Liu, Z., and **Jansen, B. J.** (2015) *A Taxonomy for Classifying Questions Asked in Social Question and Answering.* ACM CHI Conference on Human Factors in Computing (CHI 2015) Extended Abstracts, Seoul, South Korea, 18-23 Apr.

Coughlin, D. and **Jansen, B. J.** (2015) *Predicting Downloads of Academic Articles to Inform Online Content Management.* 6th International Conference on Information and Communication Systems (ICICS2015). Amman, Jordan. 8-9 Apr.

Wong, J.S., Pursel, B., Divinsky, A., and **Jansen, B. J.** (2015). *An Analysis of MOOC Discussion Forum Interactions from the Most Active Users.* 2015 International Conference on Social Computing, Behavioral-Cultural Modeling, and Prediction (SBP15). Washington DC, p. 452-457. 31 Mar.-3 Apr.

**Paper Award**

Liu, Z., and **Jansen, B. J.** (2015) *Subjective versus Objective Questions: Perception of Question Subjectivity in Social Q&A.* 2015 International Conference on Social Computing, Behavioral-Cultural Modeling, and Prediction (SBP15), p. 131-140. Washington DC 31 Mar.-3 Apr.

Mukherjee, P. and **Jansen, B. J.** (2015) *Analyzing Second Screen Based Social Soundtrack of TV Viewers from Diverse Cultural Settings.* 2015 International Conference on Social Computing, Behavioral-Cultural Modeling, and Prediction (SBP15), p. 375-380. Washington DC., 31 Mar.-3 Apr.

Ortiz-Cordova, A. and **Jansen, B. J.** (2015) *The Relationship Between Searching on Search Engines and Searching on Sites.* International Conference on Information Systems and Technologies (ICIST'2015). Istanbul, Turkey. 21-23 March.

Mukherjee, P. and **Jansen, B. J.** (2015) *Evaluating Pattern for Group Interactions using Second Screens.* In Computing, Networking and Communications Workshop (CNC), 2015 International Conference on Computing, Networking and Communications, Anaheim, CA. 16-19 Feb.

## Refereed Conference Proceedings

Mukherjee, P. and **Jansen, B. J.** (2015) *Evaluating Classification Schemes for Second Screen Interactions*, 2015 International Conference on Computing, Networking and Communications, Anaheim, CA. 16-19 Feb.

Mukherjee, P., Wong, J.S., and **Jansen, B. J.** (2014) *Patterns of Social Media Conversations Using Second Screens*. The Sixth ASE International Conference on Social Computing (SocialCom 2014). Stanford, CA. 27-31 May.

Liu, Z., and **Jansen, B. J.** (2014) *Predicting Potential Responders in Social Q&A Based on non-QA Features*. ACM CHI Conference on Human Factors in Computing (CHI 2014) Extended Abstracts, p. 2131-2136. Toronto, Canada. 26 April - 1 May.

Ortiz-Cordova, A. and **Jansen, B. J.** (2014) *Linking External and Internal Search: Investigating the Site Searching Patterns of Referred Searchers*. ACM CHI Conference on Human Factors in Computing Systems (CHI 2014) Extended Abstracts, p. 1345-1350. Toronto, Canada. 26 April - 1 May.

Mukherjee, P. and **Jansen, B. J.** (2014) *Social TV and the Social Soundtrack: Significance of Second Screen Interaction during Television Viewing*. The 2013 International Conference on Social Computing, Behavioral-Cultural Modeling, and Prediction (SBP), Washington DC. 2-4 April.

Coughlin, D. M., Campbell, M. C., and **Jansen, B. J.** (2013) *Measuring the Value of Library Content Collections*. 76th Annual Meeting of the American Society for Information Science and Technology (ASIST 2013). Montreal, Canada. 1-6 November.

Mukherjee, P. and **Jansen, B. J.** (2013) *Gender-Brand Effect of Search Queries on Sponsored Search Performance*. 76th Annual Meeting of the American Society for Information Science and Technology (ASIST 2013). Montreal, Canada. 1-6 November.

Ortiz-Cordova, A. and **Jansen, B. J.** (2013) *Site-Searching Strategies of Searchers Referred from Search Engines*. 76th Annual Meeting of the American Society for Information Science and Technology (ASIST 2013). Montreal, Canada. 1-6 November.

Liu, Z. and **Jansen, B. J.** (2013) *Question and Answering Made Interactive: An Exploration of Interactions in Social Q&A*. Proceedings of the International Conference on Social Intelligence and Technology 2013 (SOCIETY 2013), p. 1-10. State College, Pennsylvania USA, 8 -9 May.

Hafernik, C. and **Jansen, B. J.** (2013) *Understanding the specificity of web search queries*. Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2013) Extended Abstracts, p. 1845-1850. Paris France, 27 April – 2 May.

Mukherjee, P. and **Jansen, B. J.** (2013) *The gender-brand effect of key phrases on user clicks in sponsored search*. Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI 2013), p. 1845-1850. Paris France, 27 April – 2 May.

## Refereed Conference Proceedings

Liu, Z. and **Jansen, B. J.** (2013) *Factors Influencing the Response Rate in Social Question & Answering Behavior*. 16th ACM Conference on Computer Supported Cooperative Work and Social Computing (CSCW 2013), p. 1263-1274. 23-27 February. San Antonio, Texas.

Liu, Z. and **Jansen, B. J.** (2012) *Almighty Twitter, What Are People Asking For?*. 75th Annual Meeting of the American Society for Information Science and Technology (ASIST 2012), p.1-10. 26-30 October. Baltimore, MD.

Carman, S., Strong, R., Chandra, A., Oh, S., Spangler, S., Anderson, L., and **Jansen, B. J.** (2012) *Predictive Value of Comments in the Service Engagement Process*. 75th Annual Meeting of the American Society for Information Science and Technology (ASIST 2012). 26-30 October. Baltimore, MD.

Purao, S., Storey, V., Maass, W., **Jansen, B. J.**, and Reddy, M. (2012) *An Integrated Conceptual Model to Incorporate Information Tasks in Workflow Models*. 31st International Conference on Conceptual Modeling (ER 2012). 15-18 October. Florence, Italy.

Hafernik, C.T., Cheng, B., Francis, P. and **Jansen, B. J.** (2011*) Mapping User Search Queries to Product Categories*. 74th Annual Meeting of the American Society for Information Science and Technology (ASIST 2011). 9-13 October. New Orleans, LA.

**Jansen, B. J.**, Liu, Z. and Simon, Z. (2011) *Investigating the Effect of Results Ranking in Sponsored Search*. 4th Annual Meeting of the American Society for Information Science and Technology (ASIST 2011). 9-13 October. New Orleans, LA.

Tapia, A., Bajpai, K., **Jansen, B. J.**, Yen, J., Giles, C., and Mitra, P. (2011) *Seeking the Trustworthy Tweet: Can Microblogged Data Fit the Information Needs of Disaster Response and Humanitarian Relief Organizations*. Proceedings of the 8th International Conference on Information Systems for Crisis Response and Management (ISCRAM 2011), 8-11 May, Lisbon, Portugal.

Caragea, C., McNeese, N., Jaiswal, A., Traylor, G., Kim, H.W., Mitra, P., Wu, D., Tapia, A.H., Giles, L., **Jansen, B. J.**, and Yen, J. (2011) *Classifying Text Messages for the Haiti Earthquake*. Proceedings of the 8th International Conference on Information Systems for Crisis Response and Management (ISCRAM 2011), 8-11 May, Lisbon, Portugal.

**Jansen, B. J.** Sobel, K., and Cook, G. (2011) *Being Networked and Being Engaged: The Impact of Social Networking on eCommerce Information Behavior*. Proceedings of the *iConference 2011*, 8-11 February, Seattle, WA, USA.

**Jansen, B. J.** and Booth, D. (2010) *Classifying Web Queries by Topic and User Intent*. Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2010) Extended Abstracts, p. 4285-4290. Atlanta, GA, 10 – 15 April.

**Jansen, B. J.** Sobel, K., and Cook, G. (2010) *Gen X and Y's Attitudes on Using Social Media Platforms for Opinion Sharing*. Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2010) Extended Abstracts, p. 3853-3858. Atlanta, GA, 10 – 15 April.

## Refereed Conference Proceedings

**Jansen, B. J.**, Campbell, G., and Gregg, M. (2010) *Real Time Search User Behavior*. Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2010) Extended Abstracts, p. 3961-3966. Atlanta, GA, 10 – 15 April.

**Jansen, B. J.** and Solomon, L. (2010) *Gender Demographic Targeting in Sponsored Search*. Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2010) Extended Abstracts, p. 831-840. Atlanta, GA, 10 – 15 April.

**Jansen, B. J.**, Zhang, M., Booth, B. Park, D., Zhang, Y., Kathuria, A. and Bonner, P. (2009) *To What Degree Can Log Data Profile a Web Searcher?* Proceedings of the American Society for Information Science and Technology 2009 Annual Meeting. Vancouver, British Columbia. 6-11 November.

Srivatsan, V. R., Purao, S., **Jansen, B. J.**, and He, J. (2009) *Systems Developers Define their Own Information Needs*. 15th Americas Conference on Information Systems. San Francisco, California. 06-09 August.

**Jansen, B. J.**, Zhang, M, Sobel, K, and Chowdhury, A (2009) *Micro-blogging as Online Word of Mouth Branding*. ACM Conference on Computer Human Interaction (CHI2009) Extended Abstracts. p. 3859-3864. Boston, Massachusetts. 4 - 9 April.

**Jansen, B. J.**, Booth, D. and Spink, A (2009) *Predicting Query Reformulation During Web Searching*. ACM Conference on Computer Human Interaction (CHI2009) Extended Abstracts. p. 3907-3912. Boston, Massachusetts. 4 - 9 April.

Zhang, M. and **Jansen, B. J.** (2009) *Influences of Mood on Information Seeking Behavior*. ACM Conference on Computer Human Interaction (CHI2009) Extended Abstracts. p. 3395-3400. Boston, Massachusetts. 4 - 9 April.

Spink, A. and **Jansen, B. J.** (2008) The 8th International We-B (Working For E-Business) *Conference 2008*. Melbourne, Australia. 28 – 30 November.

Reddy, M., **Jansen, B. J.**, and Krishnappa, R. (2008) *The Role of Communication in Collaborative Information Searching*. 2008 Annual Meeting of the American Society for Information Science and Technology. 24-29 October Columbus, Ohio.

**Best Paper Award**    **Jansen, B. J.**, Zhang, M., and Schultz, C. (2008) *The Effect of Brand on the Evaluation of IT System Performance*. Proceedings of the Southern Association for Information Systems Conference, Richmond, VA, USA 13-15 March 2008.

Tjondronegoro, D., Spink, A., & **Jansen, B. J.** (2007) *Multimedia Searching on the Dogpile Web Meta-Search Engine*. ADCS 2007: Australian Document Computing Symposium. Melbourne, Australia. 10 December.

Spink, A., and **Jansen, B. J.** (2007) *Commerce Related Web Search: Current Trends,* The 18th Australasian Conference on Information Systems. Toowoomba, Australia. 5-7 December.

## Refereed Conference Proceedings

Zhang, Y. and **Jansen, B. J.** (2007) *An Analysis of Searchers' Perceptions of Sponsored and Non-Sponsored Links Using Nested Design,* 2007 Annual Meeting of the American Society for Information Science and Technology. Milwaukee, Wisconsin, 18-25 October.

**Jansen, B. J.** (2007) *Investigating the Relevance of Sponsored Results for Web Ecommerce Queries,* The 30th Annual International ACM Special Interest Group on Information Retrieval. Conference (SIGIR) Abstract, p. 859 – 860, Amsterdam, the Netherlands. 23-27 July.

**Jansen, B. J.**, Smith, B., and Booth, D. (2007) *Viewing Online Search Within a Learning Paradigm,* The 30th Annual International ACM Special Interest Group on Information Retrieval. Conference (SIGIR) Abstract, p. 859 – 860. Amsterdam, the Netherlands. 23-27 July.

**Jansen, B. J.**, Zhang, M., and Zhang, Y. (2007) *Brand Awareness and the Evaluation of Search Results,* 16th International World Wide Web Conference (WWW2007) Abstract, p. 1139 – 1140. Banff, Canada. 8-12 May.

**Jansen, B. J.**, Smith, B., and Booth, D. (2007) *Understanding Web Search via a Learning Paradigm,* 16th International World Wide Web Conference (WWW2007) Abstract, p. 1207 – 1208. Banff, Canada. 8-12 May.

**Jansen, B. J.**, Booth, D., and Spink, A. (2007) *Determining the User Intent of Web Search Engine Queries,* 16th International World Wide Web Conference (WWW2007) Abstract, p. 1149 – 1150. Banff, Canada. 8-12 May.

**Jansen, B. J.**, Zhang, M., and Zhang, Y. (2007) *The Effect of Brand Awareness on the Evaluation of Search Engine Results,* Conference on Human Factors in Computing Systems (SIGCHI), Work-in-Progress, p. 2471 – 2476. San Jose, California. 28 April - 3 May.

**Jansen, B. J.**, Spink, Amanda H., and Narayan, Bhuva. (2007) *Query Modifications Patterns During Web Searching.* Proceedings of the Fourth International Conference on Information Technology, IEEE, p. 439-444. Las Vegas, Nevada, 10-12 April.

Spink, A., and **Jansen, B. J.** (2006) *Changing Web search trends from 1997 to 2006,* Information Online 2007: 13th Exhibition and Conference. Sydney, Australia. 30 January – 1 February.

Yan, S., Giles, C. and **Jansen, B. J.** (2006) *Formal Definitions of Web Information Search,* American Society for Information Science & Technology 2006 Annual Meeting, p. 1-10. Austin, Texas. 3 - 8 November.

Zhang, M., **Jansen, B. J.**, and Spink, A. (2006) *Information Searching Tactics of Web Searchers,* American Society for Information Science & Technology 2006 Annual Meeting. Austin, Texas, p. 1-10. 3 - 8 November.

Koshman, S. Spink, A., **Jansen, B. J.**, Blakely, C., and Weber, J. (2006) *Metasearch Result Visualization: An Exploratory Study,* 2006 Annual Conference of the Canadian Association for Information Science, p. 1-10. Toronto, Canada. 1-3 June.
http://cais-acsi.ca/proceedings/2006/koshman_2006.pdf

## Refereed Conference Proceedings

**Jansen, B. J.**, Spink, A., Blakely, C., and Koshman, S. (2006) *Investigating Usage of the Vivisimo Clustering Search Engine Interface,* The Twelfth Australasian World Wide Web Conference (AUSWEB 06). Noosa Lakes, Australia. 1 -5 July.
http://ausweb.scu.edu.au/aw06/papers/refereed/spink/index.html

Spink, A., **Jansen, B. J.**, Blakely, C., and Koshman, S. (2006) *Overlap Among Major Web Search Engines,* IEEE Information Technology: New Generations (ITNG) 2006. p. 370 – 374. Las Vegas, NV. 10 – 12 April.

**Jansen, B. J.**, Spink, A., Blakely, C., and Koshman, S. (2005) *Web Searcher Interactions with Multiple Federate Content Collections,* Proceedings of the 10th Australasian Document Computing Symposium. Sydney, Australia. 12 December.

**Jansen, B. J.**, Koshman, S., and Spink A. (2005) *An Analysis of Repeat Users of Vivisimo.com,* American Society for Information Science & Technology 2005 Annual Meeting. Charlotte, North Carolina. 28 October – 2 November.

Doran, S. G., de Ycaza, S., Eastman, C. and **Jansen, B. J.** (2005) *Finding Nutrition Information on the Web: Coverage vs. Authority,* American Society for Information Science & Technology 2005 Annual Meeting. Charlotte, North Carolina. 28 October – 2 November.

Spink, A., Koshman, S. and **Jansen, B. J.** (2005) *Tracking Web Search Trends from 1997 to 2005,* Internet Research 6.0: Internet Generations Association of Internet Researchers. Chicago, IL. 5 – 9 October.

Resnick, M, and **Jansen, B. J.** (2005) *An Empirical Study of Paid Search in Product Search and Purchase,* The Human Factors and Ergonomics Society 49th Annual Meeting. p. 1429-1433. Orlando, Florida. 26-30 September.

Sharma, H. and **Jansen, B. J.** (2005) *Automated Evaluation of Search Engine Performance via Implicit User Feedback,* The 28th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval (SIGIR05) Abtract. p. 649-650. Salvador, Brazil. 15-19 August.

Morgan, A., **Jansen, B. J.**, and Trauth, E. (2005) *Exploring Individual User Attitudes Towards Performance with Web Search Engines: An Extension Study,* Proceedings of the Eleventh Americas Conference on Information Systems. p. 2317 – 2324. Omaha, Nebraska. 11–14 August.

Koshman, S. Spink, A., and **Jansen, B. J.** (2005) *Using Clusters on the Vivisimo Web Search Engine,* HCI International 2005. p. 742-747. Las Vegas, Nevada. 22-25 July.

Sengupta, S. and **Jansen, B. J.** (2005) *Designing a Value Based Search Engine Using Evolutionary Strategies,* IEEE 6th International Conference on Information Technology, Coding and Computing, p. 800-805. Las Vegas, Nevada. 11-13 April.

## Refereed Conference Proceedings

Spink, A., Koshman, S., Park, M., Field, C. and **Jansen, B. J.** (2005) *Multitasking Web Search on Vivisimo.com*. IEEE 6th International Conference on Information Technology, Coding and Computing. p. 486-490. Las Vegas, Nevada, 11-13 April.

Eastman, C. and **Jansen, B. J.** (2004) *The Appropriate (and Inappropriate) Use of Query Operators and Their Effect on Web Search Engine Results*, American Society for Information Science & Technology 2004 Annual Meeting, p. 274-279. Providence, Rhode Island. 13-18 November.

Spink, A., Park, M., **Jansen, B. J.**, and Pederson, J. (2004) *Information Task Switching and Multitasking Web Search*, Proceedings of the American Society for Information Science & Technology 2004 Annual Meeting, p. 213-217. Providence, Rhode Island. 13-18 November.

**Jansen, B. J.** and McNeese, M. D. (2004) *Investigating Automated Assistance and Implicit Feedback for Searching Systems*, Proceedings of the American Society for Information Science & Technology 2004 Annual Meeting, p. 280-286. Providence, Rhode Island. 13-18 November.

**Jansen, B. J.** and McNeese, M. D. (2004) *Evaluating the Effectiveness of Automated Assistance for Web Searching*, Proceedings of the Human Factors and Ergonomics Society 48th Annual Meeting, p. 1518-1522. New Orleans, Louisiana. 20-24 September.

Spink, A., Park, M., **Jansen, B. J.**, and Pederson, J. (2004) *Multitasking Web Search on AltaVista*, Proceedings of the IEEE 5th International Conference on Information Technology, Coding and Computing, p. 309-313. Las Vegas, Nevada. 5-7 April.

**Jansen, B. J.**, Spink, A., and Pederson, J. (2003) *An Analysis of Multimedia Searching on AltaVista*, Proceedings of the 5th ACM SIG Multimedia International Workshop on Multimedia Information Retrieval, p.186-192. Berkeley, California.

**Jansen, B. J.** (2003) *Designing Automated Help Using Searcher System Dialogues*, *Proceedings of the* 2003 IEEE International Conference on Systems, Man & Cybernetics, p. 744-749. Washington, D.C. 5-8 October.

**Jansen, B. J.**, Spink, A., and Pederson, J. (2003) *Web Search Agents: What Are They Doing Out There?*, Proceedings of the 2003 IEEE International Conference on Systems, Man & Cybernetics, p. 1410-1416. Washington, D.C. 5-8 October.

**Jansen, B. J.**, Spink, A., and Pederson, J. (2003) *Monsters at the Gates: When Softbots Visit Web Search Engines*, *Proceedings of the* 4th International Conference on Internet Computing, Lap. p. 620–626. Vegas, Nevada. 23-26 June.

Spink, A., Abbas, M., and **Jansen, B. J.** (2003) *Accessing E-commerce Web Information: Implications for Bridging the Digital Divide*, The 2003 Canadian Association for Information Science Conference, *p. 213-221.* Halifax, CA. 28 May-1 June.

### Refereed Conference Proceedings

**Jansen, B. J.** and Spink, A. (2003) *An Analysis of Web Documents Retrieved and Viewed*, Proceedings of the 4th International Conference on Internet Computing, p. 65-69. Las Vegas, Nevada, 23-26 June.

**Jansen, B. J.** (2003) *Operators Not Needed? The Impact of Query Structure on Web Searching Results*, Information Resource Management Association International Conference, p. 814-817. Philadelphia, PA, 18-21 May.

Duran, S., Eastman, C., and **Jansen, B. J.** (2003) *Nutritional Information on the Web: An Analysis of Information Sought and Information Provided*, Information Resource Management Association International Conference, p. 106-108. Philadelphia, PA. 18-21 May.

**Jansen, B. J.** and Spink, A. (2003) *Retrieving and Viewing Web Documents,* The 2003 National Online Meeting, p. 55-57. New York, New York, 6-8 May 2003.

**Jansen, B. J.** and Eastman, C. (2003) *The Effects of Search Engines and Query Operators on Top Ranked Results*, The IEEE 4th International Conference on Information Technology, Coding and Computing, p. 135-139. Las Vegas, Nevada, 28-30 April.

**Jansen, B. J.** and Kroner, G. (2003) *The Impact of Automated Assistance on the Information Retrieval Process*, The ACM SIGCHI 2003 Conference on Human Factors in Computing Systems, p. 1004-1006. Fort Lauderdale, Florida, 5-10 April.

**Paper Award**   **Jansen, B. J.** (2002) *Towards Implementing a Cognitive Model of Searching*, Proceedings of the E-Learning 2002 Conference (Web Track), p. 493-521. Montreal, Canada, 15-19 October.

**Jansen, B. J.** (2002) *A Preliminary Mapping of Web Queries Using Existing Image Query Schemes*, Proceedings of the E-Learning 2002 Conference (Web Track), p. 485-492. Montreal, Canada, 15-19 October.

**Jansen, B. J.**, Spink, A., and Pfaff, A. (2000) *A Linguistic Analysis of World Wide Web Queries*, Proceedings of the Annual Meeting of the American Society of Information Science, p. 169-176. Chicago, IL. 13-16 November.

**Jansen, B. J.**, Spink, A., Goodrum, A., and Pfaff, A. (2000) *Web Query Structure: Implications for IR System Design*, Proceedings of the 4[h] World Multiconference on Systems, Cybernetics and Informatics, p. 50-55. Orlando, FL. 23-26 July.

**Jansen, B. J.** (1999) *A Software Agent for Performance Improvement of Existing Information Retrieval Systems*, Proceedings of the 1999 International ACM Conference on Intelligent User Interfaces, p. 122-123. Los Angeles, CA. 5-8 January.

Smith, T. L., Ruocco, A., and **Jansen, B. J.** (1999*) Digital Video in Education*, Proceedings of the ACM Computer Science Education Conference, p. 122-126. New Orleans, LA. 21-25 February.

## Refereed Conference Proceedings

**Jansen, B. J.**, Spink, A., and Saracevic, T. (1999) *The Use of Relevance Feedback on the Web: Implications for Web IR System Design*, 1999 World Conference on the WWW and Internet, Honolulu, Hawaii. 24-30 October.

**Jansen, B. J.** and Pooch, U. (1999) *Improving the Performance of Existing Information Retrieval Systems Using a Software Agent*, 5th International Conference on Information Systems Analysis and Synthesis, p. 58-60. Orlando, Florida. 31 July-4 August.

Adams, W. J., **Jansen, B. J.**, and Smith, T. L. (1999) *Planning, Building, and Using a Distributed Digital Library*, Third International Conference on Concepts in Library and Information Science, p. 10-18. Dubrovnik, Croatia. 23-26 May.

Smith, T. L., Wolfe, D., and **Jansen, B. J.** (1999) *Digital Video in a Twenty-First Century Classroom*, Proceedings of the Information Resources Management Association Conference, Hershey, PA. 16-19 May.

Adams, W. J. and **Jansen, B. J.** (1998) *Distributed Digital Library architecture: The Key to Success for Distance Learning*, Proceedings of the IEEE Conference on Research Issues in Data Engineering, p. 2-8. Orlando, Florida. 23-24 February.

Spink, A., Chang, C., Goz, A., and **Jansen, B. J.** (1998) *User' Interactions with the Excite Web Search Engine: A Query Reformulation and Relevance Feedback Analysis*, Proceedings of the Canadian Association of Information Science Conference, p. 342-354. Vancouver, Canada. 5 –10 June.

**Jansen, B. J.**, Spink, A., and Saracevic, T. (1998) *Searchers, the Subjects They Search, and Sufficiency: A Study of a Large Sample of Excite Searches*, Proceedings of the 1998 World Conference on the WWW and Internet, Orlando, Florida.

Spink, A., Bateman, J., and **Jansen, B. J.** (1998) *Users' Searching Behavior on the Excite Web Search Engine*, 1998 World Conference on the WWW and Internet, Orlando, Florida, November.

Howard, R. and **Jansen, B. J.** (1998) *A proxy server experiment: an indication of the changing nature of the Web*, Proceedings of the Seventh International Conference on Computer Communications and Networks, p. 646-649. Lafayette, Louisiana. 12-15 November.

Adams, W. J., **Jansen, B. J.**, and Zoller, R. (1998) *Usability Measurements in an Undergraduate Programming Course*, Software Engineering Conference, Las Vegas, Nevada.

**Jansen, B. J.**, Spink, A., and Saracevic, T. (1998) *Failure analysis in Query Construction: Data and Analysis from a Large Sample of Web Queries*, Proceedings of the 3rd ACM Conference on Digital Libraries, p. 289-290. Pittsburgh, PA. 23-26 July.

## Refereed Conference Proceedings

Spink, A., Bateman, J., and **Jansen, B. J.** (1998) *User's Searching Behavior on the EXCITE Web Search Engine*, Proceedings of the 19th National Online Meeting, p. 375-386. New York, NY. 12-14 May 1997.

Adams, W. J., Howard, R., and **Jansen, B. J.** (1998) *Distributed Digital Libraries: The Key to Success for Distance Learning*, Computers and Technology in Education, 1 -5 May. Cancun, Mexico.

**Jansen, B. J.** (1997) *An Information Retrieval Application for Simulated Annealing*, Proceedings of the 2nd ACM Conference on Digital Libraries, p. 259-260. Philadelphia, PA. 25-28 July.

**Paper Award**
    **Jansen, B. J.** (1997) *Simulated Annealing for Query Results Ranking*, Computer Science Education Conference, San Jose, CA. 28 – 30 February.

Spink, A., Burkett, L., Spaid, N., Bateman, J., and **Jansen, B. J.** (1997) *Why Users Search the World Wide Web (WWW): The EXCITE Study*, First Internet Librarian Conference, Monterey, CA. 16-18 November.

Adams, W. J. and **Jansen, B. J.** (1997) *Information Technology and the Classroom of the Future*, Proceedings of the Society for Information Technology in Education Conference, Orlando, Florida. 7 May.

Hamilton, J. A. and **Jansen, B. J.** (1997) *Tactical Network Simulation in the US Army*, Simulation Multi-Conference, Atlanta, Georgia. January.

**Jansen, B. J.** and Hamilton, J. A. (1997) *Modeling and Simulating an Army Information Support Structure*, Simulation Multi-Conference, Atlanta, Georgia. January.

## Papers Presented at Technical and Professional Meetings

Salminen, J., Jung, S.G., and **Jansen, B. J.** (2022) Persona Analytics: a pathway to persona science. In CN Chapman, KZ Xu, M Callegaro, F Gao, and M Cipollone, eds. (2022). Proceedings of the 2022 Quantitative User Experience Conference (Quant UX Con). June 2022, Sunnyvale, CA.

Panel: Meet the Editors-in-Chief, 2021 Aging and Health Informatics Conference, December 6-7, 2021, Austin, Texas, USA.

Al-Thani, H., Elsayed, T., and **Jansen, B. J.** (2021) HBKU at TREC 2020: Conversational Multi-Stage Retrieval with Pseudo-Relevance Feedback. TREC 2020 Conference. Washington, DC.

Al-Thani, H., **Jansen, B. J.**, and Elsayed, T. (2020) HBKU at TREC 2020: Conversational Multi-Stage Retrieval with Pseudo-Relevance Feedback. TREC 2020 Conference. Washington, DC.

## Papers Presented at Technical and Professional Meetings

Shammur A Chowdhury, S., Abdelali, A., Darwish, K., Jung, S.G., Salminen, J., and **Jansen, B. J.** (2020) Improving Arabic Text Categorization Using Transformer Training Diversification. Proceedings of the Fifth Arabic Natural Language Processing Workshop, Barcelona, Spain (Online), December 12, 2020. pages 226–236.

Jung, S.G., Salminen, J., and **Jansen, B. J.** (2020) Explaining Data Driven Personas to End Users. Proceedings of the Workshop on Explainable Smart Systems for Algorithmic Transparency in Emerging Technologies co-located with the 25th International Conference on Intelligent User Interfaces (IUI 2020). Cagliari, Italy, 17 March.

**Jansen, B. J.**, Jung, S.G., An, J., Kwak, H. and Salminen, J. (2018) Personas as a Means for Making Sense of User Analytics Information. Sensemaking in a Senseless World Workshop, ACM CHI Conference on Human Factors in Computing Systems (CHI2018), Montréal, Canada, 21-26 April.

Jung, S.G., Salminen, J., An, J., Kwak, H. and **Jansen, B. J.** (2018) Leveraging Online Social Media Data for Persona Profiling. Qatar Foundation Annual Research Conference 2018 (ARC'18), Doha, Qatar. 22 March.

Salminen, J., Jung, S.G., An, J., Kwak, H. and **Jansen, B. J.** (2018) Research Roadmap for Automatic Persona Generation: Principles and Open Questions. The Fifth Machine Learning and Data Analytics (MLDAS2018) Symposium, 12-13 March 2018, Doha, Qatar.

Salminen, J. and **Jansen, B. J.** (2018) Use Cases and Outlooks for Automatic Analytics. The Fifth Machine Learning and Data Analytics (MLDAS2018) Symposium, 12-13 March 2018, Doha, Qatar.

**Jansen, B. J.**, Jung, S.G., Salminen, J., An, J. and Kwak, H. (2017) Social Analytics Data for Identifying Customer Segments for Online News Media. The Third International Workshop on Online Social Networks Technologies, 2017 IEEE/ACS 14th International Conference on Computer Systems and Applications (AICCSA2017). 30 Oct.-3 Nov. Hammamet, Tunisia.

Salminen, J., Sarlin, P., Olkkonen, R., and **Jansen, B. J.** (2017) *Who does what in marketing? Toward an understanding of marketer–machine interaction*, Studying Users Perceptions and Experiences with Algorithms Workshop, The 11th International AAAI Conference on Web and Social Media (ICWSM17). Montreal, Canada. 15-18 May.

Beheshti, J., **Jansen, B. J.**, Dillon, A., Lewandowski, D., Mostafa, J., Khanova, J., Wilson, T., Seadle, M. (2016). Publish or perish: Meet the editors a special panel. *Proceedings of the Association for Information Science and Technology, 53*(1), 1–4. https://doi.org/10.1002/pra2.2016.14505301021

An, J., Cho, H.Y., Kwak, H., and **Jansen, B. J.** (2016) *Towards Automatic Persona Generation Using Social Media*. The Third International Symposium on Social Networks Analysis, Management and Security (SNAMS 2016), The 4th International Conference on Future Internet of Things and Cloud. p. 206-211. 22-24 August.

## Papers Presented at Technical and Professional Meetings

Mukherjee, P. and **Jansen, B. J.** (2016) *The Changing Nature of Viewership: Formality of Social Media Conversations*. Workshop on Following user pathways: Using cross platform and mixed methods analysis in social media studies. ACM Conference on Human Factors in Computing Systems (CHI2016), San Jose, CA, USA, 7-12 May.

Kwon, S., Abbar, S.and **Jansen, B. J.** (2016) *Identifying Virality Attributes of Arabic Language News Articles*. Qatar Foundation Annual Research Conference 2016 (ARC'16), Doha, Qatar. 22 March.

An, J., Kwan, H., Cho, H., Hassen, M.Z., and **Jansen, B. J.** (2016) *Efforts Towards Automatically Generating Personas in Real-time Using Actual User Data*. Qatar Foundation Annual Research Conference 2016 (ARC'16), Doha, Qatar. 22 March.

Mukherjee, P. and **Jansen, B. J.** (2015) *Correlation of Brand Mentions in Social Media and Web Searching Before and After Real Life Events: Phase Analysis of Social Media and Search Data for Super Bowl 2015 Commercials*. 1st International Workshop on Event Analytics using Social Media Data at The IEEE International Conference on Data Mining series (ICDM 2015), Atlantic City, New Jersey, USA, 14 Nov.

Mukherjee, P. and **Jansen, B. J.** (2015) *Analyzing the Social Soundtrack From Second Screens Before, During, and After Real-life Events*. The First International Workshop on Online Social Networks Technologies, 2015 IEEE Jordan Conference on Applied Electrical Engineering and Computing Technologies (AEECT), Dead Sea, Jordan. 3-5 Nov.

**Jansen, B. J.**, Wong, J. S., Jablokow, K.W., Divinsky, A., Liu, Z., and Pursel, B. (2014) *Classifying MOOC Discussion Forum Posts as Information Seeking Interactions and Levels of Cognitive Learning*. Workshop on Learning at Scale at ACM CHI Conference on Human Factors in Computing Systems, (CHI 2014), Toronto, CA. 26 April - 1 May.

Liu, Z. and **Jansen, B. J.** (2012) *Factors Influencing the Response Rate in Social Question and Answering Behavior*. Workshop on Social Media Question Asking at 16th ACM Conference on Computer Supported Cooperative Work and Social Computing (*CSCW 2013*). 23-27 February. San Antonio, Texas.

**Jansen, B. J.** (2012) *Gender Demographic Targeting in Sponsored Search*. INFORMS International 2012. 24-27 June. Beijing, China.

**Jansen, B. J.** (2012) *Using Mobile Apps to Enhance Classroom Learning*. Teaching and Learning with Technology, University Park, PA, 24 March

Rosso, M. and **Jansen, B. J.** (2010) *Smart Marketing or Bait & Switch? Competitors' Brands as Keywords in Online Advertising*. 4th Workshop on Information Credibility on the Web (WICOW 2010). World Wide Web Conference (WWW 2010), Raleigh, NC. 26-30 April.

**Jansen, B. J.** (2009) *System Controlled Assistance for Improving Search Performance*. Human-Computer Interaction and Information Retrieval. Workshop. Washington, DC. 23 October.

### Papers Presented at Technical and Professional Meetings

**Jansen, B. J.**, Zhang, M, Sobel, K, and Chowdury, A, (2009) *The Commercial Impact of Social Mediating Technologies: Micro-blogging as Online Word-of-Mouth Branding*. ACM Conference on Computer Human Interaction (CHI2009). Boston, Massachusetts. 4 - 9 April.

Neale, L., Hunter, L., **Jansen, B. J.**, Murphy, J. (2008) *The Google Online Marketing Challenge: A Global Teaching and Learning Initiative*. 2008 Society for Marketing Advances Annual Conference. 4-9 November. St Petersburg, Florida.

**Jansen, B. J.**, Rosso, M., Russell, D., and Detlor, B. (2008) *The Google Online Marketing Challenge: A Multi-Disciplinary Global Teaching and Learning Initiative Using Sponsored Search*. 2008 Annual Meeting of the American Society for Information Science and Technology. 24-29 October Columbus, Ohio.

**Jansen, B. J.** (2008). *Viewing Searching Systems as Learning Systems*. Second Workshop on Human-Computer Interaction and Information Retrieval. 23 October. Redmond, Washington.

Murphy, J., Canhoto, A., Hofacker, C., Hunter, L., **Jansen, B. J.**, and Voorhees, C. (2008) *The Google Online Marketing Challenge: A Global Teaching and Learning Initiative*. 2008 American Marketing Association Summer Marketing Educators' Conference. 8-11 August. San Diego, California.

Reddy, M. and **Jansen, B. J.** (2008) *Learning about Potential Users of Collaborative Information Retrieval Systems*. Workshop on Collaborative Information Retrieval, Joint Conference on Digital Libraries (JCDL 2008). 19 June. Pittsburgh, Pennsylvania.

**Jansen, B. J.**, Bhavnani, S., Murray, G. C., Spink, A. and Wolfram, D. (2007) *Web Log Analysis Panel,* 2007 Annual Meeting of the American Society for Information Science and Technology. Milwaukee, Wisconsin. 18-25 October.

Spink, A. and **Jansen, B. J.** (2007) *Web Research - Results from Large-Scale Web Data Analysis,* ARC Research Network Enterprise Information Infrastructure Workshop on Data From the Field. Sydney, Australia. 24th May.

**Jansen, B. J.** and Spink, A. (2007) *The Effect on Click-through of Combining Sponsored and Non-Sponsored Search Engine Results in a Single Listing,* 16th International World Wide Web Conference (WWW2007) Workshop on Sponsored Search Auctions. Banff, Canada. 8-12 May.
Paper: http://opim.wharton.upenn.edu/ssa3/pdf/submission_96.pdf

**Jansen, B. J.** (2007) *Preserving the Collective Expressions of the Human Consciences,* 16th International World Wide Web Conference (WWW2007) Workshop on Query Log Analysis: Social and Technical Challenges. Banff, Canada. 8-12 May.
Paper: http://www2007.org/workshops/paper_58.pdf
Slides: http://querylogs2007.webir.org/slides/JimJansenQL2007.pdf

## Papers Presented at Technical and Professional Meetings

**Jansen, B. J.**, Smith, B., and Booth, D. (2007) *Learning as a Paradigm for Understanding Exploratory Search,* Conference on Human Factors in Computing Systems (SIGCHI ), Workshop on Exploratory Search Interfaces. San Jose, California. 28 April - 3 May.

Spink, A., Alvarado-Albertorio, F., and **Jansen, B. J.** (2007) *Web Search Behavior: What is Normative?,* Society of Australasian Social Psychologists (SASP) Conference. Brisbane, Australia. 12 – 15 April.

**Jansen, B. J.** and Spink, A. (2006) *Characteristics of searching on Web meta-search engines*, American Society for Information Science and Technology: Human Computer Interaction Workshop. Austin, TX. 3-9 November.

**Jansen, B. J.** (2006) *Implications of Trust of Sponsored Links for E-commerce Web Searching,* 6th Annual SIG-USE Research Symposium. American Society for Information Science and Technology (ASIS&T) Annual Conference. Austin, TX. 4 November.

Spink, A. and **Jansen, B. J.** (2006) *Web Searching: Trends and Impacts,* Oxford Internet Institute International Symposium. Journal of Information, Communication, Society: 10th Anniversary International Symposium. University of York, UK. 20 – 22 September. http://www.york.ac.uk/res/siru/icsspinketal.htm

**Jansen, B. J.**, Spink, A., Kathura, V., and Koshman, S. (2006) *How to Define Searching Sessions on Web Search Engines,* Workshop on Web Mining and Web Usage Analysis. The 12th ACM SIGKDD International Conference on Knowledge Discovery and Data Mining (KDD 2006). Philadelphia, Pennsylvania. 20-23 August.

**Jansen, B. J.** (2006) *Adversarial Information Retrieval Aspects of Sponsored Search,* Second International Workshop on Adversarial Information Retrieval on the Web (AIRWeb 2006). The 29th Annual International ACM SIGIR Conference on Research & Development on Information Retrieval (SIGIR2006). Seattle, Washington. 6-11 August.

**Jansen, B. J.**, Ramadoss, R. Zhang, M., and Zang, N. (2006) *Wrapper: An Application for Evaluating Exploratory Searching Outside of the Lab,* SIGIR 2006 Workshop on Evaluating Exploratory Search Systems. The 29th Annual International ACM SIGIR Conference on Research & Development on Information Retrieval (SIGIR2006). Seattle, Washington. 6-11 August.

Buzikashvili, N. and **Jansen, B. J.** (2006) *Limits of the Web Log Analysis Artifacts,* Workshop on Logging Traces of Web Activity: The Mechanics of Data Collection, The Fifteenth International World Wide Web Conference (WWW 2006). Edinburgh, Scotland. 22-26 May.

**Jansen, B. J.** (2006) *The Wrapper: An Open Source Application for Logging User – System Interactions during Searching Studies,* Workshop on Logging Traces of Web Activity: The Mechanics of Data Collection. The Fifteenth International World Wide Web Conference (WWW 2006). Edinburgh, Scotland. 22-26 May.

## Papers Presented at Technical and Professional Meetings

**Jansen, B. J.**, Rieh, S.Y., Spink, A., Wang, P., and Wolfram, D. (2005) *Panel Presentation: Internet Usage Transaction Log Studies: The Next Generation,* American Society for Information Science & Technology 2005 Annual Meeting. Charlotte, North Carolina. 28 October – 2 November.

Toms, E.L., **Jansen, B. J.**, and Muresan, G. (2005) *Panel Presentation: Evaluating Success in Search Systems,* American Society for Information Science & Technology 2005 Annual Meeting. Charlotte, North Carolina. 28 October – 2 November.

**Jansen, B. J.** (2005) *A Multi-Disciplinary, Multi-Level, and Multi-Spectrum View of Interaction,* The First Conference of the i-School Community: Bridging Disciplines to Confront Grand Challenges. 28-30 September 2005, State College, PA.

**Jansen, B. J.** and Resnick, M. (2005) *Examining Searcher Perceptions of and Interactions with Sponsored Results,* Workshop on Sponsored Search Auctions, The Sixth ACM Conference on Electronic Commerce (EC'05). Vancouver, Canada. 5-8 June.

**Jansen, B. J.** (2005) *Automated Searching Assistance for Exploratory Search,* Seminar on Exploratory Search Interfaces at the University of Maryland sponsored by the Human-Computer Interaction (HCI) Lab. College Park, Maryland. 2 June.

Shingle, A. **Jansen, B. J.**, and Spink, A. (2005) *Television Advertising of Prescription Drugs: A Study of Its Effect on Consumer Web Searching,* IEEE 6th International Conference on Information Technology, Coding and Computing. Las Vegas, Nevada, 11-13 April, 2005.

**Jansen, B. J.**, Spink, A., and Pederson, J. (2004) *An Analysis of Multimedia Searching on AltaVista*, Presentation at Workshop on User Searching, World Wide Web Conference, New York, New York, 18 May 2004.

De Ycaza, S., Doran, S., Eastman, C., and **Jansen, B. J.** (2003) *Nutritional Information on the Web: An Analysis of Information Sought and Information Provided*, South Carolina Nutrition Research Summit, Columbia, SC. 17 October 2004.

**Jansen, B. J.** (1998) *An Analysis of User Queries on the Web: The Implications for the Design of Military Information Retrieval Systems*, Fifth Annual US Army Research Laboratory and the United States Military Academy Technical Symposium, West Point, New York.

**Jansen, B. J.** (1997) *Simulated Annealing in Information Retrieval*, Fifth Annual US Army Research Laboratory and the United States Military Academy Technical Symposium, West Point, New York.

Adams, W. J. and **Jansen, B. J.** (1997) *Integrating Usability Design Principles into an Existing Engineering Curriculum*, The American Society for Engineering Education National Conference, Milwaukee, Wisconsin.

**Jansen, B. J.** and Adams, W. L. (1997) *Integrating User Centered Design into an Introductory Engineering Course*, American Society for Engineering Education Zone 1 Meeting, West Point, New York.

**Scholarly Reports**

**Jansen, B. J.** (2011) *The civic and community engagement of religiously active Americans*. Pew Internet & American Life Project, Pew Research Center. 13 December.
http://pewinternet.org/Reports/2011/Social-side-of-religious.aspx

**Jansen, B. J.** (2010) *65% of Internet Users Have Paid for Online Content*. Pew Internet & American Life Project, Pew Research Center. 30 December.
http://www.pewinternet.org/Reports/2010/Paying-for-Content.aspx

**Jansen, B. J.** (2010) *Use of the internet by higher income households*. Pew Internet & American Life Project, Pew Research Center. 24 November.
http://www.pewinternet.org/Reports/2010/Better-off-households.aspx

**Jansen, B. J.** (2010) *Online Product Research*. Pew Internet & American Life Project, Pew Research Center. 29 September.
http://pewinternet.org/Reports/2010/Online-Product-Research.aspx

**Funded Projects, Grants, Commissions, and Contracts**

| 2021 - 2021 | Title: Privacy Personas in the MENA Region: A Large-Scale Analysis of 21 Countries |
|---|---|
| | Granting Agency: **Facebook** (https://research.fb.com/programs/research-awards/proposals/peoples-expectations-and-experiences-with-digital-privacy-request-for-proposals/) |
| | Total Amount: $79,000 |
| | Role: Principal Investigator |

| 2019 - 2017 | Title: Technology Development Fund for Automatic Persona Generation |
|---|---|
| | Granting Agency: **Qatar Foundation Research & Development** |
| | Total Amount: $145,500 |
| | Role: Principal Investigator |

| 2015 - 2014 | Title: Web Analytics for a Research University Library |
|---|---|
| | Granting Agency: **Penn State, University Library** |
| | Total Amount: $19,717 |
| | Role: Principal Investigator |

| 2015 - 2013 | Title: Exploring Scholarly Discourse in MOOC Discussion Forums |
|---|---|
| | Granting Agency: **Penn State, Center for Online Innovation in Learning** |
| | Total Amount: $30,383 |
| | Role: Principal Investigator |

## Funded Projects, Grants, Commissions, and Contracts

2014 - 2010     Title: Broadband to Support SMEs in Pennsylvania
Granting Agency: **Commonwealth of Pennsylvania**
Total Amount: $500,000
Role: Faculty Investigator ($70,000)

2014 - 2010     Title: Semantic CiteSeerX
Granting Agency: **National Science Foundation**
Total Amount: $1,100,000
Role: Principal Investigator ($130,000)

2011 - 2008     Title: Affective and Cognitive Factors Affecting the Evaluation of Search Engines by Users
Granting Agency: **Google**
Amount: $50,000
Role: Principal Investigator

2011 - 2009     Title: Using Keyword Advertising for Economic and Workforce Development
Granting Agency: The **Pennsylvania State University**
Amount: $25,000
Role: Principal Investigator

2011 - 2010     Title: Toolkits for Deployable Best Practices
Granting Agency: **Office of Naval Research** STTR Phase II
Total Amount: $750,000
Role: Principal Investigator ($87,500)

2011 - 2010     Title: RAPID: Text Message-based Infrastructure for Emergency Response
Granting Agency: **National Science Foundation**
Total Amount: $75,000
Role: Principal Investigator ($15,000)

2009 - 2008     Title: Toolkits for Deployable Best Practices
Granting Agency: **Office of Naval Research** STTR Phase I
Total Amount: $100.000
Role: Principal Investigator ($15,000)

2009 - 2007     Title: REU Supplement for CRI: Collaborative: Next Generation CiteSeer
Granting Agency: **National Science Foundation**
Amount: $12,000
Role: Co-Principal Investigator ($12,000).

## Funded Projects, Grants, Commissions, and Contracts

2009 - 2006    Title: Synchronized Interactions Among Users, Systems, and Information
Granting Agency: **Air Force Research Lab**
Amount: $463,000
Role: Principal Investigator ($463,000).

2008 - 2005    Title: The Next Generation CiteSeer
Granting Agency: **National Science Foundation**
Amount: approximately $1,444,984
Role: Co-principal Investigator with Dr. Lee Giles, Dr. Susan Gauch, and Dr.
Jack Carroll
($48,701)

2009 - 2007    Title: Triggers in Collaborative Information Searching
Granting Agency: **National Science Foundation**
Amount: $76,000
Role: Co-principal Investigator with Dr. Madhu Reddy
($18,119)

2009 - 2008    Title: REU Supplement for Triggers in Collaborative Information Searching
Granting Agency: **National Science Foundation**
Amount: $12,000
Role: Co-principal Investigator with Dr. Madhu Reddy
($6,000)

2007 - 2006    Title: REU Supplement for CRI: Collaborative: Next Generation CiteSeer
Granting Agency: **National Science Foundation**
Amount: $9,000
Role: Co-Principal Investigator ($9,000).

2005 - 2004    Title: Design of Tools for Information Seeking, Management, and Analysis for
a Lessons Learned Knowledge System
Granting Agency: **US Marine Corps Research University**
Amount: $500,000
Role: Co-Principal Investigator ($83,957)

2005          Title: Knowledge Management
Granting Agency: **US. Department of Defense, Defense Threat Reduction
Agency (DTRA)**
Amount: $625,832
Role: Co-Principal Investigator ($18,439).

2006 - 2005    Title: REU Supplement for CRI: Collaborative: Next Generation CiteSeer
Granting Agency: **National Science Foundation**
Amount: $6,000
Role: Co-Principal Investigator ($6,000).

## Funded Projects, Grants, Commissions, and Contracts

| | |
|---|---|
| 1998 -1996 | Title: The use of software agents in information retrieval.<br>Granting Agency: **Army Research Laboratory**<br>Amount: $68,000<br>Role: Principal Investigator ($68,000) |
| 1998 | Title: Information searching on Web Search Engines<br>Granting Agency: **Army Research Laboratory**<br>Amount: $5,000<br>Role: Principal Investigator ($5,000) |
| 1997 | Title: Software agents for information retrieval.<br>Granting Agency: **Army Research Laboratory**<br>Amount: $5,000<br>Role: Principal Investigator ($5,000) |

## Software Developed

Software Development: Client-side Application for Automated Searching: that automates searching tactics via user implicit feedback.

Software Development: Application for Real-time Evaluation of Search Engine Performance: that automates the evaluation of Web search engines.

## Teaching

At *Hamad Bin Khalifa University* (Current – 2017), College of Science and Engineering, I developed ICT632 Advanced Applications of the Web and Internet, a course that I proposed and designed. A breath course, divided into eights modules, covering (a) web fundamentals, (b) ecommerce, (c) search, (d) social media, (e) cloud computing, (f) web analytics, (g) marketing analysis, and (h) mobile. An assignment due every week. 8 individual assignments. 7 team assignments. I designed the course so the students used the technologies they were studying.

At *The Pennsylvania State University* (2016 – 2002), I have taught a variety of information technology-related courses, including the undergraduate capstone project leadership course, the introductory freshman course, online marketing, graduate seminar course, and a graduate course on human information interaction. Additionally, I have mentored students in a variety of independent studies and have been on several course development committees.

At The Pennsylvania State University (2016 – 2002):

- Committee Lead, the curriculum development team for a college-level executive masters program.

## Teaching

- Committee Lead, curriculum development committee for re-design of the undergraduate senior-level capstone course.
- Committee Member, curriculum development team for re-design of the undergraduate freshmen level introductory course.
- Committee Member, the curriculum development team for the establishment of a university-wide Business Analytics minor
- Faculty Lead, the development team for the establishment of a university-wide professional library certification program
- Committee Member, the curriculum development team for the establishment of a college Entrepreneurship minor
- Course Development: (1) undergraduate capstone course in IT project management, (2) graduate course in information searching, (3) undergraduate course in keyword advertising, (4) graduate course in web analytics, (5) undergraduate course in entrepreneurship technology

2015 – Mentor for one team in the **Google Final 15 in The Google Online Marketing Challenge** for 2014. The team was in the top fifteen of 4,000 teams from around the world (top 0.4%).

Mentor for a team in the **Google Non-profit Challenge** for 2014. The teams were the top of more than 4,000 teams from around the world (top 0.4%).

2014 – Mentor for three teams in the **Global Final 15 in The Google Online Marketing Challenge** for 2013. The teams were in the top fifteen of 4,000 teams from around the world (top 0.4%).

Mentor for two teams in the **Google Media Marketing Challenge** for 2013. The teams were the top of more than 4,000 teams from around the world (top 0.4%).

2013 – Mentor for one team in the **Global Final 15 in The Google Online Marketing Challenge** for 2012. The team was in the top fifteen of more than 4,000 teams from around the world (top 0.4%).

2012 – Mentor for three teams in the **Global Final 15 in The Google Online Marketing Challenge** for 2011. The three teams were in the top fifteen from 4,000 teams from around the world (top 0.4%).

2010 – Mentor for two teams in the **Global Final 15 in The Google Online Marketing Challenge** for 2009. The two teams were in the top fifteen from 3,000+ teams from around the world (top 0.5%).

Had eight other teams get an honorable mention by placing in the Top 100 Global Teams and five other teams place in the Top 10% of all teams.

2010 – Mentor for two student teams that took 1st and 3rd in the **Penn State IdeaPitch Competition**, which is a university-wide Penn State entrepreneurship competition.

## Teaching

2009 – Mentor for three teams in the **Global Final 15 in The Google Online Marketing Challenge** for 2009. The three teams were in the top fifteen from 2,107 teams from around the world.

> Had seven other teams get an honorable mention by placing in the top 50 teams in the Americas region.

2009 - **Schreyer Honors College Teaching Grant** Recipient for developing multi-disciplinary keyword advertising, marketing, and technology course.

2008 – Mentor for the **winning team in the Americas region in The Google Online Marketing Challenge for 2008**. One of the top four teams from 1,620 teams from around the world. Won a trip to the GooglePlex with the students, plus the students all won laptops.

> Had two other teams get an honorable mention by placing in the top 50 teams in the Americas region.

2008 – Selected as **Faculty Marshall** by Student Marshall of Computer Science and Engineering Department, College of Engineering, The Pennsylvania State University as the faculty member who had the most significant impact on student's academic career

2008 – **Professor of the Year nominee** for College of Information Sciences and Technology, The Pennsylvania State University, 16802

2003 Selected as **Faculty Marshall** by Student Marshall of School of Information Sciences and Technology, The Pennsylvania State University as a faculty member who had the most significant impact on student's academic career

Guest lecturer for a month (2000) at the *Korean Military Academy* in Seoul, Republic of Korea.

At the *University of Maryland* (Asian Division) (2000 – 1999), taught courses on Web/Internet and multimedia design.

At the *United States Military Academy* (1999 – 1996), I taught several computer science-related courses, including introductory programming, advanced programming, micro-computing, and databases. Also, mentored students in a variety of independent studies.

> As an executive officer for the department (1999 – mid-1997), was responsible for course scheduling, instructor assignments, classroom allocation, student counseling, as well as many other duties concerning the day-to-day operation of the department.

## Membership on Degree Committees

Hamad Bin Khalifa University

## Membership on Degree Committees

The College of Science and Engineering

### Chair or Co-Chair

Kholoud Aldous (Committee Chair) (PhD. degree expected in 2022)
Hind Almerekhi (Committee Chair) (PhD. degree expected in 2022)
Haya Al-Thani (Committee Chair) (PhD. degree expected in 2022)
Hasan Al Sammarraie (Committee Chair) (PhD. degree expected in 2022)
Omar Shafie (Committee Chair) (MS degree conferred in 2021)
Noora Alemad (Committee Chair) (MS degree conferred in 2020)
Omar Ibrahim (Committee Chair) (MS degree conferred in 2018)

### Committee Member

Aljazi Nasseer Aljabor (Committee Member) (MS degree expected in 2021)
Ameema Zainab (Committee Member) (MS degree conferred in 2018)
Aqsa Nazir (Committee Member) (MS degree conferred in 2018)


Qatar University
Department of Computer Science & Engineering

### Committee Member

Maram Ghanem Hasanain     (Committee Member) (PhD. degree expected in 2021)
Marwa Essam          (Committee Member) (PhD. degree expected in 2022)


The Pennsylvania State University
College of Information Sciences and Technology

### Chair or Co-Chair

Partha Mukherjee (Committee Chair) (PhD degree conferred in 2016)
Alex Brown (Committee Chair) (MS degree conferred in 2016)
Zhe Liu (Committee Chair) (PhD degree conferred in 2014)
Dan Coughlin (Committee Chair) (PhD degree conferred in 2014)
Carolyn Hafernik (Committee Chair) (MS degree conferred in 2013)
Adan Ortiz-Cordova (Committee Chair) (MS degree conferred in 2013)
Jian-Syuan Wong (Committee Chair [until 2016]) (PhD degree conferred in 2018)
Steve Carmen (Committee Chair [until 2013]) (MS degree conferred in 2013)
Kathleen Moore (Committee Chair [until 2012]) (PhD degree conferred in 2015)
Mimi Zhang (Committee Chair) (PhD degree conferred in 2010)
Mike Hills (Committee Chair) (PhD degree conferred in 2010)
Hyun-Woo Kim (Committee Co-Chair) (MS degree conferred in 2010)
Young Shin Kim (Committee Co-Chair) (MS degree conferred in 2010)

### Committee Member

Eric McMillan (Committee Member) (PhD degree expected in 2017)
Nathan McNeese (Committee Member) (PhD degree conferred in 2014)
Patricia Spence (Committee Member) (PhD degree conferred in 2013)
Arvind Karunakaran (Committee Member) (MS degree conferred in 2011)
Yusuf Raza (Committee Member) (MS degree conferred in 2009)

## Membership on Degree Committees

        Sharoda Paul (Committee Member) (PhD degree conferred in 2009)
        Allison Morgan (Committee Member) (PhD degree conferred in 2008)
        Mithu Bhattacharya (Candidacy Committee Member, 2005)
        Scott Robertson (Candidacy Committee Chair, 2004)

The Pennsylvania State University
   Workforce Education and Development Program, College of Education
      John Dolan (Committee Co-Chair [until 2012]) (PhD degree expected in 2013)

The Pennsylvania State University
   School of Hospitality and Management
      Lu Zhang (Committee Co-Chair) (MS degree conferred in 2009)

The Pennsylvania State University
   Department of Industrial and Manufacturing Engineering
      Himanshu Sharma (Committee Chair) (MS degree conferred in 2005)
      Sourav Sengupta (Committee Chair) (MS degree conferred in 2005)
      Ying Zhang (Committee Chair) (MS degree conferred in 2008)

The Pennsylvania State University
   Department of Electrical Engineering
        Vijay Mohan (Committee Co-Chair) (MS degree conferred in 2009)
        Dheepak Ramaswamy (Committee Co-Chair) (MS degree conferred in 2009)
        Ashish Kathuria (Committee Chair) (MS degree conferred in 2007)

The Pennsylvania State University
   Department of Computer Science and Engineering
        Yanjun Gao (Committee co-Chair)[until 2017](PhD degree expected in 2018)
        Chandrika Gopalakrishna (Committee Chair) (MS degree conferred in 2008)

The University of Pittsburgh
   School of Information Sciences
   Department of Library and Information Science
      Zhen Yue (Committee Member) (Ph.D. degree conferred in 2014)
      Minsoo Park (Committee Member) (Ph.D. degree conferred in 2008)

Rutgers, the State University of New Jersey
   School of Communication, Information and Library Studies
        Yuelin Lee (Committee Member) (Ph.D. degree conferred in 2008)

The Pennsylvania State University
   Schreyer Honors College, thesis advising
        Megan Krause (B.S. degree conferred 2107)
        Allie Whitman (B.S. degree conferred 2106)
        Adan Ortiz-Cordova (B.S. degree conferred 2011)
        Bradley Shively (B.S. degree conferred 2010)
        Kate Sobel (B.S. degree conferred 2010)
        Steven Troxell (B.S. degree conferred in 2008)
        Steven Clancy (B.S. degree conferred in 2007)

## Membership on Degree Committees

Paulo Molina (B.S. degree conferred in 2004)
Chris Catalano (B.S. degree conferred in 2004)
Andy Shingle (B.S. degree conferred in 2004)

## Supervision of Other Undergraduate Research

| Student | Degree | Major | University | Role |
|---|---|---|---|---|
| Arielle Amchin | BS | Marketing | Penn State | Research Mentor |
| Arun Das | BS | CS | Brown University | Research Mentor |
| Manisha Dareddy | BS | MIS | Carnegie Mellon Qatar | Research Mentor |
| Satyajit Narayanan | BS | CS | Bharati Vidyapeeth University | Research Mentor |
| Will Berkheiser | BS | IST | Penn State | Work-Study Mentor http://studentaid.psu.edu/types-of-aid/work-study-and-employment/work-study/about |
| Pat Bonner | BS | IST | Penn State | Research Mentor |
| Danielle Booth | BS | IST | Penn State | Research Mentor |
| Anna Brown | BS | IST | Penn State | Research Mentor |
| Nicole Butera | BS | Chemistry | Penn State | Women in Science and Engineering Research (WISER) Mentor http://pa.spacegrant.org/wiser |
| Chris Ciamacca | BS | IST | Penn State | Research Mentor |
| Karen Lee | BS | IST | Penn State | Research Mentor |
| Dana Kracow | BS | IST | Penn State | Research Mentor |
| Daehee Park | BS | IST | Penn State | Research Mentor |
| Melissa Reizner | BS | IST | Penn State | Research Mentor |
| Mitchell Rukat | BS | IST | Penn State | Research Mentor |
| Paul Rinaldi | BS | IST | Penn State | Research Mentor |
| Simone Schuster | BS | Advertising | Penn State | Research Mentor |
| Laura Solomon | BS | Advertising | Penn State | Research Mentor |
| Meng Ting Sun | BS | Accounting | Penn State | Research Mentor |
| Pete Smith | BS | IST | Penn State | Research Mentor |
| Megan Tan | BS | Marketing | Penn State | Research Mentor |
| Courtney Weaver | BS | IST | Penn State | Research Mentor |

## Professional Service

### Editorial Boards

| | |
|---|---|
| Current – 2016 | Editor-in-chief, Information Processing & Management (Elsevier) |
| Current – 2016 | Editorial Board Member, Information Discovery and Delivery |
| Current – 2012 | Editorial Advisory Board Member, Social Networks |
| Current – 2011 | Editorial Advisory Board Member, International Journal of Electronic Business |
| Current – 2009 | Editorial Advisory Board Member, Future Internet |
| Current – 2006 | Editorial Panel, International Journal of Internet Science |
| Current – 2006 | Editorial Advisory Board Member, Information Research |
| Current – 2004 | Editorial Advisory Board Member, Information Processing & Management |
| 2021 – 2009 | Editorial Advisory Board Member, Journal of the American Society for Information Science and Technology |
| 2016 – 2011 | Editor-in-chief, Internet Research (Emerald) |
| 2011 - 2004 | Editorial Advisory Board Member, Journal of Internet Research |
| 2010 - 2004 | Editorial Advisory Board Member, Library and Information Science Journal |
| 2008 - 2004 | Associate Editor (Book Reviews), Information Processing & Management |
| 1996 –1998 | Student Editor, SIG Computer Human Interaction SIGCHI Bulletin |

## Professional Service

### Tenure Letters

| | |
|---|---|
| 2022 | External Promotion Letter Writer for faculty member of Department of Software Engineering at The Hashemite University, Jordan |
| 2021 | External Promotion Letter Writer for faculty member of College of Information Sciences and Technology, Management, The Pennsylvania State University, USA |
| 2021 | External Tenure Letter Writer for faculty member of Black School of Business, Behrend College, The Pennsylvania State University, USA |
| 2020 | External Promotion Letter Writer for faculty member of Department of Information Management, Peking University, China |

## Professional Service

### Tenure Letters

2019 External Promotion Letter Writer for faculty member of Department of Computer Information Systems, Jordan University of Science and Technology

2019 External Promotion Letter Writer for faculty member of Department of Computer Information Systems, Jordan University of Science and Technology

2018 External Promotion Letter Writer for faculty member of Department of Computer Information Systems, Jordan University of Science and Technology

2017 External Promotion Letter Writer for faculty member of School of Information Studies, McGill University

2017 External Promotion Letter Writer for faculty member of Department of Computer Information Systems, Jordan University of Science and Technology

2017 External Promotion Letter Writer for faculty member of Department of Computer Information Systems, Jordan University of Science and Technology

2016 External Promotion Letter Writer for faculty member of School of Information Sciences, University of Pittsburgh

2016 External Promotion Letter Writer for faculty member of School of Business, McMaster University

2016 External Tenure Letter Writer for faculty member of Department of Library and Information Science, The Catholic University of America

2015 External Tenure Letter Writer for faculty member of School of Communication and Information, Rutgers University

2013 External Tenure Letter Writer for faculty member of College of Information Science and Technology, Drexel University

2013 External Tenure Letter Writer for faculty member of Graduate School of Management, University of Haifa

2012 External Tenure Letter Writer for faculty member of Faculty of Social Sciences, Bar-Ilan University

2012 External Tenure Letter Writer for faculty member of Henry B. Tippie College of Business, The University of Iowa

2012 External Tenure Letter Writer for faculty member of School of Business, North Carolina Central University

2010 External Tenure Letter Writer for faculty member of School of Business Administration, Bar Ilan University, Israel

## Professional Service

### Tenure Letters
2009    External Tenure Letter Writer for faculty member of Computer Information Systems Department, Bentley University

## Professional Service

### Ad hoc Reviewing

2022    Reviewer, Journal of Transport Geography, Human Factors in Healthcare, Computers in Human Behavior Reports, Expert Systems With Applications, Journal of Consumer Policy, Designing Interactive Systems (DIS2022)

2021    Reviewer, Applied Ergonomics, International Journal of Human-Computer Studies, Personality and Individual Differences, International Journal of Human-Computer Interaction, ACM Transactions on the Web, Computers in Human Behavior Reports, Expert Systems With Applications, International Journal of Human - Computer Studies, ACM CHI Conference on Human Factors in Computing Systems (CHI2022)

2020    Reviewer, Journal of Retailing and Consumer Services, International Conference on Human-Computer Interaction (HCII2020), International Journal of Human-Computer Interaction, ACM CHI Conference on Human Factors in Computing Systems (CHI2021)

2019    Reviewer, International Journal of Electronic Commerce, ACM CHI Conference on Human Factors in Computing Systems (CHI2020)

2018    Reviewer, Electronic Commerce Research, ACM CHI Conference on Human Factors in Computing Systems (CHI2019)

2017    Reviewer, PLOS ONE, Journal of Strategy and Management (2x), Journal of the Association for Information Science and Technology, Electronic Commerce Research, Journal of Research in Interactive Marketing, ACM CHI Conference on Human Factors in Computing Systems (CHI2018)

2016    Reviewer, IEEE Systems, Man and Cybernetics, Computers in Human Behavior, International Journal of Human Computer Interaction, Cornell Hospitality Review

2015    Reviewer, Transactions on Intelligent Systems and Technology, Journal of Organizational Computing and Electronic Commerce, European Journal of Marketing, Journal of Information Management, Transactions on Management Information Systems

2014    Reviewer, MIS Quarterly, Journal of Organizational Computing and Electronic Commerce, Computers in Human Behavior, Journal of Documentation, IEEE Systems, Man and Cybernetics, Tourism Management

## Professional Service

### Ad hoc Reviewing

2013  Reviewer, Technological Forecasting & Social Change, IEEE Systems, Man and Cybernetics, International Journal of Electronic Commerce, ACM Transactions on the Web, Journal of Interactive Marketing, Journal of Electronic Commerce Research (2x), Electronic Commerce Research, Communications of the Association for Information Systems, ACM Transactions on Computer-Human Interaction, Information Research, Information and Management

2012  Reviewer, Electronic Commerce Research, International Journal of Information Management, Journal of Information Science, Communication Research, International Journal of Internet Science, Journal of Organizational Computing and Electronic Commerce, Social Science Computer Review, Information Research, MIS Quarterly, Journal of Organizational Computing and Electronic Commerce, Library and Information Science, IEEE Transactions on Multimedia, Advances in Human-Computer Interaction (2x), Journal of Theoretical and Applied Electronic Commerce Research (3x), ACM Transactions on Computer-Human Interaction

2011  Reviewer, IEEE Transactions on Multimedia, Information Technology and People, Journal of Computer-Mediated Communication (2x), Sage Publishing, Electronic Commerce Research, International Journal of Electronic Commerce, Journal of Interactive Marketing (2x), ACM Transactions on the Web, ACM Transactions on Computer-Human Interaction

2010  Reviewer, International Journal of Information Management (2x), ACM Transactions on the Web, Social Science Computing Review, MIS Quarterly, International Journal of Human-Computer Studies, PLoS One, Information Research, Netherlands Organisation for Scientific Research, Computing Surveys, Information Sciences, Future Internet, International Information and Library Review, International Journal of Internet Science, Behaviour & Information Technology, Journal of Media Economics

**Reviewer Award**

2010  Outstanding Reviewer for the Year, Internet Research

2009  Reviewer, The Computer Journal, ACM Transactions on the Web, International Journal of Electronic Commerce, Data & Knowledge Engineering Journal, ACM Transactions on Information Systems

2008  Reviewer, Journal of the Academy of Marketing Science, ACM Transactions on the Web, ACM Transactions on Information Systems, Decision Support Systems, New Media & Society, IEEE Internet Computing, Journal of Service Science and Management, IEEE Transactions on Professional Communication, International Journal of Knowledge Management Studies

2007  Reviewer, Simulation Modelling Practice and Theory, ACM Transactions on Information Systems

2006  Reviewer, Journal of Information Science, ACM Transactions on Information Systems

**App. 216**

## Professional Service

### Ad hoc Reviewing
2005    Reviewer, Journal of Medical Internet Research, ACM Transactions on Information Systems

2005    Reviewer, IEEE Systems, Man and Cybernetics Journal, Computer Networks Journal

2004    Reviewer, Information Retrieval, Information Processing & Management, Journal of Web Engineering, Journal of Library & Information Science Research

2003    Reviewer, IEEE Proceedings-Software, Information Processing & Management

2002    Reviewer, Journal of Informing Science, Information Processing & Management, The World Wide Web Journal

2001    Reviewer, International Journal of Human Computer Studies, Information Processing & Management

1999    Reviewer, Information Processing & Management

1998    Reviewer, Computer Science Education Journal, Information Processing & Management


## Professional Service

### Grant Reviewing
2015    Reviewer, Qatar Research Program, Qatar Foundation

2014    Reviewer, grant panelist for National Science Foundation, CISE Research Infrastructure (CRI) program February 2014.

2013    Reviewer for grant proposal for Reviewer, American Association for the Advancement of Science (AAAS) Research Competitiveness Program Grant Proposal for funding through the Maine Technology Institute's Development Awards

2012    Reviewer, Army Research Lab Grant Proposal

2011    Reviewer, National Science Foundation Grant Proposal

2011    Reviewer, American Association for the Advancement of Science (AAAS) Research Competitiveness Program Grant Proposal for funding through the Maine Technology Institute's Development Awards

2010    Reviewer, Standard Research Grants program of the Social Sciences and Humanities Research Council of Canada (SSHRC) Grant Proposal

## Professional Service

### Grant Reviewing

2010   Reviewer for grant proposal for Reviewer, American Association for the Advancement of Science (AAAS) Research Competitiveness Program Grant Proposal for funding through the Maine Technology Institute's Development Awards

2008   Reviewer, Israel Science Foundation Grant Proposal

2007   Reviewer, Air Force Office of Scientific Research Grant Proposal

2007   Reviewer, Israel Science Foundation Grant Proposal

2004   Grant Reviewer, Arts and Humanities Research Board Grant Proposal, Whitefairs, Lewins Mead, Bristol, UK, BS1 2AE

## Professional Service

### Other

2016   Special Issue on Computational Advertising, IEEE Intelligent Systems. Guest Editors: Yanwu Yang, Huazhong University of Science and Technology, China; Yinghui Yang, University of California, Davis, US; Bernard J. Jansen, Qatar Computing Research Institute, HBKU; Mounia Lalmas, Yahoo Labs, UK.

2016 – 2007   Academic Panelist for The Google Online Marketing Challenge (http://www.google.com/onlinechallenge/). Based on registrations from more than 100 countries and more than 11,000 student teams, the Challenge may be the largest, worldwide educational course ever done.

2015   External Examiner for Spanish PhD thesis (Universitat Pompeu Fabra Barcelona)

2014 – 2013   Faculty Advisor for the Penn State Digital Marketing Association

2012   External Examiner for Australian PhD thesis (Queensland University of Technology)

2012 - 2011   Member, Research Committee, Search Engine Marketing Professional Organization (SEMPO)

2011 – 2009   Chair of the American Society for Information Science and Technology (ASIST) Information Science Education Committee

2010   Reviewer, Cambridge University Press book proposal

2010   Reviewer, Cambridge University Press book proposal

2010   External Examiner for Australian PhD thesis (University of Sydney)

## Professional Service

**Other**

2009 – 2006    Chair of the American Society for Information Science and Technology (ASIST) Information Science Education Committee Dissertation Jury

2008    External Examiner for Australian PhD thesis (The University of New South Wales)

2008    External Examiner for Australian PhD thesis (The University of New South Wales)

2008    Guest Editor, International Journal of Electronic Business (IJEB). Special Issue on Sponsored Search

2007    External Examiner for Australian PhD thesis (Monash University)

2007    Guest Editor, with Andy Edmond, Kirstie Hawkey, Melanie Kellar, and Don Turnbull. Journal of Web Engineering. Special Issue on Logging Traces of Web Activity

2006    Guest Editor, Bulletin of the American Society for Information Science and Technology. Special Issue on Paid Search, January 2006

1995 -1994    President, Computer Science Graduate Students Association, Texas A&M University, College Station, Texas.

## Professional Service

**Conference Activities**

2022    Reviewer, ACM CHI Conference on Human Factors in Computing Systems (CHI2022), New Orleans, USA, 30 April - 6 May 2022.

2021    Reviewer, 2021 International Conference on INnovations in Intelligent SysTems and Applications (INISTA2021) Kocaeli, Turkey, 25-27 August 2021.

2021    Reviewer, 84th Annual Meeting of the Association of Information Science and Technology (ASIST 2020), Salt Lake City, UT, 23-28 October.

2021    Program Committee, The 8th International Conference on Behavioral and Social Computing (BESC 2021), Doha, Qatar, 9-11 Nov 2021.

2021    Conference Chair, 84th Annual Meeting of the Association of Information Science and Technology (ASIST 2020), Salt Lake City, UT, 23-28 October.

2021    Conference Chair, Program Chair, 2021 International Conference on Cognitive based Information Processing and Applications (CIPA2021), Huainan, China. 19-20 July, 2021.

2020    Program Committee, 83rd Annual Meeting of the Association of Information Science and Technology (ASIST 2020), Pittsburgh, PA, USA, 23-28 October.

## Professional Service

### Conference Activities

2020  Best Paper Selection Committee, 2020 Human Information Interaction and Retrieval (CHIIR2020), 14–18 March, 2020, Vancouver, British Columbia, Canada.

2019  Program Committee, Program Committee, ACM SIGIR Workshop on eCommerce (SIGIR eCom'19), Paris, France. 21-25 July.

2019  Program Committee, 82nd Annual Meeting of the Association of Information Science and Technology (ASIST 2019), Melbourne, Australia, 19-23 October.

2019  Conference Chair, The Sixth International Conference on Social Networks Analysis, Management and Security(SNAMS-2019), Granada, Spain. October 22-25, 2019.

2018  Conference Chair, The Fifth International Conference on Social Networks Analysis, Management and Security(SNAMS-2019), Granada, Spain. October 15-18, 2018.

2018  Program Committee, 81st Annual Meeting of the Association of Information Science and Technology (ASIST 2018), Vancouver, Canada, 10-14 November.

2017  Reviewer, Papers and Posters, 80th Annual Meeting of the American Society for Information Science and Technology (ASIST 2017). Washington, D.C. 27 October-! November.

2016  Chair, Program Committee, The Second International Workshop on Online Social Networks Technologies (OSNT-2016), 13th ACS/IEEE International Conference on Computer Systems and Applications AICCSA 2016. 29 November - 2 December.

2016  Chair, Program Committee, The Third International Workshop on Social Networks Analysis, Management and Security (SNAMS - 2016), The 4th International Conference on Future Internet of Things and Cloud (FiCloud-2016), Vienna, Austria. 22-24 August.

2016  Reviewer, Papers and Posters, 79th Annual Meeting of the American Society for Information Science and Technology (ASIST 2016). Copenhagen, Denmark. 14-18 October.

2015  Program Committee, 7th International Joint Conference on Knowledge Discovery, Knowledge Engineering and Knowledge Management, Lisbon, Portugal. 12-14 Nov.

2015  Meta-Reviewer, Papers and Posters, 78th Annual Meeting of the American Society for Information Science and Technology (ASIST 2015). St. Louis, Mo. 6-10 November.

2015  Reviewer, ACM CHI Conference on Human Factors in Computing Systems, Seoul, South Korea. 18-23 April.

2014  Reviewer, Papers and Posters, 77th Annual Meeting of the American Society for Information Science and Technology (ASIST 2014). Montreal, Canada. 31 October-4 November.

**App. 220**

## Professional Service

### Conference Activities

2014    Program Committee: 3rd International Information Systems for Crisis Response and Management Conference (ISCRAM 2014), State College, PA. May 2014.

2014    Reviewer, ACM CHI Conference on Human Factors in Computing Systems, Toronto, Canada. 26 April – 1 May.

2013    Reviewer, Papers, 76th Annual Meeting of the American Society for Information Science and Technology (ASIST 2013). Montreal, Canada. 1-6 November.

2013    Reviewer, Posters, 76th Annual Meeting of the American Society for Information Science and Technology (ASIST 2013). Montreal, Canada. 1-6 November.

2013    Reviewer, 22nd International World Wide Web Conference (WWW 2013). 13th-17th, May, Rio de Janeiro, Brazil.

2013    Program Committee: European Conference on Information Retrieval (ECIR 2013) Workshop on Group Membership and Search (GRUMPS), 24 March, Moscow, Russia

2013    Program Committee: Sixth ACM WSDM Conference on Web Search and Data Mining Workshop on Web Search Click Data, 4-8 February, Rome, Italy.

2012    Program Committee: Fourth Information Interaction in Context Conference (IIiX 2012), Nijmegen, the Netherlands, 21-24 August 2012.

2011    Session Track Chair, 74th Annual Meeting of the American Society for Information Science and Technology (ASIST 2011). 9-13 October. New Orleans, LA.

2011    Program Committee, iConference. Toronto, Canada, 7-10 February.

2011    Program Committee: 33rd European Conference on Information Retrieval (ECIR 2011), Best Paper Committee, Dublin, Ireland, 19-21 April 2011

2011    Program Committee: 33rd European Conference on Information Retrieval (ECIR 2011), Workshop on Information Retrieval Over Query Sessions, Dublin, Ireland, 19-21 April 2011.

2011    Program Committee: 12th ACM Conference on Electronic Commerce (EC11). San Jose, CA. 5-9 June.

2011    Program Committee: Conference on Multilingual and Multimodal Information Access Evaluation (CLEF 2011). Amsterdam, the Netherlands, 19-22 September 2011.

2011    Program Committee: 33rd European Conference on Information Retrieval (ECIR 2011). Dublin, Ireland. 18-21 April.

2010    Program Committee, American Society for Information Science and Technology Annual Meeting 2010. Pittsburgh, PA. 22-27 October.

## Professional Service

### Conference Activities

2010   Program Committee: Conference on Multilingual and Multimodal Information Access Evaluation (CLEF 2010). Padua, Italy, 20-23 September.

2010   Program Committee: LREC 2010 Workshop on Web Logs and Question Answering (WLQA2010). Malta, 22 May.

2010   Program Committee: 32st European Conference on Information Retrieval (ECIR 2010). Keynes, UK. 28-31 March.

2009   Program Committee: Web Information and Data Management. 19th International Conference on Information and Knowledge Management (CIKM 2009). Hong Kong. 6 November.

2009   Program Committee: Workshop on the Analysis of System Logs. 22nd ACM Symposium on Operating Systems Principles. Big Sky, MT.14 October.

2009   Program Committee: Collaborative Information Behavior. GROUP 2000. Sanibel Island, Florida. 10 May.

2009   Program Committee: Qualitative and Quantitative Methods in Libraries International Conference (QQML2009). Chania, Crete, Greece, 26-29 May.

2009   Program Committee: 31st European Conference on Information Retrieval (ECIR 2009). Toulouse, France. 6-9 April.

2009   Reviewer, ACM Conference on Computer Human Interaction 2009 (CHI 2009), Boston, MA, 4 – 9 April.

2008   Reviewer, 18th Conference on Information and Knowledge Management (CIKM 2008). Napa Valley, California. 26-30 October.

2008   Program Committee: Workshop on Human-Computer Interaction and Information Retrieval (HCIR 2008). Redmond, Washington.23 October.

2008   Program Committee: 1st Information Interaction in Context Symposium (IiiX 2008). London, United Kingdom. 14-17 October.

2008   Program Committee: 2008 Ad Auctions Workshop. ACM Conference on Electronic Commerce in Chicago, IL. 8-9 July.

2008   Reviewer, Southern Association for Information Systems Conference (SAIC 2008), Richmond, VA, USA 13–15 March.

2007   Program Committee, IEEE International Conference on Intelligence and Security Informatics 2007 (ISI 2007), New Brunswick, New Jersey. 23-24 May, 2007

2007   Reviewer, Graphics Interface 2007, Montréal, Canada, 28 – 30 May 2007.

## Professional Service

### Conference Activities

2007  Reviewer, American Society for Information Science and Technology Annual Meeting 2007. Milwaukee, Wisconsin. 18-25 October.

2007  Program Committee, 8th World Congress on the Management of eBusiness. Toronto, Canada. 11-13 July.

2007  Program Committee, WWW'07 Workshop on Query Log Analysis: Social and Technological Challenges. World Wide Web 2007, Banff, Alberta, Canada. 8 May.

2007  Program Committee, WWW'07 Workshop on Sponsored Search. World Wide Web 2007, Banff, Alberta, Canada. 8 May.

2007  Program Committee, Chi'07 Workshop on Exploratory Search and HCI: Designing and Evaluating Interfaces to Support Exploratory Search Interaction. ACM CHI2005, Conference on Human Factors in Computing Systems (CHI'07), San Jose, CA. 29 April 2007.

2007  Program Committee, IEEE Intelligence and Security Informatics Conference (ISI 2007), New Brunswick, NJ. 23 – 24 May, 2007.

2006  Program Committee: 2006 Research Symposium of the Special Interest Group on Human-Computer Interaction. American Society for Information Science and Technology. Austin, Texas. 5 November 5, 2006

2006  Reviewer, Hawaii International Conference on System Sciences 2007. Waikoloa, Big Island, Hawaii. 3-6 January, 2007.

2006  Program Committee: IEEE Information Technology: New Generations (ITNG) 2006, Las Vegas, NV. 16 -19 April 2007.

2006  Reviewer for SIGIR 2006 Workshop on Evaluating Exploratory Search Systems. The 29th Annual International ACM SIGIR Conference on Research & Development on Information Retrieval (SIGIR2006). 6-11 August. Seattle, Washington.

2006  Program Committee: 4th International Conference on Information Technology: New Generations, 16-19 April, 2007, Las Vegas, Nevada.

2006  Program Committee: 1st Information Interaction in Context Symposium (IiiX symposium). Copenhagen, Denmark. 18-20 October 2006.

2006  Program Committee: IEEE Information Technology: New Generations (ITNG) 2006, Las Vegas, NV. 10 – 12 April 2006.

2006  Reviewer, The Fourth Annual Pre-ICIS Workshop on HCI Research in MIS, International Conference on Information Systems, 2005.

App. 223

## Professional Service

### Conference Activities

2006   Reviewer, Human Factors and Ergonomics Society 49th Annual Meeting, 2005.

2006   Program Committee: IEEE 6th International Conference on Information Technology, Coding and Computing. Las Vegas, Nevada. 5-7 April 2005.

2006   Program Committee: the 5th International Conference on Conceptions of Library and Information Science, Glasgow, Scotland, 6-9 June 2005.

2006- 2002   Reviewer, ACM SIGIR International Conference on Information Retrieval.

2006   Session Track Co-chair, Web Searching Sessions (Three tracks), the IEEE 5th International Conference on Information Technology, Coding and Computing. Las Vegas, Nevada. 4-6 April 2005.

2005   Program Committee, IEEE 6th International Conference on Information Technology, Coding and Computing. Las Vegas, Nevada. 5-7 April, 2005.

2005   Program Committee, the 5th International Conference on Conceptions of Library and Information Science, Glasgow, Scotland, 6-9 June 2005.

2004   Session Track Co-chair, Web Searching Sessions (Three tracks), the IEEE 5th International Conference on Information Technology, Coding and Computing. Las Vegas, Nevada. 5-7 April, 2004.

2004   Reviewer, ACM CHI2005, Conference on Human Factors in Computing Systems

1998   Session Moderator, New Engineering Educators Conference, June 1998, Seattle, Washington.

1998   Co-organizer for ACM Computer Science Education Research Competition, February 1998, Atlanta, Georgia.

1998   Reviewer, New Engineering Educators Conference

1998   Reviewer, American Society for Engineering Education National Conference

1997   Session Moderator for American Society for Engineering Education National Conference, June 1997, Milwaukee, Wisconsin.

## Advisory Boards

2016 - 2012        CLAK Impressions http://www.linkedin.com/company/clak-impressions

2016 - 2010        The Pennsylvania Technical Assistance Program (PennTAP), http://penntap.psu.edu/action-council/

App. 224

## Advisory Boards

| | |
|---|---|
| 2016 - 2010 | Innoblue, http://innoblue.org/ |
| 2016 - 2007 | Global Academic Panel, Google Online Marketing Challenge, http://www.google.com/onlinechallenge/discover/judging-panel.html |
| 2012 - 2010 | Chief Marketing Officer (CMO Council) Advisory Board for research initiative, Localize to Optimize Sales Channel Effectiveness |
| 2012 - 2010 | Jabbit Board of Advisors, http://www.jabbit.com/ |

## Invited Talks (Selected)

Presentation, Invited Speaker R15E: A Computer Science Convention The Tech World with Big Data Analytics, EU Tech ACM Student Chapter, a student chapter from the Philippines, 28 June 2022

Presentation, Invited Lecture Series, Nanjing University of Finance and Economics, Nanjing, China, 11 March 2022.

Interdisciplinary Editor's Talks, Smart Tourism Education Platform, Kyung Hee University, Seoul, South Korea, 25 February 2022.

Presentation, Invited Lecture Series, Changzhou Vocational Institute of Mechatronic Technology, Changzhou, China, 15 December 2021.

Presentation, Invited Lecture Series, Oriental University, Indore, India, 6 September 2021.

**Keynote** Presentation, Invited Lecture Series, Shanghai University of Finance and Economics, Shanghai, China, 31 August 2021.

**Keynote** Keynote, 2021 International Conference on INnovations in Intelligent SysTems and Applications (INISTA2021) Kocaeli, Turkey, 25-27 August 2021.

**Keynote** Keynote, 2021 International Conference on Cognitive based Information Processing and Applications (CIPA2021), 21 August 2021, Huainan, China.

Keynote, Information Management Symposium, School of Information Management, Peking University, Peking, China, 18 June 2021.

**Keynote** Presentation, Invited Lecture Series, School of Information Management, Nanjing University, Nanjing, China, 3 June 2021.

Keynote, 2021 International Conference on Cyber Security Intelligence and Analytics (CSIA2021), Shenyang, China, 19-20 March 2021.

## Invited Talks (Selected)

Presentation, Smart Tourism Colloquial Series Spring 2021, Kyung Hee University, Seoul, South Korea. 5 March 2021

**Keynote**  Keynote, The 2020 International Conference on Progress in Informatics and Computing (PIC-2020), 19 December, 2020, Shanghai University of Finance and Economics, Shanghai China

**Keynote**  Keynote, ASIS&T Asia-Pacific Regional Conference 2020, 12 December 2020, Wuhan University, Wuhan, China

**Keynote**  Keynote, Shanghai University of Finance and Economics, 19 August 2020, Shanghai China.

Presentation, School of Convergence and Department of Interaction Science, Sungkyunkwan University (SKKU), 24 February 2020, Seoul, South Korea

Presentation, School of Economics and Management, Fuzhou University, 12 Oct. 2019, Fuzhou, China

Presentation, School of Science – Computer Science and Information Technology, RMIT University, 23 Oct. 2019, Melbourne Australia

Presentation, Business School, Nanjing University of Science and Technology, 26 Sept. 2019, Nanjing, China

Presentation, School of Economics & Management, Nanjing University, Social Informatics and Human Computing Workshop 2019, 23 Sept. 2019, Nanjing, China

**Keynote**  Keynote, Business School, Nankai University, Symposium on Interaction and Information Behavior, 14 May 2019, Tianjin, China.

Presentation, School of Information Management, Wuhan University, Wuhan China. 17 April 2019

Presentation, School of Management, Huazhong University of Science & Technology, Wuhan, China, 15 April 2019

**Keynote**  Keynote, Trademetrics 2019, Universitat Politècnica de València (UPV), València, Spain, 6 May 2019.

Presentation, The 5th PBRU International Conference, Sciences and Health Science Panel, 2-6 December 2018, Phetchabur, Thailand

**Keynote**  Keynote, 2016 Sixth National Doctoral Forum of Information Science, 7-18 July 2016, Tianjin, China.
http://jimjansen.blogspot.qa/2016/07/keynote-speaker-at-2016-sixth-national.html

**Keynote**  Keynote, The 7th International IEEE on Information and Communication Systems (ICICS 2016), 5-7 April, Irbid, Jordan.

**Keynote**

### Invited Talks (Selected)

**Keynote**  Keynote, The 10th International ACM Conference on Ubiquitous Information Management and Communication (IMCOM 2016), 4-6 January, Danang, Vietnam.
http://jimjansen.blogspot.ga/2015/12/imcom-2016-keynote-transformed-role-of.html

Presentation, Sungkyunkwan University (Sowan Campus), 23 April 2015, Seoul, South Korea. http://jimjansen.blogspot.com/2015/04/visit-to-department-of-interaction.html

Presentation, National Research University Higher School of Economics, 10 March 2014, St. Petersburg, Russia
http://jimjansen.blogspot.com/2014/03/presentation-at-national-research.html

Presentation, Yandex, 11 March 2014, St. Petersburg Russia.
http://jimjansen.blogspot.com/2014/03/visit-to-yandex-headquarters-in-st.html

Presentation, Sungkyunkwan University (Sowan Campus), 20-21 June 2013, Seoul, South Korea.
http://jimjansen.blogspot.com/2013/06/research-workshop-discussion-on-web.html

Presentation, Library and Information Science Department and College of Information and Media, Duksung Women's College, 19 June 2013, Seoul, South Korea.
http://jimjansen.blogspot.com/2013/06/theoretical-constructs-of-searching-and.html

Presentation, Library and Information Science Department, College of Liberal Arts, Sungkyunkwan University, 18 June 2013, Seoul, South Korea.
http://jimjansen.blogspot.com/2013/06/keyword-advertising-research.html

Presentation, Qatar Computer Research Institute, 24-29 April 2013, Doha, Qatar.
http://jimjansen.blogspot.com/2013/04/research-presentation-to-folks-at-qatar.html

Presentation, Department of Decision Sciences, College of Business and Public Administration, Old Dominion University, 14-15 April 2013, Norfolk, VA.
http://jimjansen.blogspot.com/2013/04/keyword-advertising-presentation-to.html

Presentation, Google Online Marketing Challenge Workshop, The University of Illinois at Urbana–Champaign, 11 March 2013.
http://jimjansen.blogspot.com/2013/03/gomc-presentation-to-students-at.html

Presentation, Casual Living Conference 2012, 22-24 February 2012, Sarasota, FL.
http://accentsandfurnishings.com/conferences/casuallivingconference/2012/index.html

**Keynote**  Keynote, The Direct Marketing Association of Washington (DMAW) Professor Institute. 3-4 January 2012, Washington. DC.
http://www.dmawef.org/Professors_Page/Professors_Page.html

**Keynote**  Keynote, Advance 2011: Rediscovering the Customer. 20-22 September 2011, San Diego, CA. http://www.idanalytics.com/advance2011/

## Invited Talks (Selected)

Webinar, Web Analytics Webinar for the American Society for Information Science and Technology, 17 June 2011. http://asist.org/Conferences/webinars/2011/web-analytics.html

**Keynote** Keynote, Buying and Selling eContent 2011. 28 March 2011, Scottsdale, AR. http://www.buy-sell-econtent.com/2011/Speakers/JimJansen.aspx

Presentation, Evri (semantic news aggregation company). 10 February 2011, Seattle, WA http://jimjansen.blogspot.com/2011/02/visit-to-evri-semantic-news-aggregation.html

Presentation, IMPAQT (search engine marketing agency). 10 November 2010, Pittsburgh, PA. http://jimjansen.blogspot.com/2010/11/visit-to-search-engine-marketing.html

Presentation, Yahoo! Research Lab. 9 November 2010, New York, New York. http://jimjansen.blogspot.com/2010/11/visit-to-yahoo-research-labs-new-york.html

Presentation, School of Communication and Information, Rutgers University. 8 November 2010, New Brunswick, NJ.

University-wide Presentation, Ryerson University, 18 October 2009, Toronto, Canada.

Presentation, Query Log Analysis: From Research to Best Practice 2009/ 27-28 May. London, UK. Funded by European Union project on Evaluation, Best Practices and Collaboration for Multilingual Information Access. http://ir.shef.ac.uk/cloughie/qlaw2009/index.html

Presentation, Google. 30 October 2008. Mountain View, CA.

Presentation, IMPAQT (search engine marketing agency). 28 October 2008, Pittsburgh, PA. http://jimjansen.blogspot.com/2008/10/visit-to-sem-impaqt.html

Presentation, Mahalo (a human power search engine). 6 July 2008, Los Angeles, CA. http://jimjansen.blogspot.com/2008/07/mahalo-human-power-search-engine.html

Presentation, Pepperjam (search engine marketing agency). 24 June 2008, Wilkes-Barre, PA. http://jimjansen.blogspot.com/2008/06/visit-to-pepperjam.html

Presentation, School of Communication and Information, Rutgers University. 2 September 2005, New Brunswick, NJ.

Presentation, College of Information, University of North Texas, 15 June 1998. Denton, TX

## Membership in Professional Societies

Association for Information Science and Technology (ASIS&T)

Armed Forces Communications and Electronics Association (AFCEA)

## Membership in Professional Societies

Association for Computing Machinery (ACM)

The Institute of Electrical and Electronics Engineers (IEEE)
*Societies*: Computer Society

## Professional Experience

Numerous **consulting projects** and **expert witnessing** (class action suits, patent ligation, and civil ligation)

**US Army Officer** (2002 – 1985): Held various command and staff positions of progressively increasing responsibility. Responsible for vision articulation, planning, directing, and day-to-day management of organizations ranging in size from 10 to over 200 personnel. Served in numerous locations in the United States, Europe, Central America, and the Far East as a communication officer. Responsible for the planning and installation of various types of communication systems including radio, telephone, computer and other digital networks. Served with the 8th U.S. Army Y2K Operational Evaluation Team validating critical information management systems. Responsible for the long term planning, developing, and budgeting of communication systems of all types for the U.S. Forces stationed on the Korean Peninsula. Responsible for a 22-person division that develops photographic, graphical, audio-visual and multimedia material for the U.S. Army War College.

**App. 229**

**Appendix B Dr. Bernard J. (Jim) Jansen Testimony in the Last Four Years**

| Deliverables | Case |
|---|---|
| Deposition | Roslyn La Liberte, Plaintiff, v. Joy Reid, Defendant. Civil Action No. 1:18-cv-05398 (DLI). In the United States District Court for the Eastern District of New York |
| Deposition | Impact Engine, Inc., Plaintiff, vs. Google LLC, Defendant. CASE NO. 3:19-cv-01301-CAB-BGS. United States District Court for the Southern District of California. |
| Deposition | JUSTIN LYTLE and CHRISTINE MUSTHALER, Plaintiffs vs. NUTRAMAX LABORATORIES, INC. and NUTRAMAX LABORATORIES VETERINARY SCIENCES, INC., Defendants. UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, Case No.: 5:19-cv-00835-JBG-SP |
| Testimony Deposition | VERNON UNSWORTH, Plaintiff, v. ELON MUSK, Defendant. Case No. 2:18-cv-8048 in the UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA |
| Deposition | CONGOO, LLC, a Delaware limited liability company, d/b/a ADIANT (Plaintiff) v. SELL IT SOCIAL, LLC, a New York limited liability company, d/b/a REBEL CIRCUS (Defendant), Docket No. C-12037-16 Civil Action, Superior Court of New Jersey Chancery Division, Somerset County |
| Deposition | Originally styled: JEFFREY EPSTEIN, Plaintiff, vs. SCOTT ROTHSTEIN, individually, BRADLEY J. EDWARDS, individually, and L. M., individually, Defendant, IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA. CASE NO.: 502009CA040800XX3OGMBAG |

**Appendix C Documents Referenced**

- 000007_ADLER_000707.pdf
- 000010_ADLER_000710.pdf
- 000016_ADLER_000716.pdf
- 000017_ADLER_000717.pdf
- 000017_ADLER_000718.pdf
- 000017_ADLER_000719.pdf
- About call ads https://support.google.com/google-ads/answer/6341403?hl=en
- About call campaigns https://support.google.com/google-ads/answer/7159344?hl=en
- Bechtold, S., & Tucker, C. (2014). Trademarks, triggers, and online search. *Journal of Empirical Legal Studies*, *11*(4), 718-750.
- Brooke Osmundson (2022) Average Click-Through Rate In Google Ads By Industry. Search Engine Journal. https://www.searchenginejournal.com/data-whats-good-ctr-cpa-conversion-rate-adwords-2018/248947
- Chiou, L., and C. Tucker. (2012) How Does the Use of Trademarks by Third-Party Sellers Affect Online Search? Marketing Science, 31(5), p. 819–837.
- Chiou, L., and C. Tucker. (2012) How Does the Use of Trademarks by Third-Party Sellers Affect Online Search? Marketing Science, 31(5), p. 819–837.
- Daniel Schneider (2022) The Basics of Conversion Funnel Optimization and How to Get Started. SimilarWeb. https://www.similarweb.com/corp/blog/eCommerce/retail-insights/conversion-funnel-optimization/
- Desai, P. S., Shin, W., & Staelin, R. (2014). The company that you keep: When to buy a competitor's keyword. *Marketing Science*, *33*(4), 485-508.
- Elan Mosbacher (2022) 10 Industry Benchmarks For Your Call Tracking Conversion Rate, Search Engine Land. https://searchengineland.com/10-industry-benchmarks-for-your-call-tracking-conversion-rate-97692
- Elisa Gabbert (2021) Organic vs. Paid Clicks: These Are Not the Clicks You're Looking For. https://www.wordstream.com/blog/ws/2012/09/07/organic-versus-paid-clicks
- Elisa Gabbert (2021) Organic vs. Paid Clicks: These Are Not the Clicks You're Looking For. https://www.wordstream.com/blog/ws/2012/09/07/organic-versus-paid-clicks
- Expert Report of Dr. David W. Stewart. July 11, 2022 (the "Stewart Report")
- Expert Report of R. Christopher Anderson. July 14, 2022 (the "Anderson Report")
- Google (2016) From confusion to clarity: How brands can help people make confident purchase decisions with Search https://www.thinkwithgoogle.com/intl/en-apac/consumer-insights/consumer-journey/reshaping-customer-journey-search/
- Google Ads: Definition https://support.google.com/google-ads/answer/6319?hl=en
- Google Extends "Click To Call" Ads To All Advertisers https://searchengineland.com/google-extends-click-to-call-ads-to-all-advertisers-37122
- Google Search (Mobile) https://www.google.com/search?q=clay+jenkins+attorney (clay jenkins attorney google search image), August 8, 2022.
- Google Search (Mobile) https://www.google.com/search?q=clay+jenkins+attorney (clay jenkins attorney google search image), August 8, 2022.

1

- Google Search (Mobile) https://www.google.com/search?q=personal+injury+attorney+dallas (personal injury attorney dallas google search image), August 8, 2022.
- Google Search (Mobile) https://www.google.com/search?q=the+texas+hammer
- Google Search https://www.google.com/search?q=accident+lawyers+in+dallas+texas, July 17, 2022
- Google Search https://www.google.com/search?q=the+texas+hammer
- Harris Interactive (2010) Are Advertisers Wasting Their Money? https://www.prnewswire.com/news-releases/are-advertisers-wasting-their-money-111254549.html
- Ioannidis JPA, Boyack KW, Baas J (2020) Updated science-wide author databases of standardized citation indicators. PLoS Biology 18(10): e3000918. https://doi.org/10.1371/journal.pbio.3000918; Data for "Updated science-wide author databases of standardized citation indicators" https://data.mendeley.com/datasets/btchxktzyw/2
- Jafarzadeh, H., Aurum, A., D'Ambra, J., & Ghapanchi Dr, A. H. (2015). A systematic review on search engine advertising. Pacific Asia Journal of the Association for Information Systems, 7(3), 2. http://journal.ecrc.nsysu.edu.tw/index.php/pajais/article/viewFile/321/151
- Jansen, B. J. (2010) 65% of Internet Users Have Paid for Online Content. Pew Internet & American Life Project, Pew Research Center. 30 December. http://www.pewinternet.org/Reports/2010/Paying-for-Content.aspx
- Jansen, B. J. (2010) Online Product Research. Pew Internet & American Life Project, Pew Research Center. 29 September. http://pewinternet.org/Reports/2010/Online-Product-Research.aspx
- Jansen, B. J. (2010) Use of the internet by higher income households. Pew Internet & American Life Project, Pew Research Center. 24 November. http://www.pewinternet.org/Reports/2010/Better-off-households.aspx
- Jansen, B. J. (2011) The civic and community engagement of religiously active Americans. Pew Internet & American Life Project, Pew Research Center. 13 December. http://pewinternet.org/Reports/2011/Social-side-of-religious.aspx
- Jansen, B. J. (2011). Understanding Sponsored Search: Coverage of the Core Elements of Keyword Advertising. Cambridge University Press: Cambridge, UK
- Jansen, B. J. and Mullen, T. (2008) Sponsored search: An overview of the concept, history, and technology, International Journal of Electronic Business. 6(2), 114 – 131.
- Jansen, B. J. and Schuster, S. (2011) Bidding on the Buying Funnel for Sponsored Search Campaigns. Journal of Electronic Commerce Research. 12(1), 1-18.
- Jansen, B. J., Booth, D., and Spink, A. (2008) Determining the informational, navigational, and transactional intent of Web queries, Information Processing & Management. 44(3), 1251-1266.
- Jansen, B. J., Jung, S.G., and Salminen, J. (2022) Measuring user interactions with websites: A comparison of two industry standard analytics approaches using data of 86 websites. PLoS ONE. 17(5): e0268212. https://doi.org/10.1371/journal.pone.0268212
- Larry Kim (2012) What's a Good Conversion Rate on Google AdWords? Average Conversion Rates by Industry. https://www.business2community.com/online-

marketing/whats-a-good-conversion-rate-on-google-adwords-average-conversion-rates-by-industry-0318438

- Matt G. Southern (2021) Over 25% of People Click the First Google Search Result, Search Engine Journal. https://www.searchenginejournal.com/google-first-page-clicks/374516/
- New research shows that 70% of mobile searchers call a business directly from search results https://adwords.googleblog.com/2013/09/new-research-shows-that-70-of-mobile.html
- Organic search result https://support.google.com/google-ads/answer/6054492?hl=en
- Purcell, K., Rainie, L., & Brenner, J. (2012). Search engine use 2012. Pew Internet Research.
- Rosso, M. A. and Jansen, B. J. (2010) Brand Names as Keywords in Sponsored Search Advertising. Communications of the Association for Information Systems. 27(1), Article 6. Available at: http://aisel.aisnet.org/cais/vol27/iss1/6
- SalesForce (2016) Customer Journey Map: What is Customer Journey Mapping & Why is it Important? https://www.salesforce.com/uk/blog/2016/03/customer-journey-mapping-explained.html
- Schultz, C. D. (2020). Informational, transactional, and navigational need of information: relevance of search intention in search engine advertising. *Information Retrieval Journal*, *23*(2), 117-135.
- Search Engines Market Share in United States https://www.similarweb.com/engines/united-states/
- Search Engines Market Share in United States https://www.similarweb.com/engines/united-states/mobile-phone/
- SimilarWeb Website Analysis for jimadler.com, August 2022
- Stephen Shankland (2021) Ad blocking surges as millions more seek privacy, security and less annoyance. CNET. https://www.cnet.com/news/privacy/ad-blocking-surges-as-millions-more-seek-privacy-security-and-less-annoyance/
- The Professional Ethics Committee for the State Bar of Texas Opinion No. 661 July 2016, pages 2-3/
- Third Amended Complaint, Jim S. Adler and JIM ADLER, Plaintiffs v. McNeil Consultants, LLC d/b/a Accident Injury Legal Center, Quintessa Marketing, LLC d/b/a Accident Injury Legal Center, and Lauren von McNeil, Defendants, Civil Action No. 3:19-cv-02025-K-BN, dated May 31, 2022 ("3rd Amended Complaint")
- Trademarks https://support.google.com/adspolicy/answer/6118?hl=en
- Tueanrat, Y., Papagiannidis, S., & Alamanos, E. (2021). Going on a journey: A review of the customer journey literature. Journal of Business Research, *125*, 336-353.
- Version Museum (2019) History of Google Search https://www.versionmuseum.com/history-of-google-search
- Wordsteam (2021) Conversion Rate: What Is a Conversion Rate? https://www.wordstream.com/conversion-rate
- Wordstream (2021) Click-Through Rate (CTR): Understanding Click-Through Rate for PPC. https://www.wordstream.com/click-through-rate

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4   JIM S. ADLER, P.C. and JIM   )
     ADLER,                       )
 5                                )
          Plaintiffs,             )
 6                                )
     VS.                          )
 7                                )
     MCNEIL CONSULTANTS, LLC      )
 8   D/B/A ACCIDENT INJURY LEGAL  ) NO. 3:19-CV-2025-K
     CENTER, QUINTESSA MARKETING, )
 9   LLC D/B/A ACCIDENT INJURY    )
     LEGAL CENTER and LAUREN VON  )
10   MCNEIL,                      )
                                  )
11                                )
          Defendants.             )
12
13
14            ORAL AND VIDEOTAPED DEPOSITION OF
15                     MONICA MADRIGAL
16                    OCTOBER 31, 2022
17                    (Reported Remotely)
18
19
20
21
22
23
24
25
```

1           ORAL AND VIDEOTAPED DEPOSITION of MONICA

2  MADRIGAL, produced as a witness at the instance of the

3  Defendants, and duly sworn, was taken in the

4  above-styled and -numbered cause on the 31st of

5  October, 2022, from 11:03 a.m. to 5:01 p.m., before

6  Audra B. Paty, CSR in and for the State of Texas,

7  reported by machine shorthand, in the City of Redwood,

8  County of San Mateo, State of California, pursuant to

9  Notice and the Federal Rules of Civil Procedure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25               A P P E A R A N C E S

Monica Madrigal - October 31, 2022

```
 1        FOR THE PLAINTIFFS:
              Mr. Jered Matthysse
 2            Mr. Giulio Yaquinto
              PIRKEY BARBER PLLC
 3            1801 East 6th Street
              Suite 300
 4            Austin, Texas 78702
              512.322.5200
 5            jmatthysse@pirkeybarber.com
              gyaquinto@pirkeybarber.com
 6
 7        FOR THE DEFENDANTS:
              Ms. Barira Munshi
 8            Ms. Rebecca L. Adams
              LYNN PINKER HURST & SCHWEGMANN
 9            2100 Ross Avenue
              Suite 2700
10            Dallas, Texas 75201
              214.981.3800
11            bmunshi@lynnllp.com
              radams@lynnllp.com
12
13         FOR THE WITNESS:
              Ms. Julie Honor
14            3Q Digital, Inc.
              1 South Wacker Drive
15            Suite 2250
              Chicago, Illinois 60606
16            847.373.0399
              julie@3qdept.com
17
18        ALSO PRESENT:
              Mr. Tony McGough, Videographer
19
20
21
22
23
24
25
```

Monica Madrigal - October 31, 2022

1    Q.   Okay.   And do you remember what kind of

2  generic keywords the Adler firm would bid on?

3    A.   I don't recall exactly.

12:06:26  4    Q.   What kind of bidding strategies did you use

5  for the Adler firm?

6    A. ███████████████████████████████

███████████████████████    ████████

█████████████████████████████

███████    ███████████████████████

10    ███    ████████████████████

████  ████████████████████████████████████

████  ████████████████████

████    ███████████████████████████████

████    ████    ██████████████████████  ████

████  █████████████████

████    ███████████████████████████

████  ██████████████████████████████████

████  ██████████████████████████████████

████  ██████  ████████████████████████

████  ██████████████████

████  ███    ██████    █████████████████████████

████  ████████████████████

████  ███    ███

████    ███  ████████████████████

████    ███    █████    ████████████████

Monica Madrigal - October 31, 2022



Monica Madrigal - October 31, 2022

1
2
3
4
5

6      Q.   And there's nothing unethical about having
7   clients who competitively bid on other competitors'
8   branded keywords, right?

9             MR. MATTHYSSE:   Objection to form.

17:00:27 10    A.   There's nothing in Google's terms of use that
11   doesn't allow you to bid on them.   It's only when it
12   comes to the ad copy and misrepresentation.

13      Q.   (BY MS. MUNSHI)  Fair enough.   And from the
14   perspective of 3Q, there's nothing unethical about
15   helping clients competitively bid on another person's
16   branded keywords, right?

17             MR. MATTHYSSE:   Same objection.

18             MS. HONOR:   Objection.   I just want to be
19   clear she's here as an individual, not as a
17:00:57 20   representative of 3Q.   So if you can please rephrase
21   your question.

22      Q.   (BY MS. MUNSHI)   Ms. Madrigal, you said you
23   also have worked for other clients who have
24   competitively bid on the branded keywords of somebody
25   else, right?

Monica Madrigal - October 31, 2022

```
 1        A.   Yes.
 2        Q.   And you don't think there is anything
 3   unethical about that?
 4        A.   No.
 5             MS. MUNSHI:  I'll pass the witness at
 6   this time.
 7             MR. MATTHYSSE:  We have no questions.
 8             MS. MUNSHI:  I didn't -- I'm sorry.
 9   Jered, I didn't hear you.
10             MR. MATTHYSSE:  Oh, sorry.  I said we
11   have no questions for now.  We reserve our questions
12   and appreciate your time, Ms. Madrigal.
13             THE VIDEOGRAPHER:  Audra, do you need to
14   get anything on the record?
15             THE REPORTER:  No, I'm good.
16             THE VIDEOGRAPHER:  And, Counsel, is there
17   anything further from anybody?
18             MR. MATTHYSSE:  Not from me.
19             MS. MUNSHI:  No, nothing further.
20             THE VIDEOGRAPHER:  Okay.  We're off the
21   record at 5:01 p.m.
22             (Deposition concluded at 5:01 p.m.)
23
24
25
```

17:01:43 (line 13)

Monica Madrigal - October 31, 2022

```
 1   STATE   OF   TEXAS )
 2   COUNTY OF DALLAS )
 3            I, Audra B. Paty, Certified Shorthand
 4   Reporter, in and for the State of Texas, certify that
 5   the foregoing deposition of MONICA MADRIGAL was
 6   reported stenographically by me at the time and place
 7   indicated, said witness having been placed under oath
 8   by me; that review was requested pursuant to Federal
 9   Rule of Civil Procedure 30(e)(1); and that the
10   deposition is a true record of the testimony given by
11   the witness.
12            I further certify that I am neither counsel
13   for nor related to any party in this cause and am not
14   financially interested in its outcome.
15            Given under my hand on this the 14th day of
16   November, 2022.
17                              _____
                               Audra B. Paty, Certified
18                             Shorthand Reporter No. 5987
                               Dickman Davenport, Inc.
19                             Firm Registration #312
                               4228 North Central Expressway
20                             Suite 101
                               Dallas, Texas 75206
21                             214.855.5100    800.445.9548
                               e-mail:  abp@dickmandavenport.com
22                             My commission expires 10-31-24
23
     Time used by each party:
24   Ms. Munshi - 5:06
     Mr. Matthysse - 0:00
17:02:45 25  Ms. Honor - 0:00
```



**Exhibit B-6**

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

**AppX42R_000646**



CONFIDENTIAL - ATTORNEYS'
EYES ONLY



CONFIDENTIAL - ATTORNEYS'
EYES ONLY

JSAPC Summary Advertising



**Exhibit B-7**





JSAPC Adv Summary type



ISARC Adv summary by category





JSAPC Adverting by category



| From: | Wendy Echeverri |
|---|---|
| Sent: | Thursday, March 21, 2019 4:52 PM CDT |
| To: | Dustin Engle |
| CC: | Brian Spencer |
| Subject: | FW: Jim Adler Review |

Hi Dustin and Brian,

In about 1 ½ weeks we'll begin our call only ads with the ██████████████████ .

We're planning running these only during the hours that our call center is open so that we have a better chance of closing the leads. Just to confirm the call center hours are:

- M-F 8 am – 10pm,
- Saturday 9 am – 1 pm,
- Sunday 9-4 pm

We do have the option of taking a small portion ███████████ and running regular search ads after the call center closes. However, the calls from the ads are likelier to convert (and give better results) while our in-house call staff answers the phones. Thoughts?

Thanks,
Wendy

From: Monica Madrigal <monicam@3qdigital.com>
Sent: Thursday, March 21, 2019 4:10 PM
To: Wendy Echeverri <wecheverri@jimadler.com>
Subject: Re: Jim Adler Review

Hi Wendy,

██████████████████████████ the call only campaigns will only run during the hours your in house call center is open do you want to run regular ads during the off hours?

Thank you

On Thu, Mar 21, 2019 at 10:38 AM Wendy Echeverri <wecheverri@jimadler.com> wrote:

Hi Monica,

Thanks,

**Exhibit B-8**

**Confidential - Attorneys' Eyes Only**

**App. 251**

**ADLER_000844**



**Monica Madrigal**
*Account Lead* at 3Q Digital
e monicam@3qdigital.com | w 3qdigital.com

**Confidential - Attorneys' Eyes Only**

| From: | Monica Madrigal |
|---|---|
| Sent: | Friday, May 10, 2019 1:34 PM CDT |
| To: | Wendy Echeverri |
| CC: | Brian Spencer |
| Subject: | Re: Jim Adler Call Only Campaigns tCPA Test |

Hi Wendy,

Yes, since call only Ads will not take end users to your landing page and the landing page URL is used for verification purpose
Google totally ignores the landing page experience when it come to calculating quality score in Ad rank.

Let me know if you hear back from Google about your complaint, have a great weekend!

On Thu, May 9, 2019 at 2:46 PM Wendy Echeverri <wecheverri@jimadler.com> wrote:

Hi Monica,

I can see that the ads for the new Target CPA test campaign were showing today already.



By the way, I filed a complaint form to Google now regarding the misleading ads that this company is running. But as they no longer use desktop ads in our market, opting for call-only campaigns, I wasn't able to submit their PPC Final URL address. I'm guessing with Call-only campaigns the relevancy of your landing page more or less goes out the window too right?



Thanks,

Wendy Echeverri

**Exhibit B-9**       **App. 253**

**Confidential - Attorneys' Eyes Only**       **ADLER_000852**

**From:** Monica Madrigal <monicam@3qdigital.com>
**Sent:** Wednesday, May 8, 2019 8:43 PM
**To:** Wendy Echeverri <wecheverri@jimadler.com>; Brian Spencer <BSpencer@jimadler.com>
**Subject:** Jim Adler Call Only Campaigns tCPA Test

Hi Wendy,



Let me know if you have any questions, looking forward to seeing performance numbers!

Thank you

--



**Monica Madrigal**
*Account Lead* at 3Q Digital
e monicam@3qdigital.com   |   w 3qdigital.com

Disclaimer

**App. 254**

**Confidential - Attorneys' Eyes Only**

**ADLER_000853**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

REQUIRED NOTICE UNDER The Texas Health and Safety Code, Sec. 181.154 – HB 300

Because our law firm gathers, stores and electronically transmits medical records (Protected Health Information — PHI), we are required to post a notice to clients that their protected health information is subject to electronic disclosure.

Texas and Federal Law prohibits any electronic disclosure of a client's protected health information to any person without a separate authorization from the client for each disclosure. This authorization for disclosure may be made in written or electronic form or in oral form if it is documented in writing by our law firm.

The authorization for electronic disclosure of protected health information described above is not required if the disclosure is made: to another covered entity, as that term is defined by Section 181.001, or to a covered entity, as that term is defined by Section 602.001, Insurance Code, for the purpose of: treatment: payment: health care operations: performing an insurance or health maintenance organization function described by Section 602.053, Insurance Code: or as otherwise authorized or required by state or federal law. In other words, no further release is necessary for electronic disclosure to other health care providers, insurance companies, governmental agencies, or defense lawyers representing adverse parties.

--



**Monica Madrigal**

*Account Lead* at 3Q Digital

**e** monicam@3qdigital.com    **|**   **w** 3qdigital.com

**Confidential - Attorneys' Eyes Only**                                    ADLER_000854

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4  JIM ADLER, P.C. and JIM     §
    ADLER,                      §
 5                              §
 6      Plaintiffs,             §
                                §
    v.                          §     NO. 3:19-CV-2025-K
 7                              §
    MCNEIL CONSULTANTS, LLC     §
 8  D/B/A ACCIDENT INJURY LEGAL §
    CENTER, QUINTESSA           §
 9  MARKETING, LLC D/B/A        §
    ACCIDENT INJURY LEGAL       §
10  CENTER and LAUREN VON       §
    MCNEIL,                     §
11                              §
        Defendants.            §
12
13
14
15      REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
16                    WENDY ECHEVERRI
17                  NOVEMBER 15, 2022
18                  VIA REMOTE COUNSEL
19
20
21
22
23
24
25
```

Wendy Echeverri - November 15, 2022

1          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
2   WENDY ECHEVERRI, produced as a witness at the instance
3   of the Defendants, and duly sworn, was taken in the
4   above-styled and numbered cause on the 15th of
5   November, 2022, from 9:04 a.m. to 3:24 p.m. CST,
6   before Jennifer Quick Davenport, CSR in and for the
7   State of Texas, reported by machine shorthand, in the
8   City of Houston, County of Harris, State of Texas,
9   pursuant to Notice and the Federal Rules of Civil
10  Procedure.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Wendy Echeverri - November 15, 2022

```
 1              A P P E A R A N C E S
 2   FOR  PLAINTIFFS:
     Mr. Jered Matthysse
 3   Mr. Giulio Yaquinto
     PIRKEY BARBER PLLC
 4   1801 East 6th Street, Suite 300
     Austin, Texas 78702
 5   512.322.5200
     jmatthysse@pirkeybarber.com
 6   gyaquinto@pirkeybarber.com
 7
     FOR DEFENDANTS:
 8   Ms. Rebecca L. Adams
     Ms. Barira Munshi
 9   LYNN PINKER HURST & SCHWEGMANN, LLP
     2100 Ross Avenue, Suite 2700
10   Dallas, Texas 75201
     214.981.3800
11   radams@lynnllp.com
     bmunshi@lynnllp.com
12
13   ALSO PRESENT:
     Mr. Ian McGar, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Wendy Echeverri - November 15, 2022

1    Q.  Why is that?

2    A.  Well, he -- it's his brand name, it's his

3    name as well, and there's years and years of a

4    reputation that he's built.

5    ████  ███████████████████████████████████████

     ██  ████████████████████████████████████████████████████

     ██  ████  █████████████████████████████████████████

     ██  █████████████████████████████████████████████

     ██  ████  ██████████████████████████████████████████

     ██  ████████████████████████████

     ██  ████  ███████████████████████████████████████

     ██  ████  ████████████████████████████████████████████

     ██  ███████████████

     ██  ████  ███████████████████████████████████████

     ██  █████████████████████████████

16   Q.  Okay.

17         MS. MUNSHI:  I'm going to drop what I'm

18   marking as Exhibit 2 into the chat box.  I'll also

19   share my screen if you want to follow along on my

20   screen.

21         (Exhibit No. 2 marked.)

22   Q.  (By Ms. Munshi)  Let me know when you can see

23   Exhibit 2 on your screen.

24   A.  Yes, I can see.

25   Q.  This is an email dated May 9th, 2019.

Wendy Echeverri - November 15, 2022

1    Q.  So you're providing some background to Brian
2  and Monica on the brand and auto campaigns, right?
3    A.  Yes.
4    Q.  And the very last question that you have is,
5  [As Read] My question is, how much budget is needed to
6  push out accidentinjurylegalcenter.com?
7          Do you see that?
8    A.  Yeah.
9    Q.  Okay.  And in this email, you are discussing
10  the average position that your ads ran in for the
11  brand campaign, right?
12    A.  Yes.
13  ████  ████   ████████████████████████  ██
█   █████████████████████████  ████████
█   ████████████████████████████████
█   █████████████████████████████
█   ██████████████████████████
█   ███████████████
█        █████████
█   ██  █████
21    Q.  So there's a response from Monica, and then
22  I'm going to scroll all the way to the top.  And
23  there's a response from Monica on May 24th, 2019.
24          Do you see that?
25    A.  Yes.

Wendy Echeverri - November 15, 2022

1

2

3

4

5

6

7

8

9

10          MR. YAQUINTO:  Objection, form.

11          Go ahead, Wendy.

12          THE WITNESS:  Sorry.

13

14

15 able to be in the absolute top

16 position, right?

17     A.  I'm sorry.  Okay.  Rephrase that again

18 because I was busy reading.

19     Q.  No, that's okay.

20

21

22

23

24

25          MR. YAQUINTO:  Objection, form.

Wendy Echeverri - November 15, 2022



10    Q.   Okay.   What did you take that to mean?

11    A.   So in the context of this communication --

12   can you scroll down again?

13    Q.   Yes.   Sorry.

Wendy Echeverri - November 15, 2022



MR. YAQUINTO:  Objection, form.

Go ahead, Wendy.

Wendy Echeverri - November 15, 2022



```
1
          MR. YAQUINTO:  Objection, form.
15        Go ahead, Wendy.
16    A.  Yes.  I don't remember what happened there.
17    Q.  (By Ms. Munshi)  That's fair.
18
```

Wendy Echeverri - November 15, 2022

1    A.   Yes.

2    ███    ███    ██████████████████████

█    ████████████████████████████████████

█    ██████████████████████████████████

█    █████████

█    ███    ██████████████████

█    ███    ██████    █████████████████

█    ███████████████████████████

█    ████████████████████████████

█    ████████████████████████████

11                MR. YAQUINTO:  Objection, form.

12                Go ahead, Wendy.

13   ███    ██████

14   Q.   (By Ms. Munshi)  Okay.  And so you'd agree

15   with me, at least looking from the -- looking at the

16   data, that the average position didn't really have a

17   correlation with the conversion rate, right?

18                MR. YAQUINTO:  Objection, form.

19                Go ahead, Wendy.

20                MS. MUNSHI:  I'll reask the question so

21   that maybe it's a little bit more specific.

22   ███    ██████████    ██████████████████

█    ████████████████████████████████

█    ██████████████████████████████████

█    ██████████████████████████

Wendy Echeverri - November 15, 2022

1      ▬   ▬   ▬▬▬

2      Q.   Okay.

3              MS. MUNSHI:  I think that's all I have

4  for this spreadsheet, actually, so I'm going to -- I

5  don't know where my button went to stop share.  There

6  it is.  Okay.

7              I think that's all I have on that

8  exhibit, and we can break for lunch if that works for

9  everyone.  And I'm happy -- can we go off the record?

10             THE VIDEOGRAPHER:  The time is 11:58 a.m.

11  We're off.

12             (Lunch 11:58-12:36.)

13             THE VIDEOGRAPHER:  The time is 12:36 p.m.

14  We're back on the record.

15     Q.  (By Ms. Munshi)  Ms. Echeverri, I'm going to

16  drop Exhibit 5, actually, back into the chat box, and

17  just open it for a minute.  I'm going to share my

18  screen with you.

19             Do you remember looking at Exhibit 5

20  before the lunch break?

21     A.  I don't remember looking at Exhibit 5 before

22  the lunch break.

23     Q.  Okay.  Well, this is an email chain between

24  you and Monica Madrigal.

25             Do you see that?

Wendy Echeverri - November 15, 2022

1     A.  Yes, I can see it.

2     Q.  This is an email dated July 11th, 2019.

3            Do you see that?

4     A.  Yes.

5     Q.  And it's an email from you to Brian, Jim,

6  Dustin and Bill.

7            So these are all internal Adler folks,

8  right?

9     A.  Yes.

10     Q.  Okay.  Subject line is, Internet leeches.

11            Do you see that?

12     A.  Yes.

13     Q.  Okay.  If you -- let's scroll down to, it's

14  ADLER_1004, which is the first email in this chain.

15            Do you see that?

16     A.  Yes.

17     Q.  And it's actually an email from Jim Adler to

18  you and Brian, right?

19     A.  Yes.

20     Q.  He's asking you to put together a list of the

21  prime violators who are buying his name on Google

22  AdWords?

23     A.  Yes.

24     Q.  Do you know what Mr. Adler meant by "prime

25  violators"?

Wendy Echeverri - November 15, 2022

1  Adler team and Monica.

2          Do you see that email?

3      A.  Yes.

4      Q.  The subject line is, We are not even showing

5  up on Google today at 2:18 p.m.  SMSH, Alliance,

6  Premium Accident Injury in injury case reviews are all

7  ahead of us.

8          Do you see that?

9      A.  Yes.

24     Q.  And Monica responds back, and she -- she's

25  asking, at the very bottom of her -- at the very end

Wendy Echeverri - November 15, 2022



1

        MR. YAQUINTO:   Objection, form.

        Wendy, you can answer.

Wendy Echeverri - November 15, 2022



    Q.

    A.

    Q.  Okay.  When you started running the call-only
ads, do you know how much of the budget for the brand

Wendy Echeverri - November 15, 2022

1    Q.  Let me -- yeah, let me back up.

13   A.  Yes.

14   Q.  So fair to say that even if AILC isn't

15   competing, there are competitors in the market who are

16   outperforming Adler on those days, right?

17            MR. YAQUINTO:  Objection, form.

18   A.  Yes.

19   Q.  (By Ms. Munshi)

20

21   A.  I'm sorry.  Can you repeat that?

22   Q.  Sure.

23

24

25

Wendy Echeverri - November 15, 2022

1    Q.  Okay.  Premiuminjuryhelp.com is competing

2   against Adler on the 22nd and 23rd, right?

3    A.  Yes.

4    Q.  And so going back to Exhibit 19, the result

5   of Accident Injury Legal Center turning off their ads

6   didn't result -- let me back -- let me reask that

7   question.

8              Accident Injury Legal Center turning off

9   their ads for August 22nd and 23rd didn't result in

10  all of the competition against Adler going away,

11  right?

12   A.  No.

13   Q.  And, in fact, in some instances, Adler's

14  competitors were performing -- or outperforming him in

15  terms of the top of page rate that we looked at,

16  correct?

17   A.  Yes.

18   Q.  And so if Accident Injury Legal Center turned

19  off their ads, that simply just resulted in other

20  competitors having their ads pushed to the top to

21  compete where AILC would have been, right?

22              MR. YAQUINTO:  Objection, form.

23              You can answer, Wendy.

24   A.  It appears that they got moved to a new

25  place.  I mean, just as a result of the auction.

Wendy Echeverri - November 15, 2022

1    Q.  (By Ms. Munshi)  Correct.

2    ████████████████████████████████████

█    ████████████████████████████████████

█    ████████████████████████████████████████

█    ████████████████████████████████████████

█    ██████████████████████████

7            ████    ████

8            MS. MUNSHI:  I'm going to stop sharing.

9    If we can take a five-minute break, I might be done.

10   I just want to look through my notes really quickly.

11           MR. YAQUINTO:  That sounds good.

12           THE VIDEOGRAPHER:  The time is 3:15 p.m.

13   We're off the record.

14           (Recess 3:15-3:21.)

15           THE VIDEOGRAPHER:  The time is 3:21 p.m.

16   We're back on.

17           MS. MUNSHI:  Ms. Echeverri, that's all I

18   have for you today.  I appreciate you taking the time

19   out of your day for this deposition, and we'll pass

20   the witness.

21           THE WITNESS:  Thank you.

22                   EXAMINATION

23   BY MR. YAQUINTO:

24       Q.  Ms. Echeverri, I just have one question for

25   you.

Wendy Echeverri - November 15, 2022

```
 1   STATE  OF  TEXAS )
 2   COUNTY OF DALLAS )
 3           I, Jennifer Quick Davenport, Certified
 4   Shorthand Reporter, in and for the State of Texas,
 5   certify that the foregoing deposition of WENDY
 6   ECHEVERRI was reported stenographically by me at the
 7   time and place indicated, said witness having been
 8   placed under oath by me; that review was requested
 9   pursuant to Federal Rule of Civil Procedure 30(e)(1);
10   and that the deposition is a true record of the
11   testimony given by the witness.
12           I further certify that I am neither counsel
13   for nor related to any party in this cause and am not
14   financially interested in its outcome.
15           Given under my hand on this the 22nd day
16   November, 2022.
17           _____
             Jennifer Quick Davenport, Certified
18           Shorthand Reporter No. 1683
             Dickman Davenport, Inc.
19           Firm Registration #312
             Suite 101
20           4228 North Central Expressway
             Dallas, Texas 75206
21           214.855.5100    800.445.9548
             email:  jqd@dickmandavenport.com
22           My commission expires 10-31-23
23   Time used by each party:
     Ms. Munshi - 3:20
24   Mr. Yaquinto - 0:02
25
```

| From: | Bill Adler |
|---|---|
| Sent: | Wednesday, August 21, 2019 7:21 AM CDT |
| To: | Jim Adler |
| Subject: | FW: Screenshot 2019-08-20 at 5.46.32 PM |

Not sure if you want to show this email to Kurt but we need to file the suit and seek the injunction asap.

**From:** Monica Madrigal [mailto:monicam@3qdigital.com]
**Sent:** Tuesday, August 20, 2019 7:48 PM
**To:** Wendy Echeverri <wecheverri@jimadler.com>
**Cc:** Jim Adler <JAdler@jimadler.com>; Bill Adler <BAdler@jimadler.com>; Dustin Engle
<DEngle@jimadler.com>; Brian Spencer <BSpencer@jimadler.com>; Michael Shore
<mshore@3qdigital.com>; Rose Kleczynski <RKleczynski@jimadler.com>; Dona Hinton
<DHinton@jimadler.com>; Vicky Killingsworth <VKillingsworth@jimadler.com>
**Subject:** Re: Screenshot 2019-08-20 at 5.46.32 PM

Hello Team,



**Exhibit B-11**          **App. 275**

**Confidential - Attorneys' Eyes Only**

**ADLER_001837**

Thank you

On Tue, Aug 20, 2019 at 4:48 PM Wendy Echeverri <wecheverri@jimadler.com> wrote:

Hi Mr. Adler,



-----Original Message-----
From: Jim Adler <JAdler@jimadler.com>
Sent: Tuesday, August 20, 2019 5:48 PM
To: Bill Adler <BAdler@jimadler.com>; Dustin Engle <DEngle@jimadler.com>; Wendy
Echeverri <wecheverri@jimadler.com>; Brian Spencer <BSpencer@jimadler.com>
Cc: Michael Shore <mshore@3qdigital.com>; Rose Kleczynski
<RKleczynski@jimadler.com>; Dona Hinton <DHinton@jimadler.com>; Vicky Killingsworth
<VKillingsworth@jimadler.com>
Subject: Screenshot 2019-08-20 at 5.46.32 PM

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

REQUIRED NOTICE UNDER The Texas Health and Safety Code, Sec. 181.154 – HB 300

Because our law firm gathers, stores and electronically transmits medical records (Protected Health Information — PHI), we are required to post a notice to clients that their protected health information is subject to electronic disclosure.

Texas and Federal Law prohibits any electronic disclosure of a client's protected health information to any person without a separate authorization from the client for each disclosure. This authorization for disclosure may be made in written or electronic form or in oral form if it is documented in writing by our law firm.

**App. 276**

Confidential - Attorneys' Eyes Only

**ADLER_001838**

The authorization for electronic disclosure of protected health information described above is not required if the disclosure is made: to another covered entity, as that term is defined by Section 181.001, or to a covered entity, as that term is defined by Section 602.001, Insurance Code, for the purpose of: treatment; payment; health care operations; performing an insurance or health maintenance organization function described by Section 602.053, Insurance Code; or as otherwise authorized or required by state or federal law. In other words, no further release is necessary for electronic disclosure to other health care providers, insurance companies, governmental agencies, or defense lawyers representing adverse parties.

--



**Monica Madrigal**
*Account Lead* at 3Q Digital
**e** monicam@3qdigital.com | **w** 3qdigital.com

**Inc.'s Best Places to Work 2019**

  

**Confidential - Attorneys' Eyes Only**

**ADLER_001839**

| From: | Monica Madrigal |
| Sent: | Tuesday, August 20, 2019 7:47 PM CDT |
| To: | Wendy Echeverri |
| CC: | Jim Adler; Bill Adler; Dustin Engle; Brian Spencer; Michael Shore; Rose Kleczynski; Dona Hinton; Vicky Killingsworth |
| Subject: | Re: Screenshot 2019-08-20 at 5.46.32 PM |

Hello Team,



Thank you

On Tue, Aug 20, 2019 at 4:48 PM Wendy Echeverri <wecheverri@jimadler.com> wrote:
 Hi Mr. Adler,



-----Original Message-----
From: Jim Adler <JAdler@jimadler.com>
Sent: Tuesday, August 20, 2019 5:48 PM
To: Bill Adler <BAdler@jimadler.com>; Dustin Engle <DEngle@jimadler.com>; Wendy
Echeverri <wecheverri@jimadler.com>; Brian Spencer <BSpencer@jimadler.com>
Cc: Michael Shore <mshore@3qdigital.com>; Rose Kleczynski
<RKleczynski@jimadler.com>; Dona Hinton <DHinton@jimadler.com>; Vicky Killingsworth
<VKillingsworth@jimadler.com>
Subject: Screenshot 2019-08-20 at 5.46.32 PM

This is ridiculous. All the money were spending and we're not even showing up in the top three
in Google ad words

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by
the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any
disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited
and may be unlawful.

REQUIRED NOTICE UNDER The Texas Health and Safety Code, Sec. 181.154 – HB 300

Because our law firm gathers, stores and electronically transmits medical records (Protected Health Information
— PHI), we are required to post a notice to clients that their protected health information is subject to electronic
disclosure.

Texas and Federal Law prohibits any electronic disclosure of a client's protected health information to any person
without a separate authorization from the client for each disclosure. This authorization for disclosure may be
made in written or electronic form or in oral form if it is documented in writing by our law firm.

The authorization for electronic disclosure of protected health information described above is not required if the
disclosure is made: to another covered entity, as that term is defined by Section 181.001, or to a covered entity,
as that term is defined by Section 602.001, Insurance Code, for the purpose of: treatment; payment; health care
operations; performing an insurance or health maintenance organization function described by Section 602.053,
Insurance Code; or as otherwise authorized or required by state or federal law. In other words, no further release
is necessary for electronic disclosure to other health care providers, insurance companies, governmental
agencies, or defense lawyers representing adverse parties.

--

**Confidential - Attorneys' Eyes Only**                    **ADLER_001818**



**Monica Madrigal**
*Account Lead* at 3Q Digital
**e** monicam@3qdigital.com | **w** 3qdigital.com

**Inc.'s Best Places to Work 2019**



**App. 280**

**Confidential - Attorneys' Eyes Only**

ADLER_001819

| From: | Wendy Echeverri |
|---|---|
| Sent: | Monday, July 15, 2019 10:27 AM CDT |
| To: | Dustin Engle |
| Subject: | FW: Internet leeches |

Hi Dustin,
Do we have these in Needles or the CRM that you're able to view?
Thanks,

**From:** Jim Adler <JAdler@jimadler.com>
**Sent:** Sunday, July 14, 2019 3:38 PM
**To:** Brian Spencer <BSpencer@jimadler.com>; Wendy Echeverri <wecheverri@jimadler.com>
**Cc:** Dustin Engle <DEngle@jimadler.com>; Bill Adler <BAdler@jimadler.com>
**Subject:** RE: Internet leeches

## Do you have the names of any clients who have been signed
## up by other law firms through the use of Google Ad words?

Jim S. Adler
Jim S. Adler and Associates
Attorneys at Law
3D International Tower
1900 W. Loop S., 20th Floor
Houston , TX 77027
(713)- 777-4000
jadler@jimadler.com

From: Brian Spencer
Sent: Thursday, July 11, 2019 12:25 PM
To: Wendy Echeverri
Cc: Jim Adler; Dustin Engle; Bill Adler
Subject: Re: Internet leeches

Thank you, Wendy.

**Exhibit B-13**                                        **App. 281**

Confidential - Attorneys' Eyes Only

On Jul 11, 2019, at 12:01 PM, Wendy Echeverri <wecheverri@jimadler.com> wrote:

Hi Mr. Adler,

███████████████████████████████████

The following list is of those bidding on jim adler over the past 6 months in order of most aggressive:

1. Accident Injury Legal Center

2. Schecter, McElwee, Shaffer & Harris, LLP aka SMSH Law Firm

3. Alliance Injury Group, LLC

4. Angel Reyes & Associates aka Reyes Browne Reilley

5. Montgomery Law, PLLC  <10%

6. Rick McGuire Law  <10%

7. Zehl & Associates, P.C. <10%

8. Thompson Law aka 1800 Lion Law  <10%

9. Eberstein & Witherite LLP aka 1800 Truck Wreck  <10%

10. Amaro Law Firm <10%

11. Injury.com (lead generator)  <10%

The following competitors are bidding on Texas Hammer. Note, there is some overlap with the list above.

1. Accident Injury Legal Center

2. Zehl & Associates, P.C.

3. Schecter, McElwee, Shaffer & Harris, LLP aka SMSH Law Firm

4. Rick McGuire Law

5. Premium Injury Help

6. Alliance Injury Group, LLC

7. Angel Reyes & Associates aka Reyes Browne Reilley

**App. 282**

8. Injury.com

9. Thompson Law aka 1800 Lion Law

10. Montgomery Law, PLLC

11. Law office of Joel Levine

12. Osiris A Gonzalez Law Firm

As per our conversation yesterday with Monica and the strategy this month. ███████████

███████████████████████████████████████

Thanks,
Wendy Echeverri

**From:** Brian Spencer <BSpencer@jimadler.com>
**Sent:** Thursday, July 11, 2019 10:19 AM
**To:** Jim Adler <JAdler@jimadler.com>
**Cc:** Wendy Echeverri <wecheverri@jimadler.com>; Dustin Engle <DEngle@jimadler.com>; Bill Adler <BAdler@jimadler.com>
**Subject:** Re: Internet leeches

Mr. Adler,

We have some tools that can give pretty good predictions on who's leeching your name in paid ads.

███████████████████████████████████████

-Brian

On Jul 10, 2019, at 10:40 PM, Jim Adler <JAdler@jimadler.com> wrote:

Brian and Wendy,
Please put together a list of the prime violators ;
the attorneys, law firms
 and lead generators who are buying my name
on Google AdWords.

███████████████████████████████████████

Confidential - Attorneys' Eyes Only



There are many more.
thanks

Jim S. Adler
Jim S. Adler and Associates
Attorneys at Law
3D International Tower
1900 W. Loop S., 20th Floor
Houston , TX 77027
(713)- 777-4000
jadler@jimadler.com

<Competitors with Addresses Feb-July 2019.docx>

**Confidential - Attorneys' Eyes Only**

Sara Drevecky - November 10, 2022

```
 1               IN THE UNITED STATES DISTRICT COURT
 2               FOR THE NORTHERN DISTRICT OF TEXAS
 3                        DALLAS DIVISION
 4    JIM ADLER, P.C. and JIM      §
      ADLER,                       §
 5                                 §
          Plaintiffs,              §
 6                                 §
      v.                           §          NO. 3:19-CV-2025-K
 7                                 §
      MCNEIL CONSULTANTS, LLC      §
 8    D/B/A ACCIDENT INJURY LEGAL  §
      CENTER, QUINTESSA            §
 9    MARKETING, LLC D/B/A         §
      ACCIDENT INJURY LEGAL        §
10    CENTER and LAUREN VON        §
      MCNEIL,                      §
11                                 §
          Defendants.              §
12
13
14
15         REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
16                      SARA DREVECKY
17                    NOVEMBER 10, 2022
18                    VIA REMOTE COUNSEL
19
20
21
22
23
24
25
```

Sara Drevecky - November 10, 2022

1    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

2 SARA DREVECKY, produced as a witness at the instance

3 of the Defendants, and duly sworn, was taken in the

4 above-styled and numbered cause on the 10th of

5 November, 2022, from 9:17 a.m. to 2:37 p.m. CST,

6 before Jennifer Quick Davenport, CSR in and for the

7 State of Texas, reported by machine shorthand, at the

8 offices of Jim Adler & Associates, 1900 West Loop

9 South, 20th Floor, in the City of Houston, County of

10 Harris, State of Texas, pursuant to Notice and the

11 Federal Rules of Civil Procedure.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sara Drevecky - November 10, 2022

```
 1              A P P E A R A N C E S
 2   FOR  PLAINTIFFS:
     Mr. Jered Matthysse
 3   PIRKEY BARBER PLLC
     1801 East 6th Street, Suite 300
 4   Austin, Texas 78702
     512.322.5200
 5   jmatthysse@pirkeybarber.com
 6
     FOR DEFENDANTS:
 7   Ms. Rebecca L. Adams
     Ms. Barira Munshi
 8   LYNN PINKER HURST & SCHWEGMANN, LLP
     2100 Ross Avenue, Suite 2700
 9   Dallas, Texas 75201
     214.981.3800
10   radams@lynnllp.com
     bmunshi@lynnllp.com
11
12   ALSO PRESENT:
     Mr. Guy Tubbs, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Sara Drevecky - November 10, 2022

1  top of page for search results containing

2  Mr. Adler's -- or Jim Adler's branded keywords?

3               MR. MATTHYSE:   Objection to form.

4       A.   I can't say how important it is to them.

5       Q.   (By Ms. Munshi) ███████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████

██████████████

        Q.   Okay.  Have you heard of "bounce rate"?

19      A.   Yes.

20      Q.   And what's a bounce rate?

21      A.   A bounce rate is the percentage of times that

22  people go to a website and click out of it quickly.

23      Q.   It's how much time a person spends on a

10:26:56 24  website before they leave it; is that what a bounce

25  rate is?

Sara Drevecky - November 10, 2022

```
 1   STATE  OF  TEXAS )
 2   COUNTY OF DALLAS )
 3          I, Jennifer Quick Davenport, Certified
 4   Shorthand Reporter, in and for the State of Texas,
 5   certify that the foregoing deposition of SARA DREVECKY
 6   was reported stenographically by me at the time and
 7   place indicated, said witness having been placed under
 8   oath by me; that review was requested pursuant to
 9   Federal Rule of Civil Procedure 30(e)(1); and that the
10   deposition is a true record of the testimony given by
11   the witness.
12          I further certify that I am neither counsel
13   for nor related to any party in this cause and am not
14   financially interested in its outcome.
15          Given under my hand on this the 22n  day of
16   November, 2022.
17                   _____
                     Jennifer Quick Davenport, Certified
18                   Shorthand Reporter No. 1683
                     Dickman Davenport, Inc.
19                   Firm Registration #312
                     Suite 101
20                   4228 North Central Expressway
                     Dallas, Texas 75206
21                   214.855.5100    800.445.9548
                     email:  jqd@dickmandavenport.com
22                   My commission expires 10-31-23
23   Time used by each party:
     Ms. Munshi - 3:20
24   Mr. Matthysse - 0:01
25
```

| From: | Wendy Echeverri |
|---|---|
| Sent: | Thursday, July 11, 2019 12:01 PM CDT |
| To: | Brian Spencer; Jim Adler |
| CC: | Dustin Engle; Bill Adler |
| Subject: | RE: Internet  leeches |
| Attachments: | Competitors with Addresses Feb-July 2019.docx |

Hi Mr. Adler,
The following list are law firms and lead generators bidding on Jim Adler and Texas Hammer. I also attached a list with each of these law firms and lead generators address.
For Smart Tough lawyer there were only two lead generators bidding which are Alliance Injury Group and Premium Injury Help.

The following list is of those bidding on jim adler over the past 6 months in order of most aggressive:

  1. Accident Injury Legal Center



The following competitors are bidding on Texas Hammer. Note, there is some overlap with the list above.

  1. Accident Injury Legal Center



As per our conversation yesterday with Monica and the strategy this month. We've managed to push down the most aggressive competitor which is Accident Injury Legal Center.

Thanks,
Wendy Echeverri

**From:** Brian Spencer <BSpencer@jimadler.com>
**Sent:** Thursday, July 11, 2019 10:19 AM
**To:** Jim Adler <JAdler@jimadler.com>
**Cc:** Wendy Echeverri <wecheverri@jimadler.com>; Dustin Engle <DEngle@jimadler.com>; Bill Adler <BAdler@jimadler.com>
**Subject:** Re: Internet leeches

Mr. Adler,

We have some tools that can give pretty good predictions on who's leeching your name in paid ads.

-Brian

On Jul 10, 2019, at 10:40 PM, Jim Adler <JAdler@jimadler.com> wrote:

Brian and Wendy,
Please put together a list of the prime violators ;
the attorneys, law firms
 and lead generators who are buying my name on
Google AdWords.
Can we tell if they are buying Texas Hammer or
tough and Smart   lawyer?

There are many more.
thanks

Confidential - Attorneys' Eyes Only

Jim S. Adler
Jim S. Adler and Associates
Attorneys at Law
3D International Tower

1900 W. Loop S., 20th Floor

Houston , TX 77027
(713)- 777-4000
jadler@jimadler.com

Confidential - Attorneys' Eyes Only

ADLER_001005

# THE PROFESSIONAL ETHICS COMMITTEE
## FOR THE STATE BAR OF TEXAS
### Opinion No. 661

### July 2016

## QUESTION PRESENTED

Does a lawyer violate the Texas Disciplinary Rules of Professional Conduct by using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company?

## STATEMENT OF FACTS

Recognizing that many potential clients search for a lawyer by using internet search engines, Lawyer A uses various search-engine optimization techniques to try to ensure that his name appears on the first page of the search results obtained when a potential client uses a search engine to seek a lawyer. One way Lawyer A seeks to achieve this goal is by participating in internet search-based advertising programs offered by search engines that are in widespread use by many types of businesses.

These search-based advertising programs allow a business to select specific words or phrases ("keywords") that will cause the business's advertisement to pop up in the search results of someone using that keyword in a search. The advertiser does not purchase exclusive rights to specific keywords; the same keywords can be used by a number of advertisers.

Lawyer B is a competing lawyer in Lawyer A's town. Lawyer B's area of practice is similar to Lawyer A's. Lawyer A and Lawyer B have never been law partners or engaged in joint representation in any case.

One of the keywords selected by Lawyer A is the name of Lawyer B. Lawyer A's keyword selection causes Lawyer A's name and a link to his website to be displayed on the search engine's search results page any time an internet user searches for Lawyer B using the search engine. Lawyer A's advertisement will appear to the side of or above the search results in an area designated for "ads" or "sponsored links." In addition to displaying Lawyer A's name and a link to Lawyer A's website, the ad or sponsored link may contain additional text concerning Lawyer A and his practice. Usually Lawyer B's name would also be listed in the search results. Moreover, if Lawyer B had also purchased similar advertising services from the search engine and had used his own name as a keyword, Lawyer B's name would also be listed in the ad or sponsored link section as well as in the regular search results when Lawyer B's name was used by a potential client as a search term.

Lawyer A's keyword advertisement or sponsored link does not indicate whether or not Lawyer A and Lawyer B are affiliated. Lawyer B did not authorize Lawyer A to use Lawyer B's name in connection with Lawyer A's keyword advertisement.

**DISCUSSION**

Advertising, including internet advertising, is addressed in Part VII of the Texas Disciplinary Rules of Professional Conduct. The Texas Disciplinary Rules do not specifically address the question of whether it is permissible for a lawyer to use a competitor's name to enhance the lawyer's internet advertising. However, several provisions of the Texas Disciplinary Rules must be considered with respect to this question.

Rule 7.01(d) states that "[a] lawyer shall not hold himself or herself out as being a partner, shareholder, or associate with one or more other lawyers unless they are in fact partners, shareholders, or associates."

Rule 7.02(a) prohibits a lawyer from making or sponsoring "a false or misleading communication about the qualifications or the services of any lawyer or firm." A communication is false or misleading if it "contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading[.]" Rule 7.02(a)(1). Comment 3 to Rule 7.02 explains the standard set forth in Rule 7.02(a)(1) as follows:

> "Sub-paragraph (a)(1) recognizes that statements can be misleading both by what they contain and what they leave out. Statements that are false or misleading for either reason are prohibited. A truthful statement is misleading if it omits a fact necessary to make the lawyer's communication considered as a whole not materially misleading. A truthful statement is also misleading if there is a substantial likelihood that it will lead a reasonable person to formulate a specific conclusion about the lawyer or the lawyer's services for which there is no reasonable factual foundation."

Under these Rules, if Lawyer A's use of Lawyer B's name as a keyword in search-engine advertising results in an advertisement that holds out Lawyer A to be a shareholder, partner, or associate of Lawyer B, then Lawyer A's use of Lawyer B's name would violate Rule 7.01(d). Furthermore, if such use of Lawyer B's name would lead a reasonable person to believe that Lawyer A and Lawyer B are associated in some way, then the use of Lawyer B's name as a keyword would be a misleading communication in violation of Rule 7.02(a).

In the opinion of this Committee, the use of a competitor's name as a keyword in the factual circumstances here considered would not in normal circumstances violate either Rule 7.01(d) or Rule 7.02(a). The advertisement that results from the use of Lawyer B's name does not state that Lawyer A and Lawyer B are partners, shareholders, or associates of each other. Moreover, since a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results, it appears highly unlikely that a reasonable person using an internet search engine would be misled into thinking

2

**App. 294**

that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search. Compare *Habush v. Cannon,* 828 N.W.2d 876 (Wis. Ct. App. 2013) (finding no violation of Wisconsin right-of-privacy statute when one law firm used the name of a competing law firm as a keyword in search-engine advertising).

In addition to Rules 7.01(d) and 7.02(a), Rule 8.04(a)(3) must also be considered. Rule 8.04(a)(3) prohibits a lawyer from engaging in conduct "involving dishonesty, fraud, deceit or misrepresentation." In the opinion of the Committee, given the general use by all sorts of businesses of names of competing businesses as keywords in search-engine advertising, such use by Texas lawyers in their advertising is neither dishonest nor fraudulent nor deceitful and does not involve misrepresentation. Thus such use of a competitor's name in internet search-engine advertising is not a violation of Rule 8.04(a)(3). In reaching this conclusion, this Committee has considered but does not concur with 2010 Formal Ethics Opinion 14 of the Ethics Committee of the North Carolina State Bar (April 27, 2012) (ruling that a lawyer's use of a competitor's name as a keyword in a search-engine advertising program violates the equivalent of Texas Disciplinary Rule 8.04(a)(3) because such use constitutes "conduct involving dishonesty" in that the conduct shows "a lack of fairness or straightforwardness").

It should be noted that this opinion addresses only whether the use of a competitor's name in internet search-engine advertising programs violates the Texas Disciplinary Rules of Professional Conduct. Although such use of a competitor's name as a keyword in advertising programs does not in the opinion of the Committee involve a violation of the Texas Disciplinary Rules, a Texas lawyer's participation in such an advertising program must comply with the other provisions of the Texas Disciplinary Rules applicable to advertising, in particular Disciplinary Rule 7.04 on advertisements in the public media. Moreover, depending on the circumstances, a Texas lawyer advertising through keywords on internet search engines may be subject to other requirements or prohibitions imposed by federal or state law or by professional ethics rules of other jurisdictions.

## CONCLUSION

A lawyer does not violate the Texas Disciplinary Rules of Professional Conduct by simply using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company. The lawyer's statements included in this advertising program must not contain false or misleading communications and must comply in all respects with applicable rules on lawyer advertising.

Jim Adler - November 8, 2022

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3   JIM S. ADLER, P.C. and JIM  )
     ADLER,                      )
 4          Plaintiffs,          )
                                 )
 5   VS.                         )
                                 )
 6   MCNEIL CONSULTANTS, LLC     ) CIVIL NO. 3:19-CV-2025-K
     D/B/A ACCIDENT INJURY       )
 7   LEGAL CENTER, QUINTESSA      )
     MARKETING, LLC D/B/A         )
 8   ACCIDENT INJURY LEGAL       )
     CENTER and LAUREN VON       )
 9   MCNEIL,                     )
            Defendant.           )
10
11   ********************************************************
12             ORAL AND VIDEOTAPED DEPOSITION OF
13                       JIM ADLER
14                    NOVEMBER 8, 2022
15   ********************************************************
16
17      ORAL AND VIDEOTAPED DEPOSITION OF JIM ADLER, produced
18   as a witness at the instance of the Defendants and duly
19   sworn, was taken in the above styled and numbered cause
20   on Tuesday, November 8, 2022, from 9:16 a.m. to 4:34
21   p.m., before ROBIN GROSS, CSR in and for the State of
22   Texas, reported by shorthand machine, at the Offices of
23   Jim Adler & Associates, 1900 West Loop South, Houston,
24   Texas, pursuant to the Federal Rules of Civil Procedure
25   and the provisions stated on the record herein.
```

Jim Adler - November 8, 2022

```
 1                    A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       MR. JERED E. MATTHYSSE
         Pirkey Barber PLLC
 5       1801 East 6th Street, Suite 300
         Austin, Texas  78702
 6       (512) 482-5245
         Jmatthysse@pirkeybarber.com
 7           AND
         MR. KURT KUHN
 8       Kurt Hobbs PLLC
         7000 North MoPac Exwy., Suite 315
 9       Austin, Texas 78731
         (512) 476-6000
10       Kurt@KuhnHobbs.com
11
     FOR THE DEFENDANTS:
12
         MR. CHRISTOPHER J. SCHWEGMANN
13       Lynn Pinker Hurst & Schwegmann, LLP
         2100 Ross Avenue
14       Dallas, Texas  75201
         (214) 981-3800
15       Cschwegmann@lynnllp.com
16
17
     ALSO PRESENT:
18
         MS. JESS RAWLS, Videographer, Legal Media, Inc.
19
20
21
22
23
24
25
```

Jim Adler - November 8, 2022

1     Q.  And you'll agree that Google permits the practice
2  itself, right?
3          MR. MATTHYSSE:  Objection to form.
4     A.  Google doesn't permit illegal activities.
5     Q.  (BY MR. SCHWEGMANN)  Okay.  You've asked Google
6  to bar my client from -- let me ask it again.
7         You've asked Google to prohibit my client from
8  bidding on the Jim Adler branded terms, correct?
9     A.  Uh-huh.  Yes.
10    Q.  Did Google do that?
11    A.  No.  They like the money.
12    Q.  Okay.  And you haven't sued Google, have you?
13          MR. MATTHYSSE:  Objection to form.
14    A.  No.
15    Q.  (BY MR. SCHWEGMANN)  And in fact, after you
16  complained to Google, you didn't get a response, did
17  you?
18    A.  No, sir.
19    Q.  And did you escalate those complaints at any
20  point in time?
21    A.  No.
22    Q.  And in fact, even as we sit here today, there's
23  plenty other law firms and lead generators that continue
24  to bid on the Jim Adler branded terms, right?
25    A.  Yes.

Jim Adler - November 8, 2022

```
1   THE STATE OF TEXAS )
    COUNTY OF _____ )
2
3                 REPORTER'S CERTIFICATION
              VIDEOTAPED DEPOSITION OF JIM ADLER
4                  TAKEN NOVEMBER 8, 2022
5
        I, ROBIN GROSS, Certified Shorthand Reporter in and
6   for the State of Texas, hereby certify to the following:
7       That the witness, JIM ADLER, was duly sworn by the
    officer and that the transcript of the oral deposition
8   is a true record of the testimony given by the witness;
9       That the deposition transcript was submitted on
    _____ to the witness or the attorney for the
10  witness for examination, signature and return to
    Dickman Davenport, Inc. by _____;
11
        That the amount of time used by each party at the
12  deposition is as follows:
13      MR. CHRISTOPHER J. SCHWEGMANN - 4:25
14      I further certify that I am neither counsel for,
    related to, nor employed by any of the parties in the
15  action in which this proceeding was taken, and further
    that I am not financially or otherwise interested in the
16  outcome of the action.
17      Certified to by me this ____ day of November, 2022.
18
19
20
21      ROBIN GROSS CSR, TEXAS CSR NO. 9015
        Expiration Date:  07-31-23
22      Dickman Davenport, Inc.
        Firm Registration No. 312
23      Firm Expiration Date: 12/31/23
        4228 North Central Expressway, Suite 101
24      Dallas, Texas 75206
        (214) 855-5100/Fax(214) 855-5181
25
```